No. 25-1892

IN THE

# United States Court of Appeals for the Fourth Circuit

KALSHIEX LLC,

*Plaintiff-Appellant,*

v.

JOHN A. MARTIN, *et al.,*

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Maryland
No. 1:25-cv-01283 (Abelson, J.)

## OPENING BRIEF FOR APPELLANT KALSHI

DAVIS CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001
(212) 530-5222
dcampbell@milbank.com

NEAL KUMAR KATYAL
JOSHUA B. STERLING
WILLIAM E. HAVEMANN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave, N.W.
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com

October 15, 2025          *Counsel for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Fourth Circuit Rule 26.1, KalshiEX LLC discloses that its parent corporation, Kalshi Inc., owns 10% or more of its stock.

## TABLE OF CONTENTS

INTRODUCTION .................................................................................... 1

STATEMENT OF JURISDICTION ........................................................ 4

STATEMENT OF THE ISSUE PRESENTED ........................................ 4

STATEMENT OF THE CASE ................................................................ 4

I.     Legal Background ........................................................................ 4

     A.    States Initially Regulate Futures Trading As Gambling ................................................................. 4

     B.    Congress Passes The CEA And Grants The CFTC Exclusive Jurisdiction Over Trading On DCMs .......................... 6

     C.    CEA Amendments Underscore The CFTC's Exclusive Jurisdiction ................................................... 8

     D.    Congress Broadens The CEA To Encompass Event Contracts ................................................................. 10

     E.    Congress Sets Forth A Comprehensive Scheme For Regulating Derivatives Trading .................................... 14

II.    Factual Background ................................................................... 17

III.   Procedural History .................................................................... 19

SUMMARY OF ARGUMENT ............................................................. 21

STANDARD OF REVIEW ................................................................... 24

ARGUMENT ........................................................................................ 24

I.     The CEA Preempts Maryland's Gambling Laws As Applied to Kalshi ................................................................... 24

     A.    Maryland's Gambling Laws Are Field Preempted As Applied To Kalshi ............................................. 25

     B.    Maryland's Gambling Laws Are Conflict Preempted As Applied To Kalshi ............................................. 35

## TABLE OF CONTENTS—Continued

II.   The District Court Erred In Rejecting Preemption ............................ 40

    A.   The District Court Erred In Creating A Gambling Exception To The CFTC's Exclusive Jurisdiction ..................... 41

    B.   The District Court Erred In Rejecting Field Preemption ................................................................. 46

    C.   The District Court Erred In Rejecting Conflict Preemption ................................................................. 56

    D.   The District Court Erred In Applying A Presumption Against Preemption ................................................... 59

CONCLUSION ............................................................. 62

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**CASES:**                                                                    Page(s)

*Air Evac EMS, Inc. v. Cheatham,*
  910 F.3d 751 (4th Cir. 2018) ............................................................... 60

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.,*
  977 F.2d 1147 (7th Cir. 1992) ................................. 2, 14, 30, 35, 53, 58, 59

*Appalachian Power Co. v. Pub. Serv. Comm'n of W. Va.,*
  812 F.2d 898 (4th Cir. 1987) ............................................................... 26

*Arizona v. United States,*
  567 U.S. 387 (2012) ............................................... 24, 25, 33, 34, 38, 58

*Bd. of Trade of Chi. v. Christie Grain & Stock Co.,*
  198 U.S. 236 (1905) ........................................................................ 5

*Bob Jones Univ. v. United States,*
  461 U.S. 574 (1983) ....................................................................... 54

*Buckman Co. v. Plaintiffs' Legal Committee,*
  531 U.S. 341 (2001) .................................................................... 61, 62

*California v. FERC,*
  495 U.S. 490 (1990) ....................................................................... 39

*CFTC v. Am. Metals Exch. Corp.,*
  775 F. Supp. 767 (D.N.J. 1991) ........................................................ 48, 49

*Chamber of Com. of U.S. v. Whiting,*
  563 U.S. 582 (2011) ....................................................................... 60

*Chi. Mercantile Exch. v. SEC,*
  883 F.2d 537 (7th Cir. 1989) ........................................................... 30, 47

*Cothran v. Ellis,*
  16 N.E. 646 (Ill. 1888) .............................................................. 4, 5, 43

*Crosby v. Nat'l Foreign Trade Council,*
  530 U.S. 363 (2000) ............................................... 24, 25, 35, 39, 40

iv

# TABLE OF AUTHORITIES—Continued

Page(s)

*CSX Transp., Inc. v. Easterwood,*
    507 U.S. 658 (1993) .............................................................. 25

*Dickson v. Uhlmann Grain Co.,*
    288 U.S. 188 (1933) ...................................................... 6, 43, 45

*Effex Cap., LLC v. Nat'l Futures Ass'n,*
    933 F.3d 882 (7th Cir. 2019) ................................................ 53

*Farina v. Nokia Inc.,*
    625 F.3d 97 (3d Cir. 2010).............................................. 39, 40

*Free v. Bland,*
    369 U.S. 663 (1962) ................................................ 24, 36, 59

*FTC v. Ken Roberts Co.,*
    276 F.3d 583 (D.C. Cir. 2001).................................... 30, 32, 53

*Garcia v. United States,*
    469 U.S. 70 (1984) .............................................................. 32

*Gordon v. New York Stock Exch., Inc.,*
    422 U.S. 659 (1975) .......................................................... 55, 56

*Hughes v. Talen Energy Mktg., LLC,*
    578 U.S. 150 (2016) .......................................................... 26, 59

*In re Bulldog Trucking, Inc.,*
    66 F.3d 1390 (4th Cir. 1995)................................................ 54

*In re Sewell,*
    690 F.2d 403 (4th Cir. 1982)................................................ 36

*Ingersoll-Rand Co. v. McClendon,*
    498 U.S. 133 (1990) .......................................................... 35, 36

*Int'l Trading, Ltd. v. Bell,*
    556 S.W.2d 420 (Ark. 1977)................................................ 30

## TABLE OF AUTHORITIES—Continued

Page(s)

*International Paper v. Ouellette,*
    479 U.S. 481 (1987)............................................................49, 50

*Inv. Co. Inst. v. CFTC,*
    891 F. Supp. 2d 162 (D.D.C. 2012) ....................................10, 13

*Irwin v. Williar,*
    110 U.S. 499 (1884) ............................................................ 5, 43

*Jones v. B. C. Christopher & Co.,*
    466 F. Supp. 213 (D. Kan. 1979) .............................................30

*Just Puppies, Inc. v. Brown,*
    123 F.4th 652 (4th Cir. 2024) ............................................. 3, 42

*KalshiEX LLC v. CFTC,*
    No. 23-cv-3257, 2024 WL 4164694
    (D.D.C. Sept. 12, 2024).........................................17, 45, 46, 48

*KalshiEX LLC v. Flaherty,*
    No. 25-cv-02152, 2025 WL 1218313
    (D.N.J. Apr. 28, 2025)......................................... 19, 20, 39, 48

*KalshiEX, LLC v. Hendrick,*
    No. 2:25-cv-00575, 2025 WL 1073495
    (D. Nev. Apr. 9, 2025) ......................................... 19, 20, 37, 41

*Kerr v. First Commodity Corp.,*
    735 F.2d 281 (8th Cir. 1984)...................................................53

*Leaders of a Beautiful Struggle v. Balt. Police Dep't,*
    2 F.4th 33 (4th Cir. 2021) ......................................................24

*Leist v. Simplot,*
    638 F.2d 283 (2d Cir. 1980) ......................................... 8, 30, 61

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) .........................................................31, 32

## TABLE OF AUTHORITIES—Continued

Page(s)

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996) ...................................................... 60

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
  456 U.S. 353 (1982) ........................................ 7, 8, 14, 33

*Metro. Life Ins. Co. v. Pettit*,
  164 F.3d 857 (4th Cir. 1998) ..................................... 36

*Mississippi v. Louisiana*,
  506 U.S. 73 (1992) ................................................. 25, 26

*Murphy v. NCAA*,
  584 U.S. 453 (2018) ............................................... 18, 56

*N. Am. Derivatives Exchange, Inc. v. Nevada*,
  No. 2:25-cv-00978 (D. Nev. Oct. 14,
  2025) (slip op.) ......................................................... 41

*Nat'l Meat Ass'n v. Harris*,
  565 U.S. 452 (2012) ..................................................... 38

*Omnipoint Commc'ns, Inc. v. City of Huntington Beach*,
  738 F.3d 192 (9th Cir. 2013) ..................................... 27

*Patry v. Rosenthal & Co.*,
  534 F. Supp. 545 (D. Kan. 1984) ............................... 53

*Pearce v. Rice*,
  142 U.S. 28 (1891) ..................................................... 43

*Power v. Arlington Hospital Association*,
  42 F.3d 851 (4th Cir. 1994) .................................. 47, 48

*PPL EnergyPlus, LLC v. Nazarian*,
  753 F.3d 467 (4th Cir. 2014) ..................... 26, 34, 39, 40, 42, 57, 59, 62

*Puerto Rico v. Franklin Cal. Tax-free Tr.*,
  579 U.S. 115 (2016) ................................................... 60

## TABLE OF AUTHORITIES—Continued

<u>Page(s)</u>

*Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*,
608 F.2d 175 (5th Cir. 1979) ..................................................30

*Retail Indus. Leaders Ass'n v. Fielder*,
475 F.3d 180, 197 (4th Cir. 2007) ...........................................35

*Rice v. Bd. of Trade of Chi.*,
331 U.S. 247 (1947) ........................................................... 27, 28

*Richardson v. Kruchko & Fries*,
966 F.2d 153 (4th Cir. 1992) ..................................................26

*Sale v. Haitian Ctrs. Council, Inc.*,
509 U.S. 155 (1993) ................................................................28

*Transcon. Gas Pipe Line Co., LLC v. Pa. Env't Hearing Bd.*,
108 F.4th 144 (3d Cir. 2024) ................................. 26, 27, 51, 61

*United States v. Brien*,
617 F.2d 299 (1st Cir. 1980) ...................................................30

*United States v. Locke*,
529 U.S. 89 (2000) ..................................................................61

*United States v. Perkins*,
67 F.4th 583 (4th Cir. 2023) ...................................................31

*United States v. South Carolina*,
720 F.3d 518 (4th Cir. 2013) ..................................................40

*W. Flagler Assocs., Ltd. v. Haaland*,
71 F.4th 1059 (D.C. Cir. 2023) ...............................................55

CONSTITUTION:

U.S. Const, art. VI, cl. 2 .................................................... 2, 4, 24

# TABLE OF AUTHORITIES—Continued

<u>Page(s)</u>

**STATUTES:**

7 U.S.C. § 1a(9) ................................................................ 10

7 U.S.C. § 1a(19)(iv) .............................................. 11, 12, 13

7 U.S.C. § 1a(40) ............................................................. 11

7 U.S.C. § 1a(47)(A)(ii) ....................................................13

7 U.S.C. § 2(a)(1)(A) ......................... 1, 7, 8, 12, 13, 25, 27, 41, 45, 49, 60, 61

7 U.S.C. § 2(c)(1)............................................................. 52

7 U.S.C. § 2(e)................................................................. 52

7 U.S.C. § 2(f) ................................................................. 52

7 U.S.C. § 6(c) .................................................................51

7 U.S.C. § 6a .............................................................34, 38

7 U.S.C. § 6b ................................................................. 34

7 U.S.C. § 6c ................................................................. 34

7 U.S.C. § 6c (1936) ........................................................ 27

7 U.S.C. § 7(a) ................................................................ 33

7 U.S.C. § 7(d) .................................................................15

7 U.S.C. § 7a-1...........................................................15, 38

7 U.S.C. § 7a-1(c)(2)(E).................................................... 38

7 U.S.C. § 7a-2(c)(1)...................................................15, 16, 18

7 U.S.C. § 7a-2(c)(4)(A) ....................................................16

7 U.S.C. § 7a-2(c)(5)(B) ....................................................16

## TABLE OF AUTHORITIES—Continued

Page(s)

7 U.S.C. § 7a-2(c)(5)(C) .................................................................. 46, 47, 59

7 U.S.C. § 7a-2(c)(5)(C)(i) ...........................................................13, 14, 18, 34

7 U.S.C. § 7a-2(c)(5)(C)(i)(I) ................................................................ 47

7 U.S.C. § 7a-2(c)(5)(C)(i)(V) ............................................................... 39

7 U.S.C. § 7a-2(c)(5)(C)(ii) ............................................................... 13, 14

7 U.S.C. § 9 ...........................................................................................16

7 U.S.C. § 9a ........................................................................................ 34

7 U.S.C. § 12c ..................................................................................16, 34

7 U.S.C. § 13 ....................................................................................16, 34

7 U.S.C. § 13a ..................................................................................... 34

7 U.S.C. § 13a-1 .................................................................................. 34

7 U.S.C. § 13a-2 .................................................................................... 9

7 U.S.C. § 13a-2(1) .................................................................. 9, 16, 17, 28

7 U.S.C. § 13a-2(7) .............................................................................. 53

7 U.S.C. § 16(e)(1) ................................................................... 9, 10, 29, 50

7 U.S.C. § 16(e)(1)(B) ...............................................................50, 51, 52, 53

7 U.S.C. § 16(e)(1)(C) ........................................................................... 50

7 U.S.C. § 16(e)(2) .................................................................... 11, 51, 52

7 U.S.C. § 16(h) ...................................................................................51

7 U.S.C. §§ 27-27f ............................................................................... 52

25 U.S.C § 2701 .................................................................................. 55

## TABLE OF AUTHORITIES—Continued

Page(s)

28 U.S.C. § 1292(a)(1) ........................................................ 4

28 U.S.C. § 1331 ................................................................ 4

28 U.S.C. § 3702(1) ........................................................... 18

31 U.S.C. § 5362(1)(E) ........................................... 29, 44, 54

31 U.S.C. § 5362(10)(A) .................................................... 29

33 U.S.C. § 1365(e) ........................................................... 50

Commodity Exchange Act,
    Pub. L. No. 74-675, 49 Stat. 1491 (1936) ................... 6

Commodity Futures Modernization Act,
    Pub. L. No. 106-554, 114 Stat. 2763A-365 (2000) ............ 10, 11

Dodd-Frank Act of 2010,
    Pub. L. 111–203, 124 Stat. 1376 (July 21, 2010) ............... 13, 52

Futures Trading Practices Act of 1992,
    Pub. L. No. 102-546, 106 Stat. 3590 (1992) .................. 10

Grain Futures Act of 1922,
    Pub. L. No. 67-331, 42 Stat. 998 ................................ 6

Haw. Rev. Stat. § 712-1220 ............................................... 45

Haw. Rev. Stat. § 712-1223 ............................................... 45

Md. Code Ann., State Gov't § 9-1E-04(b)(6) (2022) ................ 38

Md. Code Ann., State Gov't § 9-1E-04(b)(6)(ii) (2022) ............. 39

Md. Code Ann., State Gov't § 9-1E-04(b)(6)(vi) (2022) ........ 37, 38

Md. Code Regs. 36.10.14.06 (2025) .............................. 37, 38

Md. Code Regs. 36.10.16.03 (2022) .............................. 36, 37

# TABLE OF AUTHORITIES—Continued

<u>Page(s)</u>

N.J. Admin. Code § 13:69O-1.2(e)(2) (2018) ............................................. 37

N.J. Rev. Stat. § 2C:37-1(b) ........................................................... 44

N.Y. Penal L. § 225.00(2) ............................................................. 44

Nev. Rev. Stat. § 463.0193 ............................................................ 44

**RULES AND REGULATIONS:**

17 C.F.R. § 1.31(b)(1) ................................................................. 15

17 C.F.R. § 1.31(d)(1) ................................................................. 15

17 C.F.R. § 16.00 ................................................................ 33, 34

17 C.F.R. pt. 38 ...................................................................... 15

17 C.F.R. § 38.150(b) ................................................................. 33

17 C.F.R. § 38.151 .................................................................... 19

17 C.F.R. § 38.151(b) ........................................................ 15, 37, 57

17 C.F.R. § 38.155(a) ................................................................. 33

17 C.F.R. § 38.156 ............................................................... 15, 33

17 C.F.R. § 38.200 ................................................................... 38

17 C.F.R. § 38.250 .................................................................... 19

17 C.F.R. § 38.251 ................................................................... 15

17 C.F.R. § 38.255 ................................................................... 38

17 C.F.R. § 38.256 ................................................................... 15

17 C.F.R. § 38.450 .............................................................. 15, 33, 34

17 C.F.R. § 38.950 ............................................................. 15, 33, 34

## TABLE OF AUTHORITIES—Continued

Page(s)

17 C.F.R. § 38.1101(a)(2) ................................................15, 33, 34

17 C.F.R. § 40.2(a)(1)........................................................ 15, 16

17 C.F.R. § 40.2(c) ..................................................................16

17 C.F.R. § 40.3..........................................................................16

17 C.F.R. § 40.3(b) ..................................................................16

17 C.F.R. § 40.11 .....................................................................14

17 C.F.R. § 40.11(c) ................................................................16

17 C.F.R. § 40.11(c)(1)...........................................................16

17 C.F.R. § 40.11(c)(2) ...........................................................16

17 C.F.R. § 150 App. E ......................................................... 34

17 C.F.R. § 150.2 ................................................................... 34

17 C.F.R. § 180.1 ................................................................... 34

17 C.F.R. § 180.2 ................................................................... 34

40 Fed. Reg. 25,849 (June 19, 1975) ...................................15

*Concept Release*, 73 Fed. Reg. 25,669 (May 7, 2008)...................12

**LEGISLATIVE MATERIALS:**

120 Cong. Rec. 30,464 (Sept. 9, 1974)........................................ 28

156 Cong. Rec. S5902 (July 15, 2010) ...................................48, 49

156 Cong. Rec. S5906 (July 15, 2010) ...................................48, 49

H.R. Rep. No. 74-421 (1935) ......................................................... 6

H.R. Rep. No. 93-975 (1974) ................................................. 10, 32

# TABLE OF AUTHORITIES—Continued

Page(s)

H.R. Rep. No. 93-1383 (1974) ........................................................1, 7, 8, 32

H.R. Rep. No. 97-565, pt. 1 (1982) ...............................................9, 10, 32, 33

H.R. Rep. No. 106-711, pt. 2 (2000)................................................ 11, 33, 52

Hearings Before the H. Comm. on Agric., 93d Cong. (1973) ................... 6, 7

Hearings Before the S. Comm. on Agric. & Forestry, 93d Cong. (1974)................................................................................................... 7, 32

S. Rep. No. 93-1131 (1974)..........................................................7, 27, 28, 49

S. Rep. No. 97-495 (1982) ............................................................................. 9

OTHER AUTHORITIES:

Antonin Scalia & Brian Garner, *Reading Law* (2012) .......................... 55, 56

Exclusive, American Heritage Dictionary (2d ed. 1980)............................ 26

Gaming contract, Chambers Dictionary (13th ed. 2014)............................ 46

John H. Stassen, *The Commodity Exchange Act In Perspective*, 39 Wash. & Lee L. Rev. 825 (1982) .......................................................... 5

John V. Rainbolt II, *Regulating the Grain Gambler and His Successors*, 6 Hofstra L. Rev. 1 (1977)..................................................5, 31

Kelly Cloonan, *Betting markets nailed Trump's decisive win — and it's a good reminder they can be more accurate than polls*, Bus. Insider (Nov. 9, 2024), https://perma.cc/5W7W-S76X........................................................................................................17

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657 (1982) ...................................... 8, 28, 29, 31

Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1 (1976) ................................................................................................31

## INTRODUCTION

In the seminal 1974 amendments to the Commodity Exchange Act ("CEA"), Congress created the Commodity Futures Trading Commission ("CFTC") and gave it "exclusive jurisdiction" over nationwide derivatives exchanges. 7 U.S.C. § 2(a)(1)(A). In the decision below, the district court authorized Maryland state regulators to vitiate that exclusive jurisdiction. These regulators claim sweeping power not only to regulate, but to prohibit, certain trading on a CFTC-regulated exchange because they are dissatisfied with the CFTC's oversight. The district court below refused to preliminarily enjoin these efforts. This Court should reverse.

KalshiEX LLC ("Kalshi") is a CFTC-licensed and regulated exchange, known as a designated contract market ("DCM"). Federal law accordingly preempts state regulation of trading on Kalshi, as confirmed by every conceivable marker of legislative intent. The CEA's text grants the CFTC "exclusive jurisdiction" over trading on DCMs. 7 U.S.C. § 2(a)(1)(A). Congress in 1974 deleted the provision that had previously preserved concurrent state jurisdiction, noting its intent to "preempt the field." H.R. Rep. No. 93-1383, at 35 (1974). And Congress repeatedly reinforced— indeed, expanded—the CEA's exclusive-jurisdiction provision after courts uniformly and easily concluded that it preempts state regulation.

Federal law therefore bars Maryland from regulating Kalshi's contracts under straightforward principles of both field and conflict preemption. Holding otherwise would contravene Congress's judgment that a "contract market could not operate efficiently, and perhaps not at all," if subject to "varying and potentially contradictory legal standards." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992). If Maryland could enforce its laws against Kalshi, so could 49 other states, subjecting Kalshi to a patchwork of contradictory regulation, interfering with the CFTC's uniform oversight, conflicting with Kalshi's federally imposed obligation to provide impartial access to its exchange, and resulting in "total chaos." *Id.* (quotation omitted). Even the Defendants below conceded that state gambling laws "conflict[ ] with" the CFTC's oversight. JA89-90. That concession should end this case: Where federal and state law conflict, under the Supremacy Clause, federal law prevails.

To Kalshi's knowledge, the court below is the first to hold that states remain free to regulate transactions textually committed to the exclusive jurisdiction of the CFTC. Its decision conflicts with every court of appeals to address a similar question and with two district courts that have preliminarily enjoined substantially similar state efforts. Brushing aside the CEA's unequivocal text, the district court invoked various assumptions about

congressional intent to fashion an extratextual "gambling" exception to the CFTC's exclusive jurisdiction. But courts "may not replace the actual text with speculation as to Congress' intent." *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 661 (4th Cir. 2024) (quotation omitted). Moreover, overwhelming evidence refutes the district court's speculation that Congress would not have intended the CEA to preempt state gambling laws. To the contrary, for as long as derivatives trading has existed in this country, states have sought to regulate such trading as unlawful gambling. Congress was aware of these efforts and answered them by drawing a clear line: States may regulate off-exchange trading, but regulation of trading on DCMs is reserved for the CFTC.

If affirmed, the district court's decision would decimate the CFTC's exclusive jurisdiction. It would give states authority to enforce not only their sports-wagering laws, but *all* state gambling laws, as to trading on DCMs. Many states broadly define gambling in a way that would encompass the trading of all event contracts, or even all futures contracts, which necessarily involve placing a financial position on a contingent future event. Allowing states to regulate such trading as gambling would nullify the CFTC's authority and undermine the nationwide uniformity necessary for derivatives markets to work—the very consequences Congress sought to

avoid when it subjected federal exchanges to the CFTC's exclusive jurisdiction.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331 because the action arises under the Supremacy Clause of the U.S. Constitution.  This Court has jurisdiction to review the district court's refusal to issue a preliminary injunction under 28 U.S.C. § 1292(a)(1). The district court denied the injunction on August 1, 2025, JA178, and Kalshi timely appealed that same day, JA179.

## STATEMENT OF THE ISSUE PRESENTED

Whether the Commodity Exchange Act, which grants the CFTC "exclusive jurisdiction" over transactions on CFTC-designated exchanges, preempts application of Maryland gambling laws to exchange-traded sports-event contracts.

## STATEMENT OF THE CASE

### I.   LEGAL BACKGROUND

### A.    States Initially Regulate Futures Trading As Gambling.

This appeal involves derivatives: financial instruments whose value depends on one or more underlying commodities.  Futures contracts, one type of derivative, developed in the United States in the 19th century as a tool to hedge against fluctuations in commodity prices.  Because futures contracts

4

involve risk-based speculation, many states initially decried them as "gambling in grain." *Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888); *see also* John V. Rainbolt II, *Regulating the Grain Gambler and His Successors*, 6 Hofstra L. Rev. 1, 6 (1977) (documenting states' treatment of futures trading as unlawful gambling). In fact, many "anti-gaming" and so-called "anti-bucket shop" laws were originally enacted to make it "as difficult as humanly possible to trade futures." John H. Stassen, *The Commodity Exchange Act In Perspective*, 39 Wash. & Lee L. Rev. 825, 826 (1982) (quotation marks omitted).

In 1884, the Supreme Court agreed that a futures contract was "nothing more than a wager" if the parties intend a cash settlement rather than actual delivery of the underlying commodity. *Irwin v. Williar*, 110 U.S. 499, 508-509 (1884). Then, in 1905, the Court acknowledged the legitimacy of cash settlement and blessed "[s]peculation" as a "means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want." *Bd. of Trade of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 246-249 (1905) (Holmes, J.). In the 1920s, anti-futures sentiment intensified, prompting federal efforts to regulate futures. Stassen, *supra*, at 829-830 (noting denouncement of the Chicago Board of Trade as "the world's greatest gambling house").

Those efforts resulted in the Grain Futures Act of 1922, which sought to centralize futures trading on federally approved "contract market[s]." 42 Stat. 998, 1000-02. The Grain Futures Act intentionally declined to preempt state laws, including state gambling laws. Thus, in 1933, the Supreme Court upheld the application of a "Missouri law making gambling in grain futures illegal." *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933).

## B. Congress Passes The CEA And Grants The CFTC Exclusive Jurisdiction Over Trading On DCMs.

In 1936, Congress passed the Commodity Exchange Act, which subjected additional types of futures to the framework governing grain futures and added anti-fraud protections for futures market participants. 49 Stat. 1491, 1492-99. But Congress again stopped short of comprehensive federal regulation. It preserved "any State law applicable" to "transaction[s]" regulated by the Act. *Id.* at 1494. The drafters' "intention" at that point was "not to occupy the field." H.R. Rep. No. 74-421, at 5 (1935). As markets matured, however, that decision produced a patchwork of regulations, leading exchanges to recommend that "federal policy ... be uniform throughout the United States" and not "subject to the vagaries" of different obligations in "different jurisdictions." *Hearings Before the H. Comm. on Agric.*, 93d Cong. 121 (1973) [hereinafter "*House Hearings*"].

6

Congress responded in 1974 with seminal legislation designed to "[b]ring[ ] all futures trading under federal regulation." *Hearings Before the S. Comm. on Agric. & Forestry,* 93d Cong. 848 (1974) [hereinafter "*Senate Hearings*"]. Most relevant here, Congress created the CFTC to oversee trading on DCMs. Congress recognized that federal regulation would only be workable if it "prevent[ed] any possible conflicts over jurisdiction." *House Hearings* at 128. Congress in Section 2(a) of the amended statute therefore explicitly vested the CFTC with "exclusive jurisdiction" over trading on DCMs. 7 U.S.C. § 2(a)(1)(A).

Congress also deliberately reinforced the CFTC's exclusive jurisdiction in two respects. First, after House drafters introduced a state-law savings clause, the Senate added language making clear that the clause applied "except as hereinabove provided" in the grant of exclusive jurisdiction to the CFTC. S. Rep. No. 93-1131, at 31 (1974). The language ensured that "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies." *Id.* at 6. Second, the Senate "struck" the existing provision preserving "any State law applicable" to derivatives transactions. H.R. Rep. No. 93-1383, at 35 (quotation marks omitted). As the conference report explained, the amendments were designed to "preempt the field insofar as futures regulation is concerned." *Id.* Congress did "not

contemplate that there will be a need for any supplementary regulation by the States." *Id.* at 36.

Courts immediately understood the preemptive effect of those amendments. Writing for the Second Circuit, Judge Friendly explained that the CEA "preempts the application of state law" regarding trading on federal exchanges. *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). The CFTC likewise understood that the amendments preempted state laws deeming futures contracts to be "illegal gambling contracts." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 700 (1982) (quotation omitted).

The 1974 amendments did not preempt all state regulation of derivatives trading. Section 2(a) made clear that, beyond the CFTC's "exclusive jurisdiction" over trading on federal exchanges, the CEA did not "supersede or limit the jurisdiction" of "regulatory authorities under the laws ... of any State" or "restrict [state] authorities from carrying out their duties and responsibilities in accordance with such laws." 7 U.S.C. § 2(a)(1)(A).

## C. CEA Amendments Underscore The CFTC's Exclusive Jurisdiction.

After preempting state regulation in 1974, Congress in 1978 sought to grant states a limited role in combatting commodities fraud. Congress amended the CEA to authorize states "to bring *parens patriae* actions,

seeking injunctive or monetary relief for certain violations of the CEA."
*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 366-367 (1982); *see* 7 U.S.C. § 13a-2.  In this amendment, however, Congress clarified that states' authority extended only to suits against defendants "*other than a contract market*," 7 U.S.C. § 13a-2(1) (emphasis added), consistent with the CFTC's exclusive jurisdiction.

Congress returned to the CEA in 1982.  Congress recognized that the 1974 amendments already "bestowed on the CFTC exclusive jurisdiction to regulate futures trading [on DCMs] ... , thereby preempting any State regulatory laws."  H.R. Rep. No. 97-565, pt. 1, at 44 (1982).  But Congress was concerned about "off-exchange commodities activities" and believed "States should be extensively involved in ... policing transactions outside those preserved exclusively" for the CFTC.  *Id.*  Congress was urged to implement "a partial lifting of the CEA's preemption to permit" state anti-fraud laws "against registered and unregistered commodity dealers *except for contract markets*."  S. Rep. No. 97-495, at 50 (1982) (emphasis added).

Congress responded by amending the CEA to add what is now Section 16(e)(1), clarifying that "[n]othing in this chapter shall supersede or preempt" the application of state law to a transaction "that is *not* conducted on or subject to the rules" of a federally licensed exchange or to "any person

required to be registered" who fails to do so.  7 U.S.C. § 16(e)(1) (emphasis added).  Congress thus reaffirmed its intent for "a single unified program of regulation and exclusive CFTC jurisdiction over exchange-traded futures" while permitting states to police "transactions outside those preserved exclusively for the jurisdiction of the CFTC."  H.R. Rep. No. 97-565, pt. 1, at 44-45.

### D.  Congress Broadens The CEA To Encompass Event Contracts.

The CEA originally covered agricultural products.  In 1974, Congress broadened the definition of "commodity" to reach "all [ ] goods and articles … and all services, rights, and interests … in which contracts for future delivery are presently or in the future dealt in."  7 U.S.C. § 1a(9).  That broad definition ensured that the CFTC's exclusive jurisdiction would cover "all futures trading that might now exist or might develop in the future."  H.R. Rep. No. 93-975, at 76 (1974).  Since 1974, Congress has periodically revisited the instruments the CEA regulates.  Three changes are relevant here.

*First*, in 2000, Congress amended the CEA to "exclude[ ] swap transactions from CFTC oversight under the CEA."  *Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 196 (D.D.C. 2012).  An earlier 1992 CEA amendment had authorized the CFTC to exempt from CFTC oversight swaps transacted by certain sophisticated parties.  *See* 106 Stat. 3590, 3629-32.  Congress in

the 2000 amendments then exempted transactions between qualified parties "in a commodity other than an agricultural commodity" from the exchange-trading requirement. 114 Stat. 2763A-365, 2763A–379.

Because exempted transactions would not take place on DCMs, they were not under the CFTC's exclusive jurisdiction. To avoid state regulation of these transactions, Congress in 2000 further amended the CEA in what is now Section 16(e)(2) to "supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability)" as to "exempted" transactions. 7 U.S.C. § 16(e)(2). The Committee Report reaffirmed that "the current" CEA already "supersedes and preempts" state laws "in the case of transactions conducted *on a registered entity*," a category that includes DCMs. H.R. Rep. No. 106-711, pt. 2, at 71 (2000) (emphasis added). The new preemption provision clarified that "the CEA supersedes and preempts State gaming and bucket shop laws" as to exempted transactions as well. *Id.*; *see* 7 U.S.C. § 1a(40) (defining "registered entity" to include DCMs).

*Second*, Congress in 2000 expanded the definition of "commodity" to include events. A qualifying event is an "occurrence" or "contingency" that is "beyond the control of the parties" to a "transaction" and "associated with

11

a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv).
Under the CEA, such events are one type of "excluded commodity." *See id.*
§ 1a(19). Transactions on DCMs in excluded commodities, as with other
commodities, fall within the CFTC's exclusive jurisdiction. *Id.* § 2(a)(1)(A).

Following Congress's expansion of commodities to include events,
instruments known as "event contracts" gained prominence. Event contracts
identify multiple possible outcomes, a payment schedule for those outcomes,
and an expiration date. The contract's value is determined by market forces,
which means its price fluctuates from the time of its creation to its expiration
according to changing perceptions about the likelihood the event will occur.
In 2008, the CFTC solicited public comment regarding "the appropriate
regulatory treatment of" such "event contracts," which the agency explained
may be based on "varied" eventualities such as "the results of political
elections, or the outcome of particular entertainment events." *Concept
Release*, 73 Fed. Reg. 25,669, 25,669-25,670 (May 7, 2008). It explained
that the CEA "supersedes and preempts other laws, including state and local
gaming ... laws, with respect to transactions executed on" DCMs and sought
comments on "the implications of possibly preempting state gaming laws
with respect to event contracts." *Id.* at 25,673.

*Third*, before the CFTC's contemplated rulemaking was finalized, Congress in the Dodd-Frank Act of 2010 added exchange-traded swaps to the CFTC's exclusive jurisdiction. *See* 124 Stat. 1376, 1666. That represented a reversal, following the 2008 financial crisis, of the CFTC's prior decision to exempt swaps categorically from CFTC oversight. *See Inv. Co.*, 891 F. Supp. 2d at 173-174. Section 2(a) now provides that the CFTC "shall have exclusive jurisdiction … with respect to … transactions involving swaps … traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A). Congress defined "swap" to encompass, among other things, contracts providing for payment "dependent on the occurrence … of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). That language echoed the language Congress added to the "excluded commodity" definition in 2000. *Id.* § 1a(19)(iv).

Dodd-Frank also created a "Special Rule" regarding certain "swaps in excluded commodities that are based upon … occurrence[s]"—*i.e.*, "[e]vent contracts." *Id.* § 7a-2(c)(5)(C)(i). Recognizing that certain categories of event contracts warranted closer CFTC scrutiny, Congress authorized the CFTC to review and prohibit six categories of contracts if it concludes they are "contrary to the public interest." *Id.* § 7a-2(c)(5)(C)(ii). The Special Rule

provides that the CFTC "may"—but need not—"determine" event contracts to be contrary to the public interest if they "involve":

(I)     activity that is unlawful under any Federal or State law;
(II)    terrorism;
(III)   assassination;
(IV)   war;
(V)     gaming; or
(VI)   other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

*Id.* § 7a-2(c)(5)(C)(i); *see* 17 C.F.R. § 40.11.  No such contract "determined by the Commission to be contrary to the public interest" may be listed.  7 U.S.C. § 7a-2(c)(5)(C)(ii).  Absent an adverse public-interest determination, however, an exchange may list event contracts involving the Special Rule's enumerated activities, subject to the CFTC's exclusive jurisdiction.

### E.     Congress Sets Forth A Comprehensive Scheme For Regulating Derivatives Trading.

The CEA today sets out a "comprehensive regulatory structure" for entities seeking to offer derivatives.  *Curran*, 456 U.S. at 356 (quotation marks omitted).  The principal requirement is that entities become "designated" as contract markets, known as DCMs.  DCMs must comply with myriad federal obligations designed to ensure orderly trading and prevent "price manipulation, cornering and other market disturbances."  *Am. Agric.*, 977 F.2d at 1151.

To obtain CFTC designation, exchanges must prove they can comply with 23 "Core Principles" identified in the CEA and CFTC regulations. *See* 7 U.S.C. § 7(d); 17 C.F.R. pt. 38. DCMs must make daily disclosures regarding market volume, 17 C.F.R. § 38.450; keep five years' worth of trading records, *id.* §§ 38.950, 1.31(b)(1); offer "impartial access" to their platforms, *id.* § 38.151(b); make their records "open to inspection by" federal regulators, *id.* § 1.31(d)(1); and maintain capital reserves sufficient to cover "operating costs for a period of at least one year," *id.* § 38.1101(a)(2). Among many other requirements, DCMs must also create and maintain a "system capable of detecting and investigating potential trade practice violations," *id.* § 38.156, monitor for "manipulation," *id.* § 38.251, and "have the ability to comprehensively and accurately reconstruct all trading" on their exchanges, *id.* § 38.256. Additionally, DCMs must work through a CFTC-regulated clearinghouse, ensuring that financial obligations of all trade counterparties are met by entities with sufficient liquidity. 7 U.S.C. § 7a-1.

The CEA prescribes a detailed system for the approval and listing of contracts on DCMs. Until 2000, the CEA required DCMs to obtain CFTC preapproval before listing any new contract and subjected all contracts to an "economic purpose" test. *See* 40 Fed. Reg. 25,849, 25,850 (June 19, 1975). But this preapproval process proved onerous and inefficient, causing

Congress in 2000 to eliminate the economic purpose test and allow DCMs to list derivatives contracts by self-certifying compliance with applicable requirements. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a)(1). The CFTC may stay the listing of a new contract in certain circumstances. *See* 17 C.F.R. § 40.2(c). Alternatively, exchanges may voluntarily submit contracts to the CFTC for approval before listing. 7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. § 40.3. The CFTC "shall approve a new contract" unless it determines the contract would violate the CEA or CFTC regulations. 7 U.S.C. § 7a-2(c)(5)(B); 17 C.F.R. § 40.3(b).

If the CFTC concludes that an event contract may fall within an enumerated category in the Special Rule, it may subject the contract to a 90-day public-interest review. *See* 17 C.F.R. § 40.11(c). The CFTC may request that the DCM suspend the listing of that contract pending review. *Id.* § 40.11(c)(1). Following review, the CFTC "shall issue an order approving or disapproving" the contract. *Id.* § 40.11(c)(2).

The CEA also sets out a detailed enforcement scheme. If a DCM offers a contract in violation of the CEA, the CFTC may utilize an array of enforcement mechanisms, including but not limited to civil penalties, 7 U.S.C. § 9, revocation of licensing, *id.* § 12c, and referral for criminal enforcement, *id.* § 13. Following the 1978 CEA amendments, appropriate

officials "of any State" may sue over "any act or practice constituting a violation" of the CEA or its regulations, but, consistent with the exclusive-jurisdiction provision, only against parties "other than a [designated] contract market." *Id.* § 13a-2(1).

## II.    FACTUAL BACKGROUND

In 2020, the CFTC certified Kalshi as a DCM. *See KalshiEX LLC v. CFTC,* No. 23-cv-3257, 2024 WL 4164694, at *4 (D.D.C. Sept. 12, 2024). Since then, Kalshi has been fully regulated under federal law alongside entities like the Chicago Mercantile Exchange and the Intercontinental Exchange.

Kalshi offers many kinds of event contracts related to climate, technology, health, popular culture, and economics.  For example, Kalshi allows users to trade on who will win the New York City mayoral race, whether India will meet its 2030 climate goals, whether 2025 will be the hottest year ever recorded, and what the top movie on Netflix will be next week.  These contracts allow customers to hedge and trade based on financially significant events.  Because prices are driven by market forces, these contracts have significant predictive value.[1]

---

[1] Kelly Cloonan, *Betting markets nailed Trump's decisive win — and it's a good reminder they can be more accurate than polls*, Bus. Insider (Nov. 9, 2024), https://perma.cc/5W7W-S76X.

17

In December 2024, one of Kalshi's competitors began offering contracts on the outcomes of sports events. JA44. Kalshi followed suit in January 2025. JA44. Kalshi's contracts allow users to place positions on, for example, which teams will advance in the NCAA College Basketball Tournaments or who will win the U.S. Open Golf Championship. JA44. The Special Rule authorized the CFTC to review Kalshi's sports-event contracts if it concluded they involved "gaming" and prohibit them if it found them "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). To date, however, the CFTC has declined to initiate review of Kalshi's sports-event contracts. JA44. Thus, upon self-certification, these contracts were approved under federal law. 7 U.S.C. § 7a-2(c)(1).

When Congress in 2010 listed contracts involving "gaming" among the categories of contracts the CFTC could review for compliance with the public interest, a federal statute called the Professional and Amateur Sports Protection Act ("PASPA") made sports betting unlawful in nearly every state. *See* 28 U.S.C. § 3702(1). In *Murphy v. NCAA*, 584 U.S. 453, 486 (2018), the Supreme Court invalidated PASPA. Since then, most states—including Maryland—have authorized sports betting.

Kalshi's sports-event contracts differ from bets offered by sportsbooks in important respects. Unlike a traditional casino or "house," Kalshi's

exchange is not the counterparty to any trade, and prices are set by supply and demand rather than by the exchange. JA38-39. Traders enter into trades against other traders, and they may exit their positions according to movements in the market. Because DCMs like Kalshi lack incentives to offer trades to favor themselves and disfavor traders, the comprehensive federal scheme governing DCMs focuses on preventing market manipulation and disruption and ensuring market efficiency nationwide. *See* 17 C.F.R. §§ 38.250, 38.151.

## III. PROCEDURAL HISTORY

On April 7, 2025, the Maryland Lottery and Gaming Control Commission sent Kalshi a cease-and-desist letter, claiming that Kalshi's sports-event contracts are "indistinguishable" from sports wagers and thus unlawful without a Maryland sports-wagering license. JA65-66. The letter demanded that Kalshi cease its "illegal offerings" in Maryland within 15 days of receipt. JA66. Faced with the prospect of civil and criminal enforcement, Kalshi brought this suit on the ground that the CEA preempts state regulation of trading on DCMs. Kalshi also sought a preliminary injunction.

Before the district court ruled on Kalshi's motion, two other federal district courts issued injunctions preventing two other states—Nevada and New Jersey—from enforcing their gambling laws against Kalshi. *KalshiEX,*

*LLC v. Hendrick*, No. 2:25-cv-00575, 2025 WL 1073495, at *8 (D. Nev. Apr. 9, 2025); *KalshiEX LLC v. Flaherty*, No. 25-cv-02152, 2025 WL 1218313, at *8 (D.N.J. Apr. 28, 2025). Both courts recognized that the CEA's grant of "exclusive jurisdiction" to the CFTC preempted state regulation of trading on DCMs. *Hendrick*, 2025 WL 1073495, at *5-6 (holding that "Section 2's plain and unambiguous language" "reflects congressional intent to occupy the field of regulating CFTC-designated exchanges and the transactions conducted on those exchanges"); *Flaherty*, 2025 WL 1218313, at *5 (similar). New Jersey appealed the preliminary injunction to the Third Circuit; that appeal has been briefed and argued.

Breaking with its peer courts, the district court here denied Kalshi's motion on August 1, 2025. JA178. It "assume[d] without deciding that Kalshi's sports-event contracts are in fact swaps" under the CEA. JA156. But, relying heavily on a presumption against preemption, the court rejected both field and conflict preemption.

As to field preemption, the court acknowledged that "Congress had *some* field-preemptive intent" when it enacted the CEA and when it added swaps to the CFTC's exclusive jurisdiction in Dodd-Frank. JA162. But the court held that this did not "necessarily establish that the 'field' that Congress intended to 'occupy' included gambling." JA160. Concluding that the

question was "not answered by the text" of the CEA, the court canvassed evidence outside of the exclusive-jurisdiction provision's text, including the CEA's "goals and policies," to hold that Congress sought to exempt state gambling laws from the field over which the CFTC has exclusive jurisdiction. JA163, 172.  As to conflict preemption, the court concluded that the CEA and Maryland law "work in tandem," and ascribed any conflict to "Kalshi's desire not to comply with Maryland law."   JA175-176.   The court therefore concluded that Kalshi did not show "a likelihood of success on the merits," and did not address whether Kalshi "would suffer irreparable harm in the absence of an injunction or whether the balance of equities or public interest" favor injunctive relief.  JA176.

Kalshi appealed.

## SUMMARY OF ARGUMENT

**I.A.**  Starting with the plain text, every marker of congressional intent confirms that Congress preempted the field of regulating trading on DCMs like Kalshi.  Congress granted the CFTC "exclusive jurisdiction" over trading on DCMs, displacing state regulation.  Congress deleted a provision that would have preserved state regulation.  And Congress's avowed purpose in establishing a uniform set of rules for trading on DCMs was to "preempt the field."

**B.** Maryland's gambling laws are also conflict preempted as applied to Kalshi, as Defendants below effectively conceded. Applying state law—not to mention 50 different states' laws—to regulate trading on DCMs stands as an obstacle to Congress's objective of exclusive federal regulation of DCMs. It would also be impossible for Kalshi to comply with Maryland law—which requires that all trades come exclusively from within Maryland—while complying with the federal obligation to provide impartial access to a nationwide exchange. Maryland's laws also create a conflict in enforcement because they purport to criminalize conduct that the CFTC, exercising discretion expressly delegated by Congress, has allowed.

**II.A.** The district court held otherwise by carving out an extratextual gambling exception from the CFTC's exclusive jurisdiction based on the court's assumption that Congress did not intend to preempt state gambling laws. But the text of the statute—which unequivocally preempts state regulation of transactions on DCMs—controls over speculation about Congress's unstated intentions. The district court was also wrong about Congress's intent. In the decades before the CEA's enactment, many states regulated derivatives trading as unlawful gambling. One of Congress's principal purposes in granting the CFTC exclusive jurisdiction over derivatives trading was to end that state regulation.

**B.** The district court's grounds for rejecting field preemption do not withstand scrutiny. All the evidence the district court identified to support its position—the CEA's text and history, case law construing the CEA, and other federal laws related to gambling—support preemption rather than calling it into doubt.

**C.** The district court likewise erred in finding no conflict preemption. The court did not attempt to explain how Kalshi could comply with Maryland's requirement that all positions be placed by individuals in Maryland, which would be flatly impossible for a nationwide exchange that must offer impartial access. It also never addressed how letting all 50 states decide what contracts may be traded on DCMs could comport with the CEA's mandate of subjecting DCMs to a single, nationwide set of regulations. And it improperly second-guessed Congress's judgment about the importance of subjecting DCMs to one set of uniform rules.

**D.** Because the evidence of preemption is overwhelming, this Court can reverse without deciding whether a presumption against preemption applies. Regardless, the district court erred in applying such a presumption. No presumption applies where, as here, a statute contains an express-preemption clause, or where a state regulates in a domain not traditionally subject to state regulation—such as trading on DCMs.

## STANDARD OF REVIEW

This Court reviews a "denial of a preliminary injunction for abuse of discretion, reviewing factual findings for clear error and legal conclusions de novo." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021). "[T]he court abuses its discretion when it makes an error of law." *Id.*

## ARGUMENT

The plain text of the CEA makes clear that the CFTC—and only the CFTC—may regulate trading on DCMs. Every other marker of congressional intent confirms what the statute's text dictates. The district court held to the contrary only by reading an extratextual gambling exception into the CEA's text and committing multiple other legal errors. This Court should reverse.

## I.    THE CEA PREEMPTS MARYLAND'S GAMBLING LAWS AS APPLIED TO KALSHI.

The Supremacy Clause sets out a "fundamental principle of the Constitution" that "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000); U.S. Const., art. VI, cl. 2. Federal law has preemptive effect no matter how "clearly within a State's acknowledged power" the state's law resides. *Free v. Bland*, 369 U.S. 663, 666 (1962). One type of preemption, known as field preemption, occurs where states seek to regulate in a field that Congress "has determined must

be regulated by its exclusive governance." *Arizona v. United States*, 567 U.S. 387, 399 (2012).  State laws are also preempted where they conflict with federal law, including when compliance with both is an "impossibility" or state law stands as an "obstacle" to Congress's objectives.  *Id.* (quotations omitted).  Overwhelming evidence demonstrates that Maryland gambling laws are both field preempted and conflict preempted as applied to Kalshi.

> **A.    Maryland's Gambling Laws Are Field Preempted As Applied To Kalshi.**

The CEA leaves no room for state regulation of trading on DCMs. "Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). Here, every indicator of Congressional intent confirms that the CEA preempts the field of regulating trading on DCMs—both by its express text and by setting out a comprehensive scheme that displaces state regulation. *See Crosby*, 530 U.S. at 372 n.6 ("'*field*' preemption may fall into any of the categories of express, implied, or conflict preemption").

1.  "[I]n the first instance," this Court must "focus on the plain wording of" the CEA.  *CSX Transp.*, 507 U.S. at 664.  Section 2(a) grants the CFTC "*exclusive jurisdiction*" over all "transactions involving swaps" or "future delivery" contracts that are "traded or executed on a contract market designated" by the CFTC.  7 U.S.C. § 2(a)(1)(A) (emphasis added).  The "plain

meaning of 'exclusive' " "necessarily denies jurisdiction" to other entities not named in that provision. *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992); *see also Exclusive*, American Heritage Dictionary (2d ed. 1980) ("Not divided or shared with others"; "sole"; "separate; incompatible"). Kalshi's sports-event contracts are "swaps" traded on a "contract market designated" by the CFTC, which necessarily denies jurisdiction to other regulators.

The Supreme Court has recognized that the grant of "exclusive jurisdiction" to a federal agency preempts state efforts to intrude on the same "regulatory turf." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016). This Court and others have likewise repeatedly recognized that where a federal authority has "exclusive jurisdiction" over a field, state regulators lack concurrent jurisdiction. *Appalachian Power Co. v. Pub. Serv. Comm'n of W. Va.*, 812 F.2d 898, 904 (4th Cir. 1987); *see PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 475 (4th Cir. 2014) (statutory grant of "exclusive power to regulate" preempted the field); *Richardson v. Kruchko & Fries*, 966 F.2d 153, 158 (4th Cir. 1992) (state-law claims preempted where they fell within federal agency's "exclusive jurisdiction"); *Transcon. Gas Pipe Line Co., LLC v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151-152 (3d Cir. 2024) (an "explicit statutory conferral of exclusive

jurisdiction ... withdraws any concurrent jurisdiction"). The CFTC's exclusive jurisdiction over trading on DCMs is no different.

Other features of Section 2(a)'s text underscore its preemptive effect. Section 2(a) contains a savings clause preserving the jurisdiction of "other regulatory authorities" under the laws "of any State." 7 U.S.C. § 2(a)(1)(A). Crucially, the clause applies "*[e]xcept as hereinabove provided*" by the grant of exclusive jurisdiction to the CFTC. *Id.* (emphasis added). That language enables a "logical inference" of preemption as to matters within the CFTC's jurisdiction. *See Omnipoint Commc'ns, Inc. v. City of Huntington Beach*, 738 F.3d 192, 195-196 (9th Cir. 2013) (interpreting savings clause with an "*[e]xcept* as provided" proviso). Congress added the proviso specifically to ensure that "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies." S. Rep. No. 93-1131, at 6.

2. The backdrop against which Congress regulated in 1974 confirms its preemptive intent. When Congress considered the 1974 amendments, the CEA did not "impair any State law applicable to any transaction" regulated by the statute. 7 U.S.C. § 6c (1936). The Supreme Court had explained that *without* this proviso, the CEA would "almost certainly conflict with state laws," but that this proviso "serve[d] the function of preventing supersedure and preserving state control." *Rice v. Bd. of Trade of Chi.*, 331 U.S. 247, 255

(1947).  Senate drafters accordingly "deleted" this clause "to assure that Federal preemption is complete."  120 Cong. Rec. 30,464 (Sept. 9, 1974) (statement of Sen. Curtis).  The Senate also qualified the state-law savings clause by clarifying that it applied "except as hereinabove provided" by the CFTC's exclusive jurisdiction over on-DCM trading.  S. Rep. No. 93-1131, at 31.  These changes "wholly and unequivocally eliminated each of the bases" the Supreme Court had previously relied on "to hold that the CEA did not preempt state regulation."  Van Wart, *supra*, at 692-693.  They would be incomprehensible if Congress intended to preserve state authority to regulate trading on DCMs.  *See Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 168 n.16 (1993) ("Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded" (citation omitted)).

3.     Later-enacted provisions confirm that the CFTC's exclusive jurisdiction over trading on DCMs preempts state regulation.  Following the 1974 amendments, Congress enacted other provisions relevant to the states' role, but each one *excludes* the right to regulate trading on DCMs.  The 1978 amendments authorize state officials to sue over "any act or practice constituting a violation of any provision of this chapter or any [CFTC] rule."  7 U.S.C. § 13a-2(1).  But states may *only* enforce the CEA against parties "*other than a [designated] contract market*."  *Id.* (emphasis added).

28

Congress enacted this carveout because it "wanted the power to enforce the CEA *with respect to organized exchanges* to remain solely in the CFTC." Van Wart, *supra*, at 708. Similarly, the 1982 amendments make clear that the statute shall *not* "supersede or preempt" the application of state law to transactions "*not* conducted on" a DCM or to entities who are "required to be registered" as a DCM but "fail or refuse" to do so. 7 U.S.C. § 16(e)(1) (emphasis added). The only coherent inference of specifying no preemption as to off-DCM transactions is that Congress *did* intend preemption as to on-DCM transactions.

Congress again made clear in 2006 that it understood the CEA specifically to preempt state gambling laws as applied to on-DCM trading. Just four years before Congress passed Dodd-Frank in 2010, it enacted the Unlawful Internet Gaming Enforcement Act of 2006 ("UIGEA"), which generally prohibits use of the internet to transmit wagers between states "where such bet or wager is unlawful," 31 U.S.C. § 5362(10)(A), but provides that the term "bet or wager" "*does not include*" transactions conducted on "a registered entity … under the Commodity Exchange Act," *id*. § 5362(1)(E) (emphasis added). UIGEA thus underscores Congress's understanding that, under the CEA, state gambling laws do not reach trading on DCMs.

4. Precedent further reinforces this conclusion. By the time Congress revisited the CEA in Dodd-Frank, courts of appeals had repeatedly and uniformly agreed that the CEA's exclusive jurisdiction over DCMs preempts other regulation. *Leist*, 638 F.2d at 322 ("the CEA preempts the application of state law"); *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (state-law "commercial gambling" claim could not proceed because "the Commodity Exchange Act preempts all state laws inconsistent with its provisions"); *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980) ("Congress intended the CFTC to occupy the entire field of commodities futures regulation"); *FTC v. Ken Roberts Co.*, 276 F.3d 583, 590-591 (D.C. Cir. 2001) (the CFTC's jurisdiction is "exclusive with regard to the trading of futures *on organized contract markets*") (citation omitted)); *Am. Agric.*, 977 F.2d at 1157 (state-law claims "are preempted by the CEA" as applied to "the operation of a contract market"); *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989) (where "the CFTC has jurisdiction, its power is exclusive").

District courts and state courts of last resort agreed. *E.g.*, *Jones v. B. C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979) ("state regulatory agencies are likewise preempted by the 'exclusive jurisdiction' of the CFTC"); *Int'l Trading, Ltd. v. Bell*, 556 S.W.2d 420, 423 (Ark. 1977) (similar).

Commentators similarly recognized that the CEA "resulted in the preemption of all other would-be regulators at every level of government." Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1, 2 (1976) (authored by future CFTC Chairman); *see also* Rainbolt, *supra*, at 18 (authored by CFTC Commissioner); Van Wart, *supra*, at 721 ("the exclusive jurisdiction of the CEA preempts state bucket-shop laws and other anti-gambling legislation").

"As a matter of statutory construction, federal courts 'presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.'" *United States v. Perkins*, 67 F.4th 583, 611 (4th Cir. 2023) (citation omitted). When it returned to the CEA in 2010, Congress would have been aware of the uniform interpretation of every court that had addressed preemption. And Congress would have understood that confirming the CFTC's jurisdiction over event contracts preempted state law as applied to trading those instruments on DCMs.

The CFTC shares this view. In separate litigation involving the CFTC's authority to regulate certain Kalshi event contracts, the CFTC recently acknowledged that, "due to federal preemption, event contracts never violate state law when they are traded on a DCM." Appellant's Br., *KalshiEX v. CFTC*, No. 24-5205 (D.C. Cir. Oct. 16, 2024); *see Loper Bright Enters. v.*

*Raimondo*, 603 U.S. 369, 402 (2024) (courts may account for an agency's "body of experience and informed judgment" in interpreting a statute (citation omitted)).

5. While this Court need not consider legislative history given the clear statutory text and context, legislative history eliminates any doubt about preemption. Congress emphasized in the lead-up to the 1974 amendments that it sought to "avoid unnecessary, overlapping and duplicative regulation" in the derivatives markets. *Ken Roberts*, 276 F.3d at 588 (citation omitted). The Senate understood that the proposed amendments would bring "the futures markets" "under Federal regulation" because "different State laws would just lead to total chaos." *Senate Hearings* at 249, 685 (statements of Sen. Clark). Drafters reiterated that regulation should be uniform with exchanges "under the *same* set of rules." H.R. Rep. No. 93-975, at 76 (emphasis added). And the conference report to the 1974 amendments emphasized Congress's desire to "*preempt the field* insofar as futures regulation is concerned." H.R. Rep. No. 93-1383 at 35 (emphasis added); *see Garcia v. United States,* 469 U.S. 70, 76 (1984) (when resort to legislative history is warranted, committee reports are the "authoritative source").

Legislative history further underscores that when Congress returned to the CEA after 1974, it understood that the 1974 amendments had already

"bestowed on the CFTC exclusi[ve] jurisdiction to regulate futures trading … , thereby preempting any State regulatory laws."  H.R. Rep. No. 97-565, pt. 1, at 44; *see also* H.R. Rep. No. 106-711, pt. 2, at 71 ("the current" CEA already "supersedes and preempts" state laws "in the case of transactions conducted on a registered entity").  Subsequent CEA amendments allowing states to regulate *off-DCM* trading rested critically on Congress's recognition that the 1974 amendments prohibited states from regulating *on-DCM* trading.

6.  Finally, the "pervasive" regulatory framework for regulating trading on DCMs confirms that Congress preempted the field.  *Arizona*, 567 U.S. at 399.  Congress in the CEA created "a comprehensive regulatory structure" to oversee the "futures trading complex."  *Curran*, 456 U.S. at 356 (citation omitted).  That scheme leaves no room for parallel state regulation.

CFTC regulation covers the lifecycle of an exchange.  To list derivatives contracts, an exchange must receive CFTC designation.  *See* 7 U.S.C. § 7(a).  That process requires an application demonstrating myriad capabilities, including the capacity to detect and investigate actors who violate CFTC rules, 17 C.F.R. § 38.150(b), to retain adequate compliance staff, *id.* § 38.155(a), to surveil trades executed on its platform, *id.* § 38.156, and more.  Once the market becomes a DCM, it is subject to extensive oversight, including recordkeeping requirements, *id.* § 38.950, reporting obligations,

*id.* §§ 38.450, 16.00 *et seq.*, liquidity standards, *id.* § 38.1101(a)(2), and penalties, 7 U.S.C. §§ 9a, 12c.

CFTC regulation also covers transactions *on* DCMs. The CEA sets out comprehensive rules governing DCMs, including prohibitions on fraud, manipulation, and disruptive trading, as well as requirements for position-size limits in transactions involving certain commodities. 7 U.S.C. §§ 6a, 6b, 6c, 9; *see* 17 C.F.R. §§ 150.2 & App. E, 180.1, 180.2. DCMs may self-certify contracts they have determined comply with the CEA and CFTC regulations, with the CFTC retaining back-end authority to review any self-certified contract for compliance. In the case of event contracts in certain categories, the CFTC has discretion to determine whether they are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The CEA rounds out the scheme by authorizing an array of sanctions, including civil penalties, revocation of licensing, and referral for criminal enforcement. *Id.* §§ 9a, 12c, 13, 13a, 13a-1.

The CFTC's comprehensive regime leaves "no room for the States to supplement it." *Arizona*, 567 U.S. at 401 (cleaned up). Instead, "Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction," by making the CFTC's jurisdiction over trading on DCMs "plenary." *Nazarian*, 753 F.3d at 475 (quotation omitted).

## B.     Maryland's Gambling Laws Are Conflict Preempted As Applied To Kalshi.

Even if field preemption did not bar Maryland from regulating Kalshi's event contracts, conflict preemption would.  In at least three respects, complying with Maryland law would be "impossible" for Kalshi or pose an "obstacle" to the CEA's purposes.  *Crosby*, 530 U.S. at 372-373.

1.     Maryland's application of its gambling laws to Kalshi subverts Congress's aim of bringing futures markets "under a uniform set of regulations."  *Am. Agric.*, 977 F.2d at 1156.  Congress worried that states "might step in to regulate the futures markets themselves."  *Id.*  State regulation brings the specter of "varying and potentially contradictory legal standards" which would not only hamper DCM operations, but potentially prevent them from operating "at all."  *Id.*  The Seventh Circuit has accordingly held that "[w]hen application of state law would directly affect trading on or the operation of a [DCM], it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted."  *Id.* at 1156-57 (citation omitted).

Here, Maryland attempts to directly regulate trading on Kalshi—exactly the result Congress in 1974 sought to avoid.  This Court and the Supreme Court have easily found state law to conflict with federal law in comparable cases where permitting state regulation was "at odds with the

goal of uniformity that Congress sought to implement." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990); *see Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 183, 197 (4th Cir. 2007) (finding conflict preemption where state regulation would interfere with statutory purpose of permitting "uniform nationwide administration" of employee plans); *Metro. Life Ins. Co. v. Pettit*, 164 F.3d 857, 862 (4th Cir. 1998) (finding conflict preemption where Congress sought to apply "one body of national, uniform law"); *In re Sewell*, 690 F.2d 403, 407 (4th Cir. 1982) ("to allow the States to control conduct which is the subject of national regulation would create potential frustration of national purposes" (quotation omitted)).  This case is no different.

Defendants forthrightly—if inadvertently—conceded the conflict below, noting in a sworn affidavit that the CFTC "oversees" Kalshi "at the federal level" but that "this federal oversight *conflicts with state laws that govern gambling and sports betting*."  JA89-90 (emphasis added).  That concession should have ended this case.  Where state law and federal law conflict, state law "must yield"—not the other way around.  *Free*, 369 U.S. at 666.

2.  Compliance with both federal and Maryland law is outright impossible for Kalshi.  Maryland law would require Kalshi to ensure that all

"wagers" are "initiated, received, and completed within the State." Md. Code Regs. 36.10.16.03 (2022). Other states impose similar requirements. *E.g.*, N.J. Admin. Code § 13:69O-1.2(e)(2) (2018). But compliance with that geographical requirement is impossible for a nationwide DCM like Kalshi, where traders do not take positions against Kalshi, but rather enter into contracts with other traders across the country. Even worse, if Maryland is permitted to proceed here, 49 other states could equally attempt to subject Kalshi to their own geographical limitations.

Even if Kalshi could overcome that hurdle, doing so would bring Kalshi out of compliance with the Core Principles on which its federal designation depends. Core Principle 2 requires Kalshi to provide "impartial access to its markets and services." 17 C.F.R. § 38.151(b). A scheme that grants every state the power to dictate which contracts are and are not permitted in that state would violate that impartial-access requirement—creating 50 different markets rather than the single nationwide market Congress commanded. *See Hendrick*, 2025 WL 1073495, at *7 (noting the "potential existential threat" to Kalshi if it "geographically limits who can enter contracts on what is supposed to be a national exchange").

Complying with 50 states' gambling laws would be impossible for Kalshi in other respects. Maryland, like other states, subjects licensees to

cash reserve requirements, *see* Md. Code Ann., State Gov't § 9-1E-04(b)(6)(vi) (2022); Md. Code Regs. 36.10.14.06 (2025), but those requirements conflict with the CEA's different command that DCMs work through federally regulated clearinghouses that collateralize open positions. *See* 7 U.S.C. § 7a-1. Maryland dictates "the manner in which wagers are received and payouts are remitted" and the "maximum wagers that may be accepted" by bettors, Md. Code Ann., State Gov't § 9-1E-04(b)(6) (2022), obligations which likewise conflict with the CEA, which fixes "limits on the amounts of trading which may be done or positions which may be held by any person," 7 U.S.C. § 6a, and which specifies complex "[s]ettlement procedures" for trades. 7 U.S.C. § 7a-1(c)(2)(E). And pulling contracts from individual states, as Maryland has demanded, would risk "market disruptions" and facilitate "manipulation"—additional violations of the Core Principles. *See* 17 C.F.R. §§ 38.255, 38.200. This is a quintessential case of impossibility preemption—where federal law "forbids what the state law requires." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 460 (2012).

3. Application of Maryland's gambling laws to Kalshi would conflict with Congress's chosen "method of enforcement." *Arizona*, 567 U.S. at 406. Congress in 2010 recognized that event contracts involving "gaming" may raise public-interest implications, and created a specific mechanism for

resolving them: Congress provided that "*the Commission may determine*" that event contracts involving "gaming" "are contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i)(V) (emphasis added). The CFTC has declined to subject Kalshi's sports-event contracts to public-interest review, which reflects "the CFTC's exercise of its discretion and implicit decision to permit them." *Flaherty*, 2025 WL 1218313, at *6.

Maryland gives regulators unfettered discretion to ban certain wagers as "contrary to public policy." Md. Code Ann., State Gov't § 9-1E-04(b)(6)(ii) (2022). Allowing Maryland—not to mention 49 other states—to substitute its own public-interest judgment for the CFTC's would "interfer[e] with the method by which the federal statute was designed to reach its goals." *Nazarian*, 753 F.3d at 478 (quotation omitted). And allowing 50 different states to subject Kalshi to *criminal penalties* for offering contracts that the CFTC has allowed would not only "undermine[] the congressional calibration of force," *Crosby*, 530 U.S. at 380—it would render the CFTC's judgment utterly meaningless.

States may not take actions that "would disturb and conflict with the balance embodied" in a discretionary judgment Congress delegated to a federal agency. *California v. FERC*, 495 U.S. 490, 506 (1990). When Congress entrusts a decision to an agency's discretion, "it intends the agency

39

to use its reasoned judgment to weigh the relevant considerations and determine how best to prioritize between these objectives," and therefore intends to bar states from "re-balancing" those considerations. *Farina v. Nokia Inc.*, 625 F.3d 97, 123 (3d Cir. 2010); *see Nazarian*, 753 F.3d at 479 (federal law prevented Maryland from "substituting the state's preferred incentive structure for that approved by FERC"). States certainly may not "criminalize actions" that Congress has left to the "discretion" of federal officials, as Maryland has attempted here. *United States v. South Carolina*, 720 F.3d 518, 530 (4th Cir. 2013).

## II. THE DISTRICT COURT ERRED IN REJECTING PREEMPTION.

In rejecting the overwhelming evidence of preemption, the district court began by presuming that Kalshi's sports-event contracts are gambling, then worked backwards, invoking various policy rationales to read an extratextual gambling exception into the CEA's text. The statutory text and structure refute the court's grounds for rejecting preemption. If affirmed, the district court's conclusion that states may freely apply their gambling laws to trading on DCMs would amount to an unprecedented intrusion into the CFTC's exclusive jurisdiction.

## A. The District Court Erred In Creating A Gambling Exception To The CFTC's Exclusive Jurisdiction.

The district court acknowledged that Congress had "*some* field-preemptive intent" when it enacted the CEA, but declared that the scope of the preempted field "simply is not answered by the text" of the CEA. JA162-163. Relying on mistaken assumptions about Congress's intent, the court concluded that the CFTC's exclusive jurisdiction did not encompass "gambling." JA162.

The district court's analysis was fundamentally flawed. The text of Section 2(a) *does* answer the preemption question by plainly setting out the field Congress sought to occupy: The CFTC has "exclusive jurisdiction" over "transactions involving swaps" and "future[s]" contracts "traded or executed on a" DCM. 7 U.S.C. § 2(a)(1)(A). The district court did not dispute that Kalshi's sports-event contracts are swaps, and further recognized that the CEA's plain text gives the CFTC exclusive jurisdiction over "transactions involving swaps" on DCMs. JA162-163 n.4.[2] The district court offered no

---

[2] Because the district court did not dispute that Kalshi's sports-event contracts are swaps, its decision finds no support in the District of Nevada's recent decision holding that a different DCM's sports-event contracts are not swaps. *See N. Am. Derivatives Exchange, Inc. v. Nevada*, No. 2:25-cv-00978, at *8 (D. Nev. Oct. 14, 2025) (slip op.). The court there reiterated that the "plain and unambiguous language" of the CEA *would* preempt state regulation if sports-event contracts are swaps. *Id.* at *10 (quoting *Hendrick*, 2025 WL 1073495, at *5).

plausible basis to hold that transactions expressly subject to the CFTC's "exclusive jurisdiction" could nonetheless fall outside the field Congress intended to preempt. Instead, the district court effectively rewrote the CEA to make the CFTC's jurisdiction "exclusive *except for state gambling laws*." That is not the text Congress enacted.

The district court speculated that, even though Congress generally granted the CFTC exclusive jurisdiction to regulate the field of trading on DCMs, Congress did not intend to preempt gambling laws. JA162-163. But nothing in the CEA's text or structure provides any basis to conclude that states may apply gambling laws in an otherwise preempted field. Courts "may not replace the actual text with speculation as to Congress' intent." *Just Puppies*, 123 F.4th at 661 (quotation omitted). Where field preemption applies, it does not permit a "case-by-case analysis" of which state laws Congress may have silently wished to preserve. *Nazarian*, 753 F.3d at 475 (quotation omitted).

Even if speculating about legislative motives were permissible, more than a century of history refutes the district court's belief that it is "highly unlikely that Congress would have overridden state gambling laws" in the CEA. JA167-168. To the contrary, extensive evidence shows that this was precisely Congress's intent. Before the CEA, many states attempted to

regulate futures trading by treating it as unlawful gambling.  In 1888, the Illinois Supreme Court declared that "dealing in 'futures' " "according to the fluctuations of the market, is void" because it is "contrary to public policy" and "a crime"—a "species of gambling [that] has become emphatically and pre-eminently the national sin." *Cothran*, 16 N.E. at 648.  Before Congress enacted the CEA in 1936, at least 10 states had specifically regulated trading in futures as a type of "gambling." *See* Addendum 1-4.  At least 30 states had bucket-shop laws prohibiting futures contracts where the parties did not intend actual delivery.  *See* Addendum 5-16.

State efforts to regulate futures trading as gambling were not hidden—they repeatedly reached the U.S. Supreme Court.  *See Irwin*, 110 U.S. at 508-509 (Indiana law providing that if the "real intent" of a futures contract is "merely to speculate in the rise or fall of prices" it is "nothing more than a wager"); *Pearce v. Rice*, 142 U.S. 28, 34-35 (1891) (Illinois law providing that futures contracts are "gambling contracts").  Indeed, just three years before Congress enacted the CEA, the Supreme Court held that the Grain Futures Act "did not supersede any applicable provisions of the Missouri law making gambling in grain futures illegal." *Dickson*, 288 U.S. at 198.

Against that backdrop, Congress in 1936 unquestionably intended to *preserve* state gambling laws as applied to trading on federal exchanges, and

Congress in 1974 just as unquestionably intended to *preempt* such gambling laws when it granted the CFTC "exclusive jurisdiction" to regulate trading on those exchanges. It is inconceivable that, despite having "field-preemptive intent" in 1974, JA159, Congress silently intended to allow states to apply their gambling laws to DCMs. And it is equally inconceivable that Congress in Dodd-Frank intended to allow states to ban trading on DCMs as gambling even though, four years earlier, Congress in UIGEA provided that state gambling laws "do[] not include" "any transaction conducted on or subject to the rules of a [DCM] under the [CEA]." 31 U.S.C. § 5362(1)(E).

The district court's conclusion that states may enforce their gambling laws against DCMs would have radical repercussions. Many states define gambling sufficiently broadly to permit regulation of *any* financial position on an uncertain outcome. *See* N.J. Rev. Stat. § 2C:37-1(b) (defining gambling as "staking or risking something of value upon ... a future contingent event"); N.Y. Penal L. § 225.00(2) (same); Nev. Rev. Stat. § 463.0193 (regulating all entities "accepting wagers on sporting events *or other events*") (emphasis added). If, as the district court maintained, states remain free to apply their gambling laws even to DCMs, states would be free to regulate *all* event contracts, or even *all* futures contracts—which, after all, can readily be characterized as staking something of value on a future

contingent event.  *See KalshiEX*, 2024 WL 4164694, at *12 (noting that this is not a "plausible" outcome in part "because the CEA specifically preempts the application of state law over derivative markets").

States like Maryland have at least authorized gambling subject to licensure requirements, but others prohibit gambling entirely.  Hawaii prohibits participation "in *any* gambling activity," Haw. Rev. Stat. § 712-1223 (emphasis added), which it defines as "stak[ing] or risk[ing] something of value upon … a future contingent event."  *Id.* § 712-1220.  And some states reserve the "full and absolute" right to deny a gaming license "for any cause" they "deem[ ] reasonable."  States' Br. 24, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir.).  If Defendants prevail, each of these states could categorically ban *all* event contracts or futures contracts.  Indeed, if the district court is right, *Dickson* remains good law, and states remain free to wield their gambling laws to make "gambling in grain futures illegal."  288 U.S. at 198.

The district court's opinion exposes the pitfalls of its extratextual approach to preemption.  The court acknowledged that "a state presumably lacks authority to have a parallel regulatory regime for grain futures."  JA161.  But the exclusive-jurisdiction provision applies to "future[s]" contracts and "swaps" in the same way.  7 U.S.C. § 2(a)(1)(A).  Even Defendants conceded below that the two "rise and fall together."  JA140, 143.  If states may indeed

apply their gambling laws to sports-event contracts, nothing in the CEA would prevent states from applying state gambling laws to futures contracts as well, just as they did a century ago—a position the district court itself recognized was wrong and that Defendants below disavowed.

## B.   The District Court Erred In Rejecting Field Preemption.

Setting aside the district court's fundamental error in reading an extratextual gambling exception into the CEA's text, none of the court's grounds for rejecting field preemption withstands scrutiny.

*First*, the district court relied heavily on the Special Rule, but the Special Rule supports Kalshi. The Special Rule gives the CFTC discretion to prohibit the trading of certain categories of contracts if (but only if) the CFTC determines they are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C). Among the categories enumerated in the Special Rule are contracts involving "gaming." *Id.* "Gaming" means "the practice or activity of playing games" and "playing games for stakes," *KalshiEX*, 2024 WL 4164694, at *8 (quotations omitted), including sports games like a "football match," *Gaming contract*, Chambers Dictionary (13th ed. 2014). Thus, even if the district court were right that Kalshi's sports-event contracts involve "gaming," JA166, that would make them among the "event contracts" subject to the CFTC's "review and approval," and thus subject to the CFTC's exclusive

jurisdiction. 7 U.S.C. § 7a-2(c)(5)(C). The district court never addressed the Special Rule's reference to "gaming" or explained how the CFTC's authority to approve or prohibit gaming contracts could be reconciled with its theory of concurrent state authority. Where "the CFTC has jurisdiction, its power is exclusive," *Chi. Mercantile Exch.*, 883 F.2d at 548, and nothing in the CEA allows states to retain authority to approve or prohibit trading of the very same instruments the CFTC may unquestionably approve or prohibit.

The district court cited a different Special Rule category involving "activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C)(i)(I). According to the court, this provision reflects an "intent to *preserve* state laws" and to allow states to regulate all contracts on DCMs they deem unlawful. JA164. That interpretation would have dramatic consequences; it would eliminate the uniform system Congress enacted the 1974 amendments to impose. It also misreads the Special Rule, which provides that "the Commission"—not 50 different states—"may determine" that contracts "are contrary to the public interest" if they involve activity unlawful under state law. 7 U.S.C. § 7a-2(c)(5)(C)(i)(I). Congress thus authorized the *CFTC* to determine whether a contract should be prohibited. It certainly did not allow 50 different states to substitute their own regulation for the CFTC's public-interest judgment. This case therefore bears no

47

resemblance to *Power v. Arlington Hospital Association*, 42 F.3d 851 (4th Cir. 1994), the only decision cited by the district court to support its reading, which involved a statute that did not grant exclusive jurisdiction to a federal regulator and instead expressly preserved "damages available for personal injury under the law of the State" at issue. *Id.* at 860.

Regardless, Kalshi's sports-event contracts do not fall under the unlawful-activity provision. The district court concluded that Kalshi's sports-event contracts "violate Maryland sports-wagering laws and thus constitute an 'activity that is unlawful' under state law." JA165. But "the only workable interpretation" of the Special Rule's reference to unlawful activity "refers to the underlying event rather than the act of staking money on that event." *Flaherty*, 2025 WL 1218313, at *5. Otherwise, because "many states define unlawful gambling as staking money on any contingent outcome," *every* event contract would fall within the unlawful-activity provision, an interpretation that "no one would contend" is "plausible." *KalshiEX*, 2024 WL 4164694, at *12. The question is whether the sports events *underlying* Kalshi's contracts are lawful in Maryland. Because they are, Kalshi's sports-event contracts fall outside the unlawful-activity provision.

The district court cited the Special Rule's legislative history, but that history undermines its holding. Senators Feinstein and Lincoln made clear

that the Special Rule sought to "restore *CFTC's authority* to prevent trading that is contrary to the public interest." 156 Cong. Rec. S5902, S5906 (July 15, 2010) (emphasis added). As Senator Lincoln and other architects of Dodd-Frank noted to the Third Circuit, Congress "intended event contracts on designated contract markets to be regulated by the CFTC, and the CFTC alone." Members of Congress Br. 5, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir.).

*Second*, the district court held that the savings clause in Section 2(a) "cuts against a finding of field preemption." JA167. But the savings clause unambiguously supports preemption. It provides that the CEA does not supersede other regulators' jurisdiction "[e]xcept as hereinabove provided" by the grant of exclusive jurisdiction to the CFTC. 7 U.S.C. § 2(a)(1)(A). Congress included that proviso specifically to ensure the savings clause would *not* limit the preemptive effect of Section 2(a)'s grant of exclusive jurisdiction to the CFTC. *See* S. Rep. No. 93-1131, at 23.

Quoting *International Paper v. Ouellette*, 479 U.S. 481, 492 (1987), the district court maintained that the savings clause's existence "negates the inference that Congress left no room for state causes of action." JA167 (quotation omitted). But it is undisputed that the savings clause leaves room for state causes of action for *off-DCM* transactions. *See CFTC v. Am. Metals*

*Exch. Corp.*, 775 F. Supp. 767, 779 (D.N.J. 1991) (CEA authorizes "state officials to apply any state or federal law against persons engaged in 'off-exchange' commodities trading"). Nothing about *International Paper* suggests the savings clause applies more broadly. Indeed, although the statute in *International Paper* contained no express-preemption provision and preserved suits "under any statute or common law," the Court nonetheless found preemption, explaining that Congress did not intend to undermine the "carefully drawn statute through a general saving clause." 479 U.S. at 484-485, 494 (citing 33 U.S.C. § 1365(e)). The same is true here.

*Third*, the district court relied on certain provisions in Section 16, but those provisions again undercut the court's conclusion. Section 16(e) provides that the CEA does not "preempt" the application of a "State statute" to "*any transaction in or involving any commodity ... that is not conducted on or subject to the rules of a [DCM].*" 7 U.S.C. § 16(e)(1) (emphasis added). The district court dismissed this provision as "about recalcitrant exchanges that refuse to register with the CEA." JA167. But that confuses subsection (C) of Section 16(e)(1)—which allows state regulation of exchanges that refuse to register—with subsection (B)—which allows state regulation of off-DCM transactions. And the only plausible interpretation of subsection (B) is that the CEA *does* preempt the application of state law to transactions that

*are* conducted on DCMs. *See Transcon. Gas.*, 108 F.4th at 157 (similar provision "carves out permissible state regulation from an otherwise preempted field").

The district court highlighted two "express preemption clauses" in Section 16, citing "Congress's decision to expressly preempt state gaming laws for certain transactions" as evidence Congress did not "impliedly preempt state" laws falling outside these provisions. JA165-166. But the district court drew the wrong inference from these provisions. The first provision—now located in Section 16(h)—is not a preemption provision at all. Rather, it is a substantive provision prohibiting states from regulating swaps "as an insurance contract." 7 U.S.C. § 16(h). It does not support any inference about preemption.

The second provision—now located in Section 16(e)(2)—was added to the CEA along with the amendments allowing for "exempt" transactions. *See id.* § 6(c). Because exempt transactions are not traded on DCMs, they fall outside the exclusive-jurisdiction provision. Congress enacted Section 16(e)(2) to prevent states from applying their gaming laws to exempted off-DCM transactions, just as states were already prevented from applying their gaming laws to on-DCM transactions. As Congress noted in 2000, "the current" CEA already "supersedes and preempts" state laws "in the case of

transactions conducted *on a registered entity*," and the new provision clarified that "the CEA supersedes and preempts State gaming and bucket shop laws" as to exempt transactions.   H.R. Rep. 106-711, pt. 2, at 71 (emphasis added).

Congress has since expanded the scope of Section 16(e)(2) to include other types of transactions exempted from the CEA.  *See* 7 U.S.C. § 2(c)(1) (transactions in "foreign currency," "government securities," and "mortgages" exempted from the CEA); § 2(f) (any "hybrid instrument that is predominantly a security" exempted from the CEA); §§ 27-27f (certain "banking product[s]" exempted from the CEA).[3]   Each of these cross-referenced transactions *need not occur on DCMs*—exactly why Congress needed to specify that state laws are preempted.   It would have been redundant and confusing to specify preemption as to transactions on DCMs; Section 2(a) already accomplished that.

*Fourth*, the district court cited precedent holding that "Congress's preemptive intent" in the CEA "had limits."  JA168.  That much is correct: The CEA does not preempt state regulation of most off-exchange trading, 7

---

[3] Section 16(e)(2) also cross-references Section 2(e), which until 2010 excluded transactions between "electronic trading facilities" from the CEA. Congress in 2010 eliminated that exclusion, but inadvertently did not eliminate the cross-reference. *See* 124 Stat. 1376, 1722 (2010).

U.S.C. § 16(e)(1)(B), or prevent states from enforcing their "general civil or criminal antifraud statute[s]," *id.* § 13a-2(7). But those limitations on the scope of field preemption do not suggest that states may apply gambling laws to ban trading on DCMs—the heart of the preempted field.

To the contrary, those cases recognized the opposite. The Seventh Circuit in *American Agriculture* noted that any state law that "would directly affect trading on or the operation of a futures market" "is preempted." 977 F.2d at 1156-57; *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (same). In *Ken Roberts*, the D.C. Circuit confirmed that the "CFTC's jurisdiction was 'to be exclusive with regard to the trading of futures *on organized contract markets*.'" 276 F.3d at 590-591 (quotation omitted). The district court's cases proceed to hold—correctly—that the CEA does not preempt state regulation of *off-exchange* futures trading or fraud suits "brought by futures investors against their brokers." *Am. Agric.*, 977 F.2d at 1156; *see Kerr v. First Commodity Corp.*, 735 F.2d 281, 283-284, 288 (8th Cir. 1984) (punitive damages against broker for defrauding customer); *Patry v. Rosenthal & Co.*, 534 F. Supp. 545, 546 (D. Kan. 1984) (state-law case involving broker-customer dispute); *Ken Roberts*, 276 F.3d at 583-584 (false advertising in "instructional materials" targeted at commodities traders).

None remotely supports the district court's conclusion that states may ban contracts traded on DCMs.

*Finally*, the district court maintained that "[i]nterpreting the CEA to preempt state gambling laws when wagers are conducted on a DCM" would conflict with various federal gambling statutes. JA170. Not at all.

To start, Kalshi's event contracts are not subject to the Wire Act or Indian Gaming Regulatory Act ("IGRA"). UIGEA, the federal law specifically governing internet wagering, provides that the term "bet or wager" "*does not include*" "any transaction conducted on or subject to the rules of a [DCM] under the [CEA]." 31 U.S.C. § 5362(1)(E) (emphasis added). UIGEA postdates both IGRA and the Wire Act, and UIGEA's definition is entitled "to great weight" in resolving the meaning of prior statutes addressing the same subject matter. *Bob Jones Univ. v. United States*, 461 U.S. 574, 587 n.10 (1983) (quotation omitted). Interpreting IGRA and the Wire Act to exclude trading on DCMs would harmonize them with the CEA and UIGEA, fulfilling the obligation to "reconcile and harmonize" statutes on the same subject rather than interpreting them to conflict. *In re Bulldog Trucking, Inc.*, 66 F.3d 1390, 1395 (4th Cir. 1995). But the district court's interpretation does the opposite, effectively nullifying UIGEA's exclusion by subjecting the very

same CFTC-regulated transactions it excludes to criminal penalties under different federal statutes.

Even if IGRA and the Wire Act were interpreted to treat on-DCM trading as a form of bet or wager, the district court was mistaken that the CFTC's exclusive jurisdiction over Kalshi's event contracts results in any "implied repeal." JA170. The Wire Act contains a "safe harbor" for "'wagering'" "to and from states" where that activity "is lawful." *W. Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059, 1069 (D.C. Cir. 2023) (quotation omitted). Given federal preemption, trading on DCMs is lawful in every state. And IGRA gives Native American tribes the authority to regulate gaming "on Indian lands," 25 U.S.C § 2701, but does not authorize tribes to regulate gaming available over the internet. That is the province of the UIGEA, which, as noted, permits trading on DCMs.

If there were any doubt, multiple canons of construction weigh against the district court's interpretation. The CEA, as the more specific statute addressing on-DCM trading, governs over general ones—especially where, as here, the Wire Act and IGRA involve a "general prohibition" whereas the CEA provides a "specific permission." Antonin Scalia & Brian Garner, *Reading Law* 183 (2012). Likewise, both the UIGEA and the Dodd-Frank amendments, as later-enacted statutes, take precedence over earlier ones

where they would subject an entity to "conflicting standards." *Gordon v. New York Stock Exch., Inc.*, 422 U.S. 659, 689 (1975); *see also* Scalia & Garner, *supra*, at 328 (a later statute supersedes an earlier one where their provisions "are in irreconcilable conflict").

The district court cited PASPA, opining that Congress would not have intended to "override" state sports-betting laws in 1974 and 2010 because it was "largely illegal federally to engage in sports gambling" before the Supreme Court's 2018 *Murphy* decision.  JA169-170.  PASPA was a limitation on state legislatures; it did not speak to what contracts could be offered on DCMs.  But PASPA no doubt explains why no DCM offered sports-event contracts until recently; DCMs likely expected that the CFTC would deem such contracts contrary to the public interest when most states prohibited sports betting.  The rapid legalization and growth of sports betting across the country since 2018 helps explain why the CFTC has allowed sports-event contracts in this very different landscape.

## C.     The District Court Erred In Rejecting Conflict Preemption.

The district court's grounds for rejecting conflict preemption are equally unpersuasive and supply an independent basis to reverse.

*First,* the district court dismissed the conflict between Maryland and federal law, suggesting that any conflict arose from "Kalshi's desire not to

comply with Maryland law" and avoid "compliance costs." JA176. It is emphatically incorrect that Kalshi objects to mere compliance costs. Instead, Maryland law imposes obligations that are irreconcilable with Kalshi's obligations under federal law. Kalshi, for example, cannot comply with Maryland's requirement to take trades only from individuals physically located in Maryland without violating its federal obligation to provide "impartial access" to traders nationwide. 17 C.F.R. § 38.151(b). The district court's rejoinder—that Kalshi can "offer sports-event contracts to Marylanders" if it "obtain[s] a license," JA175—is a *non sequitur*. If Kalshi obtains a license, Maryland law would limit Kalshi to operating in Maryland only, which would be impossible for a nationwide exchange. And if Maryland could impose this kind of geographical limit, so could every other state.

*Second,* the district court wrongly dismissed conflict preemption "[f]or the reasons" why it rejected field preemption. JA173. Although "principles of field and conflict preemption" can be "mutually reinforcing," they operate as "two alternative theories." *Nazarian*, 753 F.3d at 474, 478. The district court stated that the CEA and Maryland's gambling laws "work in tandem," JA175, but its support for that conclusion is unpersuasive. The district court defined the CEA's purpose at a high level of generality—"to address the efficient functioning of the derivatives and futures markets," JA175—then

cherry-picked aspects of Maryland laws that do not conflict with those objectives without addressing the overwhelming evidence that Congress sought to prevent state regulation of DCMs. The Supreme Court in *Arizona* rejected a similar contention where a state claimed that a statute allowing the arrest of removable immigrants "has the same aim as federal law." 567 U.S. at 402. The Court explained that "[p]ermitting the State to impose its own penalties" for matters entrusted to a federal agency "would conflict with the careful framework Congress adopted." *Id.*

The conflict is far clearer here than in *Arizona*. Allowing 50 different states to ban contracts the CFTC has allowed would "frustrate Congress' intent to bring the markets under a uniform set of regulations," flout Congress's judgment that "a contract market could not operate efficiently" if subject to "varying and potentially contradictory legal standards," and "lead to total chaos." *Am. Agric.*, 977 F.2d at 1156 (quotation omitted). The district court contended with none of this.

*Third,* the district court picked out one of Kalshi's cited cases—*Crosby*—and rejected conflict preemption on the ground that Congress's purpose of subjecting DCMs to uniform regulation was not as substantial a "federal interest" as the national-security interests in *Crosby*. JA173-174. Such judicial weighing of legislative purposes has no place in a preemption

analysis. State law must yield to inconsistent federal law no matter how "clearly within a State's acknowledged power" the state's law resides. *Free*, 369 U.S. at 666. Notwithstanding the district court's views of the importance of ensuring uniform regulation of derivatives markets, Congress's intent to bring DCMs "under a uniform set of regulations" is what governs. *Am. Agric.*, 977 F.2d at 1156.

Apart from downplaying the importance of the CFTC's exclusive jurisdiction over DCMs, the district court did not dispute that allowing 50 different states to ban contracts on DCMs would nullify Congress's decision to entrust the CFTC with discretion to determine whether these contracts are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C); *see Hughes*, 578 U.S. at 165 (state law preempted where it would "second-guess" decision of agency with exclusive jurisdiction). That is another, independent basis to find preemption.

### D. The District Court Erred In Applying A Presumption Against Preemption.

The district court relied heavily on a "presumption against preemption" and therefore required Kalshi to show that Congress's "'clear and manifest purpose'" in amending the CEA in 1974 and 2010 was to preempt state gambling laws. JA157-158 (quotation omitted). As explained above, Kalshi has made that showing, and this Court need not decide

whether a presumption applies. *See Nazarian*, 753 F.3d at 477 ("even were we to apply the presumption, we would find it overcome"). But if the Court reaches the question, the district court erred in applying the presumption, for two reasons.

*First*, the district court cited the Supreme Court's *Medtronic* decision for the assertion that the presumption applies in "all" preemption cases. JA157-158 (quotation omitted); *see Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). But, following *Medtronic*, the Supreme Court has squarely held that the presumption does *not* apply in cases like this one: Where a statute "'contains an express pre-emption clause,' [courts] do not invoke any presumption against pre-emption but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016) (quoting *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 594 (2011)). This Court agrees: "[T]he best course is simply to follow as faithfully as we can the wording of the express preemption provision, without applying a presumption one way or the other." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 762 n.1 (4th Cir. 2018).

The CEA contains an express-preemption clause giving the CFTC "exclusive jurisdiction" over the field of trading on DCMs. 7 U.S.C.

§ 2(a)(1)(A); *see Transcon. Gas*, 108 F.4th at 151-152 (an "explicit statutory conferral of exclusive jurisdiction … is a form of express preemption"). The Court's role is to interpret that statutory text without applying a presumption that would override the "best evidence of Congress' pre-emptive intent." *Franklin*, 579 U.S. at 125.

*Second,* setting aside the express-preemption clause, no presumption applies "when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000). Here, the "federal government has been vitally concerned with [derivatives] trading" for over a century. *Leist*, 638 F.2d at 322. While the district court observed that states have traditionally regulated gambling, JA158-159, states have *not* traditionally used their gambling laws to regulate trading on DCMs—at least not since the CEA's enactment in 1936.

The Supreme Court has declined to apply a presumption where, as here, state law has not traditionally applied to the specific field at issue. In *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 347-348 (2001), for example, the Supreme Court declined to apply a presumption in concluding that a federal statute preempted a state common-law fraud claim. Although providing redress to victims of fraud is a traditional state function, the theory of fraud in *Buckman* was "fraud-on-the-FDA," and "[p]olicing

61

fraud against federal agencies is hardly 'a field which the States have traditionally occupied.'" *Id.* at 347-348 (quotation omitted); *see Nazarian*, 753 F.3d at 477 (presumption "almost certainly not applicable" in similar case of pervasive federal regulation). Similarly here, regulating trading on DCMs is not a field that states have traditionally occupied, making resort to a presumption improper.

## CONCLUSION

This Court should reverse the district court's denial of preliminary injunctive relief.

Dated:  October 15, 2025

By: */s/ Neal Kumar Katyal*

Davis Campbell
MILBANK LLP
55 Hudson Yards
New York, NY 10001
(212) 530-5222
 dcampbell@milbank.com

Neal Kumar Katyal
Joshua B. Sterling
William E. Havemann
Samantha K. Ilagan
MILBANK LLP
1101 New York Ave., N.W.
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Fourth Circuit Rule 32(b) because it contains 12,992 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Georgia font 14-point type face.

Dated: October 15, 2025

By: */s/ Neal Kumar Katyal*
Neal Kumar Katyal

## CERTIFICATE OF SERVICE

I hereby certify that, on October 15, 2025, I caused the foregoing to be electronically filed with the Clerk of the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.


Dated:  October 15, 2025

By: */s/ Neal Kumar Katyal*
Neal Kumar Katyal

**ADDENDUM**

## TABLE OF CONTENTS

Addendum A ................................................................. A1

Addendum B................................................................. A5

## ADDENDUM A

### State Gambling Laws Regulating Futures Before the Commodity Exchange Act's Enactment in 1936:

#### ARKANSAS

- "[T]he buying or selling or otherwise [dealing] in what is known as futures, either in cotton, grain or anything whatsoever, with a view to profit, is hereby declared to be **gambling**." Act of March 30, 1883, 1883 Ark. Acts 29.

#### COLORADO

- "All contracts, agreements, trades or transactions of the nature described in Section 1 of this Act [on bucket shops]," including those "respecting the purchase or sale" of "commodities, not intending the actual bona fide receipt or delivery of any such … commodities, but intending a settlement of such contract or other transaction based upon the difference in such public market quotations of or such prices at which said … commodities are, or are asserted to be, bought or sold," "are hereby declared **gambling** and criminal Acts and absolutely null and void." Colo. L., ch. 57, §§ 1(c), 5 (1931).

#### ILLINOIS

- "Whoever contracts to have or give to himself or another the option to sell or buy, at a future time, any grain, or other commodity … shall be fined not less than $10 nor more than $1,000, or confined in the county jail not exceeding one year, or both; and all contracts made in violation of this section shall be considered **gambling contracts**, and shall be void." Ill. Rev. Stat. Crim. Code § 130 (1874).

#### KANSAS

- "All pretended purchases and sales or contracts and agreements for the pretended purchase and sale of the commodities aforesaid, in manner aforesaid, wherein there is, in fact, no actual purchase and sale or sale and purchase of such commodities for or on account of the party or parties thereto, are hereby declared **gambling** and criminal acts." Kan. Rev. Stat. Ann., ch. 50, § 123 (1923) (citing Kan. L., ch. 121 § 2 (1909)).

MICHIGAN

- The "pretended buying or selling of … petroleum, cotton, grain, provisions or other produce, … without any intention of receiving and paying for the property so bought or of delivering the property so sold" is "hereby declared **gambling** and [a] criminal act[]." Mich. Acts, no. 328 § 311 (1931).

MISSISSIPPI

- As "**[g]ambling [c]ontracts**," "contract[s] for the purchase or sale of a commodity of any kind, to be delivered at a future date, the parties not intending that the commodity is to be actually delivered in kind and the price paid, shall not be enforced by any court; nor shall any contract of the kind commonly called 'futures' be enforced … ." Miss. Code Ann., ch. 31, § 2034 (1927) (citing 1882 Miss. Laws 140).

MISSOURI

- "All pretended purchases and sales or contracts and agreements for the pretended purchase and sale of the commodities aforesaid, in manner aforesaid, wherein there is, in fact, no actual purchase and sale or sale and purchase of such commodities for or on account of the party or parties thereto, are hereby declared **gambling** and criminal acts." Mo. Rev. Stat. § 4318 (1929) (citing Mo. Rev. Stat. § 3566 (1919)).

NEBRASKA

- "All pretended purchases and sales or contracts and agreements for the pretended purchase and sale of the commodities aforesaid, in manner aforesaid, where there is, in fact, no actual purchase and sale or sale and purchase of such commodities for or on account of the party or parties thereto, are hereby declared **gambling** and criminal acts." Neb. Comp. Stat. § 9813 (1922) (citing Neb. Rev. Stat. § 8817 (1913)).

NEW HAMPSHIRE

- Considered a form of "**[g]ambling**," "[n]o person or corporation shall keep, or cause to be kept, an office, store, or other place in which is conducted or permitted the pretended buying or selling of … petroleum, cotton, grain, provisions, pork or other produce… without any intention of receiving and paying for the property so bought, or of

delivering the property so sold, or in which is conducted or permitted the pretended buying or selling of such property on margins, or when the party buying, or offering to buy, such property, does not intend actually to receive the same if purchased, or deliver it if sold." N. H. Pub. L., ch. 384, § 23 (1925).

## NORTH CAROLINA

- "The test of the validity of a contract for 'future' which this section requires is the 'intention not to actually deliver' the articles bought or sold for future delivery. No matter how explicit the words in any contract which may require a delivery, if in fact there is no intention to deliver, but the real understanding is that on the stipulated date the losing party shall pay to the other the difference between the market price and the contract price, this is a **gambling contract**." Ed.'s Note, N.C. Code Ann. § 2144 (1931).

## NORTH DAKOTA

- Bucket shops, considered a "place for **gaming**," are "unlawful" where they are used for "the pretended buying or selling of grain, pork, lard or any mercantile or agricultural products on margins, without any intention of future delivery." N. D. Comp. L. Ann. § 9699 (1913).

## OHIO

- It is unlawful for a person to use a building for a "'bucket shop' or grain **gambling**." Ohio Gen. Code § 6934a-5 (1902).

## PENNSYLVANIA

- "All contracts, agreements, trades, or transactions of the nature described in section one of this act [on bucket shops] are hereby declared **gambling**, and criminal acts, and absolutely null and void." Dig. Pa. Stat. L. § 2418 (1920) (citing Act of June 1, 1907).

## SOUTH DAKOTA

- Bucket shops, as a form of "**[g]ambling in [f]utures**," are unlawful where they are used for "the pretended buying or selling of grain, pork, lard or any mercantile, mining or agricultural products or corporation

stocks, on margins, without any intention of future delivery, whether such pretended contracts are to be performed within or without the state." S. D. Comp. L. § 3925 (1929).

TENNESSEE

- "[H]ereafter any sale, contract or agreement for the sale of ... grain, cotton or other produce, property, commodity, article or thing, for future delivery, where either of the contracting parties, buyer or seller, in dealing simply for the margin, or on the prospective rise or fall in the price of the article or thing sold, and where either of the said contracting parties have had no intention or purpose of making actual delivery or receiving the property or thing in specie, shall be deemed and is hereby declared **gambling**." Act of March 30, 1883, 1883 Tenn. Pub. Acts 331.

VERMONT

- As a form of "**[g]ambling**," a bucket shop is unlawful where it is used for "the pretended buying or selling of ... petroleum, cotton, grain, provisions, pork or other produce ... without any intention of receiving and paying for the property so bought, or of delivering the property so sold." Vt. Gen. L. § 7081 (1917).

## ADDENDUM B

### State Bucket-Shop Laws Regulating Futures Before the Commodity Exchange Act's Enactment in 1936:

#### ALABAMA

- "If any person, corporation, or other association of persons … shall establish or open an office or other place of business in this state for the purpose of carrying on or engaging in any business of making contracts to sell and deliver any cotton, Indian corn, wheat, rye, oats, tobacco, meal, lard, bacon, salt pork, salt fish, beef cattle, sugar, coffee, stocks, bonds, or choses … when … **it is not intended by the parties thereto that the articles or things so agreed to be sold and delivered shall be actually delivered or the value thereof paid**, but it is intended and understood by then, that money or other thing of value shall be paid to the one party by the other, … he shall be guilty of a misdemeanor." Ala. Code § 3579 (1928).

#### CALIFORNIA

- Outlawing "'[b]ucketing' or 'bucket shopping,'" which "shall mean," in relevant part, "[t]he making of or offering to make any contract respecting the purchase or sale of any securities or commodities, wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed, or settled according to or upon the basis of the public market quotations of prices made on any board of trade or exchange upon which said securities or commodities are dealt in and **without a bona fide purchase or sale of the same**." Cal. Gen. L., tit. 75, § 2 (1923).

#### COLORADO

- Outlawing bucket-shop transactions "respecting the purchase or sale … of any … commodities, … intending that such contract or other transaction shall be terminated, closed or settled according to, or upon the basis of the public market quotations of or prices made on any board of trade or exchange or market upon which such commodities … are dealt in, **and without intending a bona fide purchase or sale of the same**." Colo. L. ch. 57, § 1(a) (1931).

## CONNECTICUT

- Outlawing bucket shops, which are defined as, in relevant part, "office[s], store[s] or other place[s] wherein the proprietor or keeper thereof … shall conduct the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale or purchase and sale of any [ ] grain, provisions or other commodity … , wherein both parties thereto, or such proprietor or keeper, shall contemplate or intend that such contracts, agreements, trades or transactions shall be or may be closed, adjusted or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange upon which the commodities … referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Conn. Gen. Stat. §§ 6345-6346 (1930).

## DISTRICT OF COLUMBIA

- Outlawing "'[b]ucketing' or 'bucket-shopping,'" which "shall mean," in relevant part, "[t]he making of or offering to make any contract respecting the purchase or sale … of any … commodities wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed, or settled according to or upon the basis of the public market quotations of prices made on any board of trade or exchange upon which said … commodities are dealt in and **without a bona fide purchase or sale of the same**." D.C. Code tit. 6, §§ 158-159 (1929).

## FLORIDA

- "[D]eclaring unlawful all the transactions conducted in and through a bucket shop," which is defined "to be an office, store, or other place wherein the proprietor or keeper thereof … conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale or purchase and sale of any … cotton, grain, provisions or other commodities … wherein both parties thereto, or said proprietor or keeper contemplated or intended that the contracts, agreements, trades or transactions shall be or may be closed, adjusted, or settled according to or on the basis of the market quotations or prices made on any board of trade or exchange upon

which the commodities ... referred to in such contracts, agreements, trades or transactions are dealt in and **without a bona fide transaction on such board of trade or exchange**." Fla. Comp. L. § 7899 (1927).

## GEORGIA

- Outlawing bucket shops, which are "defined to be and mean any place of business where" persons make "any contract of sale for future delivery of cotton, grain, stocks, or other commodities, **where it is not the bona fide intention of parties that the things mentioned therein are to be delivered**, but which is to be settled according to or upon the basis of the public market quotations or prices made on any board of trade, exchange, or other similar institution, **without any actual bona fide execution and the carrying out of such contract upon the floor of such exchange, board of trade, or similar institution**, in accordance with the rules thereof." Ga. Code Ann. §§ 4264(3)-(4) (1926 Code, 1930 Supp.).
- Futures contracts are valid when they are "(1) made in accordance with the rules of any board of trade, exchange, or similar institution, and (2) actually executed on the floor of such board of trade, exchange, or similar institution, and performed or discharged according to the rules thereof, and (3) when such contracts of sale are placed with or through a regular member in good standing of a cotton exchange, grain exchange, board of trade, or similar institution, organized under the laws of the State of Georgia or any other State." *Id.* § 4264(2).

## ILLINOIS

- Outlawing "any bucket-shop, office, store or other place wherein is conducted or permitted the pretended buying or selling of ... petroleum, cotton, grain, provisions or other produce ... **without any intention of receiving and paying for the property so bought, or of delivering the property so sold**." Ill. Rev. Stat. ch. 38, §§ 317-318 (1931).

## INDIANA

- Outlawing bucket shops, which are defined, in relevant part, "to be [ ] office[s], store[s] or other place[s] wherein the proprietor or keeper thereof ... conducts the business of making, or offering to make,

contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any [ ] grain, provisions, or other commodity ... wherein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades or transactions shall be, or may be closed, adjusted or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which the commodities ... referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Act of April 10, 1907 §§ 3837-3838.

IOWA

- Outlawing bucket shops, which are defined to include "office[s], store[s], or other place[s] wherein the proprietor or keeper thereof ... conducts the business of making, or offering to make, contracts, agreements, trades, or transactions respecting the purchase or sale, or purchase and sale, of any [ ] grain, provisions, cotton, or other commodity..." "[w]herein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades, or transactions shall be, or may be closed, adjusted, or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which the commodities ... referred to in such contracts, agreements, trades, or transactions are dealt in by competitive buying and selling, and **without a bona fide transaction on such board of trade or exchange**." Iowa Code §§ 9895, 9899, 9901 (1931).

KANSAS

- Outlawing bucket shops, which are defined, in relevant part, "to be [ ] office[s], store[s] or other place[s] wherein the proprietor or keeper thereof ... conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any [ ] grain, provisions, cotton or other commodity ... wherein both parties thereto, or said proprietor or keeper, contemplate or intend that the contracts, agreements, trades or transactions shall be, or may be, closed, adjusted or settled according to or upon the basis of the market quotations or price made on any board of trade or exchange where there is competitive buying and selling, and upon which the commodities ... referred to in such

contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Kan. Rev. Stat. Ann., ch. 50, § 122 (1923) (citing Kan. L., ch. 121 § 2 (1909)).

**MAINE**

- Outlawing bucket shops, which are defined, in relevant part, "to be [ ] office[s], store[s], or other place[s] wherein the proprietor or keeper thereof … conducts the business of making, or offering to make, contracts, agreements, trades, or transactions respecting the purchase or sale of any [ ], grain, provisions, or other commodity … wherein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades, or transactions shall be, or may be closed, adjusted, or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which the commodities **…** referred to in such contracts, agreements, trades, or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Me. Rev. Stat., ch. 136, §§ 14-15 (1930).

**MASSACHUSETTS**

- Outlawing bucket shops, which are defined to include places where "[t]he making of, or offering to make, any contract respecting the purchase or sale … of any … commodities, wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange upon which said … commodities are dealt in, and **without a bona fide purchase or sale of the same**" takes place. Mass. Gen. L., ch. 271, §§ 35-36 (1921).

**MICHIGAN**

- Outlawing bucket shops, which are defined, in relevant part, "to be [ ] office[s], store[s] or other place[s] wherein the proprietor or keeper thereof … conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale of any [ ] grains, provisions or other commodity … wherein both parties thereto, or said proprietor or

keeper contemplated or intended that the contracts, agreements, trades or transactions shall be, or may be closed, adjusted or settled according to or upon the basis of the market quotations or price made on any board of trade or exchange, upon which the commodities … referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Mich. Acts, no. 328 §§ 126-128 (1931).

## MINNESOTA

- Outlawing bucket shops, which are defined, in relevant part, to be "office[s], store[s] or other place[s] wherein the proprietor or keeper thereof … conducts the business of making, or offering to make, contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any [ ] grain, provisions, or other commodity … wherein both parties thereto, or said proprietor or keeper, contemplates or intends that such contracts, agreement, trades or transactions, shall be, or may be, closed, adjusted or settled, according to, or upon the basis of the public market quotations, of prices made on any board of trade or exchange, upon which the commodities … referred to in said contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**." Minn. Stat. §§ 10488-10489 (1927).

## MISSOURI

- Outlawing bucket shops, which are defined as "place[s] wherein the person carrying on the bucket shop, then and there, either as principal or agent, pretends to buy or sell, or goes through the form of buying or selling, to or for any other person or persons, … petroleum, cotton, grain, provisions and other commodities, or any one or more of the same, at prices fixed or pretended to be fixed by trades or transactions made or offered to be made in same on boards of exchange or otherwise, but **wherein there is in fact no actual purchase and sale, or sale and purchase of such commodity for or on account of the party or parties thereto**." Mo. Rev. Stat. §§ 4316-4318 (1929) (citing Mo. Rev. Stat. § 3565 (1919)).

**NEBRASKA**

- Outlawing bucket shops, which are defined, in relevant part, to be "office[s], store[s], **board-of-trade room[s]**, or other place[s] wherein the proprietor or keeper thereof … conducts the business of making or offering to make contracts, agreements, trades or transactions respecting the purchase or purchase and sale, of any [ ] grains, provisions, cotton or other commodity … wherein said proprietor or keeper or patron contemplates or intends that the contracts, agreements, trades or transactions shall be or may be, closed, adjusted or settled according to or upon the basis of the market quotations or prices made on any board of trade or exchange where there is competitive buying and selling, and upon which the commodities … referred to in such contracts, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board-of-trade**." Neb. Comp. Stat. §§ 28-955, 28-959 (1929).

**NEW YORK**

- Outlawing bucket shops, which are defined to include places where a person "[m]ake[s] or offer[s] to make, or assist[s] in making or offering to make any contract respecting the purchase or sale … of any … commodities … intending that such contract shall be terminated, closed or settled according to, or upon the basis of the public market quotations of prices made on any board of trade or exchange upon which such commodities … are dealt in, and **without intending a bona fide purchase or sale of the same**." N. Y. Penal Law § 390 (1909).

**OHIO**

- "[I]t shall be unlawful for any corporation, association, chamber of commerce, **board of trade,** copartnership or person to keep or cause to be kept within this state any bucket shop, office or other place wherein is conducted or permitted the pretended buying or selling of … petroleum, cotton, grain, provisions or other produce … **without any intention of receiving and paying for the property so bought, or of delivering the property so sold**." Ohio Gen. Code § 6934a-1 (1902).

### OKLAHOMA

- Prohibiting bucket shops, which are "defined to be and mean any place of business wherein are made" "contract[s] of sale for the future delivery of cotton, grain, stocks or other commodities, which is to be settled according to or upon the basis of the public market quotations or prices made on any board of trade, exchange or similar institutions, upon which contracts of sale for future delivery are executed and dealt in **without any actual bonafide execution and the carrying out or discharge of such contracts upon the floor of such exchange, board of trade, or similar institution in accordance with the rules thereof**." Okla. Comp. Stat. Ann. §§ 3885-3888 (1921).
- "[A]ll contracts of sales for future delivery of cotton, grain, stocks or other commodities" that are "(1) made in accordance with the rules of any board of trade, exchange or similar institution where such contracts of sale are executed and (2) actually executed on the floor of such board of trade, exchange or similar institution and performed or discharged according to the rules thereof; and (3) when such contracts of sale are placed with or through a regular member in good standing of a cotton, exchange, grain exchange, board of trade, or similar institution organized under the laws of the State of Oklahoma or any other State shall be, and they are hereby declared to be valid and enforceable in the courts of this State according to their terms." *Id.* § 3883.

### OREGON

- Outlawing when a person, "as broker," "[m]ake[s] or offer[s] to make, or assist[s] in making or offering to make any contract respecting the purchase or sale ... of any ... commodities, intending that such contract shall be terminated, closed or settled according to, or upon the basis of the public market quotations of or prices made on any board of trade or exchange or market upon which such commodities ... are dealt in, and **without intending a bona fide purchase or sale of the same**." Ore. L., ch. 395, § 2 (1931).

### PENNSYLVANIA

- Outlawing bucket shops, which are defined to include "an office, store, or other place, wherein the proprietor or keeper thereof ... conducts the

business of making, or offering to make, contracts, agreements, trades, or transactions respecting the purchase or sale, or purchase and sale, of any [ ] grains, provisions, or other commodity ... wherein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades, or transactions shall be or may be closed, adjusted, or settled according to, or upon the basis of, the public market quotations of prices, made on any board of trade or exchange upon which the commodities ... referred to in such contracts, agreements, trades, or transactions, are dealt in, and **without a bona fide transaction on such board of trade or exchange**.” Dig. Pa. Stat. L. § 2413 (1920) (citing June 1, 1907 Act).

**RHODE ISLAND**

- Outlawing bucket-shopping, which includes “[t]he making of or offering to make any contract respecting the purchase or sale ... of any ... commodities, wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed, or settled according to or upon the basis of the public market quotations of prices made on any board of trade or exchange upon which said securities or commodities are dealt in, and **without a bona fide purchase or sale of the same**.” R. I. Gen. L., ch. 406, § 1 (1923) (citing R. I. Gen. L,, ch. 353 (1909)).

**SOUTH CAROLINA**

- Bucket shops are unlawful; “[a]ny contract of sale for future delivery of cotton, grain, stocks, or other commodities **where it is not the *bona fide* intention of parties that the things mentioned therein are to be delivered** but which is to be settled according to or upon the basis of the public market quotations or prices made on any board of trade, exchange, or other similar institution, **without any actual *bona fide* execution and the carrying out of such contract upon the floor of such exchange, board of trade, or similar institution, in accordance with the rules thereof**, shall be null and void and unenforceable in any Court of this State, and no action shall be maintainable thereon at the suit of any party.” S. C. Acts, no. 711 §§ 3-4 (1928).
- “[A]ll contracts of sale for future delivery of cotton, grain, stocks, or other commodities, (1) made in accordance with the rules of any board of trade, exchange, or similar institution, and (2) actually executed on

the floor of such board of trade, exchange or similar institution, and performed or discharged according to the rules thereof , and (3) when such contracts of sale are placed with or through a regular member in good standing of a cotton exchange, grain exchange, board of trade, or similar institution, organized under the laws of the State of South Carolina, or any other State, shall be and they hereby are declared to be valid and enforceable in the Courts of this State, according to their terms." *Id.* § 2.

## VERMONT

- As a form of "[g]ambling," a bucket shop is unlawful where it is used for "the pretended buying or selling of … petroleum, cotton, grain, provisions, pork or other produce … **without any intention of receiving and paying for the property so bought, or of delivering the property so sold**." Vt. Gen. L. § 7081 (1917).

## VIRGINIA

- Outlawing "bucket-shopping," which includes "[t]he making of, or offering to make, any contract respecting the purchase or sale … of any … commodities wherein both parties thereto intend, or such keeper intends, that such contract shall be, or may be, terminated, closed or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which said … commodities are dealt in, and **without a bona fide purchase or sale of the same**." Va. Code Ann. §§ 4714-4715 (1924).

## WASHINGTON

- Outlawing bucket shops, which are "defined to be shed[s], tent[s], tenement[s], booth[s], building[s], float[s] or vessel[s], or any part thereof, wherein may be made contracts respecting the purchase or sale … of any commodities … wherein both parties, intend that such contract shall or may be terminated, closed and settled" **(1) "[u]pon the basis of the market prices quoted or made on any board of trade or exchange upon which such commodities … may be dealt in," (2) "[w]hen the market prices for such commodities … shall reach a certain figure in any such board of trade or exchange," or (3) "[o]n the basis of the difference**

**in the market prices at which said commodities … are, or purport to be, bought and sold**.” Wash. Code § 8932 (1919).

WEST VIRGINIA

- “If any person shall carry on in this State what is commonly known as a bucket shop, or act as agent for any person, firm or corporation carrying on such business, or engage in transactions for the purchase or sale for others of grain, provisions, … or other property wherein the parties thereto or the broker intend that such transaction shall be settled according to the public market quotations on any board of trade or exchange**,** or intend that such transaction may be deemed terminated when such public market quotations shall reach a certain figure, or intend that such property shall be resold before or at the time fixed in such transaction for the delivery of such property and that the difference between the contract price and the market price thereof shall be paid or received **without the prior receipt or delivery of such property under the former sale**, he shall be guilty of a felony, and, upon conviction thereof, shall be confined in the penitentiary not less than two nor more than five years.” W. Va. Code, ch. 61, art. 10, § 18 (1930).

WISCONSIN

- Outlawing bucket shops, which are “defined to be an office, store or other place wherein the proprietor or keeper thereof … conducts the business of making, or offering to make, contracts, agreements, trades or transactions respecting the purchase or sale, or purchase and sale, of any [ ] grains, provisions or other commodity … wherein both parties thereto, or said proprietor or keeper, contemplate or intend that such contracts, agreements, trades or transactions shall be, or may be, closed, adjusted or settled according to, or upon the basis of, the public market quotations of prices made on any board of trade or exchange, upon which the commodities … referred to in such contract, agreements, trades or transactions are dealt in, and **without a bona fide transaction on such board of trade or exchange**.” Wis. Stat. §§ 348.175-348.178 (1929).

**WYOMING**

- It is "unlawful for any corporation, association, co-partnership or person to keep or cause to be kept within this state any bucket-shop, office, store or other place wherein is conducted or permitted the pretended buying or selling of the shares of stocks or bonds of any corporation, or petroleum ... **without any intention of receiving and paying for the property so bought, or of delivering the property so sold** or wherein is conducted or permitted the pretended buying or selling of such property on margins." Wyo. Rev. Stat. Ann. § 32-924 (1931).