No. 25-1892

IN THE

# United States Court of Appeals for the Fourth Circuit

KALSHIEX LLC,

*Plaintiff-Appellant,*

v.

JOHN A. MARTIN, *et al.*,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the District of Maryland
No. 1:25-cv-01283 (Abelson, J.)

## JOINT APPENDIX

ERIK J. DELFOSSE
ASSISTANT ATTORNEY GENERAL
MARYLAND LOTTERY AND GAMING
CONTROL AGENCY
1800 Washington Blvd., Ste. 330
Baltimore, MD 21230
(410) 230-8726
erik.delfosse@maryland.gov

MAX F. BRAUER
ASSISTANT ATTORNEY GENERAL
SECURITIES DIVISION
200 Saint Paul Place, 25th Fl.
Baltimore, MD 21202
(410) 576-6950
mbrauer@oag.state.md.us

*Counsel for Defendants-Appellees*

NEAL KUMAR KATYAL
JOSHUA B. STERLING
WILLIAM E. HAVEMANN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave, N.W.
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com

DAVIS CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001
(212) 530-5222
dcampbell@milbank.com

*Counsel for Plaintiff-Appellant*

October 15, 2025

JOINT APPENDIX

**Page**

Docket Report for *KalshiEX LLC v. Martin*, No. 1:25-cv-01283
(D. Md.)..................................................................JA001

Plaintiff's Complaint, ECF No. 1.............................................JA032

Affidavit of Xavier Sottile, ECF No. 2-1....................................JA051

Exhibit 1 to Plaintiff's Preliminary-Injunction Motion (Letter
from Maryland Lottery & Gaming Control Commission),
ECF No. 2-2............................................................JA064

Exhibit 1 to Defendants' Response to Plaintiff's
Preliminary-Injunction Motion (Kalshi's Fee Schedule),
ECF No. 26-1..........................................................JA067

Exhibit 2 to Defendants' Response to Plaintiff's
Preliminary-Injunction Motion (Kalshi Article),
ECF No. 26-2 .........................................................JA074

Exhibit 3 to Defendants' Response to Plaintiff's
Preliminary-Injunction Motion (Affidavit of Michael Eaton),
ECF No. 26-3 .........................................................JA086

Exhibit 4 to Defendants' Response to Plaintiff's
Preliminary-Injunction Motion (Affidavit of John Martin),
ECF No. 26-4 .........................................................JA096

Exhibit 5 to Defendants' Response to Plaintiff's
Preliminary-Injunction Motion (Affidavit of J. Philip Metz, Jr.),
ECF No. 26-5..........................................................JA102

Exhibit 6 to Defendants' Response to Plaintiff's
Preliminary-Injunction Motion LLC (Kalshi Notification of
Initial Listing), ECF No. 26-6..........................................JA106

Exhibit 1 to Defendants' Supplemental Brief
(Preliminary-Injunction Hearing Transcript Excerpt
[Pages 15, 20, 21]), ECF No. 37-1 .....................................JA116

i

Exhibit 2 to Defendants' Supplemental Brief
(Preliminary-Injunction Hearing Transcript Excerpt
[Pages 3-6, 22-24, 31-32, 34-35, 55, 69, 72]), ECF No. 37-2 ............JA120

Preliminary-Injunction Hearing Transcript Excerpt
[Pages 51 through 62] ......................................................................... JA135

Opinion Denying Plaintiff's Preliminary-Injunction Motion,
ECF No. 70 ......................................................................................JA148

Order Denying Plaintiff's Preliminary-Injunction Motion,
ECF No. 71......................................................................................JA178

Plaintiff's Notice of Appeal, ECF No. 72 ................................................ JA179

APPEAL,STAYED

# U.S. District Court
## District of Maryland (Baltimore)
## CIVIL DOCKET FOR CASE #: 1:25–cv–01283–ABA

Kalshiex LLC v. Martin et al
Assigned to: Judge Adam B Abelson
Case in other court:      Fourth Circuit Court of Appeals,
                      25–01892
Cause: 7:1 Commodity Exchange Act

Date Filed: 04/21/2025
Jury Demand: None
Nature of Suit: 950 Constitutional – State
Statute
Jurisdiction: Federal Question

**Plaintiff**

| | | |
|---|---|---|
| **Kalshiex LLC** | represented by | **Joshua B. Sterling**<br>Milbank LLP<br>1101 New York Avenue, NW<br>Washington, DC 20005<br>202–835–7535<br>Email: jsterling@milbank.com<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **Mackenzie Austin**<br>Milbank LLP<br>2029 Century Park East<br>Ste 33rd Floor<br>Los Angeles, CA 90067<br>424–386–4225<br>Email: maustin@milbank.com<br>*TERMINATED: 06/09/2025*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |
| | | **William Ernest Havemann**<br>Milbank LLP<br>1101 New York Avenue, NW<br>Washington, DC 20005<br>202–835–7518<br>Email: whavemann@milbank.com<br>*ATTORNEY TO BE NOTICED* |
| | | **Neal Kumar Katyal**<br>Milbank LLP<br>1101 New York Avenue, NW<br>Washington, DC 20005<br>202–835–7505<br>Email: nkatyal@milbank.com<br>*ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **John A. Martin**<br>*in his official capacity as Secretary of the Maryland Lottery and Gaming Control Commission and Director of the Maryland Lottery and Gaming Control Agency* | represented by | **Erik James Delfosse**<br>Office of the Attorney General<br>1800 Washington Blvd., Ste 330<br>Baltimore, MD 21230<br>4102308726<br>Email: erik.delfosse@maryland.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Alan P Goodwich**<br>1800 Washington Blvd. Suite 330 |

**JA1**

Baltimore, MD 21230
410–230–8796
Email: alan.goodwich1@maryland.gov
*ATTORNEY TO BE NOTICED*

**Max F Brauer**
Office of the Attorney General– State of
Maryland
Securities Division
200 St. Paul Pl
Ste 25th Floor
Baltimore, MD 21202
410–576–6950
Email: mbrauer@oag.state.md.us
*ATTORNEY TO BE NOTICED*

**Defendant**

**Maryland Lottery and Gaming Control Agency**

represented by **Erik James Delfosse**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alan P Goodwich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Max F Brauer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Michael Eaton**
*n his official capacity as Managing Director of Gaming for the Maryland Lottery and Gaming Control Agency*

represented by **Erik James Delfosse**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alan P Goodwich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Max F Brauer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Everett D Browning, Sr**
*in his official capacity as Chair of the Maryland Lottery and Gaming Control Commission*

represented by **Erik James Delfosse**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alan P Goodwich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Max F Brauer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**E. Randolph Marriner**
*in his official capacity as Vice Chair of the Maryland Lottery and Gaming*

represented by **Erik James Delfosse**
(See above for address)
*LEAD ATTORNEY*

**JA2**

*Control Commission*

*ATTORNEY TO BE NOTICED*

**Alan P Goodwich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Max F Brauer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ade Adebisi**
*n h is official capacity as Commissioner of the Maryland Lottery and Gaming Control Commission*

represented by **Erik James Delfosse**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alan P Goodwich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Max F Brauer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Diane Croghan**
*in her official capacity as Commissioner of the Maryland Lottery and Gaming Control Commission*

represented by **Erik James Delfosse**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alan P Goodwich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Max F Brauer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**George L Doetsch, Jr**
*in his official capacity as Commissioner of the Maryland Lottery and Gaming Control Commission*

represented by **Erik James Delfosse**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alan P Goodwich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Max F Brauer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Harold E Hodges**
*in h is official capacity as Commissioner of the Maryland Lottery and Gaming Control Commission*

represented by **Erik James Delfosse**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alan P Goodwich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JA3**

**Max F Brauer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**James J. Stakem**
*in his official capacity as Commissioner
of the Maryland Lottery and Gaming
Control Commission*

represented by **Erik James Delfosse**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alan P Goodwich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Max F Brauer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Maryland Lottery and Gaming
Control Commission**

represented by **Erik James Delfosse**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alan P Goodwich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Max F Brauer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Anthony G. Brown**
*in his official capacity as Attorney
General for the State of Maryland*

represented by **Erik James Delfosse**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alan P Goodwich**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Max F Brauer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Indian Gaming Association**

represented by **Bryan Newland**
Powers Pyles Sutter & Verville PC
1250 Connecticut Avenue, NW
Suite 800
Washington, DC 20036
517–862–5570
Email: bryan.newland@powerslaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
Hobbs Straus Dean & Walker LLP
1899 L Street NW
Suite 1200
Washington, DC 20036

**JA4**

434–996–0802
Email: ebower@hobbsstraus.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
Hobbs, Straus, Dean & Walker LLP
1899 L Street, NW
Ste 1200
Washington, DC 20036
202–822–8282
Fax: 202–296–8834
Email: jwebster@hobbsstraus.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
Yuhaaviatam of San Manuel Nation
422 1st St. SE
Washington, DC 20003
9099369684
Email: michael.hoenig@sanmanuel–nsn.gov
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
Powers Pyles Sutter & Verville PC
1250 Connecticut Avenue NW
Ste 8th Floor
Washington, DC 20036
202–466–6550
Fax: 202–785–1756
Email: ron.connelly@powerslaw.com
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
Crowell Law Office–Tribal Advocacy
Group
1487 W SR 89A Ste 8
Sedona, AZ 86336
4258025369
Fax: 5092355017
Email: scottcrowell@clotag.net
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**National Congress of American**          represented by  **Bryan Newland**
**Indians**                                                (See above for address)
                                                           *PRO HAC VICE*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Elizabeth A. Bower**
                                                           (See above for address)
                                                           *PRO HAC VICE*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Joseph H. Webster**
                                                           (See above for address)
                                                           *PRO HAC VICE*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Michael C. Hoenig**
                                                           (See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**California Nations Indian Gaming Association**

represented by **Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Arizona Indian Gaming Association**

represented by **Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Oklahoma Indian Gaming Association**          represented by   **Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**United South and Eastern Tribes**          represented by   **Bryan Newland**
**Sovereignty Protection Fund**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Tribal Alliance of Sovereign Indian Nations**

represented by

**Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Blue Lake Rancheria**

represented by

**Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JA8**

**<u>Amicus</u>**

| | | |
|---|---|---|
| **Chicken Ranch Rancheria of Me–Wuk Indians of California** | represented by | **Bryan Newland** |

**Chicken Ranch Rancheria of Me–Wuk Indians of California**

represented by

**Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**<u>Amicus</u>**

**Elk Valley Rancheria**

represented by

**Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**<u>Amicus</u>**

represented by

**JA9**

**Enterprise Rancheria of Maidu Indians of California**

**Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Guidiville Rancheria of California**          represented by   **Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Ho−Chunk Nation of Wisconsin**          represented by   **Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JA10**

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Jamul Indian Village of California**        represented by   **Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Kalispel Tribe of Indians**        represented by   **Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*

**JA11**

*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Karuk Tribe**                    represented by  **Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Klamath Tribes**                    represented by  **Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)

**JA12**

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Lytton Rancheria of California**          represented by    **Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Middletown Rancheria of Pomo Indians of California**          represented by    **Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**

**JA13**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Morongo Band of Mission Indians**         represented by  **Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Pechanga Band of Indians**         represented by  **Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JA14**

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Penobscot Nation**                    represented by  **Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Picayune Rancheria of Chukchansi**      represented by  **Bryan Newland**
**Indians of California**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JA15**

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Pueblo of Acoma**                    represented by  **Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Amicus**</u>

**Puyallup Tribe**                     represented by  **Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**JA16**

**Amicus**

**Redding Rancheria**                    represented by **Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Rincon Band of Luiseo Mission**        represented by **Bryan Newland**
**Indians**                                              (See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**                               represented by

**JA17**

**Santa Ynez Band of Chumash Mission Indians**

**Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Seminole Tribe of Florida**                represented by **Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Shoalwater Bay Indian Tribe**              represented by **Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Suquamish Indian Tribe of the Port**        represented by   **Bryan Newland**
**Madison Reservation**                                         (See above for address)
                                                                *PRO HAC VICE*
                                                                *ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>Amicus</u>

**Table Mountain Rancheria**        represented by   **Bryan Newland**
                                                     (See above for address)
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*

**JA19**

*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**White Earth Nation**                     represented by  **Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Yuhaaviatam of San Manuel Nation**       represented by  **Bryan Newland**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth A. Bower**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph H. Webster**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael C. Hoenig**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ronald Shreve Connelly**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott David Crowell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/21/2025 | 1 | COMPLAINT *for Permanent Injunction and Declaratory Relief* against Ade Adebisi, Anthony G. Brown, Everett D Browning, Sr, Diane Croghan, George L Doetsch, Jr, Michael Eaton, Harold E Hodges, E. Randolph Marriner, John A. Martin, Maryland Lottery and Gaming Control Agency, Maryland Lottery and Gaming Control Commission, James J. Stakem ( Filing fee $ 405 receipt number AMDDC−11922786.), filed by Kalshiex LLC. (Attachments: # 1 Exhibit 1 −− April 7, 2025 Letter from Maryland Lottery & Gaming Control Commission, # 2 Exhibit 2 −− April 21, 2025 Email Exchange, # 3 Civil Cover Sheet, # 4 Summons Combined)(Katyal, Neal) (Additional attachment(s) added on 4/22/2025: # 5 Flattened Civil Cover Sheet) (ols). (Entered: 04/21/2025) |
| 04/21/2025 | 2 | MOTION for Temporary Restraining Order *and Preliminary Injunction* by Kalshiex LLC (Attachments: # 1 Affidavit of Xavier Sottile, # 2 Exhibit 1 −− April 7, 2025 Letter from Maryland Lottery & Gaming Control Commission, # 3 Exhibit 2 −− April 21, 2025 Email Exchange)(Katyal, Neal) (Entered: 04/21/2025) |
| 04/21/2025 | | Case Reassigned to Judge Julie Rebecca Rubin. Judge Ellen Lipton Hollander no longer assigned to the case. (kns, Deputy Clerk) (Entered: 04/21/2025) |
| 04/21/2025 | 3 | MOTION to Appear Pro Hac Vice for Mackenzie Austin (Filing fee $100, receipt number AMDDC−11922848.) by Kalshiex LLC(Katyal, Neal) (Entered: 04/21/2025) |
| 04/21/2025 | 4 | NOTICE of Appearance by William Ernest Havemann on behalf of Kalshiex LLC (Havemann, William) (Entered: 04/21/2025) |
| 04/21/2025 | 5 | MOTION to Appear Pro Hac Vice for Joshua B. Sterling (Filing fee $100, receipt number AMDDC−11922855.) by Kalshiex LLC(Katyal, Neal) (Entered: 04/21/2025) |
| 04/21/2025 | 6 | Local Rule 103.3 Disclosure Statement by Kalshiex LLC identifying Corporate Parent Kalshi, Incorporated for Kalshiex LLC.(Katyal, Neal) (Entered: 04/21/2025) |
| 04/22/2025 | 7 | INFORMATIONAL QC NOTICE: 1 Complaint, filed by Kalshiex LLC was filed incorrectly. *∗∗Not all pdf documents were flattened prior to filing. All pdfs uploaded to CM/ECF MUST BE FLATTENED for all future filings. Failure to comply may result in rejected filings and delays in case processing.* *∗∗This filing has been corrected by court staff and no further corrective action is required. Please ensure all future documents are flattened prior to uploading to CM/ECF using the following steps: Select File −−> Print −−> Adobe PDF or Microsoft Print to PDF.* (ols, Deputy Clerk) (Entered: 04/22/2025) |
| 04/22/2025 | 8 | Summons Issued 21 days as to Ade Adebisi, Anthony G. Brown, Everett D Browning, Sr, Diane Croghan, George L Doetsch, Jr, Michael Eaton, Harold E Hodges, E. Randolph Marriner, John A. Martin, Maryland Lottery and Gaming Control Agency, Maryland Lottery and Gaming Control Commission, James J. Stakem. (ols, Deputy Clerk) (Entered: 04/22/2025) |

| | | |
|---|---|---|
| 04/22/2025 | 9 | INFORMATIONAL QC NOTICE: 1 Complaint,, filed by Kalshiex LLC was filed incorrectly. *Your document has been accepted as filed. No corrective action is required in regard to this filing.* \*\**Pursuant to Local Rule 102, the original complaint caption "shall contain the names and addresses of all parties and the county of residence of any Maryland party".* (ols, Deputy Clerk) (Entered: 04/22/2025) |
| 04/22/2025 | 10 | QC NOTICE: 2 Motion for TRO, filed by Kalshiex LLC was filed incorrectly. \*\**The following attachments or exhibits are missing – Proposed Order. To correct this problem, file Proposed Order using the event Notice (Other) and link Proposed Order to 2* . (ols, Deputy Clerk) (Entered: 04/22/2025) |
| 04/22/2025 | 11 | QC NOTICE: 3 Motion to Appear Pro Hac Vice filed by Kalshiex LLC needs to be modified. See attachment for details and corrective actions needed regarding the signature(s) on the motion. (mh4s, Deputy Clerk) (Entered: 04/22/2025) |
| 04/22/2025 | 12 | QC NOTICE: 5 Motion to Appear Pro Hac Vice filed by Kalshiex LLC needs to be modified. See attachment for details and corrective actions needed regarding the signature(s) on the motion. (mh4s, Deputy Clerk) (Entered: 04/22/2025) |
| 04/22/2025 | | Case Reassigned to Judge Adam B Abelson. Judge Julie Rebecca Rubin no longer assigned to the case. (kns, Deputy Clerk) (Entered: 04/22/2025) |
| 04/22/2025 | 13 | ORDER Scheduling a Status Teleconference. Signed by Judge Adam B Abelson on 4/22/2025. (ols, Deputy Clerk) (Entered: 04/22/2025) |
| 04/22/2025 | 14 | NOTICE by Kalshiex LLC re 13 Order, 2 MOTION for Temporary Restraining Order *and Preliminary Injunction,* 1 Complaint,, *Notice of Filing Declaration in Compliance With Court Order of April 22, 2025* (Attachments: # 1 Exhibit 1 –– Email Notice of Plaintiff's Intent to File, # 2 Exhibit 2 –– Email Service of Filings, # 3 Exhibit 3 –– Email Service of Court's April 22 Order)(Havemann, William) (Entered: 04/22/2025) |
| 04/22/2025 | 15 | CORRECTED MOTION to Appear Pro Hac Vice for Joshua B. Sterling by Kalshiex LLC. The fee has already been paid.(Katyal, Neal) (Entered: 04/22/2025) |
| 04/22/2025 | 16 | CORRECTED MOTION to Appear Pro Hac Vice for Mackenzie Austin by Kalshiex LLC. The fee has already been paid.(Katyal, Neal) (Entered: 04/22/2025) |
| 04/22/2025 | 17 | NOTICE by Kalshiex LLC re 2 MOTION for Temporary Restraining Order *and Preliminary Injunction –– [PROPOSED] Order Granting Plaintiffs Motion for Temporary Restraining Order* (Katyal, Neal) (Entered: 04/22/2025) |
| 04/23/2025 | 18 | Telephone Status Conference held via WebEx on 4/23/2025 before Judge Adam B Abelson.(FTR: C. Barnickel–Courtroom 7D.) (cb5s, Deputy Clerk) (Entered: 04/23/2025) |
| 04/23/2025 | 19 | PAPERLESS ORDER granting 15 Corrected Motion to Appear Pro Hac Vice on behalf of Joshua B. Sterling. Directing attorney Joshua B. Sterling to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 4/23/2025. (mh4s, Deputy Clerk) (Entered: 04/23/2025) |
| 04/23/2025 | 20 | PAPERLESS ORDER granting 16 Corrected Motion to Appear Pro Hac Vice on behalf of Mackenzie Austin. Directing attorney Mackenzie Austin to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 4/23/2025. (mh4s, Deputy Clerk) (Entered: 04/23/2025) |
| 04/24/2025 | 21 | STIPULATION *Joint Stipulation Regarding Briefing Plaintiff's Motion for Preliminary Injunction* by Kalshiex LLC(Havemann, William) (Entered: 04/24/2025) |
| 04/24/2025 | 22 | ORDER Setting a Briefing Schedule for the pending Motion for Preliminary Injunction and Scheduling an In–Person Hearing. Signed by Judge Adam B Abelson on 4/24/2025. (ols, Deputy Clerk) (Entered: 04/24/2025) |
| 04/25/2025 | 23 | NOTICE of Appearance by Erik James Delfosse on behalf of All Defendants (Delfosse, Erik) (Entered: 04/25/2025) |

| | | |
|---|---|---|
| 05/01/2025 | 24 | PAPERLESS ORDER: The hearing for the motion for preliminary injunction will now be held on May 28, 2025 at 10:00 A.M. in Courtroom 7D of the Baltimore courthouse. Signed by Judge Adam B Abelson on 5/1/2025. (sp6s, Chambers) (Entered: 05/01/2025) |
| 05/09/2025 | 25 | NOTICE of Appearance by Max F Brauer on behalf of All Defendants (Brauer, Max) (Entered: 05/09/2025) |
| 05/09/2025 | 26 | –FILED IN ERROR– RESPONSE to Motion re 2 MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Ade Adebisi, Anthony G. Brown, Everett D Browning, Sr, Diane Croghan, George L Doetsch, Sr, Michael Eaton, Harold E Hodges, E. Randolph Marriner, John A. Martin, Maryland Lottery and Gaming Control Agency, Maryland Lottery and Gaming Control Commission, James J. Stakem. (Attachments: # 1 Exhibit Fee Schedule, # 2 Exhibit Article, # 3 Exhibit Affidavit of M. Eaton, # 4 Exhibit Affidavit of J. Martin, # 5 Exhibit Affidavit of P. Metz, # 6 Exhibit Reg 40.11(a)(1) Filing, # 7 Text of Proposed Order Proposed Order)(Delfosse, Erik) Modified on 5/12/2025 (ols). (Entered: 05/09/2025) |
| 05/12/2025 | 27 | QC NOTICE: 26 Response to Motion,, filed by George L Doetsch, Jr, E. Randolph Marriner, Maryland Lottery and Gaming Control Commission, Ade Adebisi, John A. Martin, Maryland Lottery and Gaming Control Agency, James J. Stakem, Harold E Hodges, Diane Croghan, Michael Eaton, Everett D Browning, Sr, Anthony G. Brown was filed incorrectly. **Incorrect event used. Please refile using Responses and Replies > Response in Opposition to Motion. It has been noted as FILED IN ERROR, and the document link has been disabled.* (ols, Deputy Clerk) (Entered: 05/12/2025) |
| 05/12/2025 | 28 | RESPONSE in Opposition re 2 MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Ade Adebisi, Anthony G. Brown, Everett D Browning, Sr, Diane Croghan, George L Doetsch, Jr, Michael Eaton, Harold E Hodges, E. Randolph Marriner, John A. Martin, Maryland Lottery and Gaming Control Agency, Maryland Lottery and Gaming Control Commission, James J. Stakem. (Attachments: # 1 Exhibit Kalshi Fee Schedule, # 2 Exhibit Article, "Ten Times Kalshi Said People Could Bet on Things", # 3 Exhibit Affidavit of Michael Eaton, # 4 Exhibit Affidavit of John Martin, # 5 Exhibit Affidavit of Phil Metz, # 6 Exhibit Kalshi Submission to CTFC, # 7 Text of Proposed Order Proposed Order)(Delfosse, Erik) (Entered: 05/12/2025) |
| 05/19/2025 | 29 | REPLY to Response to Motion re 2 MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Kalshiex LLC.(Katyal, Neal) (Entered: 05/19/2025) |
| 05/28/2025 | 30 | Motion Hearing held on 5/28/2025 re 2 MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Kalshiex LLC before Judge Adam B Abelson. (Russell Carrick – Courtroom 7D)(Court Reporter: Nadine Bachmann) (rc2s, Deputy Clerk) (Entered: 05/28/2025) |
| 05/31/2025 | 31 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 05/28/2025, before Judge Abelson. Court Reporter N. Bachmann, Telephone number 410–962–4753 nadine_bachmann@mdd.uscourts.gov. Total number of pages filed: 95. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 6/23/2025. Redacted Transcript Deadline set for 7/1/2025. Release of Transcript Restriction set for 8/29/2025.(ng, Court Reporter) (Entered: 05/31/2025) |
| 06/02/2025 | 32 | STATUS REPORT *Joint Status Report* by Ade Adebisi, Anthony G. Brown, Everett D Browning, Sr, Diane Croghan, George L Doetsch, Jr, Michael Eaton, Harold E Hodges(Delfosse, Erik) (Entered: 06/02/2025) |
| 06/05/2025 | 33 | ORDER re: Supplemental Briefing on 2 Plaintiff's Motion for a Temporary Restraining Order and/or Preliminary Injunction. Signed by Judge Adam B Abelson on 6/5/2025. (ols, Deputy Clerk) (Entered: 06/05/2025) |
| 06/06/2025 | 34 | MOTION to Withdraw as Attorney by Kalshiex LLC(Austin, Mackenzie) (Entered: 06/06/2025) |
| 06/09/2025 | 35 | ORDER granting 34 Motion to Withdraw as Attorney. Attorney Mackenzie Austin terminated. Signed by Judge Adam B Abelson on 6/9/2025. (ols, Deputy Clerk) |

| | | (Entered: 06/10/2025) |
|---|---|---|
| 06/13/2025 | 36 | Memorandum re 2 MOTION for Temporary Restraining Order *and Preliminary Injunction (Supplemental Brief)* filed by Kalshiex LLC. (Attachments: # 1 Declaration of Neal Katyal in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C)(Katyal, Neal) (Entered: 06/13/2025) |
| 06/13/2025 | 37 | Memorandum re 2 MOTION for Temporary Restraining Order *and Preliminary Injunction Supplemental Opposition* filed by Ade Adebisi, Anthony G. Brown, Everett D Browning, Sr, Diane Croghan, George L Doetsch, Jr, Michael Eaton, Harold E Hodges, E. Randolph Marriner, John A. Martin, Maryland Lottery and Gaming Control Agency, Maryland Lottery and Gaming Control Commission, James J. Stakem. (Attachments: # 1 Exhibit May 30, 2024 Transcript Excerpt, # 2 Exhibit May 28, 2025 Transcript Excerpt)(Delfosse, Erik) (Entered: 06/13/2025) |
| 06/23/2025 | 38 | NOTICE of Appearance by Ronald Shreve Connelly on behalf of Indian Gaming Association, National Congress of American Indians, California Nations Indian Gaming Association, Arizona Indian Gaming Association, Oklahoma Indian Gaming Association, United South and Eastern Tribes Sovereignty Protection Fund, Tribal Alliance of Sovereign Indian Nations, Blue Lake Rancheria, Chicken Ranch Rancheria of Me–Wuk Indians of California, Elk Valley Rancheria, Enterprise Rancheria of Maidu Indians of California, Guidiville Rancheria of California, Ho–Chunk Nation of Wisconsin, Jamul Indian Village of California, Kalispel Tribe of Indians, Karuk Tribe, Klamath Tribes, Lytton Rancheria of California, Middletown Rancheria of Pomo Indians of California, Morongo Band of Mission Indians, Pechanga Band of Indians, Penobscot Nation, Picayune Rancheria of Chukchansi Indians of California, Pueblo of Acoma, Puyallup Tribe, Redding Rancheria, Rincon Band of Luiseo Mission Indians, Santa Ynez Band of Chumash Mission Indians, Seminole Tribe of Florida, Shoalwater Bay Indian Tribe, Suquamish Indian Tribe of the Port Madison Reservation, Table Mountain Rancheria, White Earth Nation, Yuhaaviatam of San Manuel Nation (Connelly, Ronald) (Entered: 06/23/2025) |
| 06/23/2025 | 39 | MOTION for Leave to File *Amicus Brief* by Arizona Indian Gaming Association, Blue Lake Rancheria, California Nations Indian Gaming Association, Chicken Ranch Rancheria of Me–Wuk Indians of California, Elk Valley Rancheria, Enterprise Rancheria of Maidu Indians of California, Guidiville Rancheria of California, Ho–Chunk Nation of Wisconsin, Indian Gaming Association, Jamul Indian Village of California, Kalispel Tribe of Indians, Karuk Tribe, Klamath Tribes, Lytton Rancheria of California, Middletown Rancheria of Pomo Indians of California, Morongo Band of Mission Indians, National Congress of American Indians, Oklahoma Indian Gaming Association, Pechanga Band of Indians, Penobscot Nation, Picayune Rancheria of Chukchansi Indians of California, Pueblo of Acoma, Puyallup Tribe, Redding Rancheria, Rincon Band of Luiseo Mission Indians, Santa Ynez Band of Chumash Mission Indians, Seminole Tribe of Florida, Shoalwater Bay Indian Tribe, Suquamish Indian Tribe of the Port Madison Reservation, Table Mountain Rancheria, Tribal Alliance of Sovereign Indian Nations, United South and Eastern Tribes Sovereignty Protection Fund, White Earth Nation, Yuhaaviatam of San Manuel Nation (Attachments: # 1 Attachment Proposed Amicus Brief)(Connelly, Ronald) (Entered: 06/23/2025) |
| 06/23/2025 | 40 | Local Rule 103.3 Disclosure Statement by Arizona Indian Gaming Association, Blue Lake Rancheria, California Nations Indian Gaming Association, Chicken Ranch Rancheria of Me–Wuk Indians of California, Elk Valley Rancheria, Enterprise Rancheria of Maidu Indians of California, Guidiville Rancheria of California, Ho–Chunk Nation of Wisconsin, Indian Gaming Association, Jamul Indian Village of California, Kalispel Tribe of Indians, Karuk Tribe, Klamath Tribes, Lytton Rancheria of California, Middletown Rancheria of Pomo Indians of California, Morongo Band of Mission Indians, National Congress of American Indians, Oklahoma Indian Gaming Association, Pechanga Band of Indians, Penobscot Nation, Picayune Rancheria of Chukchansi Indians of California, Pueblo of Acoma, Puyallup Tribe, Redding Rancheria, Rincon Band of Luiseo Mission Indians, Santa Ynez Band of Chumash Mission Indians, Seminole Tribe of Florida, Shoalwater Bay Indian Tribe, Suquamish Indian Tribe of the Port Madison Reservation, Table Mountain Rancheria, Tribal Alliance of Sovereign Indian Nations, United South and Eastern Tribes Sovereignty Protection Fund, White Earth Nation, Yuhaaviatam of San Manuel Nation (Connelly, Ronald) (Entered: 06/23/2025) |

| 06/23/2025 | 41 | MOTION to Appear Pro Hac Vice for Elizabeth A. Bower (Filing fee $100, receipt number AMDDC−12058969.) by Arizona Indian Gaming Association, Blue Lake Rancheria, California Nations Indian Gaming Association, Chicken Ranch Rancheria of Me−Wuk Indians of California, Elk Valley Rancheria, Enterprise Rancheria of Maidu Indians of California, Guidiville Rancheria of California, Ho−Chunk Nation of Wisconsin, Indian Gaming Association, Jamul Indian Village of California, Kalispel Tribe of Indians, Karuk Tribe, Klamath Tribes, Lytton Rancheria of California, Middletown Rancheria of Pomo Indians of California, Morongo Band of Mission Indians, National Congress of American Indians, Oklahoma Indian Gaming Association, Pechanga Band of Indians, Penobscot Nation, Picayune Rancheria of Chukchansi Indians of California, Pueblo of Acoma, Puyallup Tribe, Redding Rancheria, Rincon Band of Luiseo Mission Indians, Santa Ynez Band of Chumash Mission Indians, Seminole Tribe of Florida, Shoalwater Bay Indian Tribe, Suquamish Indian Tribe of the Port Madison Reservation, Table Mountain Rancheria, Tribal Alliance of Sovereign Indian Nations, United South and Eastern Tribes Sovereignty Protection Fund, White Earth Nation, Yuhaaviatam of San Manuel Nation(Connelly, Ronald) (Entered: 06/23/2025) |
| 06/23/2025 | 42 | MOTION to Appear Pro Hac Vice for Scott David Crowell (Filing fee $100, receipt number AMDDC−12059015.) by Arizona Indian Gaming Association, Blue Lake Rancheria, California Nations Indian Gaming Association, Chicken Ranch Rancheria of Me−Wuk Indians of California, Elk Valley Rancheria, Enterprise Rancheria of Maidu Indians of California, Guidiville Rancheria of California, Ho−Chunk Nation of Wisconsin, Indian Gaming Association, Jamul Indian Village of California, Kalispel Tribe of Indians, Karuk Tribe, Klamath Tribes, Lytton Rancheria of California, Middletown Rancheria of Pomo Indians of California, Morongo Band of Mission Indians, National Congress of American Indians, Oklahoma Indian Gaming Association, Pechanga Band of Indians, Penobscot Nation, Picayune Rancheria of Chukchansi Indians of California, Pueblo of Acoma, Puyallup Tribe, Redding Rancheria, Rincon Band of Luiseo Mission Indians, Santa Ynez Band of Chumash Mission Indians, Seminole Tribe of Florida, Shoalwater Bay Indian Tribe, Suquamish Indian Tribe of the Port Madison Reservation, Table Mountain Rancheria, Tribal Alliance of Sovereign Indian Nations, United South and Eastern Tribes Sovereignty Protection Fund, White Earth Nation, Yuhaaviatam of San Manuel Nation(Connelly, Ronald) (Entered: 06/23/2025) |
| 06/23/2025 | 43 | MOTION to Appear Pro Hac Vice for Bryan Newland (Filing fee $100, receipt number AMDDC−12059054.) by Arizona Indian Gaming Association, Blue Lake Rancheria, California Nations Indian Gaming Association, Chicken Ranch Rancheria of Me−Wuk Indians of California, Elk Valley Rancheria, Enterprise Rancheria of Maidu Indians of California, Guidiville Rancheria of California, Ho−Chunk Nation of Wisconsin, Indian Gaming Association, Jamul Indian Village of California, Kalispel Tribe of Indians, Karuk Tribe, Klamath Tribes, Lytton Rancheria of California, Middletown Rancheria of Pomo Indians of California, Morongo Band of Mission Indians, National Congress of American Indians, Oklahoma Indian Gaming Association, Pechanga Band of Indians, Penobscot Nation, Picayune Rancheria of Chukchansi Indians of California, Pueblo of Acoma, Puyallup Tribe, Redding Rancheria, Rincon Band of Luiseo Mission Indians, Santa Ynez Band of Chumash Mission Indians, Seminole Tribe of Florida, Shoalwater Bay Indian Tribe, Suquamish Indian Tribe of the Port Madison Reservation, Table Mountain Rancheria, Tribal Alliance of Sovereign Indian Nations, United South and Eastern Tribes Sovereignty Protection Fund, White Earth Nation, Yuhaaviatam of San Manuel Nation(Connelly, Ronald) (Entered: 06/23/2025) |
| 06/23/2025 | 44 | MOTION to Appear Pro Hac Vice for Joseph H. Webster (Filing fee $100, receipt number AMDDC−12059073.) by Arizona Indian Gaming Association, Blue Lake Rancheria, California Nations Indian Gaming Association, Chicken Ranch Rancheria of Me−Wuk Indians of California, Elk Valley Rancheria, Enterprise Rancheria of Maidu Indians of California, Guidiville Rancheria of California, Ho−Chunk Nation of Wisconsin, Indian Gaming Association, Jamul Indian Village of California, Kalispel Tribe of Indians, Karuk Tribe, Klamath Tribes, Lytton Rancheria of California, Middletown Rancheria of Pomo Indians of California, Morongo Band of Mission Indians, National Congress of American Indians, Oklahoma Indian Gaming Association, Pechanga Band of Indians, Penobscot Nation, Picayune Rancheria of Chukchansi Indians of California, Pueblo of Acoma, Puyallup Tribe, Redding |

| | | |
|---|---|---|
| | | Rancheria, Rincon Band of Luiseo Mission Indians, Santa Ynez Band of Chumash Mission Indians, Seminole Tribe of Florida, Shoalwater Bay Indian Tribe, Suquamish Indian Tribe of the Port Madison Reservation, Table Mountain Rancheria, Tribal Alliance of Sovereign Indian Nations, United South and Eastern Tribes Sovereignty Protection Fund, White Earth Nation, Yuhaaviatam of San Manuel Nation(Connelly, Ronald) (Entered: 06/23/2025) |
| 06/23/2025 | <u>45</u> | MOTION to Appear Pro Hac Vice for Michael C. Hoenig (Filing fee $100, receipt number AMDDC−12059122.) by Arizona Indian Gaming Association, Blue Lake Rancheria, California Nations Indian Gaming Association, Chicken Ranch Rancheria of Me−Wuk Indians of California, Elk Valley Rancheria, Enterprise Rancheria of Maidu Indians of California, Guidiville Rancheria of California, Ho−Chunk Nation of Wisconsin, Indian Gaming Association, Jamul Indian Village of California, Kalispel Tribe of Indians, Karuk Tribe, Klamath Tribes, Lytton Rancheria of California, Middletown Rancheria of Pomo Indians of California, Morongo Band of Mission Indians, National Congress of American Indians, Oklahoma Indian Gaming Association, Pechanga Band of Indians, Penobscot Nation, Picayune Rancheria of Chukchansi Indians of California, Pueblo of Acoma, Puyallup Tribe, Redding Rancheria, Rincon Band of Luiseo Mission Indians, Santa Ynez Band of Chumash Mission Indians, Seminole Tribe of Florida, Shoalwater Bay Indian Tribe, Suquamish Indian Tribe of the Port Madison Reservation, Table Mountain Rancheria, Tribal Alliance of Sovereign Indian Nations, United South and Eastern Tribes Sovereignty Protection Fund, White Earth Nation, Yuhaaviatam of San Manuel Nation(Connelly, Ronald) (Entered: 06/23/2025) |
| 06/24/2025 | 46 | QC NOTICE: <u>39</u> Motion for Leave to File, filed by National Congress of American Indians, Rincon Band of Luiseo Mission Indians, Yuhaaviatam of San Manuel Nation, Chicken Ranch Rancheria of Me−Wuk Indians of California, Arizona Indian Gaming Association, Pechanga Band of Indians, White Earth Nation, Karuk Tribe, United South and Eastern Tribes Sovereignty Protection Fund, Elk Valley Rancheria, Enterprise Rancheria of Maidu Indians of California, Ho−Chunk Nation of Wisconsin, Jamul Indian Village of California, Table Mountain Rancheria, Lytton Rancheria of California, Oklahoma Indian Gaming Association, Indian Gaming Association, Kalispel Tribe of Indians, Penobscot Nation, Seminole Tribe of Florida, Blue Lake Rancheria, Picayune Rancheria of Chukchansi Indians of California, Redding Rancheria, California Nations Indian Gaming Association, Pueblo of Acoma, Middletown Rancheria of Pomo Indians of California, Puyallup Tribe, Tribal Alliance of Sovereign Indian Nations, Shoalwater Bay Indian Tribe, Guidiville Rancheria of California, Suquamish Indian Tribe of the Port Madison Reservation, Klamath Tribes, Santa Ynez Band of Chumash Mission Indians, Morongo Band of Mission Indians was filed incorrectly.<br>*\*The following attachments or exhibits are missing − Proposed Order. To correct this problem, file Proposed Order using the event Notice (Other) and link Proposed Order to <u>39</u> . DO NOT REFILE THE ENTIRE MOTION.* (ols, Deputy Clerk) (Entered: 06/24/2025) |
| 06/24/2025 | <u>47</u> | RESPONSE in Opposition re <u>39</u> MOTION for Leave to File *Amicus Brief* filed by Kalshiex LLC.(Katyal, Neal) (Entered: 06/24/2025) |
| 06/24/2025 | <u>48</u> | QC NOTICE: <u>41</u> Motion to Appear Pro Hac Vice,,,,, filed by National Congress of American Indians, Rincon Band of Luiseo Mission Indians, Yuhaaviatam of San Manuel Nation, Chicken Ranch Rancheria of Me−Wuk Indians of California, Arizona Indian Gaming Association, Pechanga Band of Indians, White Earth Nation, Karuk Tribe, United South and Eastern Tribes Sovereignty Protection Fund, Elk Valley Rancheria, Enterprise Rancheria of Maidu Indians of California, Ho−Chunk Nation of Wisconsin, Jamul Indian Village of California, Table Mountain Rancheria, Lytton Rancheria of California, Oklahoma Indian Gaming Association, Indian Gaming Association, Kalispel Tribe of Indians, Penobscot Nation, Seminole Tribe of Florida, Blue Lake Rancheria, Picayune Rancheria of Chukchansi Indians of California, Redding Rancheria, California Nations Indian Gaming Association, Pueblo of Acoma, Middletown Rancheria of Pomo Indians of California, Puyallup Tribe, Tribal Alliance of Sovereign Indian Nations, Shoalwater Bay Indian Tribe, Guidiville Rancheria of California, Suquamish Indian Tribe of the Port Madison Reservation, Klamath Tribes, Santa Ynez Band of Chumash Mission Indians, Morongo Band of Mission Indians needs to be modified. See attachment for details and corrective actions needed |

| | | |
|---|---|---|
| | | regarding the signature(s) on the motion. (mh4s, Deputy Clerk) (Entered: 06/24/2025) |
| 06/24/2025 | 49 | PAPERLESS ORDER granting 42 Motion to Appear Pro Hac Vice on behalf of Scott David Crowell. Directing attorney Scott David Crowell to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 6/24/2025. (mh4s, Deputy Clerk) (Entered: 06/24/2025) |
| 06/24/2025 | 50 | QC NOTICE: 43 Motion to Appear Pro Hac Vice,,,,, filed by National Congress of American Indians, Rincon Band of Luiseo Mission Indians, Yuhaaviatam of San Manuel Nation, Chicken Ranch Rancheria of Me–Wuk Indians of California, Arizona Indian Gaming Association, Pechanga Band of Indians, White Earth Nation, Karuk Tribe, United South and Eastern Tribes Sovereignty Protection Fund, Elk Valley Rancheria, Enterprise Rancheria of Maidu Indians of California, Ho–Chunk Nation of Wisconsin, Jamul Indian Village of California, Table Mountain Rancheria, Lytton Rancheria of California, Oklahoma Indian Gaming Association, Indian Gaming Association, Kalispel Tribe of Indians, Penobscot Nation, Seminole Tribe of Florida, Blue Lake Rancheria, Picayune Rancheria of Chukchansi Indians of California, Redding Rancheria, California Nations Indian Gaming Association, Pueblo of Acoma, Middletown Rancheria of Pomo Indians of California, Puyallup Tribe, Tribal Alliance of Sovereign Indian Nations, Shoalwater Bay Indian Tribe, Guidiville Rancheria of California, Suquamish Indian Tribe of the Port Madison Reservation, Klamath Tribes, Santa Ynez Band of Chumash Mission Indians, Morongo Band of Mission Indians needs to be modified. See attachment for details and corrective actions needed regarding the signature(s) on the motion. (mh4s, Deputy Clerk) (Entered: 06/24/2025) |
| 06/24/2025 | 51 | QC NOTICE: 44 Motion to Appear Pro Hac Vice,,,,, filed by National Congress of American Indians, Rincon Band of Luiseo Mission Indians, Yuhaaviatam of San Manuel Nation, Chicken Ranch Rancheria of Me–Wuk Indians of California, Arizona Indian Gaming Association, Pechanga Band of Indians, White Earth Nation, Karuk Tribe, United South and Eastern Tribes Sovereignty Protection Fund, Elk Valley Rancheria, Enterprise Rancheria of Maidu Indians of California, Ho–Chunk Nation of Wisconsin, Jamul Indian Village of California, Table Mountain Rancheria, Lytton Rancheria of California, Oklahoma Indian Gaming Association, Indian Gaming Association, Kalispel Tribe of Indians, Penobscot Nation, Seminole Tribe of Florida, Blue Lake Rancheria, Picayune Rancheria of Chukchansi Indians of California, Redding Rancheria, California Nations Indian Gaming Association, Pueblo of Acoma, Middletown Rancheria of Pomo Indians of California, Puyallup Tribe, Tribal Alliance of Sovereign Indian Nations, Shoalwater Bay Indian Tribe, Guidiville Rancheria of California, Suquamish Indian Tribe of the Port Madison Reservation, Klamath Tribes, Santa Ynez Band of Chumash Mission Indians, Morongo Band of Mission Indians needs to be modified. See attachment for details and corrective actions needed regarding the signature(s) on the motion. (mh4s, Deputy Clerk) (Entered: 06/24/2025) |
| 06/24/2025 | 52 | QC NOTICE: 45 Motion to Appear Pro Hac Vice,,,,, filed by National Congress of American Indians, Rincon Band of Luiseo Mission Indians, Yuhaaviatam of San Manuel Nation, Chicken Ranch Rancheria of Me–Wuk Indians of California, Arizona Indian Gaming Association, Pechanga Band of Indians, White Earth Nation, Karuk Tribe, United South and Eastern Tribes Sovereignty Protection Fund, Elk Valley Rancheria, Enterprise Rancheria of Maidu Indians of California, Ho–Chunk Nation of Wisconsin, Jamul Indian Village of California, Table Mountain Rancheria, Lytton Rancheria of California, Oklahoma Indian Gaming Association, Indian Gaming Association, Kalispel Tribe of Indians, Penobscot Nation, Seminole Tribe of Florida, Blue Lake Rancheria, Picayune Rancheria of Chukchansi Indians of California, Redding Rancheria, California Nations Indian Gaming Association, Pueblo of Acoma, Middletown Rancheria of Pomo Indians of California, Puyallup Tribe, Tribal Alliance of Sovereign Indian Nations, Shoalwater Bay Indian Tribe, Guidiville Rancheria of California, Suquamish Indian Tribe of the Port Madison Reservation, Klamath Tribes, Santa Ynez Band of Chumash Mission Indians, Morongo Band of Mission Indians needs to be modified. See attachment for details and corrective actions needed regarding the signature(s) on the motion. (mh4s, Deputy Clerk) (Entered: 06/24/2025) |
| 06/24/2025 | 53 | NOTICE by Arizona Indian Gaming Association, Blue Lake Rancheria, California Nations Indian Gaming Association, Chicken Ranch Rancheria of Me–Wuk Indians of California, Elk Valley Rancheria, Enterprise Rancheria of Maidu Indians of California, |

| | | |
|---|---|---|
| | | Guidiville Rancheria of California, Ho−Chunk Nation of Wisconsin, Indian Gaming Association, Jamul Indian Village of California, Kalispel Tribe of Indians, Karuk Tribe, Klamath Tribes, Lytton Rancheria of California, Middletown Rancheria of Pomo Indians of California, Morongo Band of Mission Indians, National Congress of American Indians, Oklahoma Indian Gaming Association, Pechanga Band of Indians, Penobscot Nation, Picayune Rancheria of Chukchansi Indians of California, Pueblo of Acoma, Puyallup Tribe, Redding Rancheria, Rincon Band of Luiseo Mission Indians, Santa Ynez Band of Chumash Mission Indians, Seminole Tribe of Florida, Shoalwater Bay Indian Tribe, Suquamish Indian Tribe of the Port Madison Reservation, Table Mountain Rancheria, Tribal Alliance of Sovereign Indian Nations, United South and Eastern Tribes Sovereignty Protection Fund, White Earth Nation, Yuhaaviatam of San Manuel Nation re 39 MOTION for Leave to File *Amicus Brief Proposed Order* (Connelly, Ronald) (Entered: 06/24/2025) |
| 06/24/2025 | 54 | CORRECTED MOTION to Appear Pro Hac Vice for Michael C. Hoenig by Arizona Indian Gaming Association, Blue Lake Rancheria, California Nations Indian Gaming Association, Chicken Ranch Rancheria of Me−Wuk Indians of California, Elk Valley Rancheria, Enterprise Rancheria of Maidu Indians of California, Guidiville Rancheria of California, Ho−Chunk Nation of Wisconsin, Indian Gaming Association, Jamul Indian Village of California, Kalispel Tribe of Indians, Karuk Tribe, Klamath Tribes, Lytton Rancheria of California, Middletown Rancheria of Pomo Indians of California, Morongo Band of Mission Indians, National Congress of American Indians, Oklahoma Indian Gaming Association, Pechanga Band of Indians, Penobscot Nation, Picayune Rancheria of Chukchansi Indians of California, Pueblo of Acoma, Puyallup Tribe, Redding Rancheria, Rincon Band of Luiseo Mission Indians, Santa Ynez Band of Chumash Mission Indians, Seminole Tribe of Florida, Shoalwater Bay Indian Tribe, Suquamish Indian Tribe of the Port Madison Reservation, Table Mountain Rancheria, Tribal Alliance of Sovereign Indian Nations, United South and Eastern Tribes Sovereignty Protection Fund, White Earth Nation, Yuhaaviatam of San Manuel Nation. The fee has already been paid.(Connelly, Ronald) (Entered: 06/24/2025) |
| 06/24/2025 | 55 | CORRECTED MOTION to Appear Pro Hac Vice for Bryan Newland by Arizona Indian Gaming Association, Blue Lake Rancheria, California Nations Indian Gaming Association, Chicken Ranch Rancheria of Me−Wuk Indians of California, Elk Valley Rancheria, Enterprise Rancheria of Maidu Indians of California, Guidiville Rancheria of California, Ho−Chunk Nation of Wisconsin, Indian Gaming Association, Jamul Indian Village of California, Kalispel Tribe of Indians, Karuk Tribe, Klamath Tribes, Lytton Rancheria of California, Middletown Rancheria of Pomo Indians of California, Morongo Band of Mission Indians, National Congress of American Indians, Oklahoma Indian Gaming Association, Pechanga Band of Indians, Penobscot Nation, Picayune Rancheria of Chukchansi Indians of California, Pueblo of Acoma, Puyallup Tribe, Redding Rancheria, Rincon Band of Luiseo Mission Indians, Santa Ynez Band of Chumash Mission Indians, Seminole Tribe of Florida, Shoalwater Bay Indian Tribe, Suquamish Indian Tribe of the Port Madison Reservation, Table Mountain Rancheria, Tribal Alliance of Sovereign Indian Nations, United South and Eastern Tribes Sovereignty Protection Fund, White Earth Nation, Yuhaaviatam of San Manuel Nation. The fee has already been paid.(Connelly, Ronald) (Entered: 06/24/2025) |
| 06/24/2025 | 56 | CORRECTED MOTION to Appear Pro Hac Vice for Joseph H. Webster by Arizona Indian Gaming Association, Blue Lake Rancheria, California Nations Indian Gaming Association, Chicken Ranch Rancheria of Me−Wuk Indians of California, Elk Valley Rancheria, Enterprise Rancheria of Maidu Indians of California, Guidiville Rancheria of California, Ho−Chunk Nation of Wisconsin, Indian Gaming Association, Jamul Indian Village of California, Kalispel Tribe of Indians, Karuk Tribe, Klamath Tribes, Lytton Rancheria of California, Middletown Rancheria of Pomo Indians of California, Morongo Band of Mission Indians, National Congress of American Indians, Oklahoma Indian Gaming Association, Pechanga Band of Indians, Penobscot Nation, Picayune Rancheria of Chukchansi Indians of California, Pueblo of Acoma, Puyallup Tribe, Redding Rancheria, Rincon Band of Luiseo Mission Indians, Santa Ynez Band of Chumash Mission Indians, Seminole Tribe of Florida, Shoalwater Bay Indian Tribe, Suquamish Indian Tribe of the Port Madison Reservation, Table Mountain Rancheria, Tribal Alliance of Sovereign Indian Nations, United South and Eastern Tribes Sovereignty Protection Fund, White Earth Nation, Yuhaaviatam of San Manuel Nation. The fee has already been paid.(Connelly, Ronald) (Entered: 06/24/2025) |

| | | |
|---|---|---|
| 06/24/2025 | 57 | CORRECTED MOTION to Appear Pro Hac Vice for Elizabeth A. Bower by Arizona Indian Gaming Association, Blue Lake Rancheria, California Nations Indian Gaming Association, Chicken Ranch Rancheria of Me–Wuk Indians of California, Elk Valley Rancheria, Enterprise Rancheria of Maidu Indians of California, Guidiville Rancheria of California, Ho–Chunk Nation of Wisconsin, Indian Gaming Association, Jamul Indian Village of California, Kalispel Tribe of Indians, Karuk Tribe, Klamath Tribes, Lytton Rancheria of California, Middletown Rancheria of Pomo Indians of California, Morongo Band of Mission Indians, National Congress of American Indians, Oklahoma Indian Gaming Association, Pechanga Band of Indians, Penobscot Nation, Picayune Rancheria of Chukchansi Indians of California, Pueblo of Acoma, Puyallup Tribe, Redding Rancheria, Rincon Band of Luiseo Mission Indians, Santa Ynez Band of Chumash Mission Indians, Seminole Tribe of Florida, Shoalwater Bay Indian Tribe, Suquamish Indian Tribe of the Port Madison Reservation, Table Mountain Rancheria, Tribal Alliance of Sovereign Indian Nations, United South and Eastern Tribes Sovereignty Protection Fund, White Earth Nation, Yuhaaviatam of San Manuel Nation. The fee has already been paid.(Connelly, Ronald) (Entered: 06/24/2025) |
| 06/24/2025 | 58 | PAPERLESS ORDER granting 54 Corrected Motion to Appear Pro Hac Vice on behalf of Michael C. Hoenig. Directing attorney Michael C. Hoenig to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 6/24/2025. (mh4s, Deputy Clerk) (Entered: 06/24/2025) |
| 06/24/2025 | 59 | PAPERLESS ORDER granting 55 Corrected Motion to Appear Pro Hac Vice on behalf of Bryan Newland. Directing attorney Bryan Newland to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 6/24/2025. (mh4s, Deputy Clerk) (Entered: 06/24/2025) |
| 06/24/2025 | 60 | PAPERLESS ORDER granting 56 Corrected Motion to Appear Pro Hac Vice on behalf of Joseph H. Webster. Directing attorney Joseph H. Webster to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 6/24/2025. (mh4s, Deputy Clerk) (Entered: 06/24/2025) |
| 06/24/2025 | 61 | PAPERLESS ORDER granting 57 Corrected Motion to Appear Pro Hac Vice on behalf of Elizabeth A. Bower. Directing attorney Elizabeth A. Bower to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 6/24/2025. (mh4s, Deputy Clerk) (Entered: 06/24/2025) |
| 06/25/2025 | 62 | Memorandum re 2 MOTION for Temporary Restraining Order *and Preliminary Injunction Plaintiffs Supplemental Response Brief* filed by Kalshiex LLC.(Katyal, Neal) (Entered: 06/25/2025) |
| 06/25/2025 | 63 | Memorandum re 2 MOTION for Temporary Restraining Order *and Preliminary Injunction Defendants' Supplemental Reply Brief* filed by Ade Adebisi, Anthony G. Brown, Everett D Browning, Sr, Diane Croghan, George L Doetsch, Jr, Michael Eaton, Harold E Hodges, E. Randolph Marriner, John A. Martin, Maryland Lottery and Gaming Control Agency, Maryland Lottery and Gaming Control Commission, James J. Stakem.(Brauer, Max) (Entered: 06/25/2025) |
| 06/26/2025 | 64 | ORDER granting 39 the Tribal Amici's Motion for Leave to File an Amcius Brief. Signed by Judge Adam B Abelson on 6/26/2025. (ols, Deputy Clerk) (Entered: 06/27/2025) |
| 06/26/2025 | 65 | AMICUS BRIEF re 2 MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Arizona Indian Gaming Association, Blue Lake Rancheria, California Nations Indian Gaming Association, Chicken Ranch Rancheria of Me–Wuk Indians of California, Elk Valley Rancheria, Enterprise Rancheria of Maidu Indians of California, Guidiville Rancheria of California, Ho–Chunk Nation of Wisconsin, Indian Gaming Association, Jamul Indian Village of California, Kalispel Tribe of Indians, Karuk Tribe, Klamath Tribes, Lytton Rancheria of California, Middletown Rancheria |

| | | |
|---|---|---|
| | | of Pomo Indians of California, Morongo Band of Mission Indians, National Congress of American Indians, Oklahoma Indian Gaming Association, Pechanga Band of Indians, Penobscot Nation, Picayune Rancheria of Chukchansi Indians of California, Pueblo of Acoma, Puyallup Tribe, Redding Rancheria, Rincon Band of Luiseo Mission Indians, Santa Ynez Band of Chumash Mission Indians, Seminole Tribe of Florida, Shoalwater Bay Indian Tribe, Suquamish Indian Tribe of the Port Madison Reservation, Table Mountain Rancheria, Tribal Alliance of Sovereign Indian Nations, United South and Eastern Tribes Sovereignty Protection Fund, White Earth Nation, Yuhaaviatam of San Manuel Nation. (ols, Deputy Clerk) (Entered: 06/27/2025) |
| 07/17/2025 | 66 | NOTICE by Ade Adebisi, Anthony G. Brown, Everett D Browning, Sr, Diane Croghan, George L Doetsch, Jr, Michael Eaton, E. Randolph Marriner, John A. Martin, Maryland Lottery and Gaming Control Agency, Maryland Lottery and Gaming Control Commission, James J. Stakem *Defendants' Notice of Subsequent Authority* (Attachments: # 1 Exhibit Opinion GenBioPro, Inc. v. Raynes)(Delfosse, Erik) (Entered: 07/17/2025) |
| 07/18/2025 | 67 | RESPONSE re 66 Notice (Other), *Defendants' Notice of Supplemental Authority* filed by Kalshiex LLC.(Katyal, Neal) (Entered: 07/18/2025) |
| 07/23/2025 | 68 | MOTION to Strike 67 Response, 66 Notice (Other), *Plaintiff's Response to Defendants' Notice of Supplemental Authority* by Ade Adebisi, Anthony G. Brown, Everett D Browning, Sr, Diane Croghan, George L Doetsch, Jr, Michael Eaton, Harold E Hodges, E. Randolph Marriner, John A. Martin, Maryland Lottery and Gaming Control Agency, Maryland Lottery and Gaming Control Commission, James J. Stakem (Attachments: # 1 Text of Proposed Order)(Delfosse, Erik) (Entered: 07/23/2025) |
| 07/25/2025 | 69 | NOTICE of Appearance by Alan P Goodwich on behalf of All Defendants (Goodwich, Alan) (Entered: 07/25/2025) |
| 08/01/2025 | 70 | MEMORANDUM OPINION. Signed by Judge Adam B Abelson on 8/1/2025. (ols, Deputy Clerk) (Entered: 08/01/2025) |
| 08/01/2025 | 71 | ORDER denying 2 Plaintiff's Motion for TRO; denying as moot 68 Defendants' Motion to Strike. Signed by Judge Adam B Abelson on 8/1/2025. (ols, Deputy Clerk) (Entered: 08/01/2025) |
| 08/01/2025 | 72 | NOTICE OF APPEAL as to 71 Order on Motion for TRO, Order on Motion to Strike, 70 Memorandum Opinion by Kalshiex LLC. Filing fee $ 605, receipt number AMDDC–12145242.(Katyal, Neal) (Entered: 08/01/2025) |
| 08/01/2025 | 73 | MOTION for Preliminary Injunction *Pending Appeal* by Kalshiex LLC(Katyal, Neal) (Entered: 08/01/2025) |
| 08/04/2025 | 74 | QC NOTICE: 73 Motion for Preliminary Injunction filed by Kalshiex LLC was filed incorrectly.<br>*\*\*The following attachments or exhibits are missing – Proposed Order. To correct this problem, file Proposed Order using the event Notice (Other) and link Proposed Order to 73 .* (ols, Deputy Clerk) (Entered: 08/04/2025) |
| 08/04/2025 | 75 | NOTICE by Kalshiex LLC re 73 MOTION for Preliminary Injunction *Pending Appeal [Proposed] Order* (Katyal, Neal) (Entered: 08/04/2025) |
| 08/04/2025 | 76 | NOTICE by Kalshiex LLC re 73 MOTION for Preliminary Injunction *Pending Appeal* (Katyal, Neal) (Entered: 08/04/2025) |
| 08/05/2025 | 77 | NOTICE by John A. Martin *,et al, Defendants* (Goodwich, Alan) (Entered: 08/05/2025) |
| 08/05/2025 | 78 | PAPERLESS ORDER: The Zoom status conference is re–scheduled to Wednesday, August 13, 2025 at 2:30 P.M. Signed by Judge Adam B Abelson on 8/5/2025. (sp6s, Chambers) (Entered: 08/05/2025) |
| 08/05/2025 | 79 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 72 Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(slss, Deputy Clerk) (Entered: 08/05/2025) |

| 08/06/2025 | 80 | USCA Case Number 25–1892 for 72 Notice of Appeal filed by Kalshiex LLC – Case Manager – Anisha Walker. (slss, Deputy Clerk) (Entered: 08/06/2025) |
|---|---|---|
| 08/13/2025 | 81 | –PER COUNSEL, FILED IN ERROR. TO BE REFILED– MOTION to Withdraw 73 MOTION for Preliminary Injunction *Pending Appeal* by Kalshiex LLC(Katyal, Neal) Modified on 8/13/2025 (ols). (Entered: 08/13/2025) |
| 08/13/2025 | 82 | QC NOTICE: 81 Motion to Withdraw filed by Kalshiex LLC was filed incorrectly. **The following attachments or exhibits are missing – Proposed Order. To correct this problem, file Proposed Order using the event Notice (Other) and link Proposed Order to 81 .* (ols, Deputy Clerk) (Entered: 08/13/2025) |
| 08/13/2025 | 83 | NOTICE by Kalshiex LLC re 73 MOTION for Preliminary Injunction *Pending Appeal –– Notice of Withdrawal of Motion for Injunction Pending Appeal* (Katyal, Neal) (Entered: 08/13/2025) |
| 08/13/2025 | 84 | Zoom Status Conference held on 8/13/2025 before Judge Adam B Abelson.(Court Reporter: Nadine Bachmann) (dg4s, Deputy Clerk) (Entered: 08/13/2025) |
| 08/14/2025 | 85 | PAPERLESS ORDER: The notice filed by Plaintiff (ECF No. 83) is APPROVED. The motion for preliminary injunction pending appeal (ECF No. 73) is DENIED as MOOT. Signed by Judge Adam B Abelson on 8/14/2025. (sp6s, Chambers) (Entered: 08/14/2025) |
| 08/19/2025 | 86 | Joint MOTION to Stay *Proceedings* by Kalshiex LLC (Attachments: # 1 Proposed Order)(Katyal, Neal) (Entered: 08/19/2025) |
| 08/21/2025 | 87 | PAPERLESS ORDER: The joint motion for a stay (ECF No. 86) is GRANTED. The case is hereby STAYED. The parties shall file a joint status report within 21 days of issuance of the mandate in Plaintiff's appeal. Signed by Judge Adam B Abelson on 8/21/2025. (sp6s, Chambers) (Entered: 08/21/2025) |
| 09/19/2025 | 88 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 08–13–2025, before Judge Abelson. Court Reporter N. Bachmann, Telephone number 410–962–4753 nadine_bachmann@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 10/10/2025. Redacted Transcript Deadline set for 10/20/2025. Release of Transcript Restriction set for 12/18/2025.(nb, Court Reporter) (Entered: 09/19/2025) |

**JA31**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

| | |
|---|---|
| KALSHIEX LLC, | Case No.: 25-cv-1283 |
| *Plaintiff*, | |
| vs. | |
| JOHN A. MARTIN, in his official capacity as Secretary of the Maryland Lottery and Gaming Control Commission and Director of the Maryland Lottery and Gaming Control Agency; MARYLAND LOTTERY AND GAMING CONTROL AGENCY; MICHAEL EATON, in his official capacity as Managing Director of Gaming for the Maryland Lottery and Gaming Control Agency; EVERETT D. BROWNING, SR., in his official capacity as Chair of the Maryland Lottery and Gaming Control Commission; E. RANDOLPH MARRINER, in his official capacity as Vice Chair of the Maryland Lottery and Gaming Control Commission; ADE ADEBISI, in his official capacity as Commissioner of the Maryland Lottery and Gaming Control Commission; DIANE CROGHAN, in her official capacity as Commissioner of the Maryland Lottery and Gaming Control Commission; GEORGE L. DOETSCH, JR., in his official capacity as Commissioner of the Maryland Lottery and Gaming Control Commission; HAROLD E. HODGES, in his official capacity as Commissioner of the Maryland Lottery and Gaming Control Commission; JAMES J. STAKEM, in his official capacity as Commissioner of the Maryland Lottery and Gaming Control Commission; MARYLAND LOTTERY AND GAMING CONTROL COMMISSION, | **COMPLAINT FOR PERMANENT INJUNCTION AND DECLARATORY RELIEF** |
| c/o John A. Martin 1800 Washington Blvd., Suite 330 Baltimore, MD 21230 | |

and ANTHONY G. BROWN, in his official
capacity as Attorney General for the State of
Maryland,

      200 St. Paul Place,
      Baltimore, MD 21202

*Defendant*s.

## INTRODUCTION

1.      This action challenges the State of Maryland's intrusion into the federal
government's "exclusive" authority to regulate futures derivatives trading on exchanges overseen
by the Commodity Futures Trading Commission ("CFTC"). 7 U.S.C. § 2(a)(1)(A). Maryland
agencies are seeking to prevent Plaintiff KalshiEX LLC ("Kalshi") from offering event contracts
for trading on its federally regulated exchange. Maryland's attempt to regulate Kalshi intrudes
upon the federal regulatory framework that Congress established for regulating futures
derivatives on designated exchanges. Maryland law is both field-preempted and conflict-
preempted. This Court should therefore issue both a preliminary and a permanent injunction, as
well as declaratory relief to that effect.

2.      Commodity futures regulation has long been under the exclusive purview of the
federal government. In 1936, Congress passed the Commodity Exchange Act ("CEA"), which
enacted a federal regulatory framework for derivatives. In 1974, Congress established a federal
agency called the CFTC to oversee it.

3.      The text, purposes, and statutory history of the CEA leave no question that
Congress sought to preempt state regulation of futures derivatives on exchanges overseen by the
CFTC, known as "designated contract markets" or DCMs. The text of the statute gives the
CFTC "exclusive jurisdiction" over contracts traded on federally regulated exchanges. 7 U.S.C.
§ 2(a)(1)(A). During the CEA's drafting process, Congress deleted a provision that would have
granted states concurrent jurisdiction over futures derivatives. *See* 120 Cong. Rec. 30,464 (Sept.
9, 1974) (statements of Sens. Curtis and Talmadge). One of Congress's avowed goals in creating
the CFTC was to avoid the "chaos" that would result from subjecting exchanges to a patchwork

of 51 different—and potentially conflicting—state laws. *Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry,* 93d Cong., 2d Sess. 685 (1974) (hereinafter "Senate Hearings") (statement of Sen. Clark). And the statute gives the CFTC comprehensive authority over regulated exchanges, including the authority to approve or reject certain categories of event contracts as against the public interest.

4.     For that reason, courts have easily found state laws preempted in similar contexts. *See, e.g., Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago,* 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867 (7th Cir. 1995). The CFTC itself agrees. It informed the U.S. Court of Appeals for the D.C. Circuit just a few months ago that, "*due to federal preemption*, event contracts *never violate state law* when they are traded on a DCM" like Kalshi. CFTC Brief at *27, *KalshiEx LLC v. CFTC*, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024) (emphasis added).

5.     Three Maryland agencies—the Maryland Lottery and Gaming Control Agency, the Maryland Lottery and Gaming Control Commission, and the Maryland Attorney General's Office—are threatening to intrude on the comprehensive federal scheme for regulating designated exchanges. Kalshi is a federally designated and approved derivatives exchange, subject to the CFTC's exclusive jurisdiction. It offers consumers the chance to invest in many types of event contracts, including, as relevant here, sports-event contracts. These contracts are subject to extensive oversight by the CFTC, and—critically—they are *lawful* under federal law. Three months ago, the CFTC allowed Kalshi's sports-event contracts to take effect without restriction.

6.     Even though Kalshi's contracts are lawful under federal law, Defendants are threatening to shut down these contracts in Maryland "immediately." Exhibit 1, at 2. Defendants' actions would subject Kalshi to the patchwork of state regulation that Congress created the CFTC to prevent and would interfere with the CFTC's exclusive authority to regulate futures derivatives contracts in the exchanges it oversees. For that reason, Defendants' actions are preempted under the Supremacy Clause of the U.S. Constitution—both because Congress has

occupied the entire field of regulating futures derivatives on CFTC-approved exchanges and because Defendants' acts would squarely conflict with federal policy.

7.      Kalshi is aware of no other exchange regulated by the CFTC subject to state law in Maryland or any other state.

8.      Kalshi is entitled to declaratory and injunctive relief to prevent Maryland authorities from enforcing their preempted state laws against Kalshi.

9.      The Maryland authorities' actions threaten immediate and irreparable harm, not just to Kalshi but to its customers. Shutting down its contracts in Maryland would threaten Kalshi's viability and require devising complex technological solutions whose feasibility is entirely untested and unclear. Defendants' acts would also impair Kalshi's existing contracts with consumers, subject Kalshi's users to uncertainty and loss, and undermine confidence in the integrity of Kalshi's platform. For those reasons, concurrently with the filing of this complaint, Kalshi seeks an emergency temporary restraining order and preliminary injunction to avoid immediate and irreparable harm that would result from Defendants' unlawful acts.

10.     The U.S. District Court for the District of Nevada recently granted Kalshi a preliminary injunction in a substantially similar case. Like the Defendants here, state officials and state agencies in Nevada threatened Kalshi with civil and criminal liability for offering event contracts that were claimed to be contrary to Nevada law. Kalshi brought suit and sought a preliminary injunction, which the court granted. The court explained that "because Kalshi is a CFTC-designated DCM, it is subject to the CFTC's exclusive jurisdiction and state law is field preempted." *KalshiEX LLC v. Hendrick*, No. 2:25-cv-00575-APG, 2025 WL 1073495, at *6 (D. Nev. Apr. 9, 2025). And the court noted that Kalshi faced irreparable harm because it "faces a 'Hobson's choice': if it does not comply with the defendants' demand to cease it faces civil and criminal liability, but if it does comply it will incur substantial economic and reputational harm as well as the potential existential threat of the CFTC taking action against it for violating the CFTC's Core Principles if Kalshi disrupts contracts or geographically limits who can enter contracts on what is supposed to be a national exchange." *Id.* at *7.

11.     The court further noted that other states like Maryland "have sent" Kalshi cease-and-desist letters, which "highlights the problem of allowing the States to regulate a national exchange" because it "raises the possibility that another State would have different rules than not only [] the CFTC, but other States." *Id.* As the court explained, "[p]reventing the difficulties that would create is the reason Congress granted the CFTC exclusive jurisdiction over CFTC-designated exchanges." *Id.*

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Supremacy Clause of the United States Constitution. The federal question presented is whether Maryland gambling laws are preempted by the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.*, as applied to Kalshi's event contracts.

13.     The Eleventh Amendment imposes no bar to this Court's jurisdiction in this suit for prospective declaratory and injunctive relief against state officials. The Eleventh Amendment, as construed in *Ex parte Young*, 209 U.S. 123, 160 (1908), allows private plaintiffs "to petition a federal court to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution or a federal statute." *Indus. Servs. Grp., Inc. v. Dobson*, 68 F.4th 155, 163 (4th Cir. 2023).

14.     Venue is proper under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2). The Individual Defendants perform their duties, and thus reside, in this District. The Maryland Lottery and Gaming Control Agency and Maryland Lottery and Gaming Control Commission are subject to this Court's personal jurisdiction and thus reside in this district. A substantial part of the events giving rise to the claim occurred in this District.

## PARTIES

15.     Plaintiff Kalshi is a financial services company with its principal place of business in New York. Kalshi operates a derivatives exchange and prediction market where users can buy and sell financial products known as event contracts. Its exchange market is federally regulated

by the Commodity Futures Trading Commission pursuant to the Commodity Exchange Act, 7

U.S.C. §§ 1, *et seq.*

16.    Defendant John A. Martin is sued in his official capacity as Secretary of the

Maryland Lottery and Gaming Control Commission and Director of the Maryland Lottery and

Gaming Control Agency.

17.    Defendant Michael Eaton is sued in his official capacity as Managing Director of

Gaming of the Maryland Lottery and Gaming Control Agency.

18.    Defendant Everett D. Browning, Sr. is sued in his official capacity as Chair of the

Maryland Lottery and Gaming Control Commission.

19.    Defendant E. Randolph Marriner is sued in his official capacity as Vice Chair of

the Maryland Lottery and Gaming Control Commission.

20.    Defendant Ade Adebisi is sued in his official capacity as Commissioner of the

Maryland Lottery and Gaming Control Commission.

21.    Defendant Diane Croghan is sued in her official capacity as Commissioner of the

Maryland Lottery and Gaming Control Commission.

22.    Defendant George L. Doetsch, Jr. is sued in his official capacity as Commissioner

of the Maryland Lottery and Gaming Control Commission.

23.    Defendant Harold E. Hodges is sued in his official capacity as Commissioner of

the Maryland Lottery and Gaming Control Commission.

24.    Defendant James J. Stakem is sued in his official capacity as Commissioner of the

Maryland Lottery and Gaming Control Commission.

25.    Defendant Maryland Lottery and Gaming Control Agency ("MLGCA") is sued as

the state agency that regulates the state's casinos and sports wagering entities and is responsible

for ensuring that all casinos and sports wagering licensees comply with all regulations before

issuing an operation license.  The MLGCA oversees licensing, internal controls, auditing and

accounting, compliance, and responsible gaming at regulated casinos and sportsbooks in

**JA37**

Maryland. As the state's gaming regulator, the MLGCA has jurisdiction over all persons participating in casino gaming.

26. Defendant Maryland Lottery and Gaming Control Commission ("MLGCC") is sued as the independent advisory board to the Maryland Lottery and Gaming Control Agency. The MLGCC oversees the work of the MLGCA's staff.

27. Defendant Anthony G. Brown is sued in his official capacity as Attorney General of Maryland.

28. Together, defendants John A. Martin, Michael Eaton, Everett D. Browning, Sr., E. Randolph Marriner, Ade Adebisi, Diane Croghan, George L. Doetsch, Jr., Harold E. Hodges, James J. Stakem, as commissioners of MLGCA and MLGCC, and Anthony G. Brown, as Attorney General, would be responsible for enforcing any demand for Kalshi to comply with Maryland state law that is preempted by federal law.

## FACTUAL ALLEGATIONS

**A. An Event Contract—Like Other Derivatives—Is A Recognized Financial Tool To Mitigate Risk.**

29. Derivatives contracts are financial tools used to mitigate risk and disseminate pricing information. Event contracts are a quintessential example of a derivatives contract—they are a type of option. This form of derivatives contract identifies a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date. Most commonly, event contracts involve a binary question: Every "yes" position has an equal and opposite "no" position. For example, a derivatives contract might center around whether an earthquake will take place in Los Angeles County before December 31, 2025. A purchaser may trade on either the "yes" or the "no" position on the Los Angeles earthquake contract. If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

30.     Event contracts are traded on an exchange.  Traders exchange positions with other traders in the marketplace.  Importantly, event contracts do not reflect a "bet" against the "house."

31.     The value of an event contract is determined by market forces.  An event contract's price will fluctuate between the time of its creation and the expiration date in accordance with changing market perceptions about the likelihood of the event's occurrence.  During that period, individuals can buy and sell the contract at its fluctuating prices.  The ultimate value of an event contract is determined at its expiration date.  If the underlying event occurs, the holder of the "yes" position is entitled to its full value.  But if the underlying event does not occur, the holder of the "no" position gets the payment.

32.     Traders price event contracts by reference to available information at any given time.  If new information comes to light portending an increase in the likelihood of the event's occurrence, then the event contract's price will increase.  The market prices of event contracts thus reflect probabilistic beliefs about whether the underlying event will occur.  Returning to the earthquake example, a "yes" contract that trades at 30 cents reflects that the market believes that there is a 30% chance of an earthquake this year.  The 30% figure can be informed by datapoints that the market deems significant, such as the time since the last earthquake in the area and the frequency of fault line tremors in preceding months surrounding Los Angeles County.

33.     Event contracts are a valuable means to hedge risk against event-driven volatility.  Event contracts reflect real-time risk assessment and thus provide a nuanced and finely tuned opportunity for traders to mitigate their exposure on real-world events in an uncertain market.  There is no other financial instrument with the unique capability to capture the risks of an event with economic consequences.  A property owner in Los Angeles County might purchase an earthquake event contract because the payoff would offset economic losses in the event an earthquake occurs.

34.     Event contracts should not be mistaken for insurance.  While insurance covers property losses, event contracts can cover a wider range of possible economic fallout like

temporary shelter, a decline in rental income, or short-term cost increases for basic needs due to shortages generated by an earthquake.

35.     Event contracts are also a valuable means of communicating information to the general public because contract prices reflect prevailing market opinions and conditions. Prediction markets thus serve as sensitive information-gathering tools that can provide insights for stakeholders—including businesses, individuals, governments, and educational institutions. The data that is generated through prediction markets can also help to set rates and prices for assets whose value depends on the occurrence or non-occurrence of the underlying event. *See* 7 U.S.C. § 5(a) (derivatives contracts, including event contracts, "are affected with a national public interest by providing" both a means for hedging risk and "disseminating pricing information through trading in liquid, fair and financially secure trading facilities").

**B.   Congress Delegated The Power To Regulate Event Contracts That Are Offered By A Regulated Exchange To The Commodity Futures Trading Commission.**

36.     Futures contracts have long been regulated by the federal government.  In 1936, Congress passed the CEA, which provides for federal regulation of all commodities and futures trading activities and requires that all futures and commodity options are traded on organized, regulated exchanges.

37.     In 1974, Congress established the CFTC as the federal agency empowered to oversee and regulate exchanges under the CEA.  Proponents of the 1974 Act were concerned that the "states . . . might step in to regulate the futures markets themselves[,]" which would lead to the undesired outcome that national futures exchanges might be subject to "conflicting regulatory demands." *Am. Agric. Movement*, 977 F.2d at 1156.  One Senator remarked that "different State laws would just lead to total chaos."  Senate Hearings, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).  As a solution, the House Committee on Agriculture put "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 79 (1974).  The Senate reaffirmed the CFTC's exclusive power by deleting a provision of the CEA that would have preserved the

states' authority over futures trading. *See* 120 Cong. Rec. 30,464 (Sept. 9, 1974) (statements of Sens. Curtis and Talmadge).

38.    To offer derivatives for public trading, an entity must seek and receive the CFTC's designation as a contract market. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a). An entity must first submit an application to the CFTC detailing how the entity complies with the 23 Core Principles of the CEA. 17 C.F.R. § 38.3(a)(2). Among other things, the proposed contract market must show that it can and will (1) comply with all CFTC requirements imposed by rule or regulation; (2) establish, monitor, and enforce compliance with the rules; (3) list only contracts that are not readily susceptible to manipulation; (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions through market surveillance, compliance, and enforcement; and (5) adopt position limitations for each contract to reduce the threat of market manipulation. 17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300. Proposed exchanges must provide detailed information demonstrating their capacity to abide by the CEA. 17 C.F.R. § 38.3(a)(2). The CFTC then reviews the application and renders a decision on the purported market's designation within 180 days of submission. 17 C.F.R. § 38.3(a)(2).

39.    Once the CFTC designates an entity as a contract market, the CEA gives the CFTC "exclusive jurisdiction" over the derivatives that are traded on the regulated market. Those derivatives include "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and transactions involving swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). This exclusive jurisdiction extends to "event contracts." *See id.* § 1a(47)(A)(ii), (iv), (vi).

40.    Once an exchange is designated as a CEA-compliant contract market—known as a DCM—the market is subject to an extensive framework for CFTC oversight. Part 38 of Title 17, Chapter 1 of the U.S. Code comprehensively regulates DCMs, ensuring that these markets continue to comply with the CEA. Exchanges must meet detailed requirements to maintain good standing as DCMs. 17 C.F.R. pt. 38. Among other things, DCMs must abide by recordkeeping

requirements that specify the form, manner, and duration of retention. 17 C.F.R. §§ 38.950,

1.31. DCMs must meet reporting obligations such as furnishing daily reports of market data on

futures and swaps to the CFTC. 17 C.F.R. § 38.450, pt. 16. Specific liquidity standards,

disciplinary procedures, dispute resolution mechanisms, board of directors requirements,

auditing demands, and more are also detailed in Part 38. A DCM must adhere to all these

requirements to comply with the CEA and remain in good standing before the CFTC. 7 U.S.C.

§ 7(d); 17 C.F.R. pt. 38. As long as the DCM abides by the requirements set forth in the CEA, it

may list contracts on its exchange without pre-approval from the CFTC. Instead, the DCM may

self-certify that the contract complies with applicable law by filing a "written certification" with

the CFTC at the time of listing. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). The CFTC may

initiate review of any contract under its purview. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R.

§ 40.11(c).

      41.    Alternatively, DCMs may submit contracts to the CFTC for approval prior to

listing. 7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. §§ 40.3(a), 40.11(c). The CFTC "shall approve a

new contract" unless the CFTC finds that it would violate the CEA. 7 U.S.C. § 7a-2(c)(5)(B).

      42.    The CEA's enforcement process rounds out the comprehensive federal framework

that regulates futures derivatives sold on DCMs. The CEA gives the CFTC discretion as to how

to police and enforce violations of the CEA for DCMs. The CFTC includes an Enforcement

Division, which may initiate investigations and, with the approval of a majority of the CFTC,

pursue enforcement actions in federal court or administrative proceedings. If the Division

concludes that there has been a violation of the CEA, it may recommend to the Commission that

it seek a wide range of enforcement measures, including civil monetary penalties; restitution;

disgorgement; the suspension, denial, revocation, or restriction of registration and trading

privileges; and injunctions or cease-and-desist orders. *See* CFTC Division of Enforcement,

Enforcement Manual (2020), at § 3.3. If the Division suspects that an entity has engaged in

criminal violations, the Division may also refer the matter to the Department of Justice or the

appropriate state authority for prosecution. *Id.*

**JA42**

43.     The CFTC regulates derivatives in products like "wheat, cotton, rice, corn, [and] oats," as well as "excluded commodities" such as interest rates, certain financial instruments, economic indices, risk metrics, and events. 7 U.S.C. § 1a(9), (19)(i)–(iv). The CFTC regulates event contracts as a type of derivative referencing an "excluded commodity." *See id.* § 1a(47)(A)(ii), (iv), (vi); *see KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. 23-3257 (JMC), 2024 WL 4164694, at *2-3 (D.D.C. Sept. 12, 2024). "Event contracts" are "agreements, contracts, transactions, or swaps in excluded commodities." 7 U.S.C. § 7a-2(c)(5)(C)(i). Events themselves constitute "excluded commodities" under the CEA and are defined as any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" financial, commercial, or economic consequences. *Id.* § 1a(19)(iv).

44.     In 2010, Congress amended the CEA to address event contracts specifically. Congress provided that the CFTC "may"—but need not—conclude that event contracts are "contrary to the public interest" if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i).

**C.    After An Extensive Regulatory Process, The CFTC Registered Kalshi As A Contract Market That Operates Under Federal Law.**

45.     Kalshi is a regulated exchange and prediction market where users can buy and sell event contracts. In 2020, the CFTC unanimously certified Kalshi as a designated contract market, affirming that its platform complied with the CEA. Since then, Kalshi has been fully regulated as a financial exchange under federal law alongside entities such as the Chicago Mercantile Exchange and the Intercontinental Exchange.

46.     Kalshi specializes in event contract trading, offering a secure and federally approved exchange where individual, retail, and institutional participants can hedge their risks on event-based outcomes.

47.     Kalshi offers many kinds of event contracts related to an array of substantive areas such as climate, technology, health, crypto, popular culture, and economics. For example, Kalshi's platform currently allows users to trade on whether India will meet its 2030 climate goals or whether the market share for electric vehicles will be above 50% in 2030. Kalshi offers contracts on the outcomes of Supreme Court decisions, congressional votes, weather events, technological benchmarks, markers of cultural influence, and Federal Reserve interest rate decisions.

48.     Among its menu of event contracts, Kalshi offers sports-event contracts.

49.     Kalshi self-certified and began listing sports-event contracts on its exchange on January 24, 2025. Kalshi's sports-event contracts allow users to place positions on which teams will advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Championship. The CFTC declined to restrict Kalshi's sports-event contracts. Unless and until the CFTC takes action on Kalshi's sports-event contracts, they remain authorized under federal law.

50.     Several other federally regulated exchanges began listing sports-related event contracts around the same time. In response, the CFTC exercised its power to commence review of a sports-related event contract offered by NADEX/crypto.com—a designated contract market that the CFTC certified under the name HedgeStreet in 2004. The CFTC initiated its 90-day review period of the sports-related contracts on January 14, 2025. The CFTC requested that NADEX/crypto.com suspend its sports-related contracts during the pendency of the review. But the CFTC never made a similar request to Kalshi.

**D. The Maryland Lottery and Gaming Control Commission Threatened Kalshi With State Criminal Action With Regard To Its Sports-Event Contracts.**

51.     On April 7, 2025, the MLGCC sent a Notice to Cease and Desist to Kalshi. The MLGCC informed Kalshi that its sports-event contracts violated Maryland law, and directed Kalshi to "immediately cease and desist offering" them in the state. Exhibit 1, at 1.

52.    The MLGCC warned that under Maryland law, gaming activities are illegal unless

expressly authorized in the Annotated Code of Maryland, Criminal Law ("Crim. Law") Titles 12

and 13.  *Id*.  The letter further noted that MLGCC has the "final determination of whether

gaming is operating legally." *Id*. (citing Crim. Law § 12-113).

53.    The MLGCC also noted that "[s]ports wagering" is a legal, authorized gaming

activity in Maryland only "if it is offered and conducted as required by the State's Sports

Wagering law." *Id*. (citing State Government Article ("SG") § 9-1E-01, *et seq*.)  According to

the letter, the Commission approves legal sports wagers in Maryland and retains a broader

responsibility to oversee sports wagering and sports gaming revenue in the state. *Id*. (citing SG §

9-1E-01(j); Code of Maryland Regulations ("COMAR") 36.10.01.02B(24); SG § 9-1E-01(b); SG

§ 9-1E-01(e); SG § 9-1E-01(k); SG § 9-1E-01(i); SG § 9-1E-04(b)(6)(ii); COMAR 36.10.14.01;

SG § 9-1E-04; SG § 9-1E-12).

54.    The MLGCC further described a January 22, 2025 letter that Kalshi sent to the

CFTC regarding an event contract "relating to American sport leagues." *Id*. at 2.  The MLGCC

concluded that those contracts are "indistinguishable from the act of placing a sports wager" as

defined under Maryland law. *Id*.

55.    The MLGCC concluded that by offering its contracts in Maryland, Kalshi was

engaged in business in Maryland, but was unable to find Kalshi on a list of business entities

registered with Maryland's State Department of Assessment and Taxation ("SDAT").  The

MLGCC further noted that failure to register with SDAT would violate Business Regulation §

14-113, Annotated Code of Maryland, which prohibits any "person" from "sell[ing] or offer[ing]

to sell any business opportunity in the State or to any prospective buyer in the State unless the

business opportunity is registered under this subtitle." *Id*.

56.    Concluding that Kalshi "is operating in Maryland and is offering and conducting

what is, in fact, wagering on sporting events" without a sports wagering license issued by the

MLGCC, approval of its "wagers" by the MLGCC, or any other authorization under Maryland

law, the MLGCC directed Kalshi to "immediately cease and desist these illegal offerings in

Maryland." *Id.* The MLGCC's letter further instructed Kalshi to let the MLGCC know "within 15 days of [April 7, 2025] that Kalshi has complied with this notice." *Id.*

57.    Kalshi's counsel acknowledged receipt of the MLGCC's letter by email on the evening of April 7, 2025 and asked for an opportunity to discuss the issues raised therein. In a written response sent the next day, defendant MLGCC Managing Director of Gaming Michael Eaton stated that the MLGCC required a written response to its letter by April 22, 2025 before it would engage with Kalshi and its counsel.

58.    On April 8, 2025, the U.S. District Court for the District of Nevada preliminarily enjoined Nevada officials from pursuing legal action against Kalshi for offering event contracts in Nevada in a substantially similar case. *Hendrick*, 2025 WL 1073495, at *8. The court found that federal law preempts the "field of regulating CFTC-designated exchanges and the transactions conducted on those exchanges." *Hendrick*, 2025 WL 1073495, at *12. The court explained that Kalshi's contracts are "legal under federal law," and that Nevada's threats of civil and criminal enforcement of state gaming laws against Kalshi establish that Kalshi was likely to incur irreparable harm absent a preliminary injunction. Under the CEA, the court noted, states that object to Kalshi's sports event contracts "must take that up with the CFTC and Congress" rather than seeking to subject Kalshi to state law that federal law has preempted. *Id.* at *6-8.

59.    On April 18, 2025, Kalshi's counsel reached out to the MLGCC, offering to discuss the issues raised in the MLGCC's April 7 cease-and-desist letter and the implications of the Nevada court's ruling in the *Hendrick* matter. Neither the MLGCC, the MLGCA, nor any of their executives, commissioners, or staff responded to Kalshi's outreach.

60.    On April 21, 2025, Kalshi's counsel responded to the cease-and-desist letter in an email to Secretary Martin and Michael Eaton, the state official identified in the cease-and-desist letter as the official to whom follow-up correspondence should be addressed. Kalshi's email response explained that the "demand in your cease-and-desist letter implicates the very same issues being litigated in federal court in Nevada in a case where Kalshi recently successfully obtained a preliminary injunction enjoining enforcement of state law as preempted by laws duly

enacted by the Congress of the United States." Exhibit 2, at 1. The email further explained that state efforts to regulate or prohibit Kalshi's contracts "are preempted under the Supremacy Clause of the U.S. Constitution," and that Maryland "lacks authority to regulate or prohibit Kalshi's event contracts." *Id.* And Kalshi explained that it hoped "you will agree to preserve the status quo and forbear any enforcement against Kalshi pending the outcome of the proceedings in Nevada." *Id.* Noting the imminent cease-and-desist letter deadline, Kalshi noted that "[y]our agreement to preserve the status quo would avoid any need to burden a Maryland court with emergency litigation involving the same issues now under review in Nevada." *Id.* at 2.

61.    Mr. Eaton acknowledged receipt of the email but did not agree to preserve the status quo. Counsel for Kalshi then followed up by telephone and by email with Mr. Eaton to obtain those assurances given the looming cease-and-desist letter deadline. Mr. Eaton responded by email, again declined to provide those assurances, noted that Kalshi had "until April 22, 2025" to comply with the cease-and-desist letter, and added that "we will take appropriate actions based on your response." Exhibit 2. Faced with the specter of imminent enforcement of Maryland civil and criminal law as early as the next day, Kalshi filed this complaint.

## REQUISITES FOR RELIEF

62.    As a result of Defendants' threatened conduct described above, there is an imminent likelihood that Defendants' forthcoming actions will violate the Supremacy Clause of the U.S. Constitution and subject Kalshi and its customers to irreparable harm.

63.    An actual and substantial controversy exists between Plaintiff and Defendants as to their respective legal rights and duties. Defendants' conduct alleged herein will result in irreparable injury to Plaintiffs, including but not limited to criminal liability, economic hardship, and impairment of existing contractual relationships.

64.    Plaintiff has no plain, speedy, or adequate remedy at law to address the wrongs described herein. Plaintiffs therefore seek declaratory and injunctive relief restraining Defendants from enforcing Maryland law that interferes with the operation and function of Plaintiff's futures market described herein.

**JA47**

## COUNT I

### (Supremacy Clause—Preemption By Commodity Exchange Act)

65.     Plaintiff incorporates all prior paragraphs by reference.

66.     The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides:

> This Constitution, and the Laws of the United States which
>
> shall be made in Pursuance thereof; and all Treaties made, or
>
> which shall be made, under the Authority of the United States,
>
> shall be the supreme Law of the Land; and the Judges in every
>
> State shall be bound thereby, any Thing in the Constitution of
>
> Laws of any State to the Contrary notwithstanding.

67.     The Supremacy Clause mandates that federal law preempt state law in any field over which Congress has expressly or impliedly reserved exclusive authority to the federal government, or where state law conflicts or interferes with federal law.

68.     Congress explicitly gave the CFTC "exclusive jurisdiction" to regulate futures trading on approved exchanges. 7 U.S.C. § 2(a)(1)(A). Without a unified approach to futures regulation, Congress feared that fragmented and uncoordinated state regulation would lead to "total chaos." Senate Hearings, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark). Having analyzed the text, purpose, and history of the CEA, courts nationwide have agreed that Congress intended to preempt state law in futures trading on CFTC-regulated exchanges. *See, e.g., Am. Agric. Movement*, 977 F.2d at 1156; *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.); *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001); *Jones v. B.C. Christopher & Co.,* 466 F. Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co.,* 459 F. Supp. 733, 737 (N.D. Cal. 1978).

69.     In threatening to enforce R.C. Chapters 2915, 3775, and any rules adopted thereunder against Kalshi, Defendants are impermissibly intruding on the CFTC's exclusive authority to regulate futures trading on CFTC-regulated exchanges. Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be

**JA48**

restricted as "against the public interest"—authority that is completely incompatible with parallel state regulation of the same putative subject matter. 7 U.S.C. § 7a-2(c)(5)(C)(i). Because federal law occupies the entire field of regulating futures trading on regulated markets, the threatened actions are field preempted under the Supremacy Clause.

70.     Maryland authorities likewise threatened to deploy Maryland law in a manner that conflicts with federal law and policy. Defendants seek to ban event contracts that federal law and the CFTC have authorized, which would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges. In addition, complying with Defendants' demand to immediately cease offering event contracts in Ohio would conflict with the federal law governing DCMs and would thus imperil Kalshi's CFTC approval. For that reason, the threatened actions are conflict-preempted under the Supremacy Clause.

71.     Defendants therefore may not enforce Maryland's gambling laws against Kalshi because Kalshi is a federally regulated exchange that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 et seq.

## PRAYER FOR RELIEF

WHERFORE, Plaintiff Kalshi requests that judgment be entered in its favor and against Defendants as follows:

1. Enter a judgment declaring that Crim. Law Titles 12 and 13, SG §§ 9-1E-01, 9-1E-03, 9-1E-04, 9-1E-12, COMAR 36.10.01.02B and 36.10.14.01, Business Regulation § 14-113, any rules adopted thereunder, and any other Maryland law that is used in a manner to effectively regulate Plaintiff's designated futures market violates the Supremacy Clause of the United States Constitution as applied to Plaintiff, and a declaratory judgment under 28 U.S.C. §§ 2201-2202 saying the same;

2. Enter both a preliminary and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from Crim. Law Titles 12 and 13, SG §§ 9-1E-01, 9-1E-03, 9-1E-04, 9-1E-12, COMAR 36.10.01.02B and

36.10.14.01, Business Regulation § 14-113, any rules adopted thereunder, or any other Maryland law that attempts to effectively regulate Plaintiff's futures market, against Plaintiff;

3. Any other relief within this Court's discretion that it deems just and proper.

Dated this 21st day of April, 2025.       */s/ Neal Kumar Katyal*

Neal Kumar Katyal (D. Md. Bar No. 21694)
Joshua B. Sterling (pro hac vice pending)
William E. Havemann (D. Md. Bar No. 19164)
Milbank LLP
1850 K Street, Suite 1100
Washington D.C. 20006
Telephone: 202-835-7505
Facsimile: 213-629-5063

Mackenzie Austin (pro hac vice pending)
Milbank LLP
2029 Century Park East, 33rd Floor
Los Angeles, California 90067
Telephone: 424-386-4000
Facsimile: 213-629-5063

ATTORNEYS FOR PLAINTIFF

**JA50**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

|  |  |
|---|---|
| KALSHIEX LLC, | Case No.:  25-cv-01283 |
| *Plaintiff*, |  |
|  | **AFFIDAVIT OF XAVIER SOTTILE** |
| vs. |  |
| JOHN A. MARTIN, et al., |  |
| *Defendants*. |  |

## AFFIDAVIT OF XAVIER SOTTILE

1.    I am the Head of Markets at KalshiEX LLC. In that role, I am responsible for the generation of new markets. I received an undergraduate degree in Economics from Yale University in 2020. Before joining Kalshi, I worked at the U.S. House of Representatives, Bridgewater Associates, and the Yale Program on Financial Stability.

2.    My duties include devising proposed new contracts and shepherding those proposals from inception to completion. I also facilitate the process by which our markets undergo the regulatory review cycle under the purview of the Commodity Futures Trading Commission (CFTC). This involves everything from personally notifying the CFTC of contracts that Kalshi has self-certified under Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the CFTC regulations, to maintaining records pursuant to their requirements, certifying that Kalshi's contracts comply with the Act, and communicating with Commission staff over the substance of contract filings.

3.    The facts set forth herein are within my personal knowledge, and if called as a witness, I could and would competently testify to them.

4.    I offer this affidavit to describe the extraordinary harm that Kalshi and its users will incur unless the court immediately prevents the Maryland Lottery and Gaming Control Commission (the "MLGCC") from enforcing its demand that Kalshi "immediately cease and

desist" offering its sports-event contracts in Maryland. Exhibit 1, at 1. Without an injunction, Kalshi will be forced into an impossible choice. It must either decline to comply with the letter, subjecting itself and its representatives to the risk of criminal and civil liability. Or it must attempt to comply with the letter, thereby subjecting itself and its users to a host of harms that could not be repaired even if Kalshi ultimately succeeds in this case. This affidavit reflects my preliminary analysis of Kalshi's harms. Other unanticipated harms are possible, or even likely, given the nature of the MLGCC's letter and the uncharted territory it would lead to.

**I.    Harms Resulting from Noncompliance**

5.    If Kalshi declines to comply with the letter and continues to offer sports-event contracts in the state of Maryland, the company and its representatives risk criminal and civil jeopardy in Maryland.

6.    Maryland authorities have directed Kalshi and its representatives to "immediately cease and desist" offering its sports-event contracts in the state. Exhibit 1, at 1. The MLGCC has expressed that it believes that Kalshi's operations in Maryland are in violation of various state laws, including provisions in the Maryland criminal code. *Id.*

7.    Since Kalshi's designation as a CFTC-regulated contract market in 2020, the company has offered event contracts nationwide. As Head of Markets, I have assiduously complied with federal regulations with regard to all our contracts, including the sports-related contracts that Maryland authorities have highlighted in their letter. *See* Exhibit 1, at 1. We have done our best to run the company according to our understanding of the regulatory framework under which we have been governed for almost five years.

8.    Since receiving the cease-and-desist letter, Kalshi's operations—which are lawful under federal laws—risk exposing the company and representatives to state criminal and civil liability. It is terrifying and stressful to attempt to operate the company while the risk of criminal and civil jeopardy looms. I am deeply concerned that Maryland will file criminal and civil charges against Kalshi and its representatives. That fear becomes all the more distressing

given that Kalshi's only other alternative is compliance with the cease-and-desist letter, which would bring about a whole host of other harms to Kalshi and its users as I describe below.

**II.    Harms Resulting From Attempted Compliance**

9.    Choosing to comply with the cease-and-desist letter would introduce a new set of barriers and challenges that themselves would subject Kalshi and its users to irreparable harm. Technical compliance with the cease-and-desist letter on short order will be exceedingly difficult. But even if Kalshi could implement a technical solution to comply with the letter, halting access to event contracts in Maryland will cause severe harm to Kalshi's existing userbase. Compliance would also risk Kalshi's status as a registered contract market under the CFTC, throwing away years of efforts to earn and maintain its federal designation. All of these harms would be avoided by this Court's entry of immediate injunctive relief.

10.    Kalshi's harms from attempting compliance can be categorized as follows: (a) harms imposed by technical barriers to compliance, (b) harms to Kalshi's users from abruptly ceasing operations in Maryland, (c) risk that complying with Maryland law would jeopardize Kalshi's CFTC designation, and (d) economic and reputational harm to Kalshi from ceasing event-based contracts in Maryland. I describe each of these categories in more detail below.

   *a.  Harms Resulting from Technical Barriers to Compliance*

11.    The cease-and-desist letter requires Kalshi to undertake technological changes that would be either difficult or impossible for Kalshi to implement "immediately." Exhibit 1, at 2. Attempting to undertake these extraordinary technological changes would impose substantial and irreparable costs that could not be recouped even if Kalshi ultimately prevails in this case.

12.    The MLGCC's letter requires Kalshi to "immediately" cease all of its event contracts in Maryland. *Id.* If Kalshi attempted to comply with this demand, it would be required, first, to undertake efforts to geolocate which of its users are in Maryland, and, second, to cease all event contracts for those users. I have engaged in internal discussions with our leadership and technical team to determine the feasibility of compliance at both of these steps. Compliance

would be difficult to implement even under a relaxed timeline and could not be done "immediately." *Id*.

<div align="center">i.  <u>Step One – Identifying Maryland Users</u></div>

13.  Because Kalshi is subject to uniform federal regulation rather than state-by-state laws, it currently lacks a mechanism to identify which of its users are located in any particular state at any particular time. Implementing such a mechanism would be incredibly costly and could not be done immediately.

14.  Traditional web-based sports pools identify their users' whereabouts through a process called geolocation (or geo-positioning). Geolocation identifies and tracks an internet-connected device's location to provide real-time data as to the geographic position of the device. This technology is more sophisticated than merely identifying the device's IP address. Instead, geolocation uses a combination of location-identifiers like GPS coordinates, cell phone towers, WiFi access points, network connections, and Bluetooth beacons to triangulate location. While IP addresses can provide city-level location accuracy, geolocation is sensitive enough to track the exact moment that a device crosses state lines.

15.  It is my understanding that geolocation is a multi-step and technically complex process even for stationary devices, and that the process is even more challenging when tracking real-time movement of devices.

16.  The reason traditional sports pools deploy geolocation is to ensure that the bets and wagers that individuals place in their pools conform to state laws governing gaming and gambling. The precision of geolocation allows sports pools to make refined geographic determinations at the transaction-level rather than the user-level. Through geolocation, a company can allow and disallow certain transactions that take place in restricted areas rather than bluntly denying gamblers access to their platforms based on their residence irrespective of where they are located at the time of wager.

17.  Kalshi is not a sports pool. As a CFTC-regulated contract market, Kalshi has never developed or implemented geolocation on its platform because it is subject to the CFTC's

<div align="center">- 4 -</div>

<div align="center">**JA54**</div>

exclusive jurisdiction and is not subject to individual state laws governing gambling. Like the Chicago Mercantile Exchange and the Intercontinental Exchange, Kalshi does not distinguish between users or trades on the basis of geographic location. Instead, Kalshi is subject exclusively to federal law, which does not apply different standards to users of different states.

18.  Kalshi keeps Know Your Customer (KYC) data on the traders that place positions on its platform. Kalshi knows the permanent residence and IP address of its users but does not geolocate its users and therefore does not know where a user's device is located at any point in time. Kalshi maintains a database of its traders' KYC data, which is available for CFTC inspection upon request.

19.  Kalshi has no evident way to comply immediately with the cease-and-desist letter. If Kalshi sought to use its existing KYC data to identify Maryland-based users on its platform, this broad-brush approach would risk being deemed both under- and over-inclusive. KYC data would capture all users who claim their permanent residence as Maryland even if they place positions when they are located outside of Maryland. Conversely, the KYC data could fail to capture users whose permanent residence is outside of Maryland but travel to the state and place a position while there.

20.  If, alternatively, Kalshi sought to implement geolocation services across its platform, this process would be incredibly costly and time-consuming. Kalshi lacks the capacity to implement this service in-house and would therefore need to contract with a cloud- or server-based geolocation platform. I estimate that a partnership with a geolocation service provider would cost Kalshi up to tens of millions of dollars annually. Thus, if it attempted compliance with the MLGCC's letter, Kalshi would be forced to expend enormous financial resources on geolocating services, even if the court ultimately concludes that Maryland law does not apply to Kalshi.

21.  Based on my prior negotiations with other key partners, moreover, I estimate that negotiating a complex contract with a geolocation service provider alone could take months. Implementing and integrating the geolocation services into our existing platform would take

longer still. Thus, attempting to comply with the MLGCC's letter could not feasibly be done quickly and, even if it could, would subject Kalshi to massive irrevocable costs.

   ii. <u>Step Two - Geographical Cessation</u>

 22. Only after identifying Kalshi users who are physically present in Maryland could Kalshi cease offering its event contracts to users in Maryland. It would be required to do so through a technical process called "geofencing." This process would involve creating a virtual geographic boundary, or geofence, around the state of Maryland. Again, this process would be technically challenging, time-consuming, and expensive.

 23. While geofencing might block *newcomers* from trading on the platform from Maryland, geographical cessation presents a host of additional difficulties for *existing* Kalshi users. As of today, there are 23,408 accounts on Kalshi that have registered with a Maryland address and 17,526 of those accounts have passed KYC protocols and become full-fledged Kalshi members. While the precise numbers are not public, these accounts have over one million dollars in open interest on the Kalshi platform, meaning Maryland users have over one million dollars' worth of open positions on Kalshi markets that have not yet been settled.

 24. The MLGCC's letter could be understood to require Kalshi to cease its contracts even with respect to these existing positions. But doing so would present intractable technical difficulties.

 25. If the MLGCC's letter is understood to require Kalshi to unilaterally liquidate all trades that originated in Maryland, compliance would either be impossible or irreparably harmful. To explain why, it is helpful to distinguish Kalshi's exchange from a sports pool or casino. A casino or sports pool operates by taking bets from gamblers on games where the house has a statistical advantage. In other words, gamblers bet against the "house," and when the house loses, it must pay the gambler on demand. Casinos and sports pools therefore maintain a high level of liquidity so that they can pay out those bets.

 26. But Kalshi does not operate a casino or sports pool. Instead, it manages a federally regulated contract market. In contrast to a casino, an exchange facilitates trades between

different users on the platform. Traders do not bet against the house but rather enter into contracts with other traders on an exchange. To ensure compliance with the CFTC regulations, Kalshi operates a CFTC-approved derivatives clearinghouse that holds traders' funds during the pendency of an open contract. But Kalshi does not have access to immediate liquidity like a sports pool or casino that it could use to refund the cost basis of a trader's investment. Attempting to facilitate those exits using Kalshi's own funds would be exceptionally expensive and require technical capabilities that Kalshi does not now have.

27. Kalshi, moreover, would want to give its users reasonable notice to allow them to exit their positions voluntarily if they so choose. But the threat of criminal and civil liability from Maryland state authorities raises serious questions about whether Kalshi could even engage in that basic diligence.

### b. *Irreparable Harms to Kalshi's Users*

28. Ceasing operations in Maryland would impose irreparable harm on Kalshi's existing userbase. Ceasing operations could be understood to require either pausing current trades pending the outcome of the event that is the subject of the contract, or else liquidating user positions. Either option would impose severe harms on users.

#### i. Pausing Positions

29. Pausing current positions on Kalshi pending the outcome of the event at issue would deny traders access to their property and threaten their economic expectations.

30. Pausing positions pending the outcome of the event would deny Maryland users access to their property. Users' capital would be locked on the Kalshi platform and users with significant investments on the platform would be unable to retrieve it. If the event at issue is months or years in the future, users' assets would be locked up for the duration. Given current market conditions and uncertainty, this lack of access to funds could result in substantial losses.

31. Pausing positions would also cause a massive disruption to users' investment-backed expectations. Financial traders on Kalshi, like investors in other markets, expect to be able to

alter their investments as facts on the ground change. Due to the unique market-sensitivity of event contracts and the ease with which exchanges allow traders to place positions, traders capitalize on the opportunity to enter and exit their positions during the pendency of the contract. Traders also deploy well-recognized strategies like stop-loss orders and portfolio-wide loss mitigation strategies. Investors may invest in a contract expecting to sell if the contract price falls below a certain value or expecting to reinvest more if the investment proves especially sound. And while some contracts operate on short timelines, many of the contracts that Kalshi offers are long-term. For example, one of Kalshi's event contracts allows traders to place positions on whether the electric vehicle market share will rise above 30% by 2030. Traders who have placed a position on this contract may be mitigating their risk on other investments by placing a position that effectively balances out the investment portfolio. As the market for electric vehicles changes so does the price of the event contract. A trader may make an investment at 45 cents on the electric-vehicle contract and institute a stop-loss order to sell the contract when the price dips below 30 cents because 30 cents is the breakeven point on the investment.

32.  Traders are constantly engaged in the practice of ascertaining risk. As facts on the ground change so do traders' strategies. Indeed, traders often do not place a position on a contract with the intent of seeing that contract through to its expiration date and risking the full amount of the entry price. Instead, they monitor market fluctuations during the lifetime of the event contract to determine when to cash out. In other words, traders do not necessarily value event contracts based on the ultimate value of the contract at its expiration date. They also value the flexibility that event contracts provide as a financial tool to mitigate risk in real-time.

33.  Hitting pause on all Maryland-based trades would completely upend this investment strategy and destroy traders' expectations. If Kalshi were to pause all trades in Maryland, traders would no longer be able to take action on their existing contracts in accordance with their investment models. The flexible investment opportunity on which Kalshi users relied when entering into these contracts would be decimated. Traders would be forced either to leave

**JA58**

the state to change positions or suffer whatever losses they may endure as a result of being locked out.

34.  Pausing all Maryland-based trades would not solely affect Maryland-based users and transactions; it would wreak havoc on the entire Kalshi exchange ecosystem. Again, exchanges do not operate like casinos where gamblers bet against the house. Instead, exchanges facilitate contracts between individual traders on the market. Traders on either side of a contract are often from different states given that Kalshi does not distinguish between the geographic location of traders. If traders in Maryland are locked out of their positions, then their trading counterparts in other states will likewise be limited in whether and how often they can enter and exit their positions on the Kalshi exchange. Traders in California, for example, may expect to rely on traders in Maryland on contracts related to water availability in the American Southwest. But if the Maryland-based traders and transactions are all of a sudden restricted on the platform, that will have an equal and opposite effect on the market for traders in other states. Pausing transactions in Maryland would thus disrupt users' positions on the exchange nationwide, which they placed in reliance on their ability to flexibly enter and exit.

ii.    Liquidating Positions

35.  Liquidating Maryland-based positions on Kalshi would similarly subject users to irreparable harm. This would require Kalshi to refund either the current value of users' existing positions or the original cost of their existing positions on their respective open contracts. Unilaterally settling traders' positions based on current market conditions or the original cost of the positions could lead to significant losses for users. A trader, for example, may have entered a long-term event contract at 80 cents, but market conditions may have caused his position to decline in value to 30 cents. Rather than allowing the trader to ride out the market dip, immediate liquidation at the market rate would force the trader to take a 50-cent loss on the contract through no fault of his own. Likewise, a trader who bought a contract during a market dip and is forced to exit at the original contract price would not be able to realize any gains that he earned over his holding period for the contract. And in either event, refunding

users based either on the cost of their positions or the position's current value would be prohibitively expensive for Kalshi to execute.

36.  By the same token, immediately liquidating Maryland-based users' positions would disrupt the market for out-of-state users by causing a false signal in the market. Event contract markets respond to market fluctuations. The immediate exit of a large portion of investors on a particular contract would have a distorting effect on the value of the contract, impairing other investors' ability to predict market changes and act accordingly. If, for example, Maryland traders make up a plurality of the trades on a particular contract, the immediate liquidation of all Maryland positions would indicate to the market that the contract's value has changed, causing a price change in response. Remaining traders would suffer from the market distortion, resulting in substantial financial losses even for Kalshi's non-Maryland users. Alternatively, Kalshi could liquidate the entire market for both Maryland and non-Maryland users by settling prices at either the current market price or the original contract price, but this would, again, be prohibitively expensive and likely occasion the end of our federally-regulated exchange simply to stave off potential criminal or civil liability.

### c.  Harms to Kalshi Resulting from the Risk of CFTC Decertification

37.  Compliance with Maryland state law would jeopardize Kalshi's status as a CFTC-designated contract market. It is difficult to overstate how harmful this would be to Kalshi.

38.  As the Head of Markets at Kalshi, I oversee the entire regulatory review process for Kalshi's contract markets. In that role, I am responsible for ensuring that each of Kalshi's contracts complies with the nearly two dozen CFTC Core Principles that govern event contracts traded on CFTC-regulated exchanges. Complying with Maryland state law could be understood to put Kalshi out of compliance with these Core Principles, imperiling Kalshi's designation as a contract market under the CFTC's purview.

39.  CFTC Core Principle 4 charges designated contract markets with the "responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement processes." 17 C.F.R. § 38.250. Immediately liquidating or pausing traders' positions could be

understood to lead to the very sort of price distortion and market manipulation that the CFTC regulations guard against. Pausing trades could cause "disruption[] of the delivery or cash-settlement process" and immediate liquidation could cause "price distortion." *Id.*

40.  CFTC Core Principle 2 requires that designated contract markets provide their "members, persons with trading privileges, and independent software vendors with impartial access to its markets and services." 17 C.F.R. § 38.151(b). Pursuant to this regulation, "access criteria" must be "impartial, transparent, and applied in a non-discriminatory manner." *Id.* Discrimination based on geographic location would at least arguably conflict with this requirement, but that is exactly what Kalshi would have to do to comply with Maryland's cease and desist letter. Traders who execute positions in Maryland will be barred from accessing Kalshi's exchange and placing positions on Kalshi's contracts whereas traders in any other state will have unlimited access to the platform.

41.  Violation of these Core Principles could subject Kalshi to the panoply of enforcement mechanisms that the CFTC has at its disposal. Those tools range from civil monetary penalties to restitution to criminal liability.

42.  Violating these principles could even jeopardize Kalshi's federal-contract-market status with the CFTC. The CFTC is authorized to suspend or revoke Kalshi's designation if Kalshi fails to comply with federal regulations. Kalshi has spent the better part of the last decade working to gain federal registration as a contract market under the CFTC and has scrupulously endeavored to comply with CFTC regulations to maintain that registration. Losing our federal license would be catastrophic for the company, even if Kalshi were to ultimately succeed in this suit against the state authorities in the long-term.

43.  CFTC enforcement is not a mere theoretical risk. Several years ago, a CFTC-regulated exchange was charged with offering contracts on a discriminatory basis because it only allowed sportsbooks to trade on its platform. Discriminating on the basis of state residence could likewise subject Kalshi to federal repercussions. It is inconceivable, for example, to imagine a CFTC-designated contract market like the Chicago Mercantile

Exchange abruptly closing its exchange to users in a particular state without serious federal repercussions. Yet that is what compliance with the MLGCC's letter would require Kalshi to do.

44.  Compliance with Maryland law thus places Kalshi in a regulatory Catch-22: Either it complies with Maryland law and risks CFTC sanctions, or it continues operations in Maryland and subjects itself to state criminal and civil liability.

### d. Economic and Reputational Harms To Kalshi

45.  Compliance with Maryland state law will also cause economic and reputational harm to Kalshi. Losses on both fronts will be irrevocable even if Kalshi ultimately wins this case.

46.  Kalshi has more than 17,000 users in Maryland with over one million dollars invested on the exchange. The market uncertainty created by abruptly closing its contracts in Maryland could lead many users to leave the platform—even users outside of Maryland. Traders must have confidence in the integrity of the market to invest in it, but market confidence would be deeply shaken by complying with the MLGCC's order and the prospect that other states may to follow Maryland's lead. Even if Kalshi were to prevail in this lawsuit, regaining that market confidence would be difficult. Kalshi has expended enormous resources to advertise its platform, onboard traders, and maintain their business. Losing those traders would mean that many of those efforts were for naught. Thus, compliance will impose significant and irrevocable economic harm on the company.

47.  The threat of state litigation also endangers Kalshi's established partnerships and relationships. One of Kalshi's banner partners, Robinhood, has already chosen not to list Kalshi's event contracts in some states as a result of state cease-and-desist letters. This marks a massive disruption for Kalshi given that Robinhood had agreed to list Kalshi's contracts to its millions of active users, but chose to deviate from that plan in direct response to a cease-and-desist letter similar to the one Maryland issued here. Other partners that help us comply with CFTC regulations by facilitating our digital investment platform and helping to detect

- 12 -

improper trading behavior may also seek to limit their exposure given the uncertainty of the application of state law to Kalshi.

48.  The effects of Maryland's cease and desist letter are not limited to the state but instead threaten to open a pandora's box of regulation for the 49 other states that may wish to impose their local laws on Kalshi's exchange. In the absence of a temporary restraining order and preliminary injunction, partners and users alike will be hesitant to engage with Kalshi given this potential for state litigation.

\* \* \*

49.  The MLGCC's cease-and-desist letter imposes irreparable harms that Kalshi cannot avoid no matter how it responds. If Kalshi does not comply with the MLGCC's demands, the company faces civil and criminal liability and its representatives face nothing short of imprisonment. But if Kalshi attempts to comply with the MLGCC's demands, it would incur massive costs, its users would be harmed, its federal registration would be imperiled, and user confidence in the integrity of its market would be shaken. All of these harms are compounded by the real risk that other states will be emboldened by the MLGCC's demands to follow Maryland's lead. And there are serious questions about whether Kalshi could implement the technical solutions on an expedited timeline. Kalshi has spent years cultivating its reputation and developing its userbase. Compliance with the MLGCC's demands to ward off Maryland criminal and civil liability will lead to economic and reputational harm that will be difficult to regain.

50.  I certify under penalty of perjury that the foregoing is true and correct.

At New York, New York, this 21st day of April, 2025.

Xavier Sottile

- 13 -

**JA63**

# Exhibit 1

# Maryland Lottery and Gaming Control Commission

Wes Moore, Governor

Montgomery Park Business Center
1800 Washington Blvd., Suite 330
Baltimore, Maryland 21230

Tel: 410-230-8800
TTY users call Maryland Relay
www.mdlottery.com

April 7, 2025

Sent via:
**U.S. mail restricted delivery**
**regular U.S. mail, postage prepaid**
**email to:** support@kalshi.com and Legal@Kalshi.com

KalshiEX LLC, dba Kalshi
594 Broadway #407
New York, NY 10012
Attention: Legal Counsel

**RE: Notice to Cease and Desist**

Dear Legal Counsel:

**By this notice, KalshiEX, LLC ("Kalshi") is directed to immediately cease and desist offering in Maryland its event contract "Will <team> win <title>?", and any other contract or product that provides an investing opportunity based on predicting the outcome of any sporting league play or any sporting event.**

Under Maryland law, a gaming activity is illegal unless it is expressly authorized in the Annotated Code of Maryland, Criminal Law Article ("Crim. Law"), Titles 12 and 13. The Maryland Lottery and Gaming Control Commission ("Commission") makes the State's final determination of whether gaming is operating legally. Crim. Law § 12-113. Sports wagering is an authorized gaming activity in Maryland that is legal only if it is offered and conducted as required by the State's Sports Wagering Law (State Government Article ("SG") § 9-1E-01, *et seq.*), under which:

(1) "Sports wagering" means "the business of accepting wagers on any sporting event by any system or method of wagering, including single-game bets, teaser bets, parlays, over-under, moneyline, pools, *exchange wagering*, in-game wagering, in-play bets, proposition bets, and straight bets." SG § 9-1E-01(j) (emphasis added). An exchange wager is "a wager in which a bettor wagers with or against another bettor through a sports wagering licensee." Code of Maryland Regulations ("COMAR") 36.10.01.02B(24).

(2) Sports wagering can be legally conducted or offered only by sports wagering licensees (SG § 9-1E-03(b)), that are "mobile sports wagering licensees" (SG § 9-1E-01(e)) or "sports wagering facility licensees" (SG § 9-1E-01(k)), who hold licenses issued by the Commission. The Commission publishes the State's list of licensed mobile sports wagering and sports wagering facility licensees at https://www.mdgaming.com/legal-vs-illegal-online-gaming/.

(3) "Sporting event" includes most professional, collegiate, Olympic, and international athletic events. SG § 9-1E-01(i).

(4) Wagers can be placed only on sporting events approved by the Commission. SG § 9-1E-04(b)(6)(ii); COMAR 36.10.14.01. The Commission publishes its catalog of approved wagers at https://www.mdgaming.com/maryland-sports-wagering/ under "Catalog of Approved Events and Wagers".

(5) The Commission is required to ensure that sports wagering in Maryland is conducted legally and account for its proceeds. SG §§ 9-1E-04, 9-1E-12.

**Everett D. Browning, Sr., Chair**
E. Randolph Marriner, Vice Chair; Commissioners: Ade Adebisi, Diane Croghan, George L. Doetsch, Jr., Harold E. Hodges, James J. Stakem

April 7, 2025
Kalshi Cease and Desist
Page 2

As described in Kalshi's January 22, 2025 letter ("Letter") to the U.S. Commodity Futures Trading Commission ("CFTC"), Kalshi will offer the "Will <team> win <title>?" Contract ("the Contract"), which "is a contract relating to American sport leagues." Letter, p.2. "The Contract operates similar to other event contracts that the Exchange lists for trading." *Id.* Contracts are purchased for a fee, purchasers "are able to adjust their positions and trade freely," and after the market closes, purchasers are paid out according to outcomes. *Id.*

The Kalshi Contracts "relate to American sports leagues," and are purchased based on a prediction or belief that a specific outcome will occur; *i.e.*, that a certain team will win a certain game, title, etc. The outcome of a sporting event is the basis for determining whether payment will be made to the purchasers of the Contract. For this reason, the purchase of the Contract is indistinguishable from the act of placing a sports wager.

Kalshi Contracts are currently available for purchase in Maryland at https://kalshi.com/. Kalshi is conducting business in the State of Maryland. However, a search on the State Department of Assessment and Taxation's business entity search for the "Kalshi" name results in a response that "the business name you entered was not found." If in fact Kalshi is not registered with SDAT, it would be in violation of Business Regulation § 14-113, Annotated Code of Maryland, which requires that "[a] person may not sell or offer to sell any business opportunity in the State or to any prospective buyer in the State unless the business opportunity is registered under this subtitle."

Kalshi is operating in Maryland and is offering and conducting what is, in fact, wagering on sporting events. However, Kalshi does not hold a sports wagering license issued by the Commission, its wagers have not been approved by the Commission, and it is not otherwise authorized under Maryland law to offer wagers on sporting events. For reasons that include the foregoing, we direct Kalshi to immediately cease and desist these illegal offerings in Maryland. Please let us know within 15 days of the date of this letter that Kalshi has complied with this notice. If there are questions, please contact the Agency's Managing Director of Gaming, Michael Eaton, at michael.eaton@maryland.gov or 410-230-8821.

Sincerely,

John A. Martin, Secretary
Maryland Lottery and Gaming Control Commission


cc:  Michael Eaton, Managing Director of Gaming
     Holly Citko, Principal Counsel, Office of the Attorney General of Maryland
     Comptroller's Office of Maryland

**JA66**

**Kalshi**

**Kalshi** 

## Trading Fees

The following terms apply to all markets on the exchange, apart from specific products listed below, which have their own fee schedule.

Trading fees are only charged for orders that are immediately matched with orders sitting on the orderbook. Trading fees are not charged for orders placed that are not immediately matched and are instead left as resting orders on the orderbook unless they are included in our "Maker Fees" section.

Trading fees are charged as a variable percentage fee of the expected earnings on an individual contract, which is calculated by multiplying the maximum potential earnings from the contract by the implied probability of making those earnings, or the price of the contract divided by $1. The current general fee charged for a trade in dollars is given by the following formula:

fees = round up(0.07 x C x P x (1-P))

P = the price of a contract in dollars (50 cents is 0.5)

C = the number of contracts being traded

round up = rounds to the next cent

## Maker Fees

The products in this section will be subject to additional maker fees, as follows:

Series tickers: KXAAAGASM, KXGDP, KXPAYROLLS, KXU3, KXEGGS, KXCPI, KXCPIYOY, KXFEDDECISION, KXFED, KXNBA, KXNBAEAST, KXNBAWEST, KXNBASERIES, KXNHL, KXNHLEAST, KXNHLWEST, KXNHLSERIES, KXINDY500

fees = round up(0.0025 x C)

Maker fees are charged for orders placed that are not immediately matched and are instead left as resting orders on the orderbook. These fees are only charged when a trade is ultimately executed, there are no fees associated with canceling a resting order.

Users who pay more in maker fees as a result of rounding will be reimbursed in the first week of the following month if their reimbursement exceeds $10. For example, if a user places a resting order on five separate occasions for five contracts each and they are filled, the total fee will be $0.10. That user will then receive a rebate from Kalshi for $0.04. The following will be assessed at market close on the last day of each month and will be a cumulative calculation. If the cumulative calculation for the month does not exceed $10 in excess paid, a reimbursement will not be issued.

example rebate: round up(5 x (round up(5 x $0.0025)) - (5 x ( 5 x $0.0025)) = $0.04

rebate: round up(round up(C x $0.0025) - (C x $0.0025))

Last Updated: May 6, 2025

**Kalshi** 

## Settlement Fees

There is no settlement fee.

## Membership Fees

There is no membership fee.

## ACH Deposit and Withdrawal Fees

There is no fee associated with ACH deposits from your bank account to your Kalshi account. There is no fee associated with ACH withdrawals to your bank account from your Kalshi account.

## Wire Deposit and Withdrawal Fees

Fees for wire transfers vary from bank to bank. Kalshi does not charge any additional fees for wire deposit transfers. (Withdrawals by wire are not currently supported for transactions under $500,000).

## Debit Deposit and Withdrawal Fees

There is a 2% fee associated with debit deposits to your Kalshi account. There is a $2 fee associated with debit withdrawals from your Kalshi account.

## Crypto Deposit and Withdrawal Fees

Crypto deposits and withdrawals may have associated fees charged by Kalshi's third-party payment processor. Such fees will be clearly disclosed prior to any associated transaction.

## Futures Commission Merchant Customers

Users accessing Kalshi via a third-party Futures Commission Merchant may be charged fees by their Futures Commission Merchant that vary from the above fee schedule. Such fees will be disclosed prior to any associated transaction.

**Kalshi**



### General Trading Fees Table (See below for fees on specific markets)

| Price of 1 contract | Fee for 1 contract | Price for 100 contracts | Fee for 100 contracts |
|---|---|---|---|
| $0.01 | $0.01 | $1.00 | $0.07 |
| $0.05 | $0.01 | $5.00 | $0.34 |
| $0.10 | $0.01 | $10.00 | $0.63 |
| $0.15 | $0.01 | $15.00 | $0.90 |
| $0.20 | $0.02 | $20.00 | $1.12 |
| $0.25 | $0.02 | $25.00 | $1.32 |
| $0.30 | $0.02 | $30.00 | $1.47 |
| $0.35 | $0.02 | $35.00 | $1.60 |
| $0.40 | $0.02 | $40.00 | $1.68 |
| $0.45 | $0.02 | $45.00 | $1.74 |
| $0.50 | $0.02 | $50.00 | $1.75 |
| $0.55 | $0.02 | $55.00 | $1.74 |
| $0.60 | $0.02 | $60.00 | $1.68 |

Last Updated: May 6, 2025

**Kaishi**


| Price of 1 contract | Fee for 1 contract | Price for 100 contracts | Fee for 100 contracts |
| --- | --- | --- | --- |
| $0.65 | $0.02 | $65.00 | $1.60 |
| $0.70 | $0.02 | $70.00 | $1.47 |
| $0.75 | $0.02 | $75.00 | $1.32 |
| $0.80 | $0.02 | $80.00 | $1.12 |
| $0.85 | $0.01 | $85.00 | $0.90 |
| $0.90 | $0.01 | $90.00 | $0.63 |
| $0.95 | $0.01 | $95.00 | $0.34 |
| $0.99 | $0.01 | $99.00 | $0.07 |

Last Updated: May 6, 2025



**Kalshi**

**Specific Trading Fees Table for S&P500[1] and NASDAQ-100[2] Markets.[3]**

The following fee table applies to all iterations of the S&P500 and Nasdaq-100 markets. For S&P500 markets, whose Rulebook ticker begins with INX, this includes but is not limited to the INXD, INXW, INXM, INXY, INXU, and any other market beginning with the INX ticker. For Nasdaq-100 markets, whose Rulebook ticker begins with NASDAQ100, this includes NASDAQ100D, NASDAQ100W, NASDAQ100M, NASDAQ100Y, NASDAQ100U, and any other market beginning with the NASDAQ100 ticker. The INX and NASDAQ100 market fees are given by the following formula: fees = round up($0.035 \times C \times P \times (1-P)$) as explained above.

| Price of 1 contract | Fee for 1 contract | Price for 100 Contracts | Fee for 100 contracts |
|---|---|---|---|
| $0.01 | $0.01 | $1.00 | $0.04 |
| $0.05 | $0.01 | $5.00 | $0.17 |
| $0.10 | $0.01 | $10.00 | $0.32 |
| $0.15 | $0.01 | $15.00 | $0.45 |
| $0.20 | $0.01 | $20.00 | $0.56 |
| $0.25 | $0.01 | $25.00 | $0.66 |
| $0.30 | $0.01 | $30.00 | $0.74 |
| $0.35 | $0.01 | $35.00 | $0.80 |

---

[1] The official product name for S&P markets is "Will $INX close <above/below/between> <value> on <date>?" and the Rulebook name for S&P500 markets is $INX.
[2] The official product name for Nasdaq-100 markets is "Will the Nasdaq-100 close <date> <above/below/between> <value>?" and the Rulebook name for Nasdaq-100 markets is NASDAQ100.
[3] S&P 500 is a registered mark of Standard & Poor's Financial Services, LLC. Kalshi is not affiliated with Standard & Poor's and neither it, nor its affiliates, sponsor or endorse Kalshi or its products in any way. In particular, the Kalshi Contracts are not sponsored, endorsed, sold or promoted by Standard & Poor's. NASDAQ-100 is a registered mark of Nasdaq, Inc. Kalshi is not affiliated with Nasdaq and neither Nasdaq, nor its affiliates, sponsor or endorse Kalshi or its products in any way. In particular, the Kalshi Contracts are not sponsored, endorsed, sold or promoted by Nasdaq. Kalshi does not sponsor, endorse, recommend, or represent in any way the quality, value, utility as a market proxy, utility as a market benchmark, or any other use of any index.

Last Updated: May 6, 2025

**Kaishi**

| $0.40 | $0.01 | $40.00 | $0.84 |
| $0.45 | $0.01 | $45.00 | $0.87 |
| $0.50 | $0.01 | $50.00 | $0.88 |
| $0.55 | $0.01 | $55.00 | $0.87 |
| $0.60 | $0.01 | $60.00 | $0.84 |
| $0.65 | $0.01 | $65.00 | $0.80 |
| $0.70 | $0.01 | $70.00 | $0.74 |
| $0.75 | $0.01 | $75.00 | $0.66 |
| $0.80 | $0.01 | $80.00 | $0.56 |
| $0.85 | $0.01 | $85.00 | $0.45 |
| $0.90 | $0.01 | $90.00 | $0.32 |
| $0.95 | $0.01 | $95.00 | $0.17 |
| $0.99 | $0.01 | $99.00 | $0.04 |

Last Updated: May 6, 2025

# Ten Times Kalshi Said People Could Bet On Things

 **DUSTIN GOUKER**
APR 03, 2025

♡ 1        💬 3        ↻                                                                    Share

Kalshi has started moving away from "betting" and "gambling" language almost universally in recent weeks. So before all of that is lost to the sands of time, deleted by Kalshi, etc., I thought it would be a good time to aggregate some of the messaging Kalshi used before the recent legal firestorm. Enjoy.

Thanks for reading Event Horizon! Subscribe for free to receive new posts and support my work.

| Type your email... | Subscribe |

## In the App Store and Google Play

Kalshi has toned down its messaging on the places where you can download its app. But until recently, it would portray its product as "bet on the headlines" or "bet on the elections":

1. **App Store:** Here is CEO Tarek Mansour sharing Kalshi's App Store ranking, showing the "Bet the 2024 Election" tagline. And this is the only artifact of the Bet on the Headlines tagline I could find:

JA74



# Kalshi: Bet on the headlines

**KalshiEX LLC**

| 4.0★ | 100K+ | |
|------|-------|---|
| 687 reviews ⓘ | Downloads | PEGI 3 ⓘ |

<  🔖

🖥  This app is not available for any of your devices



| You can bet on that | Legal in all 50 states | Hourly markets, every day | Real-time forecasts | Topics you care about |

2. **Google Play:** Again, the actual listing is scrubbed of betting language in the Play Store, but you can still see it in search.



Google Play
https://play.google.com › store › apps › datasafety › id=c...  ⋮

Kalshi: Bet on the headlines - Apps on Google Play

Here's more information the developer has provided about the kinds of data this app may collect and share, and security practices the app may follow.

## On social media

This is the easiest one to find, as Kalshi had aggressively marketed itself as a betting platform over the fall and winter. This will not be inclusive of every last thing I could find, these are just some examples:

3. Hat tip to Barron's on this one



4. Comparing itself to FanDuel (Instagram)



5. Here's every time Mansour used the term "bet." One example:



6. I started saving some of this stuff when Kalshi rolled out betting on the Super Bowl. Here are some Instagram ads that Kalshi was promoting:



**kalshi_official** ✔
Sponsored

...

# Sports Betting Legal in all 50 States on Kalshi

By Jackson Smith, Sports News

🕐 4 minute read · Updated 08:17 AM EDT, Thu Jan 23, 2025

💬 2 comments



Kalshi

Install now ›

4/22/25, 3:55 PM                                  Ten Times Kalshi Said People Could Bet On Things



92    3

**kalshi_official** Breaking News: You can now bet on sports in all 50 states with Kalshi

JA80





♡ 1 ◯ ◁

🔖

▣ 🐦 🌐 Followed by **out2win** and **102K others**

**kalshi_official** Breaking News: You can now legally bet on sports in Texas with Kalshi

## On its site/blog

7. How to bet on who will attend the inauguration

# How to bet on who will attend the inauguration

By Kalshi



8. How to bet on who Trump will pardon in his first 100 days

# How to bet on who Trump will pardon in his first 100 days

By Kalshi



9. Some blogs are now deleted and redirected to the main blog:



Kalshi
https://kalshi.com › blog › article › how-to-trade-the-20...

**How to Bet on the Grammys**

Kalshi allows you to trade on various Grammy markets, using your music industry insights to capitalize on opportunities and hedge against potential risks.

10. Its "Press" section is almost entirely links to articles that refer to Kalshi as betting, demonstrating how much Kalshi leaned into that terminology before recently:

**JA83**

## Press





Robinhood vs. Kalshi: Which Election Betting Site Is Better?

Kalshi CEO: We are expecting $100M bets on our election prediction market platform

The $100 Million Election Bet Is Here





Kalshi resumes taking bets on U.S. election after appeals court lifts freeze

MIT grads fight for your right to bet on 2024 elections

Ready your bets: Election gambling is going mainstream in the US

Thanks for reading Event Horizon! Subscribe for free to receive new posts and support my work.

| Type your email… | Subscribe |


1 Like

## Discussion about this post

Comments    Restacks

JA84

4/22/25, 3:55 PM                    Ten Times Kalshi Said People Could Bet On Things

  Write a comment...

**Herschel Bird**  Apr 3                                                    ···

Doesn't matter; the fix is in: Donald Trump Jr hired as Kalshi "advisor"; Trump names former Kalshi associate as chairman of CFTC; former Kalshi associate now with SEC/DOGE.

♡ LIKE      ⬭ REPLY                                                    ⬆ SHARE

**2 replies by Dustin Gouker and others**

**2 more comments...**

© 2025 Dustin Gouker · Privacy · Terms · Collection notice
Substack is the home for great culture

**JA85**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KalshiEX, LLC　　　　　　　　　　*　　Case No.: 25-cv-1283-ABA
　　*Plaintiff*

　　　　　　　　　　　　　　　　*

　　vs.　　　　　　　　　　　　　*

John A. Martin, et al.,　　　　　　*
　　*Defendants*.　　　　　　　　*

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

### AFFIDAVIT OF MICHAEL EATON

1.　　I am the Managing Director of the Gaming Division.  I have been employed by the Agency since December 2005 and in my current position since June 2023.

2.　　As the Managing Director of the Gaming Division, I have managerial responsibility for multiple regulatory and oversight units, including Sports Wagering, within the Agency. My role involves supervising and coordinating professional, technical, and administrative staff responsible for enforcing state gaming laws and regulations, overseeing compliance, and ensuring integrity across all regulated gaming activities.

3.　　A core component of my responsibilities is managing and overseeing the State's sports wagering program, which includes both retail and mobile operators. I lead the technical evaluation and approval process for new sports wagering licensees, ensuring that each applicant satisfies the Commission's statutory and regulatory requirements prior to commencing operations.

4.　　Before an individual or entity can be licensed as a sports wagering operator in Maryland, my team conducts comprehensive reviews of their operational readiness, including but not limited to:

- Hours of operation
- Technical specifications
- Internal control systems under COMAR 36.10.13
- Sports wagering platforms and equipment

1

**JA86**

- Data information center protocols
- Procedures for offering various types of sporting event wagers
- Testing and controlled demonstration processes
- Employee training
- Security and integrity standards
- Compliance with any additional conditions imposed by the Commission prior to launch

5.    I am responsible for determining whether applicants have adequately prepared to conduct safe, secure, and compliant sports wagering operations. Once all applicable requirements are verified and satisfied, I authorize the issuance of a mobile or retail sports wagering license.

6.    In addition to the technical evaluation and approval process, I oversee ongoing compliance efforts for all licensed sports wagering entities. This includes continuous monitoring to ensure accurate reporting of revenues, effective internal controls, adherence to regulatory changes, and the implementation of robust responsible gambling programs. I also manage the State's voluntary exclusion program for problem gamblers, ensuring it is accessible and effectively administered.

7.    As the Managing Director of the Gaming Division, I play a critical part in maintaining the integrity of Maryland's legalized sports wagering market, protecting consumers, ensuring fairness, and upholding the public trust in the gaming industry.

*Prediction Markets v. Traditional Sports Wagering*

8.    Prediction markets like Kalshi have introduced a subset of their event contracts that allow individuals to speculate on the outcomes of sports events ("gaming devices"). Kalshi began offering gaming devices as part of their event contract offerings in January 2025. While Kalshi's platform is often presented as regulated financial instruments, they raise several concerns for state regulators, particularly in the realm of sports wagering.

**JA87**

9.      Prediction markets like Kalshi blur the line between financial instruments and gambling. Kalshi's gaming devices enable users to place binary bets (e.g., "yes" or "no") on specific outcomes, such as the winner of a championship game. Although these are described as financial derivatives, their structure closely resembles traditional sports betting; Kalshi has also marketed its gaming devices as "sports wagering." This resemblance challenges the distinction between regulated financial markets and state-controlled gambling activities, undermining state authority over sports wagering.

Example – Fanduel sports wager on New York vs Boston (Game 1) - $100 money line wager to win $315



Example – Kalshi sporting event contract on New York vs Boston (Game 1) - $100 Yes Contact for New York to win $312



10.    Kalshi's gaming devices and traditional sportsbook wagering both offer individuals a mechanism to mitigate the risk of their wager – through the sell option in prediction markets and the cashout feature in sports betting. Both allow users to exit a position before the event is resolved, but they differ in mechanics, purpose, and implications. Generally, the cashout is a *convenience feature* controlled by the sportsbook with pricing tilted to protect their margin. Meanwhile, the sell option in a prediction market is part of a *market mechanism* where user actions influence price.

*Regulatory Challenges*

11.    The similarity between traditional sportsbook wagering and Kalshi's gaming devices presents challenges for State regulators in their regulation of the sports wagering business.

12.    The Commodity Futures Trading Commission (CFTC) oversees these prediction markets at the federal level. However, this federal oversight conflicts with state laws that govern

gambling and sports betting. For instance, if a platform offers contracts on local sports events without state approval, it bypasses state regulations designed to ensure fair play and consumer protection.

13.     Maryland's sports wagering law is focused on responsible gaming as a core regulatory mandate in order to prevent gambling addiction, underage gambling, and the resulting financial harm. In 2011, the MLGCA instituted a self-help program for individuals who wish to voluntarily exclude themselves from casino or lottery play. The program is also available for sports wagering and daily fantasy sports. A sports wagering licensee may not permit an individual on the voluntary exclusion list to participate in sports wagering. A sports wagering licensee may not permit an individual younger than 21 years old to participate in sports wagering.

14.     As a federally regulated prediction market, Kalshi has no responsible gambling framework in the traditional sense and allows individuals younger than 21 years old to participate in sports wagering. Commodities and futures law regulation is designed to protect market integrity – not to manage problem gambling.

15.     Kalshi's gaming devices create the potential for market manipulation and integrity issues. Both traditional sports betting and Kalshi's gaming devices allow financial speculation on sports outcomes, and, in turn, this incentivizes attempts to manipulate game results. Such risks necessitate the robust monitoring and enforcement mechanisms available to the MLGCA and which are not evident in Kalshi's practices or the CTFC's regulation of Kalshi.

16.     Maryland's sports wagering regulators are focused on game integrity and fair wagering; on the other hand, Kalshi is focused on market integrity and trading conduct. Kalshi is beginning to incorporate and borrow from sports betting best practices, but the CFTC does not require or otherwise oversee Kalshi's implementation of these practices.

5

**JA90**

17.     States generate significant revenue from regulated sports betting through licensing fees and taxes. Prediction markets operating under federal regulation do not pay licensing fees or taxes. This situation creates an uneven playing field between state-licensed sportsbooks and federally regulated prediction markets. Kalshi's model operates outside of state-regulated gaming frameworks, which means it does not directly contribute to state revenues in the same way traditional sports betting or gaming operators do.

a.     Missed Licensing Fees: States that have legalized sports betting or similar gambling products typically require operators to pay licensing fees, which can be substantial. As Kalshi asserts it is not subject to this regulatory framework, it is does not pay these fees to any state, potentially depriving states of significant revenue. Kalshi's absence from this fee structure means states lose out on this potential income.

b.     No Tax Contribution:  Maryland taxes the gross gaming revenue (GGR) of operators. These taxes can contribute substantial sums to Maryland's budget. Kalshi does not pay any gaming taxes, meaning that Maryland loses out on tax revenues that would otherwise be generated from bettors engaging with regulated platforms.

c.     Loss of Economic Activity Related to Gambling Infrastructure: Sportsbooks and other gambling platforms create jobs and economic activity in the State—through physical locations, customer service operations, and regulatory bodies. With Kalshi operating outside of these systems, Maryland misses out on the economic multiplier effect typically driven by regulated gaming.

d.     Competitive Disadvantage for State-Licensed Operators: Kalshi's ability to offer sports-related contracts without paying state taxes places state-licensed sportsbooks at a competitive disadvantage. This may deter local operators who are subject to higher taxation from competing effectively with Kalshi.

*Geolocation and Geo Fencing*

18.     In his affidavit supporting Kalshi's Motion for Preliminary Injunction, Kalshi's Head of Marketing asserted that implementing "geolocation services across its platform … would be incredibly costly and time consuming." ECF 2-1 at ¶ 20.  In addition, he alleged that geo-fencing Maryland, creating a virtual geographic boundary around the State, "would be technically challenging, time-consuming and expensive." *Id.* ¶ 22.

19.     Licensed sports betting operators in the Maryland must comply with its geolocation laws to ensure wagers are only placed within the State's boundaries.  They do this by

a.     Use of Certified Geolocation Technology: Operators partner with certified third-party geolocation service providers (e.g., GeoComply, Xpoint, or OpenBet) who offer tools for mobile apps or websites.  These services/tools collect multiple layers of location data such as: Wi-Fi signals, GPS, IP addresses, Bluetooth beacons, Cell tower triangulation.

b.     Real-time Location Checks: Geolocation is checked before and during a wagering session, and continuous polling ensures that users don't spoof their location or move out of state mid-session.

c.     Device Integrity and Fraud Prevention: These services often perform device integrity checks to detect: VPNs, Proxies, Emulator use, Location spoofing apps,

d.     Regulatory Reporting:  Logs and geolocation verification records are retained, and access is made available to Maryland regulators for audit purposes.

20.     According to Kalshi's privacy policy, Kalshi's existing tech supports similar capabilities.  According to its policy, Kalshi collects:  Precise geolocation data via browser or mobile app, IP addresses, which can be mapped to approximate physical locations, Device information, including mobile identifiers and cookies that can support location correlation.  Kalshi then uses this information: To determine an individual's "eligibility to use the Services (for example, based on your location);" and "To comply with legal obligations and enforce policies." https://kalshi.com/privacy-policy

21.     Based on the information collected from its users, Kalshi already uses location-based access controls, like geofencing within the U.S.  The framework described mirrors the infrastructure used by sportsbook operators - especially if it includes mobile or browser-based geolocation.

7

**JA92**

22.    If Kalshi needs to restrict access to gaming contracts in states where such activity is not authorized under local law, implementing state-specific configuration is both practical and technically achievable.

a.    Foundational Geolocation Controls Already Exist:  Kalshi's platform already uses essential tools such as IP address detection, device ID tracking, and geolocation-based access management. These existing mechanisms provide a solid technical foundation for enforcing state-based access restrictions.

b.    Incremental, Not Structural, Enhancements Required:  Enforcing state-specific blocks would not necessitate a full system redesign. Rather, it would involve targeted enhancements—such as integrating third-party geolocation verification services (e.g., GeoComply) or refining current rule sets—to ensure compliance at the state level.

23.    Licensed sports wagering operators must configure their trading systems to comply with each state's unique regulations, which define what sports and bet types are allowed. These systems use a state-approved event catalog to filter available betting options based on the user's location, detected through geolocation. For example, some states ban prop bets on college athletes or wagering on in-state college teams.  The trading system must enable or disable markets and ensure only approved wagers are offered to stay legally compliant.

24.    As an example of a national operator restricting a product by state, DraftKings operates *Pick6*, a peer-to-peer daily fantasy sports contest format. Participants compete against each other by building lineups of athletes from a single sport and selecting whether their chosen athletes will outperform statistical projections in real-world sporting events. Peer-to-peer fantasy sports is not permitted in Maryland and DraftKings prohibits individuals physically located in Maryland from participating.

JA93

I certify under penalty of perjury that the foregoing is true and correct.

Michael Eaton, CPA, CIA
Managing Director, Gaming
Maryland Lottery and Gaming Control Agency,

9

**JA94**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KalshiEX, LLC　　　　　　　　　　　*　　Case No.: 25-cv-1283-ABA
　　*Plaintiff*

　　　　　　　　　　　　　　　　　　*

vs.

　　　　　　　　　　　　　　　　　　*

John A. Martin, et al.,

　　*Defendants*.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

### AFFIDAVIT OF JOHN MARTIN

1.　　I am the Director of the Maryland Lottery and Gaming Control Agency (MLGCA or Agency) and the Secretary of the Maryland Lottery and Gaming Control Commission (MLGCC or Commission). I have been in the Lottery and Gaming industry since 2009 and in my current position since July 1, 2021.

2.　　I oversee the operation of the Maryland Lottery, now in our 53rd year. Last fiscal year (FY24), we achieved total sales of over $2.7 billion and generated nearly $700 million of profit to support a variety of good causes in the state of Maryland, including public health, safety, the environment and education.

3.　　In addition, under the auspices of the Commission, I oversee the regulation of Gaming interests in the state of Maryland, including six land-based casinos, over 20 sportsbooks (roughly half brick and mortar and the other half online) and a number of ancillary gaming concerns such as bingo halls, skills-based amusement devices, and online fantasy competitions. Gaming contributions to the state were over $885 million in FY 24 with the primary beneficiary being the Maryland Education Trust Fund.

1

4.      Sports wagering, in its first full year of operation, delivered over $60 million of the $885 total, with its sole beneficiary being the Blueprint for Maryland's Future Fund, which supports education programs.

5.      The MLGCA is the regulatory and enforcement Agency with jurisdiction over the legal gambling industry in the state of Maryland. In November 2020, a voter referendum was passed to include sports wagering and assigned the authority to licensing and regulating sports wagering exclusively to the Commission. Brick and mortar sportsbooks opened in December of 2021; mobile sportsbooks began accepting sports wagers in November of 2022.

6.      Sports wagers may only be offered in Maryland pursuant to a license issued by the Commission. A person or entity that accepts a sum of money risked on the outcome of a sporting event, without a valid license issued by the Agency, violates Maryland's Sports Wagering Laws. as set forth in Ann. Code of Md., St. Gov., §§ 9-1E-01 *et seq.* and Code of Maryland Regulations ("COMAR"), Chapter 36, Title 10.

7.      In February of 2025, I became aware that KalshiEX, LLC ("Kalshi") was conducting sports wagers in violation of Maryland's Sports Wagering Laws under the guise of offering "event contracts" on sporting events ("gaming devices"), specifically focused on the NFL Super Bowl game. Their offering of sports events contracts persisted during the NCAA college basketball tournament in March and April. After consulting with our Agency Executive team, I decided to notify Kalshi that it must cease conducting sports wagering business in the State of Maryland.

8.      On April 7, 2025, and in my capacity as Secretary for the Commission, I sent Kalshi a Cease and Desist letter instructing them "to immediately cease and desist offering in Maryland

**JA97**

its event contract "Will <team> win <title>?" or any other contract "based on predicting the outcome of any sporting event."

9.      Kalshi's continued operation as an unlicensed sports wagering business in Maryland presents an ongoing harm to the citizens and businesses of the State.

10.     Specifically, Kalshi's illegal conduct of sports wagering through its gaming devices poses a threat to the State because Kalshi's gaming devices:

1. Jeopardize critical tax revenues that fund important beneficiary programs;
2. Lack patron protections and consumer safeguards; and
3. Circumvent Maryland's comprehensive state licensing and regulatory standards.

*Jeopardize critical tax revenues that fund important beneficiary programs.*

11.     Kalshi's gaming devices will be in direct competition with the State's licensed, regulated sports books without being subject to the State's comprehensive licensing, enforcement, auditing and tax collection functions that licensed sports book are required to comply. The taxes collected in Maryland from licensed sports wagering operators directly benefits the Blueprint for Maryland's Future Fund:

> *"The Blueprint for Maryland's Future was passed by the Maryland General Assembly in 2021 to transform public education in the state into a world-class education system. The Blueprint will increase state funding for education over the next 10 years, enrich student experiences and accelerate student outcomes, as well as improve the quality of education for all children in Maryland, especially those who have been historically underserved."*

https://blueprint.marylandpublicschools.org/

12.     Licensed sports wagering operators are required to pay sports wagering application fees, taxes and other fees that fund critical programs like the Blueprint for Maryland's Future Fund.

13.     Kalshi's gaming devices cannibalize revenue from the established and licensed sports wagering operators in Maryland, thereby harming critical state programs funded by sports

wagering revenue. Since they have few regulatory obligations and pay no taxes, they can offer better payouts to entice players, which ultimately leads to increasing their market-share in this area.

14.    Maryland state law established a secure, responsible, fair and legal system of sports wagering to protect our state residents and capture revenue in the form of taxes and payments. By asserting that its sports wagering business is beyond the State's reach, Kalshi avoids paying the associated fees and taxes to operate a sportsbook and that licensed sportsbook operators pay. By undercutting existing lawfully operated sportsbooks, Kalshi threatens over $60 million of much-needed annual state funding with its unregulated activities in Maryland.

*Lack patron protections and consumer safeguards.*

15.    Kalshi's gaming devices place Maryland patrons at risk by disregarding the carefully crafted statutory and regulatory protections developed by the Maryland General Assembly and MLGCA. In Maryland, licensed sports wagering operators obey comprehensive rules regarding minimum age requirements (21+); Know Your Customer (KYC) guidelines; geo-location; responsible gaming and voluntary self-exclusion programs; prohibitions against accepting wagers on prohibited events – such as high school sports; and strict advertising standards.

16.    Kalshi provides none of these gaming integrity and safety standards, or patron protections. By circumventing Maryland's regulatory oversight, consumer protections and safeguards, Kalshi is providing a "backdoor" to illegal sports wagering outside of Maryland law and regulations.

17.    For example, the MLGCA has strict compliance protocols in place in support of responsible gaming patron protections. Maryland-licensed sports wagering operators must show

evidence of player protections allowing individuals to set limits on deposits, wagers, losses, time spent on the sportsbook, and periodic notifications concerning sports wagering activity. They must offer patrons an option to voluntary exclude themselves from play. They must prominently display resource information, especially the nationally supported 1-800 GAMBLER phone number for resource assistance.

18.    Problem gambling is a concern for every sports wagering regulator in the country. I am deeply troubled that Kalshi's promoting sports events contracts as an investment vehicle is adverse to MLGCA's position and contradicts a key element of our messaging on responsible play. *Circumventing of Maryland's comprehensive state licensing and regulatory standards.*

19.    The MLGCA conducts extensive background checks, detailed financial assessments, and thorough integrity and suitability due diligence prior to awarding a sports wagering operator license. Maryland's state-run regulatory system is dramatically and intentionally undermined by the Kalshi circumventing MLGCC's regulatory oversight.

20.    Public trust is crucial in any gambling endeavor. The MLGCA possesses specialized knowledge and expertise in regulating gaming to protect the public interest. Maintaining the integrity and consistency of the state's established regulatory framework for all forms of gambling is paramount to protecting the public trust, ensuring consumer safety, preserving sports integrity and safeguarding vital state revenue streams.

21.    Kalshi's gaming devices increase vulnerabilities for market manipulation, insider trading and match fixing, thereby threatening the perceived and actual integrity of sports competitions.  Today, these sports events contracts operators are targeting the legal sports wagering market regulated at the state level.

**JA100**

22.    On the other hand, Maryland is working with licensed operators, sports leagues and other stakeholders to address integrity concerns surrounding competition and wagering activity; adhere to anti-money laundering controls; ensure platform and equipment testing by respected third-parties against strict certification standards; establish data sharing between operators and sports leagues; develop sophisticated monitoring systems to detect suspicious betting patterns; and implement strict rules prohibiting participation by insiders (players, officials, etc.). Prediction markets do none of these things.

23.    Per Maryland's Sports Wagering law, sports wagering may only be conducted in Maryland by licensed sports wagering operators in accordance with Maryland's statutory and regulatory provisions. The purchase and sale of Kalshi's gaming devices is materially identical to sports wagering in that it allows individuals to make a speculative wager on the outcome of a sporting event. The U.S. Supreme Court has recognized that gambling and sports wagering is best left to regulation by the states.

24.    The Commodities and Futures Trading Commission ("CFTC") is ill-equipped to regulate the sports wagering industry. It would take years for the CFTC to create the regulatory system and oversight infrastructure that states already have in place and are working in multiple jurisdictions across the country.

I certify under penalty of perjury that the foregoing is true and correct.

John A. Martin,
Director, Maryland Lottery and Gaming Control Agency,
Secretary, Maryland Lottery and Gaming Control Commission

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KalshiEX, LLC                               *     Case No.: 25-cv-1283-ABA
    *Plaintiff*

        *

    vs.                                       *

        *

John A. Martin, et al.,                     *
    *Defendants.*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### <u>AFFIDAVIT OF J. PHILIP METZ, JR.</u>

    1.    I am the Director of the Regulatory Licensing and Investigations Division for the Maryland Lottery and Gaming Control Agency (MLGCA or Agency). I have been employed by the Agency since August 16, 2011 and in my current position since August 16, 2011.

    2.    As the Director of the Regulatory Licensing and Investigations Division, I have overall managerial responsibility for the Division. My role involves supervising and coordinating investigative, financial, and administrative staff responsible for ensuring that all entities and persons providing goods or services to gaming and sports wagering licensees are properly licensed or registered in accordance with Maryland laws and regulations.

    3.    An applicant for a sports wagering license must prove by the "Clear and Convincing" evidence standard that they have satisfied all required qualifications criteria before being issued a Maryland gaming or sports wagering license.

    4.    One of my main responsibilities is managing and overseeing the investigations of all sports wagering entities and individual applicants, which includes both retail and mobile operators, that conduct business in Maryland. I oversee the due diligence investigations and approval process for not only the initial, but also the subsequent renewals of all sports wagering applicants and licensees, ensuring that each applicant satisfies the Commission's statutory and

regulatory requirements.    My team conducts comprehensive background investigations, including but not limited to ensuring the following criteria is met by the aforementioned standard:

- Financial stability, integrity and responsibility
- Integrity of financial backers, investors, mortgages, bondholders, and other holders of indebtedness
- Good character, honesty and integrity
- Sufficient business ability and experience
- Potential Disqualifying factors listed in COMAR 36.10.03.02.C and MD State Government Article 9-1E-07 (g)(1)

5.    In addition to the investigation of initial and renewal applicants and the related Commission review approval process, my Division, through a series routine audits ensures that a licensee is adhering to their ongoing obligation to inform the Agency of any changes to the information contained in licensing applications or registrations.  This process is a critical part in maintaining the integrity of Maryland's legalized sports wagering market, protecting consumers, ensuring fairness, and upholding the public trust in the gaming industry.

6.    Failure to ensure the integrity of gaming operations would certainly result in compromising the public's trust that a fair gaming environment exists in Maryland. Repercussions from the loss of the public's trust would undoubtedly have a negative impact upon the State's gaming revenue.

7.    The State of Maryland requires that all sports wagering applicants pay licensing fees, which can be substantial.  Maryland generates significant revenue from regulated sports betting through licensing fees and taxes.

8.    The Maryland Lottery and Gaming Control Commission (the Commission) is required to determine whether sports wagering applicants have proven, by clear and

2

convincing evidence, that they meet the qualifications for licensure under the Sports Wagering Law. Requirements for qualification include: (1) applicant's financial stability and integrity; (2) integrity of any financial backers related to the application; (3) applicant's good character, honesty, and integrity; (4) applicant's business ability; and (5) whether there are any mandatory disqualifiers that prevent the applicant from proving its qualifications by clear and convincing evidence. The Commission cannot issue a license unless it determines that the applicant is qualified.

9.    The Regulatory Licensing and Investigations Division of the Maryland Lottery and Gaming Control Agency ("Agency") conducts the required background investigation of an applicant's qualifications. A report of the background investigation is provided to the Commission to assist it in determining whether the applicant is qualified.

10.    As a prerequisite to being eligible for a Sports Wagering Facility License or a Mobile Sports Wagering License, an applicant must submit a Sports Wagering Facility License Application or a Mobile Sports Wagering License Application to the Commission.

11.    The applicant must prove to the Commission, by clear and convincing evidence, that it meets the qualification criteria set forth in the Annotated Code of Maryland, State Gov't Article ("SG"), § 9-1E and the Commission's sports wagering regulations in Code of Maryland Regulations ("COMAR") 36.10 (collectively, "the Sports Wagering Law"). The Sports Wagering Law also includes and incorporates applicable licensing requirements in SG § 9-1A, and COMAR 36.03 (collectively, "the Gaming Law"), which establishes requirements for all casino-related licenses.

12.    Specifically, the applicant must prove that it is qualified under SG § 9-1E-07(e) and COMAR 36.10.03.02, 36.10.06.02 and not disqualified under SG § 9-1E-07(g)(1). An

applicant must provide all information to the Commission that is necessary for a qualification determination as to the applicant, its principals, and its principal entities.

I certify under penalty of perjury that the foregoing is true and correct.

J. Philip Metz, Jr.    5-8-2025

J. Philip Metz, Jr.
Director, Regulatory Licensing and Investigations Division
Maryland Lottery and Gaming Control Agency

*KalshiEX LLC*

January 22, 2025

**SUBMITTED VIA CFTC PORTAL**
Secretary of the Commission
Office of the Secretariat
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, D.C. 20581

Re: KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing
of the "Will <team> win <title>?" Contract

Dear Sir or Madam,

Pursuant to Section 5c(c) of the Commodity Exchange Act and Section 40.2(a) of the regulations of the
Commodity Futures Trading Commission, KalshiEX LLC (Kalshi), a registered DCM, hereby notifies
the Commission that it is self-certifying the "Will <team> win <title>?" contract (Contract). The Contract
will initially be listed on **January 23, 2025**. The Exchange intends to list the contract on a custom
basis. The Contract's terms and conditions (Appendix A) includes the following strike conditions:

- **<team>**
- **<title>**

Along with this letter, Kalshi submits the following documents:

- A concise explanation and analysis of the Contract;
- Certification;
- Appendix A with the Contract's Terms and Conditions;
- Confidential Appendices with further information; and
- A request for FOIA confidential treatment.

If you have any questions, please do not hesitate to contact me.

Sincerely,

Xavier Sottile
Head of Markets
KalshiEX LLC
xsottile@kalshi.com

*KalshiEX LLC*

**JA106**

**KalshiEX LLC**
**Official Product Name: "Will <team> win <title>?"**
**Rulebook: TITLE**
**Kalshi Contract Category: Sports ▾**
**January 22, 2025**

## CONCISE EXPLANATION AND ANALYSIS OF THE PRODUCT AND ITS COMPLIANCE WITH APPLICABLE PROVISIONS OF THE ACT, INCLUDING CORE PRINCIPLES AND THE COMMISSION'S REGULATIONS THEREUNDER

Pursuant to Commission Rule 40.2(a)(3)(v), the following is a concise explanation and analysis of the product and its compliance with the Act, including the relevant Core Principles (discussed in Appendix E), and the Commission's regulations thereunder.

### I.    Introduction

The "Will <team> win <title>?" Contract is a contract relating to American sports leagues.[1]

Further information about the Contract, including an analysis of its risk mitigation and price basing utility, as well as additional considerations related to the Contract, is included in Confidential Appendices C, D, and E.

Pursuant to Section 5c(c) of the Act and CFTC Regulations 40.2(a), the Exchange hereby certifies that the listing of the Contract complies with the Act and Commission regulations under the Act.

**General Contract Terms and Conditions:** The Contract operates similar to other event contracts that the Exchange lists for trading. The minimum price fluctuation is $0.01 (one cent). Price bands will apply so that Contracts may only be listed at values of at least $0.01 and at most $0.99. Further, the Contract is sized with a one-dollar notional value and has a minimum price fluctuation of $0.01 to enable Members to match the size of the contracts purchased to their economic risks. As outlined in Rule 5.12 of the Rulebook, trading shall be available at all times outside of any maintenance windows, which will be announced in advance by the Exchange. Members will be charged fees in accordance with Rule 3.6 of the Rulebook. Fees, if they are charged, are charged in such amounts as may be revised from time to time to be reflected on the Exchange's Website. A new

---

[1] The Contract has not been endorsed by the National Football League, the National Hockey League, the National Basketball Association, or the National Collegiate Athletic Association. The use of the terms National Football League, National Hockey League, National Basketball Association, or National Collegiate Athletic Association does not indicate an endorsement of this product.

Source Agency can be added via a Part 40 amendment. All instructions on how to access the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract. They may be clarified at any time. Furthermore, the Contract's payout structure is characterized by the payment of an absolute amount to the holder of one side of the option and no payment to the counterparty. During the time that trading on the Contract is open, Members are able to adjust their positions and trade freely. The Expiration Value and Market Outcome are determined at or after Market Close. The market is then settled by the Exchange, and the long position holders and short position holders are paid according to the Market Outcome. In this case, "long position holders" refers to Members who purchased the "Yes" side of the Contract and "short position holders" refers to Members who purchased the "No" side of the Contract. Specification of the circumstances that would trigger a Market Outcome of "Yes" are included below in the section titled "Payout Criterion" in Appendix A.

*KalshiEX LLC*

## CERTIFICATIONS PURSUANT TO SECTION 5c OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 7A-2 AND COMMODITY FUTURES TRADING COMMISSION RULE 40.2, 17 C.F.R. § 40.2

Based on the above analysis, the Exchange certifies that:

- ❏ The Contract complies with the Act and Commission regulations thereunder.
- ❏ This submission (other than those appendices for which confidential treatment has been requested) has been concurrently posted on the Exchange's website at https://kalshi.com/regulatory/filings.

Should you have any questions concerning the above, please contact the exchange at ProductFilings@kalshi.com.

_____

By: Xavier Sottile
Title: Head of Markets
Date: January 22, 2025

*KalshiEX LLC*

**Attachments:**

Appendix A - Contract Terms and Conditions

Appendix B - Trading Prohibitions

Confidential Appendices

*KalshiEX LLC*

## APPENDIX A – CONTRACT TERMS AND CONDITIONS

**Official Product Name: "Will <team> win <title>?"**
**Rulebook: TITLE**

# TITLE

**Scope:** These rules shall apply to this contract.

**Underlying:** The Underlying for this Contract is the winner of <title>. Revisions to the Underlying made after Expiration will not be accounted for in determining the Expiration Value.

**Source Agency:** The Source Agencies are the Associated Press, ESPN, The Wall Street Journal, and Fox Sports.

**Type:** The type of Contract is an Event Contract.

**Issuance:** The Contract is based on the outcome of a recurrent event. Thus, Contract iterations will be issued on a recurring basis, and future Contract iterations will generally correspond to the next year that <title> is awarded.

**<team>:** <team> refers to an entity participating in a sport.

**<title>:** <title> refers to a given sports title, and will include a specified year and/or other distinguishing information, e.g., "The 2025 National Football League Super Bowl" or "The 2025 National Football League American Football Conference Championship". <title> may refer to the titles of the National Football League, the National Hockey League, National Basketball Association, or the National Collegiate Athletic Association.[2]

**Payout Criterion:** The Payout Criterion for the Contract encompasses the Expiration Values that it is reported that the first official final result of <title> event is that <team> holds the title.

- If the <title> event is postponed past its scheduled date (e.g. because of severe weather or other emergencies), then the market will remain open and will resolve after the sooner of (1) the winner being reported or (2) two years following the <title> event's original scheduled date.
- If the <title> event is suspended during play, then the market will remain open and will resolve after the sooner of (1) the winner being reported or (2) two years following the <title> event's original scheduled date.
- If the <title> event is moved to be earlier than its scheduled date, then the market will remain open and will resolve after the winner is reported.

---

[2] The Contract has not been endorsed by the National Football League, the National Hockey League, the National Basketball Association, or the National Collegiate Athletic Association. The use of the terms National Football League, National Hockey League, National Basketball Association, or National Collegiate Athletic Association does not indicate an endorsement of this product.

*KalshiEX LLC*

- If the <title> event is cancelled outright (or declared "no contest") before it is played, or after it has started, then the markets for eligible teams (not disqualified or eliminated) will resolve so "Yes" holders receive $1/[the number of eligible teams (not disqualified or eliminated) remaining for which there is a strike listed] rounded down to the nearest cent and "No" holders receive $1 minus the Yes payout.

- If multiple teams are reported <title> holders, then the markets for those teams will resolve so "Yes" holders receive $1/[the number of teams declared <title> holders] rounded down to the nearest cent and "No" holders receive $1 minus the Yes payout. For example, if two teams tie in the <title> event and both teams are reported as <title> holder, both "Yes" and "No" holders for each <team> shall receive $0.50 per share.

- If <team> forfeits the <title> event, the market will resolve to "No" for the forfeiting team.

- If the <title> event is ended early, before regulation time has ended, but the associated governing body declares that the event is over and there is a winner or multiple winners, or a tie, then the market will resolve based on that determination.

- If <team> is disqualified before the Contract expires – even if the <title> event has finished – the market for <team> will resolve to "No". If this causes another team to be formally declared the winner of <title>, the contract will resolve on the basis of which team is named <title> holder.

- Note that any revisions after Expiration will not be considered. Therefore if <team> or its opponent is disqualified or stripped of its title after the Contract expires, that will not impact the market's resolution.

- If <team> was eliminated from contention for <title>, then the market will resolve "No". A team is eliminated from contention for <title> when it is reported so by the Source Agency.

- If <team> is eliminated from contention for <title>, and the market for <team> resolved to No, but then <team> is re-entered into contention (for example, because a team that was originally in contention was disqualified), then a new market with the same <team> may be created. The original market will remain resolved to No.

**Minimum Tick:** The Minimum Tick size for the Contract shall be $0.01.

**Position Accountability Level:** The Position Accountability Level for the Contract shall be $25,000 per strike, per Member.

**Last Trading Date:** The Last Trading Date of the Contract will be the same as the Expiration Date. The Last Trading Time will be the same as the Expiration time.

**Settlement Date:** The Settlement Date of the Contract shall be no later than the day after the Expiration Date, unless the Market Outcome is under review pursuant to Rule 7.1.

*KalshiEX LLC*

*KalshiEX LLC*

**Expiration Date:** The latest Expiration Date of the Contract shall be the day after the day the title event has an official final result. If an event described in the Payout Criterion occurs, expiration will be moved to an earlier date and time in accordance with Rule 7.2.

**Expiration time:** The Expiration time of the Contract shall be 10:00 AM ET.

**Settlement Value:** The Settlement Value for this Contract is $1.00, unless otherwise specified in accordance with the Contract's terms and conditions.

**Expiration Value:** The Expiration Value is the value of the Underlying as documented by the Source Agency on the Expiration Date at the Expiration time.

**Contingencies:** Before Settlement, Kalshi may, at its sole discretion, initiate the Market Outcome Review Process pursuant to Rule 6.3(d) of the Rulebook. If an Expiration Value cannot be determined on the Expiration Date, Kalshi has the right to determine payouts pursuant to Rule 6.3(b) in the Rulebook.

*KalshiEX LLC*

*KalshiEX LLC*

## APPENDIX B – TRADING PROHIBITIONS

In addition to the general prohibition against trading on material nonpublic information, the Exchange will be instituting additional prohibitions for trading the TITLE contract. Persons under 18 years of age are not permitted to create Kalshi accounts. The following individuals will be prohibited from trading:

- Current and former players, coaches, and staff of the National Football League, the National Hockey League, National Basketball Association, and the National Collegiate Athletic Association;
- Paid employees of the league and league participants;
- Owners of teams and the league;
- and household members and immediate family of all above.

These prohibitions apply to the appropriate values of <title>. For example, former players of the National Football League are not prohibited from trading on iterations of the Contract related to the National Basketball Association unless they are part of any other group listed for that league. To clarify, "league" here refers to any of the four organizations in the first bullet point.

USCA4 Appeal: 25-1892    Doc: 17    Filed: 10/15/2025    Pg: 119 of 182
Case 1:23-cv-03257-JMC    Document 40    Filed 06/04/24    Page 1 of 91
Case 1:25-cv-01283-ABA    Document 37-1    Filed 06/13/25    Page 1 of 4

[1]

```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3   KALSHIEX LLC,
                                         Civil Action
 4            Plaintiff,                  No.  1:23-cv-03257-JMC

 5        vs.                            May 30, 2024
                                         1:00 p.m.
 6   COMMODITY FUTURES TRADING
     COMMISSION,
 7
                  Defendant.             Washington, D.C.
 8   _____

 9               TRANSCRIPT OF THE MOTION HEARING
                 BEFORE THE HONORABLE JIA M. COBB
10                 UNITED STATES DISTRICT JUDGE
     APPEARANCES:
11
     For the Plaintiff
12
              JACOB M. ROTH, ESQ.
13            AMANDA KELLY RICE, ESQ.
              JOHN HENRY THOMPSON, ESQ.
14            JOSHUA BROOKS STERLING, ESQ.
              SAMUEL V. LIOI, ESQ.
15            Jones Day
              51 Louisiana Avenue, NW
16            Washington, D.C. 20001

17   For the Defendant

18            ANNE WHITFORD STUKES, ESQ.
              CONOR BARRY DALY, ESQ.
19            RAAGNEE BERI, ESQ.
              MARGARET P. AISENBREY, ESQ.
20            Commodity Futures Trading Commission
              Office of the General Counsel
21            1155 21st Street, N.W.
              Washington, D.C. 20581
22

23

     Court Reporter:   Stacy Johns, RPR
24                      Official Court Reporter

25      Proceedings recorded by mechanical stenography, transcript
              produced by computer-aided transcription
```

USCA4 Appeal: 25-1892    Doc: 17    Filed: 10/15/2025    Pg: 120 of 182
Case 1:23-cv-03257-JMC    Document 40    Filed 06/04/24    Page 15 of 91
Case 1:25-cv-01283-ABA    Document 37-1    Filed 06/13/25    Page 2 of 4

15

[15]

```
 1   C-SPAN, you won't be able to find it.  I think it was inserted
 2   in writing after the fact.
 3          It wasn't literally a colloquy, but you can see it in
 4   the congressional record, and they give three examples of
 5   gaming contracts:  Football, horseracing and golf.  They're all
 6   games.  I don't think that's an accident.  I think that
 7   interpretation makes sense too, because what is a game?  It's
 8   something that has no inherent economic significance.  It's
 9   something that is done for amusement.  It may be done for
10   sport.  It may be done purely to facilitate the betting itself,
11   right, for its own sake.
12          So I think it makes sense for Congress to have thought
13   about that category.  Contracts that involve games are probably
14   not the type of contracts that we want to be listed on an
15   exchange, because they don't have any real economic value to
16   them.  But again, what's tying that together is the existence
17   of the game because the game is the thing that doesn't have
18   intrinsic economic significance.
19          Now, of course, elections are not games.  They're not
20   done for amusement; they're not done for sport; they're not
21   done to facilitate betting.  Elections matter.  They determine
22   our government; they determine our governance.  Nobody would
23   really call them games.  So in our view a contract relating to
24   an election is not gaming.
25          THE COURT:  I have never before this case considered
```

USCA4 Appeal: 25-1892   Doc: 17   Filed: 10/15/2025   Pg: 121 of 182
Case 1:23-cv-03257-JMC   Document 40   Filed 06/04/24   Page 20 of 91
Case 1:25-cv-01283-ABA   Document 37-1   Filed 06/13/25   Page 3 of 4

20

[20]

1   gaming as involving a game, then there's a certain sense to it,

2   right?  As I said earlier, like games don't have any external

3   economic significance, generally speaking, so as a category it

4   makes sense for Congress the carve that out.

5        If you treat it as games plus elections, it's very

6   strange because it means you could have event contracts on the

7   weather, on whether somebody's going to be nominated for a

8   cabinet role, on what color dress Taylor Swift is going to wear

9   next week.  Any of those are fine, but elections would be swept

10  up by the gaming category.  It's just weird because even if you

11  think, look, elections are different and should be treated

12  differently.  And I know my colleague is going to try to

13  explain why that's misguided, but even if you accepted that, it

14  has nothing to do with the word "gaming."

15       So I think the, sort of, takeaway is the Commission is

16  latching onto this word as sort of a convenient way to squeeze

17  its desired policy outcome into the statute, but it's not a

18  serious attempt to really understand what Congress meant by

19  this term in this context.

20       THE COURT:  When you're saying, and I would agree,

21  that a game doesn't have any external economic significance,

22  how does that -- how is that relevant for the specific argument

23  you're making?  What exactly do you mean by that?

24       MR. ROTH:  What I mean is if we're trying to think of

25  what was Congress trying to get at with gaming --

USCA4 Appeal: 25-1892    Doc: 17    Filed: 10/15/2025    Pg: 122 of 182
Case 1:23-cv-03257-JMC    Document 40    Filed 06/04/24    Page 21 of 91
Case 1:25-cv-01283-ABA    Document 37-1    Filed 06/13/25    Page 4 of 4

21

[21]

1          THE COURT:  Okay.

2          MR. ROTH:  If we understand gaming to mean a contract

3    that involves an underlying game, then there's a certain policy

4    sense to treating that category differently, because Congress

5    could have been thinking about it and saying well -- there is

6    some of this in the legislative history, the colloquy, if you

7    look at it -- well, games don't matter in the real word;

8    they're games.  So we don't want people essentially gambling,

9    right, on something that doesn't matter in a CFTC-regulated

10   exchange.  So it gives some sense to the categorization that

11   Congress laid out.  And the problem I have with the alternative

12   interpretations is they don't have that, sort of, unifying

13   policy rationale behind them.  Right?

14         Again, the really broad version sweeps up everything;

15   that doesn't work.  And then games plus elections, what is

16   tying those things together?  It's not, it doesn't seem to me,

17   a line that you could really seriously draw from this word.  So

18   that's what I'm trying to get at.

19         THE COURT:  Okay.

20         MR. ROTH:  Okay.  So that takes care of Roman V, and

21   so our position is that is then the end of the analysis and

22   there's no need to go any further, but I will turn it over to

23   my colleague, if Your Honor has no further questions on this

24   piece, to address the arbitrary and capricious issue.

25         THE COURT:  There are a lot of references by the

USCA4 Appeal: 25-1892    Doc: 17    Filed: 10/15/2025    Pg: 123 of 182
Case 1:25-cv-01283-ABA    Document 37-2    Filed 06/13/25    Page 1 of 15

[1] 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                     NORTHERN DIVISION

 3    KALSHIEX, LLC,              )
            Plaintiff ,          )
 4                                )
            v.                    )   CASE NUMBER: ABA-25-01283
 5                                )
      JOHN A. MARTIN, et al.,    )
 6          Defendants.          )
      _____)

 7

 8     TRANSCRIPT OF PROCEEDINGS - PRELIMINARY INJUNCTION HEARING
                BEFORE THE HONORABLE ADAM B. ABELSON
 9                UNITED STATES DISTRICT JUDGE
                     Wednesday, May 28, 2025
10                      Courtroom 7A

11                     A P P E A R A N C E S

12    FOR THE PLAINTIFF:

13
          BY: WILLIAM E. HAVEMANN, ESQUIRE
14            JOSHUA B. STERLING, ESQUIRE
              RICHARD HEASLIP, ESQUIRE
15            SAMANTHA ILAGAN, ESQUIRE
              MILBANK, LLP
16            1850 K Street NW
              Washington, DC  20006
17

18    FOR THE DEFENDANT:

19        BY: ERIK J. DELFOSSE, ESQUIRE
              MAX F. BRAUER, ESQUIRE
20            RICHARD HEASLIP, ESQUIRE
              OFFICE OF THE ATTORNEY GENERAL-STATE OF MARYLAND
21            SECURITIES DIVISION
              200 St. Paul Place, 25th Floor
22            Baltimore, Maryland  21202

23

24    _____

          ***Proceedings Recorded by Mechanical Stenography***
25         Transcript Produced by Computer-Aided Transcription
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA120

```
 1    have granted Kalshi a preliminary injunction to prevent states

 2    from attempting to enforce state's gaming or gambling laws

 3    against Kalshi's event contracts.  These Courts recognize that

 4    California was likely to prevail on the merits given CFPC's

 5    exclusive jurisdiction over trading on designated contract

 6    markets.  And they also found that Kalshi was likely to suffer

 7    irreparable harm in the absence of an injunction.

 8         This Court should follow that sensible approach.  I don't

 9    think that the defendants have offered any reason for this

10    Court to depart from the considered judgments of two other

11    federal courts and subject Kalshi to irreparable harm while

12    this case is litigated.

13         And I'd be happy to answer whatever the Court --

14    questions the Court may have, but it may help just to begin

15    with the defendants' definition about what does or does not

16    qualify as a swap, which is I think the principal argument

17    that they make in their opposition to the preliminary

18    injunction motion.

19              THE COURT:  Let's get to that later.  Let's start

20    with preemption.  I know most of the state's brief focuses on

21    your point.  But you need to persuade me that when Congress

22    enacted Dodd-Frank, they intended to preempt state

23    gaming/gambling laws, right?

24              MR. HAVEMANN:  I don't think that's quite right,

25    Your Honor.  I don't think that we need to persuade Your Honor
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

**JA121**

03/28/2025 Hearing on Preliminary Injunction

 1      that Congress intended to preempt these laws in their

 2      entirety.  These laws still are laws of general applicability

 3      that apply in the vast majority of circumstances.  What we

 4      need to persuade you is that when Congress enacted Dodd-Frank

 5      and enacted the Special Rule and added the term "swap" to the

 6      definition of -- to the exclusive jurisdiction provision that

 7      it intended to preempt state regulation of trading on

 8      designated contract markets, trading of swaps on designated

 9      contract markets.

10          We do need to persuade Your Honor of that and I just

11      think that there is quite overwhelming evidence that that is,

12      in fact, what Congress intended.  And I'll just begin with the

13      texts of the statute itself.  I mean, the text of the Special

14      Rule --

15              THE COURT:  Are you talking about field preemption

16      or conflict preemption?

17              MR. HAVEMANN:  Both, Your Honor.

18              THE COURT:  So let's take one at a time.

19              MR. HAVEMANN:  Sure.

20              THE COURT:  So give me -- explain to me why you

21      think § 2(a)(1)(A) satisfies the legal standard for field

22      preemption.

23              MR. HAVEMANN:  The standard for field preemption is

24      when Congress creates a framework of regulation so pervasive

25      that it left no room for the states to supplement it.  And

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA122

USCA4 Appeal: 25-1892    Doc: 17    Filed: 10/15/2025    Pg: 126 of 182
Case 1:25-cv-01283-ABA    Document 37-2    Filed 06/13/25    Page 4 of 15
03/28/2025 Hearing on Preliminary Injunction

[5]    5

1    that's exactly what § 2 does with respect to the category of

2    trades that happen on DCMs.  And in between 1974 when Congress

3    created the CFTC and 2010 when it enacted the Special Rule out

4    of the term "swap," there's uniform agreement among the Courts

5    of Appeals -- I don't believe it was subject to any dispute --

6    that there was field preemption in this context.

7         There's a Seventh Circuit case that we cited in our

8    brief --

9              THE COURT:  That's the *Agriculture* case?

10             MR. HAVEMANN:  The *Agriculture Movement* case.

11   There's the *Leist v. Siplow* case, a Judge Friendly opinion

12   from the Second Circuit.

13             THE COURT:  Well, okay.  Let's go one at a time.  So

14   *Agriculture*.  So that was the 1992 case that involved farmers,

15   right?

16             MR. HAVEMANN:  It involved -- yeah, I think it was

17   soybean swaps or soybean options on a designated contract

18   market.  And what the Seventh Circuit noted in that case was a

19   state law that would directly affect trading on or the

20   operation of a futures market is preempted.

21             THE COURT:  And was that -- I don't remember -- a

22   field preemption holding or conflict preemption holding?

23             MR. HAVEMANN:  It's a -- I'm not sure is the answer.

24   I think that there are elements of both.  I think that the

25   Seventh Circuit rejected field preemption of all derivatives

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA123

USCA4 Appeal: 25-1892    Doc: 17    Filed: 10/15/2025    Pg: 127 of 182
Case 1:25-cv-01283-ABA    Document 37-2    Filed 06/13/25    Page 5 of 15

[6]  6

```
 1    trading, but that's because there are some derivatives trading
 2    that's off exchange that everyone agrees is not preempted.  So
 3    the Seventh Circuit rejected that field preemption with
 4    respect to that broader field than the one that we assert
 5    Congress has preempted here.
 6         But then it proceeded to say that look, it would conflict
 7    with the scheme that Congress intended to enact -- or the
 8    Court proceeded to say it would conflict with the scheme that
 9    Congress intended to enact if states could supplement
10    regulation by the CFTC and directly affect trading on a
11    designated contract market.  So that's the Seventh Circuit --
12         THE COURT:  When you say "and directly affect
13    trading," so if what we're talking about is can a regulated
14    entity comply with both federal law and state law or not, you
15    know, is there a conflict, that's a conflict preemption
16    question.  So I think -- and the analysis is different if
17    we're talking about field preemption or conflict preemption.
18         So in any event, where you were in your argument was
19    going through Court of Appeals cases that you think support
20    your field preemption theory.
21         MR. HAVEMANN:  Sure.  And just to put a little bit
22    of a finer point on the Seventh Circuit case, the reason I
23    think it does support field preemption is because I don't
24    understand the Seventh Circuit to have honed in on whether or
25    not state regulation could be deemed complementary or
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA124

```
 1        different states and the District of Columbia's licensing

 2        regimes, there is a real risk and it is hard to see it as

 3        anything other than a conflict with the obligation to offer

 4        impartial access to the exchange.

 5             THE COURT:  Why couldn't this -- another framing be

 6        Kalshi saying -- or not Kalshi, the CFTC or the CEA providing

 7        that sports bet contracts can be provided impartially to any

 8        -- by any entity on a DCM as long as they comply with

 9        otherwise applicable state laws?

10             MR. HAVEMANN:  Because I think that there is a real

11        tension between any such conclusion on the part of the CFTC

12        and actual compliance with state laws.  I mean, Maryland is a

13        state that offers -- that allows wagering on sports on the

14        part of licensed entities.  Some states do not.  And so if we

15        comply in Maryland, then we face the decision in other states

16        as to well, do we just concede that they have the authority to

17        regulate us and therefore we can't operate in the state of

18        California or New York or Texas?  And then you have the exact

19        sort of patchwork of regulation that Congress said it was

20        enacting in the 1974 amendments.

21             THE COURT:  But you agree that states traditionally

22        have had primary police power, if you will, over gambling

23        laws, right?

24             MR. HAVEMANN:  At that level of generality, yes.  I

25        agree.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

**JA125**

```
 1                    THE COURT:  And so there is, in fact, currently a
 2       patchwork of laws:  Some states you can do it, some states you
 3       can't.
 4                    MR. HAVEMANN:  But not with respect to federally
 5       regulated entities on a designated contract market.
 6                    THE COURT:  No, I understand that that's your
 7       argument.
 8                    MR. HAVEMANN:  Yeah.  And with respect to the
 9       state's traditional police power, I think we are in a
10       different posture than in the normal sort of case where the
11       presumption against preemption applies because here we are not
12       arguing that these state laws should be wiped off the books.
13       These state laws still apply.  They still apply to the vast
14       majority.  They still apply in the vast majority of
15       applications.  The only context in which they do not apply is
16       a context in which it has been well settled for 50 years that
17       if the trading occurs on a designated contract market, then
18       it's subject to the exclusive jurisdiction of the CFTC.  It is
19       not subject to the shifting frameworks of 50 different states.
20                    THE COURT:  Why -- going back to the "except as
21       herein above provided" language, in other contexts that type
22       of -- or in other statutes, that type of introductory language
23       could read something like "unless otherwise provided," or in
24       other words, out of an abundance of caution we are now making
25       clear that we are not superseding or limiting, that's the
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

**JA126**

```
 1        words of the statute, the laws of any state.
 2             So why is "except as herein above provided" evidence that
 3        exclusive jurisdiction does mean we are preempting state laws
 4        as opposed to Congress making clear in what we're referring to
 5        as a savings clause, making clear that they were not intending
 6        to supersede or limit any state laws?
 7             MR. HAVEMANN:  I think that that is the only way to
 8        interpret the language that Congress enacted, "except as
 9        herein above provided."  And then the immediately preceding
10        section refers to the exclusive jurisdiction in this narrow
11        category of cases.
12             So this is not a case -- just different language, I guess
13        is my answer, Your Honor.
14             THE COURT:  Is there any legislative history that
15        supports your interpretation?
16             MR. HAVEMANN:  There's certainly legislative history
17        that in 1974 Congress intended to preempt the field of trading
18        on DCMs.  I think that much is --
19             THE COURT:  For event contracts.
20             MR. HAVEMANN:  For event contracts.  I think that
21        there is history suggesting that when Congress enacted
22        Dodd-Frank, it intended to give the authority over event
23        contracts to the CFTC.
24             THE COURT:  But there is -- I forget which senators
25        or representatives, there's some legislative history
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

**JA127**

```
 1    only one argument that these are not swaps.  And I understand

 2    them to make the argument that sport events don't have

 3    potential economic, financial, or commercial consequences.

 4    And I believe that they make that argument --

 5              THE COURT:  Well, I think their argument is the

 6    event might, but the occurrence who wins, does not.

 7              MR. HAVEMANN:  Yes.  I think that the event in

 8    Kalshi's contracts is Rory McIlroy winning the Masters.  And

 9    so in that sense, the event is the winner of the contract.

10         And I guess first I would note the Special Rule provides

11    pretty strong evidence that that can't be right.  I mean, the

12    Special Rule refers to swaps and it refers to swaps with

13    respect to gaming.  So that I think reflects Congress'

14    understanding that it is not true as a categorical matter that

15    the outcome sports events as a categorical matter lack

16    potential economic consequences.

17         And then as just a practical point, I mean, it cannot be

18    correct that the winner of the Masters does not have economic

19    consequences or the winner of the Western Conference Finals in

20    the NBA, or the winner of the Super Bowl, or advancing to the

21    next round in the NCAA Tournament.  These are events of

22    significant economic consequences not just for the players

23    themselves, but for advertisers, sponsors, television

24    networks, local communities.  I mean, there is a whole

25    ecosystem of -- economic ecosystem surrounding these sporting
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

**JA128**

USCA4 Appeal: 25-1892   Doc: 17   Filed: 10/15/2025   Pg: 132 of 182
Case 1:25-cv-01283-ABA   Document 87-2   Filed 06/13/25   Page 10 of 15
05/28/2025 Hearing on Preliminary Injunction

**[32]**   32

```
 1    events that depend on the outcome of the events; often that

 2    depend on a particular team doing well and performing well.

 3          And so it's a clear hedging use case with respect to many

 4    of these events to allow traders to place positions, to hedge

 5    against the possibility that their team will not, in fact, do

 6    well.

 7          And we noted in our brief the UVA vs. UMBC example from a

 8    few years ago which I think it is hard to make the argument

 9    that UMBC advancing to the next round over UVA in the NCAA

10    Tournament did not have significant economic consequences for

11    a whole host of stakeholders.  And I would note that the

12    definition of swap is not significant economic consequences;

13    it is potential economic consequences that Congress clearly

14    wanted to sweep in and wanted to be brought.  And I think we

15    are in the heartland of that.

16          And that is sort of doubly proved by the fact that in the

17    Special Rule itself, Congress contemplated that this sort of

18    contract was, in fact, properly a swap.

19          **THE COURT:**  So why did Kalshi say the opposite to

20    the DC Circuit?

21          **MR. HAVEMANN:**  I think Kalshi said to the DC Circuit

22    that when Congress -- when Congress enacted the Special Rule

23    in 2010, members of -- many members of Congress expected that

24    these would not be approved.  And I think that that is

25    probably correct and I think it is not inconsistent with the
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

**JA129**

1    that was the upshot of the discussion.  It was not Congress

2    thought these were categorically prohibited.  It was not

3    Congress intended to categorically prevent them from being

4    offered.  The upshot of the discussion was it empowered the

5    CFTC to make that determination.

6         We also said in that brief that the CFTC's exclusive

7    jurisdiction over the derivatives markets preempts any state

8    law that purports to prohibit the trading of the contract on a

9    DCM.  So that's the same position we're taking here.

10        And I'd note that the CFTC in opposing us in that case

11   reached the same conclusion about preemption.  And I do think

12   that that is important.  The CFTC's own understanding -- even

13   without deference, the CFTC's own understanding of how this

14   works I think is instructive and illustrative.  And what the

15   CFTC said in that brief was, quote, "Due to federal

16   preemption, event contracts never violate state law when they

17   are traded on a DCM like Kalshi."  And so --

18             **THE COURT:**  Would your same argument apply with

19   regard to lotteries?  So let's say you had an event contract.

20   The state lottery will result in this number this week.  Would

21   that be a swap?

22             **MR. HAVEMANN:**  I think that's a harder case, Your

23   Honor.

24             **THE COURT:**  Why?

25             **MR. HAVEMANN:**  Because I think the definition of

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

**JA130**

1  swap is broad.  So maybe, but the difference between the

2  outcome of state lottery and the outcome of a sport event like

3  the Super Bowl is that the state lottery has -- it is itself

4  the economic consequence.  The winner of the lottery is itself

5  -- you bet on a thing.  You place a wager on a thing and you

6  get money and that is the event.  So it's sort of

7  self-referential in that respect.

8          **THE COURT:**  But at least for the person who wins

9  there's an economic consequence.

10         **MR. HAVEMANN:**  There is an economic consequence and

11  that's why I don't want to disavow the possibility that that

12  might be okay.  I just think it's a harder call because the

13  economic consequence is the fact of people placing positions

14  on a contingent event; whereas the economic consequence for

15  sporting events, there is that of course, people do place

16  wagers on sporting events, but there is also consequences to

17  apparel companies, consequences to sponsors, consequences to

18  television networks, consequences to local communities.  All

19  of that sort of makes this, even if you think the lottery

20  example is a close case or might present questions, these are

21  not even in the same ballpark, so-to-speak.

22         And then I would also note, you know, the CFTC, I think

23  that there is perhaps the suggestion in the defendants' brief

24  that the CFTC may have overlooked these contracts, that it's

25  not paying close attention to this, that we're sort of going

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

**JA131**

**[55]**

```
 1    scope.
 2              MR. DELFOSSE:  Correct, yes.
 3              THE COURT:  Do you agree that with respect to
 4    commodities futures contracts, the CEA preempts state laws?
 5              MR. DELFOSSE:  For the purposes of the argument
 6    today, Your Honor, I am not contesting that.
 7              THE COURT:  Well, but I need to understand the
 8    preemption argument.
 9              MR. DELFOSSE:  Okay.
10              THE COURT:  Either -- it seems to me either they
11    both preempt, in other words the CEA has either field or
12    conflict preemptive effect for both swaps and commodities
13    futures contracts, or neither.  But if you disagree with that
14    premise, explain to me why they don't rise or fall together.
15              MR. DELFOSSE:  Oh, okay.  Your Honor, I think they
16    would rise and fall together.  I just -- the State's argument
17    today is simply that these things are not swabs and so they're
18    not entitled to the exclusive jurisdiction, period.
19    Therefore--
20              THE COURT:  And you're saying they're not swaps
21    because they don't have potential financial consequence.
22              MR. DELFOSSE:  Right, right, as we have argued in
23    our brief and as you pointed out.
24         I mean, Your Honor, Kalshi tried to sort of -- I don't
25    want to say hand-wave, but again -- because I already used
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

**JA132**

USCA4 Appeal: 25-1892    Doc: 17    Filed: 10/15/2025    Pg: 136 of 182
Case 1:25-cv-01283-ABA    Document 87-2    Filed 06/13/25    Page 14 of 15

[69]    69

```
 1       bootstrapping argument?  It's lawful in Maryland if you have a

 2       license.

 3               MR. HAVEMANN:  It's lawful in Maryland because state

 4       law that would otherwise prohibit it is preempted by federal

 5       law.  That's why it's lawful in Maryland and that's why it's

 6       lawful in all 50 states.  Even if -- sorry, I didn't mean to

 7       interrupt.

 8               THE COURT:  I mean, it's lawful if you're right

 9       about preemption.

10               MR. HAVEMANN:  That is correct.  It is lawful if we

11       are right about preemption.  And so I think their argument is

12       this is an implied repeal and the statutory scheme doesn't

13       make any sense.  But our point is no, the Wire Act continues

14       to make a great deal of sense.  It's not impliedly repealed.

15       It still applies in the vast majority of circumstances, as

16       does IGRA, which is another statute they referenced.  And the

17       only thing Congress did is carve out this specific subsection

18       of event contracts that are traded on DCMs.  And there's a

19       different federal law that I'd be happy to walk Your Honor

20       through that makes that explicit.

21           But in any event, the point is with respect to the Wire

22       Act, I think that they -- I think we may have a disagreement

23       about what the provisions of the Wire Act mean.  And, in any

24       event, they are mistaken that this is an implied repeal or

25       anything like that.  And, of course, Dodd-Frank comes after
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA133

 1    the brief, and the upshot of the colloquy that Kalshi's

 2    counsel had with the DC Circuit in that case was that Congress

 3    addressed those concerns by giving the CFTC discretion to

 4    approve or disapprove of those contracts.  And I think that's

 5    the best way to understand that colloquy under the different

 6    circumstances, the different legal issues that were presented

 7    in that case.

 8              **THE COURT:**  Okay.

 9              **MR. HAVEMANN:**  My colleague referenced Sporttrade,

10    which was not an issue that they had raised in their brief,

11    but my understanding is that Sporttrade is not a designated

12    contract market.  It is not subject to the 23 core principles

13    to which Kalshi is subject.  So whether or not a different

14    entity can comply with many different state laws or not when

15    it is not subject to the 23 core principles does not pertain

16    to Kalshi.

17         I think it is very important, I believe I heard my

18    colleague say that both provisions of the exclusive -- or both

19    prongs of the exclusive jurisdiction provision rise and fall

20    together.  So that is transactions involving swaps on one

21    hand, or contracts of sale of a commodity for future delivery

22    on the other.  And that if states can regulate one, they can

23    regulate the other.  I think that's the only coherent way to

24    make sense of the statutory scheme.  And I think that that is

25    fatal to their argument.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

**JA134**

[1]    ¹

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
 2                       NORTHERN DIVISION

 3     KALSHIEX, LLC,              )
            Plaintiff ,           )
 4                                )
            v.                    )  CASE NUMBER: ABA-25-01283
 5                                )
       JOHN A. MARTIN, et al.,   )
 6          Defendants.           )
       _____)
 7


 8      TRANSCRIPT OF PROCEEDINGS - PRELIMINARY INJUNCTION HEARING
                  BEFORE THE HONORABLE ADAM B. ABELSON
 9                   UNITED STATES DISTRICT JUDGE
                      Wednesday, May 28, 2025
10                        Courtroom 7A


11                     A P P E A R A N C E S

12     FOR THE PLAINTIFF:

13
            BY: WILLIAM E. HAVEMANN, ESQUIRE
14              JOSHUA B. STERLING, ESQUIRE
                RICHARD HEASLIP, ESQUIRE
15              SAMANTHA ILAGAN, ESQUIRE
                MILBANK, LLP
16              1850 K Street NW
                Washington, DC  20006
17


18     FOR THE DEFENDANT:

19          BY: ERIK J. DELFOSSE, ESQUIRE
                MAX F. BRAUER, ESQUIRE
20              RICHARD HEASLIP, ESQUIRE
                OFFICE OF THE ATTORNEY GENERAL-STATE OF MARYLAND
21              SECURITIES DIVISION
                200 St. Paul Place, 25th Floor
22              Baltimore, Maryland  21202

23

24     _____

          ***Proceedings Recorded by Mechanical Stenography***
25         Transcript Produced by Computer-Aided Transcription
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA135

1    be in violation of a core concept.  But if you look at the

2    holding in ARISX which was in 2012 -- I don't know if it has

3    been referenced, but it is on the CFTC website.  ARISX was

4    listing contracts for sports -- they specifically were doing

5    sports wagering, but they were basically allowing sportsbooks

6    to hedge their interests saying hey, if you have this many

7    hits, we'll back you up.  The product was not being offered to

8    the entire public, but only to certain qualified individuals.

9    And the CFTC said hey, you can't do that.  That's a financial

10   -- that's a financial discrimination.  If you're not offering

11   it to everybody, you can't.  But -- if you're not offering

12   this class of contract to everyone.  But it doesn't include --

13   their core concept aspect argument doesn't -- doesn't make

14   allowances for regulatory or statutory compliance where that

15   might be required.

16        There is -- to -- again, Your Honor, it's not our burden

17   to prove that it's not -- that it's not in violation because

18   they haven't satisfied their burden to show that it is in

19   violation.  They're just saying "it may."  And that's not

20   enough for the preliminary injunction.  Again, the burden is

21   on the movant.

22             **THE COURT:**  Okay, let's go back to the merits.

23             **MR. DELFOSSE:**  Sure.

24             **THE COURT:**  I understand your argument about

25   irreparable harm.

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

**JA136**

05/28/2025 Hearing on Preliminary Injunction

**[52]** ⁵²

1          MR. DELFOSSE:  Sure.

2          THE COURT:  So in the statute 2(a)(1)(A), Congress

3    used this term "exclusive jurisdiction."

4          MR. DELFOSSE:  Correct.

5          THE COURT:  And as I pressed Mr. Havemann on it, at

6    least in part does seem to me to be referring to what I'll

7    call "horizontal exclusivity."  Allocating responsibility to

8    the CFTC as opposed to the SEC and making clear the SEC

9    shouldn't intrude on the CFTC's authority.

10         But there are also references to state law, including

11   this "except as herein above provided, nothing contained in

12   this section shall supersede or limit state laws."

13         So why doesn't that "except as herein above provided"

14   indicate that Congress understood itself to be having an

15   effect, to some extent, on state laws?

16         MR. DELFOSSE:  Well, to the extent that they are

17   recognizing they may have an effect on state laws, what

18   they're saying is if it's already illegal, you can't do that

19   and that's -- the "except as provided" aspect of it is to say

20   that states can enforce their laws.  It's acknowledgement that

21   at the time it passed Dodd-Frank, PASPA existed, IGRA existed,

22   state gaming laws existed, the Wiretap Act existed.  It's an

23   acknowledgement that there are laws other than the DCMs that

24   exist regulating these types of things.

25         I mean, Your Honor, Kalshi's basic argument is we're

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

**JA137**

 1    field preempted because of the expanded definition allowed for

 2    swaps under swaps for -- by a Special Rule.  At the same time,

 3    you know --

 4         **THE COURT:**  Well, the Special Rule I think they're

 5    saying is evidence of congressional intent.  But swaps are

 6    defined in not the Special Rule, but in the definition of

 7    swap.

 8         **MR. DELFOSSE:**  Correct, Your Honor.  And the

 9    definition of the swaps limits whatever jurisdiction -- this

10    is my point.  The Special Rule has to be read in conjunction

11    with that definition.  So whatever -- whatever is under the

12    swaps when they say "or swaps," it's got to be something

13    that's already included within that definition.

14         **THE COURT:**  But doesn't that then go to this

15    question of whether sports bets or the subject of these event

16    contracts have potential financial, economic, or commercial

17    consequences?

18         **MR. DELFOSSE:**  And yes, Your Honor.  And the answer

19    to that is, and that's why we look at the statutory scheme

20    when Dodd-Frank was enacted, okay?  You can't -- what we're

21    saying is when Dodd-Frank was enacted, all these other

22    prohibitions already existed and they wouldn't overturn that

23    in this, as we make the heightened elephants and mouse whole

24    argument, if that's what that statute -- if you believe Kalshi

25    and that that statute is doing what they're saying it's doing,

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

**JA138**

**[54]** 54

1    as you said carrying a lot of weight and it's repealing the

2    Wiretap Act.  It is repealing at the time PASPA.  It is

3    repealing -- not necessarily repealing, but reputing

4    significant parts of PASPA and IGRA by saying, we can do these

5    things.  By saying -- because that's their whole argument

6    about it's legal in these other states.

7         If you read their brief, they're talking about how it

8    bootstraps its way in.  That Dodd-Frank was -- is the one --

9    is the basis for finding that their various actions in all

10   states are legal.  So they're kind of -- they're saying

11   Wiretap Act makes everything legal.  I'm sorry, not Wiretap

12   Act, the Dodd-Frank Act made everything legal.  Therefore,

13   safe harbor is under IGRA and Wiretap Act from state law.

14        So it is a combination of things that point to the fact

15   that these contracts -- that merely listing these contracts,

16   which is what they're arguing, as soon as we put it on a DCM

17   nobody else can do anything.

18             THE COURT:  So this case is about gaming --

19             MR. DELFOSSE:  Yes.

20             THE COURT:  --contracts, sports bets.

21        Let's talk about core commodities futures contracts.  So

22   the exclusive jurisdiction of the CFTC includes swaps and

23   contracts of sale of a commodity for future delivery.

24             MR. DELFOSSE:  Yes.

25             THE COURT:  The latter being a traditional CEA

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

**JA139**

```
 1    scope.

 2              MR. DELFOSSE:  Correct, yes.

 3              THE COURT:  Do you agree that with respect to

 4    commodities futures contracts, the CEA preempts state laws?

 5              MR. DELFOSSE:  For the purposes of the argument

 6    today, Your Honor, I am not contesting that.

 7              THE COURT:  Well, but I need to understand the

 8    preemption argument.

 9              MR. DELFOSSE:  Okay.

10              THE COURT:  Either -- it seems to me either they

11    both preempt, in other words the CEA has either field or

12    conflict preemptive effect for both swaps and commodities

13    futures contracts, or neither.  But if you disagree with that

14    premise, explain to me why they don't rise or fall together.

15              MR. DELFOSSE:  Oh, okay.  Your Honor, I think they

16    would rise and fall together.  I just -- the State's argument

17    today is simply that these things are not swabs and so they're

18    not entitled to the exclusive jurisdiction, period.

19    Therefore--

20              THE COURT:  And you're saying they're not swaps

21    because they don't have potential financial consequence.

22              MR. DELFOSSE:  Right, right, as we have argued in

23    our brief and as you pointed out.

24         I mean, Your Honor, Kalshi tried to sort of -- I don't

25    want to say hand-wave, but again -- because I already used
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

**JA140**

1    that phrase -- but tried to, you know, to explain their

2    definition in their argument.

3         This is from their oral argument in the Circuit Court,

4    Your Honor.  And I don't have -- I included the timestamp and

5    the link.  We can provide that to you.  I've already provided

6    a copy to Kalshi.  This is their argument on January 17, eight

7    days before they list their contract.  As you pointed out,

8    they are making arguments on an exigent basis in the Circuit

9    Court when they were trying to say that their election

10   contract was not a gaming contract.  Well, that's because

11   gaming contracts wouldn't have any basis.

12        Here today they're arguing that the Super Bowl which they

13   referenced in their oral argument on January 17th, that that

14   contract, hey, whoever wins the Super Bowl will be very happy,

15   but it doesn't have widespread economic consequences.

16        **THE COURT:**  Why, from your understanding, was Kalshi

17   taking that position in that case?

18        **MR. DELFOSSE:**  Because I believe that the Courts

19   were trying to get to the core of what differentiates a wager

20   from -- a speculative wager from a legitimate hedging interest

21   when they were talking about how the electoral event contracts

22   constituted a hedging.  Something -- there's economic -- who

23   wins the election matters, in and of itself it matters.

24   That's what they were arguing.

25        **THE COURT:**  So if we're talking about other briefs,

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA141

05/28/2025 Hearing on Preliminary Injunction

**[57]** 57

1    what about the fact that the CFTC, I think in the same case,

2    said that the CEA has preemptive effect?  Do you remember what

3    I'm referring to?

4            **MR. DELFOSSE:**  Right.  I think that they were

5    arguing that the CEA has preemptive effect for contracts

6    listed on their markets.  Again, we keep coming back to this

7    is the core issue here, Your Honor.

8            **THE COURT:**  But that's their position.  So hasn't

9    the CFTC taken a position in the Kalshi case that event

10   contracts if they're listed on a DCM, the applicable laws

11   preempt state laws?

12           **MR. DELFOSSE:**  If the -- that the CFTC's position is

13   that the mere listing of the contract puts them within their

14   exclusive jurisdiction?  It's wrong, Your Honor.  And you can

15   make that determination.  If that's what the CFTC was really

16   arguing, then you can -- and I point to the case we cited in

17   our brief, I think it's DDR -- I made a copy of it.  I left it

18   at the table.  Oh, no, I didn't.  *DCC Data Repository*, Your

19   Honor.

20           **THE COURT:**  Oh, yes.  I did see that case.

21           What about the Seventh Circuit case, that *Agriculture*

22   case?  I think there's probably something in that case for

23   both sides.  But it did -- the Seventh Circuit did explain

24   that one of the concerns motivating the exclusive jurisdiction

25   provisions is the concern that states -- now I'm quoting,

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

**JA142**

1   "states might step in to regulate the futures markets

2   themselves."

3       So it doesn't -- why doesn't that support the notion that

4   exclusive jurisdiction provision in the statute has preemptive

5   effect?

6       **MR. DELFOSSE:**  That appears to be a reference to the

7   commodities futures which is under the -- which was what was

8   -- CFTC was created to regulate.  It's not a question about

9   these swaps.

10       And again, it is --

11       **THE COURT:**  I'm sorry, you keep saying that.  But

12   the statute today includes swaps.  So why does that help you?

13       **MR. DELFOSSE:**  Because -- okay.  What I -- I think

14   I'm understanding what you're saying.  So that Dodd-Frank now

15   includes swaps, yes.  And that's why I say they rise and fall

16   together, Your Honor.

17       But again, the predicate argument is that it's listed --

18   that it's listed.  Everyone is using the language "listed."

19   Well, it's not the mere listing; it's the lawful and not

20   otherwise prohibited listing of that contract.  That's when

21   exclusive jurisdiction kicks in.  That's when any types of

22   preemptive arguments exist.

23       We are arguing that this as a predicate matter does not

24   reach that level.  It's not a swap.  It is not, as I said in

25   my opening statement, they're not entitled to the protections

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

**JA143**

```
 1        of preemption.  They can't, they can't break the wiretap law
 2        or the Wire Act.  They can't violate the Wire Act.  They can't
 3        violate state licensing requirements and they can't list a
 4        contract that under 40.11 (a)(1) shall not be listed on a DCM
 5        and claim that well, we've listed it.  Everybody walk away.
 6        Only the CFTC.
 7             And, Your Honor, just to be clear and I know I've said it
 8        in my brief and I believe that the DER case says it, this goes
 9        into it.  The CFTC -- they hang their hat on the CFTC's
10        inaction as being approval.  It's not the case.  And the
11        DDR[sic] case makes that very clear.  And I'm reading from 25
12        Supp.3d. 39 at 18.  And they're talking about the case.  In
13        the case they compare what constitutes an action versus what
14        doesn't constitute an action.  And that's -- they found that
15        the Sprint case they analyze does have -- in that case the
16        inaction doesn't have a sort of final effect; whereas in the
17        Amador County they did.
18             And the Court said -- the Court in Amador County found
19        that judicial review of nonaction approval was appropriate
20        because of the duty it determined Congress had placed on the
21        secretary.  The duty placed on the secretary.  Pause right
22        there.  The Special Rule does not place any duty.  It says it
23        may; it's permissive.
24             THE COURT:  But on the Special Rule, I think you
25        addressed this, but I want to understand your argument.
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

JA144

1          **MR. DELFOSSE:**  I'm sorry?

2          **THE COURT:**  I want to understand your argument that

3    one of the points that Kalshi makes about the Special Rule is

4    -- not to put words in their mouth, but essentially whatever

5    the statute, whatever § 2 says and whatever -- however swaps

6    are expressly defined, in the Special Rule, by expressly

7    listing gaming as in the list, that indicates that Congress

8    understood gaming event contracts to fall within the

9    definition of swaps.

10         Why is that wrong?

11         **MR. DELFOSSE:**  I want to make sure I'm hearing what

12   you're saying.  Well, Your Honor, the reason that is wrong is

13   because of the statutory scheme at that point in time.  In

14   fact -- and again, it comes back to the language of the

15   Special Rule:  Listing agreements, contracts, transactions, or

16   swaps.  I've had it up several times, my Venn diagram.  This

17   is a provision that is hey, you can tell them to delist all

18   these different things.  That does not -- the fact that they

19   have the -- that they have the authority to and the mechanism

20   to tell people to delist certain things does not alter or

21   expand the definition of what constitutes a swap.  So

22   therefore, by saying that they can order that things be

23   delisted, it doesn't say they're otherwise approved.  Which is

24   essentially Kalshi's argument.  If they don't tell us to

25   delist it, it's otherwise approved.  And that's simply not

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland 21201 - nadine_bachmann@mdd.uscourts.gov

**JA145**

1   what this statute says, especially when you read it in

2   conjunction with the exclusive jurisdiction which says -- it

3   shows, it highlights the difference between what the Special

4   Rule is saying is that you can -- here is a process for

5   delisting these things.  You can and essentially say and

6   again, I come back to 40.11(a)(1), Your Honor.  The CFTC made

7   a very clear determination under 40.11(a)(1) that the gaming

8   contract is not permitted to be listed.

9           If they argue that they could list it, Your Honor, if the

10  CFTC was standing here saying that they could list it we'd be

11  making the same argument to you.  That's just not what the

12  Special Rule is intended for.  It is not intended as an

13  expanse of or a redefinition of what a swap is.  The swap is

14  determining what the swap is and that section was enacted with

15  the existing statutory scheme in mind which prohibited

16  interstate betting under the Wire Act and sports wagering

17  under PASPA.

18          **THE COURT:**  40.11 is a regulation.

19          **MR. DELFOSSE:**  Yes.

20          **THE COURT:**  The definition of swaps in § 7(a)(2)--

21  no, sorry.  In § (1)(a) is a statute.  So in *Loper Bright*

22  world, isn't it the statute that I have to interpret?

23          **MR. DELFOSSE:**  Yes, Your Honor.  And I think that

24  the states -- the state's position on that is consistent with

25  what we've been arguing.  And that the Special Rule doesn't

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA146

```
1    expand or grant the authority to find that something is a

2    swap, when it would be in violation of this definition.

3              THE COURT:  Okay.  Let me ask that same procedural

4    question.  Regardless of how I rule on the motion for a

5    preliminary injunction, how would you see the case playing

6    out?  Do you see this as a case that would then proceed to a

7    motion to dismiss and/or dispositive motions or is this a case

8    -- and not to hold you to it, I'm putting you on the spot --

9    that would entail discovery.

10             MR. DELFOSSE:  When you asked opposing counsel that

11   question I started thinking.  Well, I think there might be

12   some room for discovery in this case because particularly as

13   to what they're alleging and I realize it's the preliminary

14   motion, but ultimately they're going to have to say that this

15   is -- what's the harm as part of the injunctive motion.  And

16   we've already talked about well, what's your basis?  What

17   examination have you done into whether geofencing exists?

18   What have you done -- what is your basis for alleging that the

19   core concepts would prohibit you from taking Maryland out?

20   Where is this specific, the specific factual things because

21   they haven't shown that in the preliminary injunction, Your

22   Honor.  They simply haven't.  They haven't proved them in any

23   way, shape, or form.  They've made allegations.

24             THE COURT:  All right, thank you.  Anything else?

25             MR. DELFOSSE:  Let me just check, Your Honor, my
```

Nadine M. Bachmann, RMR, CRR - Federal Official Court Reporter - 101 W. Lombard Street, Baltimore, Maryland  21201 - nadine_bachmann@mdd.uscourts.gov

JA147

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KALSHIEX LLC,

     *Plaintiff,*

v.

    Case No. 25-cv-1283-ABA

JOHN A. MARTIN, *et al.,*

     *Defendants*

## MEMORANDUM OPINION

Plaintiff KalshiEX LLC ("Kalshi") is a financial services company that operates a derivatives exchange and prediction market. Kalshi has moved to enjoin the Maryland Lottery and Gaming Control Agency, and the Maryland Lottery and Gaming Control Commission, from pursuing civil and criminal enforcement of Maryland's gaming laws against Kalshi for offering sports-event contracts in Maryland without registering as a sports wagering licensee. Kalshi argues that Maryland's gaming laws are preempted by the federal Commodity Exchange Act, and thus cannot be enforced with respect to Kalshi's sports-event contracts when offered in Maryland on its designated contract market platform. For the reasons explained below, Kalshi has failed to show a likelihood of success on the merits of its claim that the Commodity Exchange Act preempts Maryland's gaming laws. The motion for a preliminary injunction will be denied.

## I.    BACKGROUND

A derivative is "a financial instrument or contract whose price is 'directly depending upon (i.e.[,] derived from)' the value of one or more underlying assets—for example, commodities (like corn and wheat), securities, or debt instruments." *KalshiEX*

1

**JA148**

*LLC v. Commodity Futures Trading Commission*, No. 23-cv-3257-JMC, 2024 WL
4164694, at *1 (D.D.C. Sep. 12, 2024), *stay denied*, 119 F.4th 58 (D.C. Cir. 2024) (citing
*Futures Glossary: A Guide to the Languages of the Futures Industry*, CFTC,
https://perma.cc/63HY-DD7E). An event contract is a kind of derivative the "payoff" of
which is "based on a specified event, occurrence or value." *Id.* at *2 (citing *Contracts &
Products: Event Contracts*, CFTC, https://perma.cc/CG2B-EYWY). "These contracts
are generally binary[;] the buyer may take a 'yes' position that the specified event will
take place whereby the seller implicitly takes the 'no' position." *KalshiEX LLC v. Mary
Jo Flaherty, et al.*, No. 25-cv-2152-ESK-MJS, 2025 WL 1218313, at *1 (D.N.J. Apr. 28,
2025) (citing *id.* at *1). The contract can be purchased or sold any time before its
expiration date for a specific value, and upon expiration, the seller will pay the buyer if
the event occurs. *Id.*

      The Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, is "a comprehensive
regulatory structure to oversee the volatile and esoteric futures trading complex."
*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 355-56 (1982). The
CEA provides the Commodity Futures Trading Commission (the "CFTC"), subject to
certain exceptions, with "exclusive jurisdiction" with respect to "accounts, agreements . .
. , and transactions involving swaps or contracts of sale of a commodity for future
delivery," where such transactions are "traded or executed" in particular markets or
platforms, including a "contract market designated pursuant to section 7 of this title." 7
U.S.C. § 2(a)(1)(A). The section providing for such "exclusive jurisdiction" contains the
following savings clause:

> Except as hereinabove provided, nothing contained in this
> section shall (I) supersede or limit the jurisdiction at any time
> conferred on the Securities and Exchange Commission or

other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

7 U.S.C. § 2(a)(1)(A).

The statute was amended to govern "swaps" in 2010, pursuant to the Dodd-Frank Act. *See DTCC Data Repository (U.S.) LLC v. CFTC*, 25 F. Supp. 3d 9, 12 (D.D.C. 2014) (explaining that, "in the wake of the financial crisis," Congress amended the CEA and "established an oversight and reporting regime for swaps"); *Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 174 (D.D.C. 2012), *as amended* (Jan. 2, 2013), *aff'd*, 720 F.3d 370 (D.C. Cir. 2013) ("Congress, in Dodd-Frank, charged the CFTC with the task of illuminating previously dark markets in the complex derivative instruments at the heart of the [2008 financial] crisis known as swaps.") (cleaned up).

The CEA defines a "swap" as any agreement, contract or transaction that "provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). An event contract is considered an "excluded commodity," which the CEA defines as an "occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity) . . . that is (I) beyond the control of the parties to the relevant contract, agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19)(iv).

**JA150**

An entity that wishes to be a designated contract market ("DCM") regulated under the CEA must apply to the CFTC for such designation. 7 U.S.C. § 2(e), 7(a). A DCM must comply with the "core principle[s]" set forth in 7 U.S.C. § 7, as well as the regulatory framework as set out in Part 38 of Title 17 of the U.S. Code, and "any requirement that the Commission may impose by rule or regulation pursuant to section 12a(5) of this title." 7 U.S.C. § 7(d)(1)(A)(ii). Once approved, a DCM may list agreements, contracts, transactions, or swaps on the exchange, but only if such instruments satisfy the requirements of 7 U.S.C. § 7a-2(c), entitled "New contracts, new rules, and rule amendments," and only if the DCM provides a written certification of such compliance, 7 U.S.C. § 7a-2(c)(1).

Kalshi "is a regulated exchange and prediction market where users can buy and sell event contracts." ECF No. 1 ¶ 45. The CFTC has certified Kalshi as a DCM. *Id.* Kalshi offers an exchange "where individual, retail, and institutional participants can hedge their risks on event-based outcomes." *Id.* ¶ 46. These "event contracts" relate "to an array of substantive areas such as climate, technology, health, crypto, popular culture, and economics." *Id.* ¶ 47. Among this array of areas, "Kalshi offers sports-event contracts." *Id.* ¶ 48.

Congress required that the Commission play an important role in deciding the types of financial instruments that could be traded on DCMs. For "a new contract or other instrument," approval by the Commission is required, although by statute the Commission "shall approve" a new event contract or other instrument unless the Commission concludes it violates the CEA or regulations. *Id.* § 7a-2(c)(5)(B). A similar rule applies to approval of a "new rule, or rule amendment," which is not at issue in this case. *Id.* § 7a-2(c)(5)(A).

But there is also a process for DCMs to avoid pre-approval if the DCM "self-certifies," in writing, that a new contract or other instrument complies with all applicable requirements. *Id.* § 7a-2(c)(1). That is the process Kalshi used for the sporting event contracts at issue here. When a DCM invokes the self-certification process for a new event contract, it must submit a "written certification that the new contract . . . complies with this chapter (including regulations under this chapter)." *Id.* The contracts are immediately effective unless and until the CFTC initiates review of any contract. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c).[1]

Although Congress required the Commission to approve new contracts if they comply with the CEA and applicable regulations, and allowed for self-certification, it expressed a concern that some "event contracts" could begin to be traded that would be "contrary to the public interest." *Id.* § 7a-2(c)(5)(C). So as part of the Dodd-Frank Act, Congress enacted a "Special rule for review and approval of event contracts and swaps contracts." *Id.* § 7a-2(c)(5)(C); Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010). That Special Rule requires a "public interest" review when it comes to event contracts that involve "(I) activity that is unlawful under any Federal or State law; (II) terrorism; (III) assassination; (IV) war; (V) gaming; or (IV) other similar activity determined by the Commission by rule or regulation, to be contrary to the public interest." *Id.* Congress considered contracts "based upon the occurrence, extent of an occurrence, or contingency" of those types of events—including "gaming" and "activity that is unlawful"—to require that additional

---

[1] The statute provides that a *rule* that has been self-certified does not become effective until 10 days after submission of the certification. 7 U.S.C. § 7a-2(c)(2). There is no statutory waiting period for new event contracts.

scrutiny. Congress then made clear that "[n]o agreement, contract, or transaction determined by the Commission to be contrary to the public interest under [§ 7a-2(c)(5)(C)(i)] may be listed or made available for clearing or trading on or through a registered entity." *Id.* § 7a-2(c)(5)(C)(ii). That public interest review does not supersede the self-certification process; a DCM may satisfy the Special Rule by self-certifying compliance. But in doing so the statute requires a DCM to certify that a new contract or rule is not "unlawful," does not involve terrorism, assassination, war or gaming, and is not otherwise "contrary to the public interest." That is what happened here: Although Kalshi could have requested pre-approval from the Commission regarding whether Kalshi could lawfully conduct sports betting on its platform, *id.* § 7a-2(c)(4)(A), instead on January 24, 2025, "Kalshi self-certified and began listing sports-event contracts on its exchange," allowing users to "place positions on which teams will advance in certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Championship." ECF No. 1 ¶ 49.

On April 7, 2025, the Maryland Lottery and Gaming Control Commission (MLGCC) sent Kalshi a cease-and-desist letter directing Kalshi "to immediately cease and desist offering in Maryland its event contract . . . and any other contract or product that provides an investing opportunity based on predicting the outcome of any sporting league play or any sporting event." ECF No. 1-1 at 2. The MLGCC explained, "[u]nder Maryland law, a gaming activity is illegal unless it is expressly authorized by the Annotated Code of Maryland, Criminal Law Article ('Crim. Law'), Titles 12 and 13." *Id.* And "[s]ports wagering is an authorized gaming activity in Maryland that is legal only if it is offered and conducted as required by the State's Sports Wagering Law (State Government Article ("SG") § 9-1E-01, *et seq.*)." *Id.*

The MLGCC stated that event contracts based on the outcome of sporting events constitute "sports wagering," which under Maryland law is defined as "the business of accepting wagers on any sporting event by any system or method of wagering, including single-game bets, teaser bets, parlays, over-under, moneyline, pools, *exchange wagering*, in-game wagering, in-play bets, proposition bets, and straight bets." SG § 9-1E-01(j) (emphasis added). An exchange wager is "a wager in which a bettor wagers with or against another bettor through a sports wagering licensee." Code of Maryland Regulations ("COMAR") 36.10.01.02B(24). A "mobile sports wagering licensee" is defined as "a sports wagering licensee who is authorized to conduct and operate online sports wagering." SG § 9-1E-01(e). Because Kalshi was engaged in sports wagering, the MLGCC explained that to operate that aspect of its business in Maryland it would have to, among other things, obtain a "sports wagering license[]" and comply with all state laws that apply to such licensees, including with regard to data security and advertising, including a prohibition on advertising to "individuals who are prohibited from participating in sports wagering and other at-risk individuals." SG § 9-1E-03.

Kalshi does not dispute that it does not comply with those state laws. But it has filed this lawsuit, seeking a declaration that it need not comply with those laws because they have been preempted by the Commodity Exchange Act. Kalshi also filed a motion for a temporary restraining order and/or preliminary injunction, arguing that Kalshi is likely to succeed on the merits of its preemption claim. ECF No. 2. The parties jointly stipulated that Defendants "will refrain from seeking to enforce against Plaintiff any state laws referenced in the April 7 cease-and-desist letter pending the Court's disposition of Plaintiff's motion for a preliminary injunction." ECF No. 21 at 1. Defendants filed a response to the preliminary injunction motion on May 12, 2025, ECF

No. 28, and Kalshi filed a reply on May 19, 2025, ECF No. 29. The Court held a hearing

on May 28, 2025 and ordered the parties to file supplemental briefing, which the parties

then filed. ECF Nos. 36, 37, 62, 63. A number of Indian tribes and gaming associations

also filed an amicus brief in this case. ECF No. 65.[2]

## II.    LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must establish four factors: (1) that

they are likely to succeed on the merits; (2) that they are likely to suffer irreparable

harm absent relief; (3) that the balance of equities favors them; and (4) that an

injunction is in the public interest. *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543

(4th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). A

party seeking preliminary injunctive relief must satisfy all four factors. *Real Truth About*

*Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, 559

U.S. 1089 (2010). And a preliminary injunction, being an "extraordinary remedy," may

---

[2] The amicus brief was filed by the Indian Gaming Association, National Congress of
American Indians, California Nations Indian Gaming Association, Arizona Indian
Gaming Association, Oklahoma Indian Gaming Association, United South and Eastern
Tribes Sovereignty Protection Fund, Tribal Alliance of Sovereign Indian Nations, Blue
Lakes Rancheria, Chicken Ranch Rancheria of Me-Wuk Indians of California, Elk Valley
Rancheria, Enterprise Rancheria of Maidu Indians of California, Guidiville Rancheria of
California, Ho-Chunk Nation of Wisconsin, Jamul Indian Village of California, Kalispel
Tribe of Indians, Karuk Tribe, Klamath Tribes, Lytton Rancheria of California,
Middletown Rancheria of Pomo Indians of California, Morongo Band of Mission
Indians, Pechanga Band of Indians, Penobscot Nation, Picayune Rancheria of
Chukchansi Indians of California, Pueblo of Acoma, Puyallup Tribe, Redding Rancheria,
Rincon Band of Luiseo Mission Indians, Santa Ynez Band of Chumash Mission Indians,
Seminole Tribe of Florida, Shoalwater Bay Indian Tribe, Suquamish Indian Tribe of the
Port Madison Reservation, Table Mountain Rancheria, White Earth Nation, and
Yuhaaviatam of San Manuel Nation.

"only be awarded upon a clear showing that the plaintiff is entitled to such relief."

*Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

## III.  LIKELIHOOD OF SUCCESS ON THE MERITS

Kalshi argues that it is likely to succeed on the merits of its claim because Maryland's gaming laws are preempted by the CEA as applied to Kalshi's sports-event contracts because Kalshi is regulated as a DCM. ECF No. 2 at 11-16. Defendants contend that (1) the sporting event contracts at issue are not "swaps" within the meaning of the CEA, and (2) even if they are covered by the CEA, the CEA does not preempt Maryland's gambling laws that apply to sports wagers. ECF No. 28 at 16-32. The Court will assume without deciding that Kalshi's sports-event contracts are in fact swaps. Nonetheless, for the following reasons, Kalshi has not established a likelihood of success on the merits of its claim that Maryland's laws regulating sports betting have been preempted by the Commodity Exchange Act.

The Supremacy Clause provides that the Constitution and other federal laws "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Congress therefore has the power to preempt state law. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). There are three types of federal preemption: (1) express preemption, (2) field preemption, and (3) conflict preemption. *Id.* "Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision." *Arizona*, 567 U.S. at 399 (citing *Chambers of Commerce of United States of America v. Whiting*, 563 U.S. 582, 592 (2011)).

Kalshi does not contend that the CEA expressly preempts state law. Kalshi instead relies principally on a field preemption theory. It argues that Congress, in

expanding the CEA to cover swaps traded on designated contract markets, has occupied that "field" such that when online sports wagers are offered by a company like Kalshi, as opposed to by online sportsbooks like FanDuel or DraftKings, they need not comply with state gaming laws. Kalshi alternatively argues that even if field preemption does not apply, the Court should construe Maryland's gaming laws to so thoroughly conflict with the CEA that they are conflict-preempted. "[T]he purpose of Congress is the ultimate touchstone in every preemption case." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996). For the following reasons, Kalshi has not shown that when Congress enacted and amended the CEA it intended to preempt state gaming laws when sports wagers are made on a platform like Kalshi's.

### A.    Field Preemption

A party arguing that Congress has occupied an entire field of law must show that "Congress, acting within its proper authority, has determined" that all "conduct in [that field] . . . must be regulated by its exclusive governance." *Arizona,* 567 U.S. at 399. Field preemption applies only "[i]n rare cases," where "Congress 'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation,'" *Kansas v. Garcia,* 589 U.S. 191, 208 (2020) (quoting *R.J. Reynolds Tobacco Co. v. Durham County,* 479 U.S. 130, 140 (1986)), or where "there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona,* 567 U.S. at 399 (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

There is a strong presumption against preemption. "In all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' . . .  [courts] 'start with the assumption that the historic police

powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Medtronic*, 518 U.S. at 485.

Kalshi argues the presumption against preemption "does not apply to the field of regulating derivatives markets" because that is "'an area where there has been a history of significant federal presence.'" ECF No. 29 at 14 (quoting *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 477 (4th Cir. 2014)). That argument is wrong for two reasons. First, the Supreme Court has held that courts must "start with the assumption" that federal law does not preempt in "*all* pre-emption cases." *Medtronic,* 518 U.S. at 485 (emphasis added). Second, the question of whether the presumption "particularly" applies here (in the *Medtronic* Court's formulation) turns not on whether the federal statute can be framed as pertaining to an area of existing federal regulation, but rather whether the *state* law governs conduct that has historically been subject to state regulation (or subject to "the historic police powers of the States" as the *Medtronic* Court put it). *See Medtronic*, 555 U.S. at 564 n.3 ("Wyeth argues that the presumption against preemption should not apply to this case because the Federal Government has regulated drug labeling for more than a century. That argument misunderstands the principle: We rely on the presumption because respect for the States as 'independent sovereigns in our federal system' leads us to assume that 'Congress does not cavalierly pre-empt state-law causes of action.' *Medtronic*, 518 U.S. at 485. The presumption thus accounts for the historic presence of state law but does not rely on the absence of federal regulation.").

"It is well recognized that regulating gambling is at the core of the state's residual powers as a sovereign in our constitutional scheme." *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 302 (4th Cir. 2009). The courts and

11

**JA158**

Congress have long recognized states' authority to regulate gambling conducted within their borders. *See, e.g.*, *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905) ("The suppression of gambling is concededly within the police powers of a state."). Gambling has been recognized as a potentially harmful "vice activity," such that states have a recognized interest in reducing "the social costs associated with" it. *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 185 (1999); *see also Murphy*, 584 U.S. at 458–59 (describing history of state gambling laws). Kalshi does not seriously dispute this. *Compare* ECF No. 26 at 30 (citing various cases) *with* ECF No. 29 (responding to none of them).

Thus, the presumption against preemption applies, and thus the question presented is whether Kalshi has shown that one of Congress's "clear and manifest purpose[s]" when it enacted the Dodd-Frank Act was to preempt states' or tribes' authority to regulate gambling if a DCM were offer sports wagers on a DCM platform. Kalshi argues that Maryland's gaming laws are field-preempted as applied to Kalshi's sports-event contracts because of the statutory text, statutory purpose, the drafting history of the CEA, and the fact that there exists a "comprehensive" federal regulatory scheme for DCMs. ECF No. 2 at 11-15. There is no question that Congress had some field-preemptive intent when it enacted the CEA, and when it amended the statute pursuant to the Dodd-Frank Act in 2010. *See* ECF No. 26 at 17 (Defendants contrasting event contracts for sporting events with, for example, "purchases and sales of contracts for delivery at some future date of certain quantities of specified commodities at fixed prices," which "are the CEA's core concern") (quoting S. Rep. No. 93-1131, 1974 U.S.C.C.A.N. 5843, 5856 (1974)); CFTC Act of 1974 Committee Report, U.S. Senate Committee on Agriculture and Forestry, 93rd Cong., 2d Sess., at 11 (Nov. 15, 1974)

(conference report, cited by Kalshi, stating that "[u]nder the exclusive grant of jurisdiction," the CEA "would preempt the field insofar as futures regulation is concerned"). But that does not necessarily establish that the "field" that Congress intended to "occupy" included gambling. Kalshi's burden with respect to its field preemption claim is to establish that Congress clearly and manifestly intended to strip states of their authority to regulate gambling if the company offering such wagering opportunities has been approved to sponsor a designated contracts market for commodities trading. Kalshi has not established that Congress had such clear and manifest purpose.

The Court begins with the text of the CEA. As noted above, the statute grants the CFTC "exclusive jurisdiction . . . with respect to accounts, agreements . . . , and transactions" involving two types of instruments—"contracts of sale of a commodity for future delivery" and "swaps"—where such transactions are conducted on (a) "a contract market designated pursuant to section 7 of this title," (b) "a swap execution facility pursuant to section 7b-3 of this title," or (c) "any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title." 7 U.S.C. § 2(a)(1)(A). That "jurisdiction" provision goes on to contain the savings clause quoted above, which provides that "[e]xcept as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws." *Id.*

Kalshi argues that Congress manifested a field-preemptive intent by granting the CFTC "exclusive jurisdiction" over, among other things, "swaps" traded on a "contract market designated pursuant to section 7," and by phrasing the savings clause as stating that Congress was not preempting the "jurisdiction" of "regulatory authorities under the laws of . . . any State" other than as "hereinabove provided." There is some force to this argument. The phrase "exclusive jurisdiction," which was added to the CEA in 1974, Pub. L. 93-463, 88 Stat. 1389 (H.R. 13113), Oct. 23, 1974, § 201, reflects some evidence of congressional intent to displace the authority of some state laws or regulatory authority. Congress's clearest intent in conferring "exclusive jurisdiction" on the CFTC with regard to commodities futures (and, since 2010, swaps[3]) was to make clear that as among *federal agencies*, the CFTC would have exclusive authority, rather than the SEC. As the Supreme Court has explained, the exclusive-jurisdiction provision was intended to "consolidate federal regulation of commodity futures trading in the Commission" and to "separate the functions of the [CFTC] from those of the [SEC] and other regulatory agencies." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386–87 (1982). But Kalshi is surely correct that Congress in 1974 also conveyed some intent for the CEA to displace *some* state laws; a state presumably lacks authority to have a parallel regulatory regime for grain futures, the original commodity regulated under federal law, to take one example. *See Merrill Lynch*, 456 U.S. at 360-62 (describing the Grain Futures Act of 1922, which steered those transactions toward exchanges designated as a "contract market" and regulated by the Secretary of Agriculture).

---

[3] As noted above, the exclusive jurisdiction provision was amended to include swaps in 2010. Dodd-Frank Wall Street Reform And Consumer Protection Act, Pub. L 111-203, 124 Stat. 1376 (July 21, 2010).

The existence of *some* field-preemptive intent is confirmed by the portion of the savings clause Kalshi highlights, which states that "[e]xcept as hereinabove provided," nothing in the "exclusive jurisdiction" section "supersede[s] or limit[s] the jurisdiction . . . conferred on . . . regulatory authorities under . . . the laws of . . . any State." 7 U.S.C. § 2(a)(1)(A). As Kalshi points out, providing that state laws are not superseded or limited *other than* as "hereinabove provided" suggests that Congress understood that the "exclusive jurisdiction" provision had at least *some* preemptive effect with respect to state laws. It is theoretically possible that the reference to state law in the savings clause was included purely out of an abundance of caution. But courts presume that Congress does not include language for no reason. *Fischer v. United States*, 603 U.S. 480, 495-96 (2024). And the grain futures example confirms that Defendants cannot avoid the conclusion that the Commodity Exchange Act reflects a congressional intent to preempt at least some state laws.

Kalshi would have this Court end the analysis here. And that is where the two other district courts that have considered Kalshi's preemption claims, and held that field preemption likely applies (those cases also arose on motions by Kalshi for a preliminary injunction), ended their analysis. *KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575-APG-BNW, 2025 WL 1073495, at *6 (D. Nev. April 9, 2025); *KalshiEX LLC v. Flaherty*, No. 25-CV-02152-ESK-MJS, 2025 WL 1218313, at *5-*6 (D.N.J. Apr. 28, 2025).

But the fact that the CEA has some field-preemptive effect does not mean that the "field" Congress intended for the CEA to occupy includes state gambling laws, and specifically sports wagering laws. In assessing field preemption, courts must avoid "interpreting the scope of the preempted field too broadly." *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680 (3d Cir. 2016); *see also Decohen v. Capital One, N.A.*,

15

**JA162**

703 F.3d 216, 224 (4th Cir. 2012) (holding that, despite broad federal laws governing banking, Congress "has not occupied the field with regard to debt cancellation agreements" and instead "le[ft] room for state regulation"). The question of whether the field that Congress intended the Commodity Exchange Act to "occupy" simply is not answered by the text of § 2. And where statutory text is ambiguous, courts turn to other tools of interpretation such as history, drafting, and purpose of the statute. *See, e.g.*, *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 654 (2020) ("This Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment."); *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 493 (1987) ("Given that the Act itself does not speak directly to the issue, the Court must be guided by the goals and policies of the Act in determining whether it in fact pre-empts an action based on the law of an affected State."). Here, the structure, context and legislative history of the CEA do not support Kalshi's argument, let alone establish that Congress clearly and manifestly intended to preempt state sports-betting laws.[4]

---

[4] As noted above, one of the reasons Defendants argue the CEA does not preempt Maryland law with respect to event contracts for sporting events is that those instruments are not "swaps" within the meaning of the CEA. Specifically, Defendants argue that event contracts for sporting events are not "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated *with a potential financial, economic, or commercial consequence.*" 7 U.S.C. § 1a(47)(A)(ii) (emphasis added). As Defendants put it, "Kalshi's gaming devices do not involve the sporting event *itself*, but rather the *outcome* of the event, *i.e.*, which team will win the game," but who wins a game does not create a financial, economic or commercial consequence (other than for "the competitors themselves"), but rather the holding of the competition itself. ECF No. 26 at 19. And Kalshi itself has represented in separate litigation that "at least in general, contracts relating to *games* – again, activities conducted for diversion or amusement – are unlikely to serve any 'commercial or hedging interest.'" *Id.* (quoting Appellee's Br. at 45, *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698, at *45 (D.C. Cir. Nov. 15, 2024)). Defendants also argue that

16

**JA163**

First, the statutory Special Rule in 7 U.S.C. § 7a-2(c) itself confirms that Congress intended for at least some state laws to operate alongside the CEA, not to be preempted by it. As discussed above, Congress expressly authorized the Commission to disallow event contracts that "involve . . . activity that is unlawful under . . . State law." 7 U.S.C. § 7a-2(c)(5)(C)(i). That plain text clearly reflects an affirmative intent to *preserve* state laws governing whether particular conduct is lawful or unlawful. The fact that Congress expressly authorized the Commission to prohibit particular categories of transactions as contrary to the public interest *based on the fact that the conduct at issue would violate state law* severely undercuts Kalshi's suggestion that Congress intended to displace all state laws that would otherwise apply to transactions that fall within the scope of the CEA. Where "a federal statute expressly incorporates state law," a "preemption analysis is inappropriate." *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 864 (4th Cir. 1994). Congress leaves "room for supplementary state legislation" where it expressly relies on and incorporates state laws. *Kansas*, 589 U.S. at 208.

That point is aptly illustrated by the state statutes at issue here. Under Maryland law, it is unlawful to, among other things, conduct sports wagering business without an appropriate sports wagering license. Md. Code Ann., St. Gov., § 9-1E-03(b), § 9-1E-04(b)(6)(ii); Md. Code Ann., Crim. Law § 12-104. Those state statutes govern whether conducting sports betting in Maryland is lawful or unlawful. To be sure, the Commission

---

these contracts cannot constitute swaps because if they were, then any casino or bingo hall, etc., allowing wagers to be placed based on the outcome of an event would be offering swaps outside of a CFTC-designated exchange on "any other board of trade, exchange, or market." *See* 7 U.S.C. §§ 2(e), 6a(1). As noted above, the Court does not decide one way or the other whether Kalshi's sporting events contracts constitute swaps, because even if they do, Kalshi must comply with state laws that would otherwise apply to those transactions.

has not elected, at least to date, to prohibit events contracts (though it has considered doing so, Event Contracts, 89 Fed. Reg. 48968 (proposed June 10, 2024) (to be codified at 17 C.F.R. pt. 40)). But if Kalshi's preemption theory were correct, that would mean those state laws are nullities when it comes to sports wagering contracts offered on a DCM platform like Kalshi's. Insofar as the event contracts at issue constitute swaps under the CEA, which the Court assumes without deciding as noted above, they violate Maryland sports-wagering laws and thus constitute an "activity that is unlawful" under state law. 7 U.S.C. § 7a-2(c)(5)(C)(i)(I). The distinct tension between Kalshi's theory and the express language of the Special Rule confirms that Congress did not clearly and manifestly intend to preempt state laws with respect to sports wagering.

Second, the CEA's express preemption clauses, 7 U.S.C. § 16(e)(2) and (h), further confirm the absence of congressional intent to preempt state sports-betting laws. In § 16(e)(2), Congress directly considered the scope of the field it considered itself to be occupying for preemption purposes when it comes to "gaming." This is the express preemption provision that currently applies:

> This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming . . . in the case of--
>> (A) an electronic trading facility excluded under section 2(e) of this title; and
>> (B) an agreement, contract, or transaction that is excluded from this chapter under section 2(c) or 2(f) of this title or sections 27 to 27f of this title, or exempted under section 6(c) of this title (regardless of whether any such agreement, contract, or transaction is otherwise subject to this chapter).

7 U.S.C. § 16(e)(2). Congress elected to expressly preempt *some* "State or local law[s] that prohibit[] or regulate[] gaming"—specifically those cross-referenced in § 16(e)(2),

18

**JA165**

as well as state insurance laws to the extent they govern swaps. *Id.* § 16(h). Kalshi does

not dispute that the Maryland laws it requests to be ruled preempted do not fall within §

16(e)(2) or (h). Kalshi does not contend it is an "electronic trading facility excluded

under section 2(e) of this title," and the sports events contracts at issue here are not

covered by the cross-referenced provisions in § 16(e)(2), which instead refer to section

2(c) (which covers agreements, contracts, and transactions in foreign currency,

government securities, and certain other commodities), section 2(f) (which covers

qualifying hybrid instruments that are predominantly securities), sections 27 to 27f

(which covers banks and banking products), and section 6(c) (which exempts certain

DCMs from regulation for public interest purposes).

Congress's decision to expressly preempt state gaming laws for certain

transactions and state-insurance laws for swaps—compared to its silence as to all

others—is strong evidence that Congress did not intend to regulate so comprehensively

as to exclude all state law. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992)

("Congress' enactment of a provision defining the pre-emptive reach of a statute implies

that matters beyond that reach are not pre-empted."); *see also Freightliner Corp. v.

Myrick*, 514 U.S. 280, 288 (1995) (explaining that where a statute expressly defines its

"the pre-emptive reach," that supports an "inference"—not a "rule"—that Congress did

not impliedly preempt state laws that fall outside the express preemption provision).

Kalshi argues that the Court should not draw that inference from § 16(e)(2)

because just above it, in § 16(e)(1)(C), Congress expressly disclaimed any intent to

"supersede or preempt" the application of state law to entities that are "required to be

registered or designated" with the CFTC but "fail or refuse" to do so. 7 U.S.C. § 16(e).

Thus, Kalshi argues, § 16(e)(1) "preserves concurrent state regulation for commodities

and futures contracts traded *outside of DCMs*," thereby "not call[ing] into question the state's regulation of casinos or other gaming establishments, none of which are DCMs." ECF No. 2 at 12 (emphasis in original). But Kalshi reads far more into that provision than it deserves. That provision applies where a person is "required" to be registered or designated, *e.g.*, as a DCM, but "fail[s] or refuse[s]" to do so. 7 U.S.C. § 16(e)(1)(C). That is about recalcitrant exchanges that refuse to register with the CEA. It provides little if any guidance for whether Congress intended to supersede state gambling laws for transactions that are placed on contract markets that *are* registered, particularly because it is unclear whether Congress intended for § 16(e)(1)(C) to apply to swaps anyway. *See* 7 U.S.C. § 2(d) (noting that, aside from specific provisions not including § 16(e)(1)(C), the CEA does not apply to swaps).

Third, although the savings clause in the exclusive-jurisdiction provision cuts both ways as discussed above, given the presumption against preemption, its ambiguity means that on balance it cuts against a finding of field preemption. A savings clause generally "negates the inference that Congress left no room for state causes of action." *Int'l Paper Co.*, 479 U.S. at 492.

Fourth, as the Supreme Court has long recognized, states have strong interests in regulating gambling. *See, e.g.*, *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018) (holding that the federal Professional and Amateur Sports Protection Act's restriction on states' ability to regulate sports gambling violates the anticommandeering doctrine); *WV Ass'n of Club Owners*, 533 F.3d at 302; *Ah Sin*, 198 U.S. at 505-06. The presence of those state interests not only means the presumption against preemption applies, as discussed above; it also is relevant to the application of the field preemption standard itself. It is highly unlikely that Congress would have overridden state gambling

laws without at least some indication in the text and legislative history that it intended to do so.

Fifth, where courts have carefully focused on the *scope* of Congress's preemptive intent when enacting the exclusive-jurisdiction provision, they have held that that intent had limits. In *Effex Capital, LLC v. Nat'l Futures Ass'n*, for example, the Seventh Circuit held that Congress "did not manifest an intent to occupy completely the entire field of commodity futures regulation." 933 F.3d 882, 894 (7th Cir. 2019). In that case, that meant that the CEA preempted state laws only "[w]hen application of state law would directly affect trading on or the operation of a futures market." *Id.* (quoting *Am. Agric. Movement, Inc.*, 977 F.2d at 1156). And earlier, in *American Agriculture Movement*, the Seventh Circuit held that the "savings clause" was "designed to preserve in the futures trading context at least some state law causes of actions." 977 F.2d at 1155. There, that meant that, in the context of regulating DCMs, the CEA "did not manifest an intent to occupy completely the entire field of commodity futures regulation" and therefore it was not "impossible to comply with both state and federal law." *Effex Capital, LLC*, 933 F.3d at 882 (citing *Am. Agric. Movement, Inc.*, 977 F.2d at 1156).

Although *American Agriculture* arose before Congress added swaps to that provision in 2010, the Seventh Circuit emphasized that Congress did not intend for the Commodity Exchange Act to preempt every field of state law that would otherwise apply to transactions falling within the scope of the Act. *Id.*; *accord Kerr v. First Commodity Corp.*, 735 F.2d 281, 288 (8th Cir. 1984) ("Nothing in the Act deals expressly with the preemption question"). One district court, in reviewing the legislative history, observed that the savings clause was added to allay fears that the exclusive-jurisdiction provision "might oust the courts' jurisdiction over typical state law claims." *Patry v. Rosenthal &*

*Co.*, 534 F. Supp. 545, 548–49 (D. Kan. 1982). And the D.C. Circuit in *FTC v. Ken Roberts Co.*, although not addressing preemption of state law, considered whether the exclusive-jurisdiction provision applied to the regulation of "instructional materials that purport to teach would-be investors how to make money investing in the commodities and securities markets" such that the CFTC had exclusive federal regulatory authority (as opposed to concurrent with the FTC). 276 F.3d 583, 589 (D.C. Cir. 2001). The *Ken Roberts* court observed that "[o]n its face, § 2(a)(1)(A) confers exclusive jurisdiction to the CFTC over a limited, discrete set of items related to the making of futures contracts"; it was "certainly not obvious that the advertising at issue in this case fits in any of these categories." *Id.*

Sixth, when Congress enacted the exclusive-jurisdiction provision in 1974 as part of the Commodity Future Trading Commission Act, and when it expanded the provision to include swaps as part of the Dodd-Frank Act, sports betting constituted a federal crime unless expressly permitted under state law. In 1974 (indeed still today, as discussed below), the Wire Act criminalized engaging in "betting or wagering" businesses "us[ing] a wire communication facility" to transmit "bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest" where such wagering is illegal under state law. 18 U.S.C. § 1084(a)-(b). And in 2010, the Professional and Amateur Sports Protection Act (PASPA), which had been enacted in 1992, prohibited sports gambling when sponsored or promoted by a governmental entity, or by a person acting "pursuant to the law or compact of a governmental entity." 28 U.S.C.A. § 3702. It was not until 2018, when the Supreme Court issued its ruling in *Murphy* overruling PASPA, that states were permitted to legalize sports wagering within their boundaries. *Murphy*, 584 U.S. at 486. Therefore, when Congress enacted and

amended the CEA, it was highly unlikely to have intended to override state laws that regulate sports betting such as Maryland's gaming laws, because at those times it was already largely illegal federally to engage in sports gambling (under either the Wire Act in 1974 or PASPA in 2010).

Seventh, Kalshi's argument necessarily has consequences with respect to other federal laws that further confirm the implausibility of its field preemption theory. Interpreting the CEA to preempt state gambling laws when wagers are conducted on a DCM would necessarily mean that the CEA impliedly (albeit partially) overrides the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et seq.* ("IGRA"), and § 1084 of the Wire Act, 18 U.S.C. § 1084(a)-(b). The IGRA provides a comprehensive regulatory framework for tribal governments to engage in gaming activity on their own lands. 25 U.S.C. § 2701(4); *see also* ECF No. 65 at 2-3 (tribes' amicus brief). The Wire Act similarly makes clear that "[w]however being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate . . . commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest . . . shall be fined under this title or imprisoned not more than two years, or both." 18 U.S.C. § 1084(a). The Supreme Court has made clear there is a "strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (cleaned up). Kalshi's proposed statutory interpretation would necessarily entail at least a partial implied repeal of the IGRA and the Wire Act.

Eighth, the limited legislative history that exists from 2010 that bears on the scope of Congress's preemptive intent cuts against preemption. Senator Feinstein

expressed concern about "derivative contract[s]" being "used predominantly by speculators or participants not having a commercial or hedging interest," and so did not understand Dodd-Frank to authorize "gambling" contracts that "served no commercial purpose at all." 156 Cong. Rec. S5902, S5906-7 (daily ed. July 15, 2010) (Sen. Feinstein). Senator Lincoln opined that "an 'event contract' around sporting events" would "not serve any real commercial purpose," but instead "would be used solely for gambling." 156 Cong. Rec. S5902-01, S5907 (July 15, 2010) (statement of Senator Lincoln). To be sure, those statements bear most directly on whether the event contracts at issue constitute swaps within the meaning of the CEA—which this Court does not decide. And isolated statements by particular legislators have limited evidentiary value when it comes to the meaning of a statute. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 385 (2012). But those statements also reflect concern about "gambling" occurring on DCMs. That contemporaneously expressed concern makes it even less likely that Congress intended for Dodd-Frank to render obsolete state laws limiting or regulating gambling for transactions that Congress brought within the purview of the CEA pursuant to Dodd-Frank.[5]

Field preemption is a high standard, and the presumption against federal preemption is especially strong "when Congress has legislated in a field traditionally occupied by the States." *Altria Grp.*, 555 U.S. at 77. "In such cases, "[c]onsideration

---

[5] On the legislative history front, Kalshi points to a 1974 Senate report and statements by two then-senators reflecting the "deletion of a CEA provision which appeared to preserve the states' authority over futures trading." *Am. Agric. Movement*, 977 F.2d at 1156; *see also* ECF No. 2 at 13. But there is no question that the CEA has *some* preemptive effect; evidence of *that* legislative intent does not help determine whether Congress intended the scope of that preemptive to encompass state gambling laws.

24

JA171

under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 661 (4th Cir. 2024) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)). Field preemption applies only in the "rare case[]" when "Congress has legislated so comprehensively that it has left no room for supplementary state legislation." *Id.* (quoting *R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 140 (1986). Here, the weight of the evidence strongly confirms that Congress did not intend for Dodd-Frank to constitute legislation not only legalizing sports betting nationwide, but displacing states' authority to regulate it, including when such betting takes place on a website of a company that happens to have been designated as a commodity futures DCM. And even if the evidence were in equipoise (which it is not), the presumption against preemption would require rejecting Kalshi's field preemption theory. In short, Kalshi has not shown a likelihood of success on the merits that the CEA has the effect of field-preempting the regulation of sports-event contracts that are traded on DCMs.

## B.    Conflict Preemption

Kalshi next argues that even if field preemption does not apply, Maryland's gaming laws are preempted with respect to sports-event contracts on Kalshi's DCM platform as a matter of conflict preemption. Unlike field preemption, conflict preemption exists when the state laws at issue conflict with federal laws, such as where "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963), or where the state law at issue "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the

25

**JA172**

federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). Assessing conflict preemption requires "a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question [of] whether they are in conflict." *H & R Block Eastern Enterprises, Inc. v. Raskin*, 591 F.3d 718, 723 (4th Cir. 2010) (quoting *Chi & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317 (1981)).

Kalshi argues that Maryland's gaming laws are "conflict-preempted as applied to Kalshi because they 'stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' as evidenced in the CEA," ECF No. 2 at 15 (quoting *Hines*, 312 U.S. at 67), and "undermine the intended purpose and natural effect of the federal scheme for regulating CFTC-designated exchanges," *id.* (citing *Crosby*, 530 U.S. at 373), in four ways.

*First*, Kalshi argues that because Congress's purpose in enacting the 1974 amendments was to bring the futures market under a uniform set of regulations, the MLGCC's actions and enforcement of Maryland's gaming laws "clearly conflict with Congress's goal to avoid subjecting regulated exchanges to multiple conflicting legal regimes." ECF No. 2 at 16. For the reasons the Court has already explained above as to why Kalshi has failed to show that field preemption applies to this case, *see* § III.A, *supra*, Kalshi has failed to show that Congress intended for the CEA to *completely preclude* any state's gaming laws from being applied to DCMs.

*Second*, Kalshi argues that subjecting DCMs to Maryland's gaming laws would lead to "the carefully calibrated federal enforcement scheme [being] displaced by a blunt application of mandatory state criminal penalties." ECF No. 2 at 17. Kalshi primarily cites *Crosby* in support of its argument, arguing that, in *Crosby*, the Supreme Court held

that conflict preemption applied because the state's regulatory scheme undermined Congress's "delegation of effective discretion" to the executive. *See Crosby*, 530 U.S. at 373-74. Kalshi argues that, similarly, Congress "gave the CFTC a variety of tools for enforcing federal law against DCMs and entrusted the CFTC with discretion to pursue the penalties it deems most appropriate." ECF No. 2 at 17. But in *Crosby*, the Court was dealing with a federal statute regulating sanctions towards Burma, a matter of national security as to which there is a uniquely federal interest. That bears little resemblance to gambling, which states have a strong interest in regulating, as explained above. Specifically, the Court in *Crosby* noted that the state statute at issue "compromise[s] the very capacity of the President to speak for the Nation with one voice in dealing with other governments." 530 U.S. at 381. Here, as explained above, *see* § III.A, *supra*, the regulation of gambling is precisely the kind of area of law that has been traditionally considered to be within the purview of state regulatory authority.

*Third*, Kalshi argues that "the CFTC has already authorized Kalshi's event contracts by declining to restrict them after Kalshi self-certified them." ECF No. 2 at 18. Therefore, Kalshi argues, because "the MLGCC now claims the authority to regulate Kalshi based on its assessment of state public policy," this is "in direct conflict with the CFTC's evaluation of the public interest." *Id.* But as MLGCC correctly points out, Congress was concerned with preempting only "incompatible state laws." *See* 120 Cong. Rec. 30, 464 (Sep. 9, 1974) (statement of Senator Curtis noting that the Act would only preempt state law if it "were contrary to or inconsistent with Federal law"). Kalshi has not demonstrated how Maryland's laws would either conflict or stand as an obstacle to achieving the purposes of the CEA. For example, Kalshi could simply obtain a mobile sports wager license in Maryland, while still being able to comply with federal regulatory

27

**JA174**

requirements imposed by the CEA and CFTC. Kalshi has not shown how obtaining a license in Maryland and otherwise complying with Maryland law would prevent it from complying with federal law. Maryland law also requires Kalshi to ensure there are age verification procedures for its online sports wagering platform, *see* SG § 9-1E-11; Kalshi has not shown it would be unable to comply with that requirement and also still comply with the requirements of the CEA.

*Fourth*, Kalshi argues that "the MLGCC's demands conflict with the CFTC Core Principles on which Kalshi's designation as a CFTC-approved market depends" because Core Principle 2 requires Kalshi to "provide its members, persons with trading privileges, and independent software vendors with *impartial access* to its markets and services." ECF No. 2 at 18 (citing 17 C.F.R. §§ 38.150, 38.151(b)) (emphasis in original). Kalshi argues that MLGCC's position that Kalshi must comply with Maryland law has the effect of threatening to cut off Maryland residents from accessing Kalshi's platform.

This last argument fails because the CFTC's Core Principles and Maryland's gaming laws work in tandem. The CEA and the CFTC's Core Principles seek to address the efficient functioning of the derivatives and futures markets; Maryland's gaming laws are focused on protecting the public from potential gambling issues. ECF No. 63 at 15-16. For example, the Core Principles focus on matters such as conflicts of interest, whereas Maryland's gaming statutes, for example, prohibit wagers that cannot be made impartially or prohibiting licensees from preying on persons with gambling addictions. To the extent Kalshi is arguing that Maryland's gaming laws prevent it from complying with the impartial access principle by not allowing it to offer sports-event contracts to Marylanders unless it were to obtain a license, the Court rejects that argument. Kalshi's point is not a basis for holding that conflict preemption exists and that Maryland's laws

are preempted simply because *not* obtaining a license limits Kalshi's geographical

access. It is Kalshi's desire not to comply with Maryland law and presumably incur some

additional compliance costs—not the existence of Maryland consumer protection laws

themselves—that creates the situation Kalshi professes to worry about. So long as Kalshi

obtains a license and complies with Maryland sports gambling laws, those laws would

not pose an obstacle to Kalshi making the sports gambling portion of its platform

available to users in Maryland.

For these reasons, Kalshi has not shown that compliance with Maryland law and

the CEA is an "impossibility," *Florida Lime*, 373 U.S. at 143, or that Maryland's gaming

laws stand as an "obstacle to the accomplishment and execution of the full purposes and

objectives of Congress," *Hines*, 312 U.S. at 67. Accordingly, it has not shown a likelihood

of success on its conflict-preemption theory.

## IV.    CONCLUSION

A party seeking a preliminary injunction must satisfy all four *Winter* elements.

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes

Powell*, 915 F.3d 197, 211 (4th Cir. 2019). Because Plaintiff has not shown a likelihood of

success on the merits, the Court does not reach the questions of whether Plaintiff has

shown that it would suffer irreparable harm in the absence of an injunction or whether

the balance of equities or public interest would weigh in favor of or against a preliminary

injunction. *Viktus v. Blinken*, 79 F.4th 352, 361-62 (4th Cir. 2023) ("a district court is

entitled to deny preliminary injunctive relief on the failure of any single *Winter* factor,

without fully evaluating the remaining factors.").

For the foregoing reasons, because Kalshi has failed to show it has a likelihood of success on the merits, Kalshi's motion for a preliminary injunction (ECF No. 2) is DENIED. A separate order follows.

Date: August 1, 2025

_____/s/_____

Adam B. Abelson
United States District Judge

30

**JA177**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KALSHIEX LLC,

     *Plaintiff*,

v.

JOHN A. MARTIN, *et al.*,

     *Defendants*

Case No. 25-cv-1283-ABA

### ORDER

Plaintiff KalshiEX LLC ("Kalshi") filed a motion for temporary restraining order and/or preliminary injunction on April 21, 2025. ECF No. 2 (the "Motion"). For the reasons explained in the accompanying memorandum opinion, it is hereby ORDERED as follows:

1. The Motion is DENIED;

2. The motion to strike (ECF No. 68) is DENIED as MOOT; and

3. The Court will hold a Zoom status conference on **Thursday, August 7 at 11:00 A.M.** Zoom information will be circulated to counsel via email in advance of the conference.

Date:  August 1, 2025

                                         */s/*
                                         Adam B. Abelson
                                         United States District Judge

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### NORTHERN DIVISION

KALSHIEX LLC,

*Plaintiff,*

vs.

JOHN A. MARTIN, et al.,

*Defendants.*

Case No.: 25-cv-1283-ABA

**PLAINTIFF'S NOTICE OF APPEAL**

PLEASE TAKE NOTICE that Plaintiff KalshiEX LLC hereby appeals to the United States Court of Appeals for the Fourth Circuit from the Court's Memorandum Opinion and Order issued on August 1, 2025, ECF Nos. 70 and 71.

Dated this 1st day of August, 2025.

Respectfully submitted,

/s/ *Neal Kumar Katyal*
Neal Kumar Katyal (D. Md. Bar No. 21694)
Milbank LLP
1101 New York Ave., NW
Washington DC 20006
Telephone: 202-835-7505
Facsimile: 202-263-7586

*Counsel for Plaintiff*

1