No. 25-1892

# United States Court of Appeals for the Fourth Circuit

---

KALSHIEX LLC,

*Plaintiff–Appellant*,

v.

JOHN A. MARTIN, *et al.*,

*Defendants–Appellees.*

---

On Appeal from the United States District Court
for the District of Maryland
No. 1:25-cv-01283

---

**BRIEF OF PARADIGM OPERATIONS LP**
**AS *AMICUS CURIAE* IN SUPPORT OF APPELLANT**

---

Tyler R. Green
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
222 S. Main Street
5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com
conor@consovoymccarthy.com

*Counsel for Amicus Curiae*

October 21, 2025

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Fourth Circuit Rule 26.1(b), *Amicus* discloses that it has no parent corporations and that no publicly held corporations hold 10% or more of its stock. No publicly held corporation not a party to this proceeding has a financial interest in the outcome of this proceeding.

Dated: October 21, 2025          */s/ Tyler R. Green*
                                 Tyler R. Green
                                 *Counsel for Amicus*

## TABLE OF CONTENTS

Corporate Disclosure Statement ........................................................................ ii

Table of Authorities ........................................................................................ iv

Interest of *Amicus Curiae* ................................................................................ 1

Introduction ..................................................................................................... 2

Argument ......................................................................................................... 4

    I.    Congress preempted state regulation of instruments falling under
the CFTC's jurisdiction. ....................................................................... 4

        A.   Over the last century, Congress brought a largely unregulated
market under a single federal regulatory regime. ....................... 5

        B.   Congress made preemption of state regulations a central
pillar of the 1974 CFTC Act. ...................................................... 11

        C.   The 1978 CEA amendments reaffirmed the CFTC's exclusive
jurisdiction over futures. ............................................................. 17

    II.   The Dodd-Frank Act extended the CFTC Act's preemptive reach
to swaps. ............................................................................................... 19

    III.  The district court erred by crediting policy arguments instead of
the text and history of commodities regulation. ................................ 21

Conclusion ...................................................................................................... 30

Certificate of Compliance .............................................................................. 31

Certificate of Service ...................................................................................... 32

## TABLE OF AUTHORITIES

**Cases**

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
    977 F.2d 1147 (7th Cir. 1992)............................................................ 26

*Bd. of Trade of City of Chi. v. Christie Grain & Stock Co.*,
    198 U.S. 236 (1905) ............................................................ 7, 21, 30

*Dickson v. Uhlmann Grain Co.*,
    288 U.S. 188 (1933) ............................................................ 8

*Effex Capital, LLC v. Nat'l Futures Ass'n*,
    933 F.3d 882 (7th Cir. 2019)............................................................ 26

*Gatewood v. North Carolina*,
    203 U.S. 531 (1906) ............................................................ 5, 7

*MacDonald v. Gessler*,
    57 A. 361 (Pa. 1904) ............................................................ 5

*Murphy v. NCAA*,
    584 U.S. 453 (2018) ............................................................ 25

*North Carolina v. McGinnis*,
    51 S.E. 50 (N.C. 1905)............................................................ 6

*PCS Phosphate Co. v. Norfolk S. Corp.*,
    559 F.3d 212 (4th Cir. 2009)............................................................ 24

*Rice v. Bd. of Trade of Chi.*,
    331 U.S. 247 (1947) ............................................................ 9

*Time Warner Cable v. Doyle*,
    66 F.3d 867 (7th Cir. 1995)............................................................ 26

**Statutes**

18 U.S.C. §1084 ............................................................ 28

1923 N.J. Laws 125 ............................................................ 6

31 U.S.C. §5362 ............................................................ 28

iv

7 U.S.C. §1a .................................................................................. 22, 28

7 U.S.C. §2 ................................................................................. 2, 20, 21

7 U.S.C. §7a-2 ................................................................................... 23

Pub. L. No. 67-331, 42 Stat. 998 (1922) ...................................... 8, 21

Pub. L. No. 74-675, 49 Stat. 1491 (1936) .................................... 9, 21

Pub. L. No. 93-463, 88 Stat. 1389 (1975) .................................. 10, 11

## Legislative History

119 Cong. Rec. H41333 (1973) ..................................................... 12

156 Cong. Rec. S5902-01 (2010) ................................................... 28

93 Cong. Rec. S16133 (1974) ........................................................ 16

*CFTC Act of 1974: Statement by the President on Signing the Bill Into Law*,
10 Wkly. Comp. of Pres. Docs. (No. 44) (1974).............................. 17

*Commodity Futures Trading Commission Act of 1974: Hearings Before the H.
Comm. on Agriculture*, 93d Cong. (1974)....................................... 13

*Commodity Futures Trading Commission Act: Hearings Before the S. Comm.
on Agriculture and Forestry*, 93d Cong. (1974)......................... 14, 16

*Extend Commodity Exchange Act: Hearings on H.R. 10285 Before the
Subcomm. on Conservation & Credit of the H. Comm. on Agriculture*,
95th Cong. (1978) .................................................... 17, 18, 29

H.R. Rep. No. 93-975 (1974).................................................. 13, 14, 21

*Review of Commodity Exchange Act and Discussion of Possible Changes,
Hearings Before the H. Comm. on Agriculture*, 93d Cong. (1973)........... 11, 12

S. Rep. No. 93-1131 (1974)............................................................. 15

S. Rep. No. 93-1194 (1974)............................................................. 15

S. Rep. No. 95-850 (1978)....................................... 18, 19, 24, 29

## Rules

Fed. R. App. P. 29.................................................................................. 1

## Regulations

*Statement of Policy Concerning Swap Transactions*, 54 Fed. Reg. 30,694 (July 21, 1989).......................................................................................... 19

## Other Authorities

Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. & Bus. Rev. 1 (2019)........................................ 20, 21, 29

CFTC Release No. 8478-22, *CFTC Orders Event-Based Binary Options Markets Operator to Pay $1.4 Million Penalty* (Jan. 2, 2022) ........................................ 21

David Hochfelder, *"Where the Common People Could Speculate": The Ticker, Bucket Shops, and the Origins of Popular Participation in Financial Markets, 1880-1920*, 93 J. Am. Hist. 335 (2006)............................................................... 5

John Hill, Jr., *Gold Brick of Speculation* (1903) ..................................................... 5

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657 (1982) ............................................................. passim

Michael Greenberger, *Overwhelming a Financial Regulatory Black Hole with Legislative Sunlight*, 6 J. Bus. & Tech. L. 127 (2011)....................... 19, 20

Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1 (1976)............... 14, 15, 16, 27

Telford Taylor, *Trading in Commodity Futures—A New Standard of Legality?*, 43 Yale L.J. 63 (1933)........................................................................................... 9

## INTEREST OF *AMICUS CURIAE*

Paradigm Operations LP is a research-driven crypto investment firm that backs entrepreneurs, companies, and protocols at the frontier of innovation. Paradigm has an interest in this case because prediction markets are an exciting application of crypto technology that drive innovation in a field in which Paradigm invests. Recently, Paradigm invested in Kalshi because of its leadership in the prediction market space. Paradigm also has an interest in supporting the broad availability of regulated prediction markets, which are a valuable source of public information and allow market participants (including investors and entrepreneurs) to hedge exposure to specific events. As a market participant in this developing field, Paradigm brings a valuable perspective and a wealth of experience that the other parties and regulatory authorities do not offer.

No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae* and its counsel, made any monetary contribution toward the preparation or submission of this brief. All parties have consented to the filing of this brief. Fed. R. App. P. 29(a)(2).

INTRODUCTION

The birth and growth of the country's financial markets in the 20th century led to corresponding birth and growth of financial market regulations. In some areas, the resulting tangle of conflicting state regulations left Congress no choice but to set uniform, national rules. One such area was the futures market, where Congress created the Commodity Futures Trading Commission and gave it "exclusive jurisdiction" over derivatives, which includes a wide swath of predictive financial instruments. 7 U.S.C. §2(a)(1)(A). Over time, those categories expanded to include some of the newest futures instruments known as "event contracts," such as those Kalshi offers.

Though derivatives have changed form, states' objections to them have not. Some of what the CFTC regulates as financial instruments the states call gambling. Maryland sounds that same horn here, mimicking objections that long precede the CFTC: When farmers traded the first futures contracts on Chicago exchanges in the 19th century, the states called that gambling, too. But even before creating the CFTC, Congress quashed those earlier objections with the Commodity Exchange Act of 1936, adopting uniform federal regulations governing then-developing financial instruments like commodity futures contracts. And as the industry developed more sophisticated contracts, Congress expanded federal jurisdiction.

Since 1974, when Congress passed the CFTC Act establishing the CFTC, the preemptive force of federal rules governing derivatives markets hasn't been subject to reasonable dispute. In the CFTC Act, Congress preempted state regulation of instruments traded on CFTC-designated exchanges. Congress has consistently reasserted since then that the CFTC—not states—has authority over contracts traded on those designated exchanges. The district court's contrary policy reasons, still focused largely on gambling, just rehash arguments Congress first rejected over a century ago when it concluded that national financial markets require a set of uniform national rules.

Kalshi's event contracts are thus subject to the CFTC's "exclusive jurisdiction," not to disparate regulation in each state. The event contracts plausibly fit in a number of the CFTC's exclusive jurisdictional buckets—as futures, options, swaps, or excluded-commodities contracts. The district court assumed that premise, taking for granted that the event contracts fall under the CFTC's jurisdiction. JA156. But the court nevertheless held that the CFTC's "exclusive jurisdiction" didn't preempt state gambling laws. That rationale occludes the text's clear meaning with decades' old thinking long ago rejected by Congress and the courts. The district court's denial of the preliminary injunction would strip the CFTC of some of its critical jurisdiction over commodity futures. This Court should reverse.

ARGUMENT

In 1974, Congress preempted state regulation of financial instruments that fall under the CFTC's jurisdiction. Four years later, it doubled down on the CFTC's exclusive jurisdiction. And in 2010, Congress extended that broad preemption to a type of financial instrument called a swap. Because Kalshi's event contracts are traded on CFTC-approved exchanges, the CFTC's regulatory authority preempts Maryland's regulatory authority over those instruments. Text, context, and history support that conclusion.

## I. Congress preempted state regulation of instruments falling under the CFTC's jurisdiction.

Congress passed the Commodity Futures Trading Commission Act of 1974 to resolve the tension between state gambling laws and federal financial regulation. Investors and business owners were developing new financial technologies to manage risk, but states sought to quash those practices as unlawful gambling. The CFTC Act overrode the states' objections, bringing order and national uniformity. Over time, Congress strengthened the CFTC Act's preemptive scope by granting the CFTC exclusive jurisdiction and expanding its authority to new financial instruments. Each step untangled a morass of state and federal regulation by preempting state laws when they overlap with the CFTC's "exclusive jurisdiction."

A.    **Over the last century, Congress brought a largely unregulated market under a single federal regulatory regime.**

The story of futures-market regulations begins with so-called "bucket shop" laws of the early 20th century. That term originally referred to "abandoned shops" that resold "drained beer kegs thrown out by pubs." David Hochfelder, *"Where the Common People Could Speculate": The Ticker, Bucket Shops, and the Origins of Popular Participation in Financial Markets, 1880-1920*, 93 J. Am. Hist. 335, 335 (2006). In the late 19th century, investors appropriated the derogatory term to refer to shops that took "bets or wagers … on the rise or fall of the prices of stocks, grain, oil, etc.," without facilitating the "transfer or delivery of the stock or commodities nominally dealt in.'" *Gatewood v. North Carolina*, 203 U.S. 531, 536 (1906). In other words, "customers simply gamble upon stocks, and never have any intention of purchasing outright." *MacDonald v. Gessler*, 57 A. 361, 362 (Pa. 1904). The practice was popular but controversial. A Chicago Board of Trade member at the time called the bucket shop "a gambling den, and nothing else." John Hill, Jr., *Gold Brick of Speculation* 20 (1903). He dedicated his anti-bucket-shop book to "exposing the methods of a class of vampires whose enterprises differ in no way from those of the highwayman or the burglar." *Id.* at xv.

States thus passed laws prohibiting trades that didn't require the purchaser to take physical delivery. North Carolina's 1905 law, for example, "made void all contracts for the sale of articles therein named for future

delivery, wherein … it is not intended that the articles agreed to be sold and delivered shall be actually delivered." *North Carolina v. McGinnis*, 51 S.E. 50, 51 (N.C. 1905). New Jersey passed a similar law in 1923 declaring "[a]ll contracts and agreements" for the sale of "securities" and "commodities" "utterly void and of no effect whatsoever" if they were made without "intending a bona fide purchase or sale or the actual bona fide receipt or delivery." 1923 N.J. Laws 125. "These statutes treated 'bucketing' as a form of gambling and made futures contracts criminally illegal where the parties to the agreement never intended delivery of the underlying commodity but were dealing only for its prospective rise or fall in price." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 663 (1982).

But the bucket-shop laws were "ill-suited to determining the validity of commodity futures contracts entered into on organized exchanges." *Id.* at 664. Even at that time, "actual delivery on futures contracts occurred on less than three percent of all such transactions." *Id.* Policymakers and jurists were equally flummoxed at distinguishing the financial-instrument wheat from the gambling chaff. Courts thus "experienced great difficulty in trying to distinguish between valid commodity transactions and those which were simply wagers on the price movement of specified commodities." *Id.* And in the absence of federal legislation, constitutional challenges to those bucket-

shop laws failed. *See Gatewood*, 203 U.S. at 542-43 (rejecting Fourteenth Amendment challenge to a conviction under North Carolina's bucket-shop law).

Justice Holmes is credited for reversing "the rigid, if not unthinking, application of … bucket-shop statutes" to contracts that divorced trading from physical delivery. Van Wart, *supra*, at 665. In a case challenging the Chicago Board of Trade as a bucket shop, the Supreme Court held that futures contracts serve "a legitimate and useful purpose" by allowing a transaction to "be offset before the time of delivery in case delivery should not be needed or desired." *Bd. of Trade of City of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 249 (1905). The practice allows "collectors and exporters of grain or other products, and manufacturers who make contracts in advance for the sale of their goods, [to] secure themselves against the fluctuations of the market by counter contracts for the purchase or sale." *Id.* The Court distinguished futures contracts traded on the exchange from other bucket-shop contracts that were "merely a speculation entered into for its own sake." *Id.* The result "was to exempt from state bucket-shop laws those transactions executed on exchanges between brokers." Van Wart, *supra*, at 665. But courts continued to wrestle with bucket-shop laws as applied to various futures contracts.

So in 1922, Congress stepped in. Responding to the manipulation of grain prices, Congress enacted the Grain Futures Act. *See* Pub. L. No. 67-331, 42 Stat. 998 (1922). The Act made it a misdemeanor to execute certain grain futures contracts unless performed through exchanges designated as "contract markets" by the Secretary of Agriculture—a precursor to the CFTC's modern designated contract markets.

This Act was the first modern financial regulatory law, passed more than a decade before the more famous financial regulatory laws governing securities. When faced with a case about the Grain Futures Act's preemptive scope, the Supreme Court held that the "Act did not supersede any applicable provisions of the Missouri law making gambling in grain futures illegal." *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933). That was because the Act set a compliance floor, not a ceiling—Congress established minimum regulatory conditions for grain futures, but it "[did] not purport to validate any dealings." *Id.* "Nor [was] there any basis for the contention that Congress occupied the field in respect to contracts for future delivery; and that necessarily all state legislation in any way dealing with that subject is superseded." *Id.* Contemporary commentators feared that the decision would pit states against futures traders, and the bucket-shop statutes "would render speculation impossible, hedging illegal, and subject all

8

brokers to criminal liability." Telford Taylor, *Trading in Commodity Futures—A New Standard of Legality?*, 43 Yale L.J. 63, 101 (1933).

Congress responded to *Uhlmann Grain* by enacting the Commodity Exchange Act. *See* Pub. L. No. 74-675, 49 Stat. 1491 (1936). The Act expanded regulation to the "'transactions and dealings of brokers and of customers'" and activities that might "'affect such trading on the futures exchanges.'" Van Wart, *supra*, at 669. It "contained its own anti-bucketing provision," and violations "would result in the federal government withholding designation of the exchange as a contract market." *Id.* The Act also liberalized speculative investing by prohibiting only "*[e]xcessive* speculation in any commodity under contracts of sale … for future delivery … causing sudden or unreasonable fluctuations or unwarranted changes in the price of such commodity." §5, 49 Stat. at 1492 (emphasis added).

Still, Congress didn't include a preemption provision. So when the Supreme Court heard another preemption challenge to Illinois regulations, it held that the Commodity Exchange Act didn't supersede state trade laws. *Rice v. Bd. of Trade of Chi.*, 331 U.S. 247 (1947). The Act provided that "[n]othing in this section or section 4b shall be construed to impair any State law applicable to any transaction enumerated or described in such sections." §5, 49 Stat. at 1494. That provision "preserv[ed] state control in two areas where state and federal law overlap." *Rice*, 331 U.S. at 255. So absent "any

conflict with the federal law," Illinois could enforce its own regulations. *Id.* Largely due to *Rice*, commodity futures were almost entirely self-regulated into the 1970s.

So Congress put its foot down once again. In 1974, Congress passed the Commodity Futures Trading Commission Act, creating the CFTC and empowering it to regulate the futures trading industry. Pub. L. No. 93-463, 88 Stat. 1389 (1975). The Act enlarged the definition of "commodity" to include not just agricultural products but also "all other goods and articles … and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt." *Id.* §201.

And this time, Congress directly addressed the preemption problems identified in *Uhlmann* and *Rice*. The Act gave the CFTC "exclusive jurisdiction with respect to accounts, agreements … and transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated" under the Act. *Id.* The Act "wholly and unequivocally eliminated each of the bases the Supreme Court had relied on in *Rice v. Board of Trade* to hold that the CEA did not preempt state regulation of commodities trading." Van Wart, *supra*, at 692-93. Given the history of prior legal fights over preemption, the inclusion of clear preemptive language cannot be taken as anything other than Congress' clear

intent to broadly and comprehensively preempt state regulations of commodity futures.

### B. Congress made preemption of state regulations a central pillar of the 1974 CFTC Act.

Congress meant what it said when it gave the CFTC "exclusive jurisdiction" over the instruments it regulated. 88 Stat. 1389, §201. "[P]reemption was a central issue in the proceedings which culminated in the 1974 amendments to the CEA." Van Wart, *supra*, at 692. From the first committee witness to the final reports to early cases interpreting the CFTC Act, virtually everyone recognized that the Act preempted state regulation of instruments traded on CFTC-approved exchanges.

The Committee on Agriculture kicked off the hearings in 1973. The first witness, Congressman Neal Smith, recommended "that trading in all futures should be under Federal regulation." *Review of Commodity Exchange Act and Discussion of Possible Changes, Hearings Before the H. Comm. on Agriculture*, 93d Cong. 10-11 (1973) (statement of Rep. Neal Smith). Representative Smith's testimony started a wave of support for federal legislation superseding state regulations. The chairman of the Chicago Board of Trade—one of the major players (and targets) in the industry—placed "particular emphasis" on the provision that "would give the commodity regulatory agency exclusive jurisdiction over futures trading." *Id.* at 128 (statement of Frederick G. Uhlmann). Uniform, exclusive federal regulation

"would prevent any possible conflicts over jurisdiction over futures trading." *Id.*

Many witnesses called for stronger federal regulation of commodities. Several New York commodities exchanges submitted a comment summing up the rationale: Because previous laws were "virtually silent on those questions," the commodities industry had been mired in confusion, conflict, and mounting legal fees. *Id.* at 121 (statement of Reed Clark). "In addition to the unfairness which is inherent in exposing exchanges to this sort of civil liability, it is extremely important that federal policy regarding commodities futures trading be uniform throughout the United States…." *Id.* at 121 (statement of Reed Clark). The message was clear: remove the jurisdictional mist that had shrouded commodities futures regulation for decades.

"On the basis of these hearings," Representative Poage, Chairman of the House Committee on Agriculture, introduced H.R. 11955 to amend the Commodity Exchange Act. Van Wart, *supra*, at 675. When introducing the bill, Representative Poage explained that "many State laws are exercising jurisdiction over these same markets to fill what had become a vacuum of regulation." 119 Cong. Rec. H41333 (1973). The resulting "[v]aried and often conflicting regulation," he feared, "could become a burden on commerce, if it is not already." *Id.* Yet H.R. 11955 did little to address the states' concurrent jurisdiction over derivatives. "The only provision … directly related to

jurisdictional issues was one which preserved the jurisdiction of the Securities Exchange Commission." Van Wart, *supra*, at 676. But that omission was not overlooked for long. The Continental Grain Company sent a letter warning that "[f]ailure to clarify … the exclusive and preemptive jurisdiction of the CFTC over regulation of all aspects of commodities and commodity trading will result in major conflicts of policy and regulation between the CFTC and the S.E.C. and between Federal and State regulatory bodies." *Commodity Futures Trading Commission Act of 1974: Hearings Before the H. Comm. on Agriculture*, 93d Cong. 322 (1974).

The committee responded by strengthening the preemption provisions. "Recognition of the need for exclusive federal jurisdiction pervaded" the committee report. Van Wart, *supra*, at 677-78. The report concluded that "[i]t is abundantly clear that all futures trading must be brought under a single regulatory umbrella." H.R. Rep. No. 93-975, at 41-42 (1974). The new version thus "provide[d] for the exclusive jurisdiction of the CFTC over all futures transactions and all cash transactions related thereto which are executed on not only domestic boards of trade but also 'on any other board of trade, exchange, or market.'" *Id.* at 7-8. The committee spent a good deal of time writing and rewriting that "exclusive jurisdiction" provision to clarify the relationship between the jurisdiction of the CFTC and of the Securities and Exchange Commission. Philip F. Johnson, *The*

*Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1, 11-13 (1976). In the end, the express purpose was to "put all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 76. It was thus "apparent that the committee intended that the proposed amendments to the CEA would serve as a check on renewed state regulatory efforts." Van Wart, *supra*, at 678.

The Senate hearings were even clearer about the need to rein in state regulations. One Senator asked a witness whether "[f]ederal legislation really ought to preempt State legislation so that we do not have the 50 different States legislating in this area." *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agriculture and Forestry*, 93d Cong. 396 (1974) (statement of Sen. Dick Clark). The witness, a Minnesota commodities exchange executive, responded, "Very definitely." *Id.* at 384-85, 396. He observed that "State legislation would make an impossible situation for exchanges." *Id.* at 396. Many witnesses highlighted the need for "'federal legislation'" that would "'preempt the states in making a determination that the various commodity contracts are, in fact, classified, regulated and traded as commodities and not as securities.'" Van Wart, *supra*, at 683 (collecting cites from *1974 S. Comm. Hearings*). Neglecting to

give the CFTC exclusive jurisdiction would result in "'confusion'" and a regulatory "'nightmare'" for exchanges. *Id.* at 682-83.

The Senate committee report confirmed that the Act would "supersede" state laws on commodity futures. S. Rep. No. 93-1131, at 23 (1974). In fact, the Senate added "clarifying amendments" that made clear that "the Commission's jurisdiction over futures contract markets or other exchanges is exclusive." *Id.* at 6, 23. And "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies," including the SEC. *Id.*

The conference report didn't mince words about what this meant for state laws: "Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) would preempt the field insofar as futures regulation is concerned." S. Rep. No. 93-1194, at 35 (1974). So "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern." *Id.* at 35-36. The conference committee thus did "not contemplate that there will be a need for any supplementary regulation by the States." *Id.* at 36.

During reconciliation, "the Senate version prevailed in the Conference," with one exception. Johnson, *supra*, at 17. "The one exception was that the House's language bringing all domestic and foreign commodity

markets under the CFTC's exclusive jurisdiction was accepted in lieu of the Senate's narrower provision limiting that exclusive authority to 'contract markets.'" *Id.* Most of the concern was over whether the CFTC Act would divest the SEC of jurisdiction over traditional stocks. Contrary to the district court's account of the history, JA161, it was understood that the Act divested states of regulatory authority over derivatives, *see* Johnson, *supra*, at 18-21.

Contrasting the disagreement over superseding the SEC's jurisdiction, Congress was generally of one mind about superseding state authority. The Senate rejected an amendment trying to introduce a presumption that the law shouldn't "be construed to impair any State law applicable to any transaction enumerated or described in such sections." 93 Cong. Rec. S16133 (1974). In fact, "the strongest statement *in favor* of a state regulatory role was not submitted until after the formal Senate hearings had concluded." Van Wart, *supra*, at 685. That sole witness advocated "the need and urgency to decentralize the structure of the commodity futures industry." *1974 S. Comm. Hearings*, at 814. But the witness missed the "major feature of the proposed amendments," which was to bring "all commodities under federal regulatory authority," calling doubt on the "validity" of his "remarks." Van Wart, *supra*, at 686.

With this clear design of federal supremacy, Congress passed the CFTC Act by a 281–43 margin in the House and by voice vote in the Senate.

On October 23, 1974, President Ford signed it into law, noting that he "fully support[ed]" the "new regulatory structure to apply to all commodity futures trading." *CFTC Act of 1974: Statement by the President on Signing the Bill Into Law*, 10 Wkly. Comp. of Pres. Docs. (No. 44), at 1366 (1974).

### C. The 1978 CEA amendments reaffirmed the CFTC's exclusive jurisdiction over futures.

It wasn't long before Congress took up the CFTC's exclusive jurisdiction again. Just four years later, the House Subcommittee on Conservation and Credit held hearings on additional amendments to the Commodity Exchange Act. "Battle lines over the issue of the CFTC's exclusive jurisdiction began to form quite early in these hearings." Van Wart, *supra*, at 699. The CFTC Commissioner explained that "[t]he idea behind the exclusive jurisdiction provisions of the Commission was to simplify and centralize regulation of the commodity market." *Extend Commodity Exchange Act: Hearings on H.R. 10285 Before the Subcomm. on Conservation & Credit of the H. Comm. on Agriculture*, 95th Cong. 80 (1978) (statement of John Rainbolt).

Even the Act's critics were aware that Congress had preempted state law. A Texas securities commissioner criticized the "grant of exclusive jurisdiction to the CFTC," which he claimed had "dismantled an effective regulatory system within the states that was adequately policing the commodity option problem." *Id.* at 364. The Minnesota Secretary of State urged Congress to "abolish the exclusive jurisdiction of the CFTC and the

consequent preemption of state action against commodity-related fraud." *Id.* at 379. But he was mainly concerned with state efforts "to help protect investors from commodities frauds." *Id.* at 380. He claimed that "[t]he simple abolition of the CFTC's exclusive jurisdiction would immediately bring fifty-one more experienced regulatory agencies into the field and vastly expand the available funding and manpower." *Id.* Even those recommendations demonstrated "virtual unanimity among participants in the [House and] Senate hearings that the 1974 amendments had preempted a state regulatory role." Van Wart, *supra* at 712.

The Senate committee report concluded that clearer, stronger regulation was necessary. The report observed that the 1974 Act "reflects the congressional awareness that futures markets would not remain static." S. Rep. No. 95-850, at 22 (1978). New technologies and financial instruments were reasons to give the CFTC more leeway, not clamp down on its jurisdiction. "So long as the futures contract serves a legitimate function, Congress has vested the Commodity Futures Trading Commission with jurisdiction." *Id.* As for the states' authority, the committee clarified that "it will remain possible, as it has been in the past, for an authorized State official to proceed in State court on the basis of an alleged violation of any *general* civil or criminal antifraud statute." *Id.* at 25. But "[t]he States would not, in these actions, be involved in enforcement of their local laws" regulating

futures. *Id.* "As to the question of state jurisdiction," both chambers thus decided "in favor of the CFTC." Van Wart, *supra*, at 718.

Congress, even today, understands the political consequences that accompany preempting the states on policymaking and regulation. To preempt the states from using some of their regulatory powers is a major step. For the CFTC Act's statutory text to so clearly preempt "any state or local law" on the subject of commodities futures regulation shows that Congress intended to establish strong federal preemption.

## II. The Dodd-Frank Act extended the CFTC Act's preemptive reach to swaps.

In the 1980s, swaps gained traction as a popular variant of derivative. Michael Greenberger, *Overwhelming a Financial Regulatory Black Hole with Legislative Sunlight*, 6 J. Bus. & Tech. L. 127, 131-32 (2011). The CFTC first defined "swaps" through rulemaking: "an agreement between two parties to exchange a series of cash flows measured by different interest rates, exchange rates, or prices with payments calculated by reference to a principal base (notional amount)." *Statement of Policy Concerning Swap Transactions*, 54 Fed. Reg. 30,694 (July 21, 1989). Over time, the industry developed more complex variants that became increasingly popular. *See* Greenberger, *supra*, at 136-43.

After the 2008 financial crisis, Congress stepped in again. The Dodd-Frank Wall Street Reform and Consumer Protection Act "transform[ed] the

regulation of OTC derivatives." *Id.* at 152. The Act defined a "swap," "swap dealer," and other key terms. And it imposed a variety of restrictions, "generally requiring that swaps be subject to clearing and exchange-like trading." *Id.* "The basic rule of the Dodd-Frank Act is that swaps must be cleared and exchange traded." *Id.* at 156.

Once again, Congress "revisited the question of state law preemption." Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. & Bus. Rev. 1, 1 (2019). It faced a familiar choice—whether to "maintain or repeal" the "protections against gaming and bucket shop laws for qualifying contracts." *Id.* And once again, "[i]nstead of backing away from preemption, Congress embraced it." *Id.*

Congress couldn't have been clearer in taking regulation of exchange-traded contracts out of the states' hands. "The Commission shall have exclusive jurisdiction" over transactions "involving swaps or contracts of sale of a commodity for future delivery … traded or executed on a [designated] contract market." 7 U.S.C. §2(a)(1)(A). The law is the same today. This provision grafted swaps into the federal preemption framework, putting swaps "on the same exclusive jurisdictional footing as exchange-traded commodity futures." Taylor-Brill, *supra*, at 3. The CFTC thus "received an explicit congressional mandate to carry out regulation of the

swap markets under federal law free from potential state interference, potentially including a patchwork of conflicting laws." *Id.* at 13.

### III. The district court erred by crediting policy arguments instead of the text and history of commodities regulation.

Because Kalshi is a CFTC-designated exchange, its event-contract offerings fall under the CFTC's "exclusive jurisdiction." 7 U.S.C. §2(a)(1)(A). That's the necessary result of the 20th century's federal regulatory evolution traced above. From the Supreme Court's exempting legitimate exchanges from state bucket-shop laws, *Christie Grain & Stock*, 198 U.S. at 249; to Congress's exempting designated exchanges from grain futures regulations, *1922 Act*, 42 Stat. 998; to Congress's expanding federal jurisdiction over designated exchanges, *1936 Act*, 49 Stat. 1491; to Congress's creating the CFTC and giving it "exclusive jurisdiction" over designated exchanges, H.R. Rep. No. 93-975, at 7-8—if it's traded on a CFTC exchange, it's exempt from state regulation.

The district court "assume[d] without deciding that Kalshi's sports-event contracts are in fact swaps." JA156. But this Court needn't assume anything: the CFTC itself said that those event contracts are swaps. *See* CFTC Release No. 8478-22, *CFTC Orders Event-Based Binary Options Markets Operator to Pay $1.4 Million Penalty* (Jan. 2, 2022), perma.cc/G9E8-ABYW. The CFTC's conclusion tracks the text. Congress defined "swap" broadly—a conclusion self-evident from the statutory text, where Congress provided six

definitions of "swap" to cover a wide variety of financial arrangements. 7 U.S.C. §1a(47)(A)(i)-(vi). At a minimum, Kalshi's sports-event contracts concern "an event or contingency associated with a potential financial, economic, or commercial consequence" because the occurrence and outcome of those sporting events have significant (and at least "potential") economic effects. *Id.* §1a(47)(A)(ii).

Defendants resist that conclusion with a red herring, arguing that there's a difference between the "event itself" and "the outcome of the event." Doc. 28 at 13. That distinction appears nowhere in the statute. And the text's broad language doesn't permit the Court to infer it: the event need only be "*associated* with a *potential* financial, economic, or commercial consequence." 7 U.S.C. §1a(47)(A)(ii) (emphasis added). Contrary to the Defendants' unexplained assertions (Doc. 28 at 13), whether "Rory McIlory or Justin Rose" wins the Masters affects their sponsors (Nike vs. Titleist), business in their respective countries (Northern Ireland vs. England), golf equipment sales ("buy the new Rory rangefinder!"), and interest in the sport, just to name a few. The league, investors, players, fans, sponsors, and hosts have strong financial interests in *who* wins the Masters, apart from pure speculation. That Defendants can't predict the "potential" consequences of those outcomes doesn't mean those close to the event won't experience them.

Even after assuming that Kalshi's contracts are CFTC-regulated "swaps," the district court held that those contracts are subject to *additional* regulation by "state sports-betting laws." JA163. The court's eight reasons demonstrate that it misunderstood the text and history of commodities regulation, substituting its own policy preferences for Congress's "exclusive" regime.

*First*, the district court pointed to 7 U.S.C. §7a-2(c), which allows "the Commission" to delist event contracts that "involve … activity that is unlawful under any Federal or State law." The court reasoned that the provision "confirms that Congress intended for at least some state laws to operate alongside the CEA, not to be preempted by it." JA164. The opposite is true. Congress gave "the Commission" exclusive authority to determine whether an event contract violates "State law." 7 U.S.C. §7a-2(c). If the Commission concludes that a contract is valid, states can't second-guess that judgment. If they could, there'd be no point in Congress giving "the Commission" the authority to determine how state law applies to exchange-traded contracts.

At a minimum, it makes no sense to infer (as the district court did) more expansive *state* power from a provision granting *the Commission* that power. And although Congress "intended for at least some state laws to operate alongside" federal regulation, plenty of other state laws fit in that

box—there's no reason to break the box to make room for state gambling laws. After Congress tightened the screws on federal jurisdiction, "it [would] remain possible, as it has been in the past, for an authorized State official to proceed in State court on the basis of an alleged violation of any *general* civil or criminal antifraud statute." S. Rep. No. 95-850, at 25 (1978). Gambling laws don't fit that bill.

***Second***, the district court concluded from the express preemption clause "that Congress did not impliedly preempt state laws that fall outside the express preemption provision." JA166. But "[a]n express preemption clause does not bar a finding of implied preemption." *PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 220 (4th Cir. 2009). The court said it was merely drawing an "'inference'" against implied preemption, not a conclusion or a "'rule.'" JA166 (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 288 (1995)). Yet the court's refusal to draw inferences the other direction undermines that assurance. Section 16(e)(1), for example, explains what the statute *doesn't* preempt. *See* Kalshi App. Br. 50-51 (explaining that §16(e)(1)(B) allows state regulation of off-exchange transactions). It's just as plausible to infer that Congress intended to preempt gambling laws, since it didn't include those laws in §16(e)(1). The court's selective inference-drawing demonstrates that policy—not text—guided its decision.

*Third*, the court found ambiguity where none exists. It then resolved that ambiguity in the states' favor, fearing that a ruling in Kalshi's favor would leave "'no room for state causes of action.'" JA167 (quoting *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987)). But Kalshi's position leaves plenty of room for states to enforce their gambling laws. The CFTC doesn't have "exclusive jurisdiction" over sports gambling. It has "exclusive jurisdiction" over contracts traded on a CFTC-designated exchange. No gymnastics are needed to reconcile the preemption clauses.

*Fourth*, the district court found that the states' "strong interests in regulating gambling" cuts against preemption. JA167-168. But none of the cases it cited have anything to do with the Commodity Exchange Act. While *Murphy v. NCAA* discusses preemption, 584 U.S. 453, 477-80 (2018), nowhere in that opinion did the Supreme Court endorse the district court's reasoning, which favored the state just because gambling laws are involved. Nor does a gambling exception to preemption make sense. States have interests in enforcing all valid exercises of their police powers—but Congress can (and did) preempt those powers under the Commodity Exchange Act. Tipping the scales in the states' favor because gambling laws are at issue creates a new presumption that no precedent supports.

*Fifth*, the district court misread Seventh Circuit precedent to bolster its opinion. Citing *Effex Capital*, the court said that the "Seventh Circuit held

that Congress 'did not manifest an intent to occupy completely the entire field of commodity futures regulation.'" JA168 (quoting *Effex Capital, LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019)). That out-of-context quote doesn't illustrate *Effex Capital*'s holding. The quoted sentence describes an earlier case in which the Seventh Circuit held that the Commodity Exchange Act did not preempt certain common-law torts. *See Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1154 (7th Cir. 1992). The circuit has since abrogated *American Agricultural Movement*, in part because the case relied on a discredited presumption against conflict and field preemption. *See Time Warner Cable v. Doyle*, 66 F.3d 867, 875 n.7 (7th Cir. 1995). The actual holding in *Effex Capital*, which the district court overlooked, was that "the Commodity Exchange Act preempts Effex's state law claims" for defamation concerning a damaging public financial disclosure. 933 F.3d at 885, 896. Both cases support Kalshi's position that the Commodity Exchange Act preempts state law that directly regulates trading on designated contract markets. In searching for support for its ruling, the district court misread and misrelied on out-of-circuit precedent.

*Sixth*, the court inferred from federal law criminalizing sports gambling that Congress must have also wanted *states* to criminalize sports gambling. The inference is as unwarranted as it is unsupported. Citing nothing, the district court reasoned that "when Congress enacted and

amended the [Commodity Exchange Act], it was highly unlikely to have intended to override state laws that regulate sports betting such as Maryland's gaming laws, because at those times it was already largely illegal federally to engage in sports gambling." JA169-170. The court cited no commission reports, speeches, debates, or other history to support its inference of Congress's intent. The inference is particularly weak because it presumes Congress legislates with perfect precision, trimming the preemptive scope of a statute to fit the contours of different criminal laws. Gambling and futures regulations have long overlapped. *See* Van Wart, *supra*, at 663. And decades of history suggest that overriding state gambling laws was precisely what Congress intended. *See supra* Sections I, II.

**Seventh**, the district court assumed that Kalshi's preemption argument "necessarily … overrides the Indian Gaming Regulatory Act and §1084 of the Wire Act." JA170 (citations omitted). The court didn't develop those theories, and it didn't cite any example of either law being applied to a contract traded on CFTC-designated exchange. The court's implied-repeal theory is far from "necessarily" true. Much of the debate surrounding the CFTC Act concerned whether it would divest the SEC of jurisdiction over traditional stocks. *See* Johnson, *supra*, at 18-21. How the Act interacts with a similarly complicated scheme like the Indian Gaming Regulatory Act is far from obvious. And the Wire Act is distinguishable on its face: if a contract is

27

traded on a CFTC-designated exchange, it involves contracts, not "bets or wagers." 18 U.S.C. §1084(a); *see also* 31 U.S.C. §5362 (generally prohibiting internet-transmitted wagers "where such bet or wager is unlawful," but noting that the term "bet or wager" "does not include" transactions conducted on "a registered entity … under the Commodity Exchange Act"). In any event, even if these laws did conflict, it wouldn't mean they're "impliedly" repealed. Both the Indian Gaming Regulatory Act and the Wire Act apply to plenty of contracts beyond what's traded on CFTC-designated exchanges.

*Eighth*, the district court misinterpreted legislative history "from 2010" while ignoring the century of history that came before. JA170-171. The court cited two statements by lone Senators who were concerned that some derivatives contracts would "not serve any real commercial purpose" and instead "would be used solely for gambling." 156 Cong. Rec. S5902, S5907 (2010) (Sen. Lincoln); *see also id.* S5906-07 (Sen. Feinstein). The court relied on those "isolated statements" despite acknowledging that they are poor evidence of congressional intent. JA171. Regardless, those Senators proposed giving "[t]he *Commission*" (not the states) "the power to … prevent derivatives contracts that are contrary to the public interest." 156 Cong. Rec. at S5906-07 (emphasis added). That's why the law gives the CFTC jurisdiction to determine whether a contract is "associated with a potential

financial, economic, or commercial consequence." 7 U.S.C. §1a(47)(A)(ii). Far from showing a reluctance to preempt state law, those statements—and the enacted text—prove that Congress entrusted the commercial-purpose analysis to the CFTC alone.

Had the district court considered the decades of history that came before, it would have realized its desire to treat CFTC-regulated instruments as illegal gambling is not new. By 1978, a CFTC Commissioner observed that the country's "problem throughout history with State regulation of commodity markets … goes back quite a ways to when they declared futures contract[s] as illegal gambling contracts and could not be enforced." *1978 H. Subcomm. Hearings*, at 80. The district court's decision revives that "patchwork of conflicting laws." Taylor-Brill, *supra*, at 13. Even Defendants admit that state gambling laws "conflict[] with" CFTC "oversight" of "prediction markets." JA89-90. But Congress ended that period long ago.

Congress has also known "that futures markets would not remain static." S. Rep. No. 95-850, at 22. That's why it adopted flexible provisions that "sought to foster a climate in which the economic benefits of futures trading could be extended to other areas where such trading would be of value." *Id.* All this comports with Justice Holmes's observation more than a century ago: "People will endeavor to forecast the future, and to make agreements according to their prophecy. Speculation of this kind by

competent men is the self-adjustment of society to the probable. Its value [is] well known as a means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want." *Christie Grain & Stock*, 198 U.S. at 247 (1905). States don't have to like what the CFTC allows. But they can't regulate it.

## CONCLUSION

For these reasons, the Court should reverse and remand with instructions to enter a preliminary injunction.

Respectfully submitted,

*/s/ Tyler R. Green*

Tyler R. Green
Conor D. Woodfin
CONSOVOY MCCARTHY PLLC
222 S. Main Street
5th Floor
Salt Lake City, UT 84101
(703) 243-9423
tyler@consovoymccarthy.com
conor@consovoymccarthy.com

October 21, 2025                 *Counsel for Amicus Curiae*

### CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Rules 29(a)(5) and 32(a)(7)(B) because it contains 6,495 words, excluding the parts exempted by Fed. R. App. P. 32(f). This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (6) because it has been prepared using Microsoft Word in 14-point Palatino.

Dated: October 21, 2025                    */s/ Tyler R. Green*
                                           Tyler R. Green
                                           *Counsel for Amicus*

**CERTIFICATE OF SERVICE**

I certify that on October 21, 2025, I filed this brief with the Clerk of Court using the appellate CM/ECF system, which will provide notice and service on counsel for all parties.

Dated: October 21, 2025        */s/ Tyler R. Green*
                                        Tyler R. Green
                                        *Counsel for Amicus*