No. 25-1892

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

KALSHIEX LLC,

*Plaintiff-Appellant*,

*v.*

JOHN A. MARTIN, ET AL.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Maryland, No. 1:25-cv-01283 (Abelson, J.)

**BRIEF FOR AMICUS CURIAE UNDERDOG SPORTS HOLDING, INC.
SUPPORTING PLAINTIFF-APPELLANT AND REVERSAL**

DAVID GRINGER
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

ADELA LILOLLARI
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

KELLY P. DUNBAR
DONNA M. FARAG
OLU O. OISAGHIE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6000

October 22, 2025

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Fourth Circuit Local Rule 26.1, *Amicus Curiae* Underdog Sports Holding, Inc. (Underdog) discloses it is not a publicly held corporation and has no parent company. No publicly held entities hold 10% or more of Underdog's stock or equitable interests. Underdog is not aware of any publicly held entity not a party to this proceeding that has a direct financial interest in this litigation.

/s/ Kelly P. Dunbar
KELLY P. DUNBAR

October 22, 2025

## TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF *AMICUS CURIAE*.............................................................1

INTRODUCTION ................................................................................3

ARGUMENT ......................................................................................7

I.    STATUTORY HISTORY EVINCES CONGRESS'S INTENT TO
      ESTABLISH A UNIFORM FEDERAL SCHEME FOR REGULATING
      DERIVATIVES MARKETS ....................................................................8

      A.    Congress Originally Enacted The CEA Against A
            Backdrop Of State Efforts To Regulate Futures Trading
            As Gambling, But Initially Stopped Short Of Federal
            Preemption...........................................................................8

      B.    Through The 1974 CEA Amendments, Congress
            Completely Preempted State Regulation, Including State
            Gambling Laws ...................................................................13

      C.    Congress's Legislation Regarding Swaps And Event
            Contracts Confirms Its Intent To Preempt State Gambling
            Laws ...................................................................................18

      D.    In The Dodd-Frank Act And 2010 Special Rule,
            Congress Affirmed Exclusive CFTC Regulation Of
            Sports-Event Contracts On Federal DCMs ........................20

II.   THE DISTRICT COURT MISCONCEIVED THE EXCLUSIVE FEDERAL
      SCHEME REGULATING DERIVATIVES TRADING ON DCMS,
      INCLUDING EVENT CONTRACTS .....................................................23

CONCLUSION ...................................................................................23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*American Agriculture Movement, Inc. v. Board of Trade City of Chicago*, 977 F.2d 1147 (7th Cir. 1992) .................................15, 24

*Board of Trade v. Olsen*, 262 U.S. 1 (1923) ...........................................11

*Cothran v. Ellis*, 16 N.E. 646 (Ill. 1888) ..............................................10

*Dickson v. Uhlmann Grain Company*, 288 U.S. 188 (1933)..................10

*English v. General Electric Company*, 496 U.S. 72 (1990) ....................7

*FTC v. Ken Roberts Company*, 276 F.3d 583 (D.C. Cir. 2001) ............17

*Hofmayer v. Dean Witter & Company*, 459 F. Supp. 733 (N.D. Cal. 1978) ....................................................................................................17

*International Trading, Ltd. v. Bell*, 556 S.W.2d 420 (Ark. 1977).........16

*James v. Clement*, 223 F. 385 (5th Cir. 1915) ......................................10

*Jones v. B.C. Christopher & Company*, 466 F. Supp. 213 (D. Kan. 1979) ....................................................................................................17

*KalshiEX LLC v. Flaherty*, 2025 WL 1218313 (D.N.J. Apr. 28, 2025)..........2, 4, 17

*KalshiEX, LLC v. Hendrick*, 2025 WL 1073495 (D. Nev. Apr. 9, 2025) ..............................................................................................17, 27

*Leist v. Simplot*, 638 F.2d 283 (2d Cir. 1980).......................................17

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982)........................................................................11, 17, 25, 26

*Mullinix v. Hubbard*, 6 F.2d 109 (8th Cir. 1925) ..................................10

*Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041 (7th Cir. 2013) ........7

*Pearce v. Rice*, 142 U.S. 28 (1891).......................................................10

*Power v. Arlington Hospital Association*, 42 F.3d 851 (4th Cir. 1994).................27

# STATUTES AND REGULATIONS

7 U.S.C.
    § 1a ......................................................................................5, 19, 20
    § 2 ...............................................................................................3, 4, 14
    § 7 ...................................................................................................4, 7
    § 7a-2 .......................................................................20, 21, 22, 26, 27
    § 16 ..................................................................................................18

42 U.S.C. § 1395dd ...............................................................................26

Grain Futures Act, Pub. L. No. 67-331, 42 Stat. 998 (1922)....................11

Commodity Exchange Act, Pub. L. No. 74-675, 49 Stat. 1491 (1936).............11, 12

Commodity Futures Modernization Act, Pub. L. No. 106-554,
    114 Stat. 2763A-365 (2000) ...........................................................18

Dodd-Frank Wall Street Reform and Consumer Protection Act,
    Pub. L. No. 111-203, 124 Stat. 1376 (2010) ....................................20

17 C.F.R.
    § 1.31 ...............................................................................................25
    § 38.156 ...........................................................................................25
    § 38.1101 .........................................................................................25
    § 38.450 ...........................................................................................25

*Concept Release on the Appropriate Regulatory Treatment of Event
    Contracts*, 73 Fed. Reg. 25,669 (May 7, 2008)...............................19

# LEGISLATIVE MATERIALS

61 Cong. Rec. 4744 (1921) .....................................................................13

62 Cong. Rec. 9406 (1922) .....................................................................13

120 Cong. Rec. 30,464 (1974) ................................................................15

156 Cong. Rec. 13,133 (2010) ..........................................................21, 22

H.R. Rep. No. 74-421 (1935).................................................................12

H.R. Conf. Rep. No. 93-1383 (1974), *reprinted in* 1974 U.S.C.C.A.N.
    5894 .........................................................................................15, 16

H.R. Rep. No. 93-975 (1974)....................................................................15

H.R. Rep. No. 106-711, Pt. 2 (2000) ...............................................18, 19

*Review of Commodity Exchange Act and Discussion of Possible
        Changes: Hearings Before House Committee on Agriculture*,
        93d Cong., 1st Sess. (1973) .............................................13, 14, 15

*Commodity Futures Trading Commission Act: Hearings Before
        Senate Committee on Agriculture and Forestry*,
        93d Cong., Pt. 3 (1974)................................................................15

S. Rep. No. 93-1131 (1974) ..................................................................17

S. Rep. No. 93-1194 (1974) ..................................................................16

S. Rep. No. 95-850 (1978) ....................................................................16

## OTHER AUTHORITIES

Aron, Dave & Matt Jones, *States' Big Gamble on Sports Betting*,
        12 UNLV Gaming L.J. 53 (2021)..........................................................2

CFTC, *US Futures Trading and Regulation Before the Creation of the
        CFTC*, https://www.cftc.gov/About/HistoryoftheCFTC/
        history_precftc.html (visited Oct. 22, 2025) .................................9

Gillen, Neal P. & Walter H.E. Jaeger, *Forward Contracting in
        Agricultural Commodities: A Case History Analysis of the
        Cotton Industry*, 12 John Marshall J. Prac. & Proc. 253 (1979) ....................9

Rainbolt, John V., *Regulating the Grain Gambler and His Successors*,
        6 Hofstra L. Rev. 1 (1977)................................................................8

Smiley, Brett, *Underdog Sports Preparing to Use Kalshi, Prediction
        Markets for Its Own Risk Management*,
        https://www.ingame.com/underdog-kalshi-pm-risk-
        management (last updated Oct. 22, 2025) ....................................1

Stassen, John H., *The Commodity Exchange Act in Perspective—A
        Short and Not-So-Reverent History of Futures Trading
        Legislation in the United States*, 39 Wash. & Lee L. Rev. 825
        (1982)...........................................................................8, 9, 10, 14

Van Wart, Kevin T., *Preemption and the Commodity Exchange Act*,
58 Chi.-Kent L. Rev. 657 (1982)............................................................10, 12

## INTEREST OF *AMICUS CURIAE*[1]

Underdog Sports Holding, Inc. ("Underdog"), by and through its wholly owned direct and indirect subsidiaries, is one of the nation's leading sports entertainment and technology companies. Its mission is to offer innovative games, products, and entertainment to millions of customers. Its platforms allow customers to engage in fantasy sports, sports wagering, and sports content, including original podcasts and shows streamed by millions of users. Underdog offers compelling fantasy sports contests across the country, including in Virginia, North Carolina, and South Carolina. Underdog is also a licensed online sports wagering license holder in good standing in North Carolina, where it currently offers online sports wagering to patrons in the state.

Underdog has a strong interest in ensuring a uniform and robust market for sports-event contracts. These contracts are financial instruments that can be used for many reasons, including to manage the financial risk associated with sporting events.[2] Such sports-event contracts are associated with substantial economic and

---

[1] No party's counsel authored this brief in whole or in part, and no person other than amicus and its counsel made a monetary contribution intended to fund the preparation of this brief. All parties in the appeal consent to the filing of this brief.

[2] Underdog has announced plans to use "well-capitalized favorites in the U.S. predictions market space," including Kalshi, "to manage risk on its own platform in certain cases where exposure on … sports events creates outsized liability." Smiley, *Underdog Sports Preparing to Use Kalshi, Prediction Markets for Its Own*

commercial consequences. *See KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025). The sports industry is a significant part of American culture and the economy, with billions of dollars at stake annually based on who wins or loses various sporting events and the performance of individual players and teams. *See* Aron & Jones, *States' Big Gamble on Sports Betting*, 12 UNLV Gaming L.J. 53, 79-80 (2021). The economic impact associated with sporting events affects a range of stakeholders, directly and indirectly—from street vendors, to advertisers, to local communities, to stadium employees, to institutional investors, and the like. For example, when a favorite team exits a tournament early, that team's sponsors and advertisers face unexpected losses. To help mitigate against the risk of such financial loss in that scenario, interested stakeholders can trade sports-event contracts based on the outcome of tournament games played by their team by investing in alternative scenarios to allow them to obtain a financial payoff if that undesirable event occurs (in this case, their team loses). Underdog is a stakeholder in sports entertainment and thus has a direct financial interest in prediction markets as a product offering, as well as the utility of prediction markets to facilitate its sports gaming operations.

---

*Risk Management*, https://www.ingame.com/underdog-kalshi-pm-risk-management (last updated Oct. 22, 2025).

By congressional design, sports-events contracts that are traded on federally licensed and regulated exchanges are subject to the "exclusive jurisdiction" of the Commodity Futures Trading Commission ("CFTC"). 7 U.S.C. § 2(a)(1)(A). The CFTC's exclusive jurisdiction promotes uniformity and predictability in the regulation of such contracts. By contrast, Maryland's application of its Sports Wagering Law to prevent offering sports-event contracts defeats the CFTC's exclusive jurisdiction, and threatens the offering of such contracts on federally licensed and regulated exchanges across the country. The district court's denial of the preliminary injunction motion conflicts with the decisions of other district courts and, left standing, has grave implications for Underdog and other market participants involved with sports-events contracts. Underdog therefore has a unique interest in and perspective on the legal issues presented in this appeal.

## INTRODUCTION

Congress granted the CFTC "exclusive jurisdiction" over derivatives trading on federally registered exchanges. 7 U.S.C. § 2(a)(1)(A). A derivative is a financial instrument that derives its value from an underlying commodity. This appeal involves one type of derivative, known as an event contract. Such contracts involve "a payoff based on a specified event, occurrence, or value" and they are "generally binary"—meaning that "the buyer may take a 'yes' position that the specified event will take place whereby the seller implicitly takes the 'no'

- 3 -

position." *Flaherty*, 2025 WL 1218313, at *1. Event contracts may be based on the outcome of any number of events, including, as relevant, sporting events. Under federal law, someone offering an event contract must receive CFTC designation as a designated contract market ("DCM"). *See* 7 U.S.C. §§ 2(e), 7(a).

Despite the CFTC's "exclusive jurisdiction" over event contracts traded on federally regulated DCMs, states have recently begun taking the position that such event contracts, particularly as they relate to sporting events, are subject to state gambling laws. In this case, Kalshi seeks to enjoin the Maryland Lottery and Gaming Control Agency and the Maryland Lottey and Gaming Control Commission from civil and criminal enforcement of its gaming laws against Kalshi for offering sports-event contracts on a DCM without registering as a sports wagering licensee under state law. The district court denied Kalshi's motion for a preliminary injunction based on the conclusion that federal law does not preempt a state from regulating as "gambling" transactions on federal DCMs—a conclusion rejected by other district courts to consider the issue.

Underdog agrees with Kalshi that federal law preempts the application of Maryland's gambling law to transactions on exchanges regulated by the CFTC, including event contracts traded on DCMs. Whatever authority Maryland has to regulate gambling generally, the Supremacy Clause demands such state authority

- 4 -

yield to federal law in the specific domain of event contracts traded nationwide and on DCMs subject to oversight by the CFTC.

Underdog writes separately to add and develop two points.

First, the CFTC's authority as the "exclusive" regulator of derivatives traded on federal exchanges is evident not only from the text and structure of federal law, but from a full understanding of the statutory history of the Commodity Exchange Act ("CEA") and related statutes. Congress enacted the Grain Futures Act in 1922 and the CEA in 1936 to regulate transactions on commodity futures exchanges. In tasking the CFTC's predecessor agencies with superintending these federally approved futures markets, Congress initially did not seek to preempt parallel state law provisions. But the resulting patchwork of federal and state regulation eventually prompted calls for uniform federal policy. Congress responded in 1974 by establishing the CFTC and granting it "exclusive jurisdiction" over derivatives trading on DCMs. And in 2010 Congress amended the CEA to subject "swap[s]" to the CFTC's exclusive jurisdiction, defining swaps to include contracts "dependent on the occurrence … of an event or contingency associated with a potential financial, economic, or commercial consequence," 7 U.S.C. § 1a(47)(A)(ii)—namely, event contracts. At the same time, Congress authorized the CFTC to prohibit registered entities from trading event contracts that the CFTC deems "contrary to the public interest." In doing so, Congress permitted the CFTC

- 5 -

to consider state law but expressly empowered the CFTC, and the CFTC alone, to make the final public interest determination.  Whether viewed through the lens of express, field, or conflict preemption, this statutory history drives home the conclusion that Congress has preempted the application of all state laws— gambling or otherwise—to the trading of derivatives on CFTC-regulated exchanges.

Second, particularly in light of that statutory history, the district court's embrace of a "state gambling law" exception to CFTC preemption cannot be right.  Indeed, such an exception would risk substantial disruption to the federal scheme.  States and others have long disparaged certain derivatives as forms of gambling.  Just as a state could not deem a futures contract pegged to interest rates, jet fuel, or wheat prices a form of gambling and then regulate or ban the trading of those contracts on federally regulated exchanges, Maryland has no constitutional authority to characterize the trading of sports-event contracts on DCMs as a form of gambling subject to state jurisdiction.  That outcome would countermand Congress's efforts to invest exclusive jurisdiction in the CFTC and would risk unraveling the federal scheme by subjecting event contracts to a patchwork of state-by-state regulation.

## ARGUMENT

Underdog agrees with Kalshi that the CEA's text and all markers of congressional intent make clear that Congress intended to vest the CFTC with exclusive jurisdiction over transactions on regulated DCMs.  *See* Kalshi Br. 24-40. In first enacting the CEA and then recalibrating that federal scheme over the years, Congress ultimately charged the CFTC with having "exclusive jurisdiction … with respect to … transactions involving swaps or contracts of sale of a commodity for future delivery … traded or executed" on DCMs.  7 U.S.C. § 2(a)(1)(A).  The history of Congress's legislative activity in this area makes clear that "exclusive jurisdiction" means just that—authority that is "exclusive" vis-à-vis other federal regulators as well as state actors.  Whether analyzed through the lens of express, field, or conflict preemption, Congress's preemptive intent is clear.  *See, e.g.*, *England v. General Elec. Co.*, 496 U.S. 72, 79 n.5 (1990) (The "three categories" of preemption are not "rigidly distinct[.]"); *id.* ("A state law that falls within a pre-empted field conflicts with Congress' intent … to exclude state regulation[.]"); *accord Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1050-1051 (7th Cir. 2013) ("When Congress occupies an entire field, one might also say that Congress has set forth a purpose and objective of controlling an entire field of regulation.").

Despite Congress's mandate that the CFTC exercise pre-eminence in regulating DCMs, the district court created an atextual "state gambling law"

exception to the CFTC's exclusive jurisdiction.  Reasoning that "regulating gambling is at the core of the state's residual powers as a sovereign[,]" JA158-159, the court refused to hold that application of Maryland's gambling law to event contracts traded on federally regulated DCMs was preempted.  But this "state gambling law" exception has no basis in the statutory text; it ignores the history of state efforts to regulate certain derivatives as types of gambling; and it would punch a hole in the CFTC's exclusive jurisdiction, upsetting Congress's objective of ensuring uniform rules for derivatives trading on federal DCMs.

## I.    STATUTORY HISTORY EVINCES CONGRESS'S INTENT TO ESTABLISH A UNIFORM FEDERAL SCHEME FOR REGULATING DERIVATIVES MARKETS

### A.    Congress Originally Enacted The CEA Against A Backdrop Of State Efforts To Regulate Futures Trading As Gambling, But Initially Stopped Short Of Federal Preemption

The establishment and history of the CFTC is rooted in longstanding attempts to regulate "speculation" or "gambling" based on futures trading.  *See, e.g.*, Rainbolt, *Regulating the Grain Gambler and His Successors*, 6 Hofstra L. Rev. 1, 6 (1977).  In the first half of the 19th century, futures contracts were developed to hedge against fluctuations in agricultural commodities prices.  *See* Stassen, *The Commodity Exchange Act in Perspective—A Short and Not-So-Reverent History of Futures Trading Legislation in the United States*, 39 Wash. & Lee L. Rev. 825, 826 n.8, 827 (1982).  As a result of the boom and bust of grain

- 8 -

cycles, buyers and sellers developed "forward" or "to arrive" contracts—that is, contracts for the purchase of goods at an agreed-upon price and delivery date. *See* CFTC, *US Futures Trading and Regulation Before the Creation of the CFTC*;[3] Gillen & Jaeger, *Forward Contracting in Agricultural Commodities: A Case History Analysis of the Cotton Industry*, 12 John Marshall J. Prac. & Proc. 253, 254 (1979) (defining the "forward contract for an agricultural commodity").

Eventually, forward contracts were themselves bought and sold in anticipation of market price fluctuations. Stassen, 39 Wash. & Lee L. Rev. at 826. The Chicago Board of Trade, founded in 1848 as a cash market for grain, became the first organized exchange to facilitate the trading of forward contracts for commodities. CFTC, *US Futures Trading and Regulation Before the Creation of the CFTC*. The Board was established by merchants "who needed some order in a world of chaos, and some relief from a hostile judicial system which only reluctantly enforced businessmen's bargains." Stassen, 39 Wash. & Lee L. Rev. at 826. The subsequent proliferation of exchanges for futures trading gave rise to "bucket shop[s]"—namely, establishments that "purport[ed] to conduct a legitimate exchange business but which actually accept[ed] bets and wagers on the price movement of stocks and commodities[,]" and were riddled with fraud.

---

[3] https://www.cftc.gov/About/HistoryoftheCFTC/history_precftc.html.

Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 662-663 (1982). The spread of bucket shops prompted states to enact "bucket shop [laws]," which "made futures contracts criminally illegal where the parties to the agreement never intended delivery of the underlying commodity but were dealing only for its prospective rise or fall in price." *Id.* at 663; *see also id.* at 664-669 (citing examples of states with bucket shop laws, including Illinois, Indiana, and Missouri).

During this time, many states disparaged trading in futures contracts as a form of illegal "gambling" and criminalized futures trading under their gambling statutes. *E.g.*, *Cothran v. Ellis*, 16 N.E. 646, 648 (Ill. 1888) ("[D]ealing in 'futures' … is a crime against the state, … against the general welfare and happiness of the people, against religion and morality, and … against all legitimate trade and business. This species of gambling has become emphatically and pre-eminently the national sin."); *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 197-198 (1933) (Missouri); *Pearce v. Rice*, 142 U.S. 28, 34-35 (1891) (Illinois); *James v. Clement*, 223 F. 385, 400-401 (5th Cir. 1915) (Georgia); *Mullinix v. Hubbard*, 6 F.2d 109, 111-112 (8th Cir. 1925) (Arkansas); *see also* Stassen, 39 Wash. & Lee L. Rev. at 825-826.

Against that backdrop, Congress enacted the Grain Futures Act in 1922 to regulate futures contracts in grain under the oversight of the U.S. Department of

Agriculture.  Pub. L No. 67-331, ch. 369, § 3, 42 Stat. 998 (1922).  The

Department's regulatory authority was limited to seven grains enumerated by

statute.  *See* 42 Stat. at 998 ("The word 'grain' shall be construed to mean wheat,

corn, oats, barley, rye, flax, and sorghum.").  And although the statute authorized

the Secretary of Agriculture to designate any exchange as a "contract market" for

futures trading—thus imposing reporting and other requirements on the

exchange—the statutory scheme generally relied on exchanges to "police

themselves," and it did not preempt state regulation.  *See id.* at 999-1000; *Merrill*

*Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 360-362 (1982).  In

upholding the Grain Futures Act's constitutionality, the Supreme Court reasoned

that the "Chicago Board of Trade is engaged in a business affected with a public

national interest"—namely, "transactions and prices of grain in dealing in futures,"

and is "subject to national regulation as such."  *Board of Trade v. Olsen*, 262 U.S.

1, 37, 41 (1923).

Fourteen years later, Congress expanded federal oversight of derivatives

markets through the enactment of the CEA.  *See* Pub. L. No. 74-675, § 545, 49

Stat. 1491 (1936).  The CEA broadened the scope of the regulatory scheme of the

Grain Futures Act from "grain" to a range of other non-grain commodities.  49

Stat. at 1491.  Congress also created the Commodity Exchange Commission, the

CFTC's predecessor agency, to oversee futures trading.  *Id.* at 1492.  In addition,

the CEA regulated the operations of commodity futures exchanges, along with the dealings of brokers and customers, and adjacent activities that did not directly involve futures trading. *See id.* at 1491-1493; Van Wart, 58 Chi.-Kent L. Rev. at 669. It also added anti-fraud protections for futures market participants, including its own version of an anti-bucket shop law, which it required regulated exchanges to enforce. 49 Stat. at 1493; Van Wart, 58 Chi.-Kent L. Rev. at 669.

Although the 1936 CEA substantially expanded existing regulation of commodity futures trading compared to its predecessor Grain Futures Act, it stopped short of comprehensive federal regulation, and it was not intended "to occupy the field." H.R. Rep. No. 74-421, at 5 (1935). Instead, the 1936 CEA explicitly allowed state laws applicable to derivatives transactions to remain in effect, stating: "Nothing in [the operative sections of the Act] shall be construed to impair any State law applicable to any transaction enumerated or described in such sections." 49 Stat. at 1494. Thus, the CEA originally left in place a patchwork of state regulation, leaving derivatives markets in a state of disuniform regulation that persisted well into the 1970s. This approach proved problematic—a problem that Congress would definitively address four decades later.

**B.    Through The 1974 CEA Amendments, Congress Completely Preempted State Regulation, Including State Gambling Laws**

By the time Congress amended the CEA in 1974 to establish the CFTC, the comparison of derivatives trading to gambling was deeply rooted in political culture.  For decades, certain legislators had criticized futures trading as a form of gambling.  The price of agricultural commodities was, according to one Senator, "determined to a large extent not by the demand and supply of the commodity itself but by the fabulous quantities sold on the exchange that never had an existence, that no grain farmer in the world ever planted, ever toiled over its cultivation and harvest, or offered for sale."  61 Cong. Rec. 4744, 4761 (1921) (Statement of Sen. Capper); *see also id.* at 4768 ("[S]o long as this cancer of gambling in one of the necessities of life is permitted, we can not expect to have permanent prosperity in the Unites States …. [T]he grain gambler must go."); 62 Cong. Rec. 9406, 9411 (1922) (Statement of Rep. Williams) ("[E]very transaction on a board of trade where the actual delivery of the grain is not contemplated is more or less a gambling transaction."); *Review of Commodity Exchange Act and Discussion of Possible Changes: Hearing Before H. Comm. on Agric.*, 93d Cong., 1st Sess. at 58 (1973) ("*1973 H. Comm. Hearings*") (Statement of Rep. Rarick) ("[I]f a man gambles and loses his money, he only hurts himself.  But speculation on food … may end up hurting both the procedure and the consumer[.]").  Futures

- 13 -

trading was premised on "the ability to sell" that which someone did not possess—
what many legislators and others viewed as a type of gambling.  Stassen, 39 Wash.
& Lee L. Rev. at 827.

It is beyond reasonable debate that by the time Congress created the CFTC
in 1974 to regulate futures contracts on federal exchanges, Congress understood
that many considered such contracts forms of gambling.  It is also beyond
reasonable debate that Congress's goal was to establish a uniform federal scheme
for regulating derivatives.  Congress was specifically and expressly accepting the
recommendations of various derivatives exchanges, such as the New York Cocoa
Exchange and the New York Coffee and Sugar Exchange, which advocated that
"federal policy … be uniform throughout the United States" and not "subject to the
vagaries" of different obligations in "different jurisdictions."  *1973 H. Comm.
Hearings*, 93d Cong., 1st Sess. at 121.

In creating the CFTC, Congress intended to decisively eliminate the
patchwork of state laws that had previously governed the regulation of derivatives
markets.  Critically, the 1974 legislation granted the CFTC "exclusive jurisdiction"
to regulate the trading of derivatives on federally designated "contract market[s]."
7 U.S.C. § 2(a)(1)(A).  Members of Congress understood this paradigm of
exclusive jurisdiction would be workable only if it "prevent[ed] any possible
conflicts over jurisdiction," *1973 H. Comm. Hearings*, 93d Cong., 1st Sess. at 128,

- 14 -

and that subjecting exchanges to "different State laws would just lead to total chaos," *CFTC Act: Hearings Before S. Comm. on Agric. and Forestry*, 93d Cong., Pt. 3 at 685 (1974) (Statement of Sen. Clark). Congress thus made a deliberate choice to create a uniform federal system of regulation, with "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 76 (1974); *see also 1973 H. Comm. Hearings,* 93d Cong., 1st Sess. at 10-11 (Statement of Rep. Smith) ("[T]rading in all futures should be under Federal regulation[.]").

As courts have recognized, "proponents" of the 1974 legislation were concerned that absent federal regulation, states "might step in to regulate the futures markets themselves." *American Agric. Movement, Inc. v. Board of Trade*, 977 F.2d 1147, 1156 (7th Cir. 1992). That result would "subject[] the national futures trading apparatus to conflicting regulatory demands." *Id.*

To ensure the supremacy of federal law, the version of the 1974 legislation passed by the Senate struck the provision from the 1936 CEA that had preserved parallel state laws applicable to derivatives transactions. H.R. Conf. Rep. No. 93-1383 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897. This was done to "ensure that Federal preemption [was] complete." 120 Cong. Rec. 30,464 (1974) (statement of Sens. Curtis and Talmadge). The House Conference Committee's report explained that the legislation, as finalized, was intended to "preempt the

- 15 -

field insofar as futures regulation is concerned," with no room for "any supplementary regulation by the States." 1974 U.S.C.C.A.N. at 5897. The Senate Report was just as unequivocal, confirming that "[u]nder the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act … would preempt the field insofar as futures regulation is concerned," and that there would be no "need for any supplementary regulation by the States." S. Rep. No. 93-1194, at 35, 36 (1974).

Importantly, Congress considered and rejected several proposals to modify the grant of exclusive jurisdiction to the CFTC based on the nature of the underlying commodity or whether the contracts market in question appeared to serve the traditional functions of a commodity futures market. *See* S. Rep. No. 95-850, at 21-23 (1978). The Report by the Senate Committee on Agriculture explained the Committee's decision not to adopt such proposals:

> The nature of the underlying commodity is not an adequate basis to divide regulatory authority. Further, the fact that a futures contract market does not fit into the traditional mold where there are both hedging and price-discovery functions should not be the determining factor in whether the contract is to be regulated by the CFTC.

*Id.* at 22.

Courts have unanimously recognized that the 1974 amendments to the CEA broadly preempted state regulation of derivatives trading on DCMs. *E.g.*, *International Trading, Ltd. v. Bell*, 556 S.W.2d 420, 424 (Ark. 1977) (The

- 16 -

exclusive-jurisdiction clause "is a clear indication that Congress intended no regulation in this field except under the authority of the act[.]"); *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (The CEA "preempts the application of state law" regarding trading on federal exchanges.), *aff'd sub nom.*, *Merrill Lynch*, 456 U.S. 353; *FTC v. Ken Roberts Co.*, 276 F.3d 583, 590-591 (D.C. Cir. 2001) ("[T]he statute's legislative history repeatedly emphasizes that the CFTC's jurisdiction was 'to be exclusive with regard to the trading of futures on organized contract markets[.]'") (quoting S. Rep. No. 93-1131, at 23 (1974)); *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979) ("[S]tate regulatory agencies are … preempted by the 'exclusive jurisdiction' of the CFTC."); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978) ("In the light of Congress' plainly stated intent to have the Commodity Exchange Act … preempt the field of regulation of commodity futures trading, any claim under federal or state securities statutes is barred."); *Flaherty*, 2025 WL 1218313, at *5 ("[T]he exclusive-jurisdiction language reflects an intent to occupy the field[.]"); *KalshiEX, LLC v. Hendrick*, 2025 WL 1073495, at *6 (D. Nev. Apr. 9, 2025) ("[S]ection 2's plain and unambiguous language … reflects congressional intent to occupy the field of regulating CFTC-designated exchanges and the transactions conducted on those exchanges. … [S]ection 2's "exclusive jurisdiction" language [thus] preempts the application of state law.") (cleaned up).

- 17 -

### C.    Congress's Legislation Regarding Swaps And Event Contracts Confirms Its Intent To Preempt State Gambling Laws

By the time Congress considered the regulation of swaps and event contracts in the 2000s, it was firmly established that the CFTC—not other federal agencies and not the states—was the exclusive cop on the beat with respect to trading on regulated derivatives exchanges.  And Congress's legislative actions only confirmed its objective of maintaining the exclusivity of CFTC jurisdiction.

In 2000, Congress amended the CEA to exempt swap transactions from the CFTC's jurisdiction.  *See* Pub. L. No. 106-554, § 106, 114 Stat. 2763A-365, 2763A-379.  Congress, however, sought to avoid state regulation of swaps, presumably to achieve the goals of "streamlin[ing] and eliminat[ing] unnecessary regulation" and "promot[ing] innovation for futures and derivatives."  H.R. Rep. No. 106-711. Pt. 2, at 2 (2000).  Thus, Congress added a provision in the amended CEA stating that the statute "supersede[d] and preempt[ed] the application [to exempted transactions] of any State or local law that prohibits or regulates gaming or the operation of bucket shops," other than generally applicable antifraud laws that are not at issue in this case.  7 U.S.C. § 16(e)(2).  That Congress adopted this provision demonstrates a contemporary understanding that the CEA already preempted state gambling law with respect to non-exempt transactions.  The Committee Report accompanying the 2000 Amendments confirmed this

- 18 -

understanding.  *See* H.R. Rep. No. 106-711. Pt. 2, at 71 ("This section … restates the current provisions that the CEA supersedes and preempts other laws in the case of transactions conducted on a registered entity or subject to regulation by the CFTC (even if outside the United States), and adds that in the case of … contracts or transactions that are excluded commodities or covered by a 4(c) exemption, the CEA supersedes and preempts State gaming and bucket shop laws ….").

Also in 2000, Congress amended the CEA's definition of a commodity to encompass "events," and it removed event contracts from the CFTC's exclusive jurisdiction by allowing them to be traded off-exchange.  *See* 7.U.S.C. § 1a(19)(iv) (defining as an excluded commodity "an occurrence, extent of an occurrence, or contingency … that is (I) beyond the control of the parties to the relevant contract, agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence").

In 2008, the CFTC solicited comments on the appropriate regulatory treatment of events contracts.  In doing so, the CFTC explained that the CEA generally "supersedes and preempts other laws, including state and local gaming … laws, with respect to transactions executed on or subject to the rules of a Commission-regulated market" and it sought comments on the possible implications of explicitly "preempting state gaming laws with respect to event contracts."  *Concept Release on the Appropriate Regulatory Treatment of Event*

- 19 -

*Contracts*, 73 Fed. Reg. 25,669, 25,673 (May 7, 2008).  The CFTC ultimately took no action to clarify the applicability of state gaming law to event contracts, because in 2010, Congress restored swaps, including event contracts, to the CFTC's exclusive jurisdiction.  *See* 7 U.S.C. § 1a(47)(A)(ii).

### D. In The Dodd-Frank Act And 2010 Special Rule, Congress Affirmed Exclusive CFTC Regulation Of Sports-Event Contracts On Federal DCMs

Congress's enactment of the Dodd-Frank Act—which restored oversight of swaps trading to the exclusive jurisdiction of the CFTC—confirms that the CFTC's authority in this arena is exclusive, and thus preempts state law, with respect to event contracts.  *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, §§ 721, 722, 745, 124 Stat. 1376, 1658-1674, 1735-1737 (2010).  The statute expressly included event contracts under the ambit of the CFTC's exclusive jurisdiction, defining "swap" to encompass contracts "dependent on the occurrence … of an event or contingency associated with a potential financial, economic, or commercial consequence."  7 U.S.C. § 1a(47)(A)(ii).

What is more, also as part of Dodd-Frank, Congress enacted the so-called "Special [R]ule."  *See* 7 U.S.C. § 7a-2(c)(5)(C).  Ordinarily, the CFTC cannot prevent a registered entity from offering a new contract or instrument for trading "unless the Commission finds that the new contract or … instrument would violate [the CEA and applicable regulations]."  *Id.* § 7a-2(c)(5)(B).  But the Special Rule

empowers the CFTC to prevent registered entities from trading certain derivatives based on event contracts that the CFTC deems "contrary to the public interest," if such contracts include: "(I) activity that is unlawful under any Federal or State law; (II) terrorism; (III) assassination; (IV) war; (V) gaming; or (VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." *Id.* § 7a-2(c)(5)(C)(i).

By identifying "gaming" as a type of event contract that the CFTC could, but need not, determine is contrary to the public interest, Congress demonstrated its understanding both that event contracts could be gaming related and that the CFTC had the exclusive power to regulate such contracts. Even those members of Congress skeptical of gaming-related event contracts understood that they were delegating to the CFTC the question of how to regulate in this area. One senator, for example, argued that the Special Rule would "correct[] a regulatory structure that today allows reckless gambling on Wall Street." 156 Cong. Rec. 13,133, 13,135 (2010) (Statement of Sen. Cardin). Another senator similarly acknowledged that the Special Rule would give the CFTC "the power to prevent … gambling through futures markets." *Id.* at 13,173 (Statement of Sen. Lincoln).

Members of Congress also understood that they were arrogating to the CFTC "the power to … prevent derivatives contracts that are contrary to the public

- 21 -

interest," such as "event contracts" involving "sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament." 156 Cong. Rec. at 13,173 (Statement of Sen. Lincoln). But, again, that choice would belong to the CFTC.

The text and structure of the Special Rule confirm that Congress was also aware that states may pursue their own public policy preferences—by enacting state gaming and gambling laws and intended federal law to supersede such laws. Under the Special Rule, the CFTC can consider state law in certain respects in making a determination that a derivatives contract is contrary to the public interest, but the CFTC is not bound by state law. The CFTC "may" find a contract to be "contrary to the public interest" if it involves "activity that is unlawful under any … State law." 7 U.S.C. § 7a-2(c)(5)(C)(i)(I). That provision allows the CFTC to consider whether the conduct underlying an enumerated event contract is unlawful under the relevant state's laws; but the Special Rule does not compel the CFTC to prohibit such contracts. Rather, the CFTC has the final say in determining whether a contract is contrary to the public interest.

* * *

In sum, the history of Congress's legislative activity with respect to derivates generally and event contracts specifically makes clear that the CFTC's "exclusive jurisdiction" over such contracts is exactly that—exclusive—as to other

- 22 -

federal regulators as well as state actors.  And as the robust legislative history demonstrates, over decades of statutory refinement, Congress has expressed a manifest intent to create a comprehensive federal regulatory structure for derivatives trading on DCMs—a structure that displaces, and was designed to displace, state law, including state gambling laws.

## II.    THE DISTRICT COURT MISCONCEIVED THE EXCLUSIVE FEDERAL SCHEME REGULATING DERIVATIVES TRADING ON DCMS, INCLUDING EVENT CONTRACTS

As evident from the CEA's statutory text and statutory history, Congress's overriding objective in granting the CFTC "exclusive jurisdiction" to oversee derivatives trading on DCMs was to displace the patchwork of state regulation with uniform federal regulation.  And Congress did so against the backdrop of disparagement by states and others of futures contracts as forms of "gambling." The district court's conclusion that there is a "state gambling law" exception to federal preemption disregards those critical points and risks destabilizing the federal regime.

The exclusivity of the CFTC's power over derivatives traded on DCMs is complete and admits of no relevant exception for state regulation.  And it is certainly the case that there is no defensible basis for creating an exception for state gambling laws.  History explains why.  As explained above, Congress enacted the CEA and the CFTC's predecessor statutes because dealing in futures

- 23 -

implicated the national public interest, and Congress calibrated and recalibrated the federal scheme over decades against a backdrop of efforts by states and others to regulate certain forms of futures contracts as gambling. Embracing a gambling exception to federal preemption under the CEA is thus as ahistorical as it is atextual—it would undo Congress's goal of "bring[ing] the markets under a uniform set of regulations." *American Agric. Movement*, 977 F.2d at 1156.

Indeed, there is no obvious limiting principle to the scope of the "state law gambling" exception. As Kalshi has explained, many state gambling laws could encompass other forms of derivatives traded on federal DCMs. *See* Br. 4-6. If the district court is right that Maryland can deem sports-event contracts a form of gaming subject to state regulation, nothing would stop other states from declaring that CFTC-regulated futures contracts based on any number of clearly accepted commodities contracts, ranging from the cost of jet fuel, red wheat, or electricity prices, are also forms of gambling subject to state regulation (or even prohibition, if States so decide). That obviously cannot be right, because it would punch a hole in the uniform federal scheme Congress has established for the regulation of such futures contracts.

Left standing, even as applied to just event contracts, the district court's rationale resurrects a long-abandoned patchwork of state-by-state regulation. Accepting Maryland's position, as the district court did, would splinter the national

market by forcing DCMs to navigate 50 different state regimes with vastly

different and conflicting rules.  That is the precise system that Congress sought to

replace through the enactment of the CEA and the creation of the CFTC.

As explained above, Congress's objective in enacting the CEA and its

subsequent amendments was to create "a comprehensive regulatory structure" over

futures trading.  *Merrill Lynch*, 456 U.S. at 355-356, 386.  This structure subjects

DCMs to a host of federal regulations that protect market participants, including

requiring DCMs to make daily disclosures, 17 C.F.R. § 38.450; make their record

"open to inspection" by federal regulators, *id.* § 1.31(d)(1); maintain capital

reserves sufficient to cover "operating costs for a period of at least one year," *id.*

§ 38.1101(a)(2); and maintain "a system capable of detecting and investigating

potential trade practice violations," *id.* § 38.156; *see also* Kalshi Br. 15-16.  It is

perhaps understandable that state gambling authorities may wish to regulate sports

wagering.  But it is not for the district court to overrule Congress's policy

determination that the CFTC should be the exclusive regulator in this instance.

The district court wrongly narrowed the "complete" preemption resulting

from the CFTC's "exclusive jurisdiction" to the horizontal relationship between

the CFTC and other federal agencies, as opposed to the vertical relationship

between federal and state governments.  *See* JA161.  But the district court was

unable to persuasively ground that narrow construction in text, structure, or

- 25 -

statutory history.  Instead, it read *Merrill Lynch* for the proposition that the

"exclusive-jurisdiction provision was intended to 'consolidate federal regulation of

commodity futures trading in the Commission' and to 'separate the functions of the

[CFTC] from those of the [SEC] and other regulatory agencies.'"  JA161 (quoting

*Merrill Lynch*, 456 U.S. at 386-387).  *Merrill Lynch*, however, did not examine the

preemptive effect of the CFTC's exclusive jurisdiction on state regulation, but only

whether an implied private remedy for damages was preserved under the CEA.

456 U.S. at 388.

Finally, the district court wrongly relied on the Special Rule as purported

confirmation "that Congress intended for at least some state laws to operate

alongside the CEA, not to be preempted by it."  JA164.  Respectfully, that misses

the point.  The Special Rule does not directly incorporate state law.  Critically, it

authorizes the CFTC to override state law in vesting it with the discretion to

consider whether "activity … is unlawful under any … State law" and nonetheless

make an independent determination as to which transactions are "contrary to the

public interest."  *See* 7 U.S.C. § 7a-2(c)(5)(C)(i).  This statutory scheme stands in

stark contrast to the ones relied on by the district court.  *E.g.*, 42 U.S.C.

§ 1395dd(d)(2)(A) ("Any individual who suffers personal harm as a direct result of

a participating hospital's violation of a requirement of this section may … obtain

those damages available for personal injury under the law of the State in which the

hospital is located[.]") (cited in *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 864 (4th Cir. 1994)).

By permitting states to apply gambling laws to event contracts traded on federally regulated DCMs, the district court effectively empowers states to second guess the CFTC's public interest determinations, thus flipping the CEA and the Supremacy Clause on their heads. Federal exchanges like Kalshi have complied with all federal regulations in listing event contracts on their DCMs. And the CFTC has authorized event contracts by declining to restrict them after DCMs, like Kalshi, self-certified pursuant to 7 U.S.C. § 7a-2(c)(1). As such, "federal law allows Kalshi to offer … sports … event contracts on its exchange." *Hendrick*, 2025 WL 1073495, at *4. Permitting states nonetheless to regulate or even prohibit such event contracts under state law conflicts with federal law and wrests control over whether to permit sports-event contracts from the CFTC.

At bottom, Maryland's pursuit of state-law civil and criminal enforcement remedies against Kalshi is based on a policy disagreement with the CFTC's exercise of its exclusive authority. But such disagreement is foreclosed by the CEA, which vests the CFTC with "exclusive jurisdiction" and grants the agency the power to decide whether to allow sports-event contracts to be traded on federally regulated exchanges.

## CONCLUSION

This Court should reverse the district court's denial of Kalshi's motion for a preliminary injunction.

Respectfully submitted,

/s/ Kelly P. Dunbar

DAVID GRINGER
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

ADELA LILOLLARI
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

KELLY P. DUNBAR
DONNA M. FARAG
OLU O. OISAGHIE
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6000

*Counsel for Amicus Curiae Underdog Sports Holding, Inc.*

October 22, 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1.    Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 6,203 words.

2.    The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


/s/ Kelly P. Dunbar
KELLY P. DUNBAR

October 22, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of October, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Kelly P. Dunbar

KELLY P. DUNBAR