No. 25-1892

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

## KALSHIEX, LLC,

*Plaintiff-Appellant*,

**v.**

## JOHN A. MARTIN, *et al*.,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court for the District of Maryland
(Adam B. Abelson, District Judge)

_____

## BRIEF OF APPELLEES

_____

ANTHONY G. BROWN
Attorney General of Maryland

ERIK DELFOSSE
Senior Assistant Attorney General
Maryland Lottery and Gaming
  Control Agency
1800 Washington Blvd., Suite 330
Baltimore, Maryland 21230
erik.delfosse@maryland.gov
(410) 230-8726

MAX F. BRAUER
Senior Assistant Attorney General
Enforcement Unit Chief
Securities Division
Office of the Attorney General
200 St. Paul Place
Baltimore, Maryland 21202
mbrauer@oag.state.md.us
(410) 576-6950

December 15, 2025

Attorneys for Appellees

# TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ...................................................................1

ISSUE PRESENTED FOR REVIEW ...............................................................2

STATEMENT OF THE CASE ..........................................................................2

    Legal Framework.........................................................................................2

        States' Historic Power to Regulate Sports Wagering ...........................2

        Maryland's Regulation of Sports Wagering .........................................4

        Federal Regulation of Commodity Futures...........................................5

    Factual Background....................................................................................12

    This Litigation ...........................................................................................14

SUMMARY OF ARGUMENT.......................................................................16

ARGUMENT ...................................................................................................18

I.     THIS COURT REVIEWS THE DENIAL OF THE PRELIMINARY INJUNCTION FOR ABUSE OF DISCRETION.................................................................18

II.    THE COMMODITY EXCHANGE ACT DOES NOT PREEMPT MARYLAND'S TRADITIONAL AUTHORITY TO REGULATE SPORTS WAGERING. ......................19

    A.    The Presumption Against Preemption Applies to Maryland's Sports Wagering Laws. ..........................................................................19

    B.    Maryland's Sports Wagering Laws Are Not Field-Preempted by the Commodity Exchange Act. ...........................................................21

        1.    Rather Than Broadly Preempt the Field, the Exclusive-Jurisdiction Provision Divides Commodities and Securities Jurisdiction. .............................................................22

2.    The Commodity Exchange Act's Express Preemption Provisions Confirm That the Exclusive-Jurisdiction Provision Does Not Field-Preempt State Gaming Law...........27

3.    The Commodity Exchange Act Incorporates and Works in Tandem with State and Federal Laws........................................29

C.    Interpreting the Commodity Exchange Act to Field-Preempt State Law, Including Gaming Law, Would Produce Extreme and Absurd Results. ...................................................................32

1.    Kalshi's Position Would Make the Commodity Futures Trading Commission the Nation's Sole Sports Wagering Regulator................................................................................33

2.    Kalshi's Position Would Legalize Sports Wagering That Other Federal Laws Prohibit. ....................................................36

3.    Kalshi's Position Would Inhibit Enforcement by Other Agencies. ......................................................................38

D.    Kalshi's Arguments Do Not Demonstrate Clear and Manifest Congressional Intent to Field-Preempt State Sports Wagering Laws. ...........................................................................39

E.    Maryland's Sport Wagering Laws Are Not Conflict-Preempted. ......44

1.    Kalshi Can Comply with Both the Commodity Exchange Act and Maryland Sports Wagering Laws..............................44

2.    Maryland Sports Wagering Laws Are Not an Obstacle to the Commodity Exchange Act's Purposes................................47

III.    ALTERNATIVELY, THE DISTRICT COURT SHOULD BE AFFIRMED BECAUSE SPORTS WAGERS ARE NOT IN THE COMMODITY FUTURES TRADING COMMISSION'S EXCLUSIVE JURISDICTION. ....................................................50

A.    Sports Wagers Are Based on the Outcome of an Event, Not Its Occurrence........................................................................51

B.    The Outcomes of Sports Events Are Not Inherently Joined or Connected with a Potential Financial, Economic, or Commercial Consequence........................................................................53

CONCLUSION ....................................................................................57

REQUEST FOR ORAL ARGUMENT ...................................................58

CERTIFICATE OF COMPLIANCE ......................................................58

TEXT OF PERTINENT PROVISIONS .................................................59

## TABLE OF AUTHORITIES

Page

### Cases

*Abdullah v. American Airlines, Inc.*, 181 F.3d 363 (3d Cir. 1999) .........................21

*Ah Sin v. Wittman*, 198 U.S. 500 (1905)......................................................20

*American Agric. Movement, Inc. v. Board of Trade of City of Chicago*,
97 F.2d 1147 (7th Cir. 1992) .......................................................... 7, 23, 48, 49

*American Fed'n of Tchrs. v. Bessent*, 152 F.4th 162 (4th Cir. 2025)......................18

*Arizona v. United States*, 567 U.S. 387 (2012)........................................... 21, 39, 40

*Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005)..........................................19

*Bond v. United States*, 572 U.S. 844 (2014) ...............................................35

*Bonito Boats v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989)............................30

*CFTC v. Yukom Commc'ns Ltd.*, No. 19-cv-05416, 2021 WL 4477874
(N.D. Ill. Sept. 30, 2021) .....................................................................33

*Champion v. Ames*, 188 U.S. 321 (1903)....................................................3

*Chicago Mercantile Exch. v. SEC*, 883 F.2d 537 (7th Cir. 1989) ................... 23, 26

*Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504 (1992) .............................................28

*Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824
(4th Cir. 2010)....................................................................................48

*Corley v. United States*, 556 U.S. 303 (2009).........................................................53

*Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) .........................19

*Dayton Power & Light Co. v. FERC*, 126 F.4th 1107 (6th Cir. 2025)....................21

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802 (4th Cir. 1991).......19

*Effex Capital, LLC v. National Futures Ass'n*, 933 F.3d 882 (7th Cir. 2019).........23

iv

*Epic Systems Corp. v. Lewis*, 584 U. S. 497 (2018) .................................... 32, 37, 55

*Farina v. Nokia Inc.*, 625 F.3d 97 (3d Cr. 2010) ......................................39

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ......................34

*Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963) ...... 44, 45, 46

*Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995) .......................................... 28, 47

*FTC v. Ken Roberts Co.*, 276 F.3d 583  (D.C. Cir. 2001) ......................................23

*GenBioPro, Inc. v. Raynes*, 144 F.4th 258 (4th Cir. 2025) ....................................48

*Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173 (1999).............2

*Guthrie v. PHH Mortg. Corp.*, 79 F.4th 328, (4th Cir. 2023) .................................44

*Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707 (1985) ...........50

*Hines v. Davidowitz*, 312 U.S. 52 (1941). ................................................ 44, 48

*Hughes v. Talen Energy Mktg.*, *LLC*, 578 U.S. 150 (2016)....................................39

*International Paper Co. v. Ouellette*, 479 U.S. 481 (1987)......................................23

*International Trading, Ltd. v. Bell*, 556 S.W.2d 420 (Ark. 1977)...........................26

*Investment Co. Inst. v. CFTC*,
    891 F. Supp. 2d 162 (D.D.C. 2012)...................................................................6, 9

*Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213 (D. Kan. 1979) .....................27

*Just Puppies, Inc. v. Brown*, 123 F.4th 652 (4th Cir. 2024) ............................ 29, 38

*KalshiEX LLC v. CFTC,* No. CV 23-3257
    (JMC), 2024 WL 4164694 (D.D.C. Sept. 12, 2024) ................................... 10, 55

*KalshiEX, LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS, 2025 WL 1218313
    (D.N.J. April 28, 2025) .....................................................................................16

*KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW,
    2025 WL 3286282 (D. Nev. Nov. 24, 2025)............................................ passim

*Kansas v. Garcia*, 589 U.S. 191 (2020)........................................................... 21, 29

*Leist v. Simplot*, 638 F.2d 283 (2d Cir. 1980)............................................27

*Marinello v. United States*, 584 U.S. 1 (2018) ......................................32

*Mazurek v. Armstrong*, 520 U.S. 968 (1997)............................................18

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ............................... 19, 20, 32

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
    456 U.S. 353 (1982).................................................................. 6, 7, 24

*Mississippi v. Louisiana*, 506 U.S. 73 (1992).........................................39

*Murphy v. NCAA*, 584 U.S. 453 (2018)........................................ 3, 4, 35

*North Am. Derivatives Exch., Inc. d/b/a Crypto.com. v. Nevada Gaming
    Control Bd.*, No. 2:25-cv-00978-APG-BNW, 2025 WL 2916151
    (D. Nev. Oct. 14, 2025) ........................................................ 11, 51

*Pinho v. Gonzales*, 432 F.3d 193 (3d Cir. 2005) .....................................39

*Power v. Arlington Hosp. Ass'n*, 42 F.3d 851 (4th Cir. 1994) ...............................29

*R. J. Hereley & Son Co. v. Stotler & Co.*, 466 F. Supp. 345 (N.D. Ill. 1979).........24

*R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130 (1986) ....................21

*Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175
    (5th Cir. 1979)..............................................................................27

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) ..........................................40

*Sackett v. EPA*, 598 U.S. 651 (2023) .....................................................21

*Speiser v. Randall*, 357 U.S. 513 (1958) ...............................................39

*Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*,
    322 F.3d 1039 (9th Cir. 2003) .......................................................9

*Transcontinental Gas Pipe Line Co., LLC v. Pennsylvania Envt'l Hearing Bd.*, 108
    F.4th 144 (3d Cir. 2024) ..............................................................43

*United States v. Bala*, 489 F.3d 334 (8th Cir. 2007) ..................................... 36, 37

*United States v. Lopez*, 514 U.S. 549 (1995)............................................56

*United States v. Lyons*, 740 F.3d 702 (1st Cir. 2014)......................................... 36, 37

*United States v. Texas*, 97 F.4th 268 (5th Cir. 2024)..............................................21

*Virginia Uranium, Inc. v. Warren*, 587 U.S. 761 (2019)................................. 21, 50

*W. Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059 (D.C. Cir. 2023) ...................37

*West Virginia v. EPA*, 597 U.S. 697 (2022) .............................................................34

*Whitman v. American Trucking Ass'ns, Inc.*, 531 U.S. 457 (2001).........................34

*WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*,
   553 F.3d 292 (4th Cir. 2009) ........................................................................2, 20

*Wyeth v. Levine*, 555 U.S. 555 (2009) .................................................. 19, 20, 30, 32

*Yates v. United States*, 574 U.S. 528 (2015)....................................................... 24, 32

*Zyla Life Scis., LLC v. Wells Pharma of Houston, LLC*, 134 F.4th 326 (5th Cir.
   2025) .......................................................................................................................38

## Statutes

5 U.S.C. § 8902.........................................................................................................43

7 U.S.C. § 1a(9) ..........................................................................................................5

7 U.S.C. § 1a(19)(iv)...................................................................................... 10, 50, 55

7 U.S.C. § 1a(28)(A)...................................................................................................33

7 U.S.C. § 1a(47)(A)......................................................................................... 9, 10, 53

7 U.S.C. § 1a(47)(A)(iii)............................................................................................53

7 U.S.C. § 1a(47)(A)(iii)(I)........................................................................................54

7 U.S.C. § 1a(47)(A)(iii)(VII)....................................................................................54

7 U.S.C. § 2(a)(1)(A) ..................................................................................... passim

7 U.S.C. § 2(g)(2)........................................................................................................28

7 U.S.C. § 7a-2(c) ................................................................................................ 10, 11

7 U.S.C. § 7a-2(c)(5)..................................................................49

7 U.S.C. § 7a-2(c)(5)(C)(i) ............................................ 10, 30, 38

7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii) ........................................... 10, 11

7 U.S.C. § 7a-2(c)(5)(C)(ii) ....................................................38

7 U.S.C. § 13(a)(2)..............................................................9, 36

7 U.S.C. § 13(a)(5)..............................................................9, 36

7 U.S.C. § 13a-2.....................................................................40

7 U.S.C. § 13a-2(7).................................................................40

7 U.S.C. § 13a-2(8)(A)............................................................40

7 U.S.C. § 16(e)(1).................................................................35

7 U.S.C. § 16(e)(2)............................................................passim

12 U.S.C. § 84(b)(3)...............................................................31

12 U.S.C. § 1828(y)................................................................31

18 U.S.C. § 1084......................................................................3

25 U.S.C. § 2710(d)(1)..............................................................3

28 U.S.C. § 3702..................................................................3, 36

29 U.S.C. § 1144(a)................................................................43

31 U.S.C. § 5361(b)................................................................37

31 U.S.C. § 5362(1)(E)(ii) .......................................................37

31 U.S.C. §§ 5361 – 5363 .........................................................3

Commodity Exchange Act, Pub. L. No. 74-675, 49 Stat. 1491 (1936)...............6, 42

Md. Code Ann., Crim. Law § 12-104 (LexisNexis 2021).........................5

Md. Code Ann., State Gov't § 9-1E-01(j) (LexisNexis 2021) ...................5

Md. Code Ann., State Gov't § 9-1E-03 (LexisNexis 2021) .......................................5

Md. Code Ann., State Gov't § 9-1E-13(a) (LexisNexis 2021)......................... 45, 46

Md. Code Ann., State Gov't § 9-1E-15(o) (LexisNexis 2021) ...............................49

Md. Code Ann., State Gov't, §§ 9-1E-01 - 9-1E-017 (LexisNexis 2021) ..........4, 45

Md. Code Ann., State Gov't., § 9-1E-01 - 9-1E-17 (LexisNexis 2021)...................2

## Regulations

12 C.F.R. § 163.172 ...........................................................................................31

12 C.F.R. § 223.33 ............................................................................................32

17 C.F.R § 38.151(b) ........................................................................................47

17 C.F.R. § 38.151(b) ........................................................................................46

17 C.F.R. § 40.11(a)....................................................................................... 11, 30

17 C.F.R. § 40.11(a)(1) .....................................................................................38

17 C.F.R. § 40.11(c) ..........................................................................................12

73 Fed. Reg. 25,669 (May 7, 2008) ..................................................................34

77 Fed. Reg. 48,208 (Aug. 13, 2012).......................................................... 12, 56

85 Fed. Reg. 40,794 (July 7, 2020) ............................................................. 31, 33

89 Fed. Reg. 48,968 (June 10, 2024). ...............................................................12

COMAR 36.10.01.02.B(24)................................................................................5

## Miscellaneous

120 Cong. Rec. 30,171 (daily ed. Sept. 9, 1974) ............................................. 26, 42

156 Cong. Rec. S5902 (daily ed. July 15, 2010) ....................................... 10, 11, 31

*Associate*, Merriam-Webster, https://www.merriam-
    webster.com/dictionary/associate (last visited Dec. 12, 2025)...........................54

*Consequence*, Merriam-Webster, https://www.merriam-
    webster.com/dictionary/consequence (last visited Dec. 12, 2025)....................54

Futures Contract, Black's Law Dictionary (12th ed. 2024)........................................5

*Futures Glossary: A Guide to the Language of the Futures Industry*, CFTC,
    https://perma.cc/63HY-DD7E (captured Sept. 11, 2024) ...................................6

H.R. Rep. No. 93-1383 (1974)................................................................................8, 26

H.R. Rep. No. 74-421 (1935)........................................................................................6

Kalshi Help Center, https://help.kalshi.com/markets/market-maker-program
    (last visited Dec. 5, 2025)**.**.................................................................................14

Kevin T. Van Wart, Preemption and the Commodity Exchange Act,
    58 Chi.-Kent L. Rev. 657 (1982) ....................................................... 6, 7, 25, 41

*Legislators' Guide to Commercial Gambling in Maryland*, Department of
    Legislative Services, Office of Policy Analysis (December 2023).....................4

S. Rep. No. 111-176 (2010) .........................................................................................8

S. Rep. No. 93-1131 (1974) .........................................................................................7

Shobit Seth, *Different Types of Swaps*, Investopedia,
    https://www.investopedia.com/articles/investing/052915/different-types-
    swaps.asp (last visited Dec. 12, 2025)...............................................................54

*Sports*, KALSHI, https://perma.cc/9SNV-3WUQ (captured Apr. 12, 2025)..........52

Thomas A. Russo & Edwin L. Lyon, *The Exclusive Jurisdiction of the Commodity
    Futures Trading Commission*, 6 Hofstra L. Rev. 57 (1977) ........................8, 25

No. 25-1892

———————————

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

———————————

## KALSHIEX, LLC,

*Plaintiff-Appellant*,

v.

## JOHN A. MARTIN, *et al*.,

*Defendants-Appellees*.

———————————

On Appeal from the United States District Court for the District of Maryland
(Adam B. Abelson, District Judge)

———————————

## BRIEF OF APPELLEES

———————————

## JURISDICTIONAL STATEMENT

The district court had federal question jurisdiction under 28 U.S.C. § 1331

and 28 U.S.C. § 1343. This Court has jurisdiction to review the district court's denial

of a preliminary injunction under 28 U.S.C. § 1292(a)(1).

## ISSUE PRESENTED FOR REVIEW

Did the district court correctly decide that the Commodity Exchange Act, which regulates commodity futures and swaps, does not preempt the application of Maryland's sports wagering laws to Kalshi's "sports event contracts"?

## STATEMENT OF THE CASE

### Legal Framework

This case arises from efforts by appellant KalshiEx, LLC ("Kalshi") to avoid having to comply with Maryland's sports wagering licensure laws by offering sports wagering on a registered futures market, in this case a "designated contract market." Sports wagering and futures trading are different. States have exercised their historic police powers to regulate intrastate sports wagering, with those intrastate efforts complemented by congressional oversight of interstate activity. Futures contracts, by contrast, are regulated by the Commodity Futures Trading Commission ("CFTC") under the Commodity Exchange Act.

### States' Historic Power to Regulate Sports Wagering

"[R]egulating gambling is at the core of the state's residual powers as a sovereign in our constitutional scheme." *WV Ass'n of Club Owners & Fraternal Servs.*, *Inc. v. Musgrave*, 553 F.3d 292, 302 (4th Cir. 2009); *see Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 185 (1999) (noting substantial government interest in "reducing the social costs associated with casino and other

forms of gambling"). Accordingly, States primarily determine what forms of sports wagering, if any, may take place within their borders. *See Murphy v. NCAA*, 584 U.S. 453, 486 (2018).

Federal law has long reflected a coherent policy of regulating interstate gaming while respecting States' traditional authority to regulate intrastate conduct. *See, e.g.*, *Champion v. Ames*, 188 U.S. 321, 356 (1903) (approving of federal regulation of interstate gambling to preserve a States' right to regulate gambling within its own borders). Numerous interstate gambling laws reflect this policy. *See, e.g.* 18 U.S.C. § 1084 (prohibiting the use of wire communications to transmit sports wagers across state lines); 25 U.S.C. § 2710(d)(1) (prohibiting gaming contracts on tribal lands unless authorized by the applicable tribe in a State with legal gambling); 31 U.S.C. §§ 5361 – 5363 (prohibiting many internet gaming transactions while respecting intrastate gambling laws).

The one exception to this measured approach was the Professional and Amateur Sports Protection Act, which made it unlawful for states "to sponsor, operate, advertise, promote, license, or authorize by law or compact" sports wagering. 28 U.S.C. § 3702. The Supreme Court ultimately struck down the statute for violating the anticommandeering principle, emphasizing that (1) federal policy concerning gambling had always been to respect each State's policy choices on this controversial issue; and (2) "[t]he legalization of sports gambling requires an

important policy choice" to be made by each State, unless Congress chooses to regulate sports gambling directly). *Murphy*, 584 U.S. at 486. The decision thus placed the question whether to permit intrastate sports wagering squarely within the authority of the states. *Id.*

### Maryland's Regulation of Sports Wagering

Maryland has regulated gaming within its borders since the 18th century. Department of Legislative Servs., Off. of Policy Analysis, *Legislators' Guide to Commercial Gambling in Maryland* at 7 (Dec. 2023). Maryland's state lottery was established in 1972 by constitutional amendment and legislative action. *Id.* at 4. In 2012, the General Assembly passed comprehensive gaming legislation that authorized the licensing of six casinos in Maryland. *Id.* at 25-26.

After *Murphy*, Maryland voters approved sports wagering by referendum in 2020. (J.A. 97.) In December 2021, sportsbooks first offered sports wagering in Maryland. (J.A. 97.) Maryland currently has over 20 authorized sportsbooks operating within the State. In its first full year, sports wagering delivered over $60 million in revenue to the Blueprint for Maryland's Future Fund, which supports public education programs. (J.A. 97.)

Maryland regulates sports wagering within its borders. *See* Md. Code Ann., State Gov't §§ 9-1E-01–9-1E-17 (LexisNexis 2021); Code of Maryland Regulations ("COMAR") ch. 36, tit. 10. Maryland defines "sports wagering" as "the business of

accepting wagers on any sporting event by any system or method of wagering." State Gov't § 9-1E-01(j). One such system or method is "exchange wagering," defined as wagering "in which a bettor wagers with or against another bettor through a sports wagering licensee." COMAR 36.10.01.02.B(24). It is illegal to conduct sports wagering business in Maryland without the appropriate sports wagering license. State Gov't § 9-1E-03; Md. Code Ann., Crim. Law § 12-104 (LexisNexis 2021). Licensees must comply with geofencing requirements to ensure that sports wagering is limited to people who are present in Maryland when they wager. (J.A. 92.) Maryland also has requirements designed to ensure that those conducting sports wagering in Maryland do not prey on people suffering from gaming addiction. (J.A. 90, J.A. 99-100.)

### Federal Regulation of Commodity Futures

The Commodity Exchange Act historically has regulated commodity futures. "Commodities" include agricultural products such as wheat, cotton, rice, corn, butter, eggs, and livestock, and "all other goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). Futures are "agreement[s] to buy or sell a standardized asset (such as a commodity, stock, or foreign currency) at a fixed price at a future time, usu[ally] during a particular time of a month." *Futures Contract*, Black's Law Dictionary (12th ed. 2024). Commodity futures are a type of

derivative; a  derivative, in turn, is a financial instrument or contract whose price is "directly dependent upon (i.e.[,] derived from)" the value of one or more underlying assets—for example, commodities (like corn and wheat), securities, or debt instruments. *See* CFTC, *Futures Glossary: A Guide to the Language of the Futures Industry*, https://perma.cc/63HY-DD7E (captured Sept. 11, 2024).  Derivatives "provide a way to transfer market risk or credit risk between two counterparties." *Investment Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 168 n.3 (D.D.C. 2012) (citations omitted).

Congress originally enacted the Commodity Exchange Act in 1936 to clamp down on excessive speculation in agricultural commodities by establishing registration requirements and by prohibiting fraud, bucket shops, and wash sales. Commodity Exchange Act, Pub. L. No. 74-675, 49 Stat. 1491 (1936); H.R. Rep. No. 74-421, at 1 (1935); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 362-63 (1982).  The term "bucket shops" refers to firms that "purport[] to conduct a legitimate exchange business but . . . actually accept[] bets and wagers on the price movement of stocks and commodities."  Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 663 (1982).  Prior to 1936, States had applied bucket shop statutes to commodity futures, but they subsequently "began to dismantle or disregard their archaic bucket-shop enactments

. . . suggest[ing] a general contentment with the system of federal regulation under the Commodity Exchange Act [of 1936]." *Id.* at 671.

In 1974, as a result of "a drastic surge in commodities trading, rapidly rising food costs, and a highly publicized and costly futures trading scandal," Congress created the Commodity Futures Trading Commission ("CFTC"). *See American Agric. Movement, Inc. v. Board of Trade of City of Chicago*, 97 F.2d 1147, 1156 (7th Cir. 1992); Van Wart, 58 Chi.-Kent L. Rev. at 673-74 (noting that "state regulation of commodities trading was almost nonexistent" and federal oversight was limited, so investors "found themselves without any regulatory protection"). The 1974 amendments kept the Commodity Exchange Act's focus on regulating "[f]utures trading," meaning "purchases and sales of contracts for delivery at some future date of certain quantities of specified commodities at fixed prices." S. Rep. No. 93-1131 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 5843, 5856.

The 1974 amendments granted the CFTC "exclusive jurisdiction" over commodity futures traded on registered exchanges. *See* 7 U.S.C. § 2(a)(1)(A). The purpose of this jurisdictional grant was to separate commodity futures regulation from both federal and state securities regulation. *See Merrill Lynch*, 456 U.S. at 386-87 (noting that the exclusive-jurisdiction provision is intended to "separate the functions of the [CFTC] from those of the [SEC] and other regulatory agencies"); Thomas A. Russo & Edwin L. Lyon, *The Exclusive Jurisdiction of the Commodity*

*Futures Trading Commission*, 6 Hofstra L. Rev. 57 (1977) (describing the SEC's and states securities regulators' application of their laws to commodity options prior to the creation of the CFTC and the turf war that took place afterward). Otherwise, the phrase "exclusive jurisdiction" was meant to preempt inconsistent state law. *See, e.g.*, H.R. Rep. No. 93-1383, at 39 (1974) (explaining that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern").

Section 2(a)(1)(A) also includes two savings clauses. The first clause states that "[e]xcept as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the [SEC] or other regulatory authorities under the laws of the United States or of any State or (II) restrict the [SEC] and such other authorities from carrying out their duties and responsibilities in accordance with such laws." 7 U.S.C. § 2(a)(1)(A). The second clause provides that "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." *Id.*

In 2010, as a "direct and comprehensive response to the financial crisis that nearly crippled the U.S. economy beginning in 2008," Congress enacted the Dodd-Frank Act, which, among other things, regulated "swaps." S. Rep. 111-176, at 2, 29-30 (2010). Swaps are agreements between two parties to exchange financial obligations, such as obligations on interest payments, foreign currencies, or

commodity prices. *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1042 (9th Cir. 2003). Like futures, swaps are used to hedge risk. *Id.* at 1043. The purpose of the Dodd-Frank Act's regulation of swaps was to illuminate "previously dark markets in the complex derivative instruments at the heart of the [2008 financial] crisis." *Investment Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 174 (D.D.C. 2013) (quotation omitted).

Congress provided a detailed regulatory framework for swaps. First, Congress provided a six-part definition of swap that reflected marketplace variety. *See* 7 U.S.C. § 1a(47)(A). Second, Congress prohibited, for most persons, "enter[ing] into a swap unless the swap is entered into on, or subject to the rules of" a designated contract market, *id.* § 2(e), and prohibited "anyone from soliciting or accepting orders for swaps or options contracts if they are not registered with the CFTC as a futures commission merchant," *CFTC v. Yukom Commc'ns Ltd.,* No. 19-cv-05416, 2021 WL 4477874, at *3 (N.D. Ill. Sept. 30, 2021) (citing 7 U.S.C. §§ 1a(28)(A), 6d(a)(1)). Any knowing or willful violation of these provisions is a felony, with penalties as high as $1 million and ten years' imprisonment. *See id.* § 13(a)(2), (5). Third, Congress added swaps to the CFTC's exclusive jurisdiction in § 2(a)(1)(A). Finally, Congress amended § 16(e)(2) to repeal the express preemption of state gaming and bucket shop laws for "excluded swaps," and it expressly preempted state regulation of swaps as insurance contracts, *id.* § 16(h).

Congress was concerned that a creative person might attempt to turn sports betting into swaps by structuring them as "event contracts."  *See* 156 Cong. Rec. S5902, S5906-07 (daily ed. July 15, 2010) (Sen. Feinstein) (expressing concern about "derivative contract[s]" being "used predominantly by speculators or participants not having a commercial or hedging interest"); *id.* at S5907 (Sen. Lincoln) (expressing concern that "[i[t would be quite easy to construct an 'event contract' around sporting events" and that "[t]hese types of contracts would not serve any real commercial purpose" but instead "would be used solely for gambling").  Congress therefore defined "swaps" to include not all event contracts, but only those that are "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."  7 U.S.C. § 1a(47)(A)(ii).

Congress also enacted a "Special Rule" allowing the CFTC to determine if "swaps in excluded commodities" are contrary to the public interest and ban these contracts from registered exchanges, such as designated contract markets.  *See* 7 U.S.C. § 7a-2(c)(5)(C)(i), (ii).  As relevant here, an "excluded commodity" includes the same sort of occurrence, nonoccurrence, or extent of occurrence described in the swap definition.  7 U.S.C. § 1a(19)(iv). Through the Special Rule, Congress authorized the CFTC to ban swaps in excluded commodities that "involve activity that is unlawful under any Federal or State law, terrorism, assassination, war,

gaming, or other similar activity determined by the Commission to be contrary to the public interest." *Id.* § 7a-2(c)(5)(C)(i). This Special Rule was necessary in part because designated contract markets can self-certify that their contracts comply with the Commodity Exchange Act, and these self-certified contracts immediately may be traded without any further action by the CFTC. *Id.* § 7a-2(c). The CFTC must then identify and remove illegal contracts. *Id.* The purpose of the Special Rule was specifically to allow the CFTC to remove gaming contracts. 156 Cong. Rec. at S5906 (Sen. Lincoln) ("[T]his provision will strengthen the government's ability to protect the public interest from gaming contracts . . . .")

Several subsequent CFTC rulemakings have addressed swaps. First, in 2011, the CFTC under the Special Rule "made [the] public interest determination on a blanket basis" in prohibiting designated contract markets from listing any "swap based on an excluded commodity . . . that 'involves, relates to, or references . . . gaming'" or any of the other the categories enumerated in the Special Rule. *North Am. Derivatives Exch., Inc. d/b/a Crypto.com v. Nevada Gaming Control Bd.*, No. 2:25-cv-00978-APG-BNW, 2025 WL 2916151, at *10 (D. Nev. Oct. 14, 2025) ("*Crypto.com*") (quoting 17 C.F.R. § 40.11(a)). "In addition to this general prohibition on the front end, the CFTC's regulation provides a review process through which it can determine on the back end whether an event contract that was

11

listed despite the prohibition involves a prohibited activity." *Id.* at *3 (citing 17 C.F.R. § 40.11(c)).

Second, in 2012, a joint CFTC-SEC rule provided that "swaps" do not include "consumer and commercial arrangements that historically have not been considered swaps" because those arrangements historically have been regulated by the States and Congress did not intend to change that. Further Definition of "Swap," 77 Fed. Reg. 48,208, 48,248 (Aug. 13, 2012).

Finally, in 2024, a proposed CFTC rule would have categorically barred designated contract markets from offering sports wagers; it noted that the CFTC does not have "the statutory mandate nor specialized experience appropriate to oversee" sports betting. *See* Event Contracts, 89 Fed. Reg. 48,968, 48,983 (June 10, 2024). Although the proposal was withdrawn, it reflects the CFTC's understanding that the Commodity Exchange Act does not preempt state sports wagering laws.

**Factual Background**

Kalshi is the type of creative entity Congress had in mind. Kalshi became a licensed designated contract market and self-certified sports wagering contracts in early 2025, thus offering sports wagering nationwide. (J.A. 36-37, J.A. 44, J.A. 106 (initial listing of "Will <team> Win <title>?").) As part of the filing, Kalshi certified that its sports wagering contracts, which it characterized as "sports event contracts,"

12

complied with the Commodity Exchange Act and the CFTC's regulations.  (J.A. 109.)

Kalshi's "sports event contracts" involve interstate wagering on the outcome of a specific sporting event.[1]  (J.A. 59, J.A. 111-112.)  Even though sports wagering is not legal nationwide and requires a license in States where it is, Kalshi has marketed its sports wagering contracts as "Betting on Kalshi, the first app for legal sports betting in all 50 states"; "Sports Betting Legal in all 50 States"; and "Kalshi: The First Nationwide Legal Sports Betting Platform."  (J.A. 76, J.A. 79, J.A. 81.) As with traditional sportsbooks, individuals purchase one of two outcomes for a sporting event based on a speculative prediction of who will win the event. (J.A. 87-90.)

According to Kalshi, its activities differ from traditional sports wagering because "Kalshi's exchange is not the counterparty to any trade, and prices are set by supply and demand rather than by the exchange."  Appellant's Br. 18-19.  But Kalshi functions like the "house" by relying on selected "market makers" to provide liquidity for its wagers "as the counterparty to trades, thereby guaranteeing that there

---

[1] Since filing its appeal, Kalshi has "issued a range of new contracts," including "prop bets on things like whether a team will score a touchdown in a certain part of a game or the point total over/under on a game."  *KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282, at *2 (D. Nev. Nov. 24, 2025) ("*Hendrick*").

is almost always someone on the other side of a transaction."  Kalshi Help Center, https://help.kalshi.com/markets/market-maker-program (last visited Dec. 5, 2025) (cited below at ECF 26, at 3).

On April 7, 2025, the Maryland Lottery and Gaming Control Commission sent a cease-and-desist letter to Kalshi. (J.A. 65-66.)  The Commission concluded that Kalshi was "offering and conducting . . . wagering on sporting events" in Maryland without the required sports wagering license.  (J.A. 66.)

**This Litigation**

In reaction to the Commission's cease-and-desist letter, on April 21, 2025, Kalshi filed suit and moved to preliminarily enjoin the Commission from enforcing Maryland's sports wagering laws; Kalshi contended that, because it is a designated contract market, the Commodity Exchange Act preempts the application of Maryland law to its sports wagering contracts.  (J.A. 21, J.A. 33.)  The district court denied the preliminary injunction because Kalshi had failed to show a likelihood of success on the merits.  (J.A. 148.)  Assuming without deciding that Kalshi's sports wagering contracts were swaps (J.A. 156), the court held that Kalshi had not met its burden to establish that Congress "clear[ly] and manifest[ly]" intended to strip States of their authority to regulate gambling (J.A. 160.)  The court cited eight reasons for this conclusion:

- The Special Rule's text demonstrates Congress's intent for some state law, including sports wagering, to operate alongside the Commodity Exchange Act.  (J.A. 164-165.)

- The Act's limited express preemption clauses, 7 U.S.C. § 16(e)(2) and (h), confirm the absence of congressional intent to preempt the field of all state law.  (J.A. 165-166.)

- The savings clauses to the CFTC's exclusive jurisdiction generally negate a preemptive inference and its ambiguity cuts against field preemption.   (J.A. 167.)

- Congress provided no indication in the text or legislative history that it intended to preempt States' strong interest in regulating sports wagering.   (J.A. 167-168.)

- Prior decisions had held that the CFTC's "exclusive jurisdiction" has limited preemptive scope. (J.A. 168-169.)

- Sports wagering was a federal crime when Congress enacted the 1974 Commodity Exchange Act amendments and the Dodd-Frank Act.  (J.A. 169-170.)

- Field preemption would effect an implied repeal of other federal sports wagering laws. (J.A. 170.)

- The Dodd-Frank Act's limited legislative history cuts against field preemption.  (J.A. 170-171.)

The court further held that Kalshi had not met its burden to demonstrate conflict preemption.  Rather than conflict with each other, the court reasoned, the Commodity Exchange Act and Maryland's sports wagering laws work in tandem. (J.A. 175-176.)

Kalshi appealed.  Since then, two other decisions have resolved similar issues in a manner unfavorable to Kalshi and one of its competitors; both decisions held

15

that sports wagering contracts were not swaps within the CFTC's exclusive jurisdiction. *See Hendrick*, 2025 WL 3286282, at *6; *Crypto.com*, 2025 WL 2916151, at *11. A third case is on appeal, with the district court having concluded that the Commodity Exchange Act preempts New Jersey's gaming laws. *KalshiEX, LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS, 2025 WL 1218313 (D.N.J. April 28, 2025), *appeal pending*, No. 25-1922 (3rd Cir.).

Finally, the CFTC recently issued a notice stating that (1) it "has not, to date, been requested to take or taken any official action to approve" the listing of sports-related event contracts; (2) all currently listed sports-related event contracts have been so listed "pursuant to self-certifications"; and (3) the CFTC "has not, to date, made a determination whether any such contracts involve an activity enumerated or prohibited under" the Special Rule and Regulation 40.11(a). CFTC Letter No. 25-36, at 2 n.4 (Sept. 30, 2025). The letter further cautioned that designated contract markets listing sports wagering contracts should disclose the effects of possible "termination of sports-related event contract positions" due to state enforcement actions. *Id.* at 2.

## SUMMARY OF ARGUMENT

Gaming has long been regulated by the States in the exercise of their historic police powers. For this reason, there is a strong presumption against preemption of Maryland's sports wagering laws by the Commodity Exchange Act. Even assuming

that Kalshi's sports wagers are swaps, and thus within the CFTC's "exclusive jurisdiction" under 7 U.S.C. § 2(a)(1)(A), Kalshi cannot overcome that presumption.

Maryland's sports wagering laws are not field-preempted. Federal law field-preempts state law only if Congress legislates so comprehensively as to leave no room for supplementary state legislation in the field. Here, Congress affirmatively conveyed its intent for at least some state law to coexist alongside the Commodity Exchange Act. It included savings clauses in § 2(a)(1)(A). It enacted two preemption clauses but kept them narrow (and inapplicable to the circumstances here). And it incorporated state law in the Special Rule. The phrase "exclusive jurisdiction" itself has no field-preemptive effect; read in context, it means only that swaps are out of the reach of securities regulators.

The implications of field preemption here would be sweeping. If Kalshi's sports wagers are swaps, and only the CFTC can regulate swaps, then the CFTC would become the Nation's sole regulator of sports wagering. Further, by placing sports wagering outside the reach of everyone but the CFTC, Kalshi's position would both effect an implied repeal of federal laws that generally prohibit interstate gaming and strip States of their traditional police power to regulate gaming within their borders. And Kalshi's "exclusive jurisdiction" theory would leave other federal regulators powerless to address illegalities within their jurisdictions that happen to involve registered exchanges.

Maryland's sports wagering laws are not conflict-preempted, either.  It is not impossible for Kalshi to comply with both those laws and the Commodity Exchange Act.  Nor do Maryland's sports wagering laws present an obstacle to the Commodity Exchange Act's purposes and objectives.   To the contrary, Maryland's sports wagering laws work in tandem with the Commodity Exchange Act, as the statute's incorporation of state law confirms.

Alternatively, the district court reached the correct result because Kalshi's sports wagers are not in the CFTC's exclusive jurisdiction.  Kalshi maintains that they fall within that exclusive jurisdiction because they are swaps.  Sports wagers are not swaps, however, because (1) they are based on the outcomes of sporting events rather than their occurrence; and (2) those outcomes have no inherent financial, economic, or commercial consequence.  Instead, sports wagers are just bets.

## ARGUMENT

## I.   THIS COURT REVIEWS THE DENIAL OF THE PRELIMINARY INJUNCTION FOR ABUSE OF DISCRETION.

A preliminary injunction is an "extraordinary and drastic" remedy, requiring a "a clear showing" that the movant is likely to succeed on the merits.  *American Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 169 (4th Cir. 2025) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).  This Court reviews a district court's decision to grant or deny a preliminary injunction for abuse of discretion, with underlying

18

legal conclusions reviewed de novo and findings of fact reviewed for clear error. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 815 (4th Cir. 1991).

## II. THE COMMODITY EXCHANGE ACT DOES NOT PREEMPT MARYLAND'S TRADITIONAL AUTHORITY TO REGULATE SPORTS WAGERING.

"[T]he purpose of Congress is the ultimate touchstone in every preemption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). There are three types of federal preemption: (1) express preemption, (2) field preemption, and (3) conflict preemption. *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000). Kalshi relies principally on field preemption and conflict preemption theories, but neither theory has merit here.

### A. The Presumption Against Preemption Applies to Maryland's Sports Wagering Laws.

All preemption cases "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). Courts must disfavor preemption when faced with two plausible readings of a statute. *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005). This presumption against preemption is strongest when Congress legislates in a field traditionally occupied by the States. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

Here, regulating gaming is an exercise of a State's core, traditional police powers. *See, e.g.*, *Ah Sin v. Wittman*, 198 U.S. 500, 505-06 (1905) ("The suppression of gambling is concededly within the police powers of a state."); *WV Ass'n of Club Owners & Fraternal Servs.*, *Inc. v. Musgrave*, 553 F.3d at 302 ("[R]egulating gambling is at the core of the state's residual powers as a sovereign in our constitutional scheme.")  The presumption against preemption thus applies with full force. *See Medtronic*, 518 U.S. at 485.

Kalshi does not seriously dispute States' historic power to regulate sports wagering.  (J.A. 159.)  Instead, Kalshi maintains that the presumption against preemption does not apply because *futures trading* is not an area of historic police power.  Appellant's Br. 61.  But that approach erroneously emphasizes the federal scheme rather than the state field, and the Supreme Court has rejected this same switch in emphasis. *See Wyeth*, 555 U.S. at 565 n.3 (rejecting the argument that "the presumption against preemption should not apply . . . because the Federal Government has regulated drug labeling for more than a century").  Here, the district court was correct to conclude that the question was not "whether the federal statute can be framed as pertaining to an area of existing federal regulation," but "whether the *state* law governs conduct that has historically been subject to state regulation." (J.A. 158 (emphasis in original).)  Consequently, the presumption against preemption applies here and, as the district court observed, "[i]t is highly unlikely

20

that Congress would have overridden state gambling laws without at least some indication in the text and legislative history that it intended to do so."  (J.A. 170.)

### B.  Maryland's Sports Wagering Laws Are Not Field-Preempted by the Commodity Exchange Act.

Field preemption applies only where "Congress 'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation,'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (quoting *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 140 (1986)), or where "there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject,'" *Arizona v. United States*, 567 U.S. 387, 399 (2012).  This high standard is met only in "rare cases."  *Garcia*, 589 U.S. at 208.  Examples include "comprehensive, complex, and national" immigration schemes, *United States v. Texas*, 97 F.4th 268, 285 (5th Cir. 2024); nuclear safety, *see Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 768 (2019); *Dayton Power & Light Co. v. FERC*, 126 F.4th 1107, 1129 (6th Cir. 2025); and in-air flight operations, *Abdullah v. American Airlines, Inc.*, 181 F.3d 363, 370 (3d Cir. 1999).

Here, although Kalshi emphasizes the Commodity Exchange Act's use of the phrase "exclusive jurisdiction," courts do not read statutory provisions in isolation. *See Sackett v. EPA*, 598 U.S. 651, 674 (2023).  Section 2 does not field-preempt state gaming laws but, instead, distinguishes commodity futures jurisdiction from securities jurisdiction.  Other sections of the Act, moreover, expressly decline to

21

preempt state gaming law as applied to swaps and even incorporate state gaming law in the Special Rule. Kalshi's field preemption theory therefore cannot survive scrutiny.

### 1. Rather Than Broadly Preempt the Field, the Exclusive-Jurisdiction Provision Divides Commodities and Securities Jurisdiction.

The district court was correct to conclude that the statutory grant of "exclusive jurisdiction" to the CFTC in § 2(a)(1)(A) has limited preemptive scope. (J.A. 168-169.) To begin, the phrase "exclusive jurisdiction," standing alone, has no canonical meaning and does not ipso facto convey preemption. More broadly, while § 2(a)(1)(A) grants the CFTC exclusive jurisdiction with respect to commodity futures and swaps traded on registered exchanges, it nowhere mentions preemption of any other laws, including laws regulating gaming.

To the contrary, the section contains two savings clauses expressly preserving state law. The regulatory savings clause provides, inter alia, that "[e]xcept as hereinabove provided," nothing in the section "shall . . . supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States *or of any State*, or restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws." 7 U.S.C. § 2(a)(1)(A) (emphasis added). The jurisdictional savings clause provides that

22

"[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." *Id.* A savings clause generally precludes field preemption because it "negates the inference that Congress left no room for state causes of action." *International Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987). That is true here.

Indeed, both the Seventh Circuit and the D.C. Circuit have relied on the savings clauses to reject field preemption. The Seventh Circuit has repeatedly "approached the preemption issue cautiously." *Effex Capital, LLC v. National Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (citing *American Agric. Movement*, 977 F.2d at 1154); *see Chicago Mercantile Exch. v. SEC*, 883 F.2d 537, 550 (7th Cir. 1989) (explaining that § 2 "carries no implicit preemptive force"). *Effex Capital* could scarcely have been clearer in stressing that the court had "determined that the Commodity Exchange Act did not manifest an intent to occupy completely the entire field of commodity futures regulation." 933 F.3d at 894. Similarly, the D.C. Circuit has explained that, although "the CFTC was created to regulate all commodities and commodities trading[,] it does not follow . . . that Congress intended to preempt the activities of all other federal agencies in their regulatory realms." *FTC v. Ken Roberts Co.*, 276 F.3d 583, 591 (D.C. Cir. 2001).

What the phrase "exclusive jurisdiction" *does* do is prohibit regulation of commodity futures under the securities laws. As the Supreme Court has explained,

the exclusive-jurisdiction provision is "intended only to consolidate federal regulation of commodity futures trading in the [CFTC]" and to "separate the functions of the [CFTC] from those of the [SEC] and other regulatory agencies." *Merrill Lynch*, 456 U.S. at 386-87; *see also R. J. Hereley & Son Co. v. Stotler & Co.*, 466 F. Supp. 345, 347 (N.D. Ill. 1979) (explaining that the provision's purpose is "to remedy the confusion about whether certain types of commodities transactions came within the definition of a security and thus [were] subject to regulation under the securities laws"). In other words, the exclusive-jurisdiction provision is designed to divide turf among regulators, not to field-preempt state law.

Language elsewhere in the same subsection confirms as much, as the statute twice juxtaposes the CFTC with the SEC. *See* 7 U.S.C. § 2(a)(1)(A) ("Except as hereinabove provided, nothing contained in this section shall supersede or limit the jurisdiction conferred on the Securities and Exchange Commission or other regulatory authorities . . . or restrict the Securities and Exchange Commission and such other authorities. . . ."). The phrase "other regulatory authorities" immediately follows the reference to the SEC and must be understood in this context. *See Yates v. United States*, 574 U.S. 528, 544-45 (2015) (applying the canons of "noscitur a sociis," under which a word is known by the company it keeps, and "ejusdem generis," under which general words are construed to embrace only objects similar to the specific words that precede them). Under these canons, "other authorities"

does not broadly mean every single regulator.  Rather, in the company of the SEC, it refers to other securities authorities, particularly state securities regulators.  By focusing this savings clause on securities regulators, Congress underscored that the exclusive-jurisdiction provision divides turf between commodities and securities, rather than preempting all other state and federal law.

The legislative history likewise yields the conclusion that Congress used the exclusive-jurisdiction provision to distinguish the CFTC's regulatory domain from that of the SEC and state securities regulators.  When Congress created the CFTC and granted it "exclusive jurisdiction" in 1974, "surprisingly little testimony was heard on the subject of state regulatory efforts in the field of commodities trading." Van Wart, 58 Chi.-Kent L. Rev. at 674.  Rather, "conflicting SEC-CFTC authority was the jurisdictional issue receiving the most attention," although some witnesses noted "the continuing efforts of the states to regulate commodities trading under securities laws."  *Id.* at 676-77; *see id.* at 681-83 (discussing recent application of securities laws to commodity futures).  The CFTC was created to fill the gap that securities regulators had been attempting to cover, with § 2(a)(1)(A) delineating jurisdiction and preempting securities law.  *See* Russo & Lyon, 6 Hofstra L. Rev. at 60-61, 64-72.

Otherwise, rather than intending to occupy the field, Congress was concerned only about *inconsistent* state laws.  Although the House Report stated that the grant

25

of exclusive jurisdiction "would preempt the field insofar as futures regulation is concerned," its next sentence—which Kalshi's brief omits—made clear that the concern was about *conflicting* state law: "Therefore, if any substantive State law regulating futures trading *was contrary to or inconsistent with* Federal law, the Federal Law would govern." H.R. Rep No. 93-1383, at 39 (1974) (emphasis added). And the final sentence of the paragraph expressed the view that supplemental state regulation would not be *necessary*, not that it would be *forbidden*: "In view of the broad grant of authority to the Commission to regulate the futures trading industry, the Conferees do not contemplate that there will be a need for any supplementary regulation by the State." *Id.* Thus, in its full context, the House Report does not indicate a "clear and manifest" intent to preempt the field and, instead, points to the need for a conflict preemption analysis. The Senate echoed this understanding. *See* 120 Cong. Rec. 30,171, 30,464 (daily ed. Sept. 9, 1974) (statement of Senator Curtis that the Act would preempt state law only if it "were contrary to or inconsistent with Federal law").

The cases that Kalshi cites do not warrant a different conclusion. Many of these cases include only limited analysis, and others address the jurisdiction of securities regulators to regulate commodity futures—i.e., the very question that the exclusive-jurisdiction provision *does* address. *See Chicago Mercantile Exch. v. SEC*, 883 F.2d 537 (7th Cir. 1989) (holding that index participations were futures contracts

subject to the exclusive jurisdiction of the CFTC rather than the SEC); *International Trading, Ltd. v. Bell*, 556 S.W.2d 420 (Ark. 1977) (holding that the exclusive-jurisdiction provision preempted a state law securities action involving commodity options); *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (stating that the Commodity Exchange Act "preempts all state laws *inconsistent with its provisions*" (emphasis added)); *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (containing a single sentence and no analysis of the CFTC's exclusive jurisdiction's preemptive effect on state law); *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980) (containing no analysis and declining to hold mail and wire fraud claims preempted); *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979) (holding that the Commodity Exchange Act does not preclude a private cause of action). These cases do not reveal a "clear and manifest intent" on Congress's part to field-preempt state law in general or sports wagering law specifically. Because Maryland sports wagering law is not securities regulation, it is not field-preempted.

> **2.   The Commodity Exchange Act's Express Preemption Provisions Confirm That the Exclusive-Jurisdiction Provision Does Not Field-Preempt State Gaming Law.**

The Commodity Exchange Act contains two express preemption clauses. Neither preempts the application of state gaming law to swaps. First, 7 U.S.C. § 16(e)(2) expressly preempts state or local gaming laws for certain categories of

excluded futures, but it does not expressly preempt these laws for swaps.  Prior to 2010, the preemptive scope of § 16(e)(2) *did* encompass "excluded swaps," through a reference to what was then § 2(g).  *See* 7 U.S.C. § 16(e)(2) (2006); *id.* § 2(g)(2) (addressing excluded swaps).  The Dodd-Frank Act, however, deleted that reference.  *See* Pub. L. No. 111-203, 124 Stat. 1376, 1748 (2010).   Consequently, the current Section 12(e)(2) reflects a deliberate choice by Congress to preempt the application of state and local gaming laws to certain commodity futures but *not* to swaps.

Second, the statute's other express preemption provision, 7 U.S.C. § 16(h), expressly preempts the application of state insurance laws to swaps.  It does not preempt the application of any *other* state laws to swaps.  Thus, this provision reflects a choice by Congress to insulate swaps from insurance regulation but not from other areas of state law, including state gaming laws.

The very existence of two express preemption provisions weighs heavily against interpreting other portions of the Commodity Exchange Act to have field-preemptive effect.  *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992) ("Congress's enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted."); *Freightliner Corp. v. Myrick*, 514 U.S. 280, 288 (1995) (explaining that the existence of an express preemption provision yields an inference that Congress did not otherwise impliedly preempt state laws).  And the specific content of those provisions shuts the door

altogether on the preemptive effect that Kalshi claims here. Kalshi claims that, via the exclusive-jurisdiction provision, the Commodity Exchange Act preempts the application of state gaming laws (and other areas of state law) to swaps. But Congress both (1) chose the areas in which state gaming laws are preempted, and omitted swaps; and (2) chose the areas of state law whose application to swaps is preempted, and omitted gaming. Those choices are dispositive.

At the same time, Kalshi's argument would render these two express preemption provisions superfluous. For instance, if all state regulation of swaps were preempted by the exclusive-jurisdiction provision, there would be no need to separately preempt the application of state insurance law to swaps. There is no reason for this Court to construe the exclusive-jurisdiction provision in a manner that would make other portions of the Commodity Exchange Act unnecessary.

### 3.    The Commodity Exchange Act Incorporates and Works in Tandem with State and Federal Laws.

The Commodity Exchange Act's interplay with state law and other federal law confirms that field preemption is inapplicable here. First, where "a federal statute expressly incorporates state law," a "preemption analysis is inappropriate." *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 864 (4th Cir. 1994). That is because, in incorporating state law, Congress necessarily leaves "room for supplementary state legislation." *Kansas*, 589 U.S. at 208; *see also Just Puppies, Inc. v. Brown*, 123 F.4th 652, 662 (4th Cir. 2024) (reasoning that a federal law's "acknowledgement

of concurrent state and local" regulation "demonstrates that Congress did not intend for the [federal law] to occupy the field . . . to the exclusion of state law").

Here, in the context of event contracts, the Special Rule confirms that some state law is expected to operate alongside the Commodity Exchange Act. The Special Rule references contracts that involve (1) gaming; and (2) anything unlawful under federal or state law. 7 U.S.C. § 7a-2(c)(5)(C)(i). Regulation 40.11, in turn, prohibits these agreements on registered exchanges. 17 C.F.R. § 40.11(a). This is just the sort of incorporation of state law that precludes a finding of field preemption. *See Wyeth*, 555 U.S. at 575 ("The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them." (quoting *Bonito Boats v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166-67 (1989))).

Second, the Special Rule did not delegate to the CFTC field-preemptive authority over contracts involving terrorism, assassination, war, or gaming, much less over the open-ended "activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C)(i). The Special Rule simply gave the CFTC the authority to ban, on registered exchanges, derivative contracts that might "involve" these enumerated fields or "other similar activity determined by the Commission . . . to be contrary to the public interest." *Id.* Legislative history confirms that the Special

Rule was created to bolster protections at the intersection of futures regulation and other fields by "strengthen[ing] the government's ability to protect the public interest from gaming contracts and other event contracts." 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (Sen. Lincoln). The Special Rule thus was designed to operate alongside gaming laws, not field-preempt them.

Put differently, Congress intended to prevent creative entities like Kalshi from offering sports wagering on registered exchanges; it did not intend to give the CFTC the option to decide whether sports wagering was in the public interest as a general matter. Senator Lincoln noted that "[i]t would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Master's Golf Tournament" and that "[t]hese types of contracts would not serve any real commercial purpose," but instead "would be used solely for gambling." 156 Cong. Rec. S5907 (daily ed. July 15, 2010). These express concerns make it all the more implausible that Congress intended to preempt state gaming laws.

Third, other federal law operates alongside the Commodity Exchange Act's swaps regime. Similar to sportsbooks like Kalshi, state banks may engage in swap transactions only if those transactions are permitted by state law. 12 U.S.C. § 1828(y); *see id.* § 84(b)(3). The Office of the Comptroller of the Currency has regulated swap activity of national banks since 1986. Activities and Operations of National Banks and Federal Savings Associations, 85 Fed. Reg. 40,794, 40,806 n.76

(July 7, 2020); *see also* 12 C.F.R. § 163.172 (Office of the Comptroller of the Currency regulation imposing risk management, oversight, and recordkeeping duties on the futures and swaps activity of federal savings associations); *id.* § 223.33 (Federal Reserve regulation imposing requirements on the futures and derivatives activities of banks).  These examples confirm that the Commodity Exchange Act leaves ample room for entities other than the CFTC to regulate swaps in their respective fields.

### C.    Interpreting the Commodity Exchange Act to Field-Preempt State Law, Including Gaming Law, Would Produce Extreme and Absurd Results.

Courts do not read preemptive provisions expansively especially in an area of traditional state regulation like gaming. *Medtronic*, 518 U.S. at 485.  More generally, a "statute's meaning does not always 'turn solely' on the broadest imaginable 'definitions of its component words,'" *Epic Sys. Corp. v. Lewis*, 584 U. S. 497, 523 (2018) (quoting *Yates*, 574 U.S. at 537), and statutes must be construed to avoid absurd results, *Marinello v. United States*, 584 U.S. 1, 7-8 (2018).  Kalshi's argument that the CFTC's "exclusive jurisdiction" over swaps preempts the field of gaming laws, however, violates this principle: it would turn the CFTC into the Nation's sole gaming regulator, would impliedly repeal other federal gaming statutes, and would hamper other regulatory agencies' ability to police unlawful conduct.

### 1. Kalshi's Position Would Make the Commodity Futures Trading Commission the Nation's Sole Sports Wagering Regulator.

Swaps must be traded on registered exchanges, with narrow exceptions not applicable here. The Commodity Exchange Act generally prohibits "enter[ing] into a swap unless the swap is entered into on, or subject to the rules of" a designated contract market, 7 U.S.C. § 2(e), and "prohibits anyone from soliciting or accepting orders for swaps or options contracts if they are not registered with the CFTC as a futures commission merchant," *CFTC v. Yukom Commc'ns Ltd.*, No. 19-cv-05416, 2021 WL 4477874, at *3 (N.D. Ill. Sept. 30, 2021) (citing 7 U.S.C. §§ 1a(28)(A), 6d(a)(1)). Thus, if sports wagers are swaps, they must be traded on designated contract markets. And if the exclusive-jurisdiction provision field-preempts state regulation of swaps, these sports wagering contracts could not be regulated by anyone but the CFTC. Kalshi's argument thus would nationalize sports wagering regulation under the authority of the nation's commodity futures regulator, notwithstanding its status as an area of historic state regulation.

The CFTC, however, is ill-equipped to regulate sports wagering nationwide. As the CFTC itself has stressed, "[t]he Commission is not a gaming regulator." Event Contracts, 89 Fed. Reg. at 48,982-83. Indeed, the very Event Contracts Concept Release that Kalshi cites, *see* Appellant's Br. 12, questions "[w]hether event contracts are within the Commission's jurisdiction" and addresses the factors that

could be used to distinguish appropriate contracts from gambling.  Concept Release, 73 Fed. Reg. 25,669 (May 7, 2008).  The CFTC has no expertise or experience with sports wagering, nor does the Commodity Exchange Act provide a regulatory structure for sports wagering, as Regulation 40.11 confirms by banning gaming contracts from registered exchanges.  At the same time, regulation of gaming is plainly indispensable—a fact underscored by recent arrests of high-profile professional athletes and coaches on charges of illegal sports gambling allegations. *See Hendrick*, 2025 WL 3286282, at *9 n.7.

Federal sports wagering laws, moreover, have always preserved and worked in tandem with state law, as explained at pages 2-4 above, and it is implausible that the Dodd-Frank Act amended the Commodity Exchange Act to radically alter this balance.  "Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion."  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000); *cf. West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (emphasizing that Congress must "speak clearly if it wishes to assign to an agency decisions of vast economic and political significance"); *Whitman v. American Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) (observing that Congress does not "hide elephants in mouseholes.").

Indeed, Kalshi's interpretation of the exclusive-jurisdiction provision would render much of *Murphy* a dead letter.  In striking down the Professional and Amateur

Sports Protection Act, the Supreme Court emphasized that "[t]he legalization of sports gambling requires an important policy choice" to be made by each State, unless Congress chooses to regulate sports gambling directly. *Murphy*, 584 U.S. at 484. The Supreme Court, which decided *Murphy* eight years *after* Congress passed the Dodd-Frank Act, no doubt would have been surprised to learn that it was replacing the Professional and Amateur Sports Protection Act with the Commodity Exchange Act, rather than truly returning the question of sports betting to the States. That is particularly true in light of the Court's recognition that Congress speaks clearly and unmistakably when it intends to shift the traditional balance of power between States and the federal government. *See Bond v. United States*, 572 U.S. 844, 857-59 (2014).

Kalshi is wrong to contend that two parallel systems could exist, one where sports wagers on designated contract markets are regulated by the CFTC, and the other where all other sports wagers are covered by other applicable laws, whether federal or state. *See* Appellant's Br. 3. If Kalshi's field preemption argument is correct, the Commodity Exchange Act would prohibit all sports wagering contracts except on designated contract markets, for that is the rule for swaps. *See* 7 U.S.C. § 2(a)(1)(A). While Kalshi cites § 16(e)(1) as providing state regulatory authority over off-exchange activity, Appellant's Br. 50-52, this provision applies only to commodity futures and does not apply to swaps, *see* 7 U.S.C. § 2(d). Thus, a parallel

system of off-exchange sports wagering would be a crime.  *See* 7 U.S.C. § 13(a)(2), (5) .

### 2. Kalshi's Position Would Legalize Sports Wagering That Other Federal Laws Prohibit.

The existence of other federal laws that restrict sports wagering casts still more doubt on the notion that Congress intended to allow sports wagering on designated contract markets, let alone have the Commodity Exchange Act preempt all other sports wagering statutes.  As the district court observed, at the time of the 1974 and 2010 amendments to the Commodity Exchange Act, sports wagering was (as it still is) a federal crime unless expressly permitted by state law.  (J.A. 169); *see* 28 U.S.C. § 3702.  And Kalshi's sports wagering contracts violate the Wire Act, which prohibits the interstate transfer of wagers.  *See United States v. Bala*, 489 F.3d 334, 342 (8th Cir. 2007) (distinguishing between "bets and wagers" and "information assisting bets and wagers"); *United States v. Lyons*, 740 F.3d 702, 713 (1st Cir. 2014) (same).

Kalshi's argument that sports wagers could freely trade on designated contract markets, subject only to regulation by the CFTC, would eviscerate these statutes. Kalshi itself would be able to evade otherwise-applicable federal criminal law.  And to conduct unfettered interstate sports wagering and avoid prosecution by federal authorities, the entire sports gaming industry would simply shift to self-certified bets traded on designated contract markets.  Kalshi's argument thus results in repeal by

36

implication, which courts strongly disfavor. *See Epic Systems Corp. v. Lewis*, 584 U.S. 510 (reasoning that Congress "will specifically address preexisting law when it wishes to suspend its normal operations in a later statute"). The district court correctly concluded that the implied repeal of other federal sports wagering laws, a consequence of Kalshi's position, weighs against field preemption. (J.A. 170.)

Kalshi is incorrect to assert that its conduct is legal under the Wire Act and the Unlawful Internet Gaming Enforcement Act. Although Kalshi contends that the Wire Act's "safe harbor" applies to its sports wagers, Appellant's Br. 55 (quoting *W. Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059, 1069 (D.C. Cir. 2023)), the safe harbor does not apply to the interstate transmission of wagers (as opposed to information assisting wagers). *See Bala*, 489 F.3d at 342; *Lyons*, 740 F.3d at 713. In addition, though the Unlawful Internet Gaming Enforcement Act exempts commodity exchange-traded products in 31 U.S.C. § 5362(1)(E)(ii), the statute also states that none of its provisions "shall be construed as altering, limiting, or any Federal or State law or Tribal-State compact prohibiting, permitting, or regulating gambling within the United States." 31 U.S.C. § 5361(b). Consequently, the Unlawful Internet Gaming Enforcement Act expressly preserves Maryland's sports wagering laws and does not make Kalshi's sports wagering in Maryland lawful.

### 3. Kalshi's Position Would Inhibit Enforcement by Other Agencies.

Kalshi's field preemption argument would allow evasion of other regulatory requirements, too, including those in the Commodity Exchange Act itself. The Special Rule, together with Regulation 40.11, prohibits contracts involving any activity that is unlawful under state or federal law. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i), (ii); 17 C.F.R. § 40.11(a)(1). As the Special Rule recognizes, States and other federal agencies have an interest in enforcing their statutes, even if the subject matter ends up on a registered exchange. *See, e.g.*, *Zyla Life Scis., LLC v. Wells Pharma of Houston, LLC*, 134 F.4th 326, 333 (5th Cir. 2025) (explaining that "States may have a legitimate interest in punishing or providing redress for wrongs even if federal law already does so," and vice versa). But if States or other federal agencies could not enforce their laws against unlawful activity on a designated contract market, it would be easy to launder illegality or evade other regulatory authority through self-certification.

In fact, Kalshi's position would enable all manner of otherwise illegal agreements to trade on a designated contract market. A person could self-certify a swap in anything from cocaine to dogs and claim that the application of narcotics laws or puppy mill laws is preempted. *Cf. Just Puppies*, 123 F.4th at 662 (rejecting field preemption of Maryland's puppy mill laws). Not only would States and other agencies be powerless, but the CFTC would have sole authority to determine

38

whether a particular event contract violated any federal or state law.  *See Speiser v. Randall*, 357 U.S. 513, 522 n.7 (1958) (noting the "basic constitutional principle that the construction of state laws is the exclusive responsibility of the state courts"); *Pinho v. Gonzales*, 432 F.3d 193, 212 (3d Cir. 2005) (stressing that "the respect that federal courts owe the States" is "owed no less by federal agencies than by federal courts").  The CFTC's "exclusive jurisdiction" notwithstanding, federal and state agencies must still possess the authority to prohibit and remedy unlawful conduct, including unlicensed sports wagering, even when such conduct involves an event contract on a designated contract market.

### D.    Kalshi's Arguments Do Not Demonstrate Clear and Manifest Congressional Intent to Field-Preempt State Sports Wagering Laws.

Kalshi's core argument is that two words, "exclusive jurisdiction," overcome the strong presumption against preemption.  But field preemption cannot rest on these two words alone.  *See Farina v. Nokia Inc.*, 625 F.3d 97, 121 (3d Cr. 2010) (finding no field preemption despite "Congress's delegation of 'exclusive authority'" over radio-frequency-emission regulation).  And the cases that Kalshi cites do not establish a two-magic-word test.  *See Arizona*, 567 U.S. 387 (immigration law concerning noncitizen removal); *Mississippi v. Louisiana*, 506 U.S. 73 (1992) (original jurisdiction of federal courts); *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150 (2016) ("States, of course, may regulate within the domain

Congress assigned to them even when their laws incidentally affect areas within FERC's domain.")

Rather than rely on two words, Kalshi must show a comprehensive federal scheme that leaves no room for supplementary state regulation, such as the noncitizen removal scheme at issue in *Arizona*. *See Arizona,* 567 U.S. at 399 ("The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it.'" (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)) (alteration in original)). But the only parts of the Commodity Exchange Act that specifically address gaming defeat the notion that the Act's regulatory scheme, however intricate, leaves no room for States to act: § 16(e)(2) expressly preempts state gaming law but *not* for swaps, and the Special Rule affirmatively incorporates state law. And § 2's savings clauses only underscore that, in granting the CFTC "exclusive jurisdiction," Congress did not intend to cover the field.

Kalshi is also wrong to claim that, while 7 U.S.C. § 13a-2 grants States the right to sue for violations of the Commodity Exchange Act, they cannot bring claims against designated contract markets. Under § 13a-2(8)(A), States may bring actions against designated contract markets for violations of the Commodity Exchange Act's antifraud provisions, and § 13a-2(7) preserves state officials' right to sue for

violations of general state civil or criminal antifraud statutes. Kalshi's textual argument thus is incorrect.

Lacking textual support, Kalshi contends that one of Congress's principal purposes in granting the CFTC exclusive jurisdiction was to end state gambling regulation of commodity futures trading. Appellant's Br. 42-43. But Kalshi cites nothing to support the notion that Congress, in granting exclusive jurisdiction to the CFTC, intended to preempt state sports wagering law in particular or gambling law in general. In fact, the very authority that Kalshi cites explains that States' commodity futures regulation and enforcement declined after the 1930s, to the point where they had largely abandoned using their bucket shop and gambling laws when Congress created the CFTC in 1974. Van Wart, 58 Chi.-Kent L. Rev. at 671. By this time, Congress's primary concern was not preempting state gambling laws because "state regulation of commodities trading was almost nonexistent." *Id.* at 673.

To the extent Congress was concerned at all about state regulation, the concern was over States that had recently begun applying securities laws to commodity futures transactions. *Id.* at 671, 676-77. It was in this context that, as explained at pages 22-27 above, Congress chose to give the CFTC exclusive jurisdiction over commodity futures to delineate between commodity futures and securities regulation.

Furthermore, although Congress did repeal a state antifraud savings clause when it amended the Commodity Exchange Act in 1974, it did not manifest clear field-preemptive intent in doing so. The savings clause in then-existing § 4c provided that the 1936 Act's prohibition on a variety of fraudulent and deceptive practices did not impair any state law applicable to such transactions. Commodity Exchange Act, Pub. L. No. 74-675, § 4c, 49 Stat. 1491 (1936). Had this savings clause stood, States could have continued to enforce their securities laws against commodity futures. Indeed, Senator Curtis, who requested this provision's repeal, previously noted that he understood "that the intent of the bill is to grant exclusive jurisdiction over commodity futures trading to the new Commission, except to the extent the bill specifies that other Federal and State agencies and Federal and State courts are to retain jurisdiction." 120 Cong. Rec. 30,171, 30,464 (daily ed. Sept. 9, 1974) (statement of Senator Curtis).

Nor is Kalshi correct to claim that the district court's decision creates a "gambling exception" to the Commodity Exchange Act that threatens the CFTC's ability to regulate commodity futures. *See* Appellant's Br. 41-46. The district court held only that sports wagering laws were not preempted by the Commodity Exchange Act. The Act's express preemption provisions in § 16(e) still apply to commodity futures, preempting state gaming and bucket shop laws and allowing state law to apply only to unregistered activity.

42

Alternatively, Kalshi argues that the exclusive-jurisdiction provision *expressly* preempts state law. Appellant's Br. 60-61. Kalshi did not make this argument below, so this Court should not consider it. Regardless, it is wrong on the merits. "Express preemption requires an explicit statement of federal law that announces and defines the scope of displaced state regulation." *Transcontinental Gas Pipe Line Co., LLC v. Pennsylvania Envt'l Hearing Bd.*, 108 F.4th 144, 151-52 (3d Cir. 2024). When Congress intends to expressly preempt state law, it does so in clear terms. *See, e.g.*, 5 U.S.C. § 8902(m)(1) ("The terms of any contract under this chapter which relate to the nature, provision, or extent of coverage or benefits . . . shall supersede and preempt any State or local law, or any regulation issued thereunder, which relates to health insurance or plans."); 29 U.S.C. § 1144(a) (stating that ERISA's provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title"). Indeed, the Commodity Exchange Act itself confirms that Congress knows how to preempt state law expressly, because the Act did just that for certain transactions in § 16(e)(2) and § 16(h) . Far from "an explicit statement of federal law that announces and defines the scope of displaced state regulation," *Transcontinental Gas*, 108 F.4th at 151-52, the Act's exclusive-jurisdiction provision uses just those two words—"exclusive jurisdiction"—and then expressly *preserves* state law and state-court jurisdiction, 7

43

U.S.C. § 2(a)(1)(A), in addition to incorporating state law in the Special Rule. This language cannot support express preemption.

### E. Maryland's Sport Wagering Laws Are Not Conflict-Preempted.

Conflict preemption requires a showing that compliance with both state and federal law is impossible, *see, e.g.*, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963), or that state law stands as an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Kalshi can make neither showing: Complying with Maryland laws would neither "be impossible for a nationwide exchange," Appellant's Br. 57, nor "frustrate Congress' intent to bring the markets under a uniform set of regulations," Appellant's Br. 58 (internal citations omitted).

### 1. Kalshi Can Comply with Both the Commodity Exchange Act and Maryland Sports Wagering Laws.

The impossibility prong of conflict preemption applies when a regulated entity effectively faces mutually exclusive commands from state and federal regulation, such that obeying one necessitates violating the other. *See, e.g.*, *Guthrie v. PHH Mortg. Corp.*, 79 F.4th 328, 337 (4th Cir. 2023) ("Under direct conflict preemption, we ask whether compliance with federal and state laws is impossible."). By contrast, if a party can comply with both state and federal law by adhering to a stricter state standard, state law is not preempted unless Congress has explicitly

44

prohibited States from regulating more strictly. *Florida Lime*, 373 U.S. at 142-43. Nothing in the record here supports Kalshi's claim that compliance with Maryland sports wagering law and the Commodity Exchange Act is "impossible for a nationwide exchange." Appellant's Br. 57.

Indeed, the Commodity Exchange Act and Maryland's sports wagering laws govern categorically different realms. The Commodity Exchange Act facilitates free and fair market transactions in commodity futures and swaps, while Maryland's sports wagering laws regulate a vice activity. As the district court concluded, Kalshi can simply obtain a license to offer sports wagering in Maryland and comply with the State's relevant sports wagering laws while still operating as a designated contract market under the CFTC. (J.A. 175); *see* State Gov't §§ 9-1E-01 – 9-1E-17.

Kalshi, for its part, identifies nothing in Maryland's sports wagering laws that would require any action that the Commodity Exchange Act prohibits. *See* Appellant's Br. 56-59. To the contrary, Maryland affirmatively requires that "wagers on sporting events" be "in accordance with applicable federal and State laws." State Gov't § 9-1E-13(a). Thus, far from making it impossible to comply with the Commodity Exchange Act, Maryland *requires* a designated contract market to do so if it wishes to engage in sports wagering in the State.

Kalshi does assert that it cannot comply with the Commodities Exchange Act's requirements for the settlement of contracts and limits on excessive

speculation and Maryland sports wagering laws' requirements for financial minimum cash reserves and wagering limits. Appellant's Br. 37-38. But these "conflicts" pose an inconvenience, not an impossibility, and thus cannot support a finding of conflict preemption. *See Florida Lime*, 373 U.S. at 142-43.

Alternatively, Kalshi claims that "Maryland law would limit Kalshi to operating in Maryland only, which would be impossible for a nationwide exchange." Appellant's Br. 57. That is incorrect: Maryland's sports wagering laws apply only to conduct within the State and require (among other things) that the wager "be initiated, received, and otherwise made within the State." State Gov't § 9-1E-13(a). Thus, as other interstate sports wagering licensees already do, Kalshi need only comply with Maryland's geofencing requirements to ensure that, for individuals located in Maryland and engaging in sports wagering on Kalshi's designated contract market, the transaction is completed wholly within the State. (J.A. 92-93.)

Kalshi is also incorrect to claim that the CFTC's "impartial access" rule prevents it from complying with both the Commodity Exchange Act and Maryland sports wagering laws. *See* Appellant's Br. 57 (citing 17 C.F.R. § 38.151(b)). That rule ensures transparent, impartial access criteria "applied in a non-discriminatory manner" and "comparable fee structures" among eligible participants, not compulsory service in jurisdictions where the underlying activity is illegal. *See* 17 C.F.R § 38.151(b). Further, as *Hendrick* observed, "it appears the CFTC would not

act against registered entities" who actively restrict access to designated contract markets through geofencing. 2025 WL 3286282, at *12.

Finally, Maryland has not (as Kalshi asserts) conceded that state gambling laws "conflict[] with" the CFTC's oversight. Appellant's Br. 17. For support, Kalshi cites a single sentence from the affidavit of Michael Eaton, Managing Director of the Maryland Lottery and Gaming Control Agency's Gaming Division. Appellant's Br. 2 (citing J.A. 89-90.) Read in context, Mr. Eaton's statement regarding "conflicts with state laws" is not a concession that Maryland's sports wagering laws are conflict-preempted by the Commodities Exchange Act. (J.A. 89-90.) Rather, the point is that *Kalshi's* application of the Commodity Exchange Act "bypasses state regulations designed to ensure fair play and consumer protection." (J.A. 89.) As an example, Mr. Eaton states that "[a]s a federally regulated prediction market, Kalshi has no responsible gaming framework in the traditional sense and allows individuals younger than 21 years old to participate in sports wagering." (J.A. 90.)

## 2. Maryland Sports Wagering Laws Are Not an Obstacle to the Commodity Exchange Act's Purposes.

As the district court concluded, Kalshi has not demonstrated obstacle preemption, either. (J.A. 174.) Obstacle preemption applies "where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Freightliner Corp. v. Myrick,* 514 U.S. 280, 287 (1995)

(quoting *Hines,* 312 U.S. at 67).  This occurs where state law "interferes with the methods by which the federal statute was designed to reach [its] goal." *Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824, 829–30 (4th Cir. 2010) (quoting *Gade v. National Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 103 (1992)) (internal quotation marks omitted).  Here, Maryland's gaming laws and their application to Kalshi do not stand as an obstacle to the CFTC's regulation of transactions on designated contract markets.  (J.A. 173-176.).

To begin, any effect of Maryland's sports wagering laws on the CFTC's regulation of designated contract markets "is but incidental to [Maryland's] regulation of" sports wagering.  *GenBioPro, Inc. v. Raynes*, 144 F.4th 258, 275-77 (4th Cir. 2025) (holding FDA regulation of minimum drug safety rules did not conflict with State's right to regulate abortion access within the State).  Maryland is not attempting to set margin or disclosure requirements for designated contract markets, and its wagering laws do not regulate or "directly affect trading on or the operation of a futures market." *American Agric. Movement*, 977 F.2d at 1156.  To the contrary, as explained at pages 22-32 above, the Commodity Exchange Act's text and legislative history affirmatively show that Maryland's sports wagering laws are *not* an obstacle to, or in conflict with, the CFTC's regulation of designated contract markets, in that Congress both incorporated and preserved the operation of state gaming law. *See Hines*, 312 U.S. at 67.

48

More broadly, Maryland's sports wagering licensing laws work in tandem with the Commodity Exchange Act, rather than acting as an obstacle to its purposes and objectives. To obtain a license, an applicant must demonstrate that it "is in the public interest" for the applicant to conduct its sports wagering business in Maryland. State Gov't § 9-1E-15(o). Similarly, Congress made evident its goal to avoid the public harm that sports wagering might cause by establishing a special procedure within the Commodity Exchange Act to determine if "gaming" related events contracts and swaps are in the "public interest." 7 U.S.C. § 7a-2(C)(5). Contrary to Kalshi's suggestion, *see* Appellant's Br. 38-39, there is no reason to think Congress meant the CFTC's public-interest determination to control for all purposes. Maryland's use of the police power to limit sports wagering to qualified licensees thus aligns with Congress's Special Rule.

Finally, Kalshi speculates that complying with Maryland's sports wagering law would "frustrate Congress' intent to bring the markets under a uniform set of regulations" and "lead to total chaos." Appellant's Br. 58 (quoting *American Agric.*, 977 F.2d at 1156). But Kalshi's characterization of that intent is oversimplified, and to assert that Congress intended to bring the markets under a uniform set of regulations is to assume the conclusion. Instead, as explained at pages 27-34 above, Congress's intent was to protect investors, increase transparency for the sorts of risks that precipitated the 2008 financial crisis, and distinguish the CFTC's regulatory

49

domain from that of the SEC and state securities regulators, all while preserving and even incorporating state law in important respects. As for "chaos," mere speculation that state laws pose a serious obstacle to the goals of federal law does not establish conflict preemption. *See Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 720 (1985). Kalshi's attempt to "[i]nvok[e] some brooding federal interest or appeal[] to a judicial policy preference should never be enough to win preemption of a state law." *Virginia Uranium*, 587 U.S. at 767.

### III. ALTERNATIVELY, THE DISTRICT COURT SHOULD BE AFFIRMED BECAUSE SPORTS WAGERS ARE NOT IN THE COMMODITY FUTURES TRADING COMMISSION'S EXCLUSIVE JURISDICTION.

The district court can also be affirmed on alternative grounds. The district court assumed that sports wagers were in the CFTC's exclusive jurisdiction as swaps—but sports wagers are not swaps.[2] This Court thus can affirm the denial of injunctive relief without deciding the preemptive effect of the CFTC's exclusive jurisdiction.

Congress added "swaps" to the CFTC's exclusive jurisdiction to increase regulation of the complex derivatives that contributed to the 2008 financial crisis.

---

[2] Kalshi's sports wagers are not within the CFTC's exclusive jurisdiction as "excluded commodities," either. *See* Appellant's Br. 12. First, the definition of "excluded commodity" mirrors the event-contract component of the definition of "swap," so Kalshi's sports wagers are not excluded commodities for the same reasons they are not swaps. *Compare* 7 U.S.C. § 1a(19)(iv), *with id.* § 1a(47)(A)(ii). Second, "excluded commodities" are not within the CFTC's exclusive jurisdiction in the first place. *See Hendrick*, 2025 WL 3286282, at * 9-12.

In so acting, Congress recognized that crises such as that one threatened economic stability even more than the commodities crises of the 1970s that led to the agency's formation. Congress defined swaps to include a range of instruments, including interest rate swaps, currency swaps, and credit default swaps. 7 U.S.C. § 1a(47)(A). Swaps also include a contract (generally termed an "event contract") "that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). Sports wagers are not swaps because (1) sports wagering is based on the outcome of an event, not its "occurrence"; and (2) that outcome, even if deemed an "occurrence," is not inherently joined or connected with a potential financial, economic, or commercial consequence. Decisions involving Kalshi's sports wagering contracts and those of a competitor have held as much, *see Hendrick*, 2025 WL 3286282, at *3-4, 6-9; *Crypto.com*, 2025 WL 2916151, at * 7-9, and there is no reason for this Court to conclude otherwise.

### A. Sports Wagers Are Based on the Outcome of an Event, Not Its Occurrence.

Event contract swaps must be "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency." 7 U.S.C. § 1a(47)(A)(ii) The "occurrence, nonoccurrence, or the extent of the occurrence" of an event refers to whether the event happened, did not happen, or happened to an extent. It is different from the *outcome* of the event, i.e., the event's result. *See Crypto.com*,

2025 WL 2916151, at *7-8 (surveying various dictionaries); *accord Hendrick*, 2025 WL 3286282, at *6. In sports, "[a]n ordinary American interpreting the word 'event' would conclude that the Kentucky Derby is an event[,] but who wins the Kentucky Derby is an outcome of that event, not a separate event in and of itself." *Crypto.com*, 2025 WL 2916151 at *8. Thus, a "swap" under the Commodity Exchange Act depends on whether (or the extent to which) an event occurs, not on the event's outcome.

Sports wagering contracts, such as Kalshi's, turn on the outcome of a sporting event—for instance, which team will win the game, or how well a player will perform—rather than on its occurrence. (J.A. 106 (initial listing of "Will <team> Win <title>?")); *see Crypto.com*, 2025 WL 2916151 at *9. For example, earlier this year, Kalshi's leading sports wager concerned the "Masters Tournament Winner." *Sports*, KALSHI, https://perma.cc/9SNV-3WUQ (captured Apr. 12, 2025). Kalshi's contracts thus are not sports *event* contracts; they are sports *outcome* contracts. (J.A. 112.) As the court concluded in *Crypto.com*, these "self-certified contracts therefore are not 'swaps' within the CFTC's exclusive jurisdiction." 2025 WL 2916151, at *9.

Interpreting "event" to include an outcome would belie the text's plain meaning and yield a practically unbounded definition. Not only would a sports wager become a "sports event contract," but a friendly wager about making a train

would become an "Amtrak event contract," and a casino game such as craps or roulette would become a "dice event contract" or a "wheel event contract." That cannot be what Congress intended.

Interpreting "event" to include an outcome, moreover, would result in event contracts subsuming other types of swaps. In addition to event contracts, the Commodity Exchange Act includes five other categories of swaps. *See* 7 U.S.C. § 1a(47)(A). One example from subsection (47)(A)(iii)(XV) is "credit default swaps." If "event" included an outcome, a credit default swap would qualify as an event contract (and therefore a swap), as it depends on the occurrence of an event (a default) associated with a potential financial, economic, or commercial consequence (credit). Kalshi's view of the definition of "event" thus would make other parts of the statute superfluous and should be avoided on that basis. *See Corley v. United States*, 556 U.S. 303, 314 (2009) (stating that a "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant").

### B.     The Outcomes of Sports Events Are Not Inherently Joined or Connected with a Potential Financial, Economic, or Commercial Consequence.

The "event" in an event contract swap must also be "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). "Associated" and "consequence" are important limiting terms.

"Associate[d]" means "join[ed] or connect[ed] together." *Associate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/associate (last visited Dec. 12, 2025). "Consequence" means "something produced by a cause or necessarily following from a set of conditions." *Consequence*, Merriam-Webster, https://www.merriam-webster.com/dictionary/consequence (last visited Dec. 12, 2025). Thus, a swap event must be "joined or connected together" with a potential financial, economic or commercial result "produced by a cause [i.e., the event] or necessarily following from" the event's occurrence.

Because the potential financial, economic, or commercial consequence must be inherently joined or connected to the event itself, it must be evident "without looking at externalities like potential downstream financial consequences." *Hendrick*, 2025 WL 3286282, at *6. Other swaps included in the statutory definition have this inherent connection. For example, an "interest rate swap," 7 U.S.C. § 1a(47)(A)(iii)(I), the most popular type of swap, allows two parties to exchange fixed and floating rates; the inherent result is cost-effective loans that further marketplace activity. *See* Shobit Seth, *Different Types of Swaps*, Investopedia, https://www.investopedia.com/articles/investing/052915/different-types-swaps.asp (last visited Dec. 12, 2025). Similarly, a currency swap, 7 U.S.C. § 1a(47)(A)(iii)(VII), allows a business to hedge foreign exchange risk efficiently, securing low-cost loans while hedging against interest rate fluctuations. *Id.* Unlike

events with mere downstream financial, economic, or commercial externalities, "the other subparts of the swap definition refer almost exclusively to financial measures, indices, or instruments." *Hendrick*, 2025 WL 3286282, at *7.

The outcome of a sports event, by contrast, has no inherent link to a potential financial, economic, or commercial consequence. Unlike (say) interest rates and currency exchanges, no marketplace underlies a sports wager. The only thing underlying the sports wager is a game. At the same time, the outcome of a game generally has no direct financial consequences. Even with a sports event as popular as golf's Masters Tournament, the financially interested parties (such as television networks and on-site vendors) profit equally from its occurrence regardless of who wins. As Kalshi has previously noted, sporting events are "staged for entertainment or to facilitate speculation for sport." Defendant's Motion for Summary Judgment at 27, *KalshiEX LLC v. CFTC*, No. CV 23-3257, 2024 WL 4164694, (D.D.C. Sept. 12, 2024).

Further, deeming externalities to be a "potential financial, economic, or commercial consequence" would yield a definition with no clear limiting principle. *See Epic Sys.*, 584 U.S. at 523 (noting that a "statute's meaning does not always turn solely on the broadest imaginable definitions of its component words."); *United States v. Lopez*, 514 U.S. 549, 565 (1995) (rejecting a "rationale [that] lacks any real limits because, depending on the level of generality, any activity can be looked upon

as commercial"). "Interpreting the statutory terms to include everything anyone can conjure up as a subject to bet on, or that might have some conceivable financial consequence if one is creative enough, is not a reasonable interpretation of the statute." *Hendrick*, 2025 WL 3286282, at *6.

Instead, sports wagers are consumer transactions. Sports wagers "involve a service provided to the consumer as entertainment." *Id.* at *8. The CFTC has commented that swaps do not include consumer transactions that have not historically been known to be swaps. Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48,208, 48,248 (Aug. 13, 2012). Thus, while swap events are associated with potential financial, economic, or commercial consequences, sports wagers are just "wagering money on an [outcome] that has no inherent economic value itself other than the money wagered." Mem. of Law in Support of Pl.'s Motion for Summary Judgment at 27, *KalshiEX LLC*, 2024 WL 4164694 (D.D.C. Sept. 12, 2024). Kalshi's sports event contracts are just bets and cannot be swaps.

## CONCLUSION

The judgment of the United States District Court for the District of Maryland should be affirmed.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ MAX F. BRAUER
_____

MAX F. BRAUER
Senior Assistant Attorney General
Enforcement Unit Chief
Office of the Attorney General
Securities Division
200 St. Paul Place
25th Floor
Baltimore, Maryland 21202
mbrauer@oag.state.md.us
(410) 576-6950

ERIK J. DELFOSSE
Senior Assistant Attorney General
Maryland Lottery and Gaming
 Control Agency
1800 Washington Blvd., Suite 330
Baltimore, Maryland 21230
erik.delfosse@maryland.gov
(410) 230-8726

*Attorneys for Appellees*

## REQUEST FOR ORAL ARGUMENT

The Appellees respectfully requests that the Court hear oral argument in this appeal because it involves a complicated federal statutory scheme and a challenge to a State's sovereign ability to enforce its own laws.

## CERTIFICATE OF COMPLIANCE

1.　　This brief complies with the type volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,917 words, excluding the parts of the brief exempted by Rule 32(f).

2.　　This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen-point, Times New Roman.

/s/ Max F. Brauer

_____

Max F. Brauer

## TEXT OF PERTINENT PROVISIONS

**7 U.S.C. § 1a.**
As used in this chapter:

\*    \*    \*

**(9) Commodity.**  The term "commodity" means wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles, except onions (as provided by section 13-1 of this title) and motion picture box office receipts (or any index, measure, value, or data related to such receipts), and all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) in which contracts for future delivery are presently or in the future dealt in.

\*    \*    \*

**(19) Excluded commodity.**  The term "excluded commodity" means--
    **(i)** an interest rate, exchange rate, currency, security, security index, credit risk or measure, debt or equity instrument, index or measure of inflation, or other macroeconomic index or measure;
    **(ii)** any other rate, differential, index, or measure of economic or commercial risk, return, or value that is--**(I)** not based in substantial part on the value of a narrow group of commodities not described in clause (i); or **(II)** based solely on one or more commodities that have no cash market;
    **(iii)** any economic or commercial index based on prices, rates, values, or levels that are not within the control of any party to the relevant contract, agreement, or transaction; or
    **(iv)** an occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity not described in clause (i)) that is--**(I)** beyond the control of the parties to the relevant contract, agreement, or transaction; and **(II)** associated with a financial, commercial, or economic consequence.

\*    \*    \*

**(47) Swap**

**(A) In general.** Except as provided in subparagraph (B), the term "swap" means any agreement, contract, or transaction--

**(i)** that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

**(ii)** that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence;

**(iii)** that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred, including any agreement, contract, or transaction commonly known as--

**(I)** an interest rate swap;

**(II)** a rate floor;

**(III)** a rate cap;

**(IV)** a rate collar;

**(V)** a cross-currency rate swap;

**(VI)** a basis swap;

**(VII)** a currency swap;

**(VIII)** a foreign exchange swap;

**(IX)** a total return swap;

**(X)** an equity index swap;

**(XI)** an equity swap;

**(XII)** a debt index swap;

**(XIII)** a debt swap;

**(XIV)** a credit spread;

**(XV)** a credit default swap;

60

**(XVI)** a credit swap;

**(XVII)** a weather swap;

**(XVIII)** an energy swap;

**(XIX)** a metal swap;

**(XX)** an agricultural swap;

**(XXI)** an emissions swap; and

**(XXII)** a commodity swap;

**(iv)** that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap;

**(v)** including any security-based swap agreement which meets the definition of "swap agreement" as defined in section 206A of the Gramm-Leach-Bliley Act (15 U.S.C. 78c note) of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein; or

**(vi)** that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v).

\*     \*     \*     \*

## 7 U.S.C. § 2

**(a)  Jurisdiction of Commission; Commodity Futures Trading Commission**

**(1) Jurisdiction of Commission**

**(A)  In general.** The Commission shall have exclusive jurisdiction, except to the extent otherwise provided in the Wall Street Transparency and Accountability Act of 2010 (including an amendment made by that Act) and subparagraphs (C), (D), and (I) of this paragraph and subsections (c) and (f), with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title. Except as hereinabove

61

provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

\*     \*     \*

**(d) Swaps.** Nothing in this chapter (other than subparagraphs (A), (B), (C), (D), (G), and (H) of subsection (a)(1), subsections (f) and (g), sections 1a, 2(a)(13), 2(c)(2)(A)(ii), 2(e), 2(h), 6(c), 6a, 6b, and 6b-1 of this title, subsections (a), (b), and (g) of section 6c of this title, sections 6d, 6e, 6f, 6g, 6h, 6i, 6j, 6k, 6*l*, 6m, 6n, 6*o*, 6p, 6r, 6s, 6t, 7, 7a-1, 7a-2, 7b, and 7b-3 of this title, sections 9 and 13b of this title, sections 13a-1, 13a-2, 12, 12a, and 13 of this title, subsections (e)(2), (f), and (h) of section 16 of this title, subsections (a) and (b) of section 13c of this title, sections 21, 24, 24a, and 25(a)(4) of this title, and any other provision of this chapter that is applicable to registered entities or Commission registrants) governs or applies to a swap.

**(e) Limitation on participation.** It shall be unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market under section 7 of this title.

\*     \*     \*     \*

**7 U.S.C. § 7a-2.**

\*     \*     \*

**(c) New contracts, new rules, and rule amendments**

\*     \*     \*

**(5) Approval.**

\*     \*     \*

**(C) Special rule for review and approval of event contracts and swaps contracts.**

**(i) Event contracts.**  In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(2)(i)[2] of this title), by a designated contract market or swap execution facility, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve--

**(I)** activity that is unlawful under any Federal or State law;

**(II)** terrorism;

**(III)** assassination;

**(IV)** war;

**(V)** gaming; or

**(VI)** other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

**(ii) Prohibition.** No agreement, contract, or transaction determined by the Commission to be contrary to the public interest under clause (i) may be listed or made available for clearing or trading on or through a registered entity.

**(iii) Swaps contracts.**

**(I) In general.**  In connection with the listing of a swap for clearing by a derivatives clearing organization, the Commission shall determine, upon request or on its own motion, the initial eligibility, or the continuing qualification, of a derivatives clearing organization to clear such a swap under those criteria, conditions, or rules that the Commission, in its discretion, determines.

**(II) Requirements.** Any such criteria, conditions, or rules shall consider-- **(aa)** the financial integrity of the derivatives clearing organization; and **(bb)** any other factors which the Commission determines may be appropriate.

> **(iv) Deadline.** The Commission shall take final action under clauses (i) and (ii) in not later than 90 days from the commencement of its review unless the party seeking to offer the contract or swap agrees to an extension of this time limitation.

\*      \*      \*      \*

## 7 U.S.C.A. § 13a-2.

**(1)** Whenever it shall appear to the attorney general of any State, the administrator of the securities laws of any State, or such other official as a State may designate, that the interests of the residents of that State have been, are being, or may be threatened or adversely affected because any person (other than a contract market, derivatives transaction execution facility, clearinghouse, floor broker, or floor trader) has engaged in, is engaging or is about to engage in, any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order of the Commission thereunder, the State may bring a suit in equity or an action at law on behalf of its residents to enjoin such act or practice, to enforce compliance with this chapter, or any rule, regulation, or order of the Commission thereunder, to obtain damages on behalf of their residents, or to obtain such further and other relief as the court may deem appropriate.

**(2)** The district courts of the United States, the United States courts of any territory, and the District Court of the United States for the District of Columbia, shall have jurisdiction of all suits in equity and actions at law brought under this section to enforce any liability or duty created by this chapter or any rule, regulation, or order of the Commission thereunder, or to obtain damages or other relief with respect thereto. Upon proper application, such courts shall also have jurisdiction to issue writs of mandamus, or orders affording like relief, commanding the defendant to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder, including the requirement that the defendant take such action as is necessary to remove the danger of violation of this chapter or of any such rule, regulation, or order. Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

**(3)** Immediately upon instituting any such suit or action, the State shall serve written notice thereof upon the Commission and provide the Commission with a copy of its complaint, and the Commission shall have the right to (A) intervene in the suit or action and, upon doing so, shall be heard on all matters arising therein, and (B) file petitions for appeal.

**(4)** Any suit or action brought under this section in a district court of the United States may be brought in the district wherein the defendant is found or is an

inhabitant or transacts business or wherein the act or practice occurred, is occurring, or is about to occur, and process in such cases may be served in any district in which the defendant is an inhabitant or wherever the defendant may be found.

**(5)** For purposes of bringing any suit or action under this section, nothing in this chapter shall prevent the attorney general, the administrator of the State securities laws, or other duly authorized State officials from exercising the powers conferred on them by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.

**(6)** For purposes of this section, "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States.

**(7)** Nothing contained in this section shall prohibit an authorized State official from proceeding in State court on the basis of an alleged violation of any general civil or criminal antifraud statute of such State.

**(8)(A)** Nothing in this chapter shall prohibit an authorized State official from proceeding in a State court against any person registered under this chapter (other than a floor broker, floor trader, or registered futures association) for an alleged violation of any antifraud provision of this chapter or any antifraud rule, regulation, or order issued pursuant to the chapter.

**(B)** The State shall give the Commission prior written notice of its intent to proceed before instituting a proceeding in State court as described in this subsection and shall furnish the Commission with a copy of its complaint immediately upon instituting any such proceeding. The Commission shall have the right to (i) intervene in the proceeding and, upon doing so, shall be heard on all matters arising therein, and (ii) file a petition for appeal. The Commission or the defendant may remove such proceeding to the district court of the United States for the proper district by following the procedure for removal otherwise provided by law, except that the petition for removal shall be filed within sixty days after service of the summons and complaint upon the defendant. The Commission shall have the right to appear as amicus curiae in any such proceeding.

\*      \*      \*      \*

**7 U.S.C. § 16**

\*       \*       \*

**(e) Relation to other law, departments, or agencies**

\*       \*       \*

> **(2)** This chapter shall supersede and preempt the application of any State or local law that prohibits or regulates gaming or the operation of bucket shops (other than antifraud provisions of general applicability) in the case of--
> **(A)** an electronic trading facility excluded under section 2(e) of this title; and
> **(B)** an agreement, contract, or transaction that is excluded from this chapter under section 2(c) or 2(f) of this title or sections 27 to 27f of this title, or exempted under section 6(c) of this title (regardless of whether any such agreement, contract, or transaction is otherwise subject to this chapter).

\*       \*       \*

**(h) Regulation of swaps as insurance under State law.** A swap-- (1) shall not be considered to be insurance; and (2) may not be regulated as an insurance contract under the law of any State.


**17 C.F.R. § 40.11 Review of event contracts based upon certain excluded commodities.**

**(a) Prohibition.** A registered entity shall not list for trading or accept for clearing on or through the registered entity any of the following:

**(1)** An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law; or

**(2)** An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which involves, relates to, or references an activity that is similar to an activity enumerated in § 40.11(a)(1) of this part, and that the Commission determines, by rule or regulation, to be contrary to the public interest.

**(b) [Reserved]**

66

**(c) 90–day review and approval of certain event contracts.** The Commission may determine, based upon a review of the terms or conditions of a submission under § 40.2 or § 40.3, that an agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), be subject to a 90–day review. The 90–day review shall commence from the date the Commission notifies the registered entity of a potential violation of § 40.11(a).

(1) The Commission shall request that a registered entity suspend the listing or trading of any agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), during the Commission's 90–day review period. The Commission shall post on the Web site a notification of the intent to carry out a 90–day review.

(2) Final determination. The Commission shall issue an order approving or disapproving an agreement, contract, transaction, or swap that is subject to a 90–day review under § 40.11(c) not later than 90 days subsequent to the date that the Commission commences review, or if applicable, at the conclusion of such extended period agreed to or requested by the registered entity.

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

|  |  |
|---|---|
| | * |
| KALSHIEX, LLC, | |
| | * |
| *Plaintiff-Appellant*, | |
| v. | *   No. 25-1892 |
| | * |
| JOHN A. MARTIN, *et al*., | * |
| | |
| *Defendants-Appellees*. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## CERTIFICATE OF SERVICE

I certify that, on this 15th day of December, 2025, the Brief of Appellees was filed and served electronically on counsel of record who are registered CM/ECF users.

/s/ Max F. Brauer

_____

Max F. Brauer