**Case No. 25-1892**

---

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**KALSHIEX LLC,**

*Plaintiff-Appellant*

**v.**

**JOHN MARTIN,** *et al.*,

*Defendants-Appellees*

---

On Appeal from the United States District Court
for the District of Maryland
(1:25-cv-01283-ABA)

---

**AMICUS BRIEF BY STOP PREDATORY GAMBLING, TEXANS AGAINST GAMBLING, AND THE ASSOCIATION OF AMERICAN PHYSICIANS AND SURGEONS IN SUPPORT OF DEFENDANTS-APPELLEES AND IN SUPPORT OF AFFIRMANCE**

---

Andrew L. Schlafly
939 Old Chester Rd.
Far Hills, NJ 07931
908-719-8608
908-934-9207 (fax)

*Attorney for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amici Curiae* Stop Predatory Gambling and the Association of American Physicians and Surgeons are non-profit corporations that have no parent corporations, and no publicly held corporation owns 10% or more of any of their stock.

*Amicus Curiae* Texans Against Gambling is a d/b/a/ of Texans Who Care, a non-profit corporation that has no parent corporations, and no publicly held corporation owns 10% or more of any of its stock.

/s/ Andrew L. Schlafly
*Counsel for Amici Curiae*

ii

# TABLE OF CONTENTS

Page

Corporate Disclosure Statement ............................................................... ii

Table of Contents ................................................................................... iii

Table of Authorities ...............................................................................iv

Identity, Interest and Authority to File .....................................................1

Summary of Argument ............................................................................3

Argument ...............................................................................................7

    I. Amid a Pandemic of Commercialized Gambling and Immense Harm Caused by It, There is a Strong Public Interest Against Kalshi's Motion for a Preliminary Injunction ........................................................................8

        A. The Immense Harm to Individuals Caused by Unrestricted Commercialized Gambling .......................................................8

        B. The Harm Caused by Unrestricted Gambling to Our Institutions Further Tilts the Public Interest Against Kalshi Here.............................15

        C. The Public Interest Has Not Shifted in Favor of Gambling Due to States' Legalizing Limited Types of Sports Gambling ..........................22

    II. *Murphy v. NCAA* Confirmed State Authority Over Gambling, Which Kalshi Fails to Distinguish ...............................................................23

    III. Kalshi's Argument Seeks an Unjustified Override of State Regulation of Gambling, Without the Required Clear Authority from Congress . ..............26

Conclusion ..........................................................................................29

Certificate of Compliance .......................................................................30

# TABLE OF AUTHORITIES

**Cases**                                                                        Page(s)

*Allen v. Hearn*, 99 Eng. Rep. 969, 1 T.R. 56 (1785) ...............................21

*Ball v. Gilbert*, 53 Mass. 397 (1847) ....................................................21

*Consol. Mfg. Co. v. Fed. Trade Com.*, 199 F.2d 417 (4th Cir. 1952) .....................14

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).................................25

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...........................................3

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000).........................29

*Feitler v. Fed. Trade Com.*, 201 F.2d 790 (9th Cir. 1953) ...................................14

*Gregory v. Ashcroft*, 501 U.S. 452 (1991)................................................................24

*Hest Techs. v. State ex rel. Perdue*, 366 N.C. 289,
    749 S.E.2d 429 (2012)...........................................................................28

*Idaho v. Coeur D'Alene Tribe*, 794 F.3d 1039 (9th Cir. 2015) .............................28

*KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 2025 U.S. Dist. LEXIS
    147815 (D. Md. 2025) ...................................................................6, 27

*MCI Telecommunications Corp.* v. *American Telephone & Telegraph Co.,*
    512 U.S. 218 (1994).......................................................................28, 29

*Murphy v. NCAA*, 584 U.S. 453 (2018)........................................ iii, 1, 6, 22, 23, 24

*New York v. United States*, 505 U.S. 144 (1992)....................................................24

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) ........................................26

*Springer v. Henry*, 435 F.3d 268 (3d Cir. 2006)....................................................3

*Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014)...........................................7

*West Virginia v. EPA*, 597 U.S. 697 (2022) ...........................................................7

*WV Ass'n of Club Owners & Fraternal Servs. v. Musgrave*,
    553 F.3d 292 (4th Cir. 2009) ...........................................................26

**Constitutions, Statutes, Regulation, and Rule**

U.S. CONST., art. VI, cl. 2 ....................................................................25

18 U.S.C. § 1084 ..................................................................................24

18 U.S.C. § 1952..................................................................................24

18 U.S.C. § 1953 ....................................................................................24

18 U.S.C. § 1955 ....................................................................................24

IDAHO CONST. Art. III, § 20 ..................................................................28

MARYLAND CONST. Article XIX ..............................................................26

Md. Code Ann., Crim. Law § 10-136 ......................................................11

Md. Code Ann., Elec. Law § 16-902 ........................................................20

N.J.S.A. § 5:12-119 ................................................................................11

Utah Code Ann. § 76-10-1102(1) ............................................................24

Md. Code Regs. 36.10.13.44....................................................................11

FED. R. APP. P. 29(A)(4)(E) ....................................................................1

**Other Authorities**

American Gaming Association, "National Economic Impact of the U.S.
        Gaming Industry 2023" (Oct. 9, 2023)
        https://www.americangaming.org/resources/national-economic-
        impact-of-the-u-s-gaming-industry/ ............................................27

American Gaming Association, "New Updates to AGA Responsible
        Marketing Code for Sports Wagering Prohibit "Risk Free," Enhance
        College-Aged Protections" (Mar. 28, 2023)
        https://www.americangaming.org/new-updates-to-aga-responsible-
        marketing-code-for-sports-wagering-prohibit-risk-free-enhance-
        college-aged-protections/ ............................................................11

M. Arain, et al., "Maturation of the adolescent brain,"
        9 *Neuropsychiatr Dis Treat*., 449 (Apr. 3, 2013)
        https://pmc.ncbi.nlm.nih.gov/articles/PMC3621648/ ............10, 11

Associated Press, "Cleveland Guardians pitchers Emmanuel Clase and
        Luis Ortiz face May trial date in gambling case,"
        *NBC News* (Dec. 2, 2025).
        https://www.nbcnews.com/sports/baseball/cleveland-guardians-
        pitchers-emmanuel-clase-luis-ortiz-face-may-trial-rcna247036 ............ 16-17

Dan Bernstein, "Chalky March Madness Slams Sportsbooks but Spares
        Kalshi," *Sportico* (April 8, 2025) ("*Sportico*")
        https://www.sportico.com/business/sports-betting/2025/march-
        madness-sports-betting-results-1234846724/................................22

D. Boland, "Sports betting demographics in the U.S.," *Birches Health*
(Feb. 28, 2024)
https://bircheshealth.com/resources/sports-betting-demographics-
in-the-u-s....................................................................................13

Mike Breen, "Best Political Betting Sites: Legal Election
Markets in the US," *Politics PA* (Dec. 14, 2025)
https://www.politicspa.com/best-political-betting-sites/ ............................22

Cleveland Clinic, "How Super Bowl stress can affect your heart,"
*Newsroom* (Feb. 5, 2025)
https://newsroom.clevelandclinic.org/2025/02/05/how-super-bowl-
stress-can-affect-your-heart...........................................................15

Charles T. Clotfelter & Philip J. Cook, *Selling Hope*
(Nat'l Bur. Econ. Research, Harvard Univ. Press 1989)...............................13

Jonathan D. Cohen, "Where are all the anti-gambling Christians?"
ARC Religion, Politics, Etc. (May 15, 2025)
https://arcmag.org/where-are-all-the-anti-gambling-christians/ ..................13

Brian Curcio, "Gambling Away Our Students' Futures,"
*Fortune* (Dec. 9, 2024)
https://www.forbes.com/sites/yassprize/2024/12/09/gambling-away-our-
students-futures/....................................................................6

Roger Ebert, "More than a game" (Oct. 8, 2004)
https://www.rogerebert.com/reviews/friday-night-lights-2004 ...................19

Jose Enrico, "Online Gambling Boom Over? Major States Hit Pause Amid
Job Loss Fears, Addiction Warnings," *Tech Times* (Oct. 16, 2024).
https://www.techtimes.com/articles/307890/20241016/online-
gambling-boom-over-major-states-hit-pause-amid-job-loss-fears-
addiction-warnings.htm..............................................................4

*The Federalist No. 51* (J. Madison)
https://avalon.law.yale.edu/18th_century/fed51.asp ...............................24

T.W. Fong, "The biopsychosocial consequences of pathological gambling,"
2 *Psychiatry* (Edgmont) 22-30 (2005)...............................................9

"Gambling policy ballot measures"
https://ballotpedia.org/Gambling_policy_ballot_measures..........................25

Jeffrey Steven Gordon, "Silence for Sale," 71 Ala. L. Rev. 1109 (2020)...............21

David Huber, "Kalshi Review – How does it work and is it any good?" *Props*
https://props.com/sportsbook/kalshi/review/.................................................12

ICD10Data.com. "Gambling and betting." ICD10Data.com
https://www.icd10data.com/ICD10CM/Codes/Z00-Z99/Z69-Z76/Z72-
/Z72.6#:~:text=Code%20POA%20Exempt-
,Z72.,a%20diagnosis%20for%20reimbursement%20purposes ....................10

Philip F. Johnson, *The Commodity Futures Trading Commission Act:
Preemption as Public Policy*, 29 Vand. L. Rev. 1 (1976)
https://scholarship.law.vanderbilt.edu/vlr/vol29/iss1/1/.........................25, 26

John W. Kindt, "The Failure to Regulate the Gambling Industry Effectively:
Incentives for Perpetual Non-Compliance," 27 S. Ill. U. L. J. 219 (2003)...13

John W. Kindt, "Legalized Gambling Activities as Subsidized by Taxpayers,"
48 Ark. L. Rev. 889 (1995) .........................................................................12

John W. Kindt, "U.S. National Security and the Strategic Economic Base:
The Business/Economic Impacts of the Legalization of Gambling
Activities," 39 St. Louis L.J. 567 (1995).....................................................13

Paula Lavigne, "Youth coaches face gambling charges," ESPN (Oct. 29, 2012)
https://www.espn.com/espn/otl/story/_/id/8568724/nine-south-florida-
youth-football-coaches-face-gambling-charges .....................................19, 20

C. Morris, "Super Bowl Monday will soar 40% over last year as more people
than ever call out of work to recover," *Fortune* (Feb. 10, 2025)
https://fortune.com/2025/02/10/office-absences-super-bowl-monday/ ........15

"NBA gambling investigation: Latest statements, updates,"
*ESPN* (Nov. 25, 2025)
https://www.espn.com/nba/story/_/id/46710738/nba-gambling-
investigation-live-updates-latest-arrests-statements-more ...........................18

"NFHS 'concerned' about Supreme Court decision on sports betting"
(May 17, 2018) ..............................................................................................7

Dana O'Neil and Kevin Dotson, "NCAA finds 6 players from 3 schools
involved in fixing games," *CNN* (Nov. 7, 2025)
https://www.cnn.com/2025/11/07/sport/basketball-ncaa-bans-6-
athletes-gambling-investigation.....................................................................17

E.T. Ozel-Kizil, "A case of frontotemporal dementia with amyotrophic lateral
sclerosis presenting with pathological gambling,"
9 *J Clin Neurol* 133-137 (2013)
https://pmc.ncbi.nlm.nih.gov/articles/PMC3633192/ ....................................9

David Purdum, "Ex-college basketball player admits to role in
     point-shaving scheme," *ESPN* (Nov. 17, 2025)
     https://www.espn.com/mens-college-basketball/story/_/id/46999646/
     ex-college-basketball-player-admits-role-point-shaving-scheme ...............17

David Purdum, "Legal NFL betting estimated to reach high of $30B
     in 2025" (Aug. 28, 2025)
     https://www.espn.com/nfl/story/_/id/46096617/legal-nfl-betting-
     estimated-reach-high-30b-2025....................................................................5

"Public Question 1, Sports Betting on State College Athletics Amendment
     (2021)" https://ballotpedia.org/New_Jersey_Public_Question_1,_Sports_
     Betting_on_State_College_Athletics_Amendment_(2021)..........................23

Jasper Sherer, "Casino and sports betting companies press for a win in Texas
     despite Senate opposition," *Texas Tribune* (Feb. 11, 2025)
     https://www.texastribune.org/2025/02/11/texas-legislature-gambling-
     casinos-sports-betting/ ...............................................................................2

E. Sohn, "How gambling affects the brain and who is most vulnerable to
     addiction," American Psychological Association (July 1, 2023)
     https://www.apa.org/monitor/2023/07/how-gambling-affects-the-
     brain#:~:text=Research%20suggests%20that%20people%20who%
     20are%20young,Related%20to%20emotional%20learning%20and
     %20stress%20regulation ............................................................................9

"Sports gambling scandal timeline: from Jontay Porter to Terry Rozier," ESPN
     (Jan. 31, 2025)
     https://www.espn.com/espn/betting/story/_/id/39908218/a-line-sports-
     gambling-scandals-2018 ............................................................................18

Ryan Young, "Multiple college basketball programs linked to federal
     investigation amid NBA gambling ring probe,"
     *Yahoo Sports* (Feb. 3, 2025)
     https://sports.yahoo.com/multiple-college-basketball-programs-
     linked-to-federal-investigation-amid-nba-gambling-ring-probe-
     204332209.html ................................................................................... 17-18

World Health Organization, "Gambling" (Dec. 2, 2024)
     https://www.who.int/news-room/fact-sheets/detail/gambling .......................8

WorldAtlas, "Countries That Gamble The Most" (2023)
     https://www.worldatlas.com/society/countries-that-gamble-the-
     most.html ....................................................................................................4

## IDENTITY, INTEREST AND AUTHORITY TO FILE[1]

*Amicus curiae* Stop Predatory Gambling is a nonprofit national organization that for decades has advocated for improving the lives of the American people by exposing the harms from state-sanctioned gambling. In 2008 it held a much-acclaimed conference at the National Harbor in Maryland which featured anti-gambling speakers including Taylor Branch, a Pulitzer Prize-winning biographer of the Rev. Martin Luther King Jr. and historian of the civil rights movement, and Bishop John R. Schol, who at the time was the head of the Baltimore/Washington United Methodist Conference. Stop Predatory Gambling led a remarkably diverse coalition, which included the Center for Popular Democracy, the Islamic Society of North America, Public Good Law Center, Public Health Advocacy Institute, United for a Fair Economy, Louisiana Baptist Convention, and the Lutheran Church – Missouri Synod, in an amicus brief filed in the landmark case of *Murphy v. NCAA*, and their amicus brief was cited favorably by the Supreme Court majority opinion. 584 U.S. 453, 460 n.16 (2018).

*Amicus curiae* Texans Against Gambling is a group of volunteers devoted to preventing the expansion of gambling. Founded in 1988 as Texans Who Care,

---

[1] All parties have consented to the filing of this amicus brief. Pursuant to FED. R. APP. P. 29(a)(4)(E), undersigned counsel certifies that: counsel for the *Amici* authored this brief in whole; no counsel for a party authored this brief in any respect; and no person or entity – other than *Amici*, their members, and their counsel – contributed monetarily to this brief's preparation or submission.

Texans Against Gambling operates as a d/b/a of this nonprofit Texas corporation. It strives to improve lives by freeing victims of predatory gambling from the lower standard of living, exploitation, and fraud that it causes. In part due to the efforts of volunteers associated with this group and many other groups, the State of Texas continues to prohibit sports gambling as ten other states do, despite immense political pressure to allow it. The precedent to be set by this Court concerning nationwide gambling on the platform of Plaintiff KalshiEX LLC ("Kalshi") could enable it to bypass Texas laws against gambling. Earlier this year Texans Against Gambling was quoted as saying that:

> Sports gambling and casinos are economically regressive, scholarly studies show, because they produce nothing of external value. They do not spur longterm economic growth. Instead they hinder it. Keep Texas, Texas.

Jasper Sherer, "Casino and sports betting companies press for a win in Texas despite Senate opposition," *Texas Tribune* (Feb. 11, 2025).[2] Texans Against Gambling stands for the legal principle that gambling issues should be resolved politically at the state level. *Id.* The possibility of entirely bypassing state laws and regulations by Kalshi offering the equivalent of wagers on sporting events and even elections is contrary to the interests of Texans Against Gambling.

---

[2] https://www.texastribune.org/2025/02/11/texas-legislature-gambling-casinos-sports-betting/ (viewed Dec. 13, 2025).

The Association of American Physicians and Surgeons (AAPS) is a national nonprofit membership organization founded in 1943, and its motto is "all for the patient." U.S. Supreme Court Justices and U.S. Courts of Appeal have utilized amicus briefs filed by AAPS. *See, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570, 704 (2008) (Breyer, Stevens, Souter, and Ginsburg, JJ., dissenting); *Springer v. Henry*, 435 F.3d 268, 271 (3d Cir. 2006). Members of AAPS have testified at many state legislative committee hearings on health and medical issues concerning the American public. AAPS members see first-hand the harm being caused by the growing pandemic of commercialized gambling.

*Amici* have a direct interest in opposing the override of many state constitutions, laws and regulations that prohibit or limit commercialized gambling, as attempted by Kalshi in this lawsuit.

## SUMMARY OF ARGUMENT

The public interest – a fundamental factor in deciding a motion for a preliminary injunction – is strongly against nationwide gambling as sought here by Kalshi in circumvention of state restrictions. Gambling has real victims, millions of them, who suffer substantial medical and financial harm. Our institutions would also suffer from what Kalshi seeks. The district court correctly referred to excessive gambling as an "addiction", which Maryland properly protects against. Allowing Kalshi to bypass decades of legislative and regulatory action by

3

Maryland on this important issue would be sharply contrary to the public interest, and thus Kalshi's motion for a preliminary injunction was correctly denied below. Affirmance can be on any ground, and the public interest against predatory commercialized gambling should be a basis for affirming here.

The rate of suicide by gamblers is an estimated 15 times the overall population. Online casino gambling is "as deadly as heroin and cocaine are," testified *Amicus* Stop Predatory Gambling national director Les Bernal in 2024 in opposing its expansion in New York.[3] Physical harm caused by gambling includes cardiovascular disease, hypertension, peptic ulcer disease, and loss of sleep. Research further suggests a link between gambling and dementia, and also Parkinson's disease. Psychiatric harm induced by gambling includes severe depression, anxiety and substance use disorders, and intense feelings of shame. Financial losses inflicted by gambling exceed $115 *billion* annually in the United States today,[4] harming demographics that can least afford it and regressively

---

[3] Jose Enrico, "Online Gambling Boom Over? Major States Hit Pause Amid Job Loss Fears, Addiction Warnings," *Tech Times* (Oct. 16, 2024). https://www.techtimes.com/articles/307890/20241016/online-gambling-boom-over-major-states-hit-pause-amid-job-loss-fears-addiction-warnings.htm (viewed Dec. 13, 2025).

[4] WorldAtlas, "Countries That Gamble The Most" (2023) https://www.worldatlas.com/society/countries-that-gamble-the-most.html (viewed Dec. 13, 2025).

transferring wealth from the poor to the rich. Wagering on NFL games alone is predicted to increase to $30 *billion* this 2025-2026 season.[5]

Maryland and every state have long traditions and experience in reducing or eliminating the harm caused by predatory gambling, which has recently become a pandemic fueled by technology. Two states on opposite sides of the political spectrum, Hawaii and Utah, completely ban all gambling within their borders. Most states prohibit gambling by those under age 21, similar to how alcohol and cigarette purchases are prohibited below that age. The two most populous states, Texas and California, prohibit gambling on sports, as do a total of nearly a dozen states. Many states prohibit wagers by those having a conflict of interest, such as college athletes betting on their own games. Wagering on elections has long been prohibited nearly everywhere, as it was banned in England for centuries, but Kalshi promotes these bets, too, in violation of public policy.

In its quest for profits from gambling addiction, Kalshi seeks to bypass all state restrictions that have been in place for many decades. What used to require an infrequent trip to Las Vegas can now be done at home or school by teenagers with Kalshi's platform and a few touches on their ubiquitous Apple or Android phones. As one commentator observed a year ago, with the problem worsening since then:

---

[5] David Purdum, "Legal NFL betting estimated to reach high of $30B in 2025" (Aug. 28, 2025) https://www.espn.com/nfl/story/_/id/46096617/legal-nfl-betting-estimated-reach-high-30b-2025 (viewed Dec. 11, 2025).

"The ease with which students can access online gambling is disturbing," explains Frank Murray, Director of Instructional Technology at Belton ISD in Texas. "It's no longer confined to casinos; it's on their phones, in their social media feeds, and even integrated into the sports they watch."

Brian Curcio, "Gambling Away Our Students' Futures," *Fortune* (Dec. 9, 2024).[6]

A police power is necessary to curb the predatory practices of gambling companies, but only states have a police power. The federal government does not. The U.S. Supreme Court struck down a federal law related to sports gambling because it "was a limitation on state legislatures," in Kalshi's own words. (Kalshi Br. 56, citing *Murphy v. NCAA*) This precedent supports Maryland here, as it should remain free to address gambling as it thinks best. The district court correctly applied the *Murphy* decision to reject Kalshi's motion for a preliminary injunction below. *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 2025 U.S. Dist. LEXIS 147815, *29 (D. Md. 2025) ("[A]s the Supreme Court has long recognized, states have strong interests in regulating gambling.") (citing *Murphy*).

States can and do prohibit gambling on high school sports, but Kalshi and other prediction market companies could offer this wagering. Former college and NBA basketball star Bill Bradley, also a U.S. Senator, declared in 2018:

I think the game will be corrupted. Do you really want to go to your son's high school basketball or football game and see people in the crowd who are

---

[6] https://www.forbes.com/sites/yassprize/2024/12/09/gambling-away-our-students-futures/ (viewed Dec. 10, 2025).

betting, who are not rooting for your child to win or lose, but are betting on a spread? It'll be pervasive.

"NFHS 'concerned' about Supreme Court decision on sports betting" (May 17, 2018).[7] State laws are the last safeguard keeping this travesty from occurring.

The vast expansion in gambling sought by Kalshi here is based on an imaginative new interpretation of an old statute. This runs afoul of major questions doctrine, which the Supreme Court has increasingly invoked to reject this approach in other contexts. *See, e.g.*, *Biden v. Nebraska*, 600 U.S. 477, 502-03 (2023) (The "eviction moratorium implemented by the Centers for Disease Control and Prevention triggered analysis under the major questions doctrine."); *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (while quoting Justice Kagan, the majority opinion emphasized that "we 'typically greet' assertions of 'extravagant statutory power over the national economy' with 'skepticism'") (quoting *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014)). This Court should reject Kalshi's brazen attempt to nationalize unlimited gambling, and instead affirm the longstanding authority of states to limit predatory commercialized gambling.

## ARGUMENT

The decision below was correct: Kalshi has not shown a likelihood of success on the merits, and thus is not entitled to a preliminary injunction. This

---

[7] https://www.highschoolot.com/story/nfhs-concerned-about-supreme-court-decision-on-sports-betting/17561561/ (viewed Dec. 19, 2025).

Court should affirm on the grounds stated by the district court, and on additional grounds set forth below. "We are, of course, entitled to affirm on any ground appearing in the record, including theories not relied upon or rejected by the district court." *Scott v. United States*, 328 F.3d 132, 137 (4th Cir. 2003) (citing *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).

**I.    Amid a Pandemic of Commercialized Gambling and Immense Harm Caused by It, There is a Strong Public Interest Against Kalshi's Motion for a Preliminary Injunction.**

The public interest weighs heavily against Kalshi's request for a preliminary injunction in at least two ways: the immense harm to individuals from unrestricted commercialized gambling, and its undermining of cherished institutions.

**A. The Immense Harm to Individuals Caused by Unrestricted Commercialized Gambling.**

The worsening public health crisis caused by commercialized gambling weighs heavily against granting a preliminary injunction to Kalshi.

The rate of suicide among gamblers is estimated to be 15 times the rate in the general population.[8] Relatively few — typically less than 10% — of addicted gamblers ever seek help to overcome their habit, so there is very little way to alleviate this harm once commercialized gambling is allowed.

---

[8] World Health Organization, "Gambling" (Dec. 2, 2024) https://www.who.int/news-room/fact-sheets/detail/gambling (viewed Dec. 13, 2025).

Significant physical health problems result from gambling, including "hypertension, sleep deprivation, cardiovascular disease, and peptic ulcer disease."[9] Psychiatric harm includes exacerbation and initiation of major depressive episodes, anxiety disorders, or substance use disorders, and intense shame, deceptive conduct, and rash decision-making.[10] Pathological gambling has also been linked to Parkinson's disease, frontotemporal dementia, and amyotrophic lateral sclerosis.[11]

The *Diagnostic and Statistical Manual of Mental Disorders Fifth Edition* ("DSM-5"), the standard used by U.S. mental health professionals, began classifying gambling addiction as an addictive disorder in 2013. Gambling addiction is the first and only behavioral addiction defined in the clinical section of *DSM-5*.[12] Like most other addictions, gambling requires increased participation over time to attain the same level of satisfaction, and withdrawal discomfort

---

[9] T.W. Fong, "The biopsychosocial consequences of pathological gambling," 2 *Psychiatry* (Edgmont) 22-30 (2005).

[10] *Id.*

[11] E.T. Ozel-Kizil, "A case of frontotemporal dementia with amyotrophic lateral sclerosis presenting with pathological gambling," 9 *J Clin Neurol* 133-137 (2013) https://pmc.ncbi.nlm.nih.gov/articles/PMC3633192/ (viewed Dec. 13, 2025).

[12] *See* E. Sohn, "How gambling affects the brain and who is most vulnerable to addiction," American Psychological Association (July 1, 2023). https://www.apa.org/monitor/2023/07/how-gambling-affects-the-brain#:~:text=Research%20suggests%20that%20people%20who%20are%20young,Related%20to%20emotional%20learning%20and%20stress%20regulation (viewed Dec. 13, 2025).

typically arises in those who attempt to overcome this addiction.[13] The ICD-10-CM, which is the International Classification of Diseases, Tenth Revision, Clinical Modification, is used for medical diagnoses and includes a code Z72.6 for "gambling and betting" disorders.[14]

Gambling by those under age 21 ("underaged gambling") is prohibited in Maryland on sports and in casinos, but Kalshi fully allows gambling by those as young as age 18. Alcohol and cigarette purchases are banned in every state by those under 21, and a ban on gambling by teenagers and 20-year-olds is common in nearly all states. "In fact, there are characteristic developmental changes that almost all adolescents experience during their transition from childhood to adulthood. It is well established that the brain undergoes a 'rewiring' process that is not complete until approximately 25 years of age." Mariam Arain, "Maturation of the adolescent brain," 9 *Neuropsychiatr Dis Treat.* 449, 449 (Apr. 3, 2013).[15] The lack of maturity for teenagers to smoke and drink also applies to gambling, as the prefrontal cortex is responsible for decision-making, planning, problem-

---

[13] *See id.*

[14] ICD10Data.com. "Gambling and betting." ICD10Data.com https://www.icd10data.com/ICD10CM/Codes/Z00-Z99/Z69-Z76/Z72-/Z72.6#:~:text=Code%20POA%20Exempt-,Z72.,a%20diagnosis%20for%20reimbursement%20purposes (viewed Dec. 13, 2025).

[15] https://pmc.ncbi.nlm.nih.gov/articles/PMC3621648/pdf/ndt-9-449.pdf (viewed Dec. 12, 2025).

solving, and controlling impulses and is not fully developed until age 25. "The

adolescent brain is structurally and functionally vulnerable to environmental stress,

risky behavior .…" *Id.* at 458-49.

Maryland law sensibly requires that:

(b)(1) Except as provided in paragraph (2) of this subsection, an individual
under the age of 21 years may not:
   (i) play a table game or video lottery terminal in a video lottery
   facility; or
   (ii) enter or remain in an area within a video lottery facility that is
   designated for table game or video lottery terminal activities.
(2) A video lottery employee who is an adult may enter or remain in an
area within a video lottery facility that is designated for table game or video
lottery terminal activities if the video lottery employee is working.

Md. Code Ann., Crim. Law § 10-136. In addition, Maryland regulations require

that: "Sports wagering by an individual younger than 21 years old is prohibited."

Md. Code Regs. 36.10.13.44.

Maryland law reflects the same 21-year-old age limit that is embraced and

encouraged by the American Gaming Association,[16] even though more profits for

its members could be obtained by accepting wagers by younger patrons. Other

states likewise have a minimum age of 21 for gambling, and punish underage

gambling as a disorderly persons criminal offense. *See, e.g.*, N.J.S.A. 5:12-119

---

[16] American Gaming Association, "New Updates to AGA Responsible Marketing
Code for Sports Wagering Prohibit "Risk Free," Enhance College-Aged
Protections" (Mar. 28, 2023) https://www.americangaming.org/new-updates-to-
aga-responsible-marketing-code-for-sports-wagering-prohibit-risk-free-enhance-
college-aged-protections/ (viewed Dec. 19, 2025).

11

(punishable by a fine of not less than $500 and not more than $1,000). Yet,

contrary to this public policy, Kalshi induces teenagers to gamble, and accepts

wagers by those aged 18 to 21.[17]

In addition to the health and social harm, the economic injuries inflicted by

commercialized gambling are also severe. The leading American expert on

gambling, Professor (now-emeritus) John W. Kindt, explains how regressive

gambling is financially:

> Gambling also has a tendency to attract those who can least afford it; it is
> well-established that legalized gambling activities act as a type of regressive
> tax on the poor and on minority groups. People living at the poverty level,
> often lacking an education which would enable them to understand the odds
> against winning, gamble with the hope of changing their lives. The statistics
> of lost paychecks, financial ruin, crime, incarceration, spousal abuse, child
> abuse and neglect, suicide, and other problems which have been documented
> by social-welfare agencies and charities should quickly dispel the notion that
> legalized gambling constitutes a painless tax. The reality is that
> legalized gambling fuels enormous social problems ….

John W. Kindt, "Legalized Gambling Activities as Subsidized by Taxpayers," 48

Ark. L. Rev. 889, 896-97 (1995) (footnotes omitted).

"Studies show that a state's legalization of online sports betting is associated

with increased bankruptcies and reduced savings, especially for low-income

---

[17] "Kalshi has become a revamped platform in 2025 that allows individuals aged 18 and above to place real-money predictions on just about any category that piques the public's interest within the United States." David Huber, "Kalshi Review – How does it work and is it any good?" *Props* https://props.com/sportsbook/kalshi/review/ (viewed Dec. 19, 2025).

households. Emerging evidence points to rising rates of problem gambling, particularly among young men." Jonathan D. Cohen, "Where are all the anti-gambling Christians?" *ARC Religion, Politics, Etc.* (May 15, 2025).[18] *See also* John W. Kindt, "U.S. National Security and the Strategic Economic Base: The Business/Economic Impacts of the Legalization of Gambling Activities," 39 St. Louis L.J. 567, 579 (1995) ("In the social-welfare context, legalized gambling is widely-accepted as constituting a regressive tax on the poor.") (citing Charles T. Clotfelter & Philip J. Cook, *Selling Hope* (Nat'l Bur. Econ. Research, Harvard Univ. Press 1989)).

In 2023, $49 billion (not merely million) was spent on table games and slot machines.[19] An estimated 26% of Americans gamble at a bricks-and-mortar casino, while 20% gamble on sporting events. "The United States has periodically experimented with legalized gambling activities. In each historical 'wave,' the social costs related to gambling became both apparent and overwhelming, consistently leading to the criminalization of all gambling activities." John W. Kindt, "The Failure to Regulate the Gambling Industry Effectively: Incentives for Perpetual Non-Compliance," 27 S. Ill. U. L. J. 219, 221 (2003).

---

[18] https://arcmag.org/where-are-all-the-anti-gambling-christians/ (viewed Dec. 19, 2025).
[19] D. Boland, "Sports betting demographics in the U.S.," *Birches Health* (Feb. 28, 2024)   https://bircheshealth.com/resources/sports-betting-demographics-in-the-u-s (viewed Dec. 19, 2025).

This Court has held that "[t]he gamblers and those who deliberately and designedly aid and abet them are both engaged in practices **contrary to public policy**." *Consol. Mfg. Co. v. Fed. Trade Com.*, 199 F.2d 417, 418 (4th Cir. 1952) (emphasis added). This Court's decision addressed the combination of merchandizing with gambling, which is not precisely the same as what is at issue here, but nevertheless this decision indicates that gambling is against the public interest. Indeed, a long line of precedents concerning actions taken by the Federal Trade Commission (FTC) are based on the recognition that inducing the public to gamble in order to buy certain goods is contrary to public policy. *See Feitler v. Fed. Trade Com.*, 201 F.2d 790, 793 (9th Cir. 1953) ("It is the fact that the interstate shipment of these devices facilitates a kind of merchandising which induces and encourages the public to gamble which makes such shipment an 'unfair trade practice.'") While in this and similar FTC cases a combination of gambling with merchandise sales was particularly objectionable – and the basis for FTC jurisdiction to enjoin it – the implicit holding of these decisions is that an inducement to gamble is contrary to the public interest.

The linkage of commercialized gambling to sports, as Kalshi offers in the form of "event contracts," is even more harmful and contrary to public policy than linking gambling to merchandise. Nicholas Ruthmann, M.D., a cardiologist for the Cleveland Clinic, explained that during the annual Super Bowl "the emotional

stress of watching the game can trigger surges of adrenaline. In turn, this can

elevate blood pressure, increase your heart rate and even provoke dangerous heart

rhythms—particularly in those with an underlying cardiovascular disease."[20] He

added that there is extensive documentation that major sporting events can increase

the risk of heart attacks.[21] Absenteeism the day after the Super Bowl in February

2025 increased by 40%, to an estimated record 22.6 million employed Americans

who failed to show up for work.[22] The added stress of gambling on the outcome

surely worsens these harms to public health, and the high emotional attachment by

fans of professional sports makes sports gambling a toxic combination.

### B. The Harm Caused by Unrestricted Gambling to Our Institutions Further Tilts the Public Interest Against Kalshi Here.

In addition to the immense individual harm resulting from unrestricted

commercialized gambling as described above, there is also severe harm to our

institutions. Kalshi welcomes wagers on elections, which Maryland and most states

prohibit, so the trend of corruption described below will soon undermine the

---

[20] Cleveland Clinic, "How Super Bowl stress can affect your heart," *Newsroom* (Feb. 5, 2025).
https://newsroom.clevelandclinic.org/2025/02/05/how-super-bowl-stress-can-affect-your-heart (viewed Dec. 19, 2025).
[21] *Id.*
[22] C. Morris, "Super Bowl Monday will soar 40% over last year as more people than ever call out of work to recover," *Fortune* (Feb. 10, 2025)
https://fortune.com/2025/02/10/office-absences-super-bowl-monday/ (viewed Dec. 19, 2025).

integrity of our political process if Kalshi's unlimited commercialized gambling is allowed. Candidates will be able to throw their elections for payouts from gamblers, or disgruntled betters could attempt to harm candidates at public events, in the desperate quest for wagering payoffs.

Major League Baseball had diligently prevented gambling from corrupting its game for more than a century after the scandal of the 1919 World Series, in which several Chicago White Sox players rigged their performances for a jackpot payout to gamblers by enabling the 5-1 underdog Cincinnati Reds to prevail in an enormous upset. *See, e.g.*, "Baseball's Original Sin: The Story of the Chicago Black Sox Scandal," *WTTW*.[23] As a result of the new permissiveness towards sports gambling that Kalshi seeks to vastly expand, two pitchers on the Cleveland Guardians have recently been arrested and charged in federal court with fixing pitches last summer for gamblers who had placed prop bets. "According to prosecutors, the two accepted thousands of dollars in bribes to help two unnamed gamblers in their native Dominican Republic win at least $460,000 on bets placed on the speed and outcome of their pitches." Associated Press, "Cleveland Guardians pitchers Emmanuel Clase and Luis Ortiz face May trial date in

---

[23] https://www.wttw.com/chicago-stories/black-sox-scandal/baseballs-original-sin-the-story-of-the-chicago-black-sox-scandal#:~:text=The%201919%20World%20Series%20was%20the%20site,gambling%20world%20that%20the%20fix%20was%20in. (viewed Dec. 12, 2025).

gambling case," *NBC News* (Dec. 2, 2025).[24] These accusations are a tragedy for the players and for every fan of America's Pastime, and apparently result from the sharp increase in sports gambling without adequate protections against corruption.

College basketball, in which players are financially struggling and thus particularly vulnerable to influence by gamblers, has suffered from multiple recent gambling scandals. One player candidly admitted on national television, *Good Morning America*, that he shaved points for gamblers because he had a newborn child and needed the cash. David Purdum, "Ex-college basketball player admits to role in point-shaving scheme," *ESPN* (Nov. 17, 2025) ("Former University of New Orleans men's basketball player Dae Dae Hunter acknowledged his role in a point-shaving scheme last season ….").[25] Alleged fixing of college basketball games in the NCAA has recently implicated many programs. "In September, the NCAA announced it was investigating 13 college basketball players from six named schools." Dana O'Neil and Kevin Dotson, "NCAA finds 6 players from 3 schools involved in fixing games," *CNN* (Nov. 7, 2025).[26] Since then the NCAA has banned multiple players for life, due to separate infractions. *Id. See also* Ryan

---

[24] https://www.nbcnews.com/sports/baseball/cleveland-guardians-pitchers-emmanuel-clase-luis-ortiz-face-may-trial-rcna247036 (viewed Dec. 12, 2025).
[25] https://www.espn.com/mens-college-basketball/story/_/id/46999646/ex-college-basketball-player-admits-role-point-shaving-scheme (viewed Dec. 12, 2025).
[26] https://www.cnn.com/2025/11/07/sport/basketball-ncaa-bans-6-athletes-gambling-investigation (viewed Dec. 12, 2025).

Young, "Multiple college basketball programs linked to federal investigation amid NBA gambling ring probe," *Yahoo Sports* (Feb. 3, 2025) ("The federal investigation into [this] gambling ring … has been linked to unusual betting activity with at least three men's college basketball programs.").[27]

The NBA has been rocked by multiple federal prosecutions of players and coaches in connection with allegations of illegal gambling. "The NBA's opening week was engulfed by news of a pair of federal investigations related to illegal sports betting and rigged poker games." "NBA gambling investigation: Latest statements, updates," *ESPN* (Nov. 25, 2025).[28] *See also* "Sports gambling scandal timeline: from Jontay Porter to Terry Rozier," *ESPN* (Jan. 31, 2025).[29]

Under Kalshi's requested injunction, Kalshi could offer bets by Maryland residents on high school games, setting the stage for tragedies of high school players being bribed and suicides resulting. In Texas, where sports gambling continues to be prohibited, high school football games are as big in many communities as professional sports, as featured in the acclaimed movie "Friday Night Lights" (2004). The movie depicts the obsession of residents of Odessa,

---

[27] https://sports.yahoo.com/multiple-college-basketball-programs-linked-to-federal-investigation-amid-nba-gambling-ring-probe-204332209.html (viewed Dec. 19, 2025).

[28] https://www.espn.com/nba/story/_/id/46710738/nba-gambling-investigation-live-updates-latest-arrests-statements-more (viewed Dec. 14, 2025).

[29] https://www.espn.com/espn/betting/story/_/id/39908218/a-line-sports-gambling-scandals-2018 (viewed Dec. 12, 2025).

Texas, with their high school football team as it strove to win the state championship. Renowned film critic Roger Ebert wrote that this "movie demonstrates the power of sports to involve us; we don't live in Odessa and are watching a game played 16 years ago, and we get all wound up." Roger Ebert, "More than a game" (Oct. 8, 2004).[30]

Youth sports is vulnerable to exploitation by commercialized gambling. "Nine youth football coaches or associates in South Florida are facing felony charges in connection with a system of rampant, elaborate and high-dollar gambling on *little league football*." Paula Lavigne, "Youth coaches face gambling charges," *ESPN* (Oct. 29, 2012) (emphasis added).[31] A state investigation found that:

> Though the games featured little boys, the gamblers made big bets, said Det. Solomon Barnes, whose confidential informant, along with undercover deputies, placed bets on youth football during the police investigation. Barnes said $20,000 was bet in a rivalry game between the Northwest Broward Raiders and the Fort Lauderdale Hurricanes a few weeks ago. And up to $100,000 would be bet on the youth leagues' championship games of the season, he said. … Sheriff Al Lamberti said deputies discovered a floor safe in the barbershop [used for placing these bets] that had $37,000 in cash in it.

---

[30] https://www.rogerebert.com/reviews/friday-night-lights-2004 (viewed Dec. 14, 2025).

[31] https://www.espn.com/espn/otl/story/_/id/8568724/nine-south-florida-youth-football-coaches-face-gambling-charges (viewed Dec. 19, 2025).

*Id.* Kalshi or another national provider of "event contracts" cannot screen for this harmful conduct at a local level.

Yet the worse may be yet to come. Allowing gambling on elections – as Kalshi does – invites a corruption of political campaigns. Maryland (and other states) properly prohibit betting on elections. The Maryland law states:

> § 16-902. Wagers on elections.
> (a) A person may not make a bet or wager on the outcome of an election held under this article.
> (b) A person who violates this section is guilty of a misdemeanor and on conviction is subject to a fine of not less than $50 nor more than $500 to be paid to the State.
> (c) Any deposit of money as a bet or a wager on the outcome of an election shall be forfeited and paid to the governing body of the county where the money is deposited.

Md. Code Ann., Elec. Law § 16-902.

For centuries the nearly unanimous view has been that wagers on elections violate public policy, extending back to English common law decisions:

> Although common law judges differed on whether wagering contracts contravened public policy, all agreed that *election* wagers violated democratic norms. In 1785, the full King's Bench held that a wager between two voters over the election of a member of Parliament was void. Whether the winner of the bet is entitled to recover, said Lord Mansfield,
>> turns on the species and nature of the contract; and if that be in the eye of the law corrupt, and against the fundamental principles of the constitution, it cannot be supported by any Court of Justice. One of the principal foundations of this constitution depends on the proper exercise of this franchise, that the election of members of Parliament should be free, and particularly that every voter should be free from pecuniary influence in giving his vote.
> The wager was therefore void because it placed the two voters under a pecuniary influence.

Jeffrey Steven Gordon, "Silence for Sale," 71 Ala. L. Rev. 1109, 1160-61 (2020) (footnotes omitted, quoting *Allen v. Hearn*, 99 Eng. Rep. 969, 971, 1 T.R. 56, 59-60 (1785)).

In the United States, the seminal decision on this was by the Massachusetts Supreme Judicial Court, explaining that allowing wagering on elections would have the detrimental effect that:

> all idea of social duty and personal responsibility [would be] overwhelmed in mere blind partisan feeling and desire of triumph, which lose sight of the object for which the right of suffrage is conferred. An election so influenced could not be regarded as the expressed will of an intelligent constituency; ***it would violate the whole theory, on which the right of suffrage is founded***, and destroy the confidence of all judicious persons in that particular power of the people, which has been regarded as the principal security for permanent, regulated, constitutional liberty. If it be true that wagers on elections would have any tendency to create such a pecuniary interest in their result, as we have no doubt they have, we can have no hesitation in saying, that ***all such wagers are illegal and utterly void***.

*Ball v. Gilbert*, 53 Mass. 397, 401-02 (1847) (emphasis added).

Kalshi's promotion of and welcoming of gambling on elections could result in candidates being harmed by disgruntled gamblers as an election approaches, or candidates themselves could be corrupted just as athletes are. This provides an additional compelling reason to affirm the denial of Kalshi's motion for a preliminary injunction.

## C. The Public Interest Has Not Shifted in Favor of Gambling Due to States' Legalizing Limited Types of Sports Gambling.

Kalshi unpersuasively argues that the public interest has shifted in favor of

its product as evidenced by roughly 39 states legalizing sports gambling, since the

*Murphy* decision allowed states to do so. Kalshi states that:

> CFTC [Commodity Futures Trading Commission] would deem such contracts contrary to the public interest when most states prohibited sports betting. The rapid legalization and growth of sports betting across the country since 2018 helps explain why the CFTC has allowed sports-event contracts in this very different landscape.

(Kalshi Br. 56) The flaw in Kalshi's argument is that no state, and certainly not

Maryland in its relevant statutes as quoted above, allow the unrestrained

commercialized gambling product that Kalshi offers, including betting by 18-year-

olds[32] and wagering on elections.[33]

New Jersey is included as a state that has legalized sports gambling, but in

fact it bans wagering on many types of sporting events (including all high school

sports), and New Jerseyans voted 57-43% ***against*** the legislature-referred ballot

---

[32] "Kalshi's age restriction is 18 rather than 21." Dan Bernstein, "Chalky March Madness Slams Sportsbooks but Spares Kalshi," *Sportico* (April 8, 2025) (hereinafter, "*Sportico*"). https://www.sportico.com/business/sports-betting/2025/march-madness-sports-betting-results-1234846724/ (viewed Dec. 19, 2025).

[33] "Kalshi has a huge 'Politics' hub featuring hundreds of markets, including those for local, statewide, national and international election outcomes." Mike Breen, "Best Political Betting Sites: Legal Election Markets in the US," *Politics PA* (Dec. 14, 2025) https://www.politicspa.com/best-political-betting-sites/ (viewed Dec. 14, 2025).

question of New Jersey Public Question 1, Sports Betting on State College

Athletics Amendment (2021).[34] By this landslide, New Jersey voters continued its

ban on betting on college sporting events held in New Jersey, or held elsewhere

while involving a New Jersey college team, but Kalshi sidesteps all state laws.

## II.    *Murphy v. NCAA* Confirmed State Authority Over Gambling, Which Kalshi Fails to Distinguish.

The U.S. Supreme Court confirmed, in *Murphy v. NCAA*, the state authority

to regulate gambling. Although this precedent was relied on below and is plainly

controlling here, Kalshi says almost nothing about it in its opening brief. Kalshi

acknowledges *Murphy* merely twice, and makes no effort to distinguish it. Kalshi's

attempt to do an end run around more than a century of federalism and the

landmark precedent of *Murphy v. NCAA* should be rejected again here.

The Supreme Court grounded its *Murphy v. NCAA* decision in favor of state

authority over gambling in multiple federal statutes:

> [Multiple federal] provisions implement a coherent federal policy: ***They respect the policy choices of the people of each State on the controversial issue of gambling***. By contrast, if § 3702(2) is severed from § 3702(1), it implements a perverse policy that ***undermines whatever policy is favored by the people of a Stat***e.

---

34

https://ballotpedia.org/New_Jersey_Public_Question_1,_Sports_Betting_on_State_College_Athletics_Amendment_(2021) (viewed Dec. 19, 2025).

*Murphy v. NCAA*, 584 U.S. at 484 (citing 18 U.S.C. §§ 1084, 1952, 1953, and 1955, emphasis added).

The Supreme Court explained further that its ruling in favor of state authority was based on a long line of precedents preserving "a healthy balance of power between the States and the Federal Government [to reduce] the risk of tyranny and abuse from either front.'" *Murphy v. NCAA*, 584 U.S. at 473 (cleaned up, quoting *New York v. United States*, 505 U.S. 144, 181-82 (1992), which quoted *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991)). This can be traced back to *Federalist No. 51*, which is often quoted for its colorful insight that "[i]f men were angels, no government would be necessary" and which further expounded on state power as a necessary check against federal overreach:

> In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people.

*The Federalist No. 51* (J. Madison).[35]

With very different traditions, two states – Hawaii and Utah – completely prohibit virtually all forms of gambling, and yet Kalshi's approach would bypass entirely those bans such that the customs and cultures in those states would be severely undermined. *See, e.g.*, Utah Code Ann. § 76-10-1102(1) (Unlawful

---

[35] https://avalon.law.yale.edu/18th_century/fed51.asp (viewed Dec. 19, 2025).

gambling occurs when a person "(a) participates in gambling or fringe gambling, including any Internet or online gambling; (b) knowingly permits gambling or fringe gambling to be played, conducted, or dealt upon or in any real or personal property owned, rented, or under the control of the actor …..") The gambling bans in these states are rooted in diverse cultures of the sort that federalism protects, by allowing states to enact their own laws that comport with their own local concerns.

Kalshi is only partly correct in arguing here that "'a fundamental principle of the Constitution' [is] that 'Congress has the power to preempt state law.'" (Kalshi Br. 24, quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000), and citing U.S. CONST., art. VI, cl. 2). Kalshi's statement is true only while respecting state autonomy over its police power for marriage, alcohol, and similar issues, including gambling. Wagering has been the subject of more than a hundred ballot initiatives dating back to 1889 in dozens of states,[36] and yet Kalshi seeks to bypass all that. The CFTC does not properly override "all other would-be regulators at every level of government" concerning gambling. Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1, 2 (1976) (quoted by Kalshi Br. 31). Kalshi's own cited article

---

[36] "Gambling policy ballot measures" https://ballotpedia.org/Gambling_policy_ballot_measures (viewed Dec. 19, 2025).

about the CFTC illustrates this point: it never mentions gambling once, because Congress never intended for the CFTC to acquire jurisdiction over gambling. *Id.*[37]

### III. Kalshi's Argument Seeks an Unjustified Override of State Regulation of Gambling, Without the Required Clear Authority from Congress.

"It is well recognized that regulating gambling is at the core of the state's residual powers as a sovereign in our constitutional scheme." *WV Ass'n of Club Owners & Fraternal Servs. v. Musgrave*, 553 F.3d 292, 302 (4th Cir. 2009). The Maryland Constitution has long required a vote of the people in order to expand gambling in a significant manner. *See* MARYLAND CONST. Article XIX. Implicit abrogation of state authority over this entire field of law is not inferred without an express command by Congress in a federal statute, which is utterly lacking here. There have not been any legislative hearings on CFTC's oversight of gambling, for example.

"States have traditionally occupied" the field of gambling regulation, and thus courts should "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). There is no "clear and manifest purpose of Congress" to give Kalshi *carte blanche* to sell the equivalent of gambling products without complying with

---

[37] https://scholarship.law.vanderbilt.edu/vlr/vol29/iss1/1/ (viewed Dec. 19, 2025).

26

regulations in Maryland, including its ban on gambling with a conflict-of-interest and on taking bets by those under 21 years old. "Maryland's gaming statutes … prohibit wagers that cannot be made impartially or prohibiting licensees from preying on persons with gambling addictions." *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025). Kalshi lacks these sensible safeguards, and does not have a viable legal argument for ignoring these guardrails in ignoring state laws against predatory gambling practices.

According to research conducted by the gaming industry itself, gambling supports a total economic impact including "$329 billion of output (business sales)" and "$53 billion of federal, state and local taxes, including $13.5 billion of gaming taxes." American Gaming Association, "National Economic Impact of the U.S. Gaming Industry 2023" (Oct. 9, 2023) (describing its research as "the first comprehensive report on the gaming industry's national economic impact since 2018").[38] Gambling thereby occupies a significant portion of the American economy, such that transferring regulatory authority over it from the states and territories to the CFTC is something that only Congress could do explicitly after holding extensive public hearings and while comporting with fundamental principles of federalism.

---

[38] https://www.americangaming.org/resources/national-economic-impact-of-the-u-s-gaming-industry/ (viewed Dec. 14, 2025).

Many state constitutions sharply limit gambling within their jurisdictions, including New York, New Jersey, Georgia, Alabama, Texas, Ohio, Idaho, and Florida. *See, e.g.*, *Idaho v. Coeur D'Alene Tribe*, 794 F.3d 1039, 1043 (9th Cir. 2015) (The Idaho Constitution provides that '[g]ambling is contrary to public policy and is strictly prohibited. …'") (quoting IDAHO CONST. Art. III, § 20); *Hest Techs., Inc. v. State ex rel. Perdue*, 366 N.C. 289, 290, 749 S.E.2d 429, 431 (2012) ("State legislatures have weighed the social costs of gambling against the economic benefits and chosen different paths according to each legislature's conclusions."). No plausible reading of any Act of Congress overrides self-governance by states as to gambling.

The U.S. Supreme Court has repeatedly rejected attempts to transfer or delegate vast powers to a federal agency based on the sort of imaginative new interpretations of a federal statute that Kalshi seeks here. *See, e.g.*, *MCI Telecommunications Corp.* v. *American Telephone & Telegraph Co.,* 512 U.S. 218, 231 (1994) ("[I]t is highly unlikely that Congress would leave the determination of whether an industry will be entirely, or even substantially, rate-regulated to agency discretion – and even more unlikely that it would achieve that through such a subtle device as permission to 'modify' rate-filing requirements."); *Hest Techs. v. State ex rel. Perdue*, 366 N.C. 289, 290, 749 S.E.2d 429, 431 (2012)

("Since the founding of this nation, states have exercised the police power to regulate gambling.").

In denying an assertion of plenary authority by the FDA over cigarettes, the Supreme Court explained further:

> As in *MCI*, we are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion.

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160-61 (2000)

(O'Connor, J., writing for the majority). Likewise, Congress has never transferred immense authority over gambling from states to the CFTC.

## CONCLUSION

The decision below should be affirmed.

Dated:   December 19, 2025

Respectfully Submitted,

/s/ Andrew L. Schlafly

Andrew L. Schlafly
Attorney at Law
939 Old Chester Rd.
Far Hills, NJ 07931
aschlafly@aol.com
Voice: 908-719-8608
Fax:   908-934-9207

Attorney for *Amici Curiae* Stop Predatory Gambling, Texans Against Gambling, and the Association of American Physicians and Surgeons

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements pursuant to Fed. R. App. P. 32(a):

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because:

    this brief contains 6,500 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

Dated: December 19, 2025

/s/ Andrew L. Schlafly
Attorney for *Amici Curiae*
Stop Predatory Gambling, Texans Against Gambling, and the Association of American Physicians and Surgeons