No. 25-1892

## IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

KALSHIEX LLC,

*Plaintiff-Appellant*,

v.

JOHN A. MARTIN, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Maryland
No. 1:25-cv-01283 (Abelson, J.)

## CORRECTED BRIEF OF AMICUS CURIAE TODD PHILLIPS IN SUPPORT OF DEFENDANTS-APPELLEES

Todd Phillips
  *Counsel of Record*
35 Broad St NW
Atlanta, GA 30303
404-413-7496
cphillips92@gsu.edu

December 22, 2025

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ii

INTEREST OF AMICUS CURIAE.............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT.................................4

ARGUMENT ...........................................................................................7

   I.  The Commodity Exchange Act Regulates Commodity Derivatives Usable for Hedging. ............................................................................7

     A. Background on commodity derivatives. ........................................7

     B. Congress enacted the CEA to regulate commodity derivative contracts usable to economic actors to hedge their risks. ..............................10

     C. The Dodd-Frank Act's amendments did not change the CEA's purpose of regulating contracts usable for hedging or expand what constitutes a commodity derivative. .............................................17

     D. The CEA does not preempt state law's application to contracts that are not commodity derivatives. ........................................................22

   II.  Sports-Related Contracts Generally Would Not be Commodity Derivatives Subject to the Commission's Exclusive Jurisdiction..........23

   III.Courts Determine Whether Particular Contracts are Subject to the Commission's Exclusive Jurisdiction, Not DCMs. ............................30

CONCLUSION........................................................................................34

CERTIFICATE OF COMPLIANCE ..........................................................36

# TABLE OF AUTHORITIES

**Cases**

*Board of Trade v. Christie Grain and Stock Co.*, 198 U.S. 236 (1905)...15

*CFTC v. Monex Credit*, 931 F. 3d 966 (9th Cir. 2019) ............................ 10

*Cothran v. Ellis*, 125 Ill. 496 (1888) ........................................................ 15

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000)......... 32

*Gatewood v. North Carolina*, 203 U.S. 531 (1906) ................................. 14

*Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162 (D.D.C. 2012) .................... 21

*KalshiEx LLC v. Flaherty*, 2025 WL 1218313 (D.N.J. Apr. 28, 2025) .. 24, 31

*KalshiEx LLC v. Hendrick*, 2025 WL 1073495 (D. Nev. Apr. 9, 2025) .. 24

*KalshiEx LLC v. Martin*, 2025 WL 2194908 (D. Md. Aug. 1, 2025)....... 25

*N. Am. Derivatives Exchange, Inc. v. Nevada*, 2025 WL 2916151 (D. Nev. Oct. 14, 2025) ........................................................... 24, 25, 35

*Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039 (9th Cir. 2003) ................................................................................. 9

*Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014) ................... 28

*West Virginia v. EPA*, 597 U.S. 697 (2022) ............................................ 28

*Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457 (2001) .... 7, 28

**Statutes**

15 U.S.C. § 78e ....................................................................................... 34

7 U.S.C. § 1a ................................................................................. passim

7 U.S.C. § 5 ...................................................................................... 12, 16

7 U.S.C. § 7 ............................................................................................. 4

7 U.S.C. § 7 (1999) ................................................................................. 19

7 U.S.C. § 7a-2 .............................................................................. passim

Commodity Exchange Act, Pub. L. No. 74-675, 49 Stat. 1491 (1936) 4, 17

Grain Futures Act, 42 Stat. 998 (1922) ................................................. 12

**Other Authorities**

*"Will <central bank> take <action> at <meeting>?"*, CBDECISION RULEBOOK, https://kalshi-public-docs.s3.amazonaws.com/contract_terms/CBDECISION.pdf ......... 29

156 Cong. Rec. S5902 (July 15, 2010) ............................................. 22, 31

61 Cong. Rec. 4761 (Aug. 9, 1921) ......................................................... 15

Alan Greenspan, Testimony, *The Commodity Exchange Act and OTC Derivatives*, before the Comm. on Agriculture, Nutrition, and Forestry, U.S. Senate (July 30, 1998), https://www.federalreserve.gov/boarddocs/testimony/1998/19980730.htm ......................................................................................... 13

Brief of Appellee KalshiEx LLC, *KalshiEx LLC v. CFTC* (D.C. Cir., Nov. 15, 2025) ................................................................................. 31

*Chairman & Commissioners*, CFTC (accessed Oct. 27, 2025), https://www.cftc.gov/About/Commissioners/index.htm ................. 31

*Economic and Public Interest Requirements for Contract Market Designation*, 64 Fed. Reg. 29217 (June 1, 1999) ...................... 19, 29

*Event Contracts*, 89 Fed. Reg. 48968 (June 10, 2024) ........................... 27

*Exemption for Certain Swap Agreements*, 58 Fed. Reg. 5587 (Jan. 22, 1993) ................................................................................. 20

*Further Definition of "Swap,"* 77 Fed. Reg. 48208 (Aug. 13, 2012) ........ 27

Ilya Beylin, *Event Contracts Are a Step Too Far for Derivatives Regulation*, 4 U. CHI. BUS. L. REV. 77 (2025) ................................. 14

*In the Matter of the Self-Certification by North American Derivatives Exchange, Inc., of Political Event Derivatives Contracts and Related Rule Amendments under Part 40 of the Regulations of the Commodity Futures Trading Commission, Order Prohibiting the Listing or Trading of Political Event Contracts*, CFTC (Apr. 2, 2012) https://www.cftc.gov/PressRoom/PressReleases/6224-12 .... 22

iii

Jerry W. Markham, *"Confederate Bonds," "General Custer," and the Regulation of Derivative Financial Instruments*, 25 Seton Hall L. Rev. 1, 7 (1994) ...................................................................... 13, 14

Nicholas Bednar & Todd Phillips, *Commission Quorums*, 78 STAN. L. REV. __ (forthcoming 2026), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5347384 .... 32

Opening Brief for Appellant Kalshi, *KalshiEx LLC v. Martin*, Docket No. 16 (Oct. 15, 2025) ............................................................. 18, 31

*Over-the-Counter Derivatives*, 63 Fed. Reg. 26114 (May 12, 1998)........ 20

*Price-Basing*, Kalshi (Aug. 4, 2022), https://news.kalshi.com/p/glossary-pricebasing .................................................................................. 11

Rena S. Miller, Cong. Rsch. Serv., R48451, *Introduction to Derivatives and the Commodity Futures Trading Commission* (Mar. 13, 2025) ....................................................................................................... 10

S. Rep. 106-390, 2000 WL 1358765 (2000) ........................................... 20

**INTEREST OF AMICUS CURIAE**

Amicus curiae Todd Phillips is Assistant Professor of Legal Studies at the J. Mack Robinson College of Business at Georgia State University in Atlanta, GA. He files this brief in his personal capacity, and his title and affiliation are provided for identification purposes only. Professor Phillips's scholarship has focused on financial regulation. *See, e.g.*, Todd Phillips, *The Bank Supervisory Dance*, 62 Am. Bus. L.J. 217 (2025). He has testified before the U.S. Senate on legislation affecting the Commodity Futures Trading Commission (CFTC or Commission) and he previously served as a member of the Commission's Market Risk Advisory Committee. He has no financial stake in the litigation.

Amicus offers his perspective due to his interest in seeing the Commission continue as a financial markets regulator that ensures the safety and stability of commodity derivative markets. KalshiEx (Kalshi) argues that its status as a Commission-regulated designated contract market (DCM) necessarily preempts any state regulation that interferes with its activities. To the extent this is true—and amicus takes no position on whether the Commodity Exchange Act conflict or field preempts state gaming laws—it is only for contracts Kalshi lists that

1

are subject to the Commission's exclusive jurisdiction: commodity derivative contracts that reasonably can be expected to be used for hedging on more than an occasional basis. To that end, courts must evaluate each event contract to ensure that the occurrence on which it is based has more than a *de minimis* level of economic consequence to economic actors and the economy, such that its derivative can be used for hedging. Holding otherwise would allow Kalshi to list for trading contracts subject to other regulatory regimes—including gaming contracts under the jurisdiction of state gaming regulators—and evade those more appropriate regulatory regimes simply by self-certifying that those contracts are commodity derivatives.

Allowing Kalshi and other DCMs to list contracts that have only limited hedging purposes would fundamentally undermine the more appropriate state laws necessary to ensure gaming occurs in a responsible manner. Regulators must have the authority to, *inter alia*, address problem gambling. *See, e.g.*, MD State Government Code § 9-1E-11(a)(7) (prohibiting gaming licensees from "accept[ing] a wager from an individual on a sporting event if the individual . . . is identified on a mandatory or voluntary sports wagering exclusion list maintained

2

by the Commission"). The Commission does not currently engage in such activities, have a history of engaging in such activities, or have the legal authority or resources to properly engage in such activities. These responsibilities are best left to state gaming regulators.

No counsel for any party authored this brief in whole or in part, and no entity or person made any monetary contribution toward the preparation or submission of this brief. All parties have consented to the filing of this brief. Fed. R. App. P. 29(a)(2).

3

## INTRODUCTION AND SUMMARY OF ARGUMENT

When facing situations in which regulators other than the Commodity Futures Trading Commission (CFTC or Commission) are attempting to apply their regulatory regimes to contracts listed on designated contract markets (DCMs) like KalshiEx (Kalshi), courts must first and foremost determine whether particular contracts are *commodity derivatives* (i.e., derivatives with a commodity reference asset). This is because the Commodity Exchange Act (CEA), Pub. L. No. 74-675, 49 Stat. 1491 (1936), gives the CFTC "exclusive jurisdiction" to regulate the trading of commodity derivatives on DCMs, but not other contracts. *See* 7 U.S.C. § 2(a)(1)(A) (giving the Commission "exclusive jurisdiction" over "transactions involving swaps or contracts of sale of a commodity for future delivery").

Subject to restrictions imposed by the Commission, DCMs may list for trading any financial instrument they wish, but this authorization does not allow it to evade other regulatory regimes when it lists contracts other than commodity derivatives. Although the Commission regulates DCMs, its exclusive jurisdiction extends only to commodity derivative contracts. *See id.* § 7(d). Accordingly, even though Kalshi

4

may list a contract for trading, the CEA could preempt state law *only* for those contracts that are commodity derivatives.

Only if the contracts at issue are commodity derivatives must courts subsequently evaluate the extent to which the CEA preempts the other regulatory regimes. In this case, courts are likely to find that Kalshi's sports-related contracts are not commodity derivatives subject to the Commission's exclusive jurisdiction and, consequentially, to find that state law is not preempted.

This brief makes three key arguments. First, Congress enacted the CEA to regulate commodity derivative contracts that are usable to hedging economic and financial risks. Beginning with grain futures and expanding to cover all sorts of commodity derivatives, the legislative history of the Act makes clear that Congress wished to regulate these contracts rather than leave their policing to the states. Importantly, the Dodd-Frank Act's amendments authorizing the Commission to prohibit the listing of events contracts, *id*. § 7a-2(c)(5)(C)(i), did not change the CEA's purpose of regulating commodity derivatives usable for hedging, nor did it expand the contracts subject to the Commission's exclusive jurisdiction; it merely restored the Commission's authority that was

5

removed a decade prior with regard to certain commodity derivative contracts.

Second, courts generally would not find sports events to be "excluded commodities" or sports-related contracts to be swaps, such that those contracts would be outside the Commission's exclusive jurisdiction. The CEA defines the term "excluded commodities" in part as "an occurrence, extent of an occurrence, or contingency . . . that is . . . *associated with a financial, commercial, or economic consequence*," and "swap" in part as "any agreement, contract, or transaction" that, *inter alia,* "provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency *associated with a potential financial, economic, or commercial consequence.*" *Id.* §§ 1a(19)(iv), (47)(A)(ii) (emphasis added).[1] To preserve the CEA's role in regulating hedging instruments, the consequence to economic actors and the economy from the event underlying a contract must be more than *de*

---

[1] Although the CEA does not define the relevant parts of the term "swap" in terms of excluded commodities, they are effectively derivatives in excluded commodities.

6

*minimis*. Without this requirement, the contract cannot reasonably be used for hedging.

Finally, courts determine whether contracts listed on DCMs are commodity derivatives subject to the Commission's exclusive jurisdiction, not DCMs or the Commission itself. The CEA allows a DCM to list contracts for trading by self-certifying that they meet all applicable legal requirements, but courts need not take the DCM's description of the contracts as commodity derivatives as gospel. State gaming regulators may challenge Kalshi's designation of gaming contracts as commodity derivatives. If a court determines that certain contracts listed by Kalshi are not commodity derivatives (following a facts-and-circumstances review of each contract), then state law is certainly not preempted.

## ARGUMENT

I.   **THE COMMODITY EXCHANGE ACT REGULATES COMMODITY DERIVATIVES USABLE FOR HEDGING.**

### A. Background on commodity derivatives.

Derivatives are a class of financial instruments "whose value depends on or is derived from the performance of a secondary source such as an underlying bond, currency, or commodity." *Derivative,*

7

Black's Law Dictionary (12th ed. 2024). This class includes options, puts, calls, and—relevant to this case—futures and swaps. Futures are "agreement[s] to buy or sell a standardized asset . . . at a fixed price at a future time[.]" *Futures Contract*, Black's Law Dictionary (12th ed. 2024).[2] For example, Party A agrees to sell to Party B 5,000 bushels of corn for $450 per bushel in eight months. This allows Party A to focus on growing corn and Party B to focus on making food with that corn, rather than worrying about market prices. Swaps are agreements "to exchange ('swap') cash flows at specified intervals, calculated by reference to an index." *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1042 (9th Cir. 2003). *See also* 7 U.S.C. § 1a(47) (providing a six-part definition of the term "swap"). For example, Party A agrees to pay Party B a 5 percent interest rate on $100,000 (i.e., $500) every month for a year, in exchange for Party B agreeing to pay Party A the Secured Overnight Financing Rate (SOFR)—a floating-rate that changes on a day-to-day basis—on $100,000 in exchange. This allows

---

[2] The CEA does not define the term "future," but rather uses the phrase "contracts of sale of a commodity for future delivery." *See, e.g.*, 7 U.S.C. § 2(a)(1)(A).

Party A to lock-in a flat rate without worrying about the ups-and-downs of the market, while Party B profits when SOFR is below the flat rate.

The "secondary source" upon which derivatives are structured is known as the "underlying," "benchmark," or "reference asset," and can be physical products (e.g., bushels of corn), rates or indices (e.g., SOFR), events (e.g., whether Microsoft stock is trading above a certain price on a given date), or practically anything else that has a price or can be measured.

The CFTC regulates commodity derivatives, meaning that it regulates derivatives for which the underlying are commodities. *See CFTC v. Monex Credit*, 931 F. 3d 966, 970 (9th Cir. 2019) ("The CFTC regulates commodity [derivative] markets under the CEA.").[3] The term "commodity" is defined in the CEA, and includes agricultural commodities like wheat, cotton, and rice; "all other goods and articles, except onions . . . and motion picture box office receipts;" and all

---

[3] In contrast, the Securities and Exchange Commission regulates security derivatives. *See* Rena S. Miller, Cong. Rsch. Serv., R48451, *Introduction to Derivatives and the Commodity Futures Trading Commission* (Mar. 13, 2025) ("The Securities and Exchange Commission (SEC) regulates a smaller slice of the derivatives markets related to securities, such as equity options and, since 2010, securities-based swaps.").

9

financial interests "in which contracts for future delivery are presently
or in the future dealt in." 7 U.S.C. § 1a(9).

Important here, the term "commodity" includes, despite the name,
so-called "excluded commodities," a category that include currency and
interest rates; macroeconomic, stock, and other indices that are
"measure[s] of economic or commercial risk, return, or value;" "economic
or commercial ind[icies]" that "are not within the control of any party to
the relevant contract;" and other "occurrence[s]" that are "associated
with a financial, commercial, or economic consequence." *Id*. § 1a(19).
This category is so named because Congress *excluded* them from the
CFTC's authority in 2000—a decision it reversed in 2010. The broad
definition of "commodity" and the existence of the "excluded
commodities" category are vestiges of the CEA's history, which is
described in the next section.

### B. Congress enacted the CEA to regulate commodity derivative contracts usable to economic actors to hedge their risks.

Congress has decided that commodity derivative contracts "are
affected with a national public interest by providing a means for
managing and assuming price risks, discovering prices, or

disseminating pricing information through trading." 7 U.S.C. § 5(a).[4]

Congress enacted the CEA and subjected these contracts to federal

regulation because it found value in allowing real economy firms to

"hedg[e] themselves against possible loss through fluctuations in price."

Grain Futures Act (GFA) § 3, 42 Stat. 998 (1922) (incorporated into the

CEA).

The story of the CEA starts in the mid-19th century, which saw the

birth of venues, known as commodity exchanges, where farmers and

other commodity suppliers could sell their crops and products to

wholesalers. To facilitate these transactions, the Chicago Board of

Trade introduced standardized futures contracts that allowed for the

delivery of a certain grade of grain at a certain location at a certain time

in the future, but with a price set at the time the contract was entered.

Other commodity exchanges soon followed with a variety of derivatives

---

[4] Derivatives' price-discovery function refers to price basing, which is the act of using derivatives' prices to determine the market price of underlying commodities. *See Price-Basing*, Kalshi (Aug. 4, 2022), https://news.kalshi.com/p/glossary-pricebasing ("Price-basing refers to the concept that the information embedded in the price of a contract can be used to accurately price other commodities, assets or securities. For example, consider an event contract on whether the U.S. will raise the debt ceiling. Suppose the event contract implies there is a 40% chance of default–that could be used to help price a contract on Treasury bills.").

11

contracts. These contracts allowed both commodity buyers and sellers to lock in prices for sales that would not be executed for some time, enabling them to hedge their risks that prices might rise or fall in the intervening period. Over time, these contracts evolved from being physically settled (i.e., physical delivery of the underlying assets) to being financially settled (i.e., parties pay the difference between contract prices and market prices at the time of settlement).

As with any new financial innovation, problems arose. Some traders endeavored to manipulate grain markets through derivatives. Traders attempted to "corner" markets by purchasing a sufficient volume of futures contracts that would expire on certain dates, increasing spot grain prices and harming sellers who had shorted those contracts. *See* Alan Greenspan, Testimony, *The Commodity Exchange Act and OTC Derivatives*, before the Comm. on Agriculture, Nutrition, and Forestry, U.S. Senate (July 30, 1998), https://www.federalreserve.gov/boarddocs/testimony/1998/19980730.htm. The era also saw the rise of "bucket shops" selling derivatives contracts. These firms did not execute customers' orders on the exchanges, instead taking customers' funds and holding them "as a bet

12

on future price changes." Jerry W. Markham, *"Confederate Bonds,"* *"General Custer," and the Regulation of Derivative Financial Instruments*, 25 SETON HALL L. REV. 1, 11 (1994). That is, they would metaphorically stick customers' funds in a bucket, rather than purchasing the underlying asset.[5] If a customer's purported purchase decreased in value, the bucket shop operator would keep the funds. If the customer's purported purchase increased in value, the operator would abscond with the funds.

Various attempts were made to control manipulators and bucket shop operators. Exchanges restricted access to their quotations in an attempt to control the bucket shops, and states subjected these shops to criminal prosecution. Markham at 12–13. But these various attempts were largely unsuccessful. States lacked the capacity to effectively regulate the trading on commodity exchanges, and "[c]ourts saw both the exchanges and the bucket shops as engaged in illegal gambling and

---

[5] *See Gatewood v. North Carolina*, 203 U.S. 531, 536 (1906) (defining "bucket shop" as "an establishment, nominally for the transaction of a stock exchange business, or business of similar character, but really for the registration of bets, or wagers, usually for small accounts, on the rise or fall of the prices of stock, grain, oil, etc., there being no transfer or delivery of the stock or commodities nominally dealt in.").

would not protect data related to this illicit activity." Ilya Beylin, *Event Contracts Are a Step Too Far for Derivatives Regulation*, 4 U. CHI. BUS. L. REV. 77, 90 (2025). *See, e.g.*, *Cothran v. Ellis*, 125 Ill. 496, 501 (1888) (declaring that "dealing in 'futures'" was a "species of gambling [that] has become emphatically and pre-eminently the national sin").

Although courts eventually agreed that exchanges could protect their price quotes, *see Board of Trade v. Christie Grain and Stock Co.*, 198 U.S. 236, 250 (1905) (contrasting "serious dealings for legitimate business purposes to those which fairly can be classed as wagers, or pretended contracts"), federal legislators did not believe that enough was being done to prevent derivatives traders from manipulating the prices of the underlying commodities. As the Senate author of the GFA explained at the time, "the price of wheat and corn has been determined to a large extent not by the demand and supply of the commodity itself but by the fabulous quantities sold on the exchange that never had an existence, that no grain farmer in the world ever planted, ever toiled over its cultivation and harvest, or offered for sale." 61 Cong. Rec. 4761, 4763 (Aug. 9, 1921) (remarks of Sen. Capper).

In response to the failures of states and exchanges to effectively police derivatives markets, on the recognition that such markets may benefit productive economic activity, and with the desire to stabilize agricultural prices that had recently fallen, Congress enacted the GFA. The Act prohibited traders from executing futures contracts related to six identified grains unless they did so on a contract market (i.e., a commodity exchange offering futures contracts) designated by the Agriculture Secretary. To be designated, contract markets were required to meet certain criteria related to the quality of their grain delivery facilities, delivery volumes, and regulation of their members. In particular, designated contract markets (DCMs) were required to prohibit their members from making or disseminating misleading reports or from manipulating markets. *See id.* § 5.

Because the GFA provided inadequate regulatory powers and left too many gaps and loopholes in its regulatory scheme, Congress enacted the CEA. The CEA continued to prohibit futures transactions that did not occur on a DCM while also regulating brokers and their interactions with their customers. Congress also prohibited "[e]xcessive speculation" in commodity futures that "caus[e] sudden or unreasonable fluctuations

15

or unwarranted changes" in commodity prices, while allowing for the moderate speculation necessary for efficient and effective derivatives markets. CEA §5.

To increase farmers' hedging opportunities, the CEA also expanded the definition of "commodity" in the Act to include "wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs and Solanum tuberosum (Irish potatoes)." *Id*. § 3(a). Though this was the first time Congress expanded the Act's definition of "commodity," it was not the last. Congress has since expanded the Act's definition to include "all services, rights, and interests," with limited exclusions. 7 U.S.C. § 1a(9). The definition of "commodity" in the Act now includes, despite the name, so-called "excluded commodities," a category that include currency and interest rates; macroeconomic, stock, and other indices that are "measure[s] of economic or commercial risk, return, or value;" "economic or commercial ind[icies]" that "are not within the control of any party to the relevant contract;" and other "occurrence[s]" that are "associated with a financial, commercial, or economic consequence." *Id*. § 1a(19). Derivatives of excluded commodities are particularly usable to financial institutions in hedging

their exposure to the real economy and real-economy firms in hedging their exposure to financial markets.

Though the definition of "commodity" in today's CEA is so much broader than its 1936 counterpart, the Act's goal remains still the same: To regulate the trading of commodity derivatives usable by economic actors to hedge their risks.

### C. The Dodd-Frank Act's amendments did not change the CEA's purpose of regulating contracts usable for hedging or expand what constitutes a commodity derivative.

In 2010, Congress added a "special rule" to the CEA that authorizes the Commission to prohibit "the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency . . . by a [DCM]" that it determines "are contrary to the public interest if [they] involve," *inter alia*, "terrorism," "assassination," "war," "gaming" and "activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C)(i).

Although Kalshi describes this special rule as permitting DCMs to "list event contracts involving the Special Rule's enumerated activities, subject to the CFTC's exclusive jurisdiction," this is only true if those

17

contracts are derivatives in excluded commodities in the first place. Opening Brief for Appellant Kalshi, *KalshiEx LLC v. Martin*, Docket No. 16 at 14 (Oct. 15, 2025). The special rule is merely a backstop provision that allows the Commission to stop DCMs from listing contracts that are subject to the CEA but that are not in the public interest; if a contract is not a commodity derivative in the first place, the special rule does not apply to it.

Congress added the special rule to the CEA as part of an effort to undo legislative changes from a decade prior that prohibited the Commission from regulating certain hedging instruments. Until 2000, the Commission used what is known as the "economic purpose" test to determine whether a contract could be listed on DCMs. Section 5(g) of the CEA provided that contracts listed on DCMs "will not be contrary to the public interest." 7 U.S.C. § 7(g) (1999). The Commission interpreted this language as allowing DCMs to list for trading only those contracts that "reasonably can be expected to be, or ha[ve] been, used for hedging and/or price basing on more than an occasional basis." *Economic and Public Interest Requirements for Contract Market Designation*, 64 Fed. Reg. 29217, 29222 (June 1, 1999). At the time, the CEA prohibited the

transacting of off-exchange futures, meaning that contracts the Commission prevented from being listed for exchange trading could not be traded at all.

In the last days of the George H.W. Bush administration, the Commission had given a regulatory exemption for swaps, a class of derivatives that had been growing in size. *See Exemption for Certain Swap Agreements*, 58 Fed. Reg. 5587, 5589 (Jan. 22, 1993). This exemption allowed these contracts to be traded off-exchange. Five years later, the Commission issued a concept release that requested comment on whether it should repeal the prior exemption. *See Over-the-Counter Derivatives*, 63 Fed. Reg. 26114 (May 12, 1998). This change, if finalized, would have required swaps to be traded on DCMs.

This effort caused Congress to significantly reconsider the regulation of derivatives markets. As the Senate Agriculture Committee noted, "[i]f these transactions were found to be off-exchange futures, a court of law could rule them to be illegal and unenforceable." S. Rep. 106-390, at *13-14, 2000 WL 1358765 (2000). Ultimately, Congress enacted the Commodity Futures Modernization Act of 2000 (CFMA), Pub. L. No. 106-554 App'x E, 114 Stat. 2763A-365, to fundamentally

19

restructure the CEA. Among other things, Congress excluded from the Commission's jurisdiction transactions in excluded commodities (i.e., the non-physical commodities described above) between sophisticated parties that are not "executed or traded on a trading facility." *See* 114 Stat. 2763A-371, 2763A-377. The CFMA also removed section 5(g), such that the Commission could regulate DCMs but could not regulate what was traded on them. *See* 114 Stat. 2763A-384 (replacing the prior section 5 with a new section 5).

Following the global financial crisis of 2007–08, Congress again restructured the CEA with the Dodd-Frank Act in 2010, undoing much of the CFMA and placing the regulation of commodity swaps squarely with the Commission. Relevant here, Congress authorized the Commission to regulate derivatives of excluded commodities by removing the prior exclusion. *See Inv. Co. Inst. v. CFTC*, 891 F. Supp. 2d 162, 173 n.8 (D.D.C. 2012) (identifying "transactions in excluded commodities between eligible contract participants and not executed or traded on a trading facility" as one of several "exclusions or exemptions removed by Dodd-Frank"). It also added the special rule language applicable to events contracts, which are a subset of contracts in

20

excluded commodities. This text permits (but does not require) the
Commission to ban from exchange trading any contract that "involve[s]"
an "(I) activity that is unlawful under any Federal or State law; (II)
terrorism; (III) assassination; (IV) war; (V) gaming; or (VI) other similar
activity determined by the Commission, by rule or regulation, to be
contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C).

The Commission has interpreted the "contrary to the public
interest" language as "Congress's [effort] to restore . . . the economic
purpose test" that was removed by Congress's deletion of section 5(g),
such that the special rule "calls for an evaluation of an event contract's
utility for hedging and price basing purposes." *In the Matter of the Self-
Certification by North American Derivatives Exchange, Inc., of Political
Event Derivatives Contracts and Related Rule Amendments under Part
40 of the Regulations of the Commodity Futures Trading Commission,
Order Prohibiting the Listing or Trading of Political Event Contracts* at
3, CFTC (Apr. 2, 2012)
https://www.cftc.gov/PressRoom/PressReleases/6224-12. Indeed, in a
colloquy on the Senate floor, Agriculture Committee Chairman Lincoln
and Senator Feinstein made clear that the purpose of this language was

21

to "restore CFTC's authority to prevent trading that is contrary to the public interest." 156 Cong. Rec. S5902, S5906 (July 15, 2010) (statement of Sen. Feinstein).

The Dodd-Frank Act brought derivatives of excluded commodities under the Commission's jurisdiction and restored its authority to prohibit any such contracts from being traded when contrary to the public interest, as defined by statute or by rule. Nothing in that Act—including the addition of the special rule—changed the CEA's fundamental purpose in regulating commodity derivative contracts that are usable for hedging.

### D. The CEA does not preempt state law's application to contracts that are not commodity derivatives.

This brief takes no position on the extent to which the CEA preempts state gaming laws. Nevertheless, the CEA could only preempt state regulation of contracts that are commodity derivatives, because those are the only contracts within the CFTC's "exclusive jurisdiction."

The CEA clearly limits the Commission's exclusive jurisdiction "to accounts, agreements . . . , and transactions involving *swaps* or *contracts of sale of a commodity for future delivery* . . . , traded or executed on a" DCM. 7 U.S.C. § 2(a)(1)(A) (emphasis added). *See N. Am.*

22

*Derivatives Exchange, Inc. v. Nevada*, 2025 WL 2916151, at *6 (D. Nev. Oct. 14, 2025) (henceforth, "*Nadex*") ("But to fall within the CFTC's exclusive jurisdiction under 7 U.S.C. § 2(a)(1)(A), the listed item must be a "swap[] or contract[] of sale of a commodity for future delivery . . . traded or executed on" a DCM). The CEA also expressly provides that, when the CFTC does not have exclusive jurisdiction, the Act does not "supersede or limit the jurisdiction at any time conferred on . . . other regulatory authorities under the laws of the United States or of any State." *Id*. Doing so "preserves the SEC and states' regulatory authority over exchanges or transactions that are not covered by the CFTC's exclusive jurisdiction." *KalshiEx LLC v. Hendrick*, 2025 WL 1073495, at *5 (D. Nev. Apr. 9, 2025).

## II. SPORTS-RELATED CONTRACTS GENERALLY WOULD NOT BE COMMODITY DERIVATIVES SUBJECT TO THE COMMISSION'S EXCLUSIVE JURISDICTION.

Courts are grappling with whether sports-related contracts listed on DCMs are subject to the Commission's exclusive jurisdiction. Some have answered that question in the affirmative, *see KalshiEx LLC v. Flaherty*, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025) ("I am persuaded that Kalshi's sports-related event contracts fall within the

23

CFTC's exclusive jurisdiction[.]"); whereas others have answered it in the negative, *see, e.g.*, *Nadex*, at *9 (holding that sports-related contracts are likely not swaps because they "turn on the outcome of the live event, not on the 'occurrence, nonoccurrence, or the extent of the occurrence' of a live event"). The court below sidestepped the question by concluding that the CEA likely does not field or conflict preempt Maryland gaming law. *See KalshiEx LLC v. Martin*, 2025 WL 2194908, at *11 (D. Md. Aug. 1, 2025).

What constitutes a commodity is key to interpreting the CEA's applicability because the Commission's exclusive jurisdiction extends only to commodity derivatives contracts. *See* 7 U.S.C. § 2(a)(1)(A). Sports events are likely not commodities, meaning that sports-related contracts are likely not commodity derivatives that are subject to the Commission's exclusive jurisdiction.

The CEA defines "commodity" to include "all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in," with limited exceptions. *Id*. § 1a(9). Excluded commodities are a subset of commodities that the CEA defines in part as "an occurrence, extent of an occurrence, or contingency . . . that is . . .

24

*associated with a financial, commercial, or economic consequence.*" *Id.* § 1a(19)(iv) (emphasis added). Relatedly, although the CEA does not define the relevant parts of the term "swap" in such terms, swaps are effectively derivatives of excluded commodities. The Act defines "swap" as "any agreement, contract, or transaction" that, *inter alia*, "provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency *associated with a potential financial, economic, or commercial consequence.*" *Id.* § 1a(47)(A)(ii) (emphasis added).

This should not be read as merely *any* financial, commercial, or economic consequence. Rather—and in order to preserve the CEA's mission of regulating hedging-usable instruments—the financial, commercial, or economic consequence from an excluded commodity must be expected to be more than *de minimis*. Holding otherwise would have the CFTC regulate contracts that cannot reasonably be expected to be usable for hedging—and would allow the CEA to preempt significant swaths of state laws that *no one* until recent years believed permissible. For example, the Commission itself has noted that a broad reading of the term "swap" could subject myriad consumer and commercial

25

contracts—including contracts to "acquire or lease real or personal property" or "to obtain a mortgage"—to the CEA, thus preempting state regulatory regimes. *Further Definition of "Swap,"* 77 Fed. Reg. 48208, 48246 (Aug. 13, 2012). Such an interpretation is contrary to what Congress could have intended. *See id.*

Moreover, if the sports-related contracts listed by Kalshi are swaps, the CEA would prohibit retail traders from entering into them on non-DCM platforms, such as state-regulated casinos. 7 U.S.C. §§ 2(c)(2)(D), 2(e). The *Nadex* court correctly noted that the consequence would be that "all sports betting must be done on a DCM." *Nadex* at *9. As the Commission recently explained, it "does not believe that it has the statutory mandate nor specialized experience appropriate to oversee [gambling], or that Congress intended for the Commission to exercise its jurisdiction or expend its resources in this manner." *Event Contracts*, 89 Fed. Reg. 48968, 48983 (June 10, 2024).

If Congress had meant to enact such a significant shift in regulatory authority between the states and the federal government, it would have done so more clearly. Congress, the Supreme Court has explained, "does not . . . hide elephants in mouseholes." *Whitman v.*

26

*American Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001). *See also West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (quoting *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014)) (rejecting claims of "'discover[y] in a long-extant statute an unheralded power' representing a 'transformative expansion [of] regulatory authority'"). Certainly, the CEA demonstrates Congress's intent that residents of all states be allowed to trade commodity derivatives usable for hedging, but it is absurd to interpret it as subsuming practically all of sports gaming.

To avoid this result, courts should distinguish contracts that are truly expected to be usable for hedging from those that are not by requiring excluded commodities to have more than a *de minimis* level of economic consequence to economic actors and the economy. If it is unlikely that a listed contract will be usable for hedging because the economic consequences of the underlying event are so minimal, Congress would not have expected them to be subject to the CEA. This test is the flip-side of the Commission's interpretation of the economic purpose test that Congress intended to restore in 2010. Whereas the Commission considered whether a contract "reasonably can be expected to be, or has been, used for hedging and/or price basing on more than an

occasional basis," *Economic and Public Interest Requirements for Contract Market Designation*, 64 Fed. Reg. 29217 (June 1, 1999), events that only have a *de minimis* economic effect cannot reasonably be expected to be usable for hedging, and therefore cannot be considered excluded commodities under the CEA.[6]

To understand the importance of this *de minimis* test, one need only look at Kalshi's "Will <central bank> take <action> at <meeting>?" contract. *See "Will <central bank> take <action> at <meeting>?"*, CBDECISION RULEBOOK, https://kalshi-public-docs.s3.amazonaws.com/contract_terms/CBDECISION.pdf (accessed Dec. 10, 2025). The events underlying this contract—whether a central bank has decided to raise, lower, or hold interest rates—have more than a *de minimis* economic effect because these decisions affect the rates at which financial institutions make loans. Accordingly, it is reasonably

---

[6] Though implausible, a court could determine that sports events are "commodities" but not "excluded commodities." Such a dubious reading would mean that Kalshi's sports-related contracts *would* be subject to the CFTC's exclusive jurisdiction *but would not* be subject to the CEA's special rule regarding event contracts. Such a result is absurd and should not be intuited from the CEA's complex drafting.

expected that this contract would be usable for hedging on more than an occasional basis.

It is quite implausible that the events or occurrences at issue in most sports-related contracts have more than a *de minimis* level of economic consequences. This amicus simply does not believe it could be the case that anyone will suffer some preexisting financial loss if the Baltimore Ravens win a game, win a game by over 2.5 points, or score over 47.5 points in a single game—or if a television announcer says "What a Catch" during the game, which is a contract one can purchase on Kalshi's DCM:

### Rules summary

What a Catch ⌄

If the play by play or color commentator(s) says What a Catch as part of New England at Baltimore professional football game originally scheduled for Dec 21, 2025, then the market resolves to Yes. Outcome verified from the Governing League.

*New England at Baltimore*, KALSHI, https://perma.cc/WXG3-4FDC. Indeed, Kalshi itself explained to the D.C. Circuit that "contracts relating to games—again, activities conducted for diversion or amusement—are unlikely to serve any 'commercial or hedging interest.'" Brief of Appellee KalshiEx LLC at *45, *KalshiEx LLC v.*

*CFTC* (D.C. Cir., Nov. 15, 2025) (quoting 156 Cong. Rec. S5902, S5906 (July 15, 2010)).

## III. Courts Determine Whether Particular Contracts are Subject to the Commission's Exclusive Jurisdiction, Not DCMs.

In its opening brief, Kashi writes that "The CFTC has declined to subject Kalshi's sports-event contracts to public-interest review, which reflects 'the CFTC's exercise of its discretion and implicit decision to permit them.'" Opening Brief for Appellant Kalshi, *KalshiEx LLC v. Martin*, Docket No. 16 at 39 (Oct. 15, 2025) (quoting *KalshiEx LLC v. Flaherty*, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025)). Whether the Commission has allowed Kalshi's contracts to be listed—or, more accurately, whether the Commission has not prohibited them from being listed—does not matter for this case.[7] What matters is whether

---

[7] To be clear, *if* Kalshi's sports-related contracts are commodity derivatives, the Commission has prohibited Kalshi from listing them unless it affirmatively gives approval, which it has not done. *See* 17 C.F.R. § 40.11. And if the contracts are not commodity derivatives, the Commission has done nothing to allow their listing in any way. Among other things, the five-member Commission currently has fewer than three members, which may render the Commission inquorate and legally unable to prohibit the listing of contracts. *See Chairman & Commissioners*, CFTC (accessed Oct. 27, 2025), https://www.cftc.gov/About/Commissioners/index.htm; Nicholas Bednar

the *courts* find that contracts at issue are commodity derivatives subject to the Commission's "exclusive jurisdiction." In the Supreme Court's words, "Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

Because the CEA provides that none of its provisions "shall be construed as implying or creating any presumption that . . . any agreement, contract, or transaction, not otherwise subject to this chapter is or would otherwise be subject to this chapter," *id*. § 2(g)(1), courts cannot presume that any given contract is a commodity derivative.

This rule against presumptions is important. Although the CEA allows DCMs to list contracts for trading by self-certifying that they meet all applicable legal requirements, these assertions may be incorrect. *See id*. § 7a-2(c)(1) (authorizing DCMs to "elect to list for trading . . . any new contract, or other instrument . . . by providing to

---

& Todd Phillips, *Commission Quorums*, 78 STAN. L. REV. __ (forthcoming 2026), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5347384 (describing the phenomenon of inquorate commissions in the current administration and the applicable law).

the Commission . . . a written certification that the new contract . . .

complies with this chapter (including regulations under this chapter)");

*id*. § 7a-2(c)(2) (providing that the new listing "shall become effective,

pursuant to the certification of the registered entity and notice of such

certification to its members" ten days after submission, with certain

exceptions).

Self-certification is subject to CFTC review, though the practical

ability of the Commission to review these certifications is limited by

resource constraints and the increasing volume of contracts being listed.

Any listing is ultimately reviewable by Article III courts. In short, self-

certification of legality is not determinative; a contract may be self-

certified for listing without actually meeting the legal requirements to

justify triggering preemption, and judicial review should place no

weight on the DCM's assessment.

Imagine that a DCM listed for trading a security (subject to the

jurisdiction of the SEC and not the CFTC) but self-certified that the

contract was a commodity derivative. Doing so would violate section 5 of

the Securities Exchange Act of 1934, which prohibits exchanges not

registered with the SEC from listing for trading securities. *See* 15

32

U.S.C. § 78e. The CFTC, of course, has the authority to reject the DCM's listing of the contract, *see* 7 U.S.C. § 7a-2(c)(5). But if it does not do so, it simply cannot be the case that a DCM's certification that a listed contract complies with the CEA and the rules promulgated thereunder and the Commission's failure to disallow the listing would allow the DCM to violate the federal securities laws. Although the CEA grants the Commission exclusive jurisdiction over certain contracts listed on DCMs, *see* 7 U.S.C. § 2(a)(1), it does not give the CFTC the ultimate authority to declare—by virtue of inaction—contracts to be something that they are not.

And when the CFTC does not have exclusive jurisdiction, the CEA expressly provides that it does not "supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State." *Id*. If the SEC sues the DCM, it would ultimately be up to a federal court to determine whether the listed contract was a commodity derivative or a security. Any other interpretation would allow DCMs to violate the federal securities laws.

The same logic applies for other contracts, including those considered gaming under state law. Even if a DCM self-certifies that a listed contract is a swap or another contract involving an excluded commodity that is based upon an occurrence, extent of an occurrence, or a contingency—that is, even if a DCM self-certifies that it has listed an event contract subject to the exclusive jurisdiction of the Commission— a regulatory authority other than the Commission may challenge that designation, and a court would ultimately be responsible for determining the contract's actual nature. To the extent that a listed contract is *not* subject to the Commission's exclusive jurisdiction, it may be subject to another law.

## CONCLUSION

The Commission "exclusive jurisdiction" over commodity derivative contracts usable for economic actors to hedge risks. If the contracts at issue are not commodity derivatives usable for hedging, then state law is certainly not preempted.

Dated: December 22, 2025          Respectfully submitted,

*/s/ Todd Phillips*

34

Todd Phillips
35 Broad St NW
Atlanta, GA 30303
404-413-7496
cphillips92@gsu.edu

## CERTIFICATE OF COMPLIANCE

As required by FRAP 32(g), I certify that this brief (1) complies with the word limit of FRAP 29(a)(5) and 32(a)(7) because, excluding the parts of the document exempted by FRAP 32(f), this document contains 6,494 words; and (2) complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6). This brief has been prepared using Microsoft Word in Century Schoolbook 14-point font, a proportionally spaced typeface.

Dated: December 22, 2025        */s/ Todd Phillips*
                                            Todd Phillips

36