No. 25-1892

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

KALSHIEX, LLC,

Plaintiff–Appellant,

v.

JOHN A. MARTIN, ET AL.,

Defendants–Appellees.

On Appeal from an Order of the
United States District Court for the District of Maryland
Case No. 1:25-cv-1283, Hon. Adam B. Abelson

BRIEF OF BETTER MARKETS, INC. AS AMICUS CURIAE
SUPPORTING APPELLEES AND AFFIRMANCE

Dennis M. Kelleher
Stephen W. Hall
Better Markets, Inc.
2000 Pennsylvania Ave., NW
Suite 408
Washington, DC 20006
(202) 618-6464
dkelleher@bettermarkets.org
shall@bettermarkets.org

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

Counsel for *Amicus Curiae*

December 22, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure ("FRAP") and Rule 26.1 of the Local Rules of this Court ("Local Rules"), Better Markets, Inc. ("Better Markets") states that it has no parent corporation; there is no publicly held corporation that owns any stock in Better Markets; it is aware of no publicly held corporation that has a direct financial interest in the outcome of this litigation by reason of a franchise, lease, other profit sharing agreement, insurance, or indemnity agreement; and it has issued no shares to the public and is aware of no similarly situated master limited partnerships, real estate investment trusts, or other legal entities whose shares are publicly held or traded.

## STATEMENT AS TO AUTHORSHIP AND FUNDING

In accordance with FRAP 29(a)(4)(E), Better Markets states that (i) no counsel for any party authored this brief in whole or in part; (ii) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (iii) no person—other than Better Markets, its members (of which there are none), or its counsel—contributed money that was intended to fund preparing or submitting this brief.

i

# TABLE OF CONTENTS

**Page(s)**

Corporate Disclosure Statement ................................................................. i

Statement as to Authorship and Funding ................................................. i

Table of Authorities ................................................................................ iv

Interets of the Amicus Curiae ................................................................. 1

Summary of Argument ............................................................................ 2

Argument ................................................................................................. 4

I.   Kalshi's sports gambling contracts are not subject to the
     exclusive jurisdiction provision in the CEA. .................................... 4

     A.   Kalshi's contracts are not swaps because they lack the
          requisite financial significance. .............................................. 5

          1.   Statutory Text................................................................. 6

          2.   Legislative History ......................................................... 8

          3.   Lack of Financial Significance ...................................... 9

          4.   Kalshi's Admissions...................................................... 13

     B.   Because Kalshi's sports wagers are flatly prohibited,
          they are not lawfully traded on a "designated contract
          market." ................................................................................ 15

II.  Even if the jurisdictional provision in Section 2 applied to
     Appellant's sports wagers, it would not preempt state
     gaming laws. .................................................................................. 18

     A.   The history of the Dodd-Frank Act confirms that
          Congress sought to enlarge the role of state law in
          financial regulation, not preempt it. ..................................... 18

     B.   Conflict preemption does not apply because the CFTC
          banned gaming contracts, and because Kalshi's sports
          gambling platform does not require uniform regulation.......... 20

III. Preempting state regulation of Kalshi's sports betting
     threatens to harm millions of American gamblers, election
     integrity, and the CFTC itself. ...................................................... 22

## TABLE OF CONTENTS—continued

A.  Preempting state law would erase important protections for Maryland's citizens and citizens in states with similar laws. ........................................................ 22

B.  Accepting Kalshi's preemption argument would also threaten election integrity. .......................................... 24

C.  The CFTC lacks the authority, expertise, and resources to oversee sports gambling, and it has a core mission that Americans depend on it to fulfill. ..................................... 26

Conclusion............................................................................ 30

Certificates........................................................................

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*American Agriculture Movement, Inc. v. Board of Trade,*
   977 F.2d 1147 (7th Cir. 1992) ................................................................ 5

*F.T.C. v. Ken Roberts Co.,*
   276 F.3d 583 (D.C. Cir. 2001) ............................................................. 5

*Frazier v. Prince George's Cnty.,*
   86 F.4th 537 (4th Cir. 2023) ............................................................. 22

*KalshiEX LLC v. CFTC,*
   No. 23-3257, 2024 WL 4164694 (D.D.C. Sept. 12, 2024) ............. 14, 15

*KalshiEX LLC v. Hendrick,*
   No. 2:25-cv-00575-APG-BNW, 2025 WL 3286282 (D. Nev. Nov. 24,
   2025) ........................................................... 6, 8, 9, 25, 27, 29

*KalshiEX LLC v. Martin,*
   No. 25-cv-1283-ABA, 2025 WL 2194908 (D. Md. Aug. 1, 2025)
   .................................................................... 4, 9, 18, 20

*North American Derivatives Exchange, Inc. v. Nevada Gaming Control
   Board,*
   No. 2:25-cv-00978-APG-BNW, 2025 WL 2916151 (D. Nev. Oct. 14,
   2025) ............................................................................... 6

*Power v. Arlington Hosp. Assoc.,*
   42 F.3d 851 (4th Cir. 1994) ............................................................. 18

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ................................................................. 22

*Yates v. United States,*
   574 U.S. 528 (2015) ................................................................. 7

## Statutes

7 U.S.C § 7a-2(c)(5)(C)(ii) ................................................................ 15

7 U.S.C. § 1a(47)(A) ................................................................. 7

7 U.S.C. § 1a(47)(A)(ii) ................................................................. 5

7 U.S.C. § 2(a)(1)(A) ............................................................... 4, 5

7 U.S.C. § 5(a) ................................................................. 12

7 U.S.C. § 7a-2(c)(5)(C)(i) ................................................................. 8

Cal. Penal Code §§ 330-337z ................................................................. 23

## TABLE OF AUTHORITIES—continued

Page(s)

Md. Code Ann., Crim. Law § 12-104 ...................................... 23
Md. Code Ann., Crim. Law § 12-113 ...................................... 23
Md. Code Ann., State Gov't § 9-1E-01 *et seq.* ......................... 23
Tex. Penal Code Ann. § 47.01-14 .......................................... 23

**Other Authorities**

Andrew Yang, *Sports Betting Hurts American Men. Time To Rethink Its Regulation*, Newsweek (Dec. 3, 2024) .................................... 23

Aislinn Keely, *Robinhood, Susquehanna take over exchange LedgerX in prediction markets push*, Reuters (Nov. 26, 2025) ............................. 29

Arthur E. Wilmarth Jr., *The Dodd-Frank Act's Expansion of State Authority to Protect Consumers of Financial Services*, 36 J. Corp. L. 893 (2011) ..................................................................... 20

Benjamin Schiffrin, Op-Ed, *The U.S. Already Has a Gambling Epidemic—24 Hour Stock Trading Would Only Make It Worse*, Fortune Magazine (Dec. 13, 2024) ........................................ 24

Benjamin Schiffrin, *Sports Betting Scandals Show the Perils of Prediction Markets*, Better Markets (Nov. 20, 2025) .......................... 21

Brief of Appellee, *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024) .................................. 14, 15

CFTC, Contracts and Products ............................................. 16

CFTC, President's Budget: FY2026 ......................................... 27

Charles Fain Lehman, *Legalizing Sports Gambling Was a Huge Mistake—The evidence is convincing: The betting industry is ruining lives*, The Atlantic (Sept. 23, 2024) .................................... 23

Concept Release on the Appropriate Treatment of Event Contracts, 73 Fed. Reg. 25669 (May 7, 2008) ................................... 10, 11, 12

Dennis M. Kelleher & Stephen Hall, *Report: More than Ever, Americans Must Look to the States for Protection Against Financial Fraud and and Abuse*, Better Markets (Sept. 9, 2025) ........................... 20

Di Wu *et al.*, *Spillover Effects of Financial Deregulation: The Unintended Consequences of the OCC Preemption Rule on Mortgage Lending Practices*, 95 Int'l Rev. of Fin. Anal., Part C (Oct. 2024) ...... 19

Event Contracts, 89 Fed. Reg. 48975 (June 10, 2024) ............... 12, 25, 27

# TABLE OF AUTHORITIES—continued

Page(s)

Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48208 (Aug. 13, 2012).. 11, 12

Ganesh Setty, *Betting, Trading Platforms Form Prediction Market Alliance*, Law360 (Dec. 12, 2025) ............................................ 29

In the Matter of the Certification by KalshiEX LLC of Derivatives Contracts with Respect to Political Control of the United States Senate and United States House of Representatives, CFTC Order (Sept. 22, 2023)................................ 10, 17, 25, 26

Letter from six U.S. Senators to Acting CFTC Chair Caroline Pham (Sept. 30, 2025)................................................................. 16

Lydia Beyoud, *Staff Cuts and Turmoil Hit the CFTC While the Crypto It Oversees Booms*, Bloomberg (Aug. 21, 2025) ....................... 27

Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, *KalshiEX, LLC v CFTC*, No. 23-cv-03257 (D.D.C. Jan. 25, 2024) ......................................................................... 14

Press Release, CFTC, Acting Chairman Pham Announces First-Ever Listed Spot Crypto Trading on U.S. Regulated Exchanges (Dec. 4, 2025) ......................................................................... 28

Provisions Common to Registered Entities, 76 Fed. Reg. 44776 (July 27, 2011) ................................................................... 16, 17

Self-certification letter submitted to the CFTC, App. A (Jan. 22, 2025) 13

*Statewide Gambling Prevalence in Maryland: 2024*, Maryland Center of Excellence on Problem Gambling (2024) ........................... 24

Terry Oldreal, *Game on: Kalshi brings 100% legal sports trading to all 50 states*, KalshiNews (Jan. 24, 2025) ............................... 14

*The Financial Crisis Inquiry Report*, Fin. Crisis Inquiry Comm'n (Off. Gov't Ed., Jan. 2011)............................................... 19

## Rules

FRAP 26.1 ............................................................................. i

FRAP 29(a)(4)(E) ................................................................... i

# TABLE OF AUTHORITIES—continued

**Page(s)**

**Regulations**

17 C.F.R. § 1.3 .................................................................. 11

17 C.F.R. § 40.11(a) .............................................. 16, 17, 26

17 C.F.R. § 40.11(a)(1) ................................................ 15, 20

17 C.F.R. § 40.2 ................................................................ 17

17 C.F.R. § 40.3 ................................................................ 17

Code of Maryland Regulations, ch. 36, tit. 10 ...................... 23

## INTERESTS OF THE AMICUS CURIAE

Better Markets is a nonprofit, nonpartisan, and independent organization that promotes the public interest in the financial markets through comment letters on proposed rules, amicus briefs, independent research, public advocacy, and congressional testimony.[1] It fights to protect investors and consumers from fraud and abuse, prevent financial crashes, and make the financial system more equitable for all Americans. It also supports the important role of state regulators as they strive to protect their citizens from harmful financial products and services.

Since its founding in 2010, Better Markets' staff has included experts in derivatives, and a large proportion of the organization's advocacy has focused on the Commodity Futures Trading Commission ("CFTC") and its oversight of the derivatives markets. Better Markets' work includes 130 comment letters filed with the CFTC on a wide range of topics, including multiple letters on the proposed definition of a swap. Over the last several years, Better Markets has devoted a significant and steadily increasing body of advocacy to the threats posed by the burgeoning event contracts industry, including a comment letter, two amicus briefs, and other materials relating specifically to the activities of appellant KalshiEX LLC ("Kalshi"). *See generally* www.bettermarkets.org (containing all advocacy materials).

---

[1] Better Markets files this brief with the consent of the Parties.

Better Markets has a strong interest in this case. The District Court correctly rejected Kalshi's preemption arguments, preserving Maryland's regulation of Kalshi's sportsbook. It thus advanced a number of Better Markets' public interest objectives—protecting consumers from sports wagers masquerading as bona fide financial instruments; ensuring that state officials retain their authority to address other threats posed by the proliferation of gambling, including harm to election integrity; and preserving the ability of the CFTC to focus its scarce resources on oversight of the legitimate derivatives markets. Those markets are vital to maintaining stable prices for the food, fuel, and durable goods Americans depend on in their everyday lives. Affirmance of the decision will help secure these benefits, while reversal will revitalize the harms presented. Better Markets therefore urges affirmance.

## SUMMARY OF ARGUMENT

Kalshi is invoking the disfavored doctrine of federal preemption in an attempt to evade the consumer protections that Maryland and dozens of other states have established to mitigate the significant financial harm and other hardships that often come with sports betting. Its arguments should be firmly rejected, as they have no basis in law and if accepted will allow Kalshi to exploit vulnerable gamblers, sidestep other important state laws, and undermine the CFTC's ability to do its job. Congress never intended the derivatives markets to become a safe haven for sportsbooks seeking immunity from state regulation, nor did it ever

envision that the CFTC would someday be cast in the role of the nation's gaming commissioner.

First, as to preemption, Kalshi's sports wagers do not fall under the "exclusive jurisdiction" clause in Section 2 of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 2(a)(1)(A), whatever its preemptive scope may be. Those wagers lack two of the attributes required under Section 2. They are not swaps, because they do not have the requisite financial significance, and they are not being traded lawfully on a designated contract market, because the CFTC has banned them by rule, 17 C.F.R. § 40.11(a)(1).

Second, even if Section 2 did encompass Kalshi's sports wagers, it would not preempt Maryland's gaming laws. Field preemption is inapplicable since, in the Dodd-Frank Act, Congress intended to regulate the financial instruments at the heart of the financial crisis, not promote gaming and prevent state regulation of sportsbooks. In that landmark set of reforms, Congress actually wanted to *exclude* gaming from the derivatives markets and give the states a *greater* role in financial regulation. Conflict preemption is also inapplicable. Because Kalshi's gaming contracts have been banned in the derivatives markets since 2011, there can be no tension or "conflict" been state gaming laws and any provisions of the CEA.

Finally, a decision in favor of Kalshi would harm consumers and the broader public interest. It would deprive Maryland's citizens of important

3

protections under the state's gaming laws and set a precedent threatening similar protections elsewhere. In addition, it would threaten the viability of other state laws that protect the public, including those that have prohibited gambling on elections since the 19th century. Finally, it would call upon the CFTC to serve as the nation's gaming commissioner and election supervisor, roles that it plainly lacks the expertise, resources, or mandate to perform. Such duties would also divert the agency's attention away from its core mission of regulating the bona fide derivatives markets for the benefit of the American people, who depend on those markets for stable prices in the essential goods they rely on in everyday life, from gasoline to groceries.

## ARGUMENT

### I.  Kalshi's sports gambling contracts are not subject to the exclusive jurisdiction provision in the CEA.

The District Court held that Kalshi had failed to show a likelihood of success on its claim that Maryland's gaming laws were subject to field and conflict preemption. *KalshiEX LLC v. Martin*, No. 25-cv-1283-ABA, 2025 WL 2194908, at *5 (D. Md. Aug. 1, 2025). The District Court's decision was correct on both counts and it should be affirmed. The record in this case also supports a separate and antecedent ground for affirmance: Kalshi's sports wagers fall entirely outside the "exclusive jurisdiction" clause in Section 2 of the CEA, 7 U.S.C. § 2(a)(1)(A), whatever its preemptive scope may be.

Section 2 provides that the CFTC shall have exclusive jurisdiction but only with respect to specified instruments executed on specified types of platforms. *See F.T.C. v. Ken Roberts Co.*, 276 F.3d 583, 589 (D.C. Cir. 2001) (the precise text of Section 2 shows that it confers exclusive jurisdiction on the CFTC over a limited, discrete set of items); *American Agriculture Movement, Inc. v. Board of Trade*, 977 F.2d 1147, 1156-57 (7th Cir. 1992) (the scope of Section 2 is defined by the specific market referenced therein, at the time, only "futures"). As relevant here, that provision is limited to transactions involving 1) swaps or futures contracts, that are 2) traded or executed on a designated contract market. 7 U.S.C. § 2(a)(1)(A). Kalshi's event contracts fail to meet either of these criteria. They are certainly not futures contracts and no party to this appeal contends otherwise. Moreover, they are not swaps and they are not being lawfully "traded or executed" on a designated contract market.

## A. Kalshi's contracts are not swaps because they lack the requisite financial significance.

The statutory definition of a swap includes a general provision covering "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency *associated with a potential financial, economic, or commercial consequence*." 7 U.S.C. § 1a(47)(A)(ii) (emphasis added). Kalshi's event contracts are not swaps because they lack two required

elements under this definition. First, as a federal district court in Nevada recently held in a case involving similar sports gambling contracts, such wagers do not hinge on "the occurrence, nonoccurrence, or the extent of occurrence" of an event but rather on the *outcome* of an event—a sports contest. *North American Derivatives Exchange, Inc. v. Nevada Gaming Control Board*, No. 2:25-cv-00978-APG-BNW, 2025 WL 2916151, at *9 (D. Nev. Oct. 14, 2025).

Second, as the same District Court held more recently with respect to Kalshi's wagers, sporting event outcomes lack sufficient economic significance to qualify as swaps. In the words of the statute, they are not "associated with a potential financial, economic, or commercial consequence," yet that is the essential attribute at the heart of the swaps definition. *KalshiEX LLC v. Hendrick*, No. 2:25-cv-00575-APG-BNW, 2025 WL 3286282, at *5-10 (D. Nev. Nov. 24, 2025).  This conclusion finds support in every source of authority bearing on the attributes of a swap, including the statutory definition, its legislative history, the regulatory treatment of event contracts, and Kalshi's own repeated admissions that sports gambling contracts lack the requisite financial significance.

### 1.    Statutory Text

The statutory definition of a swap includes no reference to gaming or sports wagers. The definition is intended to capture instruments with a fundamentally different character. The statute largely frames the swaps definition in terms of a long list of inherently financial instruments that

are clearly associated with "potential financial, economic, or commercial significance." They include items linked to interest rates, currencies, commodities, securities, instruments of indebtedness, and other financial or economic interests that transfer risk between parties. 7 U.S.C. § 1a(47)(A). A statutory term is known by the company it keeps. *See Yates v. United States*, 574 U.S. 528, 543 (2015). Here, that means the "event or contingency associated with a potential financial, economic, or commercial consequence," as used in the general definition of a swap, shares the character of those detailed lists in the neighboring sub-clauses. The outcome of a sporting event falls well outside this universe. Whether bettors win or lose money on their sports wagers, or whether the end result of a game produces other indirect downstream financial consequences, is insufficient. The text and tenor of the statute negate the idea that sports wagers are swaps.

In addition, Kalshi's boundless conception of a "swap" produces a definition with no limiting principle, one that Congress could not reasonably have intended. If the financial significance element of the swap definition is stretched to include any type of human interaction with any economic consequence, no matter how trivial—including sports wagers—the definition is meaningless and virtually any type of transaction becomes a swap. In the words of the Nevada District Court, "interpreting the statutory terms to include everything anyone can conjure up as a subject to bet on, or that might have some conceivable

financial consequence if one is creative enough, is not a reasonable interpretation of the statute." *Hendrick*, 2025 WL 3286282, at *6.

### 2. Legislative History

The legislative history of the Dodd-Frank Act confirms that sports gaming contracts lack the economic significance or functionality at the core of the swap definition. In the Dodd-Frank Act, Congress adopted the so-called "Special Rule," a statutory provision that authorizes the CFTC to ban certain event contracts. It applies to contracts involving gaming, activity that is unlawful under any Federal or State law, terrorism, assassination, war, or other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest. 7 U.S.C. § 7a-2(c)(5)(C)(i).

During the debate over this provision, Senators Lincoln and Feinstein engaged in a colloquy emphasizing the CFTC's need for authority to protect the public interest by banning event contracts based, for example, on sporting events. The Senators' exchange makes clear that such contracts serve "no commercial purpose" and are offered "solely for gambling" rather than a "commercial" or "hedging" use. 156 Cong. Rec. S5906-07, 2010 WL 2788026, at S5906-07 (daily ed. July 15, 2010).[2] The District Court cited to the colloquy as evidence Congress did not intend to preempt state gambling laws, but the Court also noted that the

---

[2] *Available at*: https://www.congress.gov/111/crec/2010/07/15/CREC-2010-07-15-senate.pdf.

colloquy bears "most directly" on the point that Kalshi's contracts are not swaps. *Martin*, 2025 WL 2194908, at *11.

The larger context in which Congress adopted Dodd-Frank Act supports this exceptionally clear insight into congressional intent. Swaps were at the heart of the 2008 financial crash. In the Dodd-Frank Act, and specifically in the extensive framework governing swaps, Congress intended to address the causes of the 2008 crash and adopt reforms that would prevent a recurrence. In this context, it is implausible in the extreme to suggest that as part of that effort, Congress intended to establish or facilitate nationwide sports gambling platforms insulated from state regulation, a "reform" that would only exacerbate consumer abuse while doing nothing to stabilize the financial system or prevent a future crisis. As the *Hendrick* Court explained: "Congress was bringing risky financial products out of the shadows . . . . [It] was not enabling nationwide gambling on CFTC-designated exchanges. *Hendrick*, 2025 WL 3286282, at *9.

### 3. Lack of Financial Significance

The longtime regulatory treatment of event contracts further confirms that they lack the type of financial significance that lies at the heart of the swaps definition. Such contracts cannot serve the core purposes of derivatives, which enable businesses to hedge price risk and create reliable pricing benchmarks for transactions in commodities.

The CFTC has been dealing with the challenges posed by event contracts since at least the 1990s. They have remained on the fringes of the agency's regulatory jurisdiction, playing no significant role in commercial finance and earning notoriety primarily due to the threats they pose to the public interest by facilitating election gambling and now unregulated sports betting. In the early 1990s and thereafter, the CFTC placed severe restrictions on the early *election* gambling contracts, limiting them to the realm of academic research. *See* In the Matter of the Certification by KalshiEX LLC of Derivatives Contracts with Respect to Political Control of the United States Senate and United States House of Representatives, CFTC Order, at 15 n.33 (Sept. 22, 2023), ("2023 Order").[3] The CFTC did not consider those political event contracts to have "hedging or price-basing utility." *Id.*

In 2008, following a marked rise in inquiries from some market participants, the CFTC issued a concept release seeking input on the "appropriate regulatory treatment" of event contracts. Concept Release on the Appropriate Treatment of Event Contracts, 73 Fed. Reg. 25669, 25670 (May 7, 2008) ("Concept Release"). The CFTC sought to determine whether such contracts fell "within the Commission's jurisdiction" at all, let alone its exclusive jurisdiction. *Id.* at 25670. The release clarifies that in general, event contracts are distinct from other types of derivatives in

---

[3]    *Available at*:    https://www.cftc.gov/sites/default/files/filings/documents/2023/orgkexkalshiordersig230922.pdf.

that they function, at best, as "information aggregation vehicles" that are linked to "eventualities or measures that *neither derive from, nor correlate with*, market prices or broad economic or commercial measures." *Id.* at 25670 (emphasis added).

Several years later, in 2012, the CFTC issued its rule defining swaps. That rule further negates the characterization of sports wagers as swaps. The rule expands upon the detailed statutory definition by adding more inherently financial instruments to the list of covered items. *See* 17 C.F.R. § 1.3 (adding, *e.g.*, cross-currency swaps, currency options, and foreign exchange rate agreements). Nowhere in the 159-page release explaining the rule is there any indication that sport wagers such as Kalshi's, entered for entertainment purposes, should be regarded as swaps. Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48208 (Aug. 13, 2012). To the contrary, the release confirms that event contracts such as sports wagers lack the attributes of a swap, including the financial significance element. For example, the release points out that swaps typically involve "risk-shifting arrangements with financial entities," a characteristic that is absent from Kalshi's sports wagers. *Id.* at 48248. The release also emphasizes that the contracts *excluded* from the definition of a swap are those entered primarily for "personal, family, or household purposes," *id.*

at 48246, which would include sports wagers for entertainment purposes, such as Kalshi's.

This lack of financial significance explains why event contracts in general do not and cannot serve the two primary purposes underlying the derivatives markets. The derivatives markets were established to enable commercial enterprises to hedge their commodity-related risks and to provide those industries with a reliable price discovery mechanism. *See* Concept Release, 73 Fed. Reg. at 25672 ("Customarily, hedging and price basing have been identified as two critical functions of the commodity derivatives markets"); *see also* Findings and Purpose Clause, CEA Section 3, 7 U.S.C. § 5(a) (citing management of price risks, price discovery, and price dissemination).

No credible evidence suggests that Kalshi's sports gambling contracts actually do or even could reliably perform either of these market functions. The CFTC's 2024 rule proposal more precisely defining gaming explains why wagers on contests in general cannot serve these dual purposes: The economic impact of such occurrences is "generally too diffuse and unpredictable to correlate to direct and quantifiable changes in the price of commodities or other financial assets or instruments, limiting the hedging and price-basing utility of an event contract involving such an occurrence." Event Contracts, 89 Fed. Reg. 48975; 48981 (June 10, 2024). The CFTC further observed that such event contracts are likely to be traded predominantly "to enable gambling" and

"used predominantly by speculators or participants not having a commercial or hedging interest," and cannot reasonably be expected to be "used for hedging and/or price basing on more than an occasional basis." *Id.* at 48982.

Event contracts are generally unfit to serve as hedging or pricing instruments for another reason. They rest on unreliable pricing information that is derived not from an underlying cash market with "bona fide economic transactions" to provide pricing information, but from opaque and unregulated sources. This feature of the event contracts market stands in contrast to pricing information on which the swaps markets depend, including government research and analysis, market-derived supply and demand data, and other reliable sources of financial information. *Id.* at 48982.

### 4. Kalshi's Admissions

Kalshi's own portrayal of its sports wagers dispels the notion that they are swaps. For example, in its self-certification filing, it described them as "event contracts," without any reference to "swaps." Self-certification letter submitted to the CFTC, App. A, at 1 (Jan. 22, 2025).[4] And Kalshi promotes its sports wagers as sports gambling opportunities, not

---

[4]  *Available at*: www.cftc.gov/sites/default/files/filings/ptc/25/01/ ptc01222514045.pdf.

commercial hedging instruments. Terry Oldreal, *Game on: Kalshi brings 100% legal sports trading to all 50 states*, KalshiNews (Jan. 24, 2025).[5]

Finally, Kalshi itself has repeatedly argued that sports wagers have no independent financial significance and do not belong on derivatives exchanges. In its litigation with the CFTC, *KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694 (D.D.C. Sept. 12, 2024), Kalshi sought to enhance the bona fides of its election wagering contracts by contrasting them with sports wagers. Kalshi explained that games and events like horse racing or boxing matches "are staged purely for entertainment and to facilitate betting. They have no independent significance; their outcomes carry no economic risks." Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment at 30, *KalshiEX, LLC v CFTC*, No. 23-cv-03257 (D.D.C. Jan. 25, 2024), ECF No. 17-1. Kalshi reiterated this position to the D.C. Circuit in the CFTC's appeal of that District Court's ruling, acknowledging that "as the legislative history directly confirms, Congress did not want sports betting to be conducted on derivatives markets." Brief of Appellee at 41, *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024), Doc. No. 2085055. Kalshi itself concedes that sports wagers lack the financial significance essential to swaps, placing them outside the exclusive jurisdiction provision in Section 2 of the CEA.

---

[5]     *Available at*:     https://news.kalshi.com/p/game-on-kalshi-sports-trading-is-now-100-legal-in-all-50-states-2.

**B. Because Kalshi's sports wagers are flatly prohibited, they are not lawfully traded on a "designated contract market."**

The exclusive jurisdiction provision that Kalshi relies upon only applies where instruments are "traded or executed on a designated contract market [("DCM")]." Kalshi's sports wagers are not being lawfully traded on a DCM because they are flatly prohibited by rule. Based on growing concerns about the potentially harmful impact of various types of event contracts, including specifically gaming contracts, *see* Lincoln-Feinstein colloquy, *supra*, Congress gave the CFTC authority to ban them as contrary to the public interest. 7 U.S.C § 7a-2(c)(5)(C)(ii). The CFTC subsequently adopted a regulation that unambiguously and categorically prohibits DCMs from listing any event contracts, among others, that "involve, relate to, or reference" gaming or an activity that is unlawful under any State or Federal law. 17 C.F.R. § 40.11(a)(1).

Kalshi's contracts fall squarely under this prohibition. There is no serious dispute that Kalshi's sports wagers involve "gaming" within the meaning of the rule. Kalshi repeatedly took that position in its fight with the CFTC over its election gambling contracts. KalshiEX Appellee Brief, *supra*, at 17. That District Court took the same view. *KalshiEX LLC v. CFTC*, 2024 WL 4164694, at *12. And Kalshi's sports wagers involve unlawful activity under state law, because they violate Maryland's laws and regulations governing sports gambling (as well as numerous other state gaming laws).

15

To the extent Kalshi contends that 17 C.F.R. § 40.11(a) is not a flat ban on its contracts, the language and intent of the rule show otherwise. The rule is unambiguously framed as a "prohibition," providing that "a registered entity *shall not* list for trading" any of the enumerated contracts. *Id.* (emphasis added). The release accompanying the rule eliminates any doubt. Provisions Common to Registered Entities, 76 Fed. Reg. 44776 (July 27, 2011) ("Prohibition Rule"). It explains that the "*prohibition* of certain 'gaming' contracts is consistent with Congress's intent to "prevent gambling through the futures markets" and to "protect the public interest from gaming and other events contracts." *Id.* at 44785 (emphasis added). The CFTC unequivocally explains on its website that "CFTC Regulation 40.11 prohibits event contracts that reference terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law." CFTC, Contracts and Products;[6] *see also* Letter from six U.S. Senators to Acting CFTC Chair Caroline Pham (Sept. 30, 2025) (pressing Chair Pham to explain why the CFTC is "not enforcing its clear regulatory mandate promulgated under Regulation 40.11").[7]

---

[6]    *Available    at*:    https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm.

[7]    *Available    at*:    https://news.bloomberglaw.com/securities-law/senators-slam-cftc-over-event-contracts-used-for-sports-betting.

While the rules include separate provisions governing self-certification and preapproval of some contracts, they do not negate the prohibition. 17 C.F.R. §§ 40.2, 40.3. Those procedures address instances where the nature of a contract is genuinely in doubt, including contracts that may be similar to those that are banned. The release explains that subject to further possible rulemaking on gaming contracts, the CFTC will, "in the meantime," prohibit contracts based upon the activities enumerated in Section 5c and "consider individual product submissions on a case-by-case basis under § 40.2 or § 40.3." Prohibition Rule, 76 Fed. Reg. at 44785.

Finally, any CFTC failure to enforce § 40.11 does not rescind the rule or validate Kalshi's unlawful trading activity. Nor does self-certification represent any form of CFTC approval that counteracts the rule. As the CFTC explained in its Order banning Kalshi's election wagers, "an exchange's certification of a product for trading pursuant to CEA section 5c(c)(1) and Commission Regulation 40.2 does not entail or amount to Commission approval of that product." 2023 Order, *supra*, at 17 n.35. Kalshi cannot break federal law to claim preemption for the purpose of evading state law.

17

## II. Even if the jurisdictional provision in Section 2 applied to Appellant's sports wagers, it would not preempt state gaming laws.

The District Court correctly rejected both of Kalshi's preemption arguments predicated on theories of field and conflict preemption. *Martin*, 2025 WL 2194908, at *8-11. *Amicus* does not elaborate on Appellee Martin's persuasive response to Kalshi's arguments on these issues, but it emphasizes two points.

### A. The history of the Dodd-Frank Act confirms that Congress sought to enlarge the role of state law in financial regulation, not preempt it.

In rejecting Kalshi's field preemption argument, the District Court primarily relied on the explicit incorporation of state law in the Special Rule as strong evidence that Congress did not intend to displace all state law in this context. *Martin*, 2025 WL 2194908, at *8 (citing *Power v. Arlington Hosp. Assoc.*, 42 F.3d 851, 864 (4th Cir. 1994) (calling preemption inappropriate when a federal statute expressly incorporates state law)).

The broader legislative context further supports the point. In the Dodd-Frank Act, Congress acted against the backdrop of the financial crisis, and one of its main objectives was to significantly increase the role of the states in multiple spheres of financial regulation to better protect financial consumers and the financial system. Congress applied the bitter lessons learned from the preemption of the states' role in policing

mortgage fraud in the lead-up to the financial crisis. Federal preemption of state anti-predatory lending laws by the Office of the Comptroller of the Currency and the Office of Thrift Supervision contributed significantly to the crisis. That preemption nullified state laws that restricted the aggressive mortgage terms national banks could offer, such as balloon payments, negative amortization schedules, and high fees— and led to much riskier lending. Di Wu *et al.*, *Spillover Effects of Financial Deregulation: The Unintended Consequences of the OCC Preemption Rule on Mortgage Lending Practices*, 95 Int'l Rev. of Fin. Anal., Part C (Oct. 2024).[8] Riskier lending led to more defaults, exacerbating the subprime meltdown and foreclosure crisis. Lei Ding *et al.*, *The Impact of Federal Preemption of State Anti-predatory Lending Laws on the Foreclosure Crisis*, 21 Cornell J. of Pol'y Anal. and Mgmt. 247-290 (2011);[9] *see also The Financial Crisis Inquiry Report*, Fin. Crisis Inquiry Comm'n, 112 (Off. Gov't Ed., Jan. 2011).[10]

Accordingly, in the Dodd-Frank Act, Congress narrowed the scope of preemption in the banking arena and granted states significantly greater

---

[8]     *Available at*: https://www.researchgate.net/publication/ 382466275_Spillover_effects_of_financial_deregulation_The_unintended _consequences_of_the_OCC_preemption_rule_on_mortgage_lending_pra ctices.

[9]     *Available at*: https://ww3.lawschool.cornell.edu/research/JLPP/ upload/White-et-al-final-2.pdf.

[10]     *Available at*: https://www.govinfo.gov/content/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf.

regulatory and enforcement authority over banks and nonbank financial institutions. Arthur E. Wilmarth Jr., *The Dodd-Frank Act's Expansion of State Authority to Protect Consumers of Financial Services*, 36 J. Corp. L. 893, 896 (2011) ("To correct the problems created by federal preemption, Dodd-Frank enlarges both the lawmaking and law enforcement authority of the states in the area of consumer financial protection."); Dennis M. Kelleher & Stephen Hall, *Report: More than Ever, Americans Must Look to the States for Protection Against Financial Fraud and Abuse*, 15-22, Better Markets (Sept. 9, 2025).[11] Congressional intent further undermines Kalshi's field preemption claim.

### B. Conflict preemption does not apply because the CFTC banned gaming contracts, and because Kalshi's sports gambling platform does not require uniform regulation.

The District Court also rightly concluded that Maryland's gaming laws were not subject to conflict preemption. *Martin*, 2025 WL 2194908, at *11-13. That holding is especially well-supported on two grounds. First, conflict preemption is inapplicable because, as explained above, the CFTC flatly prohibited all of the event contracts listed in the Special Rule, including those involving gaming. 17 C.F.R. § 40.11(a)(1). That prohibition disposes of the conflict preemption claim: Since Kalshi's gaming contracts are not allowed to be traded on any DCM, there can be

---

[11] *Available at*: https://bettermarkets.org/wp-content/uploads/2025/09/BetterMarkets_State_Action_Protection_Report_09-09-2025.pdf.

no tension between state laws governing those contracts and any provision of the CEA that would regulate their trading *if* they were permitted.

Second, the rationale for conflict preemption is absent here. Kalshi operates nothing more than a sportsbook for entertainment purposes. It is not an exchange on which financial instruments are traded so that businesses and industries can manage their price risks or obtain pricing benchmarks—the role that derivatives play. So Kalshi does not represent a meaningful financial market in special need of protection from the "chaos" or breakdown in "nationwide uniformity" that Kalshi warns against. Appellant's Br. at 2, 3. Kalshi attempts to cast its gaming platform as something more than a sportsbook by claiming that bettors deal with each other, not a "house." *Id.* at 18-19. But that distinction is irrelevant. Kalshi's attempt to aggrandize its platform as a derivatives exchange rather than a sportsbook fails because it has no distinctive attributes that call for a regulatory model other than state gaming laws. *See* Benjamin Schiffrin, *Sports Betting Scandals Show the Perils of Prediction Markets*, Better Markets (Nov. 20, 2025) (citing New York Times report illustrating that the betting experience on Kalshi is identical to that on the sportsbook FanDuel).[12]

---

[12]    *Available at*: https://bettermarkets.org/wp-content/uploads/2025/11/Prediction-Markets-Fact-Sheet-11.20.25.pdf.

## III.  Preempting state regulation of Kalshi's sports betting threatens to harm millions of American gamblers, election integrity, and the CFTC itself.

Reversing the District Court to hold that the "exclusive jurisdiction" provision of the CEA broadly preempts state law would impose a series of harms upon consumers and the broader public interest. *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), and setting forth requirements for injunctive relief, including that it serve "the public interest"). Three stand out.

### A.  Preempting state law would erase important protections for Maryland's citizens and citizens in states with similar laws.

Reversal here would eliminate Maryland's protections for its citizens who gamble, without providing a meaningful substitute. And it would increase the likelihood that courts in other states will enjoin enforcement of other state gaming laws. This matters because Kalshi's sports wagers pose the same threats of financial harm and degraded quality of life as do fundamentally identical bets offered by other sportsbooks. That threat is substantial, as sports gambling has proven to be financially and emotionally destructive for many Americans. Charles Fain Lehman, *Legalizing Sports Gambling Was a Huge Mistake—The evidence is convincing: The betting industry is ruining lives*, The Atlantic (Sept. 23,

2024).[13] Betting on sports causes households to save less, personal bankruptcies to rise, and domestic violence to increase. Andrew Yang, *Sports Betting Hurts American Men. Time To Rethink Its Regulation*, Newsweek (Dec. 3, 2024).[14]

Maryland and dozens of other states have used their longstanding police power to mitigate this harm by establishing important regulatory protections for their citizens who engage in sports gambling. Md. Code Ann., State Gov't § 9-1E-01 *et seq.*; Code of Maryland Regulations, ch. 36, tit. 10. Maryland's gaming laws and regulations contain numerous safeguards, including evaluation of the integrity and financial stability of gaming licensees; ongoing compliance obligations; and responsible gaming requirements to help protect Marylanders who are young or otherwise vulnerable to gaming addiction. Maryland reinforces these requirements with the threat of criminal sanctions for noncompliance. Md. Code Ann., Crim. Law §§ 12-104, 12-113. Other states have adopted similar protections, and eleven states—including America's most populous, California and Texas—regard sports gambling as so toxic that they have banned it entirely. Cal. Penal Code §§ 330-337z; Tex. Penal Code Ann. § 47.01-14. Kalshi proudly proclaims that its gaming platform

---

[13]    *Available    at*:    https://www.theatlantic.com/ideas/archive/
2024/09/legal-sports-gambling-was-mistake/679925/.

[14]    *Available    at*:    https://www.newsweek.com/sports-betting-hurts-american-men-time-rethink-its-regulation-opinion-1994180.

allows sports wagering in *all* states and without compliance with *any* state gaming requirements; ruling in its favor here both eliminates Maryland's protections and emboldens Kalshi to continue ignoring other states' laws as well.

The need for these state-level protections is only increasing. Maryland has lately seen a marked increase in online/mobile sports gambling. *See Statewide Gambling Prevalence in Maryland: 2024*, at 4, Maryland Center of Excellence on Problem Gambling (2024).[15] The associated harms are increasing, with problem gambling, including "disordered" or addictive gambling, on the rise. *Id.* at 54. And Maryland is hardly alone—the problem is national in scale. *See* Benjamin Schiffrin, Op-Ed, *The U.S. Already Has a Gambling Epidemic—24 Hour Stock Trading Would Only Make It Worse*, Fortune Magazine (Dec. 13, 2024).[16]

## B. Accepting Kalshi's preemption argument would also threaten election integrity.

Kalshi's preemption theory threatens other types of harm far beyond the realm of sports wagering. Kalshi and similar firms are offering the opportunity to bet on a vast array of events, including numerous elections. These wagers risk undermining the integrity of our elections and the public's faith in the electoral process.

---

[15] *Available at*: https://www.mdproblemgambling.com/wp-content/uploads/2025/09/2024-MD-Gambling-Report.pdf.

[16] *Available at*: https://fortune.com/2024/12/13/the-u-s-already-has-a-gambling-epidemic-24-hour-stock-trading-would-only-make-it-worse/.

States almost universally condemn election gambling. The vast majority of states, either through statutes or court decisions, have for 200 years outlawed election wagering as fundamentally antithetical to election integrity, and ultimately to our democracy.[17] *See* 2023 Order, at 11-12 nn.26 &27 (collecting dozens of state prohibitions on election wagering). The CFTC's 2023 Order cited overwhelming opposition to Kalshi's election wagering contract from commenters as well as members of Congress, who warned that "[e]stablishing a large-scale, for-profit political event betting market in the United States . . . would profoundly undermine the sanctity and democratic value of elections." *Id*. at 19-20. The CFTC's Gaming Proposal also addressed these concerns. It cited multiple ways in which wagering on elections can inflict harm, including manipulation of elections to profit on wagers, or the use of wagers to influence elections—with all of it increasingly tied to the deployment of AI. *See* Event Contracts, 89 Fed. Reg. at 48983.

In light of the many state laws banning election gambling, Kalshi would undoubtedly insist, as it does here, that its election wagering contracts are swaps being traded on a DCM, shielded from state prohibitions by virtue of preemption. But as here, such arguments fail. Like the sports wagers, Kalshi's election wagers fall outside the "exclusive jurisdiction" provision in Section 2. As the CFTC explained,

---

[17] Corruption in sports gambling foreshadows the risk of wagering on elections. *See Hendrick*, 2025 WL 3286282, at *9 n.7.

they lack the necessary financial significance; they do not serve as reliable risk hedging or price discovery mechanisms; and they are not based on reliable data. 2023 Order, at 15-21. And they are similarly banned under 17 C.F.R. § 40.11 as gaming and activity that violates state law. Finally, the Congress that passed Dodd-Frank assuredly did not intend to sweep aside nearly 200 years of state laws and court decisions condemning election gambling.

But the similar subject matter illustrates the stakes here: the fate of state laws that protect democracy from the corrupting influence of wagering on elections. Preemption here would bring us closer to the day when the states can do nothing to enforce their widely shared judgment that election wagering is an intolerable threat to our society.

### C. The CFTC lacks the authority, expertise, and resources to oversee sports gambling, and it has a core mission that Americans depend on it to fulfill.

Reversal here would place the CFTC in the untenable position of attempting to police the gaming industry and thousands of elections. The CFTC cannot possibly provide protections that are comparable to those that the dozens of state gaming laws and commissioners provide to their citizens. Nor could the CFTC possibly oversee the countless elections that take place throughout the country to ensure that gambling and the associated manipulation do not corrupt election outcomes.

In the first instance, the CEA and its provisions do not supply the CFTC with the legal tools necessary to regulate sports gambling or election wagering. Understandably, then, the CFTC has freely admitted it lacks the expertise or mandate to oversee sports gambling or elections. *See* Event Contracts, 89 Fed. Reg. at 48982-83 (CFTC lacks statutory mandate and specialized experience to oversee gambling); *id.* at 48983 (CFTC lacks the specialized experience appropriate for investigating election outcomes); *see also Hendrick*, 2025 WL 3286282, at *13 ("[Neither DCMs nor the CFTC is equipped to address [the harm from problem gambling] the same way state gaming regulators and licensed entities are.").

Furthermore, even if it had a statutory mandate and the requisite expertise, the CFTC lacks the staff and budget necessary to fill those roles. The CFTC ranks among the smallest regulatory agencies, with a budget of only $365 million, CFTC, President's Budget: FY2026, at 4,[18] and a small staff well under 700, which has been reduced by at least 15% since the beginning of the Trump Administration, Lydia Beyoud, *Staff Cuts and Turmoil Hit the CFTC While the Crypto It Oversees Booms*, Bloomberg (Aug. 21, 2025).[19] With those limited resources, it already

---

[18] *Available at*: https://www.cftc.gov/sites/default/files/CFTC_FY2026_Presidents_Budget.pdf.

[19] *Available at*: https://www.bloomberg.com/news/features/2025-08-21/as-crypto-duties-loom-cftc-is-hit-by-staff-cuts-and-turmoil.

must oversee a futures and swaps market with a notional value of nearly $400 trillion dollars and thousands of market participants. The CFTC also assumes responsibility for parts of the rapidly-expanding crypto market, with additional jurisdiction looming. *See* Press Release, CFTC, Acting Chairman Pham Announces First-Ever Listed Spot Crypto Trading on U.S. Regulated Exchanges (Dec. 4, 2025);[20] *Crypto Legislation: An Overview of H.R. 3633, the CLARITY Act*, CONGRESS.GOV (Sept. 30, 2025) (explaining that the "Clarity Act" would give the CFTC "a central role in regulating digital commodities and related intermediaries").[21]

The agency does not have the capacity to serve as a gaming commissioner or election supervisor for the nation, and asking it to do so would weaken its ability to discharge its core mission: maintaining the integrity and efficiency of the derivatives markets so commercial enterprises can safely and reliably hedge price risk in the raw materials they use and the products they sell. That important mission helps ensure that Americans have access to the countless products they need in their daily lives, at stable prices.

The issues presented here are urgent, with prediction markets rapidly expanding in both size and complexity. Kalshi itself is growing through

---

[20] *Available at*: https://www.cftc.gov/PressRoom/PressReleases/9145-25.

[21] *Available at*: https://www.congress.gov/crs-product/IN12583.

capital infusions and partnerships, and it has "greatly expanded its offerings." *Hendrick*, 2025 WL 3286282, at *13. Other platforms also offer betting on sports, elections, and an extraordinary variety of other events. Traditional sports books such as FanDuel and DraftKings are now seeking to adopt Kalshi's strategy for evading state laws on gaming by seeking CFTC designation as contract markets. *Hendrick*, 2025 WL 3286282, at *14. And the prediction market industry, including Kalshi, is building a trade association. Ganesh Setty, *Betting, Trading Platforms Form Prediction Market Alliance*, Law360 (Dec. 12, 2025); Aislinn Keely, *Robinhood, Susquehanna take over exchange LedgerX in prediction markets push*, Reuters (Nov. 26, 2025).[22] As the industry expands, cases involving the same preemption arguments Kalshi advances here continue to multiply. *See, e.g., KalshiEX LLC v. Williams*, No. 1:25-cv-08846 (S.D.N.Y.); *KalshiEX LLC v. Cafferelli*, No. 3:25-cv-02016 (D. Conn.); *Massachusetts v. KalshiEX LLC*, No. 2584-cv-02525 (Suffolk Cnty. Sup. Ct.). Rejecting such arguments and affirming in this case will not only preserve important state-level consumer protections but also establish an important precedent—one that will help prevent more widespread harm from unregulated sports gambling and other event contracts posing even greater threats to the public interest.

---

[22] *Available at*: https://www.reuters.com/sustainability/boards-policy-regulation/robinhood-susquehanna-take-over-exchange-ledgerx-prediction-markets-push-2025-11-26/.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be affirmed.

Respectfully submitted,

 /s/ Jim Davy

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

Dennis M. Kelleher
Stephen Hall
Better Markets, Inc.
1825 K Street, NW, Suite 1080
Washington, DC 20006
(202) 618-6464
dkelleher@bettermarkets.org
shall@bettermarkets.org

Counsel for *Amicus Curiae*

December 22, 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) because it contains 6,281 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word version 16.103.4 in 14-point Century Schoolbook font.

/s/ Jim Davy
Jim Davy

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

I further certify that, if the Court asks for paper copies, I will file them of this brief with the Clerk of Court within the time required.

/s/ Jim Davy
Jim Davy