No. 25-1892

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

KALSHIEX LLC,
*Plaintiff-Appellant,*

v.

JOHN A. MARTIN, ET AL.,
*Defendants-Appellees.*

On Appeal from the Judgment of the United States
District Court for the District of Maryland
(Dist. Ct. No. 1:25-cv-01283-ABA)

## BRIEF OF *AMICI CURIAE* OF NEVADA, OHIO, 36 OTHER STATES, AND THE DISTRICT OF COLUMBIA SUPPORTING APPELLEES

AARON D. FORD
Nevada Attorney General

HEIDI PARRY STERN
Nevada Solicitor General
JESSICA E. WHELAN
Chief Deputy Solicitor General
Office of the Nevada
Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
702.486.3420
jwhelan@ag.nv.gov

*Counsel for Amicus Curiae*
  *State of Nevada*

DAVE YOST
Ohio Attorney General

MATHURA J. SRIDHARAN*
Ohio Solicitor General
  *\*Counsel of Record*
ZACHERY P. KELLER
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Mathura.Sridharan@OhioAGO.gov

*Counsel for Amicus Curiae*
  *State of Ohio*

*Additional counsel listed after signature block*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ii

STATEMENT OF AMICI INTEREST ...................................... 1

INTRODUCTION ................................................................ 1

BACKGROUND ................................................................ 3

I.   The States traditionally have regulated gambling, including sports betting. ................................................................ 3

II.   In 2010, Congress amended the Commodity Exchange Act in the wake of the 2008 financial crisis. ........................... 7

III.   Kalshi argues that Congress—in responding to the 2008 financial crisis—legalized sports betting nationwide. ............. 11

SUMMARY OF ARGUMENT .................................... 14

ARGUMENT ................................................................ 15

I.   When Congress makes major changes to the existing state of law, it does so clearly, not obscurely. ..................... 16

   A.   Kalshi's position violates the federalism canon. ................. 17

   B.   Kalshi's position violates the major-questions doctrine. ...... 21

II.   Kalshi's position would leave sports betting largely unregulated and endanger the States' citizens. ........................... 25

   A.   States are experienced in regulating sports betting and its many potential harms. ..................................... 25

   B.   Existing federal regulation is an insufficient substitute for the States' robust gaming regulations. ........................... 31

CONCLUSION ................................................................ 34

ADDITIONAL COUNSEL ............................................ 36

CERTIFICATE OF COMPLIANCE ............................ 38

CERTIFICATE OF SERVICE ...................................... 39

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Ah Sin v. Wittman,*
    198 U.S. 500 (1905) ............................................................ 3, 14, 18, 19

*Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n,*
    576 U.S. 787 (2015) ............................................................ 33

*Bond v. United States,*
    572 U.S. 844 (2014) ............................................................ *passim*

*Cipollone v. Liggett Grp., Inc.,*
    505 U.S. 504 (1992) ............................................................ 21

*CSX Transp., Inc. v. Easterwood,*
    507 U.S. 658 (1993) ............................................................ 18

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ............................................................ 20

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Centro de*
    *Periodismo Investigativo, Inc.,*
    598 U.S. 339 (2023) ............................................................ 16

*Greater New Orleans Broadcasting Ass'n, Inc. v. United*
    *States,*
    527 U.S. 173 (1999) ............................................................ 19

*Helton v. Hunt,*
    330 F.3d 242 (4th Cir. 2003) ............................................... 19

*Inv. Co. Inst. v. CFTC,*
    720 F.3d 370 (D.C. Cir. 2013) ............................................. 7, 8

*Kalshiex, LLC v. Hendrick,*
    No. 2:25-cv-00575, 2025 WL 3286282 (D. Nev. Nov. 24,
    2025) ................................................................................... 13

*Kansas v. Garcia,*
    589 U.S. 191 (2020) ............................................................ 16

*King v. Burwell,*
 576 U.S. 473 (2015) ............................................................... 15, 22, 25

*Merrill Lynch, Pierce, Fenner & Smith v. Curran,*
 456 U.S. 353 (1982) ...................................................................... 9

*Mills-Jennings of Ohio, Inc. v. Dep't of Liquor Control,*
 70 Ohio St. 2d 95 (1982) ............................................................ 4, 5

*Murphy v. NCAA,*
 584 U.S. 453 (2018) ............................................................... *passim*

*United States v. Phillips,*
 155 F.4th 102 (2d Cir. 2025) ...................................................... 9, 10

*West Virginia v. EPA,*
 597 U.S. 697 (2022) ............................................................... *passim*

*Whitman v. Am. Trucking Ass'ns,*
 531 U.S. 457 (2001) ............................................................ 1, 14, 16

## Statutes, Regulations, and Constitutional Provisions

U.S. Const. amend. X ................................................................... 17

U.S. Const. art. VI ....................................................................... 15

Ohio Const. art. XV, §6 ................................................................. 5

17 C.F.R. §§38.100–.1200 ............................................................. 31

17 C.F.R. §38.700 ....................................................................... 31

17 C.F.R. §38.750 ....................................................................... 31

17 C.F.R. §38.850 ....................................................................... 31

54 Fed. Reg. 30694 (July 21, 1989) ................................................ 10

7 U.S.C. §1a ........................................................................ 11, 23

7 U.S.C. §2 ....................................................................... *passim*

7 U.S.C. §7a-2 ................................................................. 33

7 U.S.C. §16 ............................................................. 20, 21

Nev. Gaming Comm'n Reg. 22.010 ................................ 26

Nev. Gaming Comm'n Reg. 22.060–.063 ........................ 26

Nev. Gaming Comm'n Reg. 22.080 ................................ 26

Nev. Gaming Comm'n Reg. 22.1205 ............................... 27

Nev. Gaming Comm'n Reg. 22.121 ................................. 27

Nev. Gaming Comm'n Reg. 5.170 .................................. 26

Nev. Rev. Stat. ch. 462 ................................................... 7

Nev. Rev. Stat. ch. 463 ................................................... 7

Nev. Rev. Stat. ch. 463B ................................................ 7

Nev. Rev. Stat. ch. 464 ................................................... 7

Nev. Rev. Stat. ch. 465 ................................................... 7

Nev. Rev. Stat. ch. 466 ................................................... 7

Nev. Rev. Stat. §129.010 ............................................... 30

Nev. Rev. Stat. §463.0129 ........................................ 25, 26

Nev. Rev. Stat. §463.170 .......................................... 26, 32

Nev. Rev. Stat. §463.350 ............................................... 30

Nev. Rev. Stat. §§463.362–.3668 .................................. 26

Nev. Rev. Stat. §463.530 ............................................... 26

Nev. Rev. Stat. §463.5735 ............................................. 26

Nev. Rev. Stat. §§465.092–.094 .................................... 26

Ohio Rev. Code ch. 3769.................................................................7

Ohio Rev. Code ch. 3770.................................................................7

Ohio Rev. Code ch. 3772.................................................................7

Ohio Rev. Code ch. 3774.................................................................7

Ohio Rev. Code ch. 3775.................................................................7

Ohio Rev. Code §3109.01...............................................................30

Ohio Rev. Code §3775.02...............................................................27

Ohio Rev. Code §3775.03...............................................................27

Ohio Rev. Code §3775.09...............................................................27

Ohio Rev. Code §3775.13...............................................................27

Ohio Rev. Code §3775.99...............................................................30

Pub. L. 111-203, 124 Stat. 1376 (2010).....................................10

**Other Authorities**

Am. Gaming Ass'n, *State of the States 2025* (May 13, 2025) ..................6

Brandon Gustafson, *2024: A year of growth for sports betting revenue*, CBS Sports (Mar. 28, 2025)...................................22

Charita M. Goshay, *Ohio offers Voluntary Exclusion List for problem gamblers as calls to helpline rise*, Canton Repository (Sept. 2, 2024)....................................................28

Dustin Gouker, *Kalshi Rolls Out Same-Game Parlays For Monday Night Football Games*, Event Horizon (Sept. 30, 2025)..........................................................................12

Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon (April 3, 2025) ........................................11, 12

Erin Gottsacker, *A statewide telehealth service is changing the game for Ohioans with gambling addictions*, The Ohio Newsroom (Nov. 18, 2024) ................................................. 28

Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report: Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (2011) ...................................................................... 10

George G. Fenich, *A Chronology of (Legal) Gaming in the U.S.*, 3 UNLV Gaming Rsch. & Rev. J. 65 (1996) ........................... 3, 4

*History of Gaming in Nevada*, Nevada Resort Association .................. 4, 5

Jennifer Carleton et al., The Gambling Law Review (Carl Rohsler ed. 2016) .......................................................... 5

John C. Hull, *Options, Futures, and Other Derivatives* (8th ed. 2012) ...................................................................... 7, 8, 9

John Gramlich, *Americans increasingly see legal sports betting as a bad thing for society and sports*, Pew Research Center (Oct. 2, 2025) ........................................... 22

Kalshi Member Agreement (November 4, 2025) .................................... 29

Kalshi Website, Sports: Pro Football; Exact wins ................................ 12

Katie Mogg & Aria Bendix, *Gambling addiction hotlines say volume is up and callers are younger as online sports betting booms*, NBC News (April 5, 2024) .......................... 29

Kelly Kennedy, *'I didn't care who was playing': Has the legalization of sports betting impacted problem gambling in Ohio?*, Cleveland 19 News (July 18, 2024) ..................... 28

Lev Akabas, *Kalshi's Volume Has Been 90% Sports During Football Season*, Sportico (Oct. 3, 2025) ........................... 22

Lia Nower, et al., *The Prevalence of Online and Land-Based Gambling in New Jersey*, Rutgers University: Center for Gambling Studies (2023) ...................................................... 29

Matt Stone, *Risk of Gambling Addiction Up 30%*, 21-WFMJ (Feb. 16, 2025) ........................................................ 28

Nat'l Gambling Impact Study Comm'n, Final Report (1999) ....... 7, 27, 29

Norman Menachem Feder, *Deconstructing Over-the-Counter Derivatives*, 2002 Colum. Bus. L. Rev. 677 (2002) .............................. 8

*Ohio Gambling Survey 2022*, Ohio Casino Control Commission ............................................................... 28

Rena S. Miller, *Derivatives Regulation and Legislation Through the 111th Congress*, Congressional Research Services (Jan. 30, 2012) ........................................ 8

Randi Richardson, *Online gambling has fueled an industry boom*, NBC News (Oct. 24, 2024) ...................................... 28

Robert D. Faiss & Gregory R. Gemignani, *Nevada Gaming Statutes: The Evolution and History*, UNLV: The Center for Gaming Research Occasional Paper Series (2011) ........................ 5

Ryan Morik, *Ohio governor calls for an end to player prop betting amid investigation into Guardians pitchers*, Fox Business (July 31, 2025) ...................................... 30

Tom Withers, *Cavs coach Bickerstaff says he received threats from gamblers, feels sports betting 'gone too far'*, AP News (Mar. 20, 2024) ................................................... 30

*U.S. Charges N.B.A. Coach and Players in Gambling Schemes*, The New York Times (Oct. 23, 2025) .................................. 30

## STATEMENT OF AMICI INTEREST

*Amici* consist of Nevada, Ohio, 36 other States, and the District of Columbia (collectively, "the *amici* States"). They are interested in this case because Kalshi's aggressive theory of preemption threatens the States' longstanding ability to protect their citizens. The *amici* States submit this brief under Federal Rule of Appellate Procedure 29(a)(2).

## INTRODUCTION

As the saying goes, Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Courts do not expect Congress to make dramatic changes through obscure language. They instead expect Congress to speak clearly if it intends a sea change.

This basic point dooms Kalshi's case. By way of background, in January 2025, Kalshi began offering online sports betting on its platform. This activity, unsurprisingly, caught the States' attention. The States have long regulated gambling, including sports betting. In some States, sports betting is simply illegal, while in other States, it is allowed but comprehensively regulated. Nonetheless, Kalshi says that state gambling laws do not matter to its activities. That is so, Kalshi argues, because of financial legislation Congress enacted fifteen years ago. Back

then, sports betting was illegal in all but a few States. But, according to Kalshi, Congress subtly preempted the States from regulating sports betting when it responded to the 2008 financial crisis—apparently without anyone noticing for years.

If that sounds farfetched, that is because it is. Indeed, Kalshi's position violates two clear-statement rules that inform how courts interpret federal law. *First*, under the federalism canon, courts expect Congress to speak clearly when it intends to shift this country's traditional balance of power. It follows that Congress could not have removed the States' traditional authority over sports betting without even mentioning the subject. *Second*, under the major-questions doctrine, courts expect Congress to speak clearly if it intends to give a federal agency unprecedented authority over significant topics. That doctrine also matters here, as Kalshi's position would delegate to a federal commission the authority to set nationwide sports-gambling policy. If Congress really wanted to delegate that much power, it would not have kept the matter a secret.

In short, the unlikelihood of Kalshi's position signals its downfall. The *amici* States thus submit this brief in support of Maryland.

## BACKGROUND

Kalshi's preemption argument rests on an unrealistic premise. The company submits that, when responding to the 2008 financial crisis, Congress quietly chose to make sweeping changes to this country's gambling laws. To understand why that is so unlikely, it helps to review this country's regulatory history—both as to gambling and derivatives markets.

## I.  The States traditionally have regulated gambling, including sports betting.

A. The regulation of gambling is "concededly within the police powers of a state." *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905). Indeed, the States have a lengthy history of regulation.

Gambling regulation traces back to before the Founding. On their way to the Americas, sailors on Columbus's ships played games of chance to pass the time. *See* George G. Fenich, *A Chronology of (Legal) Gaming in the U.S.*, 3 UNLV Gaming Rsch. & Rev. J. 65, 66 (1996). But, in the seventeenth century, settling communities began to outlaw such behavior. In 1638, the Puritans of Massachusetts enacted idleness laws that barred people from possessing cards, dice, or other gambling devices. *Id.* About fifty years later, the Quakers of Pennsylvania enacted a similar prohibition. *Id.* During the next century, colonies like New Hampshire

3

and New Jersey took comparable steps. *Id.* Authorities in the Northwest Territories did, too. *Mills-Jennings of Ohio, Inc. v. Dep't of Liquor Control*, 70 Ohio St. 2d 95, 99 (1982).

After the Founding, opposition to gambling continued to build. For instance, shortly after Ohio entered the Union, its legislature made various forms of gambling illegal. *Id.* And the Ohio Constitution of 1851 expressly added prohibitions on lotteries. *Id.* Even in Nevada, perhaps the most gambling-friendly State in the Union, games of chance were prohibited by the territorial and early state legislatures. *See History of Gaming in Nevada*, Nevada Resort Association, perma.cc/M3FE-BUW2. With these and other developments, "gambling was largely banned throughout the country" by the late 1800s. *Murphy v. NCAA*, 584 U.S. 453, 458 (2018).

But in the twentieth century, many States loosened gambling prohibitions. *Id.* at 458–59. Nevada, for instance, first decriminalized certain forms of gambling in 1869. *History of Gaming in Nevada*, Nevada Resort Association, perma.cc/M3FE-BUW2. After a brief ban on gambling during the Progressive Movement, Nevada eventually legalized "wide-open" gambling in 1931, a move that soon gave rise to Nevada's booming casino

4

industry. *Id.*; Robert D. Faiss & Gregory R. Gemignani, *Nevada Gaming Statutes: The Evolution and History*, UNLV: The Center for Gaming Research Occasional Paper Series, at 1 (2011), http://digitalscholarship.unlv.edu/occ_papers/11.

Although Nevada was on the forefront, other States have also softened on gambling over time. Ohio, as one example, legalized bingo and state-conducted lotteries in the 1970s. *Mills-Jennings of Ohio*, 70 Ohio St. 2d at 101. And, about fifteen years ago, a slim majority of Ohio voters approved a constitutional amendment allowing for casino gaming. *See* Ohio Const. art. XV, §6(C).

**B.** Recently, the country's attention has turned to sports betting. *See Murphy*, 584 U.S. at 460–61. Like other forms of gambling, sports betting was illegal throughout the States for much of this country's history. *See id.* at 458. That began to change in the mid-twentieth century. Nevada set the pace in this area, too: the Silver State began permitting some sports betting with the passage of the Gaming Control Act of 1949. *See* Jennifer Carleton et al., The Gambling Law Review 147 (Carl Rohsler ed. 2016), perma.cc/3BSY-UYMZ. Over the next few decades, Montana,

5

Delaware, and Oregon also legalized certain forms of sports betting. *Murphy*, 584 U.S. at 462.

In the early 1990s, Congress tried to halt sports betting's continued growth. Through the Professional and Amateur Sports Protection Act, Congress purported to bar States from authorizing any additional sports betting. *Id.* at 461. In *Murphy*, however, the Supreme Court held that this barrier was unlawful. *Id.* at 458, 480. Thus, just seven years ago, the Supreme Court left the States "free to act" as they wished on the "controversial subject" of "sports gambling." *Id.* at 486.

The States have made different choices after *Murphy*. Eleven States—Alabama, Alaska, California, Georgia, Hawaii, Idaho, Minnesota, Oklahoma, South Carolina, Texas, and Utah—have kept sports betting illegal. *See* Am. Gaming Ass'n, *State of the States 2025*, at 12-13 (May 13, 2025), perma.cc/J27S-WLSB. But most States have chosen legalization. Today, thirty-nine States, along with the District of Columbia, permit some form of sports betting. *Id.*

**C.** The increased legalization of gambling has not left gambling unregulated. Instead, the States' "authorization of legalized gambling" over the years "has almost always been accompanied by the establishment of

6

a corresponding regulatory regime and structure." Nat'l Gambling Impact Study Comm'n, Final Report, 3-1 (1999), perma.cc/UF4R-2UXH. For example, Ohio has comprehensive statutory schemes regulating the gambling it authorizes. *See, e.g.*, Ohio Rev. Code chs. 3769 (horse racing), 3770 (lotteries), 3772 (casino gaming), 3774 (fantasy contests), 3775 (sports gaming). As does Nevada. *See, e.g.*, Nev. Rev. Stat. chs. 462 (lotteries and games), 463 (licensing and control of gaming), 463B (supervision of certain gaming establishments), 464 (pari-mutuel wagering), 465 (crimes and liabilities concerning gaming), 466 (horse racing).

## II.  In 2010, Congress amended the Commodity Exchange Act in the wake of the 2008 financial crisis.

**A.** The States' regulation of gambling has long co-existed with federal regulation of derivatives markets. Before unpacking those federal regulations, it helps to review some financial terms. A "derivative" is a financial contract whose value depends on, and usually derives from, another, more basic asset such as the value of a stock or the price of hogs. John C. Hull, *Options, Futures, and Other Derivatives*, 1 (8th ed. 2012); *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 372 (D.C. Cir. 2013). A "futures contract" is one type of derivative in which "an agreement between two parties to buy or sell an asset at a certain time in the future for a certain price."

7

Hull, *Options, Futures, and Other Derivatives*, 7.  Parties come together to trade such contracts in standardized form on "exchanges."  *Id.*

Swaps are another type of derivative in which two parties agree to exchange cash flows in the future.  *Id.* at 148; *see also Inv. Co. Inst.*, 720 F.3d at 373*;* Norman Menachem Feder, *Deconstructing Over-the-Counter Derivatives*, 2002 Colum. Bus. L. Rev. 677, 701–13 (2002) (discussing different types of swaps).  The "most common" swap is an interest-rate swap in which "a company agrees to pay cash flows equal to interest at a predetermined" rate over a number of years and, in return, receives interest at a floating rate over the same period of time.  Hull, *Options, Futures, and Other Derivatives*, 148.  As another example, a "credit-default swap" mitigates the creditors' risk of a debtor defaulting.  To illustrate, "a company that supplies auto parts to General Motors and depends on payments from GM might purchase a credit default swap on a GM bond to hedge against the risk of a GM default."  Rena S. Miller, *Derivatives Regulation and Legislation Through the 111th Congress*, Congressional Research Services, at 2 (Jan. 30, 2012).

**B.**  With those terms established, move to the regulatory history. From as early as 1921, Congress authorized legislation regulating trades

8

of certain derivatives in commodities markets. *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 360 (1982). In 1936, Congress enacted the Commodity Exchange Act to expand federal oversight to different commodities and to increase regulation over futures contracts. *Id.* at 362. Among other things, the Act authorized federal officials "to fix limits on the amount of permissible speculative trading in a futures contract." *Id.* at 362–63.

A few decades later, Congress created the Commodity Futures Trading Commission ("CFTC"). *Id.* at 365–66. It gave the CFTC "exclusive jurisdiction over commodity futures trading." *Id.* at 386. But lawmakers worried that some might overread the CFTC's jurisdiction. *Id.* at 386. Thus, the statute detailing the CFTC's exclusive jurisdiction contains two saving clauses, which protect the States' "regulatory authorities" and "the jurisdiction" of state courts. 7 U.S.C. §2(a)(1)(A).

**C.** Until 2010, the CFTC lacked authority to regulate swaps. *United States v. Phillips*, 155 F.4th 102, 112 (2d Cir. 2025). That is likely because for many years, swaps were perceived as a narrow category of derivatives with little potential for mischief. In 1989, for instance, the CFTC issued guidance distinguishing unregulated "swap transactions"

from regulated "futures contracts." *See* 54 Fed. Reg. 30694, 30694 (July 21, 1989). The commission stressed that swaps were "predominantly" confined to "commercial and institutional participants." *Id.* at 30695. A swap, moreover, typically involved parties acting "in conjunction with" their "line of business." *Id.* at 30697. The CFTC further emphasized that unregulated swaps were not "marketed to the public." *Id.*

Without regulation, however, "[t]rading in swaps exploded in the early 2000s." *Phillips*, 155 F.4th at 113. And many blamed swaps for the 2008 financial crisis. *Id.* In particular, a congressionally authorized investigation found that credit-default swaps helped "fuel the housing bubble." Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report: Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* at xxiv (2011), perma.cc/C54L-RZVE.

In response, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act. Pub. L. 111-203, 124 Stat. 1376 (2010). The Act extended the CFTC's jurisdiction to include "swaps." *See* 7 U.S.C. §2(a)(1)(A). The Act defined a "swap" to include "any agreement, contract, or transaction … that provides for any purchase, sale, payment,

or delivery … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. §1a(47)(A). The Act further made it generally "unlawful for any person ... to enter into a swap unless the swap is entered into on" a CFTC-regulated contract market. 7 U.S.C. §2(e); *see also* 7 U.S.C. §1a(18). Thus, an ordinary consumer who wishes to trade in a "swap" must do so on a designated contract market.

## III. Kalshi argues that Congress—in responding to the 2008 financial crisis—legalized sports betting nationwide.

This brings us to the dispute between Kalshi and the States. Kalshi is a designated contract market that offers online "events contracts" to users. Contracts traded on Kalshi identify a future circumstance and allow users to bet on whether the circumstance will happen. If users bet correctly, they are paid out. By this format, Kalshi boasts that users may "[t]rade on anything" regardless of state law. X Post, @Kalshi, perma.cc/X9YC-EHE7 (last accessed November 24, 2025).

Many of the "contracts" Kalshi lists are indistinguishable from sports betting. *See* Dustin Gouker, *Ten Times Kalshi Said People Could Bet On Things*, Event Horizon (April 3, 2025) perma.cc/CWK2-TZCV. Kalshi has

11

said so.  Take, for instance, this ad from the last March Madness tournament:



*Id.*

It takes only a quick trip to Kalshi's website to solidify the point.  The website has an entire category dedicated to "sports" where people can bet on "events" like whether the Baltimore Ravens will win ten or more games this season.  Kalshi Website, Sports: Pro Football; Exact wins, https://kalshi.com/sports/football (last accessed December 15, 2025).  Kalshi also recently began offering parlays, which combine two or more wagers into a single bet.  *See* Dustin Gouker, *Kalshi Rolls Out Same-Game Parlays For Monday Night Football Games*, Event Horizon (Sept. 30, 2025), perma.cc/V3M9-L59R.

To support its claim of nationwide sports betting, Kalshi relies on a novel theory. It argues that events contracts about sports are "swaps" within the CFTC's exclusive jurisdiction. Kalshi Br.25–26. Kalshi is now litigating this theory across the country. In addition to Maryland, lawsuits are ongoing in Connecticut, Nevada, New Jersey, New York, Massachusetts, and Ohio. Illinois and Montana have also sent Kalshi cease-and-desist letters.

While preliminary results have been mixed, multiple district courts have already found Kalshi's theory unlikely. Below, the district court laid out many different reasons why statutory text does not signal the necessary preemptive intent. Memo. Op. 13–20, R.70. More recently, a Nevada district court rejected the premise that sports wagers qualify as swaps under federal law. *Kalshiex, LLC v. Hendrick*, No. 2:25-cv-00575, 2025 WL 3286282, at *3 (D. Nev. Nov. 24, 2025). That court emphasized that "Kalshi's proposed reading" would upend the "the traditional balance between state and federal regulation of gaming" without an "expressed congressional intent to do so"; all while leaving "no federal gaming regulator to replace the states' regulatory infrastructures." *Id.* at *8.

13

## SUMMARY OF ARGUMENT

The *amici* States agree with Maryland that federal law does not preempt States from regulating sports betting via events contracts. Through both legal and practical considerations, this brief highlights the implausible nature of Kalshi's theory.

**I.** When Congress intends major changes to federal law, it does not obscure that intent. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Kalshi's position violates this well-settled notion in two ways.

*First*, Kalshi's position violates the federalism canon. Under the canon, courts expect Congress to speak clearly if it intends to shift the States' historic powers to the federal government. *Bond v. United States*, 572 U.S. 844, 857–59 (2014). This canon applies here. The regulation of gambling falls within the States' traditional powers. *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905). For centuries, therefore, the States have regulated gambling, including sports betting. This Court should not upset this traditional balance absent a clear congressional directive. And Kalshi identifies none.

*Second*, Kalshi's position violates the major-questions doctrine. The doctrine requires broad claims of federal-agency authority to flow from

14

"clear congressional authorization." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (quotation omitted). This doctrine also applies here. With millions of people involved and billions of dollars at stake, sports betting is a matter of great political and economic significance. Kalshi's theory gives the CFTC broad power to make nationwide decisions about sports betting. If Congress intended to give the CFTC so much power, it would have spoken far more clearly.

**II.** The negative ramifications of Kalshi's position are another sure sign that the company is wrong. The States have considerable experience in regulating gambling, including sports betting. The CFTC, by contrast, "has no expertise in crafting" policies to address sports betting. *See King v. Burwell*, 576 U.S. 473, 486 (2015). That makes it "especially unlikely that Congress would have delegated" this power in such an opaque manner. *See id.*

## ARGUMENT

Under the Supremacy Clause, federal law is "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. So, when Congress acts within its enumerated powers, it may preempt state law through federal statutes. Such preemption can take different forms: federal statutes sometimes

preempt state law expressly; other times they preempt by implication. *Kansas v. Garcia*, 589 U.S. 191, 202–03 (2020). But preemption always turns on the text of federal law. *Id.* at 202. And to give statutory text a "fair reading," courts must remain aware that "Congress legislates against the backdrop" of certain presumptions. *Bond v. United States*, 572 U.S. 844, 857 (2014) (quotation omitted).

In this case, two backdrop presumptions—the federalism canon and major-questions doctrine—render Kalshi's position untenable. And practical considerations only reinforce the point.

## I.    When Congress makes major changes to the existing state of law, it does so clearly, not obscurely.

Congress, the Supreme Court has said, does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). So when Congress seeks to change the "fundamental" nature of existing law, it does not use "vague terms or ancillary provisions." *Id.* Textual arguments that suggest otherwise "ultimately founder." *See id.*

This no-elephants-in-mouseholes principle has several context-specific applications. For example, if Congress wishes to abrogate a government body's sovereign immunity, it "must use unmistakable language." *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Centro de Periodismo*

16

*Investigativo, Inc.*, 598 U.S. 339, 342 (2023). And "absent a clear statement from Congress," courts presume that federal statutes are inapplicable outside the United States. *Bond*, 572 U.S. at 857. These and other "clear-statement rules help courts act as faithful agents of the Constitution." *West Virginia v. EPA*, 597 U.S. 697, 736 (2022) (Gorsuch, J., concurring) (quotation omitted).

Two clear-statement rules prove critical here. Specifically, the federalism canon and major-questions doctrine both demonstrate why Kalshi's counterintuitive preemption theory should fail.

### A.     Kalshi's position violates the federalism canon.

Begin with the federalism canon, which stems from "basic principles of federalism." *Bond*, 572 U.S. at 859. As every schoolchild learns, the Constitution gives the federal government "only limited powers; the States and the people retain the remainder." *Id.* at 854; *see* U.S. Const. amend. X. That setup leaves the States with considerable police powers that they exercise for the public good. *Bond*, 572 U.S. at 854. Congress, moreover, legislates against this default ordering of sovereign authority. *Id.* at 857–58. Against that "backdrop," any statute that displaces or limits a significant amount of state power constitutes a major change. *See*

17

*id.* at 857 (quotation omitted).  And one expects Congress to speak clearly when effecting a major change.  Thus, absent a "clear statement," courts should not assume that Congress intends "a significant change in the sensitive relation between" the federal and state governments in an area of "traditional state authority." *Id.* at 858–59 (quotation omitted).  That ensures that Congress "has in fact faced, and intended to bring into issue, the critical matters involved." *Id.* at 858 (quotation omitted).

This federalism canon applies with particular force to preemption. Preemption necessarily triggers the "sensitive relation between federal and state" authority. *Id.* (quotation omitted).  Courts thus need "to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers." *Id.* at 858 (quotation omitted).  Courts should thus be especially "reluctant to find" preemption in an area "traditionally governed by state law." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

The federalism canon applies with full force here.  Given the many dangers of gambling (*below* 27–30), the regulation of gambling fits neatly "within the police powers of a State." *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905).  Or, to borrow this Court's words, "because the regulation

18

of lotteries, betting, poker, and other games of chance touch all of the above aspects of the quality of life of state citizens the regulation of gambling lies at the heart of the state's police power." *Helton v. Hunt*, 330 F.3d 242, 246 (4th Cir. 2003) (quotation omitted). It should therefore come as no surprise that the States have a lengthy history of gambling regulation, including the regulation of sports betting. *Above* 3–7. And federal law historically has "defer[red] to, and even promote[d], differing gambling policies in different States." *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173, 187 (1999).

Applying the federalism canon, Kalshi's theory should fail unless Congress made a "clear statement" signaling that it intended "a significant change in the sensitive relation between" the federal and state governments as to gambling. *See Bond*, 572 U.S. at 858–59 (quotation omitted); *accord Ah Sin*, 198 U.S. at 505–06. Kalshi identifies no clear statement within federal law. Kalshi instead offers a roundabout preemption theory under which Congress—fifteen years ago, when sports betting was mostly illegal—supposedly made a subtle-but-drastic change to gambling laws by inserting the word "swap" into a pre-existing regulatory scheme aimed at financial regulation. *See* Kalshi Br.25–26; *above* 8–11.

Tellingly, Kalshi's position is much like proposed readings that have failed in past clear-statement cases. For instance, in 2000, the Supreme Court stopped a dramatic expansion of federal regulatory authority by refusing to read the word "drug"—in the context of the Food, Drug, and Cosmetic Act—to include tobacco. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000). And in *Bond*, the Supreme Court refused to read the term "chemical weapon" in an "improbably broad" and "boundless" way that would have reached "purely local crimes" and "intrude[d] on the police power of the States." *Bond*, 572 U.S. at 860. This Court should likewise refuse to read the term "swaps"—a term of art describing particular financial instruments used to hedge against economic risk—in an improbably broad and boundless way that usurps the States' police power over sports betting.

If the text clearly signals anything here, it is the *lack* of any intent to preempt sports-betting regulations. The exclusive-jurisdiction provision on which Kalshi so heavily relies includes not just one, but two saving clauses, both of which signal preservation of state authority. 7 U.S.C. §2(a)(1)(A). The statutory scheme also includes two express preemption clauses. 7 U.S.C. §16(e)(2), (h). One of those clauses preempts state laws

about select forms of "gaming."  §16(e)(2).  But that clause does not cover sports betting.  Thus, Congress's inclusion of a specific preemption provision tailored to other forms of gaming indicates a lack of preemptive intent as to sports betting.  *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992).

In sum, Kalshi invites the Court to read an express-preemption clause into federal law where none exists.  Because this is an area of traditional state authority, the Court should squarely reject that invitation.

## B.  Kalshi's position violates the major-questions doctrine.

Turn next to another clear-statement rule:  the major-questions doctrine.  The doctrine teaches that courts—when reading statutes empowering federal agencies—should employ "common sense as to the manner in which Congress would have been likely to delegate" power.  *West Virginia*, 597 U.S. at 722–23 (alteration accepted, quotation omitted).  "Extraordinary grants of regulatory authority," the Supreme Court has explained, "are rarely accomplished through modest words, vague terms, or subtle devices."  *Id.* at 723 (alteration accepted, quotation omitted).

The major-questions doctrine thus requires a clear statement whenever a federal agency claims broad and novel authority over matters of

great economic and political significance.  *See id.* at 721, 724.  In these situations, a "colorable textual basis" is not enough to support a major grant of federal-agency authority.  *Id.* at 722.  Rather, an assertion of broad authority must arise from a "clear congressional authorization." *Id.* at 724 (quotation omitted).

This case implicates the major-questions doctrine.  Sports betting is an issue of political and economic significance—and one on which "Americans have never been of one mind." *Murphy*, 584 U.S. at 458.  Like other major questions, sports betting involves "billions of dollars" and affects "millions of people." *King v. Burwell*, 576 U.S. 473, 485 (2015).  Over the last year, over one-in-five adults in this country bet money on sports. John Gramlich, *Americans increasingly see legal sports betting as a bad thing for society and sports*, Pew Research Center (Oct. 2, 2025), perma.cc/9WPS-4UYT.  And Americans wagered almost $150 billion on sports in 2024.  Brandon Gustafson, *2024: A year of growth for sports betting revenue*, CBS Sports (Mar. 28, 2025), https://tinyurl.com/yje8srnp. Indeed, Kalshi alone now reports wagering volumes of over $1 billion a month, 90% of which comes from sports betting.  Lev Akabas, *Kalshi's*

*Volume Has Been 90% Sports During Football Season*, Sportico (Oct. 3, 2025), perma.cc/X5WL-8LGM.

Beyond those staggering figures, the regulation of sports betting is politically and historically significant. As detailed above (at 5–6), sports betting has been illegal under state law for much of this country's history. It remains illegal in eleven States. And the States that do allow sports betting have made different decisions about what to allow.

Against this backdrop, Kalshi's position would grant the CFTC an incredible and unexpected amount of power. Once again, Kalshi argues that sports bets packaged as events contracts qualify as "swaps" for purposes of CFTC's exclusive jurisdiction. *See* Kalshi Br.25–26; 7 U.S.C. §2(a)(1)(A).

An important textual consequence flows from Kalshi's position. If sports bets qualify as swaps within the CFTC's exclusive jurisdiction, then sports bets cannot be treated in any other fashion. Under the federal definition of swap, a swap is any type of "agreement, contract, or transaction" that satisfies certain conditions. 7 U.S.C. §1a(47)(A). If an agreement satisfies those conditions, the federal scheme makes it "*unlawful* for any person" to enter into such an agreement except via a

23

CFTC-regulated contract market. 7 U.S.C. §2(e) (emphasis added). Thus, Kalshi is not simply arguing that sports betting *may* occur on designated contract markets. Kalshi's real argument is that sports betting *must* occur on those markets, subject to the sole regulation of the CFTC. It would follow that States which authorize sports betting via state-regulated processes—again, about forty States at present, *see above* 6—are all facilitating illegal activity under federal law.

In effect, Kalshi's position would make the CFTC this country's arbiter of sports betting. If Congress truly meant to give the commission that much discretion, it would have spoken clearly. Kalshi, again, points to no such clear statement. *Above* 19–20. Instead, its attenuated theory of preemption relies on a contextless brand of textualism that is "colorable" at best. *See West Virginia*, 597 U.S. at 724 (quotation omitted). And a merely colorable textual theory is not enough for such a change. *Id.*

To hammer the point home, revisit the history. As Kalshi would have it, Congress preempted state gambling laws as part of its response to the 2008 financial crisis. *Above* 9–13. But that makes no historical sense. Nobody thought that "sports gambling gone wrong" caused the financial crisis. Sports betting was, after all, mostly illegal at that time. *See*

24

*Murphy*, 584 U.S. at 458. Congress was instead responding to a much different problem involving derivatives like credit default swaps. *Above* 10. Thus, employing even an ounce of "common sense as to the manner in which Congress would have been likely to delegate" power, *see West Virginia*, 597 U.S. at 722–23 (quotation omitted), Kalshi's argument crumbles. Congress did not sneak sports-gambling preemption into the Dodd-Frank Act, and this Court should confirm as much.

## II. Kalshi's position would leave sports betting largely unregulated and endanger the States' citizens.

Practical concerns make Kalshi's position even less likely. As a corollary to the major-questions doctrine, Congress is "especially unlikely" to delegate broad power to an agency that "has no expertise" crafting "policy" on a given subject. *King*, 576 U.S. at 486. This Court should thus be "especially" reluctant to transfer authority over sports betting from experienced state regulators to an inexperienced federal commission.

### A. States are experienced in regulating sports betting and its many potential harms.

**1.** States that allow sports betting comprehensively regulate that activity. For example, given the importance of gambling to Nevada's overall economy, the State strictly regulates all gambling activities to ensure the public's continued "confidence and trust." Nev. Rev. Stat.

25

§463.0129(1) (outlining Nevada's public policy on gambling). A central part of Nevada's mission is ensuring that gaming proprietors are "controlled and assisted" so as to "protect the public health, safety, morals, good order and general welfare of the inhabitants of the State." *Id.*

Consistent with that goal, Nevada's regulatory scheme offers gamblers many levels of protection. As a general matter, Nevada employs a rigorous licensing process that ensures any gambling entity undergoes an indepth investigation before receiving a license. *See* Nev. Rev. Stat. §§463.170, 463.530, 463.5735; *see also below* 32–33. This process ensures that gambling is free from organized crime and other criminal elements.

Nevada's regulatory scheme also offers a variety of more specific protections. For instance, Nevada requires those that conduct gaming operations to conspicuously post information about resources for problem gamblers. Nev. Gaming Comm'n Reg. 5.170. Nevada law also includes various safeguards to protect against improper betting practices, including improper wagers on sports. *See, e.g.*, Nev. Rev. Stat. §§465.092–.094; Nev. Gaming Comm'n Regs. 22.010(14), 22.060–.063, 22.080(1); *cf. also* Nev. Rev. Stat. §§463.362–.3668 (detailing Nevada's dispute resolution process). Of particular note, Nevada prohibits sports wagers by game

26

officials, owners, coaches, players, or other team staff. *See* Nev. Gaming Comm'n Reg. 22.1205. Further, Nevada requires that those facilitating sports betting report suspicious activity. Nev. Gaming Comm'n Reg. 22.121.

Consider also Ohio's recently adopted approach to sports gambling. Similar to Nevada, Ohio prohibits companies from offering sports betting without a license. Ohio Rev. Code §3775.03(A). That requires a company to establish that it can responsibly facilitate such gambling. *See* Ohio Rev. Code §3775.09(A)–(B). Along related lines, Ohio facilitates an exclusion program whereby people worried about their sports gambling habits may place themselves on a voluntary exclusion list. *See* Ohio Rev. Code §3775.02(B)(11). To enforce that list, sports gaming proprietors are required to "employ commercially reasonable methods to prevent any person who is participating in the sports gaming voluntary exclusion program from engaging in sports gaming." Ohio Rev. Code §3775.13(C)(1).

2. These and other regulations protect the States' citizens and mitigate the risks of gambling. While gambling is entertaining for many, it is dangerous for some. Millions of Americans qualify as problematic or pathological gamblers. Nat'l Gambling Impact Study Comm'n, Final

27

Report, 4-1; Charita M. Goshay, *Ohio offers Voluntary Exclusion List for problem gamblers as calls to helpline rise*, Canton Repository (Sept. 2, 2024), perma.cc/BQY6-YBC3. And research has linked gambling to many other problems—substance abuse and psychological distress, to name a few. *See* Randi Richardson, *Online gambling has fueled an industry boom*, NBC News (Oct. 24, 2024), perma.cc/XL7W-QS2L.

Some gamble to the point of financial ruin. *See* Kelly Kennedy, *'I didn't care who was playing': Has the legalization of sports betting impacted problem gambling in Ohio?*, Cleveland 19 News (July 18, 2024), perma.cc/JG9G-P7QT. Others place gambling over the health of loved ones. *See* Erin Gottsacker, *A statewide telehealth service is changing the game for Ohioans with gambling addictions*, The Ohio Newsroom (Nov. 18, 2024), perma.cc/E4ZU-U3MN. Still others gamble to the point of suicide. *See* Matt Stone, *Risk of Gambling Addiction Up 30%*, 21-WFMJ (Feb. 16, 2025), perma.cc/76KG-5ZGS.

With the growing ease of gambling, these problems are on the rise. *See id.* A 2022 survey performed by the Ohio Casino Control Commission signaled that the prevalence of at risk/problem gamblers in the Buckeye State had nearly doubled in five years. *See Ohio Gambling Survey 2022*,

Ohio Casino Control Commission, perma.cc/4GG3-SGQE (slide five of PowerPoint).  As another datapoint, calls to Ohio's gambling hotline were up 55% in 2023.  Katie Mogg & Aria Bendix, *Gambling addiction hotlines say volume is up and callers are younger as online sports betting booms*, NBC News (April 5, 2024), https://tinyurl.com/mtjnna33.

Minors are particularly vulnerable, as online sports betting attracts a younger crowd.  A recent New Jersey-based survey reflected that nearly one in every five people surveyed between the ages of 18 and 24 was at high risk of a gambling problem.  *See* Lia Nower, et al., *The Prevalence of Online and Land-Based Gambling in New Jersey*, Rutgers University: Center for Gambling Studies, at 33 (2023), perma.cc/V3KH-BPHC.  And research reflects that those who start gambling at a young age run a higher risk of problematic gambling.  *See* Nat'l Gambling Impact Study Comm'n, Final Report, 4-12.

But Kalshi's position, if accepted, would effectively lower the gambling age in many States.  According to Kalshi's membership agreement, the company's services are open to anyone of the age of majority in their State.  Kalshi Member Agreement (November 4, 2025), https://perma.cc/ZH3B-2G9P.  In many if not most States, the age of

majority is eighteen. *See, e.g.*, Nev. Rev. Stat. §129.010; Ohio Rev. Code §3109.01. But many States have decided to limit gambling (or at least certain types of gambling) to those twenty-one or older. *See, e.g.*, Nev. Rev. Stat. §463.350; Ohio Rev. Code §3775.99(A). That discrepancy is no small matter. As just mentioned, those who begin gambling at a young age face a higher risk of long-term problems. That might be good for Kalshi's bottom line, but it is bad for the States' citizens.

One final problem deserves emphasis. As several recent events illustrate, sports betting also risks the integrity of sporting events. Just weeks ago, the federal government indicted dozens of people—including current and former NBA players—alleging unlawful betting on professional basketball games. *U.S. Charges N.B.A. Coach and Players in Gambling Schemes*, The New York Times (Oct. 23, 2025), https://tinyurl.com/yux8k2nk. Earlier this year, it took only a few pitches during baseball games to spark controversy over prop bets in Ohio. *See* Ryan Morik, *Ohio governor calls for an end to player prop betting amid investigation into Guardians pitchers*, Fox Business (July 31, 2025), perma.cc/CA26-SA28. And last year, gamblers even threatened a coach of the Cleveland Cavaliers. Tom Withers, *Cavs coach Bickerstaff says he*

30

*received threats from gamblers, feels sports betting 'gone too far'*, AP News (Mar. 20, 2024), perma.cc/4KR5-3F56.

### B. Existing federal regulation is an insufficient substitute for the States' robust gaming regulations.

Contrary to Kalshi's suggestions, federal regulation of the derivatives marketplace is not a cure-all when it comes to nationwide sports betting. Kalshi hints that federal law's "detailed system" for regulating designated contract markets should alleviate any concerns. *See* Kalshi Br.15–17. But the CFTC's present regulatory requirements provide cold comfort for sports betting. Those requirements—often called the "core principles"—are outlined within the federal code. *See* 17 C.F.R. §§38.100–.1200. They cover topics like dispute resolution, 17 C.F.R. §38.750, conflicts of interest, 17 C.F.R. §38.850, and disciplinary procedures, 17 C.F.R. §38.700.

Although Kalshi is regulated in this sense, these regulations are geared toward participants in the financial markets. They do not replace the States' regulatory schemes, which are specifically designed to combat problems associated with gambling. Moreover, relying on federal regulation alone forces a one-size-fits-all regime, eliminating the States' ability to experiment with other approaches.

Take Nevada again. The State, after all, has nearly one hundred years' experience in regulating legalized gambling to respond to challenges unique to both the gambling industry and local Nevadan concern.

With that experience in mind, consider a gap that would result from a federal-only regime. Nevada has developed robust procedures for determining the suitability of any person involved in the gaming industry in Nevada. This suitability determination is a front-loaded process in which the person seeking a gaming approval bears the burden of showing the person is qualified to hold a license. Nev. Rev. Stat. §463.170(1). This burden entails satisfying the Nevada Gaming Commission that the person is a "person of good character, honesty and integrity"; that the person's "prior activities, criminal record ..., reputation, habits and associations do not pose a threat to the public interest of [Nevada] or to the effective regulation and control of gaming"; and that the person is "[i]n all other respects qualified to be licensed or found suitable consistently with the declared policy of [Nevada]." Nev. Rev. Stat. §463.170(2). This burden extends to the person showing "adequate business probity, competence and experience, in gaming" and that the financing for the operation is both adequate and from a suitable source. Nev. Rev. Stat. §463.170(3).

In this way, Nevada takes care to screen out potentially predatory, bad actors from its system of legalized gambling.

The Commodity Exchange Act offers no comparator to Nevada's suitability procedures. Worse still, designated contract markets like Kalshi may list new types of events contracts on their exchange without pre-approval, simply by self-certifying to the CFTC that the new contract complies with federal law. *See* 7 U.S.C. §7a-2(c)(1). Such loose processes will allow individuals who would be unable to clear state-law hurdles to run de facto sports books, immune from the States' regulation.

The takeaway is simple. Under Kalshi's theory, the various state-law safeguards discussed above would disappear. That, in turn, would create a sizeable hole in the States' ability to protect their citizens from predatory practices and other problematic behavior.

*

One critical benefit of our constitutional structure is that the States act "as laboratories" of democracy, "devising solutions" to new and difficult problems. *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015) (quotation omitted). That flexibility is a particularly good thing here since "Americans have never been of one mind

about gambling." *Murphy*, 584 U.S. at 458. States are in the best position to implement innovative regulatory schemes responsive to particularized concerns that arise within their borders, thereby protecting the public and promoting confidence in the gaming industry. Nothing in federal law suggests, much less clearly states, that Congress has stripped the States of their traditional power over sports betting. This Court, it follows, should not do so.

## CONCLUSION

The Court should affirm.

AARON D. FORD
Nevada Attorney General

HEIDI PARRY STERN
Nevada Solicitor General
JESSICA E. WHELAN
Chief Deputy Solicitor General
Office of the Nevada
Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
702.486.3420
jwhelan@ag.nv.gov

*Counsel for Amicus Curiae
State of Nevada*

DAVE YOST
Ohio Attorney General

*/s/ Mathura J. Sridharan*
MATHURA J. SRIDHARAN*
Ohio Solicitor General
  **Counsel of Record*
ZACHERY P. KELLER
Deputy Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
Mathura.Sridharan@OhioAGO.gov

*Counsel for Amicus Curiae
State of Ohio*

35

## ADDITIONAL COUNSEL

STEVE MARSHALL
Alabama Attorney General

STEPHEN J. COX
Alaska Attorney General

KRISTIN K. MAYES
Arizona Attorney General

TIM GRIFFIN
Arkansas Attorney General

ROB BONTA
California Attorney General

PHILIP J. WEISER
Colorado Attorney General

WILLIAM TONG
Connecticut Attorney General

KATHLEEN JENNINGS
Delaware Attorney General

BRIAN L. SCHWALB
District of Columbia
Attorney General

ANNE E. LOPEZ
Hawai'i Attorney General

RAÚL R. LABRADOR
Idaho Attorney General

KWAME RAOUL
Illinois Attorney General

THEODORE E. ROKITA
Indiana Attorney General

BRENNA BIRD
Iowa Attorney General

KRIS KOBACH
Kansas Attorney General

LIZ MURRILL
Louisiana Attorney General

AARON M. FREY
Maine Attorney General

ANDREA JOY CAMPBELL
Massachusetts Attorney General

DANA NESSEL
Michigan Attorney General

KEITH ELLISON
Minnesota Attorney General

LYNN FITCH
Mississippi Attorney General

MICHAEL T. HILGERS
Nebraska Attorney General

MATTHEW J. PLATKIN
New Jersey Attorney General

RAÚL TORREZ
New Mexico Attorney General

LETITIA JAMES
New York Attorney General

JEFF JACKSON
North Carolina Attorney General

GENTNER DRUMMOND
Oklahoma Attorney General

DAN RAYFIELD
Oregon Attorney General

DAVID W. SUNDAY, JR.
Pennsylvania Attorney General

PETER F. NERONHA
Rhode Island Attorney General

ALAN WILSON
South Carolina Attorney General

MARTY JACKLEY
South Dakota Attorney General

JONATHAN SKRMETTI
Tennessee Attorney General
and Reporter

DEREK E. BROWN
Utah Attorney General

CHARITY R. CLARK
Vermont Attorney General

NICHOLAS W. BROWN
Washington Attorney General

JOSH KAUL
Wisconsin Attorney General

37

**CERTIFICATE OF COMPLIANCE**

I hereby certify, in accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, that this brief complies with the type-volume for an *amicus* brief supporting an appellant and contains 6,394 words. *See* Fed. R. App. P. 32(a)(7)(B)(i), 29(a)(5).

I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.


                     */s/ Mathura J. Sridharan*
                     MATHURA J. SRIDHARAN
                     Ohio Solicitor General

38

**CERTIFICATE OF SERVICE**

I hereby certify that on December 22, 2025, the foregoing was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

 */s/  Mathura J. Sridharan*
MATHURA J. SRIDHARAN
Ohio Solicitor General