No. 25-1892

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

KALSHIEX LLC,

*Plaintiff-Appellant*,

v.

JOHN A. MARTIN et al.,

*Defendants-Appellees*.

Appeal from the United States District Court
for the District of Maryland
No. 1:25-cv-01283

**BRIEF OF INDIAN GAMING ASSOCIATION, NATIONAL CONGRESS OF AMERICAN INDIANS, CALIFORNIA NATIONS INDIAN GAMING ASSOCIATION, ARIZONA INDIAN GAMING ASSOCIATION, MINNESOTA INDIAN GAMING ASSOCIATION, OKLAHOMA INDIAN GAMING ASSOCIATION, WASHINGTON INDIAN GAMING ASSOCIATION, UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND, SAN MANUEL GAMING AND HOUSING AUTHORITY, TRIBAL ALLIANCE OF SOVEREIGN INDIAN NATIONS, AND 30 FEDERALLY RECOGNIZED TRIBES AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES**

Joseph H. Webster
Elizabeth Bower
Jens W. Camp
Hobbs, Straus, Dean & Walker LLP
1899 L Street NW, Ste. 1200
Washington, DC 20036
(202) 822-8282
jwebster@hobbsstraus.com
ebower@hobbsstraus.com
jcamp@hobbsstraus.com

*Counsel for Tribal Amici*

Bryan Newland
Powers, Pyles, Sutter & Verville PC
1250 Connecticut Ave N, 8th Floor
Washington, DC 20036
(202) 349-4265
Bryan.Newland@Powerslaw.com

*Counsel for Tribal Amici*

Scott Crowell
Crowell Law Office
Tribal Advocacy Group PLLC
1487 W State Rte 89A, Suite 8
Sedona, AZ 86336
(425) 802-5369
scottcrowell@clotag.net

*Counsel for Rincon Band of*
*Luiseño Indians, Santa Ynez*
*Band of Chumash Mission Indians, and*
*the Spokane Tribe of the Spokane*
*Reservation*

Michael Hoenig
Yuhaaviatam of San Manuel Nation
422 1st Street SE
Washington, DC 20003
(909) 936-9684
Michael.Hoenig@sanmanuel-nsn.gov

*Counsel for Yuhaaviatam of San Manuel*
*Nation and San Manuel Gaming and*
*Housing Authority*

December 22, 2025

## CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1, *Amici Curiae*

disclose that they have no parent corporations and that no publicly held corporations

hold 10% or more of stock in any of the *Amici Curiae*.

DATE: December 22, 2025

  /s/ Joseph H. Webster           /s/ Scott Crowell
Joseph H. Webster                Scott Crowell

  /s/ Bryan Newland              /s/ Michael Hoenig
Bryan Newland                    Michael Hoenig

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................... i

INTRODUCTION ........................................................................................1

IDENTITY AND INTERESTS OF AMICI ...................................................2

STATEMENT ..............................................................................................5

SUMMARY OF THE ARGUMENT .............................................................7

ARGUMENT ..............................................................................................9

    I.    Congress Did Not Impliedly Repeal IGRA.................................9

        A.    The Indian Gaming Regulatory Act....................................11

        B.    Kalshi's preemption argument would impliedly repeal IGRA.............12

        C.  Kalshi's theory does not meet the standard for implied repeals.............15

            1.   Kalshi's sports-betting contracts are not "swaps." ...........................16

            2.  Congress did not manifest clear intent to repeal IGRA or to make the CFTC a gaming regulator..................................................18

            3.  The Indian Canons of Construction implore this Court to resolve any ambiguity in favor of tribes. ................................................21

    II.    The Major Questions Doctrine Forecloses Kalshi's Theory....................22

    III.    Kalshi's Preemption Argument Would Violate the Private Nondelegation Doctrine. ..................................................................................27

CONCLUSION ...........................................................................................29

# TABLE OF AUTHORITIES

## Cases

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*,
121 F.4th 1314 (D.C. Cir. 2024)........................................................................28

*Bryan v. Itasca Cnty.*,
426 U.S. 373 (1976)...........................................................................................21

*California v. Cabazon Band of Mission Indians*,
480 U.S. 202 (1987)..................................................................................... 6, 11

*California v. Iipay Nation of Santa Ysabel*,
898 F.3d 960 (9th Cir. 2018) ...........................................................................15

*Carter v. Carter Coal Co.*,
298 U.S. 238 (1936)...........................................................................................27

*Chicken Ranch Rancheria of Me-Wuk Indians v. California*,
42 F.4th 1024 (9th Cir. 2022) ..................................................................... 7, 24

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018)...........................................................................................16

*FCC v. Consumers' Rsch.*,
606 U.S. 656 (2025).................................................................................... 27, 28

*FDA v. Brown & Williamson*,
529 U.S. 120 (2000)...........................................................................................24

*KalshiEX LLC v. CFTC*,
No. 24-5205 (D.C. Cir. Nov. 15, 2024)............................................................19

*KalshiEX, LLC v. Hendrick*,
No. 2:25-cv-575, 2025 WL 3286282 (D. Nev. Nov. 24, 2025) ... 1, 8, 13, 17, 18, 20, 26

*Michigan v. Bay Mills Indian Cmty.*,
572 U.S. 782 (2014)............................................................................................6

*Morton v. Mancari*,
417 U.S. 535 (1974)...........................................................................................22

*Murphy v. NCAA*,
   584 U.S. 453 (2018) .................................................................. 23, 24, 25

*N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.* (*Crypto.com*),
   No. 2:25-CV-00978, 2025 WL 2916151 (D. Nev. Oct. 14, 2025) ........ 13, 17, 20

*N. Carolina Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*,
   76 F.4th 291 (4th Cir. 2023) ................................................. 20, 21, 22, 23, 24, 25

*Pittston Co. v. United States*,
   368 F.3d 385 (4th Cir. 2004) ................................................................29

*Robinhood Derivatives, LLC v. Dreitzer*,
   No. 2:25-cv-1541, 2025 WL 3283308 (D. Nev. Nov. 25, 2025) ......................17

*Shoshone-Bannock Tribes of Fort Hall Rsrv. v. DOI*,
   153 F.4th 748 (9th Cir. 2025) ................................................................22

*Solid Waste Agency v. U.S. Army Corps of Eng'rs*,
   531 U.S. 159 (2001) ................................................................23

*Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*,
   951 F.3d 1142 (9th Cir. 2020) ................................................................22

*United States v. Frank*,
   8 F.4th 320 (4th Cir. 2021) ................................................................ 10, 16

*United States v. Simmons*,
   143 F.4th 200 (4th Cir. 2025) ................................................................28

*West Flagler Associates, Ltd. v. Haaland*,
   71 F.4th 1059 (D.C. Cir. 2023) ................................................................14

*WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*,
   553 F.3d 292 (4th Cir. 2009) ........................................................ 5, 23

**Statutes**

18 U.S.C. § 1084 ................................................................24

18 U.S.C. § 1166 ................................................................24

18 U.S.C. § 1166(d) ................................................................12

18 U.S.C. § 1952 ...................................................................................24

18 U.S.C. § 1953 ...................................................................................24

18 U.S.C. § 1955 ...................................................................................24

25 U.S.C. § 2701(5) ..................................................... 5, 6, 11, 12, 13

25 U.S.C. § 2710(b) ..............................................................................7

25 U.S.C. § 2710(d) .................................................................. 7, 11, 12

31 U.S.C. § 5361(b) ............................................................................15

31 U.S.C. § 5362 .................................................................................15

7 U.S.C. § 16(e) ..................................................................................24

7 U.S.C. § 1a(47)(A)(ii) ................................................................ 2, 16

7 U.S.C. § 2(a) ....................................................................................17

7 U.S.C. § 2(e) ....................................................................................13

7 U.S.C. § 5(a) ............................................................................... 9, 26

7 U.S.C. § 5(b) ............................................................................... 9, 26

7 U.S.C. § 7a-2(c)(5)(C)(i)–(ii)...........................................................18

Pub. L. 100-497, 102 Stat. 2467 (Oct. 17, 1988)......................................6

**Regulations**

25 C.F.R. § 293.26 ..............................................................................14

25 C.F.R. § 502.4(c) ..................................................................... 7, 10, 11

**Other Authorities**

152 Cong. Rec. H8029–30 (daily ed. Sept. 29, 2006)...........................15

156 Cong. Rec. S5907 (2010)...............................................................11

2024 Amendments to the Lac du Flambeau Band of Lake Superior Chippewa
   Indians and State of Wisconsin Gaming Compact of 1992 (Mar. 29, 2024) .....12

76 Fed. Reg. 44776, 44786 (Jul. 27, 2011).............................................................19

Agreement Between the Mohegan Tribe of Indians of Connecticut and the State of
   Connecticut (Sep. 10, 2021) .................................................................................12

CTFC Staff Letter No. 25-36 (Sep. 30, 2025) .........................................................21

Event Contracts, 89 Fed. Reg. 48968 (Jun. 10, 2024).............................................20

Farewell Address of Commissioner Kristin N. Johnson, CFTC (Sep. 3, 2025)......28

NIGC, FY 2023 Gross Gaming Revenue Report (July 2024)....................................6

**INTRODUCTION**

Kalshi's appeal wholly abandons the national policy of state and tribal sports-betting regulation. Congress's objective in enacting the Indian Gaming Regulatory Act ("IGRA") was to promote tribal economic development and self-determination, which has been successful and lifted tribes across the country from poverty. Though America's history is replete with prospectors taking resources from Indian lands without permission, Congress put a stop to that practice long ago. Nonetheless, Kalshi argues that without even a whisper of intent, Congress gave its permission to wrest control of Indian tribes' sovereign authority to conduct and control gaming on their tribal lands. Congress did no such thing.

Kalshi argues it can offer wagers on the outcome of sporting events to (and accept wagers from) people located on Indian lands through its self-proclaimed "legal sports betting" app.[1] *See KalshiEX, LLC v. Hendrick*, No. 2:25-cv-575, 2025 WL 3286282, at *1 (D. Nev. Nov. 24, 2025), *appeal filed*, No. 25-7516 (9th Cir.). If this were correct, then Congress impliedly repealed core provisions of IGRA without any reference to IGRA, Indian tribes, or Indian lands when it added a definition of "swap" into the Commodity Exchange Act ("CEA") in 2010—a

---

[1] Dustin Gouker, *Ten Times Kalshi Said People Could Bet on Things*, Event Horizon (Apr. 3, 2025), https://nexteventhorizon.substack.com/p/ten-times-kalshi-said-people-could.

1

time when Congress prohibited sports betting throughout most of the United States. *See* 7 U.S.C. § 1a(47)(A)(ii).

The consequences of Kalshi's arguments are difficult to overstate. Its reading of the CEA would amount to a *sub silentio* reversal of congressional policy and Supreme Court precedent and allow Kalshi—not states or tribes—to regulate its sports-betting business on Indian lands, siphon gaming revenues from tribal governments, and diminish tribal self-sufficiency.

The District Court below recognized that Congress did not intend to supplant all state gaming laws through its amendments to the CEA. *See* JA167–168. It also acknowledged that Kalshi's argument would "necessarily entail a partial implied repeal of the IGRA." JA170. The District Court was correct on both counts.

Accordingly, this Court should uphold the lower court's decision.

## IDENTITY AND INTERESTS OF AMICI

The Indian Gaming Association ("IGA"), National Congress of American Indians ("NCAI"), California Nations Indian Gaming Association ("CNIGA"), Arizona Indian Gaming Association ("AIGA"), Minnesota Indian Gaming Association ("MIGA"), Oklahoma Indian Gaming Association ("OIGA"), Washington Indian Gaming Association ("WIGA"),  United South and Eastern Tribes Sovereignty Protection Fund ("USET SPF"), San Manuel Gaming and Housing Authority ("SMGHA"), Tribal Alliance of Sovereign Indian Nations

2

("TASIN"), and 30 federally recognized Indian tribes[2] ("Amici Tribes") (collectively, "Tribal Amici"), submit this brief as amici curiae pursuant to Rule 29(a)(2) of the Federal Rules of Appellate Procedure.[3]  While the Tribal Amici concur with and support the arguments submitted by the Defendants-Appellees, they believe that this brief's additional arguments are relevant and helpful to the Court's deliberation.

IGA is a non-profit organization comprised of 124 federally recognized Indian tribes that operate gaming enterprises throughout Indian Country.  IGA is an

---

[2] The Amici Tribes include: Agua Caliente Band of Cahuilla Indians; Bay Mills Indian Community; Elk Valley Rancheria; Enterprise Rancheria of Maidu Indians of California; Jamul Indian Village of California; Karuk Tribe; Kickapoo Traditional Tribe of Texas; Klamath Tribes; Leech Lake Band of Ojibwe; Little Traverse Band of Odawa Indians; Lytton Rancheria of California; Mashantucket Pequot Tribal Nation; Mescalero Apache Tribe; Morongo Band of Mission Indians; Mohegan Tribe of Indians of Connecticut; Pechanga Band of Indians; Picayune Rancheria of Chukchansi Indians of California; Pokagon Band of Potawatomi Indians; Pueblo of Acoma; Pueblo of Sandia; Rincon Band of Luiseño Indians; Saginaw Chippewa Indian Tribe of Michigan; Santa Ynez Band of Chumash Mission Indians; Seminole Tribe of Florida; Snoqualmie Indian Tribe; Spokane Tribe of the Spokane Reservation; Sycuan Band of Kumeyaay Nation; Table Mountain Rancheria; Tunica-Biloxi Indian Tribe; and Yuhaaviatam of San Manuel Nation.

[3] Counsel for both Appellants and Appellee have consented to the filing of this brief.  Neither party's counsel authored this brief in whole or in part.  No person (including a party or party's counsel) other than Tribal Amici and their counsel contributed money to fund the preparation and submission of this brief.

educational and public-policy resource for tribes, policy makers, and the public concerning Indian gaming and tribal community development.

NCAI is a national organization comprised of American Indian and Alaska Native tribal governments and their citizens. NCAI represents more than 275 tribes in working to strengthen tribes' ability to ensure the health and welfare of their communities.

CNIGA, AIGA, MIGA, OIGA, and WIGA are regional non-profit associations representing federally recognized Indian tribes within their respective regions on gaming-related matters. They advance tribal sovereignty and support their member tribes on Indian gaming legislative, policy, legal, and educational matters.

USET SPF is a non-profit organization advocating on behalf of 33 federally recognized Tribal Nations. It is dedicated to promoting, protecting, and advancing the inherent sovereign rights and authorities of Tribal Nations and in assisting its membership with public policy issues.

SMGHA is a governmental instrumentality of Yuhaaviatam of San Manuel Nation created to independently carry out the investment in, and ownership and management of, gaming and hospitality businesses outside of the San Manuel Reservation.

TASIN is an intergovernmental association of federally recognized tribal governments throughout Southern California that protects and promotes tribal sovereign government rights and the cultural identity and interests of its member tribes.

The Amici Tribes are 30 federally recognized Indian tribes, as defined by IGRA.  25 U.S.C. § 2703(5).  Each of the Amici Tribes is a separate and distinct tribal government with the sovereign authority to conduct and regulate gaming activities on its Indian lands.

Together, the Tribal Amici share a strong interest in this case because of its potential to significantly impact their or their member tribes' sovereign rights regarding gaming on Indian lands and tribal governmental revenue as a whole. Tribal gaming revenue provides vital funding for essential government services, tribal programs, and economic development needed to reach the goals of self-governance and self-sufficiency.

## STATEMENT

Indian tribes have primary jurisdiction over their lands and activities occurring thereon.  Tribes, like states, have a strong sovereign interest in determining what gaming activities may take place on their land.  *See* 25 U.S.C. § 2701(5); *cf. WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 302 (4th Cir. 2009) ("[R]egulating gambling is at the core of the state's

residual powers as a sovereign").  This inherent and exclusive sovereign right to

conduct and regulate gaming on their Indian lands has long been recognized.  *See*

*California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 218–22 (1987); 25

U.S.C. § 2701(5).

In 1988, Congress enacted IGRA to provide a comprehensive regulatory

framework for tribal gaming and "a statutory basis for the operation of gaming by

Indian tribes as a means of promoting tribal economic development, self-

sufficiency, and strong tribal governments."  *See* Pub. L. 100-497, 102 Stat. 2467

(Oct. 17, 1988).  IGRA has been incredibly successful on that front.[4]  Through

IGRA, many tribes have lifted entire generations out of poverty.  Gaming revenue

supports thousands of jobs in hundreds of communities, and provides critical

funding to tribal, state, and local governments through revenue-sharing

agreements, taxes, and economic stimulus.  *See Michigan v. Bay Mills Indian*

*Cmty.*, 572 U.S. 782, 810 (2014) (Sotomayor, J., concurring) ("[T]ribal gaming

operations cannot be understood as mere profit-making ventures that are wholly

separate from the Tribes' core governmental functions").  For tribes, gaming is not

a "commercial" endeavor, but an existential one.  *See Chicken Ranch Rancheria of*

---

[4] *See, e.g.*, NIGC, FY 2023 Gross Gaming Revenue Report 4–5 (July 2024),
available at https://www.nigc.gov/wp-content/uploads/2025/02/GGR23_Final.pdf.

*Me-Wuk Indians v. California*, 42 F.4th 1024, 1032 (9th Cir. 2022) ("Class III

gaming is not only a source of substantial revenue for tribes, but *the lifeblood on*

*which many tribes ha[ve] come to rely*." (internal quotation marks and citations

omitted and emphasis added)).

Under IGRA, no gaming can occur on "Indian lands" unless it is authorized

by the tribal government and is in a state that permits such gaming.  25 U.S.C.

§ 2710(b).  Class III gaming—including sports wagering—is only authorized on

Indian lands where tribes and states have entered into a compact to regulate that

gaming after review by the Secretary of the Interior.  25 U.S.C. § 2710(d)(1); *see*

*also* 25 C.F.R. § 502.4(c).  These core provisions have remained unchanged since

1988.

<b>SUMMARY OF THE ARGUMENT</b>

To succeed, Kalshi must convince this Court that when Congress defined

"swap" in its 2010 amendments to the CEA, it intended to legalize sports betting

nationwide and, by extension, impliedly repeal both IGRA and the Professional

and Amateur Sports Protection Act ("PASPA").  Congress intended no such thing.

First, Kalshi's sweeping interpretation of "swap" falls short of the standard

for implied repeals.  Congress simply did not intend to grant the Commodity

Futures Trading Commission ("CFTC")—which has historically regulated the

pricing of agricultural commodities—the exclusive authority to regulate sports

7

betting (and, under Kalshi's theory, possibly other forms of gaming) to the detriment of tribes and states. *See Hendrick*, 2025 WL 3286282, at *1. The text and legislative history of the 2010 CEA amendments and subsequent CFTC actions confirm the CFTC was not intended to regulate sports betting. It is Kalshi, not Congress or the CFTC, that seeks to convert the CFTC into the nation's sole sports-betting regulator. To the contrary, the CEA avoids all conflict with IGRA by excluding from the CFTC's jurisdiction the type of sports-betting contracts Kalshi offers.

Second, Kalshi's argument violates the major questions doctrine. Under Kalshi's theory, the 2010 CEA amendments displaced both state and tribal gaming regulators and made the CFTC the sole sports-betting regulator. Such a broad grant of authority must come with clear congressional intent, of which there is none. Gaming regulation has historically been within state and tribal authority, and Congress has repeatedly affirmed states and tribes as the primary gaming regulators. Indeed, in 2010, federal law explicitly relied on state gambling laws to prohibit sports betting nationwide. It is implausible that Congress meant to overturn the long tradition of state and tribal gaming regulation—let alone its own efforts to prohibit sports betting—when it changed a definition in an unrelated statute.

Third, Kalshi's theory that it can preempt state and federal gaming law merely by self-certifying that its contracts comply with the CEA and CFTC regulations violates the private non-delegation doctrine. The Court should avoid an interpretation of the CEA that raises such serious constitutional issues.

## ARGUMENT

The State's brief sets out textual reasons for rejecting Kalshi's interpretation of the CEA. The Tribal Amici concur with those arguments. But even if Kalshi's interpretation were plausible (it is not), the canon against implied repeal, the Indian canons of construction, the major questions doctrine, and the canon of constitutional avoidance foreclose it.

## I.    Congress Did Not Impliedly Repeal IGRA.

Congress does not silently repeal comprehensive and longstanding statutory schemes. Yet Kalshi argues that by defining a single term—"swaps"—within a statute whose entire purpose is to address the risk, discovery, and dissemination of commodity prices, 7 U.S.C. § 5(a)–(b), Congress intended to nullify IGRA and transfer all authority over sports-betting[5] (and potentially other kinds of class III

---

[5] Kalshi also suggests that its sports-event contracts are not gaming because there is no betting against the "house." Appellant Br. at 18–19, ECF No. 16. Not so. A "house" is not a necessary element of gaming. For example, pari-mutuel wagering—a type of betting system where all bets or wagers are pooled and players bet against each other rather than a "house"—is considered gaming. *See*

9

gaming) to the CFTC. Kalshi's reading of the CEA not only eradicates state laws but cuts against binding precedent that Congress does not impliedly repeal federal statutes, including IGRA.

This Court disfavors repeals by implication. *United States v. Frank*, 8 F.4th 320, 330 (4th Cir. 2021). Presented with two laws, courts must treat both as effective unless they are in "irreconcilable conflict" or Congress's intent to repeal is "clear and manifest." *Id.*. Here, Kalshi's preemption argument demands, rather than avoids, conflict between the CEA and IGRA.

Under IGRA, tribes may regulate sports betting under tribal-state compacts. 25 C.F.R. § 502.4(c). But if sports-betting contracts are "swaps" subject to the exclusive jurisdiction of the CFTC as Kalshi maintains, then all off-market sports betting—including sports betting conducted subject to a tribal-state compact—is prohibited by the CEA, and Congress effectively repealed IGRA. This Court should reject Kalshi's boundless interpretation of "swap" and give effect to both

---

Md. Bus. Reg. § 11-101(m) (defining "pari-mutuel betting" as "the system of betting in which those who successfully bet on horses that finish in specified positions share the mutuel pool, less the takeout and the breakage"). Further, even if sports betting requires a "house" (it does not), Kalshi's subsidiary, "Kalshi Trading," sets bet prices, holds the opposite side to its customers on trades, and effectively acts as the "house." *See* Pl. Br. Supp. Prelim. Inj. Ex. 3 at 3–5, *KalshiEX LLC v. Schuler*, No. 2:25-cv-1165-SDM-CMV (S.D. Ohio Oct. 7, 2025), ECF No. 11-3.

statutes by excluding sports-betting contracts from the CEA's definition of "swap"—an interpretation that, in any case, is more faithful to statutory language and legislative intent. *See* 156 Cong. Rec. S5907 (2010) (statement of Sen. Lincoln) ("It would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament. These types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling.").

### A.    The Indian Gaming Regulatory Act

The Supreme Court has "consistently recognized that Indian tribes retain 'attributes of sovereignty over both their members and their territory.'" *Cabazon*, 480 U.S. at 207. Recognizing this sovereign authority, Congress enacted IGRA and mandated that tribes "have the exclusive right to regulate gaming activity on Indian lands." 25 U.S.C. § 2701(5).

IGRA provides that class III gaming activities (including sports betting) on Indian lands "shall be lawful" only if, among other things, those gaming activities are conducted in conformance with a tribal-state compact. 25 U.S.C. § 2710(d)(1); 25 C.F.R. § 502.4(c). Tribes can and do permit sports betting on their lands pursuant to such compacts. Indeed, the federal government has affirmatively

11

approved tribal-state gaming compacts that define "sports betting" to include exactly the type of betting that Kalshi offers.[6]

**B. Kalshi's preemption argument would impliedly repeal IGRA.**

Kalshi posits that the CFTC has the exclusive authority to regulate all sports betting.  If the CEA governs Kalshi's sports-betting contracts on Indians lands, then Congress must have intended to repeal key provisions of IGRA that expressly grant regulatory authority over such activity to states, tribes, the National Indian Gaming Commission ("NIGC"), and the Department of Justice.  *See* 25 U.S.C. §§ 2701(5), 2710(d); 18 U.S.C. § 1166(d).[7]  But moreover, by granting the CFTC exclusive jurisdiction over nationwide sports betting, including on Indian lands,

---

[6] *See, e.g.*, 2024 Amendments to the Lac du Flambeau Band of Lake Superior Chippewa Indians and State of Wisconsin Gaming Compact of 1992, Part IV.A.12 (Mar. 29, 2024) (defining "event wagering" as "accepting wagers on the outcomes of, and occurrences within, sports and non-sports games, competitions, and matches"); Agreement Between the Mohegan Tribe of Indians of Connecticut and the State of Connecticut, Section 1(nn) (Sep. 10, 2021) (defining "sports wagering" as "risking or accepting any money … or other thing of value for gain contingent in whole or in part, (A) by any system or method of wagering, … and (B) based on (1) a live sporting event or a portion or portions of a live sporting event, including future or propositional events during such an event, or (2) the individual performance statistics of an athlete or athletes in a sporting event or a combination of sporting events").

[7] Kalshi's sports-event contracts also violate other federal laws, including the Wire Act, 18 U.S.C. § 1084.  *See* JA170 (holding that Kalshi's proposed interpretation of the CEA "would necessarily entail at least a partial implied repeal of the IGRA and the Wire Act"); ECF No. 27, at 36.

Congress must also have intended to completely override the entire purpose and function of IGRA, which is to recognize tribal sovereignty to conduct and regulate gaming activity that occurs on Indian lands. *See* 25 U.S.C. § 2701(5).

Furthermore, under Kalshi's theory, all sports betting pursuant to a tribal-state compact is illegal. *See* ECF No. 27, at 33, 35–36. With one inapplicable exception, the CEA prohibits off-market swaps. *See* 7 U.S.C. § 2(e). Consequently, if all sports-betting contracts are swaps, "then all sports betting must be done on a [Designated Contract Market ('DCM')]." *N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.* (*Crypto.com*), No. 2:25-CV-00978, 2025 WL 2916151, at *9 (D. Nev. Oct. 14, 2025). Kalshi's preemption argument thus does double violence to IGRA. By permitting Kalshi to offer sports betting on tribal land, that argument sweeps aside Congress's recognition that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands." 25 U.S.C. § 2701(5). It also prohibits tribes from offering sports betting that IGRA plainly authorizes.

This implied repeal is not limited to sports betting. Kalshi's preemption argument depends on embracing an interpretation of "swap" that has "no limiting principle." *Hendrick*, 2025 WL 3286282, at *6; *see Crypto.com*, 2025 WL 2916151, at *9. Kalshi's definition of "an event or contingency associated with a potential financial, economic, or commercial consequence" is so broad that it

13

necessarily includes betting on other casino games.  If Kalshi's preemption argument were accepted, then IGRA would be largely meaningless.

Kalshi attempts to sidestep the implied repeal of IGRA by asserting that IGRA "does not authorize tribes to regulate gaming available over the internet." Appellant Br. at 55, ECF No. 16 (quoting 25 U.S.C § 2701).  But the issue here isn't whether tribes can regulate Kalshi's sports betting, it is whether Congress set up a regulatory system that is incompatible with IGRA.  And Kalshi's theory means it can offer sports betting even to people physically located on tribal lands contrary to tribal prohibitions, just as it does in states notwithstanding state law prohibitions.  Ironically, in the very same paragraph that Kalshi argues IGRA does not authorize tribes to regulate online gaming, it cites *West Flagler Associates, Ltd. v. Haaland*, in which the D.C. Circuit held that IGRA allows states and tribes to "allocate jurisdiction" over the regulation of internet gaming conducted by a tribe throughout the state, including on its Indian lands.  71 F.4th 1059, 1061–62, 1066 (D.C. Cir. 2023), *cert. denied*, 144 S. Ct. 2671 (2024).  IGRA's implementing regulations also expressly state that tribes can regulate online gaming pursuant to the terms of their IGRA compacts.  *See* 25 C.F.R. § 293.26.  IGRA, therefore, clearly recognizes tribes' authority to regulate internet gaming.

Kalshi also argues that the Unlawful Internet Gaming Enforcement Act ("UIGEA"), not IGRA, solely governs the online gaming aspect of its sports-

14

betting contracts, and UIGEA excludes event contracts from its definition of "bet or wager." *See* Appellant Br. at 54, ECF No. 16. Kalshi vaguely argues that the exclusion for DCM transactions from the definition of "bet or wager" in 31 U.S.C. § 5362 should be "harmonized" with IGRA, implying that IGRA's requirements are somehow repealed by UIGEA. *Id.* But this ignores UIGEA's own language that "[n]o provision of this subchapter shall be construed as altering, limiting, or extending any Federal or State law or Tribal-State compact prohibiting, permitting, or regulating gambling within the United States." 31 U.S.C. § 5361(b). UIGEA "prevents using the internet to circumvent existing state and federal gambling laws, but it does not create any additional substantive prohibitions." *California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 965 (9th Cir. 2018). While UIGEA may provide insight as to what the term "sports betting" generally means, its statutory exceptions should not be imported wholesale into IGRA.[8]

### C. Kalshi's theory does not meet the standard for implied repeals.

Kalshi's preemption argument and interpretation of "swap" must be rejected because they would manufacture an implied repeal of IGRA where none exists.

---

[8] *See* 152 Cong. Rec. H8029–30 (daily ed. Sept. 29, 2006) (statement of Rep. Leach) (explaining UIGEA's definition of a "bet or wager" does not change the principle that "if a person on tribal lands plays a gambling game with a state-based gambling business, the game must not violate tribal law").

Kalshi cannot meet the "heavy burden" of proving Congress intended to repeal IGRA because there is a reasonable interpretation of the CEA that gives full effect to both statutes: the CEA's definition of "swap"—and thus the CFTC's jurisdiction—simply does not extend to Kalshi's sports bets. The Supreme Court applies the "strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (internal quotations omitted). Congress's intent to repeal must be "clear and manifest." *Id.* (internal quotations omitted). Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Id.* (internal quotations omitted). Here, IGRA and the CEA can easily be harmonized by reading the CEA to exclude sports betting.

### 1. *Kalshi's sports-betting contracts are not "swaps."*

As relevant here, the CEA defines "swap" as "any agreement, contract, or transaction … that provides for any purchase, sale, payment, or delivery … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Kalshi's sports-betting

16

contracts simply do not fall under this definition and Congress therefore could not have intended to repeal IGRA.[9]  *See* ECF No. 27, at 51–56.

First, Kalshi's sports-event contracts are not dependent on the *occurrence, nonoccurrence, or extent of the occurrence* of a sports event—i.e., whether the sports event occurs—but rather on the *outcome* of the sports event (or parts thereof)—i.e., which team wins or who scores a touchdown.  In three recent decisions, the Nevada District Court held that sports bets are not swaps for precisely this reason.  *Crypto.com*, 2025 WL 2916151, at *1; *Hendrick*, 2025 WL 3286282, at *3; *Robinhood Derivatives, LLC v. Dreitzer*, No. 2:25-cv-1541, 2025 WL 3283308, at *1 (D. Nev. Nov. 25, 2025).

Second, there is no "financial, commercial, or economic consequence" associated with Kalshi's sports-betting contracts.  Aside from whether the purchaser of a sports-betting contract wins or loses their bet, Kalshi's sports-betting contracts have no direct financial consequences for the purchaser.  To constitute a swap, the underlying event itself "must be inherently associated

---

[9] Kalshi has previously argued that its preemption argument applies even if its sports-betting contracts are not swaps because they involve "excluded commodities."  But even under that theory, 7 U.S.C. § 2(a) "does not state that the CFTC has exclusive jurisdiction over excluded commodities, which are defined separately from commodities."  *Hendrick*, 2025 WL 3286282, at *11

with a potential financial consequence." *Hendrick*, 2025 WL 3286282, at *7.

"[E]xternalities like whether people bet on the event or contingency, or whether the

event's occurrence or nonoccurrence causes downstream financial consequences,

are not sufficient." *Id.* Sports-betting contracts do not satisfy this requirement and

therefore do not qualify as swaps. *Id.* at *9.

> 2. *Congress did not manifest clear intent to repeal IGRA or to make the CFTC a gaming regulator.*

Further, rather than manifest an intent to repeal IGRA and grant the CFTC

the exclusive authority to regulate nationwide sports betting, Congress expressed

the opposite and went out of its way to prevent contracts markets from being

exploited by those seeking to use them for sports gambling, even in the context of

sports mega-events that might have significant economic consequences, such as the

Super Bowl, the Kentucky Derby, or the Masters golf tournament. 156 Cong. Rec.

S5906-07 (colloquy between Sens. Feinstein and Lincoln). To that end, Congress

enacted the "Special Rule" authorizing the CFTC to "determine that such

agreements, contracts, or transactions are contrary to the public interest and to

*disallow* any "gaming" activity on DCMs at all. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i)–

(ii). The CFTC acted consistently with Congress's intent by promulgating the

blanket prohibition of event contracts involving gaming. 17 C.F.R. § 40.11(a)(1).

The CFTC explained that its "prohibition of certain 'gaming' contracts is

18

consistent with Congress's intent to 'prevent gambling through the futures markets' and to 'protect the public interest from gaming and other events contracts.'" 76 Fed. Reg. 44776, 44786 (Jul. 27, 2011). As it recognized, the Special Rule reinforced Congress's existing policy *against* sports betting. Kalshi even acknowledged before the D.C. Circuit that sports betting involves "gaming" and runs afoul of the categorical prohibition. *See* Brief of Appellee at 17, 43, 54, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Nov. 15, 2024). The Special Rule and the CFTC's regulations undermine any claim that Congress intended to repeal IGRA and legalize sports betting in 2010. That the CEA and IGRA only overlap here is due to Kalshi's backdoor attempt to evade comprehensive gaming regulations.[10]

---

[10] Under Kalshi's theory, simply calling a sports wager a "swap"—regardless of whether it is actually a valid "swap"—and listing it for trade on a DCM automatically grants the CFTC exclusive jurisdiction, to the detriment of all other regulatory authorities. *See* Appellant Br. at 25–26, 28, ECF No. 16. What, then, would prevent Kalshi from calling "contracts" on other traditional forms of gaming, like roulette and lotteries, "swaps" and subjecting them to the exclusive jurisdiction of the CFTC? According to Kalshi, CFTC inaction—despite banning "gaming" contracts via 17 C.F.R. § 40.11(a)(1)—is all that is required to bless contracts blatantly designed for no other purpose than to enable gambling.

Kalshi's theory would likewise strip this Court of its own jurisdiction to interpret what, under the terms of the CEA, constitutes a "swap." Kalshi has argued that determination is exclusively up to the CFTC and would only be judicially reviewable pursuant to an Administrative Procedures Act challenge. *See* Pl.'s

Furthermore, only Kalshi (an interested private company), not Congress or the CFTC, claims that the CEA's definition of "swap" displaces tribal, state, and federal regulation of sports betting.  The text and legislative history of the 2010 CEA amendments, as well as subsequent CFTC actions, confirm that the CFTC was not meant to regulate sports betting, let alone assume the role of the nation's sole sports-betting regulator.  Ultimately, Kalshi's attempt to foist authority onto the CFTC that it does not claim for itself indicates that Kalshi is wrong about the meaning of "swap."  *Cf. N. Carolina Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291, 299 & n.8 (4th Cir. 2023); Event Contracts, 89 Fed. Reg. 48968, 48982–83 (Jun. 10, 2024) ("The [CFTC] is not a gaming regulator. … and the [CFTC] does not believe that it has the statutory mandate nor specialized experience appropriate to oversee [gambling], or that Congress intended for the [CFTC] to exercise its jurisdiction or expend its resources in this manner.").

The CFTC's recent actions confirm that it has not asserted authority to regulate sports betting.  In a recent advisory letter, the CFTC clarified it has not

---

Resp. in Opp. to Emergency Mot. to Dissolve Prelim. Inj. at 7, *Hendrick*, No. 2:25-cv-00575 (Oct. 31, 2025), ECF No. 183.  But "the CEA does not expressly delegate to the CFTC the exclusive power to decide what is a swap … [and] [n]othing in the CEA takes statutory interpretation away from courts." *Crypto.com*, 2025 WL 2916151, at *6.

"taken any official action to approve the listing for trading of sports-related event contracts on any DCM." CTFC Staff Letter No. 25-36 at 2 (Sep. 30, 2025). Referring to the very opinion that Kalshi asks this Court to reverse, the CFTC noted that "at least one federal district court has found that the [CEA] does not preempt the application of State gambling, wagering, and gaming laws to sports-related event contracts listed and traded on a CFTC-registered trading venue," and it advised DCMs to ensure customers "understand the possible effects should State regulator actions … result in termination of sports-related event contracts." *Id.* at 2 n.3–4. Kalshi's arguments thus stand in sharp contrast to the CFTC's own "lack of confidence that it has [the] authority" to regulate sports betting. *Capt. Gaston LLC*, 76 F.4th at 299. The Court should reject Kalshi's private efforts to expand the CFTC's jurisdiction to a vast new area of regulation.

> 3. *The Indian Canons of Construction implore this Court to resolve any ambiguity in favor of tribes.*

Even if there were ambiguity as to whether Congress intended to repeal IGRA when it amended the CEA in 2010 (there is not), the Indian Canons of Construction require courts to resolve statutory ambiguities in favor of tribes. *Bryan v. Itasca Cnty.*, 426 U.S. 373, 392 (1976); *See Capt. Gaston LLC,* 76 F.4th at 296. Moreover, later-enacted statutes of general applicability cannot repeal earlier-enacted legislation that is specifically designed to advance the United

21

States' special relationship with Indians, without a clear statement from Congress. *See, e.g.*, *Morton v. Mancari*, 417 U.S. 535, 550 (1974); *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142, 1159–60 (9th Cir. 2020); *Shoshone-Bannock Tribes of Fort Hall Rsrv. v. DOI*, 153 F.4th 748, 765 (9th Cir. 2025); *see also Capt. Gaston LLC*, 76 F.4th at 296 (listing "liberal constructions to benefit Indians" as an example of "background interpretive principles or rules of construction" that "influence [this Court's] reading of a statute, sometimes even moving [the Court] to interpret a provision differently than [it] might otherwise").

This Court should therefore reject Kalshi's arguments requiring an implied repeal of IGRA.

## II. The Major Questions Doctrine Forecloses Kalshi's Theory.

In 2010, federal law prohibited sports betting nationwide. Kalshi's position thus requires interpreting the CEA not only to eradicate state and federal gaming laws by preemption or implied repeal, but to reverse federal policy from prohibition of sports betting to nationwide authorization. Whether Congress did so is a major question.

The major questions doctrine requires courts to look for "clear congressional authorization" before adopting "an expansive construction of [a] statute" that would amount to an "extraordinary grant of regulatory authority" on issues with significant political and economic consequences. *Capt. Gaston LLC*, 76 F.4th at

22

296–97 (internal citations and quotations omitted).  There can be no doubt that Kalshi's preemption argument presents such a question.

In effect, Kalshi contends that the 2010 CEA amendments displaced both state and tribal gaming regulations, legalized sports betting nationwide, and placed sports betting under the exclusive jurisdiction of the CFTC, all at a time when federal law prohibited states from legalizing sports betting themselves.  Kalshi's preemption argument thus bears many of the "hallmarks that should send [the Court] searching for clear authorization from Congress." *Id.* at 297.

First, "Congress must be explicitly clear if it wishes to 'alter[ ] the federal-state framework by permitting federal encroachment upon a traditional state power.'" *Id.* at 298 (quoting *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172–73 (2001)).  And, as this Court has recognized, "regulating gambling is at the core of the state's residual powers as a sovereign in our constitutional scheme." *WV Ass'n of Club Owners*, 553 F.3d at 302.

Moreover, a clear statement from Congress is especially needed when "Congress has repeatedly confirmed that states have the primary authority to regulate" that area of the law. *Capt. Gaston LLC*, 76 F.4th at 298.  Gambling is such an area.  As the Supreme Court noted in *Murphy v. NCAA*, Congress has long structured federal criminal law to "respect the policy choices of the people of each State on the controversial issue of gambling."  584 U.S. 453, 484 (2018); *see, e.g.,*

23

18 U.S.C. §§ 1084, 1166, 1952, 1953, 1955 (incorporating state gambling

prohibitions); *Chicken Ranch*, 42 F.4th at 1031 (explaining that IGRA strikes "a

delicate balance" between tribal and state sovereignty over gaming). And even

when Congress chose to prohibit sports betting nationally through PASPA, it did

so *through* state regulation, rather than by directly regulating private actors. *See*

*Murphy*, 584 at 484–85.

Because Congress "has repeatedly confirmed that states have the primary

authority to regulate" gaming, this Court should "demand 'exceedingly clear

language'" before concluding that the CEA preempts all state sports-betting laws.

*Capt. Gaston LLC*, 76 F.4th at 299. No such language exists. Rather, the CEA

actually *reinforces* the federal policy in favor of state gaming regulation by

disclaiming preemption of state gaming laws. *See* 7 U.S.C. § 16(e). And nothing

in the definition of "swap" indicates that Congress meant to overturn the entire

field of state sports-betting regulations.

Second, Congress already had a "'distinct regulatory scheme' in place to

deal with the issue" of sports betting at the time of the CEA amendments: PASPA.

*Capt. Gaston LLC*, 76 F.4th at 297 (quoting *FDA v. Brown & Williamson*, 529

U.S. 120, 143–46 (2000)). The conflict between Kalshi's argument that the CEA's

2010 amendments authorized sports betting nationwide and the existence of

24

PASPA's nationwide sports-betting prohibition in 2010 "indicates that Congress did not mean to regulate the issue in the way [Kalshi] claim[s]." *Id.* at 297.

The Supreme Court eliminated PASPA as a barrier to sports betting in 2018 when it held PASPA unconstitutional. *See Murphy*, 584 U.S. at 486. Since then, several states (including Maryland) have established regulatory schemes for sports betting under their traditional police powers.

But that has no bearing on whether Congress's CEA amendments *in 2010* had the effect of obliterating PASPA and the state laws on which it relied. Kalshi's position that Congress legalized sports betting in 2010 would certainly come as a surprise to the Supreme Court and litigants in *Murphy*—none of whom seemed to think that the state prohibition at issue had actually been preempted years earlier.

In holding PASPA unconstitutional, the Supreme Court made no suggestion that Congress had *already* preempted all state gaming laws eight years earlier. *Murphy*, 584 U.S. at 479–480. To the contrary, the majority opinion concluded with an observation utterly incompatible with Kalshi's contention: "The legalization of sports gambling requires an important policy choice, but the choice is not ours to make. Congress can regulate sports gambling directly, but if it elects not to do so, each State is free to act on its own." *Id.* at 486. In other words, Kalshi's deregulatory elephant was hidden in a statutory mousehole far too small

25

for the Supreme Court to notice when deciding whether sports betting would be legal.

Ignoring history, context, and common sense, Kalshi presents an alternate reality in which a statutory scheme whose scope is limited to addressing the risk, discovery, and dissemination of commodity pricing information, *see* 7 U.S.C. § 5(a)–(b), exclusively governs nationwide sports betting, including that occurring on Indian lands. Kalshi, therefore, creates a world where Congress repealed the comprehensive regulatory scheme set forth in IGRA, similar structures set up by state legislatures and regulators, and the federal policy codified in PASPA *requiring* states to prohibit sports betting, all without even a whisper of legislative intent.

Kalshi's revisionist history cannot withstand even the slightest scrutiny. As the Nevada District Court aptly stated, "[i]t is absurd to think that Congress intended for DCMs to turn into nationwide gambling venues on every topic under the sun to the exclusion of state regulation and with no comparable federal regulator without ever mentioning that was the goal when Congress added swaps to the CEA in 2010." *Hendrick*, 2025 WL 3286282, at *9.

### III. Kalshi's Preemption Argument Would Violate the Private Nondelegation Doctrine.

Kalshi's preemption argument turns on the extraordinary claim that Congress delegated the power to preempt state law to an interested private party simply by self-certifying its own sports-betting contracts and listing them on its exchange. The private non-delegation doctrine, however, guards against precisely the type of unchecked, privately exercised powers upon which Kalshi relies. *See Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) ("This is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business.").

While the Supreme Court upholds congressional delegations of power to federal agencies with an intelligible principle, it applies a different standard when those delegations are to private entities. "[A] law … violates the private nondelegation doctrine when it allows non-governmental entities to govern." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 697 (2025). Recently, the Supreme Court found that the permissibility of a private delegation depends upon whether the agency retains oversight and ultimate decision-making authority over the private entity's actions. The Court upheld the delegation to a private entity, determining

27

that it played merely "an advisory role" and the final decision-making authority rested with the agency. *Id.* at 693.

In contrast, the CEA's self-certification provisions empower Kalshi—a private, for-profit entity—to oversee its own sports-betting enterprise, yet simultaneously fail to provide any mechanism for advance public comment, mandatory agency oversight, or standards by which the CFTC may implement its discretion. *See* Farewell Address of Commissioner Kristin N. Johnson, CFTC (Sep. 3, 2025), available at

https://www.cftc.gov/PressRoom/SpeechesTestimony/opajohnson25?utm_source=substack&utm_medium=email (warning that the CFTC "[has] too few guardrails and too little visibility into the prediction market landscape").

Further, even according to Kalshi, its self-certification is not merely advisory. Rather, it has the force of law and CFTC inaction is sufficient to trigger preemption. "The result of this regulatory scheme is that [Kalshi] can, without any [CFTC] review of its decision on the merits, effectively decide" to engage in sports betting free from tribal and state regulation. *See Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1328 (D.C. Cir. 2024). Consequently, construing the CEA to attribute legal effect on state law via Kalshi's self-certification would be unconstitutional—a construction that must be avoided. *See United States v. Simmons*, 143 F.4th 200, 208 (4th Cir. 2025) ("Constitutional avoidance principles

restrain us from resolving constitutional challenges when a case can be resolved on other grounds.").

Moreover, "[a]ny delegation of regulatory authority 'to private persons whose interests may be and often are adverse to the interests of others in the same business' is disfavored." *Pittston Co. v. United States*, 368 F.3d 385, 394 (4th Cir. 2004) (internal quotations omitted).  Here, Kalshi's interests in offering lucrative nationwide sports betting are adverse to the interests of tribes, states, and businesses offering regulated sports betting.  The effects of Kalshi's self-certification go even further; in Kalshi's view, it could block tribes and states from regulating that which has long been within their sovereign authority to regulate simply by listing sports-betting contracts on its exchange.

## CONCLUSION

For the foregoing reasons, the Tribal Amici respectfully request that the Court affirm the lower court's decision.

Dated: December 22, 2025          Respectfully submitted,

Joseph H. Webster                 Scott Crowell
Elizabeth Bower                   Crowell Law Office
Jens W. Camp                      Tribal Advocacy Group PLLC
Hobbs, Straus, Dean & Walker LLP  1487 W State Rte 89A, Suite 8
1899 L Street NW, Ste. 1200       Sedona, AZ 86336
Washington, DC 20036              (425) 802-5369
(202) 822-8282                    scottcrowell@clotag.net
jwebster@hobbsstraus.com
ebower@hobbsstraus.com            *Counsel for Rincon Band of*
jcamp@hobbsstraus.com             *Luiseño Indians, Santa Ynez*
                                  *Band of Chumash Mission Indians, and*
*Counsel for Tribal Amici*        *the Spokane Tribe of the Spokane*
                                  *Reservation*
Bryan Newland
Powers, Pyles, Sutter & Verville PC   Michael Hoenig
1250 Connecticut Ave N, 8th Floor Yuhaaviatam of San Manuel Nation
Washington, DC 20036              422 1st Street SE
(202) 349-4265                    Washington, DC 20003
Bryan.Newland@Powerslaw.com       (909) 936-9684
                                  Michael.Hoenig@sanmanuel-nsn.gov
*Counsel for Tribal Amici*
                                  *Counsel for Yuhaaviatam of San Manuel*
                                  *Nation and San Manuel Gaming and*
                                  *Housing Authority*

30

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type volume limitations of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 6472 words, excluding those parts exempted by Rule 32(f).

2.  This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: December 22, 2025                          /s/ Joseph H. Webster
                                                   Joseph H. Webster


## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2025, a copy of the foregoing was filed with the Clerk of Court via this Court's CM/ECF's electronic filing system, which will provide notice and service on all counsel of record for all parties.

Dated: December 22, 2025                          /s/ Joseph H. Webster
                                                   Joseph H. Webster