No. 25-1892

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

KALSHIEX LLC,
*Plaintiff-Appellant*,

v.

JOHN A. MARTIN, et al.,
*Defendants-Appellees*.

---

On Appeal from the United States District Court
for the District of Maryland
No. 1:23-cv-01283 (Abelson, J.)

---

## BRIEF OF AMICUS CURIAE AMERICAN GAMING ASSOCIATION
## IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE

---

Bruce Bennett
Benjamin Sovocool
COVINGTON & BURLING LLP
30 Hudson Yards
New York, NY 10001

Kevin F. King
  *Counsel of Record*
Matthew J. Glover
Scott Garfing
Hassan Ahmad
Eli Nachmany
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
kking@cov.com

*Counsel for Amicus Curiae*

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Fourth Circuit Local Rule 26.1, *Amicus Curiae* American Gaming Association (AGA) discloses that it is not a publicly held corporation or other publicly held entity, and it has no parent corporation. No publicly held entity holds 10% or more of AGA's stock or equitable interests. AGA is not aware of any publicly held entity not a party to this proceeding that has a direct financial interest in this litigation.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ..................................................................... i

TABLE OF AUTHORITIES ..................................................................... iii

INTEREST OF AMICUS CURIAE ......................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 2

ARGUMENT ..................................................................................... 4

I.  Federal Law Has Long Facilitated State Gaming Regulation. ........................ 4

II.  Licensed Gaming Operators Have Built Their Businesses Around the
     State Model and Partner with Regulators to Make It Effective. ................... 7

III.  Kalshi's Interpretation Would Upend the Longstanding Framework
      Governing Sports Wagering. ........................................................ 12

IV.  Kalshi's Arguments Defy Settled Legal Principles and Common
      Sense. ................................................................................ 22

CONCLUSION .................................................................................... 30

CERTIFICATE OF COMPLIANCE ......................................................... 31

CERTIFICATE OF SERVICE ................................................................ 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Clinical Lab. Ass'n v. FDA,*
   776 F. Supp. 3d 554 (E.D. Tex. 2025).............................................................24

*Casino Ventures v. Stewart,*
   183 F.3d 307 (4th Cir. 1999) .........................................................................5

*Christopher v. SmithKline Beecham Corp.,*
   567 U.S. 142 (2012).......................................................................................24

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000).......................................................................................22

*Flynt v. Bonta,*
   131 F.4th 918 (9th Cir. 2025) .......................................................................5

*Greater New Orleans Broad. Ass'n, Inc. v. United States,*
   527 U.S. 173 (1999).........................................................................................4

*Gregory v. Ashcroft,*
   501 U.S. 452 (1991).......................................................................................26

*KalshiEx, LLC v. Hendrick,*
   No. 2:25-cv-575, 2025 WL 3286282 (D. Nev. Nov. 24, 2025) ..................16, 22

*Murphy v. NCAA,*
   584 U.S. 453 (2018).....................................................................................4, 6

*Nixon v. Missouri Municipal League,*
   541 U.S. 125 (2004).......................................................................................26

*S.J. Groves & Sons Co. v. Occupational Safety & Health Rev. Comm'n,*
   648 F.2d 95 (2d Cir. 1981) ...........................................................................24

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001).......................................................................................26

**Statutes**

7 U.S.C. § 2 ................................................................................27

7 U.S.C. § 7a-2 ...........................................................................26

15 U.S.C. § 3001 ...........................................................................6

18 U.S.C. § 1084 ...........................................................................5

18 U.S.C. § 1955 ...........................................................................5

25 U.S.C. § 2701 ...........................................................................6

25 U.S.C. § 2710 ...........................................................................6

28 U.S.C. § 3704 ...........................................................................6

31 U.S.C. § 5362 ...........................................................................5

31 U.S.C. § 5363 ...........................................................................5

Md. Code, State Gov't § 9-1E-01 ..............................................13

Md. Code, State Gov't § 9-1E-03 .........................................7, 10

Md. Code, State Gov't § 9-1E-07 ................................................9

Md. Code, State Gov't § 9-1E-10 ................................................9

Md. Code, State Gov't § 9-1E-11 ........................................13, 14

S.C. Code Ann. § 16-19-130 .......................................................7

Utah Code Ann. § 76-9-1402 .......................................................7

Va. Code Ann. § 18.2-328 ...........................................................8

Va. Code Ann. § 58.1-4039 ..........................................................8

**Constititional Provisions**

Md. Const. art. XIX .....................................................................9

**Regulatory Materials**

17 C.F.R. § 40.11 ..................................................................27

Event Contracts, 89 Fed. Reg. 48968 (June 10, 2024) ...........................27

Md. Code Regs. § 36.01.03.01 ...............................................18

Md. Code Regs. § 36.03.08.04 ...............................................12

Md. Code Regs. § 36.10.01.02 ...........................................9, 15

Md. Code Regs. § 36.10.02.03 .................................................9

Md. Code Regs. § 36.10.02.04 .................................................9

Md. Code Regs. § 36.10.02.05 .................................................9

Md. Code Regs. § 36.10.02.06 .................................................9

Md. Code Regs. § 36.10.02.08 .................................................9

Md. Code Regs. § 36.10.02.09 .................................................9

Md. Code Regs. § 36.10.10.02 ...............................................18

Md. Code Regs. § 36.10.10.03 ...............................................15

Md. Code Regs. § 36.10.13.43 ...............................................15

Md. Code Regs. § 36.10.14.04 ...............................................19

Md. Code Regs. § 36.10.18.05 ...............................................20

**Legislative Materials**

156 Cong. Rec. S5907 (July 15, 2010) ....................................25

*Building the New Derivatives Regulatory Framework: Oversight of
Title VII of the Dodd-Frank Act: Hearing Before the S. Comm. on
Banking, Hous., & Urban Affs.*, S. Hrg. No. 112-102 (Apr. 12,
2011) ................................................................................26

H.R. Rep. No. 109-412 (2006).................................................5

## Other Authorities

American Gaming Ass'n, *Gaming by the Numbers: Maryland* (Dec. 31, 2024) ........................................................................10

American Gaming Ass'n, *Regulated Sports Betting Protects Game Integrity* (accessed Dec. 22, 2025) ....................................19

American Gaming Ass'n, *Responsible Gaming Regulations and Statutes Guide* (Sept. 1, 2022) ........................................11, 12

American Gaming Ass'n, *Responsible Play* (accessed December 22, 2025) ........................................................................15

American Gaming Ass'n, *State of the States 2025: The AGA Analysis of the Commercial Casino Industry* (May 2025)..............7, 10, 12, 13

Anthony Macuk, *No, You Can't Bet on College Sports Online in Oregon* (Mar. 21, 2024).......................................................8

Aoyon Ashraf, *Robinhood Partners with Kalshi to Launch NFL and College Football Prediction Markets*, Yahoo! Finance (Aug. 19, 2025) .........................................................................20

Becky Harris, *Regulated Sports Betting: A Nevada Perspective*, 10 UNLV Gaming L.J. 75 (2020).........................................7

Ben Blatt & Amy Fan, *Is Sports Betting Illegal in Your State? Not If You Call it a 'Prediction Market,'* N.Y. Times (Oct. 5, 2025) .........................23

Carson Deveau, *Best California Sportsbook Promos & Betting Bonuses for Today*, Covers.com (Dec. 4, 2025)................................17

CFTC, Advisory Letter No. 25-36 (Sept. 30, 2025)................................29

U.S Equal Employment Opportunity Commission, *Commodity Futures Trading Commission (CFTC) Workforce Composition* (accessed Dec. 22, 2025) ......................................................27

Chris Altman, *Best Oregon Sportsbooks December 2025*, Vegas Insider (accessed Dec. 22, 2025) ........................................17

Dan Bernstein, *Robinhood to Offer Custom Sports Parlays Using Kalshi Tech*, Sportico (Dec. 16, 2025) ...............................................18

Dan Holmes, *Maryland Removes College Player Prop Bets from Approved Wager List*, PlayMaryland (Mar. 5, 2025)............................8

Declaration of Xavier Sottile, *KalshiEx, LLC v. Hendrick*, No. 2:25-cv-575, ECF No. 183-4 (D. Nev. Oct. 31, 2025)..................................20

Dominique Maria Bonessi, *Maryland Overwhelmingly Votes to Legalize Sports Betting at Stadiums and Casinos*, WAMU (Nov. 6, 2020) ....................................................................................................10

Dustin Gouker, *Kalshi Hits Record High on Sunday, But Weekly Volume Dips*, Event Horizon (Dec. 9, 2025).......................................24

Dustin Gouker, *Kalshi Is Advertising that 'Sports Betting' Is Legal in California, Texas*, Event Horizon (Sept. 17, 2025)...........................16

Dustin Gouker, *Kalshi Rolls Out Same-Game Parlays for Monday Night Football Games*, Event Horizon (Sept. 30, 2025) ...................23

Dustin Gouker, *Kalshi Says It's 'Kind of Addicting' In Instagram Post*, Event Horizon (Oct. 21, 2025) ................................................16

Dustin Gouker, *Yes, Kalshi Is Still Marketing Itself as a Betting Platform*, Event Horizon (Aug. 27, 2025) ........................................16

Indiana Gaming Commission, *Directive on Betting Catalogues, Wagers and Other Events* (July 1, 2024)..........................................8

Jeff Barker, *As March Loomed, Maryland Told Sportsbooks to Stop Offering Bets on NCAA Players' Individual Performances*, Baltimore Sun (Mar. 22, 2024)..........................................................13

Jessica Welman, *Kalshi's Lawyer Goes Hard at State Regulated Gambling*, SBC Americas (July 11, 2025) .........................................18

Justin Byers, *Charlotte Motor Speedway Taps BetMGM for NC Access Deal*, SBC Americas (Jan. 8, 2024)........................................11

Kalshi, *Personalized Funding Cap* (accessed Dec. 22, 2025)................................19

Kalshi, *Responsible Risk Management* (accessed Dec. 22, 2025)....................17, 18

Kalshi, *Trading Break* (accessed Dec. 22, 2025) ....................................................18

Laya Neelakandan, *Fanatics Launches Prediction Market in 24 States*, CNBC (Dec. 3, 2025)................................................................15

Letter from Alexandra Roth, General Counsel, NBA, to CFTC (May 1, 2025)................................................................................28

Liz Napolitano, *Kalshi Makes Move to Court Crypto Traders with Tokenized Betting Contracts*, CNBC (Dec. 1, 2025)..........................................20

Md. Dep't of Mgmt. and Budget, FY 2025 Maryland Budget Highlights (Jan. 17, 2024)................................................................27

Md. Lottery & Gaming Control Agency, *Maryland Sports Wagering* (accessed Dec. 22, 2025) ........................................................9

Md. Lottery & Gaming Control Agency, *Status of Sports Wagering License Applicants* (accessed Dec. 22, 2025)....................................9

Pat Forde, *Inside the Alabama Baseball Gambling Scandal*, Sports Illustrated (July 10, 2023)................................................................19

Prince J. Grimes, *Which States Allow Betting on College Player Props?*, USA Today (Nov. 4, 2024) .....................................................8

Robert Linnehan, *Crypto.com No Longer Offers Sport Event Contracts in Arizona, Eight Other States*, SportsBettingDime (Dec. 16, 2025) ................................................................15

Robinhood, Press Release, *Robinhood Launches Prediction Markets Hub* (Mar. 17, 2025) ................................................................18

Tracee Wilkins, *MGM Casino Prepares for Opening at National Harbor*, NBC4 Washington (Dec. 5, 2016)......................................11

## INTEREST OF AMICUS CURIAE[1]

The American Gaming Association (AGA) is a non-profit trade association whose members represent the full spectrum of the legal, regulated gaming industry—including commercial and tribal casino operators, suppliers, and sports betting operators. AGA's members participate in gaming markets throughout the United States, which generate $53 billion in annual tax revenue and support 1.8 million jobs nationwide. On behalf of its members, AGA works with law enforcement, elected officials, state agencies, and tribal leaders to combat illegal gambling and promote next-generation regulatory regimes.

AGA submits this brief to address the disruptive effects that Kalshi's unlicensed sports wagers will have on the longstanding regulatory framework in Maryland and other states. AGA and its members also have a strong interest in orderly application of federal law, which complements and facilitates state gaming laws—rather than preempting them as Kalshi asserts in this litigation.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29, undersigned counsel certifies that (i) no party or party's counsel authored this brief in whole or in part, (ii) no entity or person, aside from amicus curiae or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief, and (iii) all parties have consented to the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For decades, Congress and the States have worked together to establish a regulatory framework for casino gaming that elevates local policy choices, protects consumers, and safeguards the integrity of sporting events. Licensed gaming operators, including members of the AGA, have built their businesses around that framework and partner with state regulators to make it effective. That cooperative model has delivered enormous benefits: capital investments, jobs, tax revenues, and a safe and transparent marketplace where every operator plays by the same rules.

Kalshi's theory would eviscerate that longstanding regulatory structure. Seeking to avoid the compliance burdens of state laws, Kalshi masks its wagers as derivatives contracts governed exclusively by the Commodity Futures Trading Commission (CFTC). But as is obvious to anyone who visits Kalshi's platform, Kalshi's contracts are not novel financial instruments—they are sports bets. Kalshi's offerings involve point spreads, over/under bets, and parlays, all of which are standard sportsbook fare, and Kalshi presents these bets through the same user interface as prominent online sportsbooks. Kalshi's own advertisements reinforce the point, touting the company's "sports betting" options, and its paid affiliates likewise refer to Kalshi as a "sportsbook" that offers "sports betting." Kalshi thus engages in precisely the type of conduct that Maryland's laws (and the laws of many other states) expressly prohibit: unlicensed sports betting.

Crediting Kalshi's carefully crafted legal fiction would lead to practical problems as well. For example, Kalshi's arguments would force the CFTC to serve as the nation's sportsbook regulator, despite lacking the expertise and resources needed to address the unique challenges posed by sports betting. As its authorizing statute and regulations make clear, the CFTC's job is to oversee soybean futures, not Super Bowl bets. Consumers, meanwhile, would have fewer and weaker protections than under state law. Kalshi allows 18-year-olds to bet, despite rules in Maryland and most other states requiring bettors to be at least 21 years old. Kalshi permits wagering on college sporting events, in violation of laws in many jurisdictions that limit or prohibit such wagers. It offers only a subset of the self-exclusion tools required by Maryland law. And Kalshi's distributed market structure allows users to place sports bets via third-party markets over which Kalshi has limited oversight, as well as "tokenized" transactions that facilitate anonymous trading—thus hindering the company's ability to investigate, prevent, and prosecute insider threats to the integrity of sporting events.

According to Kalshi, Congress accepted those risks and authorized nationwide sports betting when it enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act in 2010 (Dodd-Frank). But there is no evidence—let alone the clear statement required by binding precedent—that Congress took that radical step. The Supreme Court has emphasized that Congress does not hide elephants in

mouseholes, yet Kalshi insists that Congress overrode the laws of dozens of states and rearranged an entire market sector through obscure provisions regarding swaps transactions. Kalshi's argument is even more implausible given the statutory context: Congress enacted Dodd-Frank following the 2008 global financial crisis and focused the Act on protecting the public from the systemic risks posed by unregulated over-the-counter derivatives, such as credit default swaps. Sports wagering has nothing to do with those issues.

Because Kalshi does not come close to meeting the demanding test for a preliminary injunction, this Court should affirm.

## ARGUMENT

### I.    Federal Law Has Long Facilitated State Gaming Regulation.

Regulation of casino gaming has long been a matter primarily entrusted to the States. When Congress has stepped in to regulate gaming matters, it has been clear about its intentions and taken steps to preserve state authority. Time and again, Congress has chosen to forgo comprehensive gaming regulation in favor of enacting laws that cover specific areas of interstate activity, taking a "general federal approach" that "respect[s] the policy choices of the people of each State on the controversial issue of gambling." *Murphy v. NCAA*, 584 U.S. 453, 484 (2018); *see also Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 187 (1999) ("That Congress has generally exempted state-run lotteries and casinos from

federal gambling legislation reflects a decision to defer to, and even promote, differing gambling policies in different States."); *Flynt v. Bonta*, 131 F.4th 918, 930, 932 (9th Cir. 2025) (acknowledging the States' "traditional ability to regulate gambling activity" and observing that "[g]ambling does not involve an inherently national system of regulation, given the states' long-understood authority in this area"); *Casino Ventures v. Stewart*, 183 F.3d 307, 310 (4th Cir. 1999) (rejecting federal preemption argument in case involving state gaming laws and noting that laws "restrict[ing] gambling within South Carolina … represent a well-recognized exercise of state police power").

For example, the Wire Act generally prohibits interstate transmission of sports wagers, but it carves out exceptions for intrastate wagers and transmission of information assisting in the placing of a wager from a state where sports wagering is authorized to another state where such wagering is legal.  *See* 18 U.S.C. § 1084(b). Similarly, the Unlawful Internet Gambling Enforcement Act prohibits the knowing acceptance of payments for unlawful internet gambling, but it defines that term as gambling that violates *state* law.  *See* 31 U.S.C. §§ 5362(10)(A), 5363;[2] *see also* 18

---

[2] The Unlawful Internet Gambling Enforcement Act distinguishes sports wagers from "transaction[s] … under the Commodity Exchange Act."  31 U.S.C. § 5362(1)(E)(ii).  That provision reflects the commonsense understanding that sports wagers are different from "business transactions such as securities trading or buying or selling insurance contracts."  H.R. Rep. No. 109-412, pt. 1, at 10 (2006).

U.S.C. § 1955 (defining "illegal gambling business" as one that "is a violation of the law of a *State* or political subdivision in which it is conducted" (emphasis added)). And the Interstate Horseracing Act explains "that the States should have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001.[3]

Congress has likewise taken a decentralized approach with respect to tribal gaming. The Indian Gaming Regulatory Act grants Native American tribes "the exclusive right" to conduct casino gaming "on Indian lands," 25 U.S.C. §§ 2701(5), 2710, and establishes a cooperative process that gives tribal and state governments a role in determining the scope of authorized gaming. Under that scheme, tribes may offer "class III" casino-style gaming—such as blackjack and sports wagering— when it occurs "in a State that permits such gaming" and is "conducted in conformance with a Tribal-State compact." *Id.* § 2710(d)(1)(B)-(C).

As a result, the States have become the predominant regulators of casino gaming. Some states, like Maryland and Nevada, have authorized a broad spectrum

---

[3] When Congress deviated from this federal-state balance, the Supreme Court stopped it. The Professional and Amateur Sports Protection Act sought to freeze state sports-wagering laws as they existed 1993 by prohibiting states from authorizing sports wagers after that date, while grandfathering jurisdictions that had already done so. *See* 28 U.S.C. § 3704. That restriction, the Supreme Court held, violated the Tenth Amendment, which prohibits Congress from "issu[ing] direct orders to the governments of the States"—including, for example, telling states that they cannot authorize sports wagering. *Murphy*, 584 U.S. at 471.

of gaming, including sports wagering, while other states, like South Carolina and Utah, prohibit gaming altogether.[4]  Many states fall somewhere in between.[5]  But even in more permissive jurisdictions like Nevada, "[e]very entity that conducts wagering … is subject to a rigorous licensing investigation to ensure that the entity itself, and the individuals associated with it, meet [the state's] strict gaming standards."[6]

## II. Licensed Gaming Operators Have Built Their Businesses Around the State Model and Partner with Regulators to Make It Effective.

That enduring framework has shaped industry expectations and created reliance interests: licensed gaming operators have long structured their businesses around state-law requirements.  The operators also work closely with state regulators to implement those requirements and ensure that consumers can enjoy gaming as a safe, responsible form of entertainment.

Most fundamentally, AGA's members operate only in the jurisdictions where they are licensed.  State laws generally prohibit gaming except when expressly authorized, and they back those prohibitions with stiff civil and criminal penalties

---

[4] *Compare* Becky Harris, *Regulated Sports Betting: A Nevada Perspective*, 10 UNLV Gaming L.J. 75, 76–80 (2020), and Md. Code, State Gov't § 9-1E-03, *with* Utah Code Ann. § 76-9-1402 and S.C. Code Ann. § 16-19-130.

[5] *See* American Gaming Ass'n, *State of the States 2025: The AGA Analysis of the Commercial Casino Industry* (May 2025), https://perma.cc/JY4C-96AD (hereinafter *State of the States*) (providing overview of gaming laws in all fifty states).

[6] Harris, *supra*, at 79.

for noncompliance.  *See, e.g.*, Va. Code Ann. § 18.2-328 (operator of an illegal gambling entity shall be guilty of a felony punishable by fines and imprisonment of one to ten years).  Thus, while various forms of gaming are permitted within this Circuit (in Maryland, North Carolina, Virginia, and West Virginia), the mix of companies that offer gaming varies from state to state depending on where each company is licensed.

In jurisdictions that allow casino gaming, state law specifies, among other things, which types of licenses are available (for brick-and-mortar casinos, riverboat casinos, online sportsbooks, etc.), where gaming may be offered, and what types of games may be offered.  For example, some states broadly permit betting on college sports, while Oregon largely prohibits such wagers and Virginia allows them only if the event does not involve Virginia schools.[7]  Maryland and Virginia prohibit individual player proposition (or "prop") bets for college sporting events, while Indiana permits them only before the beginning of the game.[8]  Licensed operators

---

[7] *See* Anthony Macuk, *No, You Can't Bet on College Sports Online in Oregon*, KGW8 (Mar. 21, 2024), https://perma.cc/T2RU-4WZT; Va. Code Ann. § 58.1-4039(A)(3).

[8] *See* Dan Holmes, *Maryland Removes College Player Prop Bets from Approved Wager List*, PlayMaryland (Mar. 5, 2025), https://www.playmaryland.com/maryland-regulators-ban-ncaa-prop-bets/; Va. Code Ann. § 58.1-4039(A)(2); Indiana Gaming Commission, *Directive on Betting Catalogues, Wagers and Other Events* (July 1, 2024), https://perma.cc/8STA-5WFC; *see also* Prince J. Grimes, *Which States Allow Betting on College Player* (continued…)

take the steps necessary to conform their offerings to these state-specific requirements.

Maryland's gaming laws illustrate how state gaming oversight functions. Maryland has enacted separate rules for brick-and-mortar casinos and online sports betting. *See, e.g.*, Md. Code Regs. § 36.10.02.02(C); Md. Code, State Gov't § 9-1E-10; Md. Const. art. XIX (authorizing casinos in specific locations). Those rules require parties that wish to offer gaming to submit an application—and a substantial application fee[9]—to state regulators for authorization to operate.[10] Regulators scrutinize applications to ensure that they meet statutory and regulatory criteria, a process that involves extensive investigations of the applicant's directors, officers, partners, and other principals. *See, e.g.*, Md. Code Regs. §§ 36.10.02.03–06, 36.10.02.08–09; Md. Code, State Gov't § 9-1E-07(e). Operators that obtain licenses must pay special gaming taxes on their revenues (in addition to other generally applicable taxes); comply with detailed rules on a broad range of issues (such as

---

*Props?*, USA Today (Nov. 4, 2024), https://ftw.usatoday.com/story/sports/ncaaw/2024/11/04/states-college-player-props-betting-legal-ncaa/76050579007/.

[9] Application fees vary by license type and are as high as $2 million. *See* Md. Lottery & Gaming Control Agency, *Maryland Sports Wagering* (accessed Dec. 22, 2025), https://perma.cc/L4SJ-LBZN.

[10] *See* Md. Lottery & Gaming Control Agency, *Status of Sports Wagering License Applicants* (accessed Dec. 22, 2025), https://perma.cc/FTG9-5R8P.

consumer protection and employment practices); and periodically renew their licenses. *See, e.g.*, Md. Code, State Gov't § 9-1E-03(a)-(b).

The result is a process in which the people have a direct say, through referenda, their elected representatives, and their state agencies, over whether, where, and how gaming is available in their communities. Maryland voters, for example, approved a proposal to authorize sports wagering by an "overwhelmin[g]" 2-1 margin in 2020.[11] And because gaming operators compete with one another for a scarce pool of licenses, the process creates an incentive for operators to make substantial investments in the state's economy.

In Maryland, licensed gaming operators support jobs for more than 27,300 residents and generate $1.4 billion in tax revenue annually across all levels of government, with a total annual statewide economic impact of $5.8 billion.[12] Nationwide, licensed commercial gaming operators contributed $15.91 billion in direct gaming tax revenue to state and local governments in 2024 alone.[13]

Beyond tax payments, licensed gaming operators make many other types of investments. For brick-and-mortar casinos, these investments include construction

---

[11] Dominique Maria Bonessi, *Maryland Overwhelmingly Votes to Legalize Sports Betting at Stadiums and Casinos*, WAMU (Nov. 6, 2020), https://perma.cc/S9CY-327W.

[12] American Gaming Ass'n, *Gaming by the Numbers: Maryland* (Dec. 31, 2024), https://perma.cc/6A3N-Z6VV.

[13] *See State of the States*, *supra*, at 8.

and upkeep of gaming facilities and surrounding amenities, hiring staff, and contracting with local businesses.[14] Online sportsbooks likewise hire employees, establish in-state operations centers, and partner with local sports teams.[15] Licensed operators put significant resources into complying with state gaming laws and regulations as well, including advertising guidelines and other consumer protections, requirements for self-exclusion programs, minimum standards for employee training, and restrictions on the financial instruments that operators may accept as payment.[16]

Responsible gaming initiatives are an especially important part of these compliance programs. Each year, licensed operators invest "nearly a half a billion dollars … [in]to responsible gaming initiatives that include support for independent academic research, development of best practices and new technological innovations, distribution of educational campaigns and materials for patrons,

---

[14] *See, e.g.*, Tracee Wilkins, *MGM Casino Prepares for Opening at National Harbor*, NBC4 Washington (Dec. 5, 2016), https://perma.cc/JYE8-868X (noting MGM's $1.4 billion investment in Prince George's County, Maryland).

[15] *See, e.g.*, Justin Byers, *Charlotte Motor Speedway Taps BetMGM for NC Access Deal*, SBC Americas (Jan. 8, 2024), https://sbcamericas.com/2024/01/08/betmgm-secures-north-carolina-access/ (describing agreement between sportsbook and Charlotte Motor Speedway pursuant to North Carolina law requiring such partnerships).

[16] *See* American Gaming Ass'n, *Responsible Gaming Regulations and Statutes Guide* (Sept. 1, 2022), https://www.americangaming.org/resources/responsible-gaming-regulations-andstatutes-guide/.

extensive and continuing employee training, and funding for problem gambling services." *Id.* at 3; *see also State of the States*, *supra*, at 11. Operators also monitor patron behavior for signs of problem gaming and employ a tiered outreach approach that increases the level of intervention according to the seriousness of the issue. *See id.* And the industry funds state responsible gaming efforts, with nearly every dollar earmarked by states for problem gambling prevention and treatment coming from taxes paid by the industry. *See*, *e.g.*, Md. Code Regs. § 36.03.08.04 (designating annual Problem Gaming Fund fees per table game and video lottery terminal).

There is a bargain at the heart of this framework. Licensed operators provide state and local governments with revenue, investments, gaming options approved by the community, and compliance functions designed to ensure that gaming is a safe, responsible form of entertainment. The States, in return, provide a market in which all competitors are subject to the same rigorous standards of financial fitness, integrity, and responsibility. That level playing field has been a key driver of the gaming industry's success, in Maryland and in other jurisdictions.

## III. Kalshi's Interpretation Would Upend the Longstanding Framework Governing Sports Wagering.

The District Court's order preserves the state regulatory model by requiring Kalshi to follow the same rules of the road as everyone else: If Kalshi wants to offer sports wagers in Maryland, it needs to get a Maryland license. Kalshi's theory, on the other hand, would destroy the framework that Congress, state governments, and

licensed gaming operators have relied upon for decades. Indeed, Kalshi's unlicensed sports bets sidestep nearly every aspect of the state regulatory scheme.

*Wagering Restrictions.* Maryland and other states have adopted rules that limit who may place sports wagers and the types of sports wagers that licensees may offer. A bettor may not be under 21 years of age, *see* Md. Code, State Gov't § 9-1E-11(a)(1), or an athlete, coach, referee, or director or employee of a sports governing entity or any of its member teams, *id.* § 9-1E-11(a)(3). And bettors may not wager on "high school sports or athletic event[s]," Md. Code, State Gov't § 9-1E-01(i)(2)(i) (defining "sporting event" to exclude high school sports), or place prop bets on college athletes, for example by wagering that a specific running back will rush for more than 50.5 yards in a particular football game.[17]

Kalshi's sports bets, in contrast, are available to all users 18 or older, in violation of Maryland law and the laws of most states. *See State of the States*, *supra*, at 16-21. Kalshi thus allows a vulnerable demographic—individuals as young as high school students—to bet on sports, despite Maryland's judgment that allowing those bets presents unacceptable risks. In addition, while Kalshi thus far has not offered wagers on high school sporting events or proposition bets on individual

---

[17] *See* Jeff Barker, *As March Loomed, Maryland Told Sportsbooks to Stop Offering Bets on NCAA Players' Individual Performances*, Baltimore Sun (Mar. 22, 2024), https://www.baltimoresun.com/2024/03/22/march-maryland-sportsbooks-bets-ncaa/ (reporting on directive transmitted to sportsbook operators).

college athletes, there would be no apparent legal barrier to Kalshi doing so under its federal preemption theory, because the CFTC's rules are silent on those issues (understandably so, given the CFTC's lack of involvement in sports wagering throughout its 51 years of existence). Kalshi already offers a broad range of wagers on college sporting events nationwide, without making any effort to comply with state laws that restrict or prohibit such wagers (such as the Maryland, Virginia, and Oregon rules noted above).

*Geofencing*. State laws allow online sportsbooks to operate only where they are licensed and require licensed operators to employ sophisticated geofencing technology to ensure that gaming is limited to authorized locations. *See, e.g.*, Md. Code, State Gov't § 9-1E-11(b)(1)(ii). These geofencing tools allow operators to tailor the wagers they offer to each state's particularized requirements, and also to block users from states where they are not licensed. An online sportsbook run by a large, national operator thus works differently in Maryland than in Virginia, given differences between those states' laws.

Kalshi's approach bypasses these geofencing requirements entirely. Kalshi is not authorized to offer sports wagers in Maryland or any other state, but it nevertheless does so nationwide—including in states like South Carolina that prohibit gaming outright. Kalshi also refuses to employ geofencing technologies that would make its wagers unavailable in jurisdictions where state authorities have

14

ordered the company to cease and desist from offering unlicensed gambling. That refusal sets Kalshi apart from other prediction market operators. For example, Fanatics launched its sports-based event contracts in only 24 states,[18] and Crypto.com recently confirmed that it has ceased offering its sports-based event contracts in (or otherwise walled off) nine states.[19] These companies have excluded Maryland from their offerings, showing that there are no technological or economic barriers to geofencing specific jurisdictions.

*Advertising*. State-licensed gaming operators are also subject to restrictions on the nature and content of advertising. Casinos and sportsbooks are required to avoid targeting minors and rigorously comply with those rules—as illustrated by data showing that nearly 95% of advertisements by licensed entities are delivered to persons at least 21 years old.[20] Casinos and gambling-related affiliates must also ensure that individuals who have self-excluded from gaming do not receive solicitations and that advertising contains prominent responsible gaming messages. *See, e.g.*, Md. Code Regs. §§ 36.10.10.03, 36.10.13.43, 36.10.01.02(B)(57)(a).

---

[18] *See* Laya Neelakandan, *Fanatics Launches Prediction Market in 24 States*, CNBC (Dec. 3, 2025), https://perma.cc/K5HJ-FJLL.

[19] *See* Robert Linnehan, *Crypto.com No Longer Offers Sport Event Contracts in Arizona, Eight Other States*, SportsBettingDime (Dec. 16, 2025), https://perma.cc/P23D-E923.

[20] *See* American Gaming Ass'n, *Responsible Play* (accessed December 22, 2025), https://www.americangaming.org/responsibility/responsible-play/.

Kalshi's advertising is not similarly tailored. Kalshi falsely advertises that it offers "legal sports betting in all 50 states," *KalshiEx, LLC v. Hendrick*, No. 2:25-cv-575, 2025 WL 3286282, at *8 (D. Nev. Nov. 24, 2025), including in states like California where sports betting is illegal.[21]

 

Moreover, Kalshi's advertisements describe the company's prediction contracts as "kind of addictive"[22] and use imagery featuring large amounts of cash, such as this video advertisement[23]:

---

[21]     Dustin Gouker, *Kalshi Is Advertising that 'Sports Betting' Is Legal in California, Texas*, Event Horizon (Sept. 17, 2025), https://perma.cc/8NJ4-HFUR; Dustin Gouker, *Yes, Kalshi Is Still Marketing Itself as a Betting Platform*, Event Horizon (Aug. 27, 2025), https://perma.cc/QEH6-YA3L.

[22] Dustin Gouker, *Kalshi Says It's 'Kind of Addicting' In Instagram Post*, Event Horizon (Oct. 21, 2025), https://perma.cc/5W6T-5UZK.

[23] The video is available on devices logged into the Instagram application, at the following address: https://www.instagram.com/p/DP17INKgFeZ/.

Many of Kalshi's affiliates describe Kalshi as a "sportsboo[k]" that offers "sports betting"[24]  And unlike licensed operators, Kalshi has not shown that it takes steps to prevent its advertisements from reaching minors and self-excluded individuals.

*Responsible Gaming*.  Kalshi also lags well behind licensed operators regarding responsible gaming protections for consumers.  Although Kalshi offers what it describes as "risk management tools," they fall short of the safeguards provided by licensed gaming operators.[25]  Kalshi's risk management features include

---

[24] Carson Deveau, *Best California Sportsbook Promos & Betting Bonuses for Today*, Covers.com (Dec. 4, 2025), https://perma.cc/P6P4-QZWA; *see* Chris Altman, *Best Oregon Sportsbooks December 2025*, Vegas Insider (accessed Dec. 22, 2025), https://perma.cc/B477-RV8H (describing Kalshi as a "sports betting" site and offering a "$10 Bonus" to readers who sign up for Kalshi accounts).

[25] Kalshi, *Responsible Risk Management* (accessed Dec. 22, 2025), https://perma.cc/WH2Q-KWSE.

a "trading break" and a "voluntary opt-out" procedure.  *Id.*  These mechanisms limit

user access to Kalshi's sports bets on its own website (and smartphone application),

but users can continue to access Kalshi's bets via third-party futures commission

merchants, such as Robinhood, which "accoun[t] for more than half of Kalshi's

betting volume."[26]  In contrast, Maryland's framework allows individuals to self-

exclude from *all* licensed gaming operators and activities statewide.  *See* Md. Code

Regs. § 36.01.03.01 *et seq.*

Kalshi notes that "it is ultimately the trader's responsibility not to trade" when

making use of its risk-management features,[27] and its counsel remarked earlier this

year that if sports bettors "lose their shirt, that's on them."[28]  Consistent with that

hands-off approach, there is no record evidence that Kalshi affirmatively monitors

for signs of problem gaming or reaches out to users who exhibit signs of

irresponsible use—steps that all licensed operators in Maryland must take.  *See* Md.

Code Regs. § 36.10.10.02.  Similarly, while Kalshi provides a voluntary deposit

---

[26] Dan Bernstein, *Robinhood to Offer Custom Sports Parlays Using Kalshi Tech*, Sportico (Dec. 16, 2025), https://perma.cc/877W-CV78; *see* Robinhood, Press Release, *Robinhood Launches Prediction Markets Hub* (Mar. 17, 2025), https://perma.cc/4Q82-WUE4.

[27] *See* Kalshi, *Trading Break* (accessed Dec. 22, 2025), https://perma.cc/CWS6-4J92.

[28] Jessica Welman, *Kalshi's Lawyer Goes Hard at State Regulated Gambling*, SBC Americas (July 11, 2025), https://sbcamericas.com/2025/07/11/kalshi-nclgs-sports-contract-debate/.

limit,[29] it does not offer customers the ability to set spending or time limits, both of which must be offered by licensed operators in Maryland, *see* Md. Code Regs. § 36.10.14.04(A)–(D).

*Integrity Controls*.  Licensed operators have a vital interest in protecting the integrity of sporting events.  To protect that interest, licensed operators work to prevent and detect fraud (such as point shaving) by "establish[ing] data sharing" protocols with sports leagues and state regulators, "develop[ing] sophisticated monitoring systems to detect suspicious betting patterns[,] and implement[ing] strict rules" that "prohibi[t] participation by insiders (players, officials, etc.)."  Aff. of John Martin ¶¶ 15, 22, ECF No. 28-4 (D. Md. May 12, 2025).  These efforts have yielded real-world results—preventing, for example, a college baseball coach from placing a $100,000 bet against his own team based on inside information in 2023.[30]

Kalshi's sports bets, in contrast, are structured in ways that make it difficult or impossible to detect threats to game integrity.  Kalshi allows "tokenization" of its

---

[29] *See* Kalshi, *Personalized Funding Cap* (accessed Dec. 22, 2025), https://perma.cc/AL8D-9W4R.

[30] *See* Pat Forde, *Inside the Alabama Baseball Gambling Scandal*, Sports Illustrated (July 10, 2023), https://www.si.com/college/2023/07/10/inside-the-alabama-baseball-gambling-scandal (describing how "[t]he suspicious bets were flagged quickly by a wagering integrity firm contracted by" a licensed online sportsbook, causing betting "on Alabama baseball" to be "halted in multiple states"); American Gaming Ass'n, *Regulated Sports Betting Protects Game Integrity*, at 2 (accessed Dec. 22, 2025), https://perma.cc/X98A-9G2X (providing additional examples).

event contracts, which involves creating "token" versions of the contracts (similar to Bitcoin) that are traded on cryptocurrency markets.[31]  Unlike wagering on state-regulated sportsbooks, which are governed by rigorous know-your-customer requirements, Md. Code Regs. § 36.10.18.05, tokenized trading is designed to allow users to have "anonymity" when they trade.[32]  That anonymity undercuts Kalshi's ability to monitor for integrity concerns or to identify trading by users who have exercised self-exclusion tools.

Kalshi also offers its sports bets not only on its own designated contract market, but also on third-party markets such as Robinhood.[33]  Under that distributed structure, Kalshi "has significantly less data" than when customers directly use its platform, because third-party markets "[d]o not provide Kalshi with" detailed customer information and instead "only provide Kalshi with a customer identification number, which is used to anonymously associate transactions" with a third-party user.[34]  Kalshi thus has less visibility into these wagers (which make up

---

[31] Liz Napolitano, *Kalshi Makes Move to Court Crypto Traders with Tokenized Betting Contracts*, CNBC (Dec. 1, 2025), https://perma.cc/HSC6-SK92.

[32] *See* Napolitano, *supra*.

[33] *See* Aoyon Ashraf, *Robinhood Partners with Kalshi to Launch NFL and College Football Prediction Markets*, Yahoo! Finance (Aug. 19, 2025), https://sg.finance.yahoo.com/news/robinhood-partners-kalshi-launch-nfl-155902168.html.

[34] Declaration of Xavier Sottile, *KalshiEx, LLC v. Hendrick*, No. 2:25-cv-575, ECF No. 183-4, ¶ 12 (D. Nev. Oct. 31, 2025).

more than half its order volume, *see* note 26, *supra*) than traditional sportsbooks, making it even more difficult to carry out an effective integrity-monitoring program or its already limited self-exclusion offerings.

*Gaming Taxes*. Licensed gaming operators make billions of dollars in tax payments to state and local governments annually, as outlined above. *See* pp. 10-11, *supra*. These revenues go to schools, law enforcement, social services, and other state priorities, as well as regulatory expenditures associated with gaming. Kalshi, however, claims to be exempt from state gaming fees and taxes, and thus it contributes nothing to those important public services. As a result, a ruling in Kalshi's favor would inflict serious damage on state budgets.

*       *       *

Kalshi's preemption argument would leave consumers with fewer and weaker protections, cause state and local governments to lose substantial revenues, and override the decisions made by voters and legislators regarding the types of gaming that may be offered in their communities. The regime advocated by Kalshi would also result in an unfairly bifurcated marketplace in which prediction markets offer a lightly regulated, low-cost service that competes directly with highly regulated, high-cost services operated by state-licensed gaming operators. That dynamic would create competitive imbalances and make participation in state regimes less viable for licensed operators. Indeed, it has already led some sportsbooks to exit

state-regulated markets.[35]   As Appellees demonstrate, there is no evidence that Congress intended federal law to upend the regulatory framework in these ways.

## IV.   Kalshi's Arguments Defy Settled Legal Principles and Common Sense.

At bottom, Kalshi's contention is that federal law allows prediction markets to bypass state gaming laws altogether.  Precedent requires the Court to apply "common sense" in determining whether Congress made "a policy decision of such economic and political magnitude" when it enacted Dodd-Frank's amendments to the Commodity Exchange Act (CEA) in 2010.  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).  Here, common sense dictates that Congress did not override well-established state gaming laws by passing a bill focused on systemic risks in global financial markets.  Five considerations support that conclusion.

*First*, Kalshi's contracts "are sports wagers and everyone who sees them knows it."  *Hendrick*, 2025 WL 3286282, at *8.  In addition to advertising its contracts as sports bets, Kalshi presents the contracts to users in a way that makes

---

[35] *See Hendrick*, 2025 WL 3286282, at *14 (noting that "two of the largest sports betting operators in the U.S., FanDuel and DraftKings," recently "agreed … to not seek licensing in Nevada in order to focus efforts on launching prediction markets in other states" (citation and quotation marks omitted)).

them indistinguishable from sports bets. The graphic below illustrates the point.[36] The first image shows betting options for an NFL game on a state-regulated online sportsbook; the second shows betting options offered by Kalshi for the same game.[37] Both use the same format, the same point spread, and the same over/under for the number of points scored.





Kalshi also offers proposition bets on individual player performances and parlays that allow users to combine several different wagers on the same game,[38]

---

[36] *See* Ben Blatt & Amy Fan, *Is Sports Betting Illegal in Your State? Not If You Call It a 'Prediction Market,'* N.Y. Times (Oct. 5, 2025), https://www.nytimes.com/2025/10/05/upshot/sports-betting-prediction-markets.html.

[37] Kalshi presents sports bets in this manner when users select the "[s]ports fan mode" option in the settings menu.

[38] *See, e.g.*, Dustin Gouker, *Kalshi Rolls Out Same-Game Parlays for Monday Night Football Games*, Event Horizon (Sept. 30, 2025), https://perma.cc/YE6G-CWCN.

both of which are standard fare at online sportsbooks.[39]  Kalshi's revenues show that, while it is a prediction market in name, it is a sportsbook in fact: 90 percent of the company's trading volume now comes from sports wagers.[40]

*Second*, the industry's understanding of the regulatory framework is itself evidence that Kalshi's preemption argument is incorrect.  Longstanding industry practice can, and often does, inform a court's understanding of the meaning of a federal law.  *See, e.g.*, *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 157 (2012) (rejecting Labor Department interpretation because, among other things, it contravened "the industry's decades-long practice"); *S.J. Groves & Sons Co. v. Occupational Safety & Health Rev. Comm'n*, 648 F.2d 95, 97 (2d Cir. 1981) (concluding that "principles of statutory interpretation, industry practice[,] and common sense require[d] reversal of the Commission's order"); *Am. Clinical Lab. Ass'n v. FDA*, 776 F. Supp. 3d 554, 583 (E.D. Tex. 2025) (vacating regulation that "defie[d] bedrock principles of statutory interpretation, common sense, and longstanding industry practice").  Here, longstanding industry practice shows that sports wagering is subject to state regulation, and that the federal commodities laws

---

[39] For instance, a parlay for the game shown above would involve wagering that Dallas would win by more than 2.5 points *and* that the teams would collectively score more than 47.5 points.

[40] *See, e.g.*, Dustin Gouker, *Kalshi Hits Record High on Sunday, But Weekly Volume Dips*, Event Horizon (Dec. 9, 2025), https://perma.cc/72AG-AB26 (noting that "[s]ports accounted for 90% of volume over the most recent trailing seven days").

do not provide an exemption from such regulation. Before January 2025, no one had *ever* placed a sports bet on a futures exchange. Congress was aware that sports betting had no place on futures exchanges when it enacted Dodd-Frank, making the *Christopher* rationale particularly relevant here. *See, e.g.*, 156 Cong. Rec. S5907 (July 15, 2010) (statement of Sen. Lincoln) (explaining that "an 'event contract' around sporting events such as the Super Bowl" would "not serve any real commercial purpose" but instead "would be used solely for gambling").

The fact that Dodd-Frank was in effect for more than fourteen years before anyone relied on it as a basis to offer nationwide sports wagering makes Kalshi's claim even more improbable. Given the significant state compliance and tax costs that federal preemption would avoid, sportsbooks have long had an incentive to make the argument Kalshi presses here. Yet no one in the gaming industry adopted that approach until Kalshi launched its sports wagers earlier this year.

*Third*, Dodd-Frank does not contain any language stating that it anoints the CFTC as the nation's sportsbook regulator. Given the long-running national debate about whether and how to allow sports betting, the number of states affected, and the size of the market, one would expect Congress to say *something* affirmative on that issue if it sought to bring about a sea change in gaming regulation. But the best Kalshi can do is point to provisions regarding swaps transactions. *See* Kalshi Br. at 25-34. That weak evidence does not come close to meeting the governing legal test.

Congress, the Supreme Court has observed, does not hide elephants in mouseholes.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Kalshi's position implicates that principle about as squarely as any argument ever could:  It maintains that Congress buried authorization for nationwide sports betting in obscure provisions regarding commodities markets.  To state the point is to refute it.  The fact that Kalshi seeks to displace state law reinforces that conclusion. "Congress needs to be clear before it constrains traditional state authority."  *Nixon v. Missouri Municipal League*, 541 U.S. 125, 130 (2004) (citing *Gregory v. Ashcroft*, 501 U.S. 452 (1991)).  But here, Dodd-Frank does not contain anything resembling a clear statement that prediction markets may disregard state sports wagering laws. Nor would such a statement make sense.  Dodd-Frank sought, among other things, to regulate over-the-counter derivatives that contributed to the 2008 global financial crisis.[41]  Those financial instruments bear no resemblance to the sports bets at issue here.  Moreover, Dodd-Frank expressly authorizes the CFTC to *prohibit* event contracts that involve "gaming" or "activity that is unlawful under … State law," 7

---

[41] *See, e.g., Building the New Derivatives Regulatory Framework: Oversight of Title VII of the Dodd-Frank Act: Hearing Before the S. Comm. on Banking, Hous., & Urban Affs.*, S. Hrg. No. 112-102, at 1 (Apr. 12, 2011), https://perma.cc/PBQ3-MCK5 (opening statement of Chairman Tim Johnson) (Dodd-Frank "addresses problems that greatly exacerbated the 2008 financial crisis.").

U.S.C. § 7a-2(c)(5)(C)(i)-(ii), and the CFTC has adopted a rule doing just that, *see* 17 C.F.R. § 40.11(a).

*Fourth*, the CFTC has neither the expertise nor the resources necessary to serve as an effective sportsbook regulator. The CFTC's core role consists of overseeing commodity futures contracts and derivatives markets. *See* 7 U.S.C. § 2(a). As the agency recently acknowledged, it "is not a gaming regulator" and lacks the specialized knowledge of gaming regulators. Event Contracts, 89 Fed. Reg. 48968, 48982-83 (June 10, 2024); *see also* Martin Aff., *supra*, at ¶ 24 ("It would take years for the CFTC to create the regulatory system and oversight infrastructure that states already have in place and are working in multiple jurisdictions across the country."). Notably, the CFTC has approximately 699 employees as of December 2025,[42] compared with 377 employees at the Maryland Gaming and Lottery Control Agency,[43] which regulates gaming in a state that accounts for less than two percent of the United States' population—showing that the CFTC does not have sufficient personnel to regulate sports wagering nationwide.

---

[42] *See* U.S Equal Employment Opportunity Commission, *Commodity Futures Trading Commission (CFTC) Workforce Composition* (accessed Dec. 22, 2025), https://www.eeoc.gov/federal-sector/commodity-futures-trading-commission-cftc-0.

[43] *See* Md. Dep't of Mgmt. and Budget, FY 2025 Maryland Budget Highlights at App'x III (Jan. 17, 2024), https://perma.cc/4G5P-K5HW.

Sports wagering also presents risks that are distinct from those traditionally addressed by the CFTC, including problem gaming, underage use, money laundering, and match fixing. Because the CFTC's current rules do not tackle those issues, the agency (and perhaps Congress) would need to promulgate a complex body of new regulations tailored to the sportsbook market. The absence of regulatory controls and oversight is particularly problematic with respect to integrity issues. Unlike state regulators, the CFTC lacks the infrastructure to prevent or prosecute insider trading on sports betting markets. Its regulations do not require exchanges or brokers to report potentially suspicious trades or trading patterns to affected sports leagues, or to cooperate with subsequent league investigations into trading activities.[44]  Although Kalshi has voluntarily implemented certain protections, such as a prohibited bettor list furnished by a third-party contractor, there is no requirement that other prediction markets take that step, and likewise no guarantee that Kalshi will maintain this safeguard in the future. Allowing Kalshi to provide sports wagers in the guise of derivatives would thus require the CFTC to regulate beyond its core role and capabilities. That is not fair to Maryland, its consumers, or the gaming industry participants that have long made the investments necessary to comply with the state's licensing laws.

---

[44] *See* Letter from Alexandra Roth, General Counsel, NBA, to CFTC (May 1, 2025), https://perma.cc/MM6U-GFF7.

*Fifth*, and finally, although Kalshi asserts that the CFTC has approved its sports wagers, the agency recently made clear that this is not the case. On September 30, 2025, the CFTC issued an advisory directing designated contract markets, such as Kalshi, to adopt "appropriate contingency plan[s]" in light of "State regulatory actions."[45] The advisory explains that "[t]he Commission has not, to date, been requested to take or taken any official action to approve the listing for trading of sports-related event contracts on any [designated contract market]." *Id.* at 2 n.4. Thus, "[a]ll sports-related event contracts that are currently listed for trading on [such markets] have been listed pursuant to self-certifications filed by the relevant [market operator]" and "the Commission has not, to date, made a determination regarding whether any such contracts involve an activity enumerated or prohibited under" the CEA and applicable regulations. *Id.* The upshot is that the CFTC has not approved Kalshi's sports wagers; those wagers are available solely because Kalshi has self-certified—without any regulatory review—that they comply with applicable laws.

---

[45] CFTC, Advisory Letter No. 25-36, at 2 & n.2-3 (Sept. 30, 2025), https://www.cftc.gov/csl/25-36/download.

## CONCLUSION

This Court should affirm the District Court's order and reject Kalshi's brazen

attempt to circumvent state gaming laws.

Respectfully submitted,

*/s/ Kevin F. King*

Bruce Bennett
Benjamin Sovocool
COVINGTON & BURLING LLP
30 Hudson Yards
New York, NY 10001

Kevin F. King
  *Counsel of Record*
Matthew J. Glover
Scott Garfing
Hassan Ahmad
Eli Nachmany
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
kking@cov.com

*Counsel for Amicus Curiae*

December 22, 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,482 words, including the words in the images on pages 16, 17, and 23, but excluding the parts of the brief exempted by Rule 32(f).  This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman and 14-point font.

*/s/ Kevin F. King*
Kevin F. King

**CERTIFICATE OF SERVICE**

I hereby certify a true and correct copy of the foregoing brief was filed electronically with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system on December 22, 2025. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Kevin F. King*
Kevin F. King