No. 25-1892

IN THE

# United States Court of Appeals
# for the Fourth Circuit

KALSHIEX LLC,

*Plaintiff-Appellant,*

v.

JOHN A. MARTIN, *et al.,*

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Maryland
No. 1:25-cv-01283 (Abelson, J.)

## REPLY BRIEF FOR APPELLANT KALSHI

DAVIS CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001
(212) 530-5222

NEAL KUMAR KATYAL
JOSHUA B. STERLING
WILLIAM E. HAVEMANN
SAMANTHA K. ILAGAN
MILBANK LLP
1101 New York Ave, NW
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com

January 26, 2026

*Counsel for Plaintiff-Appellant*

## TABLE OF CONTENTS

INTRODUCTION ................................................................1

ARGUMENT ................................................................ 3

I.     DEFENDANTS' ARGUMENTS AGAINST PREEMPTION FAIL............................ 3

     A.    The CEA Expressly And Impliedly Preempts
         The Field Of Regulating Trading On DCMs.............................. 3

     B.    Maryland's Gambling Laws Conflict With
         The CEA ..........................................................18

     C.    The Presumption Against Preemption Does
         Not Apply .........................................................21

II.    DEFENDANTS' ALTERNATIVE ARGUMENT THAT KALSHI'S
    CONTRACTS ARE NOT SWAPS FAILS ...................................... 23

CONCLUSION ............................................................ 32

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES:**                                                                                  Page(s)

*Air Evac EMS, Inc. v. Cheatham,*
   910 F.3d 751 (4th Cir. 2018) ................................................... 21

*Ali v. Fed. Bureau of Prisons,*
   552 U.S. 214 (2008) .................................................................. 7

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.,*
   977 F.2d 1147 (7th Cir. 1992) ......................................... 7, 11, 14, 16, 19, 23

*Appalachian Power Co. v. Pub. Serv. Comm'n of W. Va.,*
   812 F.2d 898 (4th Cir. 1987) .................................................. 5

*Arizona v. United States,*
   567 U.S. 387 (2012) ................................................................. 21

*Big Lagoon Rancheria v. California,*
   789 F.3d 947 (9th Cir. 2015) (en banc) ................................. 24

*Blue Lake Rancheria v. Kalshi Inc.,*
   No. 25-cv-06162-JSC, 2025 WL 3141202
   (N.D. Cal. Nov. 10, 2025)..................................................... 15, 16

*CFTC v. Erskine,*
   512 F.3d 309 (6th Cir. 2008).............................................. 30, 31

*Chi. Mercantile Exch. v. SEC,*
   883 F.2d 537 (7th Cir. 1989) ............................................... 7, 8

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.,*
   162 F.4th 631 (6th Cir. 2025) .............................................. 23

*Cipollone v. Liggett Grp., Inc.,*
   505 U.S. 504 (1992) ................................................................. 10

*Coventry Health Care of Missouri, Inc. v. Nevils,*
   581 U.S. 87 (2017).................................................................. 9, 10

*Crosby v. Nat'l Foreign Trade Council,*
   530 U.S. 363 (2000) ............................................................. 21, 22

## TABLE OF AUTHORITIES—Continued

Page(s)

*Dickson v. Uhlmann Grain Co.*,
  288 U.S. 188 (1933) ................................................................3, 31

*Effex Cap., LLC v. Nat'l Futures Ass'n*,
  933 F.3d 882 (7th Cir. 2019) ................................................. 8, 9

*Freightliner Corp. v. Myrick*,
  514 U.S. 280 (1995) ........................................................... 10, 11

*FTC v. Ken Roberts Co.*,
  276 F.3d 583 (D.C. Cir. 2001)................................................8, 14

*GenBioPro, Inc. v. Raynes*,
  144 F.4th 258 (4th Cir. 2025)................................................. 20

*Hughes v. Talen Energy Mktg., LLC*,
  578 U.S. 150 (2016)................................................................ 4, 5

*In re Bulldog Trucking, Inc.*,
  66 F.3d 1390 (4th Cir. 1995)....................................................16

*Ingersoll-Rand Co. v. McClendon*,
  498 U.S. 133 (1990) ................................................................19

*Int'l Trading, Ltd. v. Bell*,
  556 S.W.2d 420 (Ark. 1977)................................................... 7, 8

*Just Puppies, Inc. v. Brown*,
  123 F.4th 652 (4th Cir. 2024)............................................ 13, 14

*KalshiEX LLC v. CFTC*,
  No. 23-3257, 2024 WL 4164694
  (D.D.C. Sep. 12, 2024) .....................................................12, 26

*Leist v. Simplot*,
  638 F.2d 283 (2d Cir. 1980) ..................................................1, 4

*Loving v. IRS*,
  742 F.3d 1013 (D.C. Cir. 2014) ......................................... 26, 27

# TABLE OF AUTHORITIES—Continued

Page(s)

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) ...................................................... 9

*Nelson v. Adams USA, Inc.*,
529 U.S. 460 (2000) ................................................... 22

*Oklahoma v. Castro-Huerta*,
597 U.S. 629 (2022) ................................................ 1, 6

*Power v. Arlington Hosp. Ass'n*,
42 F.3d 851 (4th Cir. 1994) ...................................... 13

*PPL EnergyPlus, LLC v. Nazarian*,
753 F.3d 467 (4th Cir. 2014) ................................... 22

*Puerto Rico v. Franklin Cal. Tax-free Tr.*,
579 U.S. 115 (2016) ................................................. 21

*R. J. Hereley & Son Co. v. Stotler & Co.*,
466 F. Supp. 345 (N.D. Ill. 1979) .............................. 9

*Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*,
608 F.2d 175 (5th Cir. 1979) ..................................... 7

*Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*,
108 F.4th 144 (3d Cir. 2024) ..................................... 5

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001) ............................................ 27, 28

*United States v. Brien*,
617 F.2d 299 (1st Cir. 1980) ...................................... 8

*United States v. Locke*,
529 U.S. 89 (2000) ................................................... 22

*United States v. Monsanto*,
491 U.S. 600 (1989) ................................................... 6

iv

# TABLE OF AUTHORITIES—Continued

<u>Page(s)</u>

*United States v. Wilkinson,*
986 F.3d 740 (7th Cir. 2021) .................................................................. 29

**STATUTES:**

7 U.S.C. §§

    1a(19) ........................................................................................ 28

    1a(19)(iv) .............................................................................. 28, 29

    1a(47)(A) ................................................................................. 26

    1a(47)(A)(ii) .................................................................. 24, 25, 27

    1a(47)(A)(iii) ........................................................................... 26

    1a(47)(A)(iv) ........................................................................... 26

    1a(47)(B) ................................................................................. 27

    2(a) .......................................................................... 2, 5, 6, 7, 16

    2(a)(1)(A) ............................................................... 3, 5, 6, 7, 29

    2(d) ......................................................................................... 10

    2(e) .................................................................................... 29, 30

    7a-2(c)(5)(C)(i) ........................................................ 11, 12, 13, 28

    7a-2(c)(5)(C)(ii) ................................................................. 12, 13

    7b-3(d)(1) ................................................................................ 10

    7b-3(d)(2) ................................................................................ 10

    13a-2(1) ............................................................................... 4, 24

    13a-2(7) .................................................................................... 8

## TABLE OF AUTHORITIES—Continued

Page(s)

16 ................................................................................. 2

16(e)(1) ................................................................. 8, 30, 32

16(e)(2) ................................................................. 9, 31, 32

16(h) .......................................................................9, 10

2143(a)(8) ............................................................ 13, 14

12 U.S.C. § 1828(y) ..................................................14

15 U.S.C. § 8302(d)(1) ........................................ 27, 30

31 U.S.C. § 5361(b) ...................................................15

31 U.S.C. § 5362(1)(E) ..............................................15

31 U.S.C. § 5362(1)(E)(ii) ........................................ 30

42 U.S.C. § 1395dd(d)(2)(A) ...................................13

**RULES & REGULATIONS:**

12 C.F.R. § 223.33(b) .................................................14

17 C.F.R. § 38.151(b) ..................................................18

17 C.F.R. § 40.11(a) ....................................................13

17 C.F.R. § 40.11(c) ....................................................13

*Event Contracts,*
    89 Fed. Reg. 48,968 (June 10, 2024) .................12, 26

*Further Definition of "Swap,"*
    77 Fed. Reg. 48,208 (Aug. 13, 2012) .................30, 31

*Provisions Common to Registered Entities,*
    76 Fed. Reg. 44,776 (July 27, 2011) .........................13

## TABLE OF AUTHORITIES—Continued

Page(s)

**LEGISLATIVE MATERIALS:**

156 Cong. Rec. S5902 (daily ed. July 15, 2010) ............................................18

156 Cong. Rec. S5906 (daily ed. July 15, 2010) ............................................18

156 Cong. Rec. S5907 (daily ed. July 15, 2010)...................................... 17, 18

H.R. Rep. No. 93-1383 (1974) ...................................................... 4, 16, 17

H.R. Rep. No. 97-565, pt. 1 (1982) .................................................17

H.R. Rep. No. 106-711, pt. 2 (2000) ..........................................9, 17

S. Rep. No. 93-1131 (1974)........................................................ 5

**OTHER AUTHORITIES:**

*Associated*, Oxford English Dictionary
(3d. ed 2011)........................................................................ 25

Brett Smiley, *Underdog Sports Preparing to Use Kalshi, Pre-
diction Markets For Its Own Risk Management*, In Game
(Oct. 22, 2025), https://perma.cc/BT4A-BK8T ..................................... 25

*CME to Launch Hurricane Futures and Options on Futures
Contracts*, CME Group (Feb. 14, 2007),
https://perma.cc/5MKV-WCTH ........................................................ 28

*Contingency*, Merriam-Webster's Collegiate Dictionary
(11th ed. 2003)....................................................................... 26

*Event*, Random House Webster's Pocket American Dictionary
(5th ed. 2008)........................................................................ 25

*Event*, Random House Webster's Unabridged Dictionary
(2d ed. 2001)......................................................................... 25

*Exclusive*, American Heritage Dictionary
(2d ed. 1980)....................................................................... 4

## TABLE OF AUTHORITIES—Continued

<u>Page(s)</u>

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657 (1982)................................................3, 4, 17

## INTRODUCTION

The district court held that Defendants may ban Kalshi's contracts even though Congress granted the CFTC "exclusive jurisdiction" over these contracts. The court reached this holding not by interpreting the statutory text, but by engrafting an extratextual "gambling" exception onto the CEA based on policy-driven assumptions about congressional intent. But "assumptions are not laws." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 648 (2022). The text governs and compels reversal here.

A mountain of evidence proves the CEA both expressly and impliedly "preempts the application of state law" on DCMs. *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). Even setting aside field preemption, compliance with state regulation would be impossible for Kalshi and contravene Congress's system of uniform derivatives regulation. As Defendants acknowledged below, the CEA "conflicts" with state regulation. JA89-90.

Defendants contend with almost none of this. Their principal argument—that the CFTC's jurisdiction supersedes only *securities* regulators—ignores the CEA's text and is plainly incorrect. Defendants also invoke the Special Rule, but that provision dooms their argument: It is textual proof that Congress knew contracts involving "gaming" might be traded on DCMs and gave the CFTC—not 50 different states—authority to decide whether to

permit them. Defendants rely on two provisions in Section 16,[1] but they support Kalshi, because Congress adopted them to preempt state regulation of certain *off-DCM* transactions, just as the CEA already preempted state regulation of *on-DCM* transactions. And while Defendants ask this Court to apply a presumption against preemption, no presumption applies to express preemption provisions like Section 2(a) of the CEA, and states traditionally have not regulated *interstate* wagering—Defendants' own label (at 13) for Kalshi's contracts.

Defendants alternatively contend that Kalshi's contracts fall outside CFTC jurisdiction because they are not "swaps." The district court did not address this argument, and this Court should decisively reject it. Defendants' theory that an "outcome" cannot be an "event" under the CEA's broad definition of "swap" is flatly wrong as a matter of plain meaning, and it contravenes the CFTC's view. And the theory that swaps must involve events "inherently" connected to financial consequences is made out of whole cloth: The CEA requires "potential" financial consequences, not "inherent" ones. Defendants assert (at 32) their interpretation is needed to prevent the CFTC from becoming "the Nation's sole gaming regulator," but that is mistaken.

---

[1] Kalshi's briefs refer to provisions of the CEA by their section numbers in Title 7 of the U.S. Code.

The CEA preempts state regulation of on-DCM trading, leaving states free to regulate off-DCM transactions like sportsbook wagers—which, in any case, differ fundamentally from Kalshi's sports-event contracts.

Defendants cannot escape the startling implications of their own position. Many states a century ago regulated all futures trading as "gambling in grain." *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933). The 1974 CEA amendments were designed to end that practice. But Defendants' position would allow states to restore it, upending the system of uniform federal regulation that has prevailed in this Nation for 50 years. The Court should reject that position and reverse.

## ARGUMENT

### I.  DEFENDANTS' ARGUMENTS AGAINST PREEMPTION FAIL.

#### A.  The CEA Expressly And Impliedly Preempts The Field Of Regulating Trading On DCMs.

As Kalshi's opening brief explained, every marker of congressional intent supports preemption. Under the CEA's plain text, the CFTC's "exclusive jurisdiction" expressly "supersede[s]" state regulation of trading on DCMs. 7 U.S.C. § 2(a)(1)(A). While the original CEA did not preempt state law, Congress in 1974 "wholly and unequivocally eliminated each of the bases" the Supreme Court previously relied on "to hold that the CEA did not preempt

state regulation." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 692-693 (1982). The conference report explained Congress's intent to "preempt the field." H.R. Rep. No. 93-1383, at 35. Congress later clarified states' "jurisdiction" to regulate derivatives, specifically *withholding* the power to regulate DCMs under state gambling laws. 7 U.S.C. §13a-2(1). In the following decades, courts and commentators uniformly recognized that "the CEA preempts the application of state law." *Leist*, 638 F.2d at 322. And the CFTC has made clear that, "due to federal preemption, event contracts never violate state law when they are traded on a DCM." Appellant's Br. 27, *KalshiEX v. CFTC*, No. 24-5205 (D.C. Cir. Oct. 16, 2024).

The district court barely grappled with this evidence. Instead, it acknowledged that the CFTC's exclusive jurisdiction preempts "some" state law, but found that state "gambling" laws fall outside the preempted field. JA162. Defendants' defenses of that conclusion are unpersuasive.

Text: Defendants first contend (at 22) that the phrase "exclusive jurisdiction" "does not ipso facto convey preemption." But that is exactly what it conveys. "Exclusive" means "[n]ot divided or shared with others." *Exclusive*, American Heritage Dictionary (2d ed. 1980). The Supreme Court has repeat-

edly instructed that state law is preempted where a federal agency's jurisdiction is "exclusive." *See Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016). This Court agrees. *See Appalachian Power Co. v. Pub. Serv. Comm'n of W. Va.*, 812 F.2d 898, 904 (4th Cir. 1987). While Defendants cite (at 43) a Third Circuit case for the proposition that the grant of exclusive jurisdiction does not expressly preempt state law, that case holds the opposite: "The explicit statutory conferral of exclusive jurisdiction … is a form of express preemption." *Transcon. Gas Pipe Line Co. v. Pa. Env't Hearing Bd.*, 108 F.4th 144, 151-152 (3d Cir. 2024).

Defendants observe (at 43-44) that Section 2(a) contains a savings clause that "*preserves* state law." But the savings clause applies "*[e]xcept as hereinabove provided*" by the CFTC's exclusive jurisdiction over on-exchange trading. 7 U.S.C. §2(a)(1)(A) (emphasis added). Congress added that proviso to reject the theory Defendants ask this Court to adopt. S. Rep. No. 93-1131, at 6 (adding the proviso to ensure that "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies"). Congress's dictate that state law is not "supersede[d]" outside the scope of the CFTC's exclusive jurisdiction underscores that state law *is* superseded within that jurisdiction. Even the district court acknowledged the

savings clause would make no sense unless the CFTC's exclusive jurisdiction supersedes state regulators.  JA162.

Defendants seek (at 7-8) to avoid the plain meaning of the CFTC's "exclusive jurisdiction" by interpreting it to exclude only "securities" regulators. "The fundamental problem" with this argument is that the CEA's text "says no such thing." *Castro-Huerta*, 597 U.S. at 642.  Nothing about Section 2(a) preempts only state securities regulators; it instead categorically gives the CFTC "exclusive jurisdiction" over trading on DCMs.  Defendants rely (at 24) on Section 2(a)'s savings clause, which ("except" for the CFTC's exclusive jurisdiction over on-DCM trading) preserves the jurisdiction of "the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State."  7 U.S.C. §2(a)(1)(A).  By its plain terms, this clause applies not just to securities regulators, but "other regulatory authorities" under federal and state law.  Defendants' construction ignores this text.

Defendants support their securities-only theory (at 24) by invoking various interpretive canons.  But "canons are not a license for the judiciary to rewrite language enacted by the legislature." *United States v. Monsanto,* 491 U.S. 600, 611 (1989) (citation modified).  Section 2(a)'s savings clause

refers specifically to the SEC and then generally to "other regulatory authorities." 7 U.S.C. § 2(a)(1)(A). The Supreme Court has explained that *ejusdem generis* does not apply in precisely this context, where a statute contains "one specific and one general category" rather than "a list of specific items separated by commas and followed by a general or collective term." *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008). Nor can *noscitur a sociis* justify rewriting Section 2(a) to preempt only state securities regulation. One reference to the SEC is not a remotely strong enough "contextual cue[]" to apply the canon. *Id.* at 226.

    <u>Precedent</u>: Mountains of authority confirm that the CEA preempts application of state law to trading on DCMs. Defendants note (at 26-27) that some of these cases involved preemption of securities regulators. But Defendants have no answer to the many cases preempting state law outside the securities context. *See, e.g.*, *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (state "commercial gambling" charge preempted as "inconsistent" with the CEA); *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1157 (7th Cir. 1992) (state common-law claims preempted). Even where courts found preemption of securities regulators, nothing about their reasoning limited preemption to that context. Quite the contrary, these courts recognized that "if the

CFTC has jurisdiction, its power is exclusive." *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989); *see Int'l Trading, Ltd. v. Bell*, 556 S.W.2d 420, 423 (Ark. 1977) (CEA "supersede[s] the jurisdiction of all state and federal agencies").

Defendants cite cases (at 23, 27) holding the CEA does not "occupy completely the entire field of commodity futures regulation." *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019). But these cases simply reaffirm states' authority to regulate *outside* the preempted field, including off-DCM transactions and through general antifraud laws, which the CEA permits. *See* 7 U.S.C. § 13a-2(7); *id.* § 16(e)(1). Thus, the D.C. Circuit held the FTC may regulate false advertising "that leads only tangentially to the actual purchase of futures," but reaffirmed that the CFTC's jurisdiction is "exclusive with regard to the trading of futures *on organized contract markets*." *FTC v. Ken Roberts Co.*, 276 F.3d 583, 591-592 (D.C. Cir. 2001). The First Circuit held that the CEA did not preempt federal fraud statutes, while noting that "Congress intended the CFTC to occupy the entire field of commodities futures regulation." *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980). And the Seventh Circuit held the CEA does not preempt all state regulation of derivatives, but deemed it "obvious" that state

tort claims were preempted because they would impose an "obstacle to Congress's purposes" in the CEA. *Effex Cap.*, 933 F.3d at 894-895.

Defendants cite cases (at 24, 27) upholding an implied private right of action under the CEA itself. *See generally Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386 (1982); *R. J. Hereley & Son Co. v. Stotler & Co.*, 466 F. Supp. 345, 347 (N.D. Ill. 1979). Nothing about a private right of action to enforce *federal law* suggests that states may apply *state laws* against DCMs.

<u>Section 16</u>: Like the district court, Defendants rely (at 28) "heavily" on Sections 16(e)(2) and 16(h). But both provisions support Kalshi. They bar state regulation of certain *off-DCM* transactions, *outside* the CFTC's exclusive jurisdiction.

Section 16(e)(2) "preempt[s]" state "gaming" and "bucket shop" laws as to "excluded"—off-DCM—transactions. Congress's enactment of this provision in 2000 turned critically on its recognition that "the current" CEA already "supersedes and preempts" those state laws "in the case of transactions conducted on a registered entity" but not as to excluded transactions. H.R. Rep. No. 106-711, pt. 2, at 71. And Congress's use of the word "preempt" in Section 16(e)(2) does not cut against the preemptive effect of the CFTC's exclusive jurisdiction—preemption does not require "a particular linguistic

9

formulation." *Coventry Health Care of Mo., Inc. v. Nevils,* 581 U.S. 87, 99 (2017). Defendants wrongly argue (at 28) that Section 16(e)(2) does not apply to swaps because it no longer cross-references a subsection (removed by Dodd-Frank) addressing "excluded swaps." But Section 2(d) clearly provides that Section 16(e)(2) does apply to swaps. 7 U.S.C. § 2(d). Similarly, Section 16(h) prevents states from applying insurance law to swap transactions—including over-the-counter swap transactions that would not otherwise fall within CFTC jurisdiction. *See id.* §§ 7b-3(d)(1), (2). Kalshi's position does not, as Defendants claim (at 29), "render these two express preemption provisions superfluous." They both ensure that excluded off-DCM transactions are shielded from state laws, just as on-DCM transactions have been since 1974.

This case bears no resemblance (at 28) to *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992), or *Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995), which found that the presence of an express preemption provision weighed against a finding of implied preemption elsewhere in the statute. Neither case involved a statute like the CEA, which contains a preemption provision for on-DCM transactions as well as a narrower preemption provision for excluded transactions, both of which must be given effect. Regardless, both cases rejected as "without merit" the argument "that implied pre-

10

emption cannot exist when Congress has chosen to include an express pre-emption clause in a statute." *Myrick*, 514 U.S. at 287.

If Defendants were correct, states could freely apply state laws to comprehensively regulated *on-DCM* transactions, but not over-the-counter transactions outside the CFTC's exclusive jurisdiction. That is backwards. Congress sought to impose "a uniform set of regulations" on DCMs, not on over-the-counter transactions, because DCMs require "uniform legal rules." *Am. Agric.*, 977 F.2d at 1156.

<u>Special Rule</u>: Defendants have no answer to the Special Rule, which reaffirms the CFTC's jurisdiction over event contracts involving "gaming" and allows the CFTC—not 50 states—to prohibit those contracts if it deems them "contrary to the public interest." 7 U.S.C. §7a-2(c)(5)(C)(i). Defendants' insistence (at 29) that Congress "omitted gaming" from the CFTC's exclusive jurisdiction is irreconcilable with the express grant of authority to the CFTC to regulate gaming contracts.

Defendants maintain (at 30, 40) the Special Rule "affirmatively incorporates" state law and shows Congress intended state law "to operate alongside" the CEA. This argument obviously misreads the Special Rule, which gives "*the Commission*," not states, authority to prohibit contracts involving "unlawful" activity or "gaming." 7 U.S.C. §7a-2(c)(5)(C)(i) (emphasis

added).  Nothing about the Special Rule suggests that Congress intended parallel state and federal regulation.  Otherwise, states could ban *all* event contracts, because "many states define unlawful gambling as staking money on any contingent outcome," meaning that *every* event contract would fall within the unlawful-activity provision, an interpretation that "no one would contend" is "plausible."  *KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *12 (D.D.C. Sep. 12, 2024).  Defendants have no response.

Defendants cite a proposed rule (at 12) they claim "reflects the CFTC's understanding" that the CEA "does not preempt state sports wagering laws." But the proposed rule said the opposite.  It noted that "[p]ermitting event contracts involving gaming … to trade on CFTC-regulated markets" would let them "avoid" state law.  *Event Contracts*, 89 Fed. Reg. 48,968, 48,983 (June 10, 2024).  It thus underscored that sports-event contracts are subject to CFTC jurisdiction, cannot be regulated by states, and could be barred only by an exercise of the CFTC's Special Rule authority.  Although the prior administration *proposed* exercising that authority, that proposal was never adopted, meaning Kalshi's contracts are lawful.

Defendants assert (at 11) that, under the Special Rule, the CFTC "must" remove contracts involving unlawful activity or gaming.  Again, this clearly misreads the Special Rule, which states the CFTC "may" do so subject to its

public-interest review. 7 U.S.C. §§ 7a-2(c)(5)(C)(i), (ii). Defendants claim (at 30) that 17 C.F.R. § 40.11 "prohibits" Kalshi's contracts, but that too is wrong. While subsection (a) generally prohibits contracts involving the enumerated categories, subsection (c) permits the CFTC to review such contracts on a case-by-case basis. *See* 17 C.F.R. § 40.11(c). The CFTC itself has recognized as much. *See Provisions Common to Registered Entities*, 76 Fed. Reg. 44,776, 44,785-86 (July 27, 2011) (DCMs "may always" self-certify contracts, and Section 40.11 operates to allow review "on a case-by-case basis"). Even if Section 40.11 were a blanket ban on sports contracts, it would merely provide grounds for CFTC enforcement against Kalshi, not state enforcement under state law.

Defendants' cases do not help. As Kalshi explained in its opening brief, the statute in *Power v. Arlington Hospital Ass'n*, 42 F.3d 851 (4th Cir. 1994), did not grant exclusive jurisdiction to a federal regulator, but instead created a cause of action providing for "damages available for personal injury under the law of the State." *Id.* at 860 (quoting 42 U.S.C. § 1395dd(d)(2)(A)). And the statute in *Just Puppies, Inc. v. Brown*, 123 F.4th 652 (4th Cir. 2024), made clear that the Secretary of Agriculture's "authority to set animal welfare standards 'shall not prohibit any State ... from promulgating standards *in*

*addition to* those standards promulgated by the Secretary.' " *Id.* at 662 (emphasis added) (quoting 7 U.S.C. § 2143(a)(8)). The Special Rule contains no comparable language.

Defendants cite various laws (at 31-32) that purportedly "operate[ ] alongside" the CEA. But each example regulates *banks*—not DCMs—by limiting their credit exposure, including from derivatives. *See, e.g.*, 12 U.S.C. § 1828(y) (an "insured State bank" can only "engage in a derivative transaction" if applicable state lending limits "take[ ] into consideration credit exposure to derivative transactions"); 12 C.F.R. § 223.33(b) (requiring Federal Reserve member banks to "establish and maintain policies and procedures reasonably designed to manage the credit exposure arising from its derivative transactions"). They impose no obligations on DCMs and do not "directly affect trading on or the operation of" DCMs. *Am. Agric.*, 977 F.2d at 1156-57.

Defendants' argument (at 38-39) that preemption would prohibit states from enforcing their criminal drug and puppy-mill laws is perplexing. The CEA preempts state laws only insofar as they "directly affect trading on or the operation of a futures market," *Am. Agric.*, 977 F.2d at 1156, but does not "preempt the activities of all other ... agencies in their regulatory realms," *Ken Roberts Co.*, 276 F.3d at 591 (citation omitted). States of course may

criminalize unlawful drugs or the operation of inhumane breeding facilities. They just may not regulate trading on DCMs.

<u>Implied repeal</u>:  Finding preemption would not (at 36) "eviscerate" other federal gambling statutes.  As Kalshi explained, *see* Opening Br. 54-55, its contracts are not "bet[s] or wager[s]" under federal law, 31 U.S.C. § 5362(1)(E), and therefore not subject to IGRA, the Wire Act, or other federal gambling legislation.  Defendants note (at 37) that UIGEA does not "alter[], limit[], or extend[]" other federal or state laws, 31 U.S.C. § 5361(b); Kalshi does not contend otherwise.  Instead, UIGEA confirms Congress's judgment that on-DCM transactions are not bets or wagers.  Defendants cannot explain why Congress would have exempted on-DCM transactions from UIGEA if Congress intended the very same transactions to be subject to criminal penalties under other federal laws.  Nor can they explain why Congress created that exemption from federal gambling legislation if Congress did not intend for the CEA's preemptive effect to reach state gambling laws.

Interpreting federal statutes to bar Kalshi's contracts would improperly interpret these statutes to conflict with the CEA's grant of exclusive jurisdiction to the CFTC.  The Northern District of California recently rejected an IGRA challenge to Kalshi contracts for precisely this reason, explaining

that UIGEA, "a later enacted, more specific statute," governs Kalshi's con-
tracts. *Blue Lake Rancheria v. Kalshi Inc.*, No. 25-cv-06162-JSC, 2025 WL
3141202, at *6 (N.D. Cal. Nov. 10, 2025). This was not an implied repeal, but
an exercise of the court's duty to "reconcile" statutes capable of co-existence.
*In re Bulldog Trucking, Inc.*, 66 F.3d 1390, 1395 (4th Cir. 1995).

Legislative history: This Court need not rely on legislative history given
the overwhelming evidence of preemption, but it supports Kalshi. The con-
ference report is unmistakable: Congress intended to "preempt the field" re-
garding trading on DCMs, and "the Conferees do not contemplate that there
will be a need for *any* supplementary regulation by the States."
H.R. Rep. No. 93-1383, at 35-36 (emphasis added).

Defendants contend (at 25-26) that Congress intended to preempt only
"*conflicting* state law," citing the conference report's reference to preempting
"contrary" or "inconsistent" state law. H.R. Rep. No. 93-1383, at 36. That
reference is perfectly consistent with field preemption: It reflects Congress's
view that "a contract market could not operate efficiently" or "at all" if subject
to "varying and potentially contradictory legal standards." *Am. Agric.*, 977
F.2d at 1156. If the CEA only preempted conflicting state law, it would render
the adjective "exclusive" in Section 2(a) meaningless, because conflicting

16

state laws would be preempted regardless of whether the CFTC's jurisdiction is exclusive.

Defendants observe (at 25) that "conflicting SEC-CFTC authority" received "the most attention" during debates on the 1974 amendments. But that is because there was broad agreement on the need to preempt state law. *See* H.R. Rep. No. 93-1383, at 35-36. The article Defendants cite confirms the amendments were designed to "displace *any* parallel regulation by the states" and that "state bucket-shop laws and other anti-gambling legislation" are "at variance" with Congress's "intent to preempt state regulation of commodity futures trading." Van Wart, *supra*, at 660, 675 (emphasis added).

Defendants ignore legislative history from later amendments to the CEA. They have no answer to Congress's recognition in 1982 that the 1974 amendments already "bestowed on the CFTC exclusive jurisdiction to regulate futures trading" on DCMs, "thereby preempting any State regulatory laws." H.R. Rep. No. 97-565, pt. 1, at 44. Nor do they acknowledge Congress's recognition in 2000 that "the current" CEA already "supersedes and preempts" state laws "in the case of transactions conducted on a registered entity" such as a DCM. H.R. Rep. No. 106-711, pt. 2, at 71.

Defendants cite (at 31) Senator Lincoln's statements regarding event contracts based on "sporting events such as the Super Bowl" (quoting 156

Cong. Rec. S5907 (daily ed. July 15, 2010)). But these statements undermine Defendants' argument, as they recognize that the Special Rule would "restore *the CFTC's* authority" to prohibit contracts involving gaming. 156 Cong. Rec. S5902, S5906 (daily ed. July 15, 2010) (emphasis added). As Senator Lincoln informed the Third Circuit, "Congress intended for the CFTC alone to make that determination." Members of Congress Br. 16, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir. July 31, 2025).

## B.    Maryland's Gambling Laws Conflict With The CEA.

1. Compliance with Maryland law is impossible for Kalshi. Defendants concede (at 46) that Maryland law requires covered "transaction[s]" to be "completed *wholly within the State*" (emphasis added). As a nationwide exchange that facilitates trades between persons across the country, Kalshi cannot comply. Sportsbooks are different, as they act as the counterparty to each wager rather than as a nationwide exchange.

Defendants also concede (at 46) that "impartial access" principles require DCMs to grant access to trading "in a non-discriminatory manner," *see* 17 C.F.R. § 38.151(b), yet they demand that Kalshi discriminate either against Maryland residents (by cutting them off from trading) or against the rest of the country (by operating only within Maryland). Operating 50 different

markets in 50 different states would be totally anathema to a nationwide exchange. Defendants' speculation (at 46-47) that the CFTC might not immediately punish Kalshi for violating Core Principles is no answer; even if it were true, state and federal law would still conflict. And the impossibility of complying with state law is even clearer given that if Maryland could subject Kalshi to licensing obligations, so could every other state, forcing DCMs to restrict access in a manner that would effectively destroy their markets by fragmenting and draining liquidity.

2. Defendants conceded below that the CFTC's "oversight" of Kalshi "conflicts with state laws that govern gambling and sports betting." JA89-90. They now backtrack (at 47), but their concession is fatal. Letting each state regulate DCMs differently would plainly frustrate Congress's aim of bringing futures markets "under a uniform set of regulations." *Am. Agric.*, 977 F.2d at 1156. Kalshi's opening brief cited myriad cases finding conflict preemption where state regulation is "at odds with the goal of uniformity that Congress sought to implement." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990). Defendants do not respond. Nor do Defendants dispute the Seventh Circuit's holding that "application of state law" to "directly affect trading on or the operation of a futures market" constitutes "an obstacle" to the CEA. *Am. Agric.*, 977 F.2d at 1156-57 (citation omitted). Defendants

assert without elaboration (at 48) that Maryland's "wagering laws do not reg-
ulate or 'directly affect trading on'" a DCM. But that cannot be taken seri-
ously—Defendants seek to use state law to *outright ban* trading on DCMs.

Defendants claim (at 49) "Kalshi's characterization" of Congress's "in-
tent" is "oversimplified." But it is not Kalshi's characterization—it is the
courts' uniform and settled interpretation of the CEA's purpose. Defendants
also claim (at 48) their interference with CFTC regulation is merely "inci-
dental" (quoting *GenBioPro, Inc. v. Raynes*, 144 F.4th 258, 275-277 (4th Cir.
2025)). But *GenBioPro* did not uphold state laws that conflict with federal
law incidentally. Instead, the state law at issue—restrictions on abortion-
inducing drugs—did not conflict with federal law only because nothing in the
federal law's text "emphasized the importance of 'uniform standards'" and
because Congress chose "to allow state regulation" of prescription drugs. 144
F.4th at 274-275. Neither is true here.

3. Defendants have no answer to Kalshi's argument that their efforts
to regulate Kalshi conflict with Congress's chosen "method of enforcement."
*See* Opening Br. 38-40. They instead claim (at 49) that Maryland law and
the CEA can work "in tandem" because both seek, at a high level of generality,
to ensure that contracts are in the "public interest." The problem is that 50
different states' understanding of the public interest will inevitably diverge

from the CFTC's.  State laws conflict with federal law despite sharing "the same aim as federal law" where, as here, they "conflict with the careful framework Congress adopted." *Arizona v. United States*, 567 U.S. 387, 402 (2012). That conflict is especially clear given that Defendants claim the right to *criminally prosecute* DCMs for offering contracts the CFTC has permitted.  If 50 states could prosecute DCMs for offering contracts that any state concludes are contrary to the public interest, the CFTC's exclusive jurisdiction to make a public-interest judgment would be meaningless.

## C.    The Presumption Against Preemption Does Not Apply.

This Court need not address the presumption against preemption because it would be overcome even if it applied.  But if the Court reaches the question, no presumption applies.

Defendants do not dispute that no presumption limits the reach of an express preemption clause like Section 2(a).  *See Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016); *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 762 n.1 (4th Cir. 2018).  Defendants instead suggest (at 43) Kalshi did not argue express preemption below, but that contention is meritless. Field preemption can be either "express" or "implied."  *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n.6 (2000).  Kalshi has consistently argued that the CEA's text expressly preempts the field of regulating

trading on DCMs. *See* JA33 ("The text … of the CEA" shows "that Congress sought to preempt state regulation" on DCMs.); JA48 (federal law preempts state law "in any field over which Congress has expressly or impliedly reserved exclusive authority to the federal government," and Congress "explicitly gave the CFTC the 'exclusive jurisdiction' to regulate" trading on DCMs); D. Ct. Dkt. No. 2 at 10 (similar); D. Ct. Dkt. No. 29 at 3-4 (similar); D. Ct. Dkt. No. 36 at 24-25 (similar). Defendants suggest Kalshi had to use the words "express preemption" to preserve its arguments, but preservation "does not demand the incantation of particular words," *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 469 (2000), especially given that "the categories of preemption are not 'rigidly distinct,'" *Crosby*, 530 U.S. at 372 n.6 (citation omitted).

Defendants also ignore that the presumption "is not triggered when the State regulates in an area where there has been a history of significant federal presence"—such as derivatives regulation. *United States v. Locke*, 529 U.S. 89, 108 (2000); *PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 477 (4th Cir. 2014). They argue (at 20) that courts should ask "whether the state law governs conduct that has historically been subject to state regulation" (quoting JA158). But that does not help, either. Defendants tout (at 2) states' longstanding regulation of "*intrastate* sports wagering," but they describe (at

13) Kalshi's contracts as "*interstate* wagering" (emphasis added). As the
Sixth Circuit recently confirmed, because "the regulation of *interstate* gam-
bling isn't a traditional area of state regulation, the presumption against
preemption doesn't apply." *Churchill Downs Tech. Initiatives Co. v. Mich.
Gaming Control Bd.*, 162 F.4th 631, 642 n.5 (6th Cir. 2025). And as Defend-
ants themselves note (at 41), states "largely abandoned" applying their gam-
bling laws to derivatives trading over 50 years ago.

## II. DEFENDANTS' ALTERNATIVE ARGUMENT THAT KALSHI'S CON-TRACTS ARE NOT SWAPS FAILS.

Defendants urge affirmance on the alternative ground that Kalshi's
contracts are not swaps. The district court did not reach that argument, and
this Court should reject it for numerous reasons.

1. To begin, the CEA bars states from second-guessing whether DCM-
traded instruments are swaps or other derivatives. The CEA preempts regu-
lation of trading on DCMs—full stop. Kalshi's contracts trade on a DCM, and
the CEA therefore reserves the authority to regulate these contracts exclu-
sively for the CFTC. If states could regulate instruments offered on DCMs
merely by claiming that they are not derivatives, states could "directly affect
trading on or the operation of a futures market"—exactly what Congress
"preempted." *Am. Agric.*, 977 F.2d at 1156-57. This difficulty would be com-

pounded exponentially if state regulators could scrutinize every contract offered on every DCM, contract-by-contract, to determine whether any of tens of thousands of contracts may or may not qualify as a derivative—all with the looming threat of criminal prosecution if any regulator anywhere concludes that any such contract is not a derivative after all. Defendants identify no case, decided by any court, permitting a state to proceed in this manner.

The limited role the CEA grants to states reinforces that conclusion. Section 13a-2 lets states sue "any person" that has "engaged in" a violation of the CEA, but *not* a "contract market." 7 U.S.C. §13a-2(1). A claim that a DCM listed an improper instrument is simply a claim that the DCM violated the CEA—exactly the type of claim Congress prohibited. Defendants' real complaint is with the CFTC, which allowed Kalshi to list its sports contracts. While the Administrative Procedure Act may provide a remedy if Defendants are aggrieved by the CFTC's regulation of Kalshi, Defendants cannot "use a collateral proceeding to end-run the procedural requirements governing appeals of administrative decisions." *Big Lagoon Rancheria v. California*, 789 F.3d 947, 953 (9th Cir. 2015) (en banc) (citation omitted).

2. Regardless, Kalshi's contracts are swaps. They "provide[]" for payment based on the "occurrence … of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C.

§ 1a(47)(A)(ii). "Associated" commonly means "connect[ed]." *See Associated*, Oxford English Dictionary (3d. ed 2011). A swap thus requires an event connected to a potential financial, economic, or commercial consequence.

Kalshi's contracts easily qualify. Outcomes of sporting events are connected to significant financial consequences for a broad ecosystem of stakeholders, including team sponsors, advertisers, television networks, franchises, local communities, and more. They also have direct economic consequences for state-regulated sportsbooks, which face substantial financial risks associated with sports events (if their customers win, they lose, providing a natural hedging need). Some sportsbooks have turned to Kalshi's contracts to hedge their financial risks accordingly.[2]

Defendants dispute (at 51) this conclusion principally on the ground that an "outcome" is not an "event" or "contingency" that may underlie a swap. But dictionaries define "event" to mean "outcome." *E.g.*, *Event*, Random House Webster's Unabridged Dictionary (2d ed. 2001). "Event" also means "[s]omething that happens." *E.g.*, *Event*, Random House Webster's Pocket American Dictionary (5th ed. 2008). The Seahawks winning the NFC

---

[2] Brett Smiley, *Underdog Sports Preparing to Use Kalshi, Prediction Markets For Its Own Risk Management*, In Game (Oct. 22, 2025), https://perma.cc/BT4A-BK8T.

Championship is something that happened—an event. Similarly, "contingency"—a term Defendants do not address—includes "something liable to happen as an adjunct to or result of something else." *Contingency*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). That definition comfortably encompasses outcomes. Courts accordingly recognize that "event contracts" are "based on the outcome of a contingent event." *KalshiEX*, 2024 WL 4164694, at *1. The CFTC likewise recognized last year that an event contract may be based on "the outcome of … a game in which one or more athletes compete." 89 Fed. Reg. at 48,975.

Defendants provide no reason to depart from the CEA's plain text. They claim (at 53) their reading is needed to avoid rendering other subsections of the swap definition "superfluous." *See* 7 U.S.C. § 1a(47)(A). But the definitions are intended to overlap. For example, subsection (iv) defines "swap" to include any "transaction that is, or in the future becomes, commonly known to the trade as a swap," *id.* § 1a(47)(A)(iv), a definition that broadly overlaps with subsection (iii), which enumerates twenty-two contracts that are "commonly known as" swaps, *id.* § 1a(47)(A)(iii), many of which in turn overlap with subsection (ii). This overlap confirms Congress's intent to define swap broadly, and weighs decisively against any artificial narrowing. "[L]awmakers, like Shakespeare characters, sometimes employ

overlap or redundancy so as to remove any doubt and make doubly sure." *Loving v. IRS,* 742 F.3d 1013, 1019 (D.C. Cir. 2014) (Kavanaugh, J.).

A rule providing that event contracts cannot be based on outcomes would yield intractable interpretive difficulties. Almost any event can be re-characterized as the outcome of a different event. The passage of a law could be framed as the outcome of a legislative vote, or the inauguration of a President as the outcome of an election. Construing the CFTC's exclusive jurisdiction to turn on a distinction between events and outcomes would be unworkable, undermining the validity of almost every conceivable event contract and inviting endless litigation.

Defendants additionally declare (at 54) that an underlying event must be "inherently joined" to a financial consequence. But that limitation is made out of whole cloth. The dictionaries Defendants cite (at 54) provide only that an event must be "joined or connected together" with a financial consequence, not "inherently" joined. In fact, to underlie a swap, an event's financial consequences need only be "potential"—effectively the opposite of "inherent." 7 U.S.C. §1a(47)(A)(ii). And Congress specified ten exclusions from the swap definition, *id.* §1a(47)(B), and authorized the CFTC and SEC to "further define" swap by regulation, 15 U.S.C. §8302(d)(1), underscoring that it did not want courts to add limitations of their own. *See TRW Inc. v.*

*Andrews,* 534 U.S. 19, 28 (2001) (explicit enumeration of exceptions to general provision weighs against implying "additional exceptions").

Traders often hedge risk from events that are not "inherently" financial but nonetheless have clear downstream financial consequences, like weather events. And the Special Rule contemplates CFTC jurisdiction over event contracts involving "war," and "gaming," neither of which is inherently financial. 7 U.S.C. §7a-2(c)(5)(C)(i). While Defendants quote (at 55-56) from a brief Kalshi filed in separate litigation concerning election-based contracts, in that case Kalshi merely argued that its election contracts did not involve "gaming" under the Special Rule. Kalshi never remotely suggested that contracts involving "gaming" would not qualify as swaps.

3. Kalshi's contracts are also futures or options in "excluded commodities." Excluded commodities include intangibles such as commercial benchmarks, *see* 7 U.S.C. §1a(19), as well as "occurrence[s] ... associated with a financial, commercial, or economic consequence," *id.* §1a(19)(iv). An "occurrence"-based futures contract or option results in a payment based on a specified occurrence or extent of an occurrence—for example, the occurrence or severity of a hurricane.[3]

---

[3] *See CME to Launch Hurricane Futures and Options on Futures Contracts*, CME Group (Feb. 14, 2007), https://perma.cc/5MKV-WCTH.

Defendants deny (at 50) that outcomes of sporting events are excluded commodities.  But outcomes of sporting events are "occurrence[s]" that are "associated with a financial, commercial, or economic consequence."  7 U.S.C. § 1a(19)(iv).  Defendants also err in asserting (at 50) that excluded-commodity futures fall outside the CFTC's exclusive jurisdiction.  Despite the name, "excluded commodities" "remain 'commodities' under the Act as a whole." *United States v. Wilkinson*, 986 F.3d 740, 745 (7th Cir. 2021).  Otherwise, myriad commonplace futures based on intangible commodities like interest rates and weather events would fall outside the CFTC's exclusive jurisdiction.

4.  Defendants claim (at 33) that recognizing Kalshi's contracts as swaps "would nationalize sports wagering regulation" under the CFTC.  That straw-man argument is emphatically mistaken.

The CEA's plain text preempts state law as to on-DCM trading but leaves states free to regulate off-DCM transactions like bets offered by sportsbooks.  Section 2(a) contains a savings clause making clear that, except for the CFTC's exclusive jurisdiction over on-DCM trading, "nothing" in Section 2 shall "restrict" state authorities "from carrying out their duties and responsibilities in accordance with [state] laws."  7 U.S.C. § 2(a)(1)(A). While Defendants claim Section 2(e) would require all sports bets to be traded on

29

DCMs if Kalshi's contracts are swaps, interpreting Section 2(e) to prevent state sportsbook licensure would "restrict" state authorities from "carrying out their duties" under state law—exactly what the savings clause forbids. Defendants point (at 35) to a different provision, Section 16(e)(1), which they claim "provide[s] state regulatory authority over off-exchange activity" but "does not apply to swaps." But they ignore Section 2(a)'s savings clause entirely.

In addition, pursuant to an express congressional delegation of authority, 15 U.S.C. § 8302(d)(1), the CFTC and SEC have made clear that instruments like Kalshi's contracts that are "traded on organized markets and over the counter" are swaps, even though "consumer and commercial transactions" that "are not traded on an organized market or over-the-counter" are not. *Further Definition of "Swap,"* 77 Fed. Reg. 48,208, 48,247 (Aug. 13, 2012). This regulation recognizes that products offering similar economic exposure can fall under different regulatory regimes based on their structure and how they are traded. Congress in UIGEA likewise instructed that a "bet or wager" should be regulated differently than on-DCM transactions. 31 U.S.C. § 5362(1)(E)(ii).

The distinction is not limited to sports contracts; the CFTC distinguishes insurance contracts from swaps on precisely these grounds—*i.e.*,

they are "not traded" and are "regulated as insurance under applicable state law."  77 Fed. Reg. at 48,212-13; *see CFTC v. Erskine*, 512 F.3d 309, 323-324 (6th Cir. 2008) (only "standardized," "fungible" instruments "traded on an exchange" are subject to the CEA's DCM-trading requirement).  Thus, treating Kalshi's contracts as swaps would not withdraw state jurisdiction over sportsbooks, let alone (at 52-53) "friendly wager[s]" or "casino game[s]."

By contrast, Defendants cannot avoid the untenable results of their position.  If the CFTC's exclusive jurisdiction supersedes only securities regulators, then state gambling regulators may regulate not just sports contracts, but *all* on-DCM trading.  Dozens of states a century ago barred "gambling in grain futures," *see Dickson*, 288 U.S. at 198; Opening Br. Addendum, and Defendants' position would leave them free to apply these laws to trading on DCMs today.  This would contravene decades of settled precedent and mean that, although Congress has repeatedly amended the CEA since 1974, it silently intended an interpretation of the CFTC's exclusive jurisdiction that no court—in 50 years—has ever endorsed.

Defendants' only response (at 42) is that "express preemption provisions" in Section 16(e) prevent states from regulating on-DCM futures as gambling.  But Section 16(e)(2) preempts state regulation only of "excluded" transactions that occur *off-DCM*.  And Section 16(e)(1) lets states regulate

only transactions "that [are] *not* conducted on or subject to the rules of a registered entity" (emphasis added). Accordingly, Defendants' position would necessarily allow states to criminalize the trading of grain futures on DCMs as gambling—a result the district court recognized was wrong and that Defendants below disavowed. *See* JA140, JA143, JA161.

## CONCLUSION

This Court should reverse.

By: /s/ *Neal Kumar Katyal*

Davis Campbell
MILBANK LLP
55 Hudson Yards
New York, NY 10001
(212) 530-5222

Neal Kumar Katyal
Joshua B. Sterling
William E. Havemann
Samantha K. Ilagan
MILBANK LLP
1101 New York Ave, NW
Washington, DC 20005
(202) 835-7505
nkatyal@milbank.com

Dated: January 26, 2026

*Counsel for Plaintiff-Appellant KalshiEX LLC*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Fourth Circuit Rule 32(b) because it contains 6,495 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).  This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Georgia font 14-point type face.

Dated: January 26, 2026          By:  */s/ Neal Kumar Katyal*
                                      Neal Kumar Katyal

## CERTIFICATE OF SERVICE

I hereby certify that, on January 26, 2026, I caused the foregoing to be electronically filed with the Clerk of the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

Dated: January 26, 2026          By:  */s/ Neal Kumar Katyal*
                                      Neal Kumar Katyal