UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| QCX LLC, | ) | |
|        Plaintiff, | ) | |
| | ) | No. 1:26-cv-710 |
| v. | ) | |
| | ) | |
| | ) | Honorable Paul L. Maloney |
| DANA NESSEL, *et al.*, | ) | |
|        Defendants. | ) | |
| | ) | |

## <u>OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER</u>

This matter comes before the Court on Plaintiff's motion for a temporary restraining order ("TRO") and preliminary injunction. (ECF No. 15). Defendants have not yet had the opportunity to be heard, so the Court presently only considers the motion insofar as it requests a TRO. *See* Fed. R. Civ. P. 65(b). The Court is not persuaded that the likelihood of success on the merits is great enough to warrant a TRO, nor is it persuaded that there is sufficient evidence that irreparable injury will result before Defendants can be heard. *See id.* 65(b)(1)(A). While additional argument and evidence may yet persuade the Court with regard to a preliminary injunction, the Court finds a TRO is not warranted, so Plaintiff's motion will be denied to that extent.

## I.

District courts may issue TROs at their discretion. *See Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). Under Rule 65, courts may issue TROs without notice to the adverse party only if two conditions are met. Fed. R. Civ. P. 65(b)(1). First, the

1

moving party must establish specific facts through an affidavit or a verified complaint showing that an immediate and irreparable injury will result to the moving party before the adverse party can be heard in opposition to the motion. Fed. R. Civ. P. 65(b)(1)(A). Second, counsel for the moving party must certify in writing any efforts made to give notice and the reasons why notice should not be required. Fed. R. Civ. P. 65(b)(1)(B). In addition, courts must consider each of four factors: (1) whether the moving party demonstrates a strong likelihood of success on the merits; (2) whether the moving party would suffer irreparable injury without the order; (3) whether the order would cause substantial harm to others; and (4) whether the public interest would be served by the order. *Ohio Republican Party*, 543 F.3d at 361 (quoting *Ne. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)). The four factors "are not prerequisites that must be met, but are interrelated concerns that must be balanced together." *Ne. Ohio Coal.*, 467 F.3d at 1009. TROs are meant to preserve the status quo until a more fulsome exploration of the legal issues is possible, so the weighing of factors may differ between the TRO and preliminary injunction contexts. *See Moore v. U.S. Ctr. for SafeSport*, 685 F. Supp. 3d 490, 495 (E.D. Mich. 2023).

## II.

Plaintiff operates a prediction contract market, wherein parties may form contracts with each other stipulating that one party will pay the other if a specified thing happens (or fails to) in a specified way. Plaintiff then charges a fee for facilitating the transaction. The prediction contracts include contracts involving sporting events, including individual happenings within sporting events, such as the scores of games. Defendants, officials of the state of Michigan, recently brought an enforcement action against a different prediction

2

contract market operator, KalshiEX. Defendants alleged that KalshiEX was in violation of state laws against operating an unlicensed sports betting establishment. Fearing that enforcement action against it is imminent, Plaintiff filed the present motion for a TRO and for a preliminary injunction.

III.

### A. Plaintiff Has Not Shown a Substantial Enough Likelihood of Success on the Merits to Merit a TRO.

Plaintiff's theory is that Defendants may initiate proceedings against it similar to those initiated against KalshiEX in Michigan state courts, and that the laws Defendants would seek to enforce are preempted by federal law. Plaintiff's legal theory hinges on the contention that the "event contracts" on its marketplace fall under the definition of "swap" under 7 U.S.C. § 1a(47)(A)(ii). If this is true, then the rest of Plaintiff's preemption theory builds naturally from there: other parts of the legislation would expressly preempt state laws, *see id.* § 2(a)(1)(A), and there would be evidence that Congress intended to occupy the field of event contract regulation and that state laws could conflict with federal law, *see KalshiEX LLC v. Orgel*, No. 3:26-cv-00034, 2026 WL 474869, at *9-10 (M.D. Tenn. Feb. 19, 2026). But if the relevant event contracts are not "swaps," then Plaintiff's theory never gets off the ground. This is a statutory interpretation question, so the Court must begin with the text. *Ohio Telecom Ass'n v. FCC*, 150 F.4th 694, 708 (6th Cir. 2025). It must then construe that text consistent with its "place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012).

3

Plaintiff devotes precious little energy in its brief expounding on its theory of what the text in § 1a(47)(A)(ii) means. It argues that the definition "comfortably covers event contracts" and would include "event contracts based on the winner or score of the NFC Championship" but does not explain exactly why. (ECF No. 14 at PageID.82). The relevant portion of the statute for Plaintiff's argument is "the term 'swap' means any agreement, contract, or transaction-- . . . that provides for any purchase, sale, payment or delivery . . . dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." § 1a(47)(A)(ii). There are two pertinent questions here based on the plain text: what constitutes an *event* or a *contingency*, what does it mean for each to be *associated with* an enumerated consequence?

The Court must first determine what *events* and *contingencies* are for the purposes of the statute, since the other terms interact with those central objects. Other courts interpreting the word "event" surveyed dictionaries and found it to refer to happenings of some importance, but not to outcomes or results of those things. *See, e.g., N. Am. Derivatives Exch., Inc. v. Nevada*, No. 2:25-cv-00978-APG-BNW, 2025 WL 2916151, at *7 (D. Nev. Oct. 14, 2025). The term does have common usages that allow it to mean essentially anything that happens. *See* American Heritage Dictionary, *Event* (3d ed. 1996) ("Something that takes place; an occurrence"). But to read the statute this way would flatten the differences between "event" and any other term by expanding its reach beyond any logical limit. *See N. Am. Derivatives Exch., Inc.*, 2025 WL 2916151, at *9. There would be no difference between *event* and *occurrence*, and the statute's other inclusive definitions of *swap* would

4

serve little to no purpose as they would be subsumed by the all-encompassing *event* clause. *See id.* at *8-9. In addition to rendering superfluous much of § 1a(47)(A) itself, such a broad reading of *event* would also be contrary to legislative intent regarding the statute's interaction with gambling and have wide-reaching consequences for other federal legislation not clearly spoken to in the legislative text. *See id.* at *10; *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 683-84 (D. Md. 2025).

Based on Plaintiff's arguments, the Court sees no logical way to interpret the term *event* consistent with Plaintiff's position without extending its reach to any and all things that happen. Individual actions and scores in individual sporting events have no intrinsic importance outside the context of the game. The definition of *swap* under this expansive interpretation of *event* would sweep in not only all wagers on sporting events but would potentially sweep in all service contracts in any industry, as *swap* includes any "contract" that "provides for any payment" that "is dependent on the occurrence . . . of an event." § 1a(47)(A)(ii). That would include contracts dependent on the performance of a service. A grant of exclusive authority in the CFTC that radical would surely call for a more explicit statement. *N. Am. Derivatives Exch., Inc.*, 2025 WL 2916151, at *10. The Court is thus at this time most persuaded by the District of Nevada's more limiting conception of "event" as a happening "of some significance that took place or will take place, in a certain location, during a particular interval of time, such as a particular sporting event or an organized activity or celebration for the public or a particular group." *Id.* at *8. This definition also allows for a separate, significant role for the word *contingency,* which would include those hypothetical

events dependent on certain outcomes. *See id.* at *8 n.9; *KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575-APG-BNW, 2025 WL 3286282, at *6 (D. Nev. Nov. 24, 2025).

One potential limit on Plaintiff's necessarily implied vision of *events* and *contingencies* is the statutory requirement that they be *associated with a potential financial, economic, or commercial consequence.* But Plaintiff's position would render this restriction meaningless as well. Plaintiff puts forward evidence that individual happenings within a sporting event, such as the number of points scored, can have economic ramifications in terms of "the team's valuation, retailers' sales of team merchandise, and the hometown economy." (ECF No. 14 at PageID.83). These are all potential consequences dependent on the reactions of parties outside the game. Anything can potentially have economic ramifications given enough attenuation and happenstance. Reading *associated with* to require an inherent connection to those consequences rather than a downstream, attenuated consequence reins in the potential chains of association to infinity. *See Hendrick*, 2025 WL 3286282, at *6. This reading also keeps the pertinent provisions of § 1a(47)(A)(ii) in line with its surrounding provisions, which "refer almost exclusively to financial measures, indices, or instruments." *Id.* at *7.

The text, then, when read in the light of the rest of the provision and its place in the statutory scheme, seems to undercut the necessary basis of Plaintiff's preemption arguments. If the event contracts allegedly threatened by the state's enforcement actions are not "swaps," federal law does not stand in the state's way. The Court recognizes that other courts across the country have reached contrary conclusions. *See KalshiEX LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS, 2025 WL 1218313, at *4-6 (D.N.J. Apr. 28, 2025); *Orgel*, 2026 WL

474869, at *7-8. However, the Court is more persuaded by the relatively more fulsome explorations of the text, purpose, and structure of the statutes and relevant surrounding provisions in *North American Derivatives Exchange, Hendrick*, and *Martin*. Plaintiff has raised questions meriting further argument and investigation. *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007). But the Court is not convinced at this juncture that it is so likely to succeed that a TRO is warranted given the lack of limiting principles inherent to their reading of the statute.

### B. Plaintiff Has Not Shown that It Is Likely to Suffer Irreparable Injury Before Defendants Can Respond.

One difference between the analyses of a motion for a TRO and one for a preliminary injunction is the requirement in Rule 65 that the moving party provide "specific facts" showing that irreparable injury will result "before the adverse party can be heard in opposition." While Plaintiff has demonstrated that state officials have begun articulating their legal position by suing KalshiEX, it is not yet clear that "the prospect of state suit" is "imminent" for Plaintiff. *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 382 (1992). Plaintiff has not provided any evidence that Defendants have threatened enforcement actions against them specifically in the coming days. It is thus not yet clear that Defendants would bring enforcement action against Plaintiff specifically rather than waiting for the resolution of the Kalshi case. *See Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.,* 162 F.4th 631, 643 (6th Cir. 2025) (explaining that when a plaintiff's license was suspended, it could get an injunction, but if it had sought an injunction beforehand, "it would have been premature"). The threat of prosecution Plaintiff cites is currently in the realm of the

hypothetical rather than so immediate as to warrant relief before Defendants can respond. *See D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019).

Plaintiffs must also comply with Rule 65(b)(1)(B), which requires that the movant's attorney certify in writing "the reasons why [notice] should not be required." The Court notes the absence of such reasoning in Plaintiff's filings related to the present motion.

## C.  The Balance of Harms and Interests Does Not Clearly Favor Plaintiff.

Plaintiff's arguments regarding the balance of harms and the public interest rely on Plaintiff succeeding on the merits. Plaintiff argues that it is in the public interest to block the application of unconstitutional laws and that state officials have no legitimate interest in enforcing unconstitutional laws. This is fair enough in and of itself. But the argument falls apart if the state laws are not in violation of the Supremacy Clause, so Plaintiff's public interest arguments are only as persuasive as its arguments on the likelihood of success on the merits. Plaintiff is not clearly ahead there, so it is not clearly ahead here either. In the Court's judgment at this point, Plaintiff is fighting to keep things even there, so the factors cannot tip far enough in its favor to warrant the extraordinary remedy of a TRO.

## IV.

Plaintiff certainly presents issues warranting further argument and examination. Courts across the country have reached different conclusions and no appeals court has yet provided conclusive guidance. But the most fulsome explorations of the statutory interpretation question at the heart of the issue do not favor Plaintiff's position, and Plaintiff has not demonstrated that irreparable harm is likely to occur so imminently that there is no time for Defendants to respond or for the Court to continue its examination of the issues.

8

Plaintiff's motion (ECF No. 15) is **DENIED IN PART** to the extent it seeks a temporary restraining order. Briefing on Plaintiff's motion insofar as it seeks a preliminary injunction shall proceed as usual under the Court's rules.

**IT IS SO ORDERED.**

Date:   March 10, 2026                          /s/ Paul L. Maloney
                                                          Paul L. Maloney
                                                          United States District Judge