**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 25-1892

KALSHIEX LLC,

Plaintiffs - Appellants,

v.

JOHN A. MARTIN, in his official capacity as Secretary of the Maryland Lottery and Gaming Control Commission and Director of the Maryland Lottery and Gaming Control Agency; MARYLAND LOTTERY AND GAMING CONTROL AGENCY; MICHAEL EATON, in his official capacity as Managing Director of Gaming for the Maryland Lottery and Gaming Control Agency; EVERETT D. BROWNING, SR., in his official capacity as Chair of the Maryland Lottery and Gaming Control Commission; E. RANDOLPH MARRINER, in his official capacity as Vice Chair of the Maryland Lottery and Gaming Control Commission; ADE ADEBISI, in his official capacity as Commissioner of the Maryland Lottery and Gaming Control Commission; DIANE CROGHAN, in her official capacity as Commissioner of the Maryland Lottery and Gaming Control Commission; GEORGE L. DOETSCH, JR., in his official capacity as Commissioner of the Maryland Lottery and Gaming Control Commission; HAROLD E. HODGES, in his official capacity as Commissioner of the Maryland Lottery and Gaming Control Commission; JAMES J. STAKEM, in his official capacity as Commissioner of the Maryland Lottery and Gaming Control Commission; MARYLAND LOTTERY AND GAMING CONTROL COMMISSION; ANTHONY G. BROWN, in his official capacity as Attorney General for the State of Maryland,

Defendants – Appellees,

------------------------------------

PARADIGM OPERATIONS LP; UNDERDOG SPORTS HOLDING, INC.

Amici Supporting Appellant,

and

STOP PREDATORY GAMBLING; TEXANS AGAINST GAMBLING, d/b/a Texans Who Care; THE ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS; TODD PHILLIPS; BETTER MARKETS, INC.; NEVADA, OHIO, 36 OTHER STATES, AND THE DISTRICT OF COLUMBIA; AMERICAN GAMING ASSOCIATION; INDIAN GAMING ASSOCIATION; NATIONAL CONGRESS OF AMERICAN INDIANS; CALIFORNIA NATIONS INDIAN GAMING ASSOCIATION; ARIZONA INDIAN GAMING ASSOCIATION; MINNESOTA INDIAN GAMING ASSOCIATION; OKLAHOMA INDIAN GAMING ASSOCIATION; WASHINGTON INDIAN GAMING ASSOCIATION; UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND; SAN MANUEL GAMING AND HOSPITALITY AUTHORITY; TRIBAL ALLIANCE OF SOVEREIGN INDIAN NATIONS; 30 FEDERALLY RECOGNIZED TRIBES,

Amici Supporting Appellee.

---

Appeal from the United States District Court for the District of Maryland, at Baltimore. Adam B. Abelson, District Judge. (1:25-cv-01283-ABA)

---

Argued: May 7, 2026 Decided: November 18, 2026

---

Before GREGORY, THACKER, and BENJAMIN, Circuit Judges.

---

Affirmed by published per curiam opinion, in which Judge Gregory and Judge Thacker joined.

Judge Gregory wrote a concurring opinion. Judge Thacker wrote a concurring opinion. Judge Benjamin wrote a dissenting opinion.

---

**ARGUED:** William E. Havemann, MILBANK LLP, Washington, D.C., for Appellant. Max F. Brauer, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees. **ON BRIEF:** Davis Campbell, New York, New York, Neal Kumar Katyal, Joshua B. Sterling, Samantha K. Ilagan, MILBANK LLP, Washington, D.C., for Appellant. Anthony G. Brown, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland; Erik Delfosse, Senior Assistant Attorney General, MARYLAND LOTTERY AND GAMING CONTROL AGENCY, Baltimore, Maryland, for Appellees. Tyler R. Green, Conor D. Woodfin, CONSOVOY MCCARTHY PLLC, Salt Lake City, Utah, for Amicus Paradigm Operations LP. David Gringer, New York, New York, Adela Lilollari, Boston,

Massachusetts, Kelly P. Dunbar, Donna M. Farag, Olu O. Oisaghie, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., for Amicus Underdog Sports Holding Inc. Andrew L. Schlafly, Far Hills, New Jersey, for Amici Stop Predatory Gambling, Texans Against Gambling, and the Association of American Physicians and Surgeons. Todd Phillips, Atlanta, Georgia, for Amicus Todd Phillips. Dennis M. Kelleher, Stephen W. Hall, BETTER MARKETS, INC., Washington, D.C.; Jim Davy, ALL RISE TRIAL & APPELLATE, Philadelphia, Pennsylvania, for Amicus Better Markets, Inc. Aaron D. Ford, Attorney General, Heidi Parry Stein, Solicitor General, Jessica E. Whelan, Chief Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF NEVADA, Las Vegas, Nevada, for Amicus State of Nevada. Dave Yost, Attorney General, Mathura J. Sridharan, Solicitor General, Zachery P. Keller, Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Amicus State of Ohio. Steve Marshall, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALABAMA, Montgomery, Alabama, for Amicus State of Alabama. Stephen J. Cox, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALASKA, Anchorage, Alaska, for Amicus State of Alaska. Kristin K. Mayes, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARIZONA, Phoenix, Arizona, for Amicus State of Arizona. Tim Griffin, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARKANSAS, Little Rock, Arkansas, for Amicus State of Arkansas. Rob Bonta, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CALIFORNIA, Sacramento, California, for Amicus State of California. Philip J. Weiser, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF COLORADO, Denver, Colorado, for Amicus State of Colorado. William Tong, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CONNECTICUT, Hartford, Connecticut, for Amicus State of Connecticut. Kathleen Jennings, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF DELAWARE, Wilmington, Delaware, for Amicus State of Delaware. Brian L. Schwalb, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF THE DISTRICT OF COLUMBIA, Washington, D.C., for Amicus District of Columbia. Anne E. Lopez, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF HAWAI'I, Honolulu, Hawai'i, for Amicus State of Hawai'i. Raúl Labrador, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF IDAHO, Boise, Idaho, for Amicus State of Idaho. Kwame Raoul, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ILLINOIS, Chicago, Illinois, for Amicus State of Illinois. Theodore E. Rokita, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF INDIANA, Indianapolis, Indiana, for Amicus State of Indiana. Brenna Bird, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF IOWA, Des Moines, Iowa, for Amicus State of Iowa. Kris Kobach, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF KANSAS, Topeka, Kansas, for Amicus State of Kansas. Liz Murrill, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF LOUISIANA, Baton Rouge, Louisiana, for Amicus State of Louisiana. Aaron M. Frey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MAINE, Augusta, Maine, for Amicus State of Maine. Andrea Joy Campbell, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MASSACHUSETTS, Boston, Massachusetts, for

Amicus Commonwealth of Massachusetts. Dana Nessel, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MICHIGAN, Lansing, Michigan, for Amicus State of Michigan. Keith Ellison, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MINNESOTA, St. Paul, Minnesota, for Amicus State of Minnesota. Lynn Fitch, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MISSISSIPPI, Jackson, Mississippi, for Amicus State of Mississippi. Michael T. Hilgers, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEBRASKA, Lincoln, Nebraska, for Amicus State of Nebraska. Matthew J. Platkin, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY, Trenton, New Jersey, for Amicus State of New Jersey. Raúl Torrez, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW MEXICO, Santa Fe, New Mexico, for Amicus State of New Mexico. Letitia James, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW YORK, New York, New York, for Amicus State of New York. Jeff Jackson, Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Amicus State of North Carolina. Gentner Drummond, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OKLAHOMA, Oklahoma City, Oklahoma, for Amicus State of Oklahoma. Dan Rayfield, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OREGON, Salem, Oregon, for Amicus State of Oregon. David W. Sunday, Jr., Attorney General, OFFICE OF THE ATTORNEY GENERAL OF PENNSYLVANIA, Harrisburg, Pennsylvania, for Amicus Commonwealth of Pennsylvania. Peter F. Neronha, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF RHODE ISLAND, Providence, Rhode Island, for Amicus State of Rhode Island. Alan Wilson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Amicus State of South Carolina. Marty Jackley, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH DAKOTA, Pierre, South Dakota, for Amicus State of South Dakota. Jonathan Skrmetti, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF TENNESSEE, Nashville, Tennessee, for Amicus State of Tennessee. Derek E. Brown, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF UTAH, Salt Lake City, Utah, for Amicus State of Utah. Charity R. Clark, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VERMONT, Montpelier, Vermont, for Amicus State of Vermont. Nicholas W. Brown, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON, Olympia, Washington, for Amicus State of Washington. Josh Kaul, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WISCONSIN, Madison, Wisconsin, for Amicus State of Wisconsin. Bruce Bennett, Benjamin Sovocool, New York, New York, Kevin F. King, Matthew J. Glover, Scott Garfing, Hassan Ahmad, Eli Nachmany, COVINGTON & BURLING LLP, Washington, D.C., for Amicus American Gaming Association. Joseph H. Webster, Elizabeth Bower, Jens W. Camp, HOBBS, STRAUS, DEAN & WALKER LLP, Washington, D.C.; Bryan Newland, POWERS, PYLES, SUTTER & VERVILLE PC, Washington, D.C., for Tribal Amici. Scott Crowell, CROWELL LAW OFFICE, TRIBAL ADVOCACY GROUP PLLC, Sedona, Arizona, for Amici Rincon Band of Luiseño Indians, Santa Ynez Band of Chumash Mission Indians, and the Spokane Tribe of the Spokane Reservation. Michael Hoenig, YUHAAVIATAM OF SAN

MANUEL NATION, Washington, D.C., for Amici Yuhaaviatam of San Manuel Nation and San Manuel Gaming and Hospitality Authority.

PER CURIAM:

The judgment of the district court is

*AFFIRMED*.

GREGORY, Circuit Judge, concurring:

KalshiEX, LLC ("Kalshi") brings this appeal, which presents a narrow question of federal preemption. The Commodity Exchange Act ("CEA" or "the Act") grants the Commodity Futures Trading Commission ("CFTC") exclusive jurisdiction over transactions involving swaps traded or executed on a designated contract market ("DCM"). 7 U.S.C. § 2(a)(1)(A). But Congress also enacted a separate provision elsewhere in the same Act providing separate treatment for certain event contracts specifically involving gaming, among other things, and providing that certain such contracts may not be listed or traded on a DCM. *Id.* § 7a-2(c)(5)(C)(i)–(iii). The question here is whether, when read together, those provisions clearly establish that the CFTC's authority over the sports event contracts at issue excludes Maryland's traditionally recognized authority to enforce its gaming laws.

I do not decide whether Kalshi's sports event contracts are "swaps" within the meaning of the CEA. That is because, even assuming they are, neither the Act nor the CFTC's implementation of it clearly establish that such contracts are entitled to trade on a DCM free from state gaming laws. Whether the contracts are swaps bears on the scope of the CFTC's regulatory authority; it does not alone answer whether that authority is *exclusive* to the CFTC and displaces Maryland's concurrent authority to regulate gambling. Rather than providing a settled answer, the statutory and regulatory framework leaves unresolved the relationship between the CEA's grant of exclusive jurisdiction and Congress's treatment of gaming contracts.

Because the regulation of gambling has long been a matter of traditional state police power, I would not infer that Congress displaced Maryland's concurrent authority absent a clear expression of its intent to do so. Nor has Kalshi shown that complying with both the CEA and the Maryland law at issue would be impossible or stand as an obstacle to Congress's objective to create a centralized federal regulatory framework for trading derivative contracts. I therefore conclude that Kalshi has not demonstrated that the CEA preempts Maryland's sports wagering laws and concur in the judgment affirming the district court.

# I.

## A.

Kalshi operates a federally regulated trading exchange known as a designated contract market, or DCM, which is overseen by the CFTC. Through its platform, users trade standardized financial contracts tied to future events, including the outcome of sporting events. Unlike a traditional sportsbook, such as FanDuel or DraftKings, where the house takes the other side of every bet, Kalshi never becomes the customer's opponent. If a customer bets on the Lakers to beat the Celtics through FanDuel, FanDuel is the other party to that wager. On Kalshi's exchange, by contrast, the customer trades directly with another user who takes the opposite view, and prices are determined by supply and demand based on what participants believe is likely to happen—much like prices are determined on a traditional stock exchange. Even so, Kalshi advertises itself as "the first app for legal

*sports betting* in all 50 states" and "the first nationwide legal *sports betting* platform." (emphasis added).

Maryland law generally prohibits sports wagering unless the operator is licensed by the state. The Maryland Lottery and Gaming Control Commission and the Maryland Lottery and Gaming Control Agency (collectively referred to herein as the "Maryland gaming authorities") are the state agencies responsible for administering and enforcing those laws. Because Kalshi was engaged in sports wagering as defined in Md. Code Ann., State Gov't §§ 9-1E-01(j), 9-1E-01(e), the Maryland gaming authorities concluded that Kalshi was required to obtain a "sports wagering license[]" and comply with all laws applicable to licensed operators to conduct that aspect of its business in Maryland. *See id.* § 9-1E-03. The applicable requirements consist of data security obligations and advertising restrictions, including prohibitions on deceptive advertising and advertising directed at individuals prohibited from participating in sports wagering and other at-risk individuals. *Id.*

On April 7, 2025, the Maryland gaming authorities sent Kalshi a cease-and-desist letter, asserting that Kalshi was unlawfully offering "wagering on sporting events" by making its sports event contracts available to Marylanders without the state license required to operate. The letter ordered Kalshi to stop making its sports wagering contracts available within fifteen days.

B.

On April 21, 2025, after receiving the Maryland gaming authorities' cease-and-desist letter, Kalshi filed this action against the Maryland Attorney General, the Maryland

Lottery and Gaming Control Agency, the Maryland Lottery and Gaming Control Commission, and various Maryland gaming officials in their official capacities. Kalshi sought declaratory and injunctive relief, alleging that the CEA preempts Maryland's sports-wagering laws as applied to trading activity conducted on its federally regulated exchange. Kalshi simultaneously moved for a preliminary injunction barring Maryland from enforcing its sports wagering laws against Kalshi's sports event contracts.

To win a preliminary injunction, a plaintiff must establish four factors: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm absent relief; (3) that the balance of equities favors them; and (4) that an injunction is in the public interest. *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). In arguing that its claim is likely to succeed on its merits, Kalshi primarily contended that its gaming contracts are swaps traded on a federally designated contract market, so they fall within the CEA's exclusive jurisdiction. *See* 7 U.S.C. § 2(a)(1)(A).

While Kalshi's motion was pending, two other federal district courts entered preliminary injunctions preventing the states of Nevada and New Jersey from enforcing state gambling laws against Kalshi, although the district court in Nevada later changed its position. *See KalshiEX LLC v. Hendrick* (*Hendrick I*), No. 2:25-cv-00575, 2025 WL 1073495 (D. Nev. Apr. 9, 2025) (enjoining the Nevada Gaming Commission and the Nevada Gaming Control Board from pursuing penalties against Kalshi for "offering event-based contracts" in violation of Nevada law), *injunction later dissolved by*, *KalshiEX LLC v. Hendrick* (*Hendrick II*), 817 F. Supp. 3d 1014 (D. Nev. 2025) (*see* n. 1 below); *KalshiEX*

*LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS, 2025 WL 1218313 (D.N.J. Apr. 28, 2025), *aff'd*, 172 F.4th 220 (3d Cir. 2026) (enjoining New Jersey Division of Gaming Enforcement from pursuing penalties against Kalshi for "listing unauthorized sports wagers" in violation of New Jersey state law).

Those courts concluded that the CEA's grant of "exclusive jurisdiction" to the CFTC likely preempted state regulation of trading activity conducted on federally regulated exchanges. *Hendrick I*, 2025 WL 1073495, at *7 (finding preemption because "[s]ection 2's plain and unambiguous language" "reflects congressional intent to occupy the field of regulating CFTC-designated exchanges and the transactions conducted on those exchanges"); *Flaherty*, 2025 WL 1218313, at *6 (same).

The federal district court in Maryland reached a different conclusion here and denied Kalshi's motion on August 1, 2025.[1] *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 675–76 (D. Md. 2025). The court "assume[d] without deciding" that Kalshi's sports event contracts qualified as swaps under the CEA. *Id.* at 675. The court nevertheless concluded that Kalshi failed to demonstrate a likelihood of success on the merits because Congress had not "clearly and manifestly intended to strip states of their authority to regulate gambling." *Id.* at 676. Although the district court acknowledged that Congress intended some degree of field preemption when it granted the CFTC exclusive jurisdiction over

[1] Following this decision of the Maryland district court, the Nevada district court reversed its earlier ruling and dissolved the preliminary injunction in light of both *Martin* discussed here and its intervening decision in *N. Am. Derivatives Exch., Inc. v. Nevada ex rel. Nevada Gaming Control Bd.*, 815 F. Supp. 3d 1169 (D. Nev. 2025), which concluded that sports event contracts of the type at issue are not swaps subject to the CEA. *Hendrick II*, 817 F. Supp. 3d 1014, 1022 (D. Nev. 2025).

trading on DCMs generally, the court concluded that the CEA did not clearly establish that Congress intended to occupy the field of gambling regulation specifically, thus leaving "room for supplementary state legislation" where Congress expressly relies on and incorporates state laws. *Id.* at 679–80 (quoting *Kansas v. Garcia*, 589 U.S. 191, 208 (2020)). So, according to the district court of Maryland, when "Congress expressly authorized the [CFTC] to prohibit particular categories of transactions as contrary to the public interest *based on the fact that the conduct at issue would violate state law*," this signaled shared jurisdiction between the state and the CFTC over gambling that happens on a DCM. *Id.* at 680 (emphasis in original).

The district court further determined Maryland's sports wagering laws did not conflict with the federal regulatory framework because Kalshi could comply with state law through state licensure requirements, which bear no burden on Kalshi's ability to comply with the CEA. *Id.* at 685–86. Having concluded Kalshi failed to establish a likelihood of success on the merits, the court declined to address the remaining preliminary injunction factors. *Id.* at 686–87.

Since Kalshi first filed suit in Maryland, several courts have addressed the question presented in this appeal in cases involving Kalshi or similarly situated prediction markets, but they have reached no consensus. *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025) (finding no preemption because court determined Kalshi's sporting event contracts are not swaps, and, even if they are swaps, the CEA "does not state that the CFTC has exclusive jurisdiction over" commodities it excludes from trading); *KalshiEX, LLC v. Schuler*, No. 2:25-CV-1165, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026) (finding no

preemption because court determined Kalshi's sporting event contracts are not swaps and Congress's intent to displace state authority is unclear); *Kalshiex LLC v. Williams*, No. 25 Civ. 8846 (AT), 2026 WL 2017466 (S.D.N.Y. July 13, 2026) (finding no preemption because of ambiguity in statutory reading); *QCX LLC v. Nessel*, No. 1:26-CV-710, 2026 WL 1895958 (W.D. Mich. June 17, 2026) (holding that, because of ambiguity in statutory reading, there is no preemption in a suit brought by another prediction market alleging imminent enforcement after the action against Kalshi); *KalshiEX LLC v. Cox*, No. 2:26-cv-00151-RJS-CMR (D. Utah Aug. 8, 2026) (finding no preemption according to 7 U.S.C. § 16(e)(2)).

*But see KalshiEX LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS, 2025 WL 1218313 (D.N.J. Apr. 28, 2025), *aff'd*, 172 F.4th 220 (3d Cir. 2026) (finding preemption because the court held Kalshi's sporting event contracts are swaps over which the CEA has exclusive jurisdiction); *KalshiEX LLC v. Johnson*, No. CV-26-01715-PHX-MTL, 2026 WL 1223373 (D. Ariz. May 5, 2026) (same); *Kalshiex LLC v. Orgel*, No. 3:26-CV-00034, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) (holding that Tennessee's intrastate wagering requirement conflicted with the CEA and declining to address field preemption); *United States v. Minnesota*, No. 26-CV-2661 (KMM/DTS), 2026 WL 2150211 (D. Minn. July 27, 2026) (finding preemption because it "appears to be the case" that sporting event contracts traded on Kalshi's exchange are swaps).

Other federal courts of appeals likewise have reached no consensus. *Kalshiex LLC v. Schuler*, No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026) (finding no preemption because Kalshi's sporting event contracts are not swaps and "Kalshi fail[ed] to establish

that Congress intended the CEA to preempt state laws on sports gambling"); *KalshiEX LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026) (finding preemption because "Kalshi's sports-related event contracts are swaps traded on a CFTC-licensed DCM, so the CFTC has exclusive jurisdiction"); *KalshiEx LLC v. Assad*, 190 F.4th 1098 (9th Cir. 2026) (finding no preemption because "sports event contracts are likely not swaps under the CEA").

Kalshi timely appealed. On appeal, it raises the same preemption arguments as it raised below.

## II.

Long before Congress enacted the Commodities Exchange Act ("CEA"), the Constitution established a system of government that divided authority between the national government and the states. The Framers rejected a national government of unlimited power in favor of a federal system that preserved the sovereignty of the states while entrusting the federal government with powers of national concern. That division of authority safeguards individual liberty, promotes political accountability, and allows the states to govern matters traditionally committed to their care. *The Federalist* No. 39, at 245 (James Madison) (Clinton Rossiter ed., 1961) (describing the states' "residuary and inviolable sovereignty" as ascribed by the Constitution).

But "[w]ith dual sovereignty . . . 'follows the possibility that laws can be in conflict or at cross-purposes.'" *GenBioPro, Inc. v. Raynes*, 144 F.4th 258, 270 (4th Cir. 2025) (quoting *Arizona v. United States*, 567 U.S. 387, 398–99 (2012)). The Framers anticipated that possibility. Their solution was the Supremacy Clause, which provides that federal law

"shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Thus, when Congress acts within its constitutional authority, federal law prevails over conflicting state law. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

Those seemingly conflicting principles give rise to the doctrine of federal preemption. Whatever form a preemption claim takes, "[p]re-emption fundamentally is a question of congressional intent." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). This is because, while Congress unquestionably possesses the authority to displace state law, courts presume that Congress "does not cavalierly pre-empt" the exercise of states' traditional police powers because "the States are independent sovereigns in our federal system." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Accordingly, I "start with the assumption that the historic police powers of the States were not to be superseded by [a] Federal Act unless that was the *clear and manifest* purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (emphasis added).

That presumption carries particular force here. No one disputes that regulating gambling has long fallen within the states' traditional police powers. And doctrine says that the power to override the states' historic authority "is an extraordinary power in a federalist system," so courts expect Congress to make its intention clear. *Gregory*, 501 U.S. at 460. Thus, courts do not use statutory uncertainty to redraw the federal-state balance themselves. Rather, "[i]n areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention 'clear and manifest.'" *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) (quoting *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655

(1995)). Accordingly, where a federal statute reasonably admits competing interpretations regarding its preemptive scope, courts "have a duty to accept the reading that disfavors pre-emption." *Id.*; *see also GenBioPro*, 144 F.4th at 270 (quoting *Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 139 (2005) (plurality opinion)) (explaining that lawmakers do not usually "intrude on sensitive domains" through language that does not *clearly* convey that result (emphasis added)); *cf. Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) ("We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." (internal quotation omitted)).

With those principles in mind, I turn to Kalshi's two preemption theories. First, Kalshi argues that Congress occupied the field by granting the CFTC exclusive jurisdiction over the sports event contracts at issue, thereby leaving no room for concurrent state regulation. Second, Kalshi contends that, even if Maryland retains some regulatory authority, its gaming laws conflict with the CEA because they stand as an obstacle to the federal scheme Congress established. I disagree with both arguments and address each separately.

A.

I first consider Kalshi's argument that the CEA occupies the field. Field preemption arises when "Congress has legislated so comprehensively that it has left no room for supplementary state legislation." *R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 140 (1986); *see also Arizona v. United States*, 567 U.S. at 401. The question is therefore not whether Congress regulates these contracts through the CEA. Rather, the question is whether Congress clearly intended the CEA to vest the CFTC with *exclusive*

regulatory authority over gaming contracts, thereby withdrawing Maryland's historic authority to regulate gambling in this area.

Kalshi principally relies on the CEA's exclusive-jurisdiction provision, which grants the CFTC "exclusive jurisdiction" over certain "transactions involving swaps." 7 U.S.C. § 2(a)(1)(A). Read in isolation, that language appears to support Kalshi's position. But statutes are not read one provision at a time. We must interpret the exclusive-jurisdiction provision in conjunction with the remainder of the statutory scheme, including § 7a-2(c)(5)(C)(i), known as the "Special Rule," which appears within the same statute and governs event contracts involving gaming. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme . . . ." (internal quotation marks omitted)).

As I explain below, the clarity necessary to displace Maryland's traditional police powers disappears when those provisions are read together.

i.

I begin with the text Congress enacted. Subject to some exceptions, the CEA grants the CFTC "exclusive jurisdiction" over "transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market" designated under the Act. 7 U.S.C. § 2(a)(1)(A). Kalshi contends that its sports event contracts are swaps traded on a federally regulated designated contract market ("DCM") and therefore fall within the CFTC's exclusive jurisdiction beyond the reach of Maryland's gaming laws. Reading the provision alone, that argument makes sense if we agree that those gaming contracts are swaps.

Whether sports event contracts of this kind qualify as "swaps" under the CEA, however, has divided courts considering the question and presents difficult and technical questions of statutory interpretation. I need not enter that debate here because the preemption question can be resolved without deciding it.[2] Even assuming Kalshi's contracts are swaps, that establishes only that they fall within the CEA's regulatory framework. It does not answer the question here, which is whether the CEA clearly grants the CFTC *exclusive* authority over those contracts to the exclusion of Maryland's traditional authority to regulate gambling. Put differently, whether the contracts are swaps bears on the CFTC's authority to regulate them at all; by contrast, the field preemption question here is whether that authority wholly *excludes* concurrent and supplemental state regulation of contracts involving gaming specifically. Kalshi's position would effectively answer that question based on the form the wagering takes: because the wagers are packaged as derivative contracts traded on a DCM, Kalshi contends that they fall

[2] My colleague argues that the preemption question must turn on whether the sports-related contracts are held to be swaps. Dissent at 57–58. In the dissent's view, if the sports-related contracts are swaps, then the CFTC is conferred exclusive jurisdiction, and field preemption necessarily applies. *Id.* But the critical question is whether that exclusive jurisdiction language over the field of DCM trading creates an inference that Congress "left no room for supplementary state regulation." *Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 713 (1985); *See Flaherty*, 172 F.4th at 236 (Roth, J., dissenting) (explaining that the federal occupation of a subfield of futures trading does not overcome the presumption against preemption of states' historic police powers over gambling). The dissent's view would allow Kalshi, or any person or entity for that matter, to circumvent state gambling laws by repackaging ordinary gambling as futures trading on a DCM. As discussed further below, the statutory context of the CEA does not evince a "clear and manifest" intention to preempt traditional state authority and permit this loophole. *See Rice*, 331 U.S. at 230.

exclusively within the federal sphere and beyond the reach of traditional state gaming regulation.

But the CEA itself makes that inference difficult to sustain. Congress did not treat the gaming subject as irrelevant merely because it takes the form of a derivative contract. To the contrary, Congress enacted the Special Rule specifically addressing event contracts involving gaming and other sensitive subjects. Under that Rule, the CFTC "may determine" that an event contract is "contrary to the public interest" if it involves, among other things, gaming. *Id.* § 7a-2(c)(5)(C)(i). If the CFTC makes that determination, "[n]o agreement, contract, or transaction" so determined "may be listed or made available for clearing or trading on or through a registered entity." *Id.* § 7a-2(c)(5)(C)(ii). Congress further authorized the CFTC to determine the continuing eligibility of clearing organizations to clear such contracts. *Id.* §§ 2(a)(1)(A), 7a-2(c)(5)(C)(iii).

Read together, as we must, these provisions reveal why the swap question does not resolve the preemption question. Congress did not treat every derivative contract traded on a DCM alike. It granted the CFTC exclusive jurisdiction over transactions "traded or executed" on DCMs while separately recognizing that certain event contracts involving gaming are prohibited from trading on those markets at all. *Id.* § 7a-2(c)(5)(C)(ii). Thus, even assuming Kalshi's gaming contracts are swaps, the Special Rule raises a further question before Kalshi can establish exclusive federal authority: how does Congress's treatment of gaming contracts interact with the exclusive-jurisdiction provision on which Kalshi relies?

Congress did not clearly answer that question. The Special Rule authorizes the CFTC to prohibit certain gaming contracts from being listed or traded on a DCM, but it says nothing about how that authority affects the CEA's grant of exclusive jurisdiction. Nor does it explain the legal significance of a gaming contract that remains listed without a final determination under the Special Rule. The statutory text therefore leaves unresolved whether, and under what circumstances, gaming contracts fall within the CEA's grant of exclusive jurisdiction.

I therefore look to the CFTC's implementation of the Special Rule to determine whether the agency has supplied the clarity the statute itself does not.

ii.

The CFTC's implementation of the Special Rule does not eliminate the uncertainty left by the statutory text. If anything, it further muddies the water by not clarifying how the Special Rule operates and how it interacts with the CEA's grant of exclusive jurisdiction.

The CFTC's only final legislative rule implementing the Special Rule is Rule 40.11. That Rule provides that a registered entity "*shall* not list for trading or accept for clearing" an event contract that "involves, relates to, or references" gaming, terrorism, assassination, war, or activity unlawful under state or federal law. 17 C.F.R. § 40.11(a)(1) (emphasis added). It separately prohibits contracts involving activities "similar" to those expressly enumerated when the CFTC determines "by rule or regulation" that the activity is contrary to the public interest. *Id.* § 40.11(a)(2).

Read naturally, Rule 40.11 supports the view that gaming contracts categorically occupy a distinct place within the CEA's regulatory framework. Unlike subsection (a)(2), which requires an additional CFTC determination for activities merely "similar" to those expressly identified, subsection (a)(1) directs that DCMs "*shall* not" list contracts involving the enumerated activities, including gaming, at all. At a minimum, Rule 40.11 reflects the CFTC's view that gaming contracts are not treated like every other derivative contract traded on a DCM. It reasonably suggests that the agency made a categorical determination to exclude gaming, which is expressly named in subsection (a)(1), while reserving further rulemaking for other similar activities.

The CFTC's subsequent actions reinforce that understanding. In its 2023 order concerning Kalshi's congressional control contracts, the CFTC concluded that those contracts involved "gaming" and activity unlawful under state law, found them contrary to the public interest, and prohibited them under the Special Rule and Rule 40.11. *In re Certification by KalshiEX LLC of Derivatives Contracts with Respect to Political Control of the U.S. Senate & U.S. House of Representatives*, CFTC No. 23-14, at 7–13, 23 (Sept. 22, 2023).

In defending that order before the U.S. Court of Appeals for the D.C. Circuit, the CFTC repeatedly described the contracts as "election gambling contracts" and argued that the Special Rule authorizes the CFTC to prevent gambling through federally regulated

derivatives markets.[3] Brief for Appellant at 1–2, 28–56, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Oct. 16, 2024). Far from treating a contract's presence on a DCM as dispositive, the CFTC maintained that the Special Rule exists to determine whether gaming contracts should be permitted to trade there in the first place. *Id.* at 2, 38–56.

The CFTC's position in defending that order further confirms that it did not view a contract's presence on a DCM as placing the contract beyond the Special Rule. Rather, the CFTC argued that the Special Rule determines whether gaming contracts may be permitted to trade on a DCM in the first place. Brief for Appellant at 2, 38–56, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Oct. 16, 2024). The CFTC rejected the premise that a contract's listing on a federally regulated exchange necessarily establishes its lawfulness, explaining that such reasoning would "put[] the conclusion before the inquiry" by assuming the legality of election betting before completing the Special Rule analysis. *Id.* at 54.

At the same time, the CFTC has continued to revisit how the Special Rule should operate. In March 2026, it issued an advance notice of proposed rulemaking seeking public comment on the meaning of "gaming," the standards governing public-interest

---

[3] Although the contracts at issue in the CFTC's 2023 order involved wagering on congressional elections rather than sporting events, the CFTC determined that those election contracts themselves involved "gaming" because trading them entailed wagering on the outcome of electoral contests. *KalshiEX LLC v. CFTC*, No. 24-5205, at 28–38 (D.C. Cir. Oct. 16, 2024) (maintaining that a contract involves gaming when wagering is an essential feature or consequence of the transaction, even though the contract's underlying event is not itself a game). *See* 7 U.S.C. § 7a-2(c)(5)(C); 17 C.F.R. § 40.11(a). I discuss the order and the CFTC's appellate briefing not because the underlying events are analogous, but because they reflect the CFTC's interpretation of the Special Rule and Rule 40.11, including its position that election event contracts fall within the statutory category of "gaming." That interpretation informs the CFTC's broader understanding of the Special Rule governing gaming contracts, which is the same framework Kalshi invokes here.

determinations, and the procedures for reviewing prediction market event contracts. *Prediction Markets*, 91 Fed. Reg. 12,516, 12,520–25 (Mar. 16, 2026). Three months later, it proposed amendments to Rule 40.11 that would clarify the role of affirmative public-interest determinations and expressly acknowledged uncertainty regarding the operation of the Rule's current text. *Prediction Markets; Public Interest Determinations*, 91 Fed. Reg. 35,806, 35,818 (June 12, 2026) (proposed rule). Those proposals remain pending and therefore do not alter the text of Rule 40.11 presently in force. *See Medtronic, Inc.*, 518 U.S. at 505–06; *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006) (recognizing that courts may look to an agency's regulations, preambles, interpretive statements, and responses to comments to explain an ambiguous regulatory scheme and its application, but that such interpretive materials cannot override or conflict with the agency's duly promulgated regulatory text).

The point is not that the CFTC has adopted irreconcilable positions or that Rule 40.11 lacks meaning. Rule 40.11 remains the CFTC's only final legislative rule implementing the Special Rule, and the agency has explained by other means that gaming contracts warrant special treatment under the CEA. At the same time, the agency continues to examine how Rule 40.11 should operate and how the Special Rule should be implemented. Neither Congress nor the CFTC has therefore supplied a clear answer to the question central to this appeal: what jurisdictional significance should attach to gaming contracts that remain listed on a DCM despite Rule 40.11's prohibition, and how does the Special Rule affect the CEA's grant of exclusive jurisdiction over such contracts?

Because neither the statute nor the CFTC's implementation resolves that question with clarity, I cannot infer that Congress unmistakably intended to displace Maryland's traditional authority to regulate gambling. *See Dow Agrosciences LLC*, 544 U.S. at 449 (2005) (holding that when a federal statute reasonably permits competing readings of its preemptive scope, courts have "a duty to accept the reading that disfavors pre-emption" in light of the arisen ambiguity); *Medtronic, Inc.*, 518 U.S. at 489 ("Given the ambiguities in the statute and the scope of the preclusion that would occur otherwise, we cannot accept [Kalshi's] argument that by using" a term with preemptive force, "Congress clearly signaled its intent to deprive States of any role in" regulating the traditionally recognized state police power at issue); *GenBioPro, Inc.*, 144 F.4th at 272 (holding that a state law regulating a matter within the states' traditional police powers is not transformed into a regulation of exclusive federal domain merely because it incidentally affects a federally regulated subject).

iii.

Kalshi nevertheless argues that one fact resolves the issue here—because its sports event contracts continue to trade on a DCM, it is "traded and executed" on a designated market, and thus subject to the exclusive-jurisdiction provision. 7 U.S.C. § 2(a)(1)(A). Based on this, Kalshi asks us to conclude that Congress necessarily intended those contracts to trade nationwide free from contrary state gaming laws. Continued trading, however, does not answer the questions Congress and the CFTC left unresolved.

Contrary to Kalshi's position, the statutory and regulatory framework points in the opposite direction. The Special Rule provides that once the CFTC determines an event contract involving gaming to be contrary to the public interest, that contract "may [not] be

listed or made available for clearing or trading on or through a registered entity." *Id.* § 7a-2(c)(5)(C)(ii). Rule 40.11 similarly provides that a registered entity "*shall* not list for trading or accept for clearing" an event contract that "involves, relates to, or references" gaming. 17 C.F.R. § 40.11(a)(1) (emphasis added); *Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 400 (2008) ("use of the term 'shall' indicates an intent to impose discretionless obligations" (internal quotations omitted)); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("The . . . instruction comes in terms of the mandatory 'shall,' which normally creates an obligation impervious to judicial discretion."). Those provisions identify the contracts that cannot be listed or traded on a DCM and impose a legal obligation on the registered entity not to make such contracts available for trading. At the same time, the exclusive-jurisdiction provision applies only to transactions "traded or executed on a contract market designated pursuant to section 7." 7 U.S.C. § 2(a)(1)(A). Whether these contracts properly fall within that provision is therefore the question to be answered, and it is not one answered simply because the contracts continue to trade.

The CEA's self-certification process confirms as much. Under Rule 40.2, a DCM generally may list a new product without first obtaining formal approval from the CFTC by certifying that the product complies with the Commodity Exchange Act and the CFTC's regulations. *See* 17 C.F.R. §§ 38.7, 40.2. That certification must include, among other things, the exchange's legal analysis supporting its own conclusion that the contract complies with federal law. *See id.* § 40.2(a)(3). One of the regulations with which the exchange certifies compliance is Rule 40.11.

The CFTC's review occurs afterward. Rule 40.11(c) provides that, based on its review of a submission made under Rule 40.2 or Rule 40.3, the CFTC "may determine" that a proposed contract involves gaming or another activity identified in the Rule and initiate the Special Rule's review procedures. *Id.* § 40.11(c). *If* the CFTC undertakes that review, it requests that the exchange suspend listing or trading and ultimately issues an order approving or disapproving the contract. *Id.* § 40.11(c)(1)–(2).

The regulations therefore distinguish between an exchange's certification that a contract complies with federal law and the CFTC's own determination that it does. A self-certified contract reflects only the exchange's legal position. It does not constitute an affirmative determination by the CFTC that the contract complies with the Special Rule, that it is properly listed under the CEA, or that it is entitled to trade. As discussed above, the CFTC's ongoing rulemaking likewise recognizes that the operation of the Special Rule remains unsettled and that contracts may continue trading while the CFTC's review is ongoing. This demonstrates why continued trading alone cannot supply the explicit clarity necessary to answer the question before us.

Put simply, Kalshi's gaming contracts remain listed because Kalshi certified that they comply with the CEA and the CFTC has not issued a final determination requiring their removal. But that explains why the contracts continue to trade. It does not establish that they are traded pursuant to § 7 in the sense required for the CEA's grant of exclusive jurisdiction. Indeed, the very statutory and regulatory provisions governing gaming contracts provide that such contracts *shall* not be listed or traded if the Special Rule applies. Continued trading therefore cannot itself answer whether these contracts belong on a DCM

in the first place. That is precisely the legal/jurisdictional question Congress and the CFTC have left unresolved. The CFTC may ultimately agree with Kalshi's certification. It may ultimately reject it. It may determine that the contracts satisfy the Special Rule. It may determine that they do not. Or it may never exercise its authority to initiate a Rule 40.11 review. Neither the CEA nor the CFTC's regulations instruct courts to infer any one of those possibilities merely from the fact that trading continues.

Nothing in the CEA or the CFTC's regulations converts agency inaction into a determination carrying sweeping preemptive consequences. Rule 40.2 does not provide that a self-certified contract is deemed approved by the CFTC. Rule 40.11 does not provide that every contract remaining listed necessarily complies with the Special Rule. Nor does § 2(a)(1)(A) of the CEA provide that a contract's continued presence on a DCM conclusively establishes that it is being traded pursuant to § 7, where § 7 itself contains the Special Rule governing whether gaming contracts may be listed or traded on that market. The statute therefore does not clearly equate continued trading with exclusive federal authority free from state gaming laws.

Kalshi's argument ultimately asks us to treat the continued listing of its self-certified contracts as more legally significant than the text of the Special Rule and Rule 40.11. Neither Congress nor the CFTC has directed courts to do so. The question before us is not whether Kalshi's contracts ultimately satisfy the Special Rule. Nor is it whether the CFTC will eventually determine that those contracts may continue to trade on a DCM. The question is whether Congress clearly expressed an intent to withdraw Maryland's historic authority to regulate gambling based solely on the contracts' continued presence on a DCM. Here, the

statutory and regulatory framework leaves unresolved whether the continued listing of a self-certified gaming contract—despite an exchange's obligation not to make such contracts available—has any jurisdictional consequence, specifically whether such continued listing places the contract within the CEA's grant of exclusive jurisdiction.[4] Because neither the CEA nor the CFTC's regulations clearly attach that consequence to continued trading, I decline to infer an express grant of exclusive federal authority where Congress and the CFTC have not spoken with the clarity necessary to displace a state's traditional police powers.

Accordingly, the CEA does not field preempt Maryland's gaming laws.

B.

Finally, I address Kalshi's argument for conflict preemption. Kalshi alternatively argues that Maryland's gaming laws are conflict preempted because they make compliance with the CEA impossible and stand as an obstacle to Congress's objectives. I disagree.

Conflict preemption exists where "compliance with both federal and state regulations is a physical impossibility" or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. at 399 (internal quotation marks omitted); *Gen. Elec. Co.*, 496 U.S. at 79. "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."

[4] In its opening brief filed at the D.C. Circuit, discussed *supra* II.A.ii., the CFTC likewise recognized that exclusive federal authority over exchange trading does not necessarily displace state laws addressing separate state interests that Congress directed the CFTC to consider under the Special Rule. Brief for Appellant at 51–56, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Oct. 16, 2024).

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). Assessing conflict preemption requires "a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question [of] whether they are in conflict." *H & R Block Eastern Enterprises, Inc. v. Raskin*, 591 F.3d 718, 723 (4th Cir. 2010) (quoting *Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317 (1981)).

As discussed above, the CEA requires Kalshi, as a DCM, to comply with the CEA and the CFTC's regulations governing the listing and trading of derivatives contracts, including the self-certification requirements applicable to new event contracts. Recall that the Maryland law at issue here does not prohibit DCMs or derivatives trading generally. It requires entities offering sports wagering within Maryland to (1) obtain a state license before accepting wagers from persons located in the state; (2) refrain from advertising targeting individuals who are prohibited from participating in sports wagering and other at-risk individuals; and (3) avoid false or deceptive advertising. *See* Md. Code Ann., State Gov't § 9-1E-03.

Kalshi contends these requirements conflict with the CEA. None of its arguments establishes conflict preemption.

For one, Kalshi argues that Maryland's gaming requirements frustrate Congress's objective of creating a nationally regulated derivatives market administered by the CFTC. I am not persuaded.

Kalshi's argument rests on the premise that because the CEA establishes its objective as creating a nationally regulated derivative market, this reflects a congressional objective to ensure that every contract listed on a DCM may trade nationwide free from state gaming laws. But neither the text of the CEA nor the CFTC's implementation of it

clearly establishes such an objective with respect to gaming contracts.[5] As explained above, the CEA's exclusive-jurisdiction provision and the Special Rule leave unresolved the jurisdictional significance of a self-certified gaming contract that remains listed on a DCM while the Special Rule's applicability remains unsettled.

Because neither Congress nor the CFTC has clearly determined that self-certified gaming event contracts are entitled to trade nationwide free from state gaming laws, I decline to infer that Congress intended to displace Maryland's traditional authority to regulate gambling. *See Medtronic, Inc.*, 518 U.S. at 489.

Maryland's licensing requirement therefore does not frustrate a clearly expressed congressional objective. *See Dow Agrosciences*, 544 U.S. at 450 ("Dow and the United States greatly overstate the degree of uniformity and centralization that characterizes [federal statute at issue]."). It does not determine whether a gaming contract may be listed

---

[5] In fact, the text of the CEA is contrary to Kalshi's argument here. True, Congress sought to centralize federal regulation of derivatives markets by establishing a uniform federal regulatory framework administered by the CFTC. However, that objective is not frustrated merely because Maryland requires entities offering sports wagering within its borders to obtain a state license and abide by advertising restrictions. Maryland does not regulate the operation of DCMs as such. Nor does it purport to administer the CEA or the CFTC's regulatory program. It regulates the separate question of *who* may lawfully offer sports wagering within Maryland.

Indeed, Kalshi's obstacle preemption argument sits uneasily with the CEA's own statement of purpose. Congress identified among the Act's objectives protecting market participants and the public, promoting responsible innovation and fair competition, and ensuring the financial integrity of derivatives markets. *See* 7 U.S.C. § 5. Maryland's licensing and advertising requirements further those same kinds of consumer protection and market integrity interests. Whatever their merits as a matter of state policy, they cannot fairly be characterized as frustrating the objectives Congress identified in the CEA. This further undercuts Kalshi's argument that state regulations governing licensing and advertising frustrate Congress's purpose for enacting the CEA.

or traded on a DCM—that authority remains with the CFTC. Instead, it imposes generally applicable conditions on entities that choose to offer these sports event contracts within Maryland, including obligations to obtain a license and comply with applicable advertising restrictions. Those requirements leave Kalshi free to operate its federally regulated exchange while requiring compliance with Maryland law when it elects to offer these sports event contracts to persons located within the state. *See Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963) (explaining that impossibility preemption exists only where compliance with both sovereigns' requirements is impossible).

Kalshi also argues that Maryland's licensing regime improperly intrudes on the CFTC's authority to determine whether gaming contracts are contrary to the public interest. That argument appears to assume that Maryland's licensing determination requires the state to reach its own conclusion regarding whether a particular gaming contract should be permitted to trade. But, as I have already said, Maryland's licensing regime does not determine whether a contract may be listed or traded on a DCM, nor does it determine whether a contract is contrary to the public interest under the Special Rule. Those questions remain with the CFTC. Maryland instead regulates whether an entity offering sports wagering within the state must obtain a license and comply with generally applicable requirements governing licensed operators, including advertising restrictions.

The possibility that the CFTC and Maryland could nevertheless reach different conclusions in exercising their respective regulatory authorities does not itself create a present conflict. If the CFTC ultimately determines under the Special Rule that a gaming contract may not trade on a DCM, federal law controls. If the CFTC permits the contract

to trade while Maryland requires a state license before an entity may offer those contracts to persons located within its borders, Kalshi may comply with both sovereigns by satisfying Maryland's licensing requirements or declining to offer the individual contracts within the state. The mere *possibility* that federal and state regulators could exercise their respective authorities differently does not establish that compliance with both regimes is impossible or that Maryland's licensing requirement frustrates Congress's objectives. Kalshi cannot manufacture a conflict by choosing not to comply with one sovereign's otherwise valid regulatory requirements. *See Wyeth v. Levine*, 555 U.S. 555, 573 (2009) ("Impossibility pre-emption is a demanding defense.").

Accordingly, Maryland's gaming laws neither make compliance with federal law impossible nor stand as an obstacle to the accomplishment of Congress's objectives. They therefore are not conflict preempted.

III.

Accordingly, my conclusion is a narrow one. I need not decide whether Kalshi's sports event contracts are swaps or resolve the other questions the CEA and the CFTC have left open. Even assuming the contracts are swaps, Kalshi has not shown that the CEA clearly displaces Maryland's concurrent authority to regulate sports gambling or that compliance with both federal and state law is impossible.

Congress knows how to displace traditional state police powers when it chooses to do so. Here, it has not done so with the clarity our precedents require. I would therefore decline to infer preemption from this unsettled statutory and regulatory scheme. Until

Congress and the CFTC are clear, I conclude that Maryland has concurrent authority under these facts. *Dow Agrosciences*, 544 U.S. at 452 (where Court declined to find preemption, it allowed concurrent jurisdiction in the form of "state rules that are fully consistent with federal requirements").

THACKER, Circuit Judge, concurring in the judgment:

Although I ultimately concur in the bottom line opinion, that is, affirmance of the district court, I get there via a different route than does my concurring colleague.

KalshiEX, LLC ("Appellant") operates a prediction market. On that market, users enter into contracts with one another in which they try to predict whether or not a given event will occur. This appeal focuses on Appellant's sporting event based contracts. For instance, a user can predict whether a given NASCAR driver will win Talladega, or whether a college basketball team will win or lose a particular game. If the prediction is correct, the user gets paid. If not, they lose money.

In this appeal, we are asked whether Appellant's sporting event based contracts are "swaps" as defined by the Commodity Exchange Act ("CEA"). In my view, Appellant's sporting event based contracts are not swaps within the meaning of the CEA. *See also*, *KalshiEX, LLC v. Assad,* No. 25-7516, 2026 WL 2543846 (9th Cir. Aug. 28, 2026). As a result, I would hold that Appellant's contracts lie beyond the exclusive regulatory authority of the Commodity Futures Trading Commission ("CFTC"). Therefore, Maryland officials can co-regulate these contracts.

I.

This case presents a routine issue of statutory interpretation. Such analysis begins with the text. *Harrell v. Freedom Mortg. Corp.*, 976 F.3d 434, 439 (4th Cir. 2020) ("When interpreting a statute, we start with its text."). And when analyzing the text, I apply the ordinary "interpretive principles and canons" of construction. *Emps.' Innovative Network, LLC v. Bridgeport Benefits, Inc.*, 144 F.4th 571, 581 n.16 (4th Cir. 2025). Absent some

indication to do otherwise, the text is accorded its ordinary meaning. *United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020); *see also United States v. Mills*, 485 F.3d 219, 222 (4th Cir. 2007) ("It is a cornerstone of statutory interpretation that an undefined term is construed 'in accordance with its ordinary or natural meaning.'" (quoting *FDIC v. Meyer*, 510 U.S. 471, 476 (1994))). And, finally, statutes must be read in a manner that leads to sensible results, as opposed to absurd ones. *United States v. Young*, 989 F.3d 253, 260 (4th Cir. 2021) ("[C]ourts . . . should interpret statutes to avoid absurdities.").

II.

With those guiding principles in mind, I now turn to the statute under examination. Section 1a(47)(A)(ii) of the CEA defines a "swap," in pertinent part, as:

> [A]ny agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence.

7 U.S.C. § 1a(47)(A)(ii). When parsed out, the statute provides two independent requirements a contract must meet before it can be considered a swap. First, the contract's payment must "depend[] on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency." *Id.* Second, that "event or contingency" must be "associated with a potential financial, economic, or commercial consequence." *Id.*

Appellant contends that its sporting event based contracts meet both requirements and are therefore swaps. First, Appellant asserts that someone winning a sporting event, such as the Super Bowl or World Cup, is an event. Second, Appellant contends that the

outcome of a sporting event, i.e., who wins the game or tournament, has "financial consequences for a broad ecosystem of stakeholders, including team sponsors, advertisers, television networks, franchises, local communities, and more." Appellant's Reply Br. at 25. But this argument pays short shrift to the statutory text, embraces an archaic meaning over an ordinary meaning, and reaches an absurd result that would criminalize any sports bet placed in the United States -- from Las Vegas casinos to local pool halls.

A.

I begin with the first requirement in the definition of a "swap" in the CEA: that payment "depend[] on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency." 7 U.S.C. § 1a(47)(A)(ii). The CEA does not define either "occurrence" or "event." So, to determine what Congress meant when it used those two terms, I look to common dictionaries from 2010, when Congress amended the CEA as part of the Dodd-Frank Act.[1] *FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011) ("When a statute does not define a term, we typically 'give the phrase its ordinary meaning.'" (quoting *Johnson v. United States*, 559 U.S. 133, 138 (2010))); *Davidson v. United Auto Credit Corp.*, 65 F.4th 124, 129 (4th Cir. 2023) ("Searching for the plain meaning of a statute's text often starts with reading dictionaries published close in time to when it was enacted.").

Dictionaries from the time define an "occurrence" as "[s]omething that happens or takes place." *Occurrence*, Black's Law Dictionary (9th ed. 2009); *see also Occurrence*,

[1] Congress added swaps to the CFTC's exclusive jurisdiction as part of the Dodd-Frank Act. Pub. L. No. 111-203, 124 Stat. 1376 (2010).

Merriam-Webster's Collegiate Dictionary (11th ed. 2003) (defining "occurrence" as "something that occurs" and "the action or instance of occurring"). Additionally, dictionaries from the time give "event," a similar, albeit slightly different, definition: "a thing that happens, esp. one of importance." *Event*, New Oxford American Dictionary (3d ed. 2010); *see also Event*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) (defining "event" as "a noteworthy happening"); *Event*, The American Heritage Dictionary of the English Language (5th ed. 2011) (defining "event" as "something that takes place, especially a significant occurrence"). And a "contingency" is "an event" "that may but is not certain to occur." *Contingency*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003); *see also Contingency*, New Oxford American Dictionary (3d ed. 2010) (defining a "contingency" as "a future event or circumstance that is possible but cannot be predicted with certainty"). Thus, properly defined, a "swap" is a contract that has a payment obligation dependent upon whether or not, or to what extent, an important event occurs or takes place.

Some sporting event hypotheticals help illustrate how this definition applies. Take, for instance, a boxing promoter that is concerned about a highly touted boxer missing weight. To hedge against that risk, the promoter enters a contract, in which he predicts the event -- the prize fight -- will not occur. Or, consider a sponsor of that same fight, who is worried that the boxer will make weight but knock out his opponent in a matter of seconds. Fearing the money she spent to have her company's logo emblazoned on the mat will be wasted if the fight lasts only a few moments, she enters a contract and predicts that the fight will last less than three rounds. In the first scenario, payment is conditioned on an

event failing to occur; in the second, payment is conditioned on the extent that same event did occur. But, in each, payment depends on whether or to what extent the event occurs. This is not so with Appellant's sporting event based contracts.

Rather than conditioning payment on whether or to what extent an event takes place, Appellant's sporting event based contracts condition payment on the *result* of an event. In other words, these contracts take for granted that the selected event will occur (and occur to completion, at that). For Appellant's contracts, whether a prediction turns out to be right or wrong -- and who gets paid -- depends solely on the *outcome of the completed sporting event*. But the outcome of an event is not the occurrence of the event. They are two different things, and Congress defined a swap to cover only one of the two -- the occurrence. Because Appellant's sporting event based contracts revolve around the other -- the outcome -- they fall outside the definition of a swap.

At argument, Appellant's counsel acknowledged that its argument hinges on the event being the outcome rather than being the occurrence of the event itself. As support, Appellant's counsel offered, "dictionary after dictionary expressly defines 'event' to include 'outcomes.'" Oral Argument at 55:56–56:04, *Kalshiex LLC v. Martin*, No. 25-1892 (4th Cir. May 7, 2026), https://www.ca4.uscourts.gov/OAarchive/mp3/25-1892-20260507.mp3 (hereinafter "Oral Argument"). Thus, in Appellant's view, the outcome of an event can itself be the event, and therefore its sporting event based contracts meet the first prong of the definition of a swap.

True, some dictionaries define event to include an outcome. *See, e.g.*, *Event*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). But, critically, those same

dictionaries caution that this definition of event is "archaic." *Event*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) (defining "event" to mean "outcome" but cautioning that this definition is "archaic"); *see also Event*, The American Heritage Dictionary of the English Language (5th ed. 2011) (same).

The dictionaries literally state, "archaic: outcome," *Event*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003), and "Archaic[:] a final result; an outcome," *Event*, The American Heritage Dictionary of the English Language (5th ed. 2011) (emphasis omitted). And courts are to "give words their ordinary, contemporary, and common meaning." *Scott v. United States*, 328 F.3d 132, 139 (4th Cir. 2003). "Archaic" is antithetical to "ordinary, contemporary, and common."

As a result, I reject the idea that the outcome of a sporting event is itself an event. Instead, I would adopt the common sense conclusion that an event, in the sports context, is the contest or match itself. *Event*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ("event" means "any of the contests in a program of sports"); *Event*, New Oxford American Dictionary (3d ed. 2010) ("event" means "each of [the] several particular contests making up a sports competition"). Because Appellant's sporting event based contracts do not condition payment on whether or to what extent an event takes place, I would hold that they fail the first prong of the swap test.

B.

To read the statute otherwise is not just at odds with the plain text of § 1a(47)(A)(ii), it results in an absurdity. *See United States v. Young*, 989 F.3d 253, 260 (4th Cir. 2021) ("[C]ourts, of course, should interpret statutes to avoid absurdities.").

For the past 16 years, the CEA has required laypeople that want to execute or trade swaps to do so on a prediction market. 7 U.S.C. § 2(e) ("It shall be unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market under section 7 of this title.").[2] In other words, it is illegal for the average American to enter a swap off market.

Americans have been gambling on sports for centuries. In fact, Americans have been gambling on stick and ball sports since the 1800s. Alexandra Eichner, *Supreme Court Makes it Easier for People to Win Big*, 43 Nova. L. Rev. 21, 27 (2018). Yet no one has ever suggested that Americans must use a prediction market and be subject to the regulatory authority of the CFTC in order to place their sports bets -- until now, that is.

After all, Appellant's sporting event based contracts are no different than traditional sports bets. Indeed, Appellant previously held itself out as a sports betting platform. And Appellant's counsel admitted as much at oral argument. Oral Argument at 8:08–12 (Appellant's counsel stating, "I don't dispute that a year ago we did advertise as sports betting"); *see also KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 235 (3d Cir. 2026) (Roth, J., dissenting) (screenshot from Appellant's social media page, in which Appellant held itself out as "The First Nationwide Legal Sports Betting Platform"). It is telling that, now that it is trying to distance itself from traditional sports bets and evade State regulation, Appellant

---

[2] An "eligible contract participant" is a sophisticated entity such as a financial institution, insurance company, investment company, commodity pool, corporation, partnership, and the like. *See* 7 U.S.C. § 1a(18).

no longer uses those advertisements. When Appellant's counsel was asked at argument why Appellant no longer markets itself as a sports betting platform, counsel deflected, "because it has caused the very confusion that I think, you know, is raised in briefs against us." Oral Argument at 8:15–20. I, for one, am not confused. What is happening here is sports betting. In both sporting event based contracts and traditional sports bets, two parties enter an agreement in which the party that correctly predicts the outcome of a sporting event gets paid. That is gambling, plain and simple.

Appellant tries to distinguish itself from a traditional sports book or casino by pointing out that Appellant, unlike the house, is not a party to the gambling agreement. But that is a distinction without a difference. In a swap, just as in a traditional sports bet, two parties stake money on the outcome of a sporting event. Thus, Appellant's contracts meet the definition of a swap, then so would nearly every sports bet in America, and federal law would require every sports bet from here on out to be placed exclusively on prediction markets or run afoul of federal law. This is not to mention the fact that nearly every off-market sports bet that has been placed over the better part of the past two decades -- whether in Drafts Kings or on the green at the country club -- was illegal, per the CEA.

As a result, what has been an area of traditional State regulation will suddenly become an exclusively federal domain. *Johnson v. Collins Ent. Co.*, 199 F.3d 710, 720 (4th Cir. 1999) ("The regulation of gambling enterprises lies at the heart of the state's police power."). Not only will States be stripped of their historic police power to regulate conduct that has come to permeate American society, but every bit of regulatory oversight of sports gambling will also be funneled to the Commodity Futures Trading Commission -- an entity

that was never intended to be the sole regulator of every nook and cranny of sports betting in America. *See id.* ("The question of how best to regulate gambling activity is also one to which different states can arrive at different answers based on their different experiences.").

As the Supreme Court has said time and again, Congress "does not . . . hide elephants in mouseholes." *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). Nor does Congress cause a sea change in our federalist system -- and strip States of their age-old police powers -- without clearly expressing an intent to do so. *See Banister v. Davis*, 590 U.S. 504, 515 (2020) ("When Congress intends to effect a change in existing law . . . it usually provides a clear statement of that objective." (internal quotation marks and citation omitted)). And Congress has never given us any indication -- much clear a one -- that it intended to create upheaval and upend the existing balance of power between States and the federal government when it placed swaps within the exclusive regulatory jurisdiction of the CFTC.

Indeed, Congress first defined swaps and placed them within the exclusive regulatory jurisdiction of the CFTC when it passed the Dodd-Frank Act in 2010. Pub. L. No. 111-203, 124 Stat. 1376 (2010). Notably, Congress enacted Dodd-Frank "in the wake of the 2008 financial crisis . . . to 'promote the financial stability of the United States by improving accountability and transparency in the financial system.'" *Digit. Realty Tr., Inc. v. Somers*, 583 U.S. 149, 155 (2018) (quoting 124 Stat. 1376 (2010)). Specifically, Congress enacted Dodd-Frank to "bring[] risky financial products out of the shadows that had threatened the stability of the entire U.S. financial sector, and which had catastrophic

ripple effects on the U.S. and world economies during the financial crisis of 2007-2008." *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1031 (D. Nev. 2025). This stated purpose of Dodd-Frank has nothing to do with sports betting -- because it clearly was not intended to give the federal government the exclusive prerogative to regulate sports betting.

Therefore, I would hold that Appellant's sporting event based contracts are <u>not swaps</u>, and I would affirm the district court on that basis.

DEANDREA GIST BENJAMIN, Circuit Judge, dissenting:

This case concerns whether the Commodity Exchange Act ("CEA") preempts Maryland's application of its gambling laws to KalshiEX's ("Kalshi") sports-related event contracts traded on a federally regulated exchange. Kalshi argues that because it operates as a designated contract market ("DCM") under the CEA, its contracts fall within the exclusive jurisdiction of the Commodity Futures Trading Commission ("CFTC"). Maryland argues that Kalshi's contracts are functionally indistinguishable from sports betting and thus remain subject to traditional state authority over gambling.

This appeal turns on two issues: (1) whether Kalshi's sporting event contracts are "swaps" under the CEA and, if so, (2) whether the CEA preempts otherwise applicable state law. Because I think Kalshi's sports-related event contracts are "swaps" under the CEA, and because Congress has granted "exclusive jurisdiction" over such swaps to the CFTC, I would vacate the district court's denial of the preliminary injunction and remand for further proceedings. I respectfully dissent.

## I. Kalshi's Sporting Event Contracts are "Swaps" Under the CEA

### A. The CEA

The first issue is whether Kalshi's sporting event contracts are "swaps" under the CEA. When interpreting a statute courts "start, as always, with the text." *Bufkin v. Collins*, 604 U.S. 369, 379 (2025). The relevant portion of the CEA defines a swap as:

> [A]ny agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the

> occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence.

7 U.S.C. § 1a(47)(A)(ii).

So, for a contract to be a "swap" it must (1) condition payment "on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency," and (2) that the "event or contingency" at issue must be "associated with a potential financial, economic, or commercial consequence." Thacker Concurrence at 38.[1]

**i. Occurrence, Nonoccurrence, or the Extent of the Occurrence of an Event or Contingency**

First, I must determine whether Kalshi's sporting event contracts are "events" under the CEA. "A plain reading of the [CEA's] text suggests that Kalshi's sports-event contracts fit comfortably within the statutory definition." *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 227 (3d Cir. 2026); *KalshiEX LLC v. Schuler*, No. 26-3196, 2026 WL 2884087, at *9 (6th Cir. 2026) ("[T]he better reading of the statute is that "occurrence" merely clarifies that the provision's reach depends on whether an event happens in full, in part, or not at all.").

The second concurrence reads the statute differently. Relying on dictionaries of the time, it concludes that "a 'swap' is a contract that has a payment obligation dependent upon whether or not, or to what extent, an important event occurs or takes place." Thacker Concurrence at 37. It then uses this definition to distinguish an "event," like a boxing match, from an "outcome"—*i.e.*, the victor of the bout. In other words, the second

[1] For ease of reference only, I will refer to Judge Gregory's concurrence as the first concurrence and Judge Thacker's concurrence as the second concurrence.

concurrence distinguishes an event happening from the event's later result. I think this interpretation artificially narrows the meaning of "event."[2] I find it hard to agree that the outcome of a sporting event, such as whether a team wins a game, is not the "occurrence" of an event—even if it is also the "outcome" of an event. In my view, these terms are not mutually exclusive.[3]

The Dodd-Frank Act's "special rule" confirms this conclusion. This rule gives the CFTC discretionary power to review and prohibit six categories of contracts if it concludes they are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C), (C)(i). Relevant here, those categories include contracts that involve "gaming" or "other similar activity

---

[2] While I reach a different conclusion, the second concurrence is not alone in its distinction between "event" and "outcome". The Ninth Circuit also used this reasoning to find that Kalshi's sports-related derivatives are not "swaps" under the CEA. *KalshiEX, LLC v. Assad*, No. 25-7516, 2026 WL 2543846, at *8–9 (9th Cir. Aug. 28, 2026).

[3] Adopting the second concurrence's position reveals problems. If a sporting contest is an "event" but the resulting outcome is not, the definition of a "swap" devolves into semantics. For example, rather than an event contract being written as "Bills Win Super Bowl," a DCM could invoke the exclusive jurisdiction of the CEA by changing the wording to "Victory Parade Held in Buffalo Following Super Bowl" or "Lombardi Trophy Presented to Bills." In my opinion, this is equally as concerning as the second concurrence's position that the definition of "event" must exclude "outcomes."

The "event" versus "outcome" distinction also fails because every "event" could itself be framed as the "outcome" to some prior event. The boxing match in the second concurrence, or the Super Bowl example above, can both be framed as outcomes to prior events—either training camps, earlier matches, or certain record statistics. The second concurrence's attempt to narrow the scope of "swap" to what it describes as "events" and not "outcomes" at first appears to provide clarity, but further obfuscates what an "event" is. In my view, a simpler rule is better—an outcome can be, and in fact often is, an event of its own. *Flaherty*, 172 F.4th at 228 ("[E]vent outcomes associated with economic consequences . . . fit within the [CEA]'s definition of 'swaps' subject to the CFTC's jurisdiction." (citing 7 U.S.C. §§ 2(a)(1)(A), 1a(47)(A)(ii))).

determined by the [CFTC], by rule or regulation, to be contrary to the public interest." 7 U.S.C. §§ 7a-2(c)(5)(C)(i)(V)–(VI). The CFTC codified the special rule in a regulation, 17 C.F.R. § 40.11 (2011), which prohibits a DCM from listing or trading "[a]n agreement, contract, transaction, or swap based upon an excluded commodity . . . which involves, relates to, or references . . . gaming."

During the debate over this provision, Senators Blanche Lincoln and Dianne Feinstein emphasized the CFTC's need for authority to protect the public interest by banning event contracts based on, for example, sporting events. The senators' exchange confirmed that such contracts serve "no commercial purpose" and are offered "solely for gambling" rather than a "commercial" or "hedging" use. 156 Cong. Rec. S5906–07, 2010 WL 2788026. Senator Lincoln noted that "[i]t would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament" and that "[t]hese types of contracts would not serve any real commercial purpose," but instead "would be used solely for gambling." *Id.*

The special rule's authority over gaming necessarily means that there can be event contracts around gaming. Based on the special rule and the above colloquy, it's the CFTC's responsibility to differentiate swaps used for gaming from those which can be used for legitimate risk avoidance. Just because the CFTC isn't exercising discretion to the degree Maryland would like under the CEA, doesn't mean that sports-related contracts don't

qualify as swaps.[4] This is consistent with Congress' decision to define "swaps" broadly and to bring a wide range of event contracts within the CFTC's regulatory framework. *KalshiEX, LLC v. Assad*, No. 25-7516, 2026 WL 2543846, at *17 (9th Cir. Aug. 28, 2026) (Lee, J., concurring) (noting that while the special rule "appears to give the CFTC discretion whether to ban altogether gaming contracts . . . the statute does not seem to categorically bar all gaming contracts, despite the text and contextual clues suggesting otherwise").

This conclusion makes sense because sports-related contracts can serve the same economic functions as derivatives. Derivatives such as futures and swaps can help commercial actors hedge real-world risk and present similar risk profiles. *See generally* Steven L. Schwarcz, *Regulating Derivatives: A Fundamental Rethinking*, 70 Duke L.J. 545, 557–60 (2020) ("[D]erivatives are not inherently riskier than the option contracts and guarantees they functionally represent."). Commercial actors in sports face genuine financial exposure tied to team performance or event outcomes. For example, a sponsor with revenue tied to a team's postseason performance, or a hospitality business dependent on tournament attendance, could use these contracts to hedge downside risk. Kalshi states that some sports books have even turned to Kalshi's contracts to hedge their financial risks.

[4] As my colleague notes in the first concurrence, the CFTC is authorized to "determine" that an event contract is "contrary to the public interest" if it involves, among other things, gaming. Gregory Concurrence at 19 (quoting § 7a-2(c)(5)(C)(i)). If the CFTC makes that determination, "[n]o agreement, contract, or transaction" so determined "may be listed or made available for clearing or trading on or through a registered entity." § 7a-2(c)(5)(C)(ii). Congress further authorized the CFTC to determine the continuing eligibility of clearing organizations to clear such contracts. *Id.* §§ 2(a)(1)(A), 7a-2(c)(5)(C)(iii).

Reply Br. [ECF No. 59] at 34[5] (citing Brett Smiley, *Underdog Sports Preparing to Use Kalshi, Prediction Markets For Its Own Risk Management*, In Game (Oct. 22, 2025), https://www.ingame.com/underdog-kalshi-pm-risk-management/ [https://perma.cc/BT4A-BK8T]. This use suggests that the contracts are tied to an economic consequence.

As for the second concurrence's conclusion that Kalshi's derivatives market is "gambling, plain and simple," Thacker Concurrence at 41, or the Ninth Circuit's position that Kalshi "has a gambling problem," *Assad*, 2026 WL 2543846, at *10, the presence of speculative trading—*i.e.*, trading by non-commercial actors like gamblers—doesn't disqualify these contracts from being swaps. Modern futures markets are dominated by traders with no intention of taking delivery of the underlying commodity and instead use derivatives to hedge risk. Lynn A. Stout, *Why the Law Hates Speculators: Regulation and Private Ordering in the Market for OTC Derivatives*, 48 Duke L.J. 701, 766 (1999) (explaining that while some traditional derivatives users "are driven by speculative passions," many "employ derivatives to hedge against business risks from fluctuating interest rates and commodity prices"). The fact that many participants trade sports-event contracts for entertainment doesn't negate the contracts' utility in hedging. Indeed, statutory language doesn't require that a contract be used primarily for hedging or that the underlying event be a traditional commodity or financial instrument. It requires only that the contract be tied to an event associated with a "*potential* financial, economic, or

---

[5] Page numbers for citations to ECF documents utilize the page numbers in the header on each document.

commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). There is no requirement that all users participate strictly for business.

Accordingly, I would find that Kalshi's sports-event contracts qualify as "events" and thus satisfy the first prong of the "swap" definition.

**ii. Potential Financial, Economic, or Commercial Consequence**

Next, an "event or contingency" must be "associated with a potential financial, economic, or commercial consequence" to qualify as a "swap." 7 U.S.C. § 1a(47)(A)(ii). Kalshi's sporting event contracts satisfy this prong.

Outcomes in professional and collegiate sports undeniably have economic consequences, including impacts on ticket sales, broadcasting revenue, sponsorships, and related markets. For example, mass ticket resellers might hedge their investments in seating against low fan attendance or poor team performance. Additionally, hotels, bars, and restaurants near prominent stadiums might use Kalshi's contracts to limit risks for a losing season, player injuries and trades, or extreme weather. For instance, Murphy's Bleachers, a famed Chicago sports bar, might like the opportunity to limit risk related to a midseason slump in the Cubs' performance. Under a literal reading, the statutory language is sufficiently broad to encompass these contracts.

That said, Maryland makes a valid point that a limiting principle is needed. Appellees' Br. [ECF No. 27] at 66. A limitless definition of "swap" could have far reaching results. If "swap" includes any agreement that pays out based on the occurrence of an event with some conceivable economic consequence, then the definition might extend to casino games, sportsbook wagers, office pools, charity raffles, and even private bets

between individuals. At that point, there would be no meaningful boundary between derivatives markets and everyday gambling.[6] *See Flaherty*, 172 F.4th at 233 (Roth, J., dissenting) ("[E]ven a bet over the outcome of a friendly neighborhood ping pong match may have a '*potential* financial . . . consequence' because one of the bettors would reap a financial reward based on the match's outcome." (quoting 7 U.S.C. § 1a(47)(A))). Here, there are several established limiting principles that stop event contracts from overreaching into the traditionally state-regulated area of gambling.

Common sense partially limits the definition. When Congress enacted the Dodd-Frank Act and incorporated the modern definition of "swap," traditional gambling markets were already deeply embedded in state regulatory frameworks. If Congress had intended to displace that system and bring all gambling under the CEA, it would have said so. *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[I]t is generally presumed that Congress

[6] That reading quickly becomes concerning when its consequences are taken seriously. If all such wagers were "swaps," then the CFTC would effectively become the primary regulator of all gambling activity in the United States. Casinos, sportsbooks, and other gaming operators, which have long been regulated by the states, would suddenly fall within the CFTC's exclusive jurisdiction. That would represent a sweeping reallocation of regulatory authority from the states to a federal financial regulator that Congress never intended.

The problem worsens when considered alongside 7 U.S.C. § 2(e), which makes it unlawful to trade swaps off DCMs. Under a limitless definition, anyone placing a bet outside a DCM engages in illegal off-exchange swap trading. That would mean ordinary gambling activity, widely accepted and regulated under state law, would suddenly constitute a federal crime. *See Flaherty*, 172 F.4th at 233 (Roth, J., dissenting) ("[B]ecause the trading of swaps outside DCMs is illegal under 7 U.S.C. § 2(e), any individual who engages in gambling outside of a DCM would commit a felony were we to take the definition of swaps to its logical extreme.").

acts intentionally and purposely." ); *Assad*, 2026 WL 2543846, at *17 (Lee, J., concurring) ("Given that sports gambling is a multibillion-dollar industry historically regulated by states and Indian tribes, it would seem odd to read abstract terms such as 'event' and 'financial, economic, or commercial consequence' as upending this longstanding regulatory regime."). Instead, it used general language about events associated with financial, economic, or commercial consequences. 7 U.S.C. § 1a(47)(A)(ii).

The "associated with" language of the CEA also provides a limit. This phrase suggests a meaningful connection between the event contract and genuine financial or commercial exposure. 7 U.S.C. § 1a(47)(A)(ii). This means that event contracts which have potential economic consequences independent of the underlying event—individual game results, season outcomes, or the Super Bowl for example—would qualify as "swaps." Thus, commercial users would be allowed to use event contracts to hedge risk. Alternately, traditional sports betting functions such as parlays[7] and props,[8] would not fall under the

---

[7] A parlay is a single sports bet that links together two or more individual wagers (legs), requiring all selections to win for the bet to pay out. It offers higher returns for a smaller stake, with odds multiplying for each added leg, but is much harder to win than a single bet because one loss causes the entire bet to fail. Gene Menez, *Parlay Betting Guide: What a Parlay Bet Is and How It Works*, SPORTSLINE (Aug. 19, 2026), https://www.sportsline.com/guides/parlay [https://perma.cc/6PLD-5536]. One example would be picking the South Carolina Gamecocks to win (leg 1); picking the Carolina Panthers to win (leg 2); and picking the Charlotte Hornets to win (leg 3). Although these individual events may have independent financial consequences, when chained together they much more closely resemble traditional sports betting and thus often would fall outside the definition of a "swap."

[8] Proposition bets, or "props," are wagers on specific events or individual player performances within a game, separate from the final outcome. They include player statistics (*e.g.*, passing yards, rebounds, home runs) and game occurrences (*e.g.*, first team (Continued)

definition because they could not reasonably be used to hedge, have no independent economic consequence, and are better understood as pure speculation.

Lastly, courts avoid interpretations that lead to outcomes plainly inconsistent with legislative intent. *Lara-Aguilar v. Sessions*, 889 F.3d 134, 144 (4th Cir. 2018) ("We are to avoid 'interpretations of a statute which would produce absurd results . . . if alternative interpretations consistent with the legislative purpose are available.' " (ellipsis in original) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982)). A reading that would make ordinary casino gambling a federal crime or place every private wager under the jurisdiction of the CFTC is precisely the kind of result that violates this principle. *See W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 723 (2022) ("Extraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].' " (alteration in original) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)).

* * *

Thus, Kalshi's sports-related event contracts satisfy the second prong of the "swap" definition and are "swaps" under the CEA. The contracts are dependent on the occurrence of an event and are associated with potential financial consequences. Having concluded

---

to score or total corners). Josh Nagel, *Prop betting guide: What Props are and How to Bet on Them*, SPORTSLINE (Aug. 19, 2026), https://www.sportsline.com/guides/props [https://perma.cc/EZU5-MQ5V].

that Kalshi's contracts are "swaps," the second question is whether the CEA preempts Maryland law. In my opinion, it does.[9]

## II. Maryland Law is Field Preempted by the CEA

Because I conclude that Kalshi's sporting event contracts are "swaps," the second issue is whether the CEA preempts Maryland law. I believe Maryland law is field preempted and so Maryland can't regulate the contracts at issue.

### A. Field Preemption

Field preemption applies where "Congress 'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation,' " *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (quoting *R.J. Reynold Tobacco Co. v. Durham Cnty*, 479 U.S. 130, 140 (1986)), "or where 'there is a federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject,' " *Arizona v. United States*, 567 U.S. 387, 399 (2012) (ellipsis in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). This high standard is met only in

---

[9] I depart from the first concurrence on this issue because, in my view, a finding that preemption applies depends upon Kalshi's sports-related contracts qualifying as "swaps." Gregory Concurrence at 7. ("I do not decide whether Kalshi's sports event contracts are 'swaps' within the meaning of the CEA. That is because, even assuming they are, neither the [CEA] nor the CFTC's implementation of it clearly establish that such contracts are entitled to trade on a DCM free from state gaming laws."); *see also Flaherty*, 172 F.4th at 233 (Roth, J., dissenting) ("[B]ecause I would rule against Kalshi on the basis of preemption, I need not—and will not—decide whether Kalshi's sports-event contracts fall within the statutory definition of swaps."). Because I agree that Congress has preempted the field regarding trading on a DCM, this then requires the court to make a finding as to whether Kalshi's sports-contracts qualify as "swaps." *See Flaherty*, 172 F.4th at 229.

"rare cases." *Garcia*, 589 U.S. at 208. Examples include comprehensive, complex, and national immigration schemes, nuclear safety, and in-air flight operations. *See Pharm. Rsch. & Mfrs. of Am. v. McCuskey*, 171 F.4th 675, 709 (Benjamin, J., dissenting), *rehearing en banc granted*, 176 F.4th 830 (4th Cir. 2026) (mem.).

**B. Discussion**

Again, the text of the CEA is the starting point of the analysis. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) ("Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue.") (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95 (1983)).

The CEA grants the CFTC "exclusive jurisdiction" over "accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated pursuant to section 7 of this title." 7 U.S.C. § 2(a)(1)(A). The CEA's saving clause further provides that:

> Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

*Id.*

Though the first saving clause provides that state regulatory authority is not superseded, that clause must be read in the context of the exclusive jurisdiction provision, which supersedes Securities and Exchange Commission ("SEC") and state authority over

contracts on designated exchanges. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386 (1982) ("The purpose of the exclusive-jurisdiction provision . . . was to separate the functions of the [CFTC] from those of the [SEC] and other regulatory agencies."); *see also Assad*, 2026 WL 2543846, at *7 ("[The exclusive jurisdiction provision] shows that Congress meant it to be a preemptive provision."). The first saving clause therefore merely preserves SEC and state authority over contracts that are not subject to the CFTC's exclusive jurisdiction. The second saving clause's reference to state courts' jurisdiction says little about preemption of state regulation of designated contract markets. This "exclusive jurisdiction" language reflects an intent to occupy the field. *Assad*, 2026 WL 2543846, at *17 ("[T]he CEA is a comprehensive regulatory scheme and 'preempts state law purporting to regulate futures trading.' " (quoting *Flaherty*, 172 F.4th at 229)).

The CEA's legislative history further supports this conclusion. *See, e.g.*, *Am. Agric. Movement, Inc. v. Bd. of Trade*, 977 F.2d 1147, 1155–56 (7th Cir. 1992) (describing the legislative history surrounding the 1974 amendments and preemption, noting that "proponents were concerned that the states . . . might step in to regulate the futures markets themselves," subjecting "the national futures trading apparatus to conflicting regulatory demands," and how the Senate committee "delet[ed] . . . a CEA provision which appeared to preserve the states' authority over futures trading"); *see also* U.S. S. Comm. on Agric. & Forestry, Commodity Futures Trading Commission Act of 1974 Committee Report, 93rd Cong., 2d Sess., at 11 (Nov. 15, 1974) ("Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by

the Commission) *would preempt the field* insofar as futures regulation is concerned." (emphasis added)).

While Maryland cites *American Agriculture Movement, Inc. v. Board of Trade*, 977 F.2d 1147 (7th Cir. 1992), to support its argument that Congress intended the exclusive-jurisdiction provision to have limits, caselaw is clear that "preemption is appropriate '[w]hen application of state law would directly affect trading on or the operation of futures market.' " *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (quoting *Am. Agric.*, 977 F.2d at 1156). For example, *Effex Capital* explained "common law claims such as negligence, fraud, and breach of fiduciary duty could be brought by futures investors against their brokers" because "claims against brokers had 'little or no bearing upon the actual operation of the commodity futures markets' and that [o]nly in the context of market regulation does the need arise for uniform legal rules." *Id.*

The special rule also reaffirms that Congress intended the CFTC to have jurisdiction over event contracts involving gaming on DCMs. The special rule allows the CFTC to prohibit these gaming contracts if it deems them contrary to the public interest. 7 U.S.C. §§ 7a-2(c)(5)(C). This is an express grant of authority to the CFTC to regulate gaming contracts on DCMs.

I, of course, agree with my colleague that "gambling has long been a matter of traditional state police power." Gregory Concurrence at 8. That said, the weight of authority indicates that if Kalshi's sports-related contracts are held to be "swaps" under the CEA, the CFTC is conferred exclusive jurisdiction, and field preemption applies. *See Assad*, 2026 WL 2543846, at *7 ("We conclude that, based on its plain wording, § 2

preempts state regulation of swaps that are 'traded or executed' on a DCM.")[10]; *see also Flaherty*, 172 F.4th at 229 ("Because Kalshi's sports-related event contracts are swaps under the [CEA], the . . . scope of field preemption [i]s the regulation of trading on a DCM (a form of futures trading) rather than as gambling (a broader and traditionally state-regulated field)."); *contra Schuler*, 2026 WL 2884087, at *18 (6th Cir. Sept. 25, 2026). And, while states have long regulated gambling, Congress has long regulated futures trading. *See Flaherty*, 172 F.4th at 229 (citing *Bd. of Trade v. Olsen*, 262 U.S. 1, 43 (1923)).[11] The common criticism of Kalshi's platform—that it walks like a casino, swims like a casino, and quacks like a casino, and thus should be regulated like a casino—appears logical. But that's not what Congress said. Rather, "exclusive jurisdiction" belongs to the CFTC.

In sum, if Kalshi were offering its contracts without CFTC designation, then Maryland could regulate it. But because Kalshi is a CFTC-designated DCM, it's subject

[10] I recognize that the Ninth Circuit in *Assad* later found that field preemption did not apply. 2026 WL 2543846, at *15. However, that conclusion was based on the court's finding that Kalshi's "sports events contracts [were] likely not swaps under the CEA." *Id.* Thus, *Assad* supports the position that if Kalshi's event contracts are "swaps," they fall under the CFTC's exclusive jurisdiction. *Id.* at 17. This is the same conclusion that the Third Circuit reached in *Flaherty*. *See* 172 F.4th at 229 ("[T]he [CEA] grants the CFTC exclusive jurisdiction over 'swaps . . . traded or executed on a [DCM],' which include Kalshi's sports-related event contracts.").

[11] Kalshi also argues that Maryland's laws are conflict preempted. However, because I agree that field preemption applies, it's unnecessary to reach Kalshi's conflict preemption arguments. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376–77 (2015) ("Congress may implicitly pre-empt a state law, rule, or other state action . . . through 'field' pre-emption or 'conflict' pre-emption . . . [i]n either situation, federal law must prevail.").

to the CFTC's exclusive jurisdiction and state law is field preempted. Maryland regulatory agencies have no jurisdiction to decide that Kalshi's conduct violates state law where those activities are not illegal under federal law. Just because the CFTC hasn't disapproved Kalshi's sports-related contracts under its regulations, doesn't mean Maryland can regulate Kalshi in its place.

## III. Conclusion

The prevalence of prediction markets and swaps has undoubtably increased in recent years. *See, e.g.*, *Can Prediction Markets Become Bigger Than the Stock Market?*, Certuity (July 16, 2025), https://certuity.com/insights/prediction-markets [https://perma.cc/VMZ4-2XGP] (noting that the prediction market industry is predicted to reach $95.5 billion by 2035). What hasn't changed is Congress' command that "exclusive jurisdiction" over these swaps belongs to the CFTC.

Because Kalshi's sports-related contracts qualify as "swaps," I would conclude that Maryland's laws are field preempted. Kalshi has demonstrated a likelihood of success on the merits of its claims. I would thus vacate the district court's order and remand for the district court to consider the remaining preliminary injunction factors in the first instance. Therefore, I respectfully dissent.